No. 25-1385

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

LAUREL D. LIBBY, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER, RENE FRASER, and DONALD DUBUC,
*Plaintiffs-Appellants,*

v.

RYAN M. FECTEAU, in their official capacity as Speaker of the Maine House of Representatives, and ROBERT B. HUNT, in their official capacity as Clerk of the House,
*Defendants-Appellees,*

On Appeal from the United States District Court
for the District of Maine
No. 1:25-cv-83-MRD

## EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

Taylor A.R. Meehan
Daniel M. Vitagliano*
Marie E. Sayer*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
mari@consovoymccarthy.com

Patrick N. Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Supervised by principals of the firm
 admitted to practice in VA

*Counsel for Appellants*

## RULE 26.1 DISCLOSURE STATEMENT

Appellants are individuals. They have no parent corporation, and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

Introduction ........................................................................................................1

Background.........................................................................................................2

Argument ...........................................................................................................3

    I.     Legislative immunity does not shield District 90's disenfranchisement from judicial review. ....................................................................4

    II.    Movants will likely succeed on the merits........................................ 12

        A.    Defendants' retaliation violates the First Amendment. ...................... 12

        B.    District 90's disenfranchisement violates the Fourteenth Amendment. ............................................................................... 16

    III.   The remaining injunction factors favor relief.................................... 19

Conclusion........................................................................................................ 20

Certificate of Compliance ............................................................................... 21

Certificate of Service ....................................................................................... 22

Addendum

**INTRODUCTION**

Defendants have disenfranchised 9,000 Mainers. The Clerk of the Maine House of Representatives refuses to count votes cast by District 90's representative for the rest of her elected term. Why? Because Representative Laurel Libby took to social media to call attention to an issue of intense public interest in Maine: the fairness of transgender athletes competing in girls' sports. Such retaliation for protected speech violates the First Amendment. *Bond v. Floyd*, 385 U.S. 116 (1966). And the resulting indefinite disenfranchisement of District 90 violates the Fourteenth Amendment. *Reynolds v. Sims*, 377 U.S. 533 (1964).

The district court acknowledged that indefinitely denying a representative her vote was "a weighty sword to wield," Order (Dkt.39) 30, but denied Plaintiffs' motion for preliminary injunction. It held that legislative immunity precludes relief against the Clerk to restore District 90's equal representation in the House. That holding is irreconcilable with *Kilbourn v. Thompson*, 103 U.S. 168 (1880), and *Powell v. McCormack*, 395 U.S. 486 (1969). It also turns legislative immunity on its head. Immunity ensures free and full debate in the legislative chamber. But here, the court applied immunity to allow Defendants to *exclude* Libby from such debate and to deny her constituents a vote on legislation.

Movants ask this Court to restore the status quo pending appeal and ensure that District 90's votes count for the rest of the legislative session. Movants respectfully

request a decision **before April 29, 2025**, when the House convenes another floor session.

## BACKGROUND

Representative Libby represents Maine House District 90. Compl. (Dkt.1) ¶10. She's an outspoken critic of Maine's policy permitting transgender athletes to participate in girls' sports and received national attention for speaking out about Maine's track-and-field championship. ¶¶2, 31, 35-36. The championship was a public event with participants' names, schools, and photos broadcast online. ¶¶32-34. Reposting that already-public information on Facebook, Libby observed that the first-place girls' pole vaulter previously competed in boys' pole vault. ¶31.

When Libby's post put a spotlight on Maine's policy, the House censured Libby along a party-line vote (75-70). ¶50. The resolution required Libby to "publicly apologize" for "criticizing the participation of transgender students" and reposting already-public information. *Id.* Dissenting representatives decried the resolution as "a mockery of the censure process," "set[ting] a standard that … the majority party, when they're displeased with a social media post that upsets them, can censure a member of the minority party and by a majority vote, … without them giving an apology, keep them out of the Legislature." ¶52. When Libby refused to recant her views, Speaker Fecteau invoked House Rule 401(11), providing that a member "guilty of a breach of any of the rules and orders of the House … may not be allowed to vote or speak … until the member has made satisfaction." ¶¶57-58.

Ever since, Libby's district has had no voice or vote on the House floor. Libby-Decl. (Dkt.34-1) ¶4. The Clerk did not count District 90's vote on the State's biennial budget legislation. ¶11. Nor will he count District 90's vote on 1,800-plus bills coming before the House. ¶13; Compl. ¶¶67-70; *see* Mot. Expedite ¶10.

Libby, joined by six constituents, sued to restore District 90's equal representation. The district court denied Plaintiffs' preliminary injunction motion, holding legislative immunity precluded judicial review because the Speaker's "imposition of the sanction" is a legislative act and District 90's disenfranchisement was not so "extraordinary" to overcome immunity. Order 2. The district court did not separately address Plaintiffs' requested relief against the Clerk to redress his refusal to count Libby's votes. Order 26 n.9. The district court denied an injunction pending appeal for the same reasons. Text-Order (Dkt.47).

## ARGUMENT

Movants seek narrow relief pending appeal: an injunction against only the House Clerk to restore District 90's representation by counting Libby's votes.[1] Plaintiffs are entitled that relief because they show likely success on the merits, irreparable harm absent relief, that the equities favor them, and the public interest is served. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008).

---

[1] Plaintiffs preserve all claims against all Defendants for their appeal. *See Does 1-6 v. Mills*, 16 F.4th 20, 36 n.11 (1st Cir. 2021).

3

I.     **Legislative immunity does not shield District 90's disenfranchisement from judicial review.**

The district court fundamentally erred by invoking legislative immunity simply because a legislator's directive precipitated the ongoing disenfranchisement of District 90. The Supreme Court has denied immunity in nearly identical circumstances.

**A.** "Legislative immunity does not … bar all judicial review of legislative acts." *Powell*, 395 U.S. at 503. It covers only "purely legislative activities," *United States v. Brewster*, 408 U.S. 501, 512 (1972), meaning acts "integral" to the "deliberative and communicative processes" of members, *Gravel v. United States*, 408 U.S. 606, 625 (1972). Immunity ensures legislators "enjoy the fullest liberty of speech" on the floor by prohibiting judicial inquiry into their "motives"—not for legislators' benefit but for "the public good." *Tenney v. Brandhove*, 341 U.S. 367, 373-79 (1951). In this way, immunity is "designed to preserve legislative independence, not supremacy." *Brewster*, 408 U.S. at 508. It does not "protect[] all conduct *relating* to the legislative process." *Id.* at 515.

The Clerk's *refusal* to count Libby's votes is no legislative act and serves no legislative purpose. *See* Compl. ¶60. It defies all logic to contend that the ongoing denial of District 90's voice and vote is "an integral part of the deliberative and communicative processes." *Gravel*, 408 U.S. at 625. It is the antithesis of it. It neither "protect[s] the integrity of the legislative process" nor "insur[es] the independence of individual legislators"—the twin aims of legislative immunity. *Brewster*, 408 U.S. at 507. It simply permits Defendants to evade judicial review after stripping District 90's vote because a

4

bare legislative majority disagreed with Libby's views shared online. That refusal to count an elected representative's vote is anything but "essential to legislating." *Gravel*, 408 U.S. at 621.

**B.** The district court concluded that legislative immunity precluded Movants from challenging "Speaker Fecteau's imposition of the sanction." Order 2. That misstates the nature of this suit. Plaintiffs also challenge the Clerk's ongoing refusal to count District 90's votes. There is no dispute that the Clerk counts the votes in Maine. *See* Me. H.R. Rule 301(3). And there is no dispute that the complaint seeks relief to enjoin the Clerk from refusing to count Libby's votes. Compl. ¶¶59, 67-70, D.

The district court inexplicably declined to conduct "a separate analysis" of the Clerk's actions, including because those actions were precipitated by the Speaker's directive. Order 26 n.9. Contrary to that reasoning, it does not matter the Clerk's unconstitutional acts were precipitated by a House resolution and rule. Even when precipitating acts are "legislative in nature," the Clerk's subsequent acts are "subject to judicial review insofar as [their] execution impinge[s] on a citizen's rights." *Gravel*, 408 U.S. at 618.

In *Kilbourn*, for example, immunity did not bar a suit against the House's sergeant-at-arms who arrested the plaintiff pursuant to a House resolution. 103 U.S. at 200, 205. *Kilbourn* distinguished between a suit against a *legislator* for supporting the resolution and a suit against the *sergeant-at-arms* for enforcing it, which could "no more justify the person who executed it than King Charles's warrant for levying ship-money could justify

5

his revenue officer." *Id.* at 202. The sergeant-at-arms "was held liable" for merely "ex-ecut[ing] the House Resolution." *Powell*, 395 U.S. at 505. Legislative immunity "could not be construed to immunize an illegal arrest even though directed by an immune legislative act." *Gravel*, 408 U.S. at 619. And the "relief could be afforded without proof of a legislative act or the motives or purposes underlying such an act." *Id.* at 621

Similarly, in *Powell*, immunity did not bar a suit against the House clerk for refus-ing to tally a representative's vote, the sergeant-at-arms for refusing to pay his salary, or the doorkeeper for denying him admission to the chamber—even though all those acts were taken pursuant to a resolution excluding the representative. 395 U.S. at 494, 504-06. "That House employees are acting pursuant to express orders of the House does not bar judicial review … ." *Id.* at 504. Staff, including the clerk, "are responsible for their acts," *id.*, and nothing bars this Court from "determin[ing] the validity of legislative actions" and "afford[ing] relief" after the implementation of an "invalid resolution[]," *Gravel*, 408 U.S. at 620.

*Kilbourn* and *Powell* control here. Like those cases, the existence of some House resolution or rule does not foreclose this suit to restore District 90's vote. *See Powell*, 395 U.S. at 504-06; *Sweeney v. Tucker*, 375 A.2d 698, 704 (Pa. 1977) (rejecting immunity for House comptroller "acting pursuant to express orders of the legislature"); *see also Sup. Ct. of Va. v. Consumers Union of U.S.*, 446 U.S. 719, 734-36 (1980) (holding "enforce-ment" of unconstitutional state bar rules was not immune). Because injunctive relief would run against the Clerk "in a purely non-legislative capacity," there is "no reason

why [he] should be entitled to legislative immunity simply because the harm alleged originated, in some sense, with a legislative act." *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 89 (2d Cir. 2007). A vote on the censure resolution or House rules cannot "in and of itself" insulate Defendants' acts. *Kamplain v. Curry Cnty. Bd. of Comm'rs*, 159 F.3d 1248, 1252 (10th Cir. 1998). Legislative staff are not immune for acts not "essential to legislating" even if undertaken under the auspices of a "resolution," *Gravel*, 408 U.S. at 621, including the Clerk's act of counting (or not counting) votes, *Powell*, 395 U.S. at 504-06.

The district court distinguished *Powell* on the thinnest ground: because "Libby has not been disqualified or expelled from her seat." Order 26. But *Powell*'s immunity holding turned on the clerk's refusal to count votes, not the particulars of the underlying resolution. In *Powell* and *Kilbourn*, it was the employees' acts that mattered, not the resolution that precipitated them. *Gravel*, 408 U.S. at 620-21.

**C.** The district court further erred by likening the extraordinary circumstances here to the generally applicable procedural rules challenged in *National Association of Social Workers v. Harwood*, 69 F.3d 622 (1st Cir. 1995), and *Cushing v. Packard*, 30 F.4th 27 (1st Cir. 2022) (en banc). *Harwood* concerned a rule prohibiting lobbying on the House floor. 69 F.3d at 632. *Harwood* distinguished that "procedural rule" from circumstances that are *not* immune, including "*punitive* enforcement" of measures that do not "govern the conduct of legislative proceedings" generally. *Id.* at 631-33 & n.9. Similarly, *Cushing* concerned voting "procedures" barring "remote participation" applicable to *all* House

7

members. 30 F.4th at 49. Neither case involved singling out a legislator to strip her district's vote. Unlike *Harwood*'s "regulation of admission to the House floor" by lobbyists, denying Libby's vote in retaliation for her protected speech serves no "legitimate legislative purposes." 69 F.3d at 632, 634; *see* Compl. ¶60. And unlike *Cushing*, where legislators sought "to require the Speaker to institute procedures" for remote participation, Plaintiffs' requested remedy to have the Clerk count Libby's vote (like *Powell*) "would run against an employee of the House and not a legislator." 30 F.4th at 30, 51. *Contra* Order 18.

Both *Harwood*, 69 F.3d at 634, and *Cushing*, 30 F.4th at 50, distinguished the challenged procedures from acts "of an extraordinary character" for which immunity would not apply. This appeal presents extraordinary circumstances: the unprecedented refusal to count a legislative district's votes for the rest of its representative's term. The district court erred by likening District 90's disenfranchisement to *Cushing*'s circumstances—in the district court's words, "forcing members to choose between their health and/or physical ability to be present in person for sessions and the ability to perform the responsibilities of their elected position." Order 24. No district in *Cushing* was denied its vote. And *Cushing* cannot be read to *sub silentio* overrule binding Supreme Court precedent in *Powell*. The extraordinary circumstances here are the very sort that *Cushing*, consistent with *Powell*, anticipated would not be immune.

Immunity does not shield acts "so flagrantly violative of fundamental constitutional protections," namely "invidiously discriminatory" acts, even if "legislative."

8

*Harwood*, 69 F.3d at 634. Here, Libby has been "target[ed]" for her speech, leaving her district disenfranchised. *See Cushing*, 30 F.4th at 51. It is invidious viewpoint discrimination, *see Rosenberger v. Rector & Visitors of UVA*, 515 U.S. 819, 829 (1995), irreconcilable with *Bond*, where the Supreme Court overturned the Georgia House's exclusion of a legislator because of his protected speech espousing a viewpoint the majority rejected. 385 U.S. at 135-37. There is no distinguishing *Bond*, as the district court did, because "Libby has not been disqualified, excluded, or expelled from her elected seat." Order 25-26.[2] No different than *Bond*, Libby's district is denied its vote because Libby dared to exercise her First Amendment rights.

Defendants' "abuse" of immunity "warrant[s] the 'extraordinary character' descriptor." *Cushing*, 30 F.4th at 52. Legislative immunity is a "shield" limited to "what is necessary to preserve the integrity of the legislative process." *Brewster*, 408 U.S. at 517. Denying Libby's vote is antithetical to that process. Legislators vote "as political representatives executing the legislative process." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011). Their voting "consummate[s] their duty to their constituents." *Miller v. Town of Hull*, 878 F.2d 523, 533 (1st Cir. 1989). District 90's disenfranchisement "run[s] counter to our fundamental ideas of democratic government." *Reynolds*, 377 U.S. at 564.

---

[2] The deprivation here is *worse* than expulsion. Had the House had the two-thirds support to expel Libby, a special election could have restored District 90's vote. *See* Me. Const. art.IV, Pt.1, §6 & Pt.3, §4. Instead, a bare majority imposed *greater* harm by denying District 90's chosen representative her vote indefinitely. *Infra* pp.18-19.

Worse, "the voters" cannot "be the ultimate reliance for discouraging or correcting such abuse[]" here. *Tenney*, 341 U.S. at 378. Mainers in District 90 cannot vote out the Speaker or replace the Clerk. Applying immunity here "serves" only antidemocratic ends, not any "democratic end." *Contra Cushing*, 30 F.4th at 52.

Defendants transform "the shield of legislative immunity into a sword." *Powell v. Ridge*, 247 F.3d 520, 525 (3d Cir. 2001). Defendants have prohibited a representative from exercising her voice and vote—the very freedoms legislative immunity protects. Legislative immunity "support[s] the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions." *Tenney*, 341 U.S. at 373-74. It protects a representative from being "withdrawn from his seat by a summons," depriving "the people, whom he represents, [of] their voice in debate and vote." II Joseph Story, *Commentaries on the Constitution of the United States* §857 (1833). But here Defendants perversely invoked immunity to insulate the denial of District 90's voice and vote from judicial review. The district court agreed, turning the privilege on its head. *E.g.*, *Coffin v. Coffin*, 4 Mass. 1, 29 (1808) (immunity "should not unreasonably prejudice the rights of private citizens").

**D.** That sweeping view of immunity deployed here "has no limiting principle." *Cushing*, 30 F.4th at 65 (Thompson, J., dissenting). The district court dismissed the consequences of its reasoning, declining to "explore hypothetical scenarios." Order 24. But there is no rational way to distinguish this case from any future case where a representative is denied her vote pursuant to another legislator's directive. By Defendants' logic,

they could prohibit Asian-American or female representatives, or those in same-sex or interracial marriages, from making floor speeches or voting and then claim immunity so long as a resolution precipitated those restrictions. *But see SFFA v. Harvard*, 600 U.S. 181 (2023); *Obergefell v. Hodges*, 576 U.S. 644 (2015); *Loving v. Virginia*, 388 U.S. 1 (1967). Or why not order the House Clerk to ignore votes of legislators refusing to stand for the pledge of allegiance, opposing President Trump's agenda, or excusing themselves from legislative prayers? *But see W.Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Town of Greece v. Galloway*, 572 U.S. 565, 586-91 (2014). If immunity puts Defendants "above the Constitution" here, *Harwood*, 69 F.3d at 638 (Lynch, J., dissenting), so too in those circumstances.

Sixty years ago, the Georgia House admitted that if a legislator were excluded "on racial *or other clearly unconstitutional grounds*," the federal judiciary could "test[] the exclusion." *Bond*, 385 U.S. at 130 (emphasis added). Defendants insist different rules apply in Maine. Where a legislature "by its rules ignore[s] constitutional restraints or violate[s] fundamental rights," *United States v. Ballin*, 144 U.S. 1, 5 (1892), it is "emphatically the province and duty of the judicial department" to say so, *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 177 (1803); *see Kilbourn*, 103 U.S. at 199. It is "competent and proper" for this Court to consider whether the refusal to count District 90's votes is "in conformity with the Constitution." *Powell*, 395 U.S. at 506.

11

## II.     Movants will likely succeed on the merits.

### A.     Defendants' retaliation violates the First Amendment.

To prevail on her First Amendment retaliation claim, Libby must show she "engaged in constitutionally protected conduct" that "was a substantial or motivating factor" behind "adverse action." *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023).

**1.**   Defendants did not dispute that Libby's Facebook post is constitutionally protected or that it motivated the speech and voting restrictions. Nor could they. Legislators, like ordinary citizens, have "the right to speak freely on questions of government policy." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022). Libby expressed "ideas for the bringing about of political and social changes." *Roth v. United States*, 354 U.S. 476, 484 (1957). Her speech "is the essence of self-government" in the heartland of the First Amendment's protection. *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 758-59 (1985) (plurality op.). But now she cannot speak or vote "because of the position [she] took." *Miller*, 878 F.2d at 533. There's no dispute that "but for [her] speech" Libby could vote today like any other legislator. *Davignon v. Hodgson*, 524 F.3d 91, 106 (1st Cir. 2008).

**2.**   Nor could Defendants dispute that stripping a legislator of her vote is adverse action. Libby's claim is indistinguishable from *Bond. Contra* Order 25-26. Just like *Bond*, this case "implicate[s] not only the speech of an elected official" but also "the franchise of [her] constituents." *Wilson*, 595 U.S. at 481. Neither history nor contemporary

12

doctrine suggests an elected representative can be stripped of her vote for her protected speech.

**a.** There is no "[l]ong settled and established practice," *id.* at 474-77, of refusing to count a legislator's vote consistent with the First Amendment or other federal constitutional provisions. There was no "unanimity" that legislatures could "exclude members indefinitely from their seats" in colonial times. Clarke, *Parliamentary Privilege in the American Colonies* 200 (Da Capo Press ed. 1971).

Stripping Libby of her vote contravenes "the prevailing view … that members of the legislature do not have the power to suspend members and therefore deprive them of the right to vote." *Boquist v. Courtney*, 32 F.4th 764, 783 (9th Cir. 2022). The U.S. House, consistent with the "weight of authority," does not consider itself to have a punitive power "to deprive a Member of the right to vote," *Jefferson's Manual and Rules of the House of Representatives* §672 (2023), https://perma.cc/U78W-KZ2G, given the "constitutional impediments" to such disenfranchisement, 3 *Deschler's Precedents of the United States House of Representatives* Ch.12 §§15-15.1 (1994), https://perma.cc/7RVY-6F95; *accord Michel v. Anderson*, 14 F.3d 623, 630 (D.C. Cir. 1994) (explaining the House cannot lawfully "deprive any *member* of the right to vote in the Committee of the Whole"). The U.S. House Speaker has "declined to assume the authority to deprive Members present in custody of the Sergeant-at-Arms of the right to vote." 5 *Hinds' Precedents of the House of Representatives of the United States* §5937 (1907), https://perma.cc/CJ3H-SVNF. Thus, censures in the U.S. House generally are only

verbal. Cong. Rsch. Serv., *Expulsion, Censure, Reprimand, and Fine* 10-16 (2016), https://perma.cc/T2P8-5Q55.

Defendants below cited no "settled and established practice" over the Nation's 250-year history of stripping legislators of their vote indefinitely. *Wilson*, 595 U.S. at 474. While "a temporary suspension is traditionally listed" as a "possible disciplinary action[]," "there is no evidence that such a sanction was regularly imposed, let alone imposed to punish protected speech." *Boquist*, 32 F.4th at 782. None of Defendants' four cited examples of suspensions arose in response to protected speech. Three arose from criminal indictments and one from a physical altercation on the floor.[3] That meager and distinguishable history has no precedential value for the circumstances here. *See Powell*,

---

[3] In 1784, the Massachusetts House suspended an indicted representative "until he shall have his trial" despite the investigative committee "find[ing] nothing in the constitution, which considers him as a person disqualified to hold his seat." J. H.R. Mass. 13, 18 (1784), https://bit.ly/4ielTqk. In 1808, the Massachusetts House suspended a representative pending "further order upon the report of the [special] committee" after his forgery conviction. J. H.R. Mass. 14-15 (1808), https://bit.ly/42qrzI0. As to the 1902 contempt of two U.S. senators for assault on the floor, the question of suspending their "right to vote … was not decided." 2 *Hinds'* §1665, https://perma.cc/R2WB-3YHL. One senator objected that denying their votes would deprive their State of "equal suffrage in the Senate," and several senators dissented from the committee report asserting the power "to suspend a Senator and thus deprive a State of its vote." *Id.* While the 1905 Wisconsin Senate temporarily suspended an indicted senator, 1Wis. Sen. J., 47th Sess., 801-14, 862-64 (1905), https://bit.ly/3RrGn48, the State's attorney general concluded the suspension was without "authority," emphasizing that "the people of that district" were left "not represented," 4 Wis. Op. Att'y Gen. 81-84 (1915), https://perma.cc/MCS3-G7S2. Wisconsin today recognizes the "generally accepted parliamentary practice that a legislative body cannot prevent a member from voting." Wis. Leg. Ref. Bur., *Discipline in the Wisconsin Legislature* 4 (2020), https://perma.cc/FK4F-JF6L.

395 U.S. at 546. In any event, "[t]hat an unconstitutional action has been taken before," a mere handful of times, "surely does not render that same action any less unconstitutional at a later date." *Id.* at 546-47.

It does not suffice to point to an old House rule, never applied in practice to disenfranchise a district until now. For example, early U.S. House rules barred the Speaker from voting absent a tie, yet the Speaker voted on behalf of his constituents "although the rule forbade." 5 *Hinds'* §§5966-67. In any event, even ancient state rules may not be "used as an instrument for circumventing a federally protected right." *Reynolds*, 377 U.S. at 566; *accord South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966).

The Supreme Court and this Court have held that the First Amendment protects elected officials from being excluded or suspended because of their speech on public issues. *See Bond*, 385 U.S. at 136-37; *Miller*, 878 F.2d at 532-33. There is every "reason to think the First Amendment was designed or commonly understood to upend" what is currently occurring in Maine. *Wilson*, 595 U.S. at 475.

**b.** Contemporary doctrine confirms adverse action. Retaliation against elected officials is adverse action where it denies "the full range of rights and prerogatives that came with having been publicly elected." *Boquist*, 32 F.4th at 777. The Supreme Court has upheld only purely verbal censures that "did not prevent [an official] from doing his job" and "did not deny him any privilege of office." *Wilson*, 595 U.S. at 479. But here, barring Libby from voting denies her the most central privilege of legislative office. It is adverse action. *See Boquist*, 32 F.4th at 783-84.

15

**B.     District 90's disenfranchisement violates the Fourteenth Amendment.**

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Thus, "the right to vote—the wellspring of all rights in a democracy—is constitutionally protected." *Bonas v. Town of North Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001); *accord Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1885).

The Equal Protection Clause requires "all who participate in the election have an equal vote," ensuring "equal state legislative representation." *Reynolds*, 377 U.S. at 557-58, 568. That requirement of equality is denied "by wholly prohibiting the free exercise of the franchise" or "by a debasement or dilution of the weight of a citizen's vote." *Id.* at 555; *see Wesberry*, 376 U.S. at 7. And that requirement would be an empty promise if constituents' chosen representative later had no vote. *See Michel*, 14 F.3d at 626 ("It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor."). Whether labeled "disenfranchise-ment" or "vote dilution," refusing to count Libby's vote violates the Fourteenth Amendment.

Denying Libby's vote disenfranchises District 90. A legislator's vote "is not per-sonal to" her; it "belongs to the people." *Carrigan*, 564 U.S. at 126. Libby casts her votes "as trustee for [her] constituents." *Id.* That "vote is the commitment of [her] appor-tioned share of the legislature's power to the passage or defeat of a particular proposal."

*Id.* at 125-26. Thus, "[r]estrictions on a public official's participation … infringe upon voters' rights to be represented." *Peeper v. Callaway Cnty. Ambulance Dist.*, 122 F.3d 619, 623 (8th Cir. 1997).

The Clerk's refusal creates "two classes of voters": those in District 90 who effectively have no representation in the House, and those in every other district who do. *Kucinich v. Forbes*, 432 F. Supp. 1101, 1116 (N.D. Ohio 1977); *see Bonas*, 265 F.3d at 74 (identifying equal protection denial "when a discrete group of voters … will suffer disproportionately"). It "contracts the value of some votes and expands that of others." *Wesberry*, 376 U.S. at 7. While those outside District 90 have a say in the ongoing legislative process, Libby's district does not. *See, e.g.*, *Kucinich*, 432 F. Supp. at 1116-17. This "across-the-board disenfranchisement" for District 90 voters "betokens an utter breakdown of the electoral process." *Bonas*, 265 F.3d at 75. It "deprive[s] the district … of representation," "effectively disenfranchis[ing]" those "who elected that person to represent them." 3 *Deschler's* Ch.12 §15.1; *see* McLaughlin, *Congressional Self-Discipline: The Power to Expel, to Exclude and to Punish*, 41 Fordham L. Rev. 43, 60 (1972) (suspension "robs" a district "of its right to congressional representation"); Hobbs, *Comment on* Powell v. McCormack, 17 U.C.L.A. L. Rev. 129, 152 (1969) ("suspension deprives the suspended member's district of representation"). Courts have thus held that suspending or excluding a lawmaker and depriving constituents of representation violates the Equal Protection Clause. *See Kucinich*, 432 F. Supp. at 1116-17; *Ammond v. McGahn*, 390 F. Supp. 655, 660 (D.N.J. 1975), *rev'd on mootness grounds*, 532 F.2d 325 (3d Cir. 1976).

That denial of voting rights is no different than if Plaintiffs had not participated "on an equal basis with other citizens" across Maine on election day. *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). That the "dilution occurs after the voters' representative is elected" is immaterial. *Michel*, 14 F.3d at 626. Equal protection applies to "the initial allocation of the franchise" and "the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05. As the D.C. Circuit observed, "It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor." *Michel*, 14 F.3d at 626. Just as the Maine House could not reduce the strength of District 90's vote by one-half, it cannot reduce District 90's vote to nothing. *See Reynolds*, 377 U.S. at 555-58.

It is no answer to point to incidental benefits of office Libby retains, as the district court did, such as committee work or getting paid. Order 30. Those incidents are no substitute for a legislator "executing the legislative process" through her vote on legislation. *Carrigan*, 564 U.S. at 126. A legislator who cannot vote is like a judge who cannot hear or decide cases; no one would confuse the judge's ability to attend judicial conferences or hire law clerks with that absence of judicial power.

Absent judicial intervention, Plaintiffs are disenfranchised for at least the remainder of the 132nd Legislature, and perhaps *indefinitely* should Libby be reelected. There is no political solution for Defendants' unconstitutional acts. *Cf. Monserrate v. N.Y. Senate*,

599 F.3d 148, 155 (2d Cir. 2010) (rejecting Fourteenth Amendment claims when expulsion was quickly followed by a special election). Libby remains District 90's representative with no constitutional mechanism to restore her vote (save Libby's apologizing to the Speaker's liking).[4] *See* 3 *Deschler's* Ch.12 §15.1. Denying Libby's vote violates the Fourteenth Amendment's guarantee of equal representation.

## III.    The remaining injunction factors favor relief.

Plaintiffs will suffer irreparable harm absent relief. Thousands in District 90 are without House representation. That abridgment of "fundamental voting rights" and the right to equal representation imposes "irreparable injury" warranting "immediate relief." *LWV of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see, e.g.*, *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016). That constitutional harm "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). The House will vote on consequential measures each day it sits in session, for which "there can be no do-over and no redress." *LWV*, 769 F.3d at 247. And because Libby has shown likely success on her First Amendment claim, "it follows that the irreparable injury

---

[4] Any such apology would raise its own constitutional questions, including being an unconstitutional condition, *see Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013), or unconstitutionally compelled speech, *see Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796-97 (1988).

component of the preliminary injunction analysis is satisfied as well." *Sindicato Puertor-riqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012).

The equities and public interest also favor Plaintiffs. The public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); *see LWV of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). And protecting "political speech" and ensuring "robust debate" is in the public interest. *Fortuño*, 699 F.3d at 15-16. Conversely, neither Defendants nor the public "can claim an interest in the enforcement of an unconstitutional" resolution or rule. *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003). Defendants will not be harmed by an injunction restoring the status quo and ensuring District 90's equal representation.

## CONCLUSION

This Court should grant an injunction pending appeal before April 29, 2025.

Dated: April 21, 2025

Taylor A.R. Meehan
Daniel M. Vitagliano*
Marie E. Sayer*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
mari@consovoymccarthy.com

*Supervised by principals of the firm
  admitted to practice in VA

Respectfully submitted,

/s/ Patrick N. Strawbridge
Patrick N. Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Counsel for Appellants*

20

**CERTIFICATE OF COMPLIANCE**

This motion complies with Federal Rule of Appellate Procedure 27(d)(2)(A) be-cause it contains 5,154 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

Dated: April 21, 2025                    /s/ *Patrick N. Strawbridge*

**CERTIFICATE OF SERVICE**

I filed this motion via the Court's ECF system, which will electronically notify

the following:

> Jonathan R. Bolton
> Kimberyl L. Patwardhan
> Office of the Maine Attorney General
> 6 State House Station
> Augusta, ME 04333
> 207-626-8551
> jonathan.bolton@maine.gov
> kimberly.patwardhan@maine.gov

Dated: April 21, 2025                    */s/ Patrick N. Strawbridge*

**ADDENDUM**

| Document | Page # |
|---|---|
| Memorandum and Order on Plaintiffs' Motion for Preliminary Injunction (Dkt.39) | ADD1 |
| Amended Memorandum and Order on Plaintiffs' Motion for Preliminary Injunction (Dkt.45) | ADD32 |
| Transcript of Preliminary Injunction Hearing (Dkt.37) | ADD63 |
| Verified Complaint (Dkt.1) | ADD102 |
| Libby Decl. (Dkt.34-1) | ADD131 |
| District Court Docket Sheet | ADD135 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| Laurel D Libby, et al., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-cv-83-MRD |
| | ) | |
| Ryan M Fecteau, et al., | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.*

Participation in sports by transgender students is one of many policies that law makers around the country are fiercely debating. In Maine, "individual[s] at . . . educational institution[s]" have an equal opportunity and civil right to "participate in all educational . . . programs . . . and all extracurricular activities [including athletic programs] without discrimination because of sex, sexual orientation or gender identity, a physical or mental disability, ancestry, national origin, race, color or religion." Me. Rev. Stat. Ann. tit. 5, §§ 4601, 4602 (2021). Maine House Representative Laurel Libby self-identifies as "an outspoken critic of Maine's state policy allowing boys who identify as transgender to compete in girls' sports." Compl. at ¶ 2 (ECF No. 1). As part of her advocacy against this policy, Representative Libby generates social media content that she posts across various social media platforms including but not limited to Facebook. One such post, described below, earned her a

---

* Of the District of Rhode Island, sitting by designation.

*ADD1*

formal censure by her colleagues in the Maine House of Representatives and a corresponding sanction prohibiting her from speaking or voting on the House floor until she apologizes for her post. Aggrieved, she and six of her constituents filed suit in this court, claiming that the imposition of this sanction is a violation of their constitutional rights under the First, Fourth, and Fourteenth Amendments. The plaintiffs collectively moved for a preliminary injunction to prevent the enforcement of the sanction. The defendants, House Speaker Ryan Fecteau and House Clerk Robert Hunt, assert that legislative immunity shields them from liability for these claims. For the reasons explained in detail below, the court concludes that legislative immunity bars the claims in this case. In short, Speaker Fecteau's imposition of the sanction plainly identified in the House of Representatives Rule that governs when House members are found in breach of House rules is a legislative act that does not, according to binding caselaw and within the context of this censure, qualify for the narrow exception carved out for conduct of an extraordinary character. The court, therefore, denies the motion for preliminary injunction.

## I.    BACKGROUND

Before summarizing the sequence of events which led to this litigation, the court starts by setting the table with some additional details about the parties and laying out the relevant rules of procedure for Maine legislators. Plaintiff Laurel Libby represents House District 90 in the current session – the 132nd – of the Maine Legislature, her third consecutive term in this elected position. Compl. at ¶ 10; Libby Decl. ¶¶ 2-3 (ECF No. 34-1). Plaintiffs Ronald P. Lebel, Wendy Munsell, Jason

Levesque, Bernice Fraser, Rene Fraser, and Donald Duboc reside within Maine House District 90 and voted in the last state legislative election.  Constituents' Decls. at ¶ 3 (ECF Nos. 8-1 – 8-6).  Defendant Ryan Fecteau represents House District 132 in the 132nd Maine Legislature, his fifth term in this elected position, and serves as the elected Speaker of House.  Fecteau Decl. at ¶¶ 2-3 (ECF No. 29).  All the court knows about defendant Robert Hunt is that he is serving as the Clerk of the House.  Compl. at ¶ 18.

Pursuant to *Mason's Manual of Legislature Procedure*, "[a] legislative body has the right to regulate the conduct of its members and may discipline a member as it deems appropriate, including reprimand, censure or expulsion."  Section 561(1) (2020).  The Maine Constitution confers upon the State Legislature the sole authority to promulgate its own rules of procedure.  Fecteau Decl. at ¶ 5.  *See* Me. Const. Art. IV, Pt. 3, § 4 ("Each House may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of 2/3, expel a member, but not a 2nd time for the same cause.").  Pursuant to this express authority, the 132nd Maine Legislature adopted its House Rules on December 4, 2024.[1]  House Rule 401 details the "[r]ights and duties of members."  Fecteau Decl. Ex. A at 12 (ECF No. 29-1).  Rule 401(11) covers "'breach of rules" and states, in its entirety:

> When any member is guilty of a breach of any of the rules and orders of
> the House and the House has determined that the member has violated

---

[1] The Rules adopted on this day were the same as those which governed the previous legislative session and were passed by consent of the entire House after no members requested a roll-call vote when provided with the opportunity to do so. Fecteau Decl. at ¶ 6.

*ADD3*

a rule or order, that member may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction.

Fecteau Decl. Ex. A at 13.[2]  Members of the House are also governed by the

Legislative Code of Ethics adopted by the 100th Legislature and amended by the

127th Legislature.  The Code of Ethics, in its entirety, states:

> Legislative service is one of democracy's worthiest pursuits. A Maine Legislator is charged with civility and responsible conduct inside and outside of the State House commensurate with the trust placed in that Legislator by the electorate.
>
> In a free government, a Legislator is entrusted with the security, safety, health, prosperity, respect and general well-being of those the Legislator serves and with whom the Legislator serves.
>
> To work well, government requires a bond of trust and respect between citizens and their Legislators. With such a trust, high moral and ethical standards producing the public's confidence, with the reduction to a minimum of any conflict between private interests and official duties, should be observed.
>
> No Maine Legislators will accept any employment that will impair their independence and integrity of judgment nor will they exercise their position of trust to secure unwarranted privileges for themselves or for others.  The Maine Legislator will be ever mindful of the ordinary citizen who might otherwise be unrepresented and will endeavor conscientiously to pursue the highest standards of legislative conduct inside and outside of the State House.

Fecteau Decl. Ex B (ECF No. 29-2).

With these details laid out, the following is the sequence of events which led to

this cause of action and pending motion, as alleged in the complaint and declared by

---

[2] This particular rule seems to have been in place since at least 1820, when the rules governing the first session of the Maine House of Representatives included the same protocol with almost identical wording.  Defs.' Opp'n Ex. 1 at 2, 8 (section XV) (ECF No. 28-1).

the parties in support of their respective positions.  On February 17, 2025, Representative Libby used her official Representative Laurel Libby Facebook account to create a post which included the juxtaposition of two photos and some commentary. Compl. at ¶ 31.  Each photo shows three adolescent student athletes standing side-by-side on a winner's podium, wearing athletic attire, and either holding a ribbon or a medal in their hand or wearing a medal around their neck.  *Id.* ¶ 31.  One student athlete in each photo is highlighted by way of double yellow lines encircling them from head to toe.  *Id.* ¶ 31.  In the right-side photo, the two student athletes not highlighted by circles have their faces blurred out; in the left photo, the faces of all three students are clearly visible.  *Id.* ¶ 31.  The text above the photos in the post states:

> UPDATE:  We've learned that just *ONE* year ago [athlete] was competing in boy's pole vault…that's when he had his 5th place finish.  So all of this transpired in the last year, with the full blessing of the Maine Principals' Association.
>
> Two years ago, [athlete] tied for 5th place in boy's pole vault.  Tonight, "[athlete]" won 1st place in the girls' Maine State Class B Championship.

*Id.* ¶ 31.[3]

On February 18, 2025, Speaker Fecteau, "concern[ed] that publicizing the student's identity would threaten the student's health and safety," contacted Representative Libby twice (once by letter, once by phone call) to ask that she delete

---

[3] The court sees no reason to repeat the name of the targeted student athlete here.  Also, the original photographer or source of the photos is not clear, though the court understands each to have been published prior to Representative Libby's post.

the Facebook post.  Fecteau Decl. at ¶¶ 13-14; Compl. at ¶ 42.[4]  At the next scheduled session of the House, February 25, 2025, Representative Matt Moonen presented "House Resolution Relating to the Censure of Representative Laurel D. Libby of Auburn by the Maine House of Representatives."  Fecteau Decl. at ¶ 17, Ex. D (ECF No. 29-4).  The Resolution summarized the Facebook post, the national attention that Representative Libby received for her post, and her decision not to remove the post after hearing concerns about the minor's safety as a result of the post.  Fecteau Decl. Ex. D.  The Resolution also cited excerpts from the Code of Ethics and pronounced Representative Libby's actions as "in direct violation" of the Code of Ethics.  *Id.*  The Resolution resolves that Representative Libby is "censured by the House of Representatives for just cause" and "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine."  *Id.*

House members engaged in debate over the introduced Resolution and then adopted it by a vote of 75-70.[5]  Fecteau Decl. ¶ 18.  Speaker Fecteau called Representative Libby to the well of the House, "lectured her on the House's ethics standards, and offered her an opportunity to apologize."  Compl. at ¶ 57.  Representative Libby declined to apologize and Speaker Fecteau found her in violation of Rule 401(11), *id.*, announcing she would "not be able to cast a vote or

---

[4] Speaker Fecteau's letter articulated his concern with Representative Libby sharing the student's name, school, and photo as a "risk[ to] their health and safety" and as a "violat[ion of] one of the long held political traditions of 'leaving kids out of it.'"  Fecteau Decl. Ex. C (ECF No. 29-3).

[5] *Archived Hearings & Meetings: House Chamber,* 5:57:35-7:03:40 PM, Me. Leg. (Feb. 25, 2025), https://bit.ly/43tBMp4.

speak on the floor until [she] comes back into compliance with House Rule 401 part 11," *Archived Hearings & Meetings: House Chamber*, 7:11:02-7:11:11 PM, Me. Leg. (Feb. 25, 2025), https://bit.ly/43tBMp4.  According to Speaker Fecteau, he "exercised [his] duty as Speaker to rule her in violation of House Rule 401(11), and therefore barred her from casting a vote or participating in debate on the House floor until she made satisfaction by coming into compliance with the Resolution."  Fecteau Decl. ¶ 20.  "No member, including Rep. Libby, made any objection to [his] ruling."  *Id.* ¶ 21.

On March 11, 2025, Representative Libby and six of her constituents from District 90 filed a verified complaint in this court pursuant to 42 U.S.C. § 1983 against Speaker Fecteau and Clerk Hunt, in their official capacities, claiming that barring Representative Libby from speaking on the House floor or voting on legislation violated fundamental rights protected by the U.S. Constitution.  Compl. at 1.  In Count I, Representative Libby alleges the sanction is an action taken in retaliation for her posts on social media and violates her First Amendment right to free speech. *Id.* ¶¶ 72-76.  In Count II, Representative Libby (along with the six constituents from District 90) allege that the sanction is a result of arbitrary and disparate treatment, impinges on the "one person, one vote" principle, and effectively disenfranchises the constituents in violation of the Fourteenth Amendment's Equal Protection clause.  *Id.* ¶¶ 84-86.  In Count III, all plaintiffs claim the sanction is also excluding Representative Libby from the office to which she was duly elected and depriving her constituents of a vote for state representative in violation of the Fourteenth Amendment's Due Process clause's protection against fundamental unfairness in the

electoral process. *Id.* ¶¶ 89-94. In Count IV, all plaintiffs allege that the sanction deprives Representative Libby of the privileges of her office and deprives her constituents of representation in the House in violation of Article IV, § 4 of the U.S. Constitution which "guarantees to every State . . . a Republication Form of Government. *Id.* ¶¶ 101-05. The plaintiffs seek a declaratory judgment that the sanction infringes their constitutional rights as alleged in each count, an injunction barring the enforcement of the sanction against Representative Libby, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988. *Id.* at 28.

In their Motion for Preliminary Injunction, the plaintiffs ask this court to preliminarily enjoin the defendants from enforcing the sanction Speaker Fecteau imposed while the parties litigate the merits of the plaintiffs' claims. The defendants opposed the motion and the plaintiffs filed a reply to the defendants' opposition. The court heard argument on April 4, 2025.[6]

## II. LEGAL STANDARD

A preliminary injunction may be granted when a plaintiff demonstrates "four long-established elements." *Santiago v. Municipality of Utuado*, 114 F.4th 25, 34-35 (1st Cir. 2024). First, "the probability of the movant's success on the merits of their

---

[6] The court is also in receipt of a letter the plaintiffs filed on Friday, April 11. ECF No. 38. The court reminds the plaintiffs that the briefing schedule entered by the court was requested by the plaintiff in a consent motion that the plaintiff filed two days after filing the motion for preliminary injunction. The court confirmed with the parties, during a chambers conference held on April 18, that the briefing timeline proposed in the consent motion was indeed satisfactory to all and the court scheduled the hearing on the earliest date suggested by the parties. The plaintiff's letter, filed one week after the hearing, neglects to mention these details.

claim(s)." *Id.* (quoting *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003)). Second, "the prospect of irreparable harm absent the injunction." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). Third, "the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does)." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). Fourth, "the effect of the court's action on the public interest." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). "The movant's likelihood of success on the merits is the element that 'weighs most heavily in the preliminary injunction calculus.'" *Id.* at 35 (quoting *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022)).

## III. DISCUSSION

As previewed above, the defendants contend that they are immune from this lawsuit under the doctrine of legislative immunity. Defs.' Opp'n at 1 (ECF No. 28). The court must address this threshold issue before considering the parties arguments about the preliminary injunction factors. If legislative immunity applies, then the court must deny the motion for preliminary injunction because the plaintiffs will not meet the weighty likely-to-succeed-on-the-merits-of-their-claims element of the preliminary injunction standard. *See Santiago*, 114 F.4th at 42 (ending the preliminary-injunction analysis after concluding the plaintiff-appellant would not prevail on this factor).

For those readers not familiar with this form of immunity from suit, the Supreme Court has long considered legislators (and often, but not always, their staff)

absolutely immune from being sued for their legislative acts. *Cushing v. Packard*, 30 F.4th 27, 36-37 (1st Cir. 2022) (en banc). The immunity has some guardrails, however. It "protects 'only purely legislative activities,'" *Nat'l Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 630 (1st Cir. 1995) (quoting *United States v. Brewster,* 408 U.S. 501, 507 (1972)), and "does not attach to the activities that are merely 'casually or incidentally related to legislative affairs,'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528), or to administrative actions that "fall outside the 'legitimate legislative sphere,'" *Harwood*, 69 F.3d at 630, 631 n.9 (quoting *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 503 (1975)). In addition to these limitations, immunity does not protect legislative activities that are deemed of an "extraordinary character," *Cushing*, 30 F.4th at 50 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)), a vaguely defined but rarely applied concept to circumvent the immunity shield. The court will take a deeper dive into this immunity and its common law limitations after setting out the parties' broad arguments about whether the defendants are entitled to legislative immunity from the plaintiffs' claims.

According to the defendants, the action the plaintiffs challenge as violating their constitutional rights – barring Representative Libby from speaking or voting on the House floor – was a legislative act entitled to the protection of legislative immunity. Defs.' Opp'n at 4, 6-7. The defendants assert that the "extraordinary character" exception is not met here because Speaker Fecteau imposed the sanction in strict adherence to a centuries-old rule of House procedure, and because Representative Libby has not been barred from performing all legislative work on

behalf of her district. Defs.' Opp'n at 9 (citing Fecteau Decl. ¶¶ 27-38)). The defendants contend that for this court to apply the "extraordinary character" exception, thereby removing the legislative immunity shield, would result in this court taking an impermissible step into another branch of government's jurisdiction and traversing into a political battle in which the court should not involve itself. Defs.' Opp'n at 9-10.

The plaintiffs counter that this action was not legislative in nature but an administrative action that falls outside the sphere of protection conferred by legislative immunity. Pls.' Reply at 1 (ECF No. 34). The imposition of the sanction stripping Representative Libby's voice and vote from the House floor is not, according to the plaintiffs, an action that the courts would consider to be part of the legislative process. Pls. Reply at 1-2. During the hearing on the pending motion, the plaintiffs also argued that stripping a House representative of what they consider her core responsibilities to her district – speaking on the House floor and voting – is so blatantly unconstitutional that the Speaker's imposition of this sanction must fall into the narrow exception for "extraordinary" conduct to which the courts have indicated legislative immunity will not apply. Apr. 4, 2025 Hearing Tr. ("Tr.") at 5:15-21, 6:3-5, 6:14-19, 9:2-4 (ECF No. 37).

This threshold issue is a narrow one because the plaintiffs are clear that they are challenging the sanction imposed and "not the wisdom of the underlying censure,

as unwise as it may be." Pls.' Reply at 2.[7]  While the appellate courts have explored

many contours of legislative immunity, the situation presented in this case does not

fit squarely into any of these courts' past discussions and applications of this absolute

immunity.  And so this court will start its deeper dive into the issue by describing

some of the contours of this doctrine as it understands the Supreme Court and First

Circuit to have defined them, beginning with the basic philosophy behind legislative

immunity before moving onto the distinctions between legislative acts and

nonlegislative (or administrative) acts and describing the amorphous exception for

extraordinary conduct.

The original source of legislative immunity is the Speech and Debate Clause of

the U.S. Constitution.  *Cushing*, 30 F.4th at 36; *Harwood*, 69 F.3d at 629

(acknowledging that "state legislators and their surrogates enjoy a parallel immunity

from liability for their legislative acts"); *see also Bogan v. Scott-Harris*, 523 U.S. 44,

49 (1998) (noting that "state and regional legislators are entitled to absolute

immunity from liability under § 1983 for their legislative activities").  The First

Circuit highlights this immunity as

> serv[ing] an important democratic end notwithstanding that it insulates
> elected representatives from legal challenges for certain of their official
> actions.  For that reason, we must be cognizant – as the [Supreme] Court
> has instructed us to be – of the risks associated with failing to respect
> the traditional scope of legislative immunity, bounded though it is, out

---

[7] During the hearing on the pending motion, the plaintiffs repeated that their
constitutional challenges are only to the imposition of the sanction – the "prohibition
on her speaking on the floor and casting a vote to represent her constituents" – and
not on the Resolution censuring Representative Libby for the Facebook post.  Tr. at
11:9-16, 14:24-25.

of respect for legislative freedom and thus democratic self-government.

*Cushing*, 30 F.4th at 52; *see Harwood*, 69 F.3d at 630 ("absolute immunity . . . afforded . . . to protect the integrity of the legislative process by insuring the independence of individual legislators."). "In reading the Clause broadly [courts] have said that legislators acting within the sphere of legitimate legislative activity 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.'" *Eastland*, 421 U.S. at 503 (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967)). It is well-settled that legislative immunity may apply against claims (such as those we have here) which "seek only declaratory or prospective injunction relief." *Cushing*, 30 F.4th at 37 (citing *Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732 (1980)).

As mentioned above, the entitlement to legislative immunity is restricted in two ways and the court will consider each separately. First, immunity is reserved for actions that are legislative in nature. As Justice Thomas wrote on behalf of the unanimous Supreme Court, "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. As an obvious example, "'voting by Members' itself constitutes a legislative act." *Cushing*, 30 F.4th at 49 (quoting *Gravel v. United States*, 408 U.S. 606, 624 (1972)). The case law is clear that legislative acts include a broad swath of conduct, including "any act 'generally done in a session of the House by one of its members in relation to the business before it.'" *Harwood*, 69 F.3d at 630 (quoting *Kilbourn*, 103 U.S. at 204); *Eastland,* 421 U.S. at 503 (holding that subpoenas issued pursuant to

an investigation related to a legitimate task of Congress fell within the "sphere of legitimate legislative activity").

As already previewed, the plaintiffs' position is that the challenged conduct is not part of the House's "general policymaking" role but an administrative act because Representative Libby was "targeted . . . specifically for the content of her speech made on her own time outside the Legislature." Pls.' Reply at 2. The plaintiffs argue that "denying Representative Libby's right to speak or vote in the House is not 'an integral part' of the House's 'deliberative and communicative processes'" and therefore outside the scope of acts that are considered legislative. Pls.' Reply at 1 (quoting *Gravel*, 408 U.S. at 625). There is no immunity, say plaintiffs, "for acts not 'essential to legislating' even if undertaken under the auspices of a resolution" "nor [for] the House clerk's act of counting (or not counting) votes." Pls.' Reply at 3 (first quoting *Gravel*, 408 U.S. at 621, and then citing *Powell v. McCormack*, 395 U.S. 486, 504 (1969)).

Common law does indeed instruct that "[a]cts undertaken by legislators that are administrative in nature do not 'give rise to absolute immunity from liability in damages under § 1983.'" *Negron-Gaztambide v. Hernandez-Torres*, 35 F.3d 25, 26, 28 (1st Cir. 1994) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). "'Employment decisions generally are administrative' except when they are 'accomplished through traditional legislative functions' such as policymaking and budgetary restructuring that 'strike at the heart of the legislative process.'" *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 8 (1st Cir. 2000) (quoting *Rateree v. Rockett*, 852 F.2d 946, 950-51 (7th Cir. 1988)). In *Negron-Gaztambide*, the Circuit identified "two

tests for distinguishing between legislative and administrative activity." 35 F.3d at

28 (quoting *Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984)).

> The first test focuses on the nature of the facts used to reach the given
> decision. If the underlying facts on which the decision is based are
> 'legislative facts,' such as 'generalizations concerning a policy or state of
> affairs,' then the decision is legislative. If the facts used in the
> decisionmaking are more specific, such as those that relate to particular
> individuals or situations, then the decision is administrative. The
> second test focuses on the 'particularity of the impact of the state action.'
> If the action involves establishment of a general policy, it is legislative;
> if the action 'singles out specifiable individuals and affects them
> differently from others,' it is administrative.

*Id.* (quoting *Cutting*, 724 F.2d at 261). At first blush, the application of the plain

language of these tests might indicate that the imposition of the sanction on

Representative Libby is an administrative act because she was "single[d] out" and

"affect[ed] differently than others." *Id.* (quoting *Cutting*, 724 F.2d at 261). However,

these two tests have been applied to situations readily distinguishable to the case

before the court.

In *Negron-Gaztambide*, the challenged act was the head of the House of

Representatives terminating a librarian who worked in the Legislative Library in the

Commonwealth of Puerto Rico allegedly because of that employee's political

affiliation. 35 F.3d at 26, 28. In *Cutting*, the Circuit Court tacitly concluded (while

remanding for further proceedings due to an insufficiently developed record) that a

local planning board's rejection of a developer's plans for a subdivision was an

administrative act. 724 F.2d at 260, 260 n.1, 261. And, in *Acevedo-Garcia*, the Circuit

Court held that the execution of a layoff plan was an administrative act because the

actions taken to implement the plan "targeted specific individuals" and "affected

particular individuals differently from others." 204 F.3d at 9; *but see id.* at 8 (distinguishing the conduct at issue in *Bogan*, 523 U.S. at 55, where the Supreme Court held legislative immunity did apply when an employee's termination was effected through the adoption of an ordinance which eliminated the department that employed the plaintiff and not through targeting specific individuals).

These cases demonstrate the application of the test first articulated in *Cutting* to causes of action in which the plaintiff was either a former employee of the legislature whose employment had been terminated after a turnover in political party majority or a public citizen before a local board seeking approval of a land development plan, but **not** where the challenged conduct occurred during a legislative session and the legislative body was applying a black-letter house rule. At no time do the plaintiffs explain to the court why any of the cases which applied the aforementioned tests are closer analogues to the plaintiffs' situation than the cases in which the First Circuit considered challenges to procedural rules. After all, when the Circuit considered a challenge by groups of lobbyists to a house rule prohibiting lobbyists from sitting around the perimeter of the Rhode Island House of Representatives' floor during session, it decided that when the court is

> dealing with a procedural rule adopted by a house of the legislature as a whole for the management of its own business . . . [the court is] not concerned with whether the adoption of the rule comprises a legislative act – that is transparently clear – but, rather, with whether that act is more than 'casually or incidentally related' to core legislative functions.

*Harwood*, 69 F.3d at 631 n.9 (quoting *Brewster*, 408 U.S. at 528).

In this case, focusing as this court must on the nature of the action and not on the motivation or intent behind it, *Bogan*, 523 U.S. at 54, Speaker Fecteau was not terminating an employee or unilaterally deciding on a proposal for economic development. Rather, he executed the will of the body of the House of Representatives pursuant to the Resolution passed by a majority vote after full debate. The Resolution censured the Representative's conduct as a breach of the governing Code of Ethics and demanded that she issue an apology. When she did not, Speaker Fecteau imposed the precise sanction articulated in the Rule that governs members' conduct. There is, therefore, no doubt that these actions were "done in a session of the House by one of its members in relation to the business before it." *Harwood*, 69 F.3d at 630 (quoting *Kilbourn*, 103 U.S. at 204). As such, the nature of the Speaker's conduct falls "within the 'legitimate legislative sphere,'" *Eastland,* 421 U.S. at 503 (quoting *Kilbourn*, 103 U.S. at 204), and is not "merely 'casually or incidentally related to legislative affairs,'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528). Indeed, the Circuit Court has been clear that it is

> beyond serious dispute that enforcing a duly enacted legislative rule which [affects conduct] on the House floor during House sessions is well within the legislative sphere [because] [s]uch a restriction necessarily affects the manner in which the House conducts its most characteristic legislative functions, *e.g.,* debating and voting. A rule that colors the very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials (whether or not elected members) in enforcing it are therefore fully protected against judicial interference by the doctrine of legislative immunity.

*Harwood*, 69 F.3d at 632 (concluding the enforcement of a House rule prohibiting lobbyists from seating on the perimeter of the House floor was a legislative act). The rule applied here affects one censured member of the House and not an entire class of non-legislators as in *Harwood*, but the sentiment expressed above applies with equal force because the sanction imposed does in fact affect debating and voting on measures before the House during full House sessions while the sanction is in place. The court's conclusion that the plaintiffs are challenging a legislative act is also in line with the Circuit's reasoning in *Cushing* that legislative acts include situations where "the injunctive relief that the plaintiffs seek is, on their own account, relief that must run against a legislator directly to be effective." 30 F.4th at 49.

With this conclusion that the challenged conduct is to a legislative act, the court moves on to the second restriction on legislative immunity: the exception for conduct of an "extraordinary character." The court starts with a close examination of the relevant cases and the parties' arguments related to the application of these cases, and then considers the precise details provided by the parties about the process by which Speaker Fecteau imposed the sanction on Representative Libby.

As the Supreme Court has long recognized, "[l]egislative immunity does not, of course, bar all judicial review of legislative acts." *Powell*, 395 U.S. at 503. The case law carves out an exception to the entitlement to legislative immunity for "things done, in the one House or of the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible." *Cushing*, 30 F.4th at 50 (quoting *Kilbourn*, 103 U.S. at 204). Broadly speaking, "[t]here may be some

conduct, even within the legislative sphere, that is so flagrantly violative of fundamental constitutional protections that traditional notions of legislative immunity would not deter judicial intervention." *Harwood*, 69 F.3d at 634. The Supreme Court has not identified precisely what conduct would clear the "high bar" set by this exception, but suggests that a "perversion of [legislative] powers [for] a criminal purpose [such as 'imitating the Long Parliament in the execution of the Chief Magistrate of the nation, or to follow the example of the French assembly in assuming the function of a court for capital punishment'] would be screened from punishment by the constitutional provision for freedom of debate." *Cushing*, 30 F.4th at 51 (quoting *Kilbourn*, 103 U.S. at 204-05).[8] The Circuit instructs that "the assessment of when a given act that, though seemingly legislative in nature, is nonetheless 'of an extraordinary character' that makes it unworthy of the immunity's protection must be sensitive to context." *Id.* at 52 (quoting *Kilbourn*, 103 U.S. at 204). This court must therefore "ensure that [its] focus is on the character of the legislative act being challenged." *Id.*

---

[8] The dissenting opinion in *Cushing* pointed out that the Supreme Court "has never addressed a case in which it has held the extraordinary-character exception to apply." *Cushing*, 30 F.4th at 56 (Thompson, J., dissenting). "As examples of potentially extraordinary legislative acts, the Supreme Court has hypothesized a legislature that 'execut[es] . . . the Chief Magistrate of the nation, or . . . assum[es] the function of a court for capital punishment.'" *Id.* at 57 (quoting *Kilbourn*, 103 U.S. at 204-05). The dissent further explained that "[w]e have similarly pondered a legislature that 'votes to allow access to its chambers to members of only one race or to adherents of only one religion,' suggesting these might veer into the orbit of the extraordinary-character exception." *Id.* (quoting *Harwood*, 69 F.3d at 634).

The First Circuit closely examined the notion of the extraordinary-character exception in *Cushing*. 30 F.4th at 50-53. The plaintiffs – all members of the New Hampshire House of Representatives with "medical conditions and other limitations" and "disabilit[ies] plac[ing] them at greater risk than the general public for serious complications or death from COVID-19" – introduced a "proposal . . . to amend the House rules to permit virtual proceedings of the full House." *Id.* at 32-33, 35. The House voted on the proposal and rejected it. *Id.* at 32-34. A few plaintiffs sent letters to the House Speaker (and others), requesting reasonable accommodations so that they could participate remotely in House proceedings, all to no avail. *Id.* at 34. The plaintiffs sued the Speaker, alleging that his refusal to allow them to participate remotely in official House sessions (which had the consequence of keeping them from voting on bills before the House) violated Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act as well as the Fourteenth Amendment. *Id.* at 34-35, 49. The Circuit grappled with whether the Speaker's denial of some legislators' requests for accommodations to procedural rules were of such extraordinary character that the NH House Speaker would not be entitled to legislative immunity for the claims made against him. *Id.* at 52. The First Circuit, sitting en banc, concluded that the "extraordinary character" exception had not been met in part because the plaintiffs' claims asserting a Fourteenth Amendment violation was "not in and of itself suffic[ient] . . . under the *Kilbourn* standard" to obliterate the shield of legislative immunity. *Id.* at 50-52. The Circuit cautioned that the Supreme Court's jurisprudence on legislative immunity indicated that courts needed "to be wary of

construing *Kilbourn* in a manner that would deem even such a 'quintessentially legislative act' as the decision by the Speaker of the House to follow [its] rules . . . to be beyond the protection of the immunity that has been historically afforded to such an act." *Id.* at 53 (quoting *McCarthy v. Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021)).

Here, like in *Cushing*, the House took a vote on a formal request from a member. The Speaker then enforced the will of the majority of the body by enforcing the plainly written sanction articulated in the rule. As in *Cushing*:

> [T]he plaintiffs [here] take aim at conduct by the Speaker that involves a decision to follow -- rather than depart from -- existing House rules that were overwhelmingly [here, unanimously] passed . . . . The challenged conduct by the Speaker . . . involves adhering to existing rules rather than making new ones.

*Id.* at 51. The court also sees similarities to the issue presented and reasoning expressed in *Harwood*: "[A] legislative body adopt[ed] a rule, not invidiously discriminatory on its face," and Speaker Fecteau did "no more than carry out the will of the body by enforcing the rule as part of [his] official duties." 69 F.3d at 631. The plaintiffs assert that these cases are inapposite because each "concerned a generally applicable procedural rule," Pls.' Reply at 3-4, but the plaintiffs fail to acknowledge that their case is also about the application of a procedural rule. The court agrees with the plaintiffs that neither *Cushing* nor *Harwood* foreclose a future case that could present extraordinary conduct to which immunity would not apply. Pls.' Reply at 4. Neither case defined what that conduct would be, though the Circuit indicated that a category of such conduct would be met if "legislators engaged in conduct so clearly exceeding the powers delegated to them." *Cushing*, 30 F.4th at 51.

The plaintiffs also assert that the sanction imposed on Representative Libby is "punitive enforcement" that disenfranchises her constituents and reflects "invidious viewpoint discrimination" which "so flagrantly violat[es] fundamental constitutional protections" that the immunity shield cannot protect the defendants from their suit. Pls.' Reply at 4. The unconstitutional application of the sanction identified in Rule 401(11) to Representative Libby, according to the plaintiffs, must be reviewed by this court because the rule may not "trump the constitution" and Speaker Fecteau acted outside the scope of his power. Tr. at 14:16-18, 35:18-21. The appellate courts have, however, put to rest any notion that legislative immunity could be circumvented simply because a plaintiff alleges a claim for a constitutional violation. While the First Circuit has acknowledged it would draw the line at "flagrant violat[ions] of fundamental constitutional protections," *Harwood*, 69 F.3d at 634 (implying a house rule excluding all members of one race or one religion would be so flagrantly violative as to qualify for the exception) (citing *Kilbourn*, 103 U.S. at 204), it has also relied on more recent discussions by the Supreme Court to generalize "that immunity is not forfeited simply because the activities, if unprotected, might violate a plaintiff's constitutional rights," *id.* (holding that a House Rule – and alleged selective enforcement – prohibiting lobbyists from sitting around the perimeter of the House floor did not "even closely approach" the border of the extraordinary character exception). Moreover, the Supreme Court has said that to believe the judiciary will intervene to protect First Amendment rights as soon as allegations are made that congressional action has infringed these rights "ignores the absolute nature of the

speech or debate protection and our cases which have broadly construed that protection." *Eastland*, 421 U.S. at 509-510. The Supreme Court has also stated that immunity applies even if the legislators' "conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) (holding congressional committee members immune from suit for alleged violations of, among other things, privacy rights when those defendants' actions were limited to conducting hearings, preparing the report, authorizing its publication). Furthermore, the courts are not "to oversee the judgment of the [legislative body] . . . to impose liability on its Members if [it] disagree[s] with their legislative judgment." *Id.* at 313. And, in a case specifically considering whether the application of a statute pertaining to legislator recusal rules (which had the effect of barring a legislator from voting on certain legislative proposals) was an infringement on the legislator's First Amendment rights, the Court declared that "restrictions upon legislators' voting are not restrictions upon legislators' protected speech" because "a legislator's vote is the commitment of [their] apportioned share of the legislature's power to the passage or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011) (Scalia, J.).

What all this means is that the court has no indication that the Circuit or Supreme Court would conclude that Speaker Fecteau's imposition of the sanction pursuant to House Rule 401(11) is of such an extraordinary character that it would

decline to leave up the shield of legislative immunity. Recall that the plaintiffs are not challenging Rule 401(11) itself, but only the imposition of the sanction identified in this rule on Representative Libby. If the Circuit was not moved by the New Hampshire Speaker's enforcement of its procedural rule with the effect of forcing members to choose between their health and/or physical ability to be present in person for sessions and the ability to perform the responsibilities of their elected position, *see Cushing*, 30 F.4th at 50-52, then the court does not see how it can conclude that prohibiting an elected member of the House from speaking or voting on the House floor is of such an extraordinary character. The court takes the prudent course of exercising judicial restraint especially because the case law does not indicate this should be the first case to clear the high bar for applying this exception to a legislator's conduct.

The plaintiffs warn that if the court allows immunity to shield the defendants here, then the defendants could next "prohibit Asian-American representatives from making floor speeches or voting, silence those in same-sex marriages or interracial marriages, or prohibit voting by women." Pls.' Reply at 4. The Circuit Court in *Harwood* was also presented with a "parade of horribles" – there "a hypothetical legislature that votes to allow access to its chambers to members of only one race or to adherents of only one religion" – which prompted the reminder that there is a border past which immunity would not apply. *Harwood*, 69 F.3d at 634. But the court need not explore hypothetical scenarios and instead stays focused on the situation at hand.

Finally, the plaintiffs lean heavily on two Supreme Court cases which, they say, seal the deal here that immunity should not shield the defendants. Pls.' Reply at 4-5. The court, however, finds that neither case is as dispositive as the plaintiffs contend. In *Bond v. Floyd*, a duly elected candidate to the Georgia House of Representatives was not allowed to take his oath or his seat in the legislature because of comments he had made against the Vietnam war between election day and the first day of the legislative session. 385 U.S. 116, 118 (1966). Bond, an African American, alleged racial discrimination and violation of his First Amendment rights. The State of Georgia did not argue it was immune from suit and the Supreme Court did not explore (because it was not asked to) whether the situation presented in that case represented conduct of an extraordinary character that would not be entitled to immunity. Rather, the Supreme Court acknowledged that "[t]he State does not claim that it should be completely free of judicial review whenever it disqualifies an elected Representative; it admits that, if a State Legislature excluded a legislator on racial or other clearly unconstitutional grounds, the federal (or state) judiciary would be justified in testing the exclusion by federal constitutional standards." *Id.* at 130. This is not the same as the Court concluding that the conduct alleged against defendants met the extraordinary character exception. While the plaintiffs insist this case is on point because here there is also an "exclusion of an elected legislator" in "flagrant violation of Supreme Court precedent barring exclusion of an elected legislator because of their protected speech espousing a viewpoint that majority rejects," Pls.' Reply at 4, the court agrees with the defendants that this case is

factually distinguishable because Representative Libby has not been disqualified, excluded, or expelled from her elected seat. *Bond* is about a member-elect being prevented from taking his seat at all and not about a sanction imposed on a seated member of the House for violations of the Code of Ethics pursuant to a democratically passed censure. Defs.' Opp'n at 6 n.6.

Next, in *Powell*, the Supreme Court held that certain legislative employees were not entitled to the protection of legislative immunity for their roles in enforcing a resolution which excluded a member-elect from his seat in the U.S. House of Representatives. 395 U.S. at 489, 506. The Court affirmed the proposition that legislators were completely immune from suit, but a House clerk, sergeant-at-arms, and doorkeeper were not protected by immunity even though their conduct was pursuant to an express order of the House. *Id.* at 504-05. The Court relied on *Kilbourn*, where the Court had allowed a lawsuit against a sergeant-at-arms for his execution of an illegal arrest warrant resulting in an alleged false imprisonment to go forward. *Id.* at 503-04 (citing *Kilbourn*, 103 U.S. at 204). Like with *Bond*, however, the court considers Representative Libby's situation to be readily distinguishable from *Powell* because Representative Libby has not been disqualified or expelled from her seat.[9]

---

[9] The plaintiffs do not include any allegations against Clerk Hunt or provide any indication or argument in their motion about how or why any actions he has taken would qualify as extraordinary for purposes of getting around legislative immunity and so the court does not provide a separate analysis for this defendant. The law, however, is clear that, "as long as [a legislative employee's] conduct would be covered by legislative immunity were the same conduct performed by the legislator

Despite the court's take on the applicable law, especially that the appellate courts have been clear that simply alleging claims for constitutional violations does not automatically meet the high bar set for the extraordinary-character exception, the appellate courts also instruct that context is an important consideration. *See Cushing*, 30 F.4th at 52 (instructing that the court must be "sensitive to [the] context" in which the legislative act arose and must focus on the "character of the legislative act being challenged"). The court is also mindful of the serious effect the imposed sanction has on Representative Libby's ability to fulfill her duties as an elected representative of District 90, so the court will closely examine the context surrounding the imposition of the sanction to determine whether the details known at this time about the defendants' conduct will reach the high bar of this exception.

The Resolution introduced by Representative Moonen included a "resolve[]" that Representative Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." Fecteau Decl. Ex. D. Representative Libby was on notice of the potential consequence if the Resolution passed because the consequence is clearly identified in Rule 401(11). The Resolution was deeply debated on the floor of the House. Throughout the hour-long debate, Speaker Fecteau repeatedly refocused the comments from the members on the precise Resolution before the House, redirecting members on both sides of the aisle when another member raised a point of order or on his own when the comments

---

himself, the [legislature's employee] shares the immunity." *Harwood*, 69 F.3d at 631, 631 n.10.

strayed from the merits of the censure for Representative Libby's conduct. *See, e.g.,* *Archived Hearings & Meetings: House Chamber*, at 6:17:10 PM. None of the comments discussed the precise sanction allowed by Rule 401(11) or questioned what the consequence might be if Representative Libby refused to comply with the Resolution. None of the comments raised concerns about the effect of imposing the sanction articulated in Rule 401(11). After the Resolution passed, Speaker Fecteau provided Representative Libby with an opportunity to make the satisfaction demanded by the Resolution – the apology – but she declined. Speaker Fecteau then proceeded to announce the precise sanction identified in Rule 401(11), without objection from any member of the body.

As the parties brought to the court's attention, this is not the first time that Rule 401(11) has been invoked or applied in the Maine House.[10] But this is the first time a censured Representative has refused to apologize and so the first time the

---

[10] Two censures passed in April 2024 pursuant to violations of House Rule 401(11) where the body found two members in "egregious violation of the decorum of the House" when they made statements on the House floor "claiming that the 2023 Lewiston mass shooting was God's response to a recent abortion law that took effect the same day." Compl. at ¶ 53 (citing to the Resolutions). The Speaker for the 131st Legislature summoned the members to the well of the House, announced the censure, and "await[ed] an assurance and an issuance of a formal apology, to be read on the House floor, to make satisfaction." Journal and Legislative Record – House, Apr. 11, 2024 at 2 [https://perma.cc/BG6W-SVTU]. Both members apologized to the House and to the public, Journal and Legislative Record – House, Apr. 11, 2024 at 3 [https://perma.cc/BG6W-SVTU], which obviated the need for any further sanction.

The parties also point this court to the first censure imposed on a House member. In 2001, the House voted to adopt a Resolution censuring a member who had "verbally abused a female Senator in the hallway outside the chamber of the House of Representatives." Journal and Legislative Record – House, Feb. 8, 2001 at 10 [https://perma.cc/GL5C-FVY7]. That member also apologized immediately following the vote to adopt the Resolution to censure him. *Id.* at 14.

Speaker imposed the consequence of the censure when satisfaction has not been made. This "first" does not in and of itself make the act extraordinary, however, because the consequence is plainly stated in the rule.

The effect of the sanction, as clearly known by now, is that Representative Libby is prohibited from speaking on the House floor during the debate of proposed legislation and voting on proposed legislation and other matters up for a vote by the full House. Fecteau Decl. at ¶ 24. Representative Libby considers the suspension of these privileges to be indefinite, but the sanction remains in place only until Representative Libby apologizes, the House votes to dispense with Rule 401(11), or the 132nd Legislature session ends. *Id.* ¶ 25. As indicated by Speaker Fecteau, a House member may move to dispense with or suspend the Resolution and a majority vote will pass the motion. *Id.* ¶¶ 41-42. At least two attempts since February 25 to do so have failed. On March 20, a member of the House made such a motion so Representative Libby could speak during the debate on the State's proposed budget, but the motion did not receive a majority vote. *Id.* ¶¶ 39-41. On March 25, a similar motion was made and failed. *Id.* ¶ 42. Of course, pursuant to Rule 401(11), Representative Libby may also choose to make satisfaction.

Representative Libby considers "speaking and voting on behalf of her District 90 constituents to be "[t]he two most critical responsibilities of a duly elected legislator." Libby Decl. at ¶ 10. This court hears the predicament but notes that the sanction does not render her unable to represent her constituents or speak in favor of or in opposition to policies and legislation in all ways. As Speaker Fecteau points

out in his declaration (and Representative Libby does not challenge), Representative

Libby can:

- Fully participate on committees to which she is assigned, including voting, debating, and testifying at public hearings.
- Sponsor and co-sponsor bills and resolutions.
- Lobby other members for support or opposition to proposed legislation.
- Participate in legislative caucus meetings.
- Testify at public hearings about any pending legislation.
- Be present on the House floor during debates and votes.
- Engage in procedural actions on the House floor such as make a motion to amend or postpone a bill or raise an objection thereto.
- Use all legislative staff and offices without any restrictions.
- Be fully compensated, including travel-related expenses and meal allowances.

Fecteau Decl. at ¶¶ 28-31, 34-38.  At the time of the briefing on this motion,

Representative Libby had introduced several amendments to a measure regarding

the State's biennial budget.  *Id.* ¶ 39.

After carefully considering the case law, the details presented by the parties

about the House governing rules, and the process by which the House adopted the

Resolution and imposed the censure on Representative Libby, the court concludes

that the suspension of Representative Libby's privilege to speak or vote on the House

floor is not of such an extraordinary character that this exception to absolute

legislative immunity for legislators will apply.  That said, the ability to suspend an

elected representative's privileges to either speak on the House floor or enter a vote

on legislation pending before the entire House until the representative apologizes for

censured conduct is a weighty sword to wield.  However, the process Speaker Fecteau

followed when he imposed the sanction ultimately reflected the will of the majority of

the House members.  The court must carefully heed the caution from the First Circuit

that federal judges should not "improperly intrud[e] into internal state legislative affairs [or] warring sides in partisan state legislators' battles." *Cushing*, 30 F.4th at 52. The censure and its sanction on Representative Libby is, at bottom, an internal Maine House affair. "As a rule, a legislature's regulation of the atmosphere in which it conducts its core legislative activities—debating, voting, passing legislation, and the like—is part and parcel of the legislative process, and, hence, not subject to a judicial veto." *Harwood*, 69 F.3d at 635 (citing *Eastland,* 421 U.S. at 509). And so, in this context (and with the plaintiff's plain instruction that they are challenging the application of Rule 401(11) to Representative Libby and not the Rule itself firmly rooted in mind), the imposition of the sanction plainly identified and authorized by the House Rule is not of such extraordinary character as to obliterate the formidable shield the courts have provided to legislative acts. The defendants are, therefore, immune from the plaintiffs' claims against them.

## IV. CONCLUSION

For the reasons stated above, the plaintiffs' Motion for a Preliminary Injunction (ECF No. 8) is DENIED.

IT IS SO ORDERED.

Melissa R. DuBose
United States District Judge


April 18, 2025

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| Laurel D Libby, et al., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-cv-83-MRD |
| | ) | |
| Ryan M Fecteau, et al., | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.*

Participation in sports by transgender students is one of many policies that lawmakers around the country are fiercely debating. In Maine, "individual[s] at . . . educational institution[s]" have an equal opportunity and civil right to "participate in all educational . . . programs . . . and all extracurricular activities [including athletic programs] without discrimination because of sex, sexual orientation or gender identity, a physical or mental disability, ancestry, national origin, race, color or religion." Me. Rev. Stat. Ann. tit. 5, §§ 4601, 4602 (2021). Maine House Representative Laurel Libby self-identifies as "an outspoken critic of Maine's state policy allowing boys who identify as transgender to compete in girls' sports." Compl. at ¶ 2 (ECF No. 1). As part of her advocacy against this policy, Representative Libby generates social media content that she posts across various social media platforms including but not limited to Facebook. One such post, described below, earned her a

---

* Of the District of Rhode Island, sitting by designation.

formal censure by her colleagues in the Maine House of Representatives and a corresponding sanction prohibiting her from speaking or voting on the House floor until she apologizes for her post. Aggrieved, she and six of her constituents filed suit in this court, claiming that the imposition of this sanction is a violation of their constitutional rights under the First, Fourth, and Fourteenth Amendments. The plaintiffs collectively moved for a preliminary injunction to prevent the enforcement of the sanction. The defendants, House Speaker Ryan Fecteau and House Clerk Robert Hunt, assert that legislative immunity shields them from liability for these claims. For the reasons explained in detail below, the court concludes that legislative immunity bars the claims in this case. In short, Speaker Fecteau's imposition of the sanction plainly identified in the House of Representatives Rule that governs when House members are found in breach of House rules is a legislative act that does not, according to binding caselaw and within the context of this censure, qualify for the narrow exception carved out for conduct of an extraordinary character. The court, therefore, denies the motion for preliminary injunction.

## I.    BACKGROUND

Before summarizing the sequence of events which led to this litigation, the court starts by setting the table with some additional details about the parties and laying out the relevant rules of procedure for Maine legislators. Plaintiff Laurel Libby represents House District 90 in the current session – the 132nd – of the Maine Legislature, her third consecutive term in this elected position. Compl. at ¶ 10; Libby Decl. ¶¶ 2-3 (ECF No. 34-1). Plaintiffs Ronald P. Lebel, Wendy Munsell, Jason

Levesque, Bernice Fraser, Rene Fraser, and Donald Duboc reside within Maine House District 90 and voted in the last state legislative election. Constituents' Decls. at ¶ 3 (ECF Nos. 8-1 – 8-6). Defendant Ryan Fecteau represents House District 132 in the 132nd Maine Legislature, his fifth term in this elected position, and serves as the elected Speaker of House. Fecteau Decl. at ¶¶ 2-3 (ECF No. 29). All the court knows about defendant Robert Hunt is that he is serving as the Clerk of the House. Compl. at ¶ 18.

Pursuant to *Mason's Manual of Legislature Procedure*, "[a] legislative body has the right to regulate the conduct of its members and may discipline a member as it deems appropriate, including reprimand, censure or expulsion." Section 561(1) (2020). The Maine Constitution confers upon the State Legislature the sole authority to promulgate its own rules of procedure. Fecteau Decl. at ¶ 5. *See* Me. Const. Art. IV, Pt. 3, § 4 ("Each House may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of 2/3, expel a member, but not a 2nd time for the same cause."). Pursuant to this express authority, the 132nd Maine Legislature adopted its House Rules on December 4, 2024.[1] House Rule 401 details the "[r]ights and duties of members." Fecteau Decl. Ex. A at 12 (ECF No. 29-1). Rule 401(11) covers "'breach of rules" and states, in its entirety:

> When any member is guilty of a breach of any of the rules and orders of the House and the House has determined that the member has violated

---

[1] The Rules adopted on this day were the same as those which governed the previous legislative session and were passed by consent of the entire House after no members requested a roll-call vote when provided with the opportunity to do so. Fecteau Decl. at ¶ 6.

a rule or order, that member may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction.

Fecteau Decl. Ex. A at 13.[2]  Members of the House are also governed by the Legislative Code of Ethics adopted by the 100th Legislature and amended by the 127th Legislature.  The Code of Ethics, in its entirety, states:

> Legislative service is one of democracy's worthiest pursuits. A Maine Legislator is charged with civility and responsible conduct inside and outside of the State House commensurate with the trust placed in that Legislator by the electorate.
>
> In a free government, a Legislator is entrusted with the security, safety, health, prosperity, respect and general well-being of those the Legislator serves and with whom the Legislator serves.
>
> To work well, government requires a bond of trust and respect between citizens and their Legislators. With such a trust, high moral and ethical standards producing the public's confidence, with the reduction to a minimum of any conflict between private interests and official duties, should be observed.
>
> No Maine Legislators will accept any employment that will impair their independence and integrity of judgment nor will they exercise their position of trust to secure unwarranted privileges for themselves or for others.  The Maine Legislator will be ever mindful of the ordinary citizen who might otherwise be unrepresented and will endeavor conscientiously to pursue the highest standards of legislative conduct inside and outside of the State House.

Fecteau Decl. Ex B (ECF No. 29-2).

With these details laid out, the following is the sequence of events which led to this cause of action and pending motion, as alleged in the complaint and declared by

---

[2] This particular rule seems to have been in place since at least 1820, when the rules governing the first session of the Maine House of Representatives included the same protocol with almost identical wording.  Defs.' Opp'n Ex. 1 at 2, 8 (section XV) (ECF No. 28-1).

the parties in support of their respective positions.  On February 17, 2025, Representative Libby used her official Representative Laurel Libby Facebook account to create a post which included the juxtaposition of two photos and some commentary. Compl. at ¶ 31.  Each photo shows three adolescent student athletes standing side-by-side on a winner's podium, wearing athletic attire, and either holding a ribbon or a medal in their hand or wearing a medal around their neck.  *Id.* ¶ 31.  One student athlete in each photo is highlighted by way of double yellow lines encircling them from head to toe.  *Id.* ¶ 31.  In the right-side photo, the two student athletes not highlighted by circles have their faces blurred out; in the left photo, the faces of all three students are clearly visible.  *Id.* ¶ 31.  The text above the photos in the post states:

> UPDATE:  We've learned that just *ONE* year ago [athlete] was competing in boy's pole vault…that's when he had his 5th place finish. So all of this transpired in the last year, with the full blessing of the Maine Principals' Association.
>
> Two years ago, [athlete] tied for 5th place in boy's pole vault.  Tonight, "[athlete]" won 1st place in the girls' Maine State Class B Championship.

*Id.* ¶ 31.[3]

On February 18, 2025, Speaker Fecteau, "concern[ed] that publicizing the student's identity would threaten the student's health and safety," contacted Representative Libby twice (once by letter, once by phone call) to ask that she delete

---

[3] The court sees no reason to repeat the name of the targeted student athlete here.  Also, the original photographer or source of the photos is not clear, though the court understands each to have been published prior to Representative Libby's post.

the Facebook post.  Fecteau Decl. at ¶¶ 13-14; Compl. at ¶ 42.[4]  At the next scheduled session of the House, February 25, 2025, Representative Matt Moonen presented "House Resolution Relating to the Censure of Representative Laurel D. Libby of Auburn by the Maine House of Representatives."  Fecteau Decl. at ¶ 17, Ex. D (ECF No. 29-4).  The Resolution summarized the Facebook post, the national attention that Representative Libby received for her post, and her decision not to remove the post after hearing concerns about the minor's safety as a result of the post.  Fecteau Decl. Ex. D.  The Resolution also cited excerpts from the Code of Ethics and pronounced Representative Libby's actions as "in direct violation" of the Code of Ethics.  *Id.*  The Resolution resolves that Representative Libby is "censured by the House of Representatives for just cause" and "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine."  *Id.*

House members engaged in debate over the introduced Resolution and then adopted it by a vote of 75-70.[5]  Fecteau Decl. ¶ 18.  Speaker Fecteau called Representative Libby to the well of the House, "lectured her on the House's ethics standards, and offered her an opportunity to apologize."  Compl. at ¶ 57.  Representative Libby declined to apologize and Speaker Fecteau found her in violation of Rule 401(11), *id.*, announcing she would "not be able to cast a vote or

---

[4] Speaker Fecteau's letter articulated his concern with Representative Libby sharing the student's name, school, and photo as a "risk[ to] their health and safety" and as a "violat[ion of] one of the long held political traditions of 'leaving kids out of it.'"  Fecteau Decl. Ex. C (ECF No. 29-3).

[5] *Archived Hearings & Meetings: House Chamber,* 5:57:35-7:03:40 PM, Me. Leg. (Feb. 25, 2025), https://bit.ly/43tBMp4.

speak on the floor until [she] comes back into compliance with House Rule 401 part 11," *Archived Hearings & Meetings: House Chamber*, 7:11:02-7:11:11 PM, Me. Leg. (Feb. 25, 2025), https://bit.ly/43tBMp4.  According to Speaker Fecteau, he "exercised [his] duty as Speaker to rule her in violation of House Rule 401(11), and therefore barred her from casting a vote or participating in debate on the House floor until she made satisfaction by coming into compliance with the Resolution."  Fecteau Decl. ¶ 20.  "No member, including Rep. Libby, made any objection to [his] ruling."  *Id.* ¶ 21.

On March 11, 2025, Representative Libby and six of her constituents from District 90 filed a verified complaint in this court pursuant to 42 U.S.C. § 1983 against Speaker Fecteau and Clerk Hunt, in their official capacities, claiming that barring Representative Libby from speaking on the House floor or voting on legislation violated fundamental rights protected by the U.S. Constitution.  Compl. at 1.  In Count I, Representative Libby alleges the sanction is an action taken in retaliation for her posts on social media and violates her First Amendment right to free speech. *Id.* ¶¶ 72-76.  In Count II, Representative Libby (along with the six constituents from District 90) allege that the sanction is a result of arbitrary and disparate treatment, impinges on the "one person, one vote" principle, and effectively disenfranchises the constituents in violation of the Fourteenth Amendment's Equal Protection clause.  *Id.* ¶¶ 84-86.  In Count III, all plaintiffs claim the sanction is also excluding Representative Libby from the office to which she was duly elected and depriving her constituents of a vote for state representative in violation of the Fourteenth Amendment's Due Process clause's protection against fundamental unfairness in the

electoral process. *Id.* ¶¶ 89-94. In Count IV, all plaintiffs allege that the sanction deprives Representative Libby of the privileges of her office and deprives her constituents of representation in the House in violation of Article IV, § 4 of the U.S. Constitution which "guarantees to every State . . . a Republication Form of Government. *Id.* ¶¶ 101-05. The plaintiffs seek a declaratory judgment that the sanction infringes their constitutional rights as alleged in each count, an injunction barring the enforcement of the sanction against Representative Libby, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988. *Id.* at 28.

In their Motion for Preliminary Injunction, the plaintiffs ask this court to preliminarily enjoin the defendants from enforcing the sanction Speaker Fecteau imposed while the parties litigate the merits of the plaintiffs' claims. The defendants opposed the motion and the plaintiffs filed a reply to the defendants' opposition. The court heard argument on April 4, 2025.[6]

## II.  LEGAL STANDARD

A preliminary injunction may be granted when a plaintiff demonstrates "four long-established elements." *Santiago v. Municipality of Utuado*, 114 F.4th 25, 34-35 (1st Cir. 2024). First, "the probability of the movant's success on the merits of their

---

[6] The court is also in receipt of a letter the plaintiffs filed on Friday, April 11. ECF No. 38. The court reminds the plaintiffs that the briefing schedule entered by the court was requested by the plaintiff in a consent motion that the plaintiff filed two days after filing the motion for preliminary injunction. The court confirmed with the parties, during a chambers conference held on April 18, that the briefing timeline proposed in the consent motion was indeed satisfactory to all and the court scheduled the hearing on the earliest date suggested by the parties. The plaintiff's letter, filed one week after the hearing, neglects to mention these details.

claim(s)." *Id.* (quoting *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003)). Second, "the prospect of irreparable harm absent the injunction." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). Third, "the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does)." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). Fourth, "the effect of the court's action on the public interest." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). "The movant's likelihood of success on the merits is the element that 'weighs most heavily in the preliminary injunction calculus.'" *Id.* at 35 (quoting *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022)).

## III. DISCUSSION

As previewed above, the defendants contend that they are immune from this lawsuit under the doctrine of legislative immunity. Defs.' Opp'n at 1 (ECF No. 28). The court must address this threshold issue before considering the parties arguments about the preliminary injunction factors. If legislative immunity applies, then the court must deny the motion for preliminary injunction because the plaintiffs will not meet the weighty likely-to-succeed-on-the-merits-of-their-claims element of the preliminary injunction standard. *See Santiago*, 114 F.4th at 42 (ending the preliminary-injunction analysis after concluding the plaintiff-appellant would not prevail on this factor).

For those readers not familiar with this form of immunity from suit, the Supreme Court has long considered legislators (and often, but not always, their staff)

absolutely immune from being sued for their legislative acts. *Cushing v. Packard*, 30 F.4th 27, 36-37 (1st Cir. 2022) (en banc). The immunity has some guardrails, however. It "protects 'only purely legislative activities,'" *Nat'l Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 630 (1st Cir. 1995) (quoting *United States v. Brewster,* 408 U.S. 501, 507 (1972)), and "does not attach to the activities that are merely 'casually or incidentally related to legislative affairs,'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528), or to administrative actions that "fall outside the 'legitimate legislative sphere,'" *Harwood*, 69 F.3d at 630, 631 n.9 (quoting *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 503 (1975)). In addition to these limitations, immunity does not protect legislative activities that are deemed of an "extraordinary character," *Cushing*, 30 F.4th at 50 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)), a vaguely defined but rarely applied concept to circumvent the immunity shield. The court will take a deeper dive into this immunity and its common law limitations after setting out the parties' broad arguments about whether the defendants are entitled to legislative immunity from the plaintiffs' claims.

According to the defendants, the action the plaintiffs challenge as violating their constitutional rights – barring Representative Libby from speaking or voting on the House floor – was a legislative act entitled to the protection of legislative immunity. Defs.' Opp'n at 4, 6-7. The defendants assert that the "extraordinary character" exception is not met here because Speaker Fecteau imposed the sanction in strict adherence to a centuries-old rule of House procedure, and because Representative Libby has not been barred from performing all legislative work on

behalf of her district. Defs.' Opp'n at 9 (citing Fecteau Decl. ¶¶ 27-38)). The defendants contend that for this court to apply the "extraordinary character" exception, thereby removing the legislative immunity shield, would result in this court taking an impermissible step into another branch of government's jurisdiction and traversing into a political battle in which the court should not involve itself. Defs.' Opp'n at 9-10.

The plaintiffs counter that this action was not legislative in nature but an administrative action that falls outside the sphere of protection conferred by legislative immunity. Pls.' Reply at 1 (ECF No. 34). The imposition of the sanction stripping Representative Libby's voice and vote from the House floor is not, according to the plaintiffs, an action that the courts would consider to be part of the legislative process. Pls. Reply at 1-2. During the hearing on the pending motion, the plaintiffs also argued that stripping a House representative of what they consider her core responsibilities to her district – speaking on the House floor and voting – is so blatantly unconstitutional that the Speaker's imposition of this sanction must fall into the narrow exception for "extraordinary" conduct to which the courts have indicated legislative immunity will not apply. Apr. 4, 2025 Hearing Tr. ("Tr.") at 5:15-21, 6:3-5, 6:14-19, 9:2-4 (ECF No. 37).

This threshold issue is a narrow one because the plaintiffs are clear that they are challenging the sanction imposed and "not the wisdom of the underlying censure,

as unwise as it may be." Pls.' Reply at 2.[7]  While the appellate courts have explored

many contours of legislative immunity, the situation presented in this case does not

fit squarely into any of these courts' past discussions and applications of this absolute

immunity.  And so this court will start its deeper dive into the issue by describing

some of the contours of this doctrine as it understands the Supreme Court and First

Circuit to have defined them, beginning with the basic philosophy behind legislative

immunity before moving onto the distinctions between legislative acts and

nonlegislative (or administrative) acts and describing the amorphous exception for

extraordinary conduct.

The original source of legislative immunity is the Speech and Debate Clause of

the U.S. Constitution.  *Cushing*, 30 F.4th at 36; *Harwood*, 69 F.3d at 629

(acknowledging that "state legislators and their surrogates enjoy a parallel immunity

from liability for their legislative acts"); *see also Bogan v. Scott-Harris*, 523 U.S. 44,

49 (1998) (noting that "state and regional legislators are entitled to absolute

immunity from liability under § 1983 for their legislative activities").  The First

Circuit highlights this immunity as

> serv[ing] an important democratic end notwithstanding that it insulates
> elected representatives from legal challenges for certain of their official
> actions.  For that reason, we must be cognizant – as the [Supreme] Court
> has instructed us to be – of the risks associated with failing to respect
> the traditional scope of legislative immunity, bounded though it is, out

---

[7] During the hearing on the pending motion, the plaintiffs repeated that their
constitutional challenges are only to the imposition of the sanction – the "prohibition
on her speaking on the floor and casting a vote to represent her constituents" – and
not on the Resolution censuring Representative Libby for the Facebook post.  Tr. at
11:9-16, 14:24-25.

Case: 25-1385 Document: 00118276025 Page: 45 Date Filed: 04/16/25 Entry ID: 6715174
Case: 25-1325 Document: 00118278025 Page: 128 Date Filed: 04/18/25 Entry ID: 6715174

Case 1:25-cv-00083-MRD-PAS Document 45 Page: 123 of 531 PageID #: 337

of respect for legislative freedom and thus democratic self-government.

*Cushing*, 30 F.4th at 52; *see Harwood*, 69 F.3d at 630 ("absolute immunity . . . afforded
. . . to protect the integrity of the legislative process by insuring the independence of
individual legislators."). "In reading the Clause broadly [courts] have said that
legislators acting within the sphere of legitimate legislative activity 'should be
protected not only from the consequences of litigation's results but also from the
burden of defending themselves.'" *Eastland*, 421 U.S. at 503 (quoting *Dombrowski v.
Eastland*, 387 U.S. 82, 85 (1967)). It is well-settled that legislative immunity may
apply against claims (such as those we have here) which "seek only declaratory or
prospective injunction relief." *Cushing*, 30 F.4th at 37 (citing *Sup. Ct. of Va. v.
Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732 (1980)).

As mentioned above, the entitlement to legislative immunity is restricted in
two ways and the court will consider each separately. First, immunity is reserved for
actions that are legislative in nature. As Justice Thomas wrote on behalf of the
unanimous Supreme Court, "[w]hether an act is legislative turns on the nature of the
act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S.
at 54. As an obvious example, "'voting by Members' itself constitutes a legislative
act." *Cushing*, 30 F.4th at 49 (quoting *Gravel v. United States*, 408 U.S. 606, 624
(1972)). The case law is clear that legislative acts include a broad swath of conduct,
including "any act 'generally done in a session of the House by one of its members in
relation to the business before it.'" *Harwood*, 69 F.3d at 630 (quoting *Kilbourn*, 103
U.S. at 204); *Eastland,* 421 U.S. at 503 (holding that subpoenas issued pursuant to

an investigation related to a legitimate task of Congress fell within the "sphere of legitimate legislative activity").

As already previewed, the plaintiffs' position is that the challenged conduct is not part of the House's "general policymaking" role but an administrative act because Representative Libby was "targeted . . . specifically for the content of her speech made on her own time outside the Legislature." Pls.' Reply at 2. The plaintiffs argue that "denying Representative Libby's right to speak or vote in the House is not 'an integral part' of the House's 'deliberative and communicative processes'" and therefore outside the scope of acts that are considered legislative. Pls.' Reply at 1 (quoting *Gravel*, 408 U.S. at 625). There is no immunity, say plaintiffs, "for acts not 'essential to legislating' even if undertaken under the auspices of a resolution" "nor [for] the House clerk's act of counting (or not counting) votes." Pls.' Reply at 3 (first quoting *Gravel*, 408 U.S. at 621, and then citing *Powell v. McCormack*, 395 U.S. 486, 504 (1969)).

Common law does indeed instruct that "[a]cts undertaken by legislators that are administrative in nature do not 'give rise to absolute immunity from liability in damages under § 1983.'" *Negron-Gaztambide v. Hernandez-Torres*, 35 F.3d 25, 26, 28 (1st Cir. 1994) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). "'Employment decisions generally are administrative' except when they are 'accomplished through traditional legislative functions' such as policymaking and budgetary restructuring that 'strike at the heart of the legislative process.'" *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 8 (1st Cir. 2000) (quoting *Rateree v. Rockett*, 852 F.2d 946, 950-51 (7th Cir. 1988)). In *Negron-Gaztambide*, the Circuit identified "two

tests for distinguishing between legislative and administrative activity." 35 F.3d at

28 (quoting *Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984)).

> The first test focuses on the nature of the facts used to reach the given
> decision. If the underlying facts on which the decision is based are
> 'legislative facts,' such as 'generalizations concerning a policy or state of
> affairs,' then the decision is legislative. If the facts used in the
> decisionmaking are more specific, such as those that relate to particular
> individuals or situations, then the decision is administrative. The
> second test focuses on the 'particularity of the impact of the state action.'
> If the action involves establishment of a general policy, it is legislative;
> if the action 'singles out specifiable individuals and affects them
> differently from others,' it is administrative.

*Id.* (quoting *Cutting*, 724 F.2d at 261). At first blush, the application of the plain

language of these tests might indicate that the imposition of the sanction on

Representative Libby is an administrative act because she was "single[d] out" and

"affect[ed] differently than others." *Id.* (quoting *Cutting*, 724 F.2d at 261). However,

these two tests have been applied to situations readily distinguishable to the case

before the court.

     In *Negron-Gaztambide*, the challenged act was the head of the House of

Representatives terminating a librarian who worked in the Legislative Library in the

Commonwealth of Puerto Rico allegedly because of that employee's political

affiliation. 35 F.3d at 26, 28. In *Cutting*, the Circuit Court tacitly concluded (while

remanding for further proceedings due to an insufficiently developed record) that a

local planning board's rejection of a developer's plans for a subdivision was an

administrative act. 724 F.2d at 260, 260 n.1, 261. And, in *Acevedo-Garcia*, the Circuit

Court held that the execution of a layoff plan was an administrative act because the

actions taken to implement the plan "targeted specific individuals" and "affected

particular individuals differently from others." 204 F.3d at 9; *but see id.* at 8 (distinguishing the conduct at issue in *Bogan*, 523 U.S. at 55, where the Supreme Court held legislative immunity did apply when an employee's termination was effected through the adoption of an ordinance which eliminated the department that employed the plaintiff and not through targeting specific individuals).

These cases demonstrate the application of the test first articulated in *Cutting* to causes of action in which the plaintiff was either a former employee of the legislature whose employment had been terminated after a turnover in political party majority or a public citizen before a local board seeking approval of a land development plan, but **not** where the challenged conduct occurred during a legislative session and the legislative body was applying a black-letter house rule. At no time do the plaintiffs explain to the court why any of the cases which applied the aforementioned tests are closer analogues to the plaintiffs' situation than the cases in which the First Circuit considered challenges to procedural rules. After all, when the Circuit considered a challenge by groups of lobbyists to a house rule prohibiting lobbyists from sitting around the perimeter of the Rhode Island House of Representatives' floor during session, it decided that when the court is

> dealing with a procedural rule adopted by a house of the legislature as a whole for the management of its own business . . . [the court is] not concerned with whether the adoption of the rule comprises a legislative act – that is transparently clear – but, rather, with whether that act is more than 'casually or incidentally related' to core legislative functions.

*Harwood*, 69 F.3d at 631 n.9 (quoting *Brewster*, 408 U.S. at 528).

In this case, focusing as this court must on the nature of the action and not on the motivation or intent behind it, *Bogan*, 523 U.S. at 54, Speaker Fecteau was not terminating an employee or unilaterally deciding on a proposal for economic development. Rather, he executed the will of the body of the House of Representatives pursuant to the Resolution passed by a majority vote after full debate. The Resolution censured the Representative's conduct as a breach of the governing Code of Ethics and demanded that she issue an apology. When she did not, Speaker Fecteau imposed the precise sanction articulated in the Rule that governs members' conduct. There is, therefore, no doubt that these actions were "done in a session of the House by one of its members in relation to the business before it." *Harwood*, 69 F.3d at 630 (quoting *Kilbourn*, 103 U.S. at 204). As such, the nature of the Speaker's conduct falls "within the 'legitimate legislative sphere,'" *Eastland*, 421 U.S. at 503 (quoting *Kilbourn*, 103 U.S. at 204), and is not "merely 'casually or incidentally related to legislative affairs,'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528). Indeed, the Circuit Court has been clear that it is

> beyond serious dispute that enforcing a duly enacted legislative rule which [affects conduct] on the House floor during House sessions is well within the legislative sphere [because] [s]uch a restriction necessarily affects the manner in which the House conducts its most characteristic legislative functions, *e.g.,* debating and voting. A rule that colors the very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials (whether or not elected members) in enforcing it are therefore fully protected against judicial interference by the doctrine of legislative immunity.

*Harwood*, 69 F.3d at 632 (concluding the enforcement of a House rule prohibiting lobbyists from seating on the perimeter of the House floor was a legislative act). The rule applied here affects one censured member of the House and not an entire class of non-legislators as in *Harwood*, but the sentiment expressed above applies with equal force because the sanction imposed does in fact affect debating and voting on measures before the House during full House sessions while the sanction is in place. The court's conclusion that the plaintiffs are challenging a legislative act is also in line with the Circuit's reasoning in *Cushing* that legislative acts include situations where "the injunctive relief that the plaintiffs seek is, on their own account, relief that must run against a legislator directly to be effective." 30 F.4th at 49.

With this conclusion that the challenged conduct is to a legislative act, the court moves on to the second restriction on legislative immunity: the exception for conduct of an "extraordinary character." The court starts with a close examination of the relevant cases and the parties' arguments related to the application of these cases, and then considers the precise details provided by the parties about the process by which Speaker Fecteau imposed the sanction on Representative Libby.

As the Supreme Court has long recognized, "[l]egislative immunity does not, of course, bar all judicial review of legislative acts." *Powell*, 395 U.S. at 503. The case law carves out an exception to the entitlement to legislative immunity for "things done, in the one House or of the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible." *Cushing*, 30 F.4th at 50 (quoting *Kilbourn*, 103 U.S. at 204). Broadly speaking, "[t]here may be some

conduct, even within the legislative sphere, that is so flagrantly violative of fundamental constitutional protections that traditional notions of legislative immunity would not deter judicial intervention." *Harwood*, 69 F.3d at 634. The Supreme Court has not identified precisely what conduct would clear the "high bar" set by this exception, but suggests that a "perversion of [legislative] powers [for] a criminal purpose [such as 'imitating the Long Parliament in the execution of the Chief Magistrate of the nation, or to follow the example of the French assembly in assuming the function of a court for capital punishment'] would be screened from punishment by the constitutional provision for freedom of debate." *Cushing*, 30 F.4th at 51 (quoting *Kilbourn*, 103 U.S. at 204-05).[8] The Circuit instructs that "the assessment of when a given act that, though seemingly legislative in nature, is nonetheless 'of an extraordinary character' that makes it unworthy of the immunity's protection must be sensitive to context." *Id.* at 52 (quoting *Kilbourn*, 103 U.S. at 204). This court must therefore "ensure that [its] focus is on the character of the legislative act being challenged." *Id.*

---

[8] The dissenting opinion in *Cushing* pointed out that the Supreme Court "has never addressed a case in which it has held the extraordinary-character exception to apply." *Cushing*, 30 F.4th at 56 (Thompson, J., dissenting). "As examples of potentially extraordinary legislative acts, the Supreme Court has hypothesized a legislature that 'execut[es] . . . the Chief Magistrate of the nation, or . . . assum[es] the function of a court for capital punishment.'" *Id.* at 57 (quoting *Kilbourn*, 103 U.S. at 204-05). The dissent further explained that "[w]e have similarly pondered a legislature that 'votes to allow access to its chambers to members of only one race or to adherents of only one religion,' suggesting these might veer into the orbit of the extraordinary-character exception." *Id.* (quoting *Harwood*, 69 F.3d at 634).

The First Circuit closely examined the notion of the extraordinary-character exception in *Cushing*. 30 F.4th at 50-53. The plaintiffs – all members of the New Hampshire House of Representatives with "medical conditions and other limitations" and "disabilit[ies] plac[ing] them at greater risk than the general public for serious complications or death from COVID-19" – introduced a "proposal . . . to amend the House rules to permit virtual proceedings of the full House." *Id.* at 32-33, 35. The House voted on the proposal and rejected it. *Id.* at 32-34. A few plaintiffs sent letters to the House Speaker (and others), requesting reasonable accommodations so that they could participate remotely in House proceedings, all to no avail. *Id.* at 34. The plaintiffs sued the Speaker, alleging that his refusal to allow them to participate remotely in official House sessions (which had the consequence of keeping them from voting on bills before the House) violated Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act as well as the Fourteenth Amendment. *Id.* at 34-35, 49. The Circuit grappled with whether the Speaker's denial of some legislators' requests for accommodations to procedural rules were of such extraordinary character that the NH House Speaker would not be entitled to legislative immunity for the claims made against him. *Id.* at 52. The First Circuit, sitting en banc, concluded that the "extraordinary character" exception had not been met in part because the plaintiffs' claims asserting a Fourteenth Amendment violation was "not in and of itself suffic[ient] . . . under the *Kilbourn* standard" to obliterate the shield of legislative immunity. *Id.* at 50-52. The Circuit cautioned that the Supreme Court's jurisprudence on legislative immunity indicated that courts needed "to be wary of

construing *Kilbourn* in a manner that would deem even such a 'quintessentially
legislative act' as the decision by the Speaker of the House to follow [its] rules . . . to
be beyond the protection of the immunity that has been historically afforded to such
an act." *Id.* at 53 (quoting *McCarthy v. Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021)).

Here, like in *Cushing*, the House took a vote on a formal request from a
member. The Speaker then enforced the will of the majority of the body by enforcing
the plainly written sanction articulated in the rule. As in *Cushing*:

> [T]he plaintiffs [here] take aim at conduct by the Speaker that involves
> a decision to follow -- rather than depart from -- existing House rules
> that were overwhelmingly [here, unanimously] passed . . . . The
> challenged conduct by the Speaker . . . involves adhering to existing
> rules rather than making new ones.

*Id.* at 51. The court also sees similarities to the issue presented and reasoning
expressed in *Harwood*: "[A] legislative body adopt[ed] a rule, not invidiously
discriminatory on its face," and Speaker Fecteau did "no more than carry out the will
of the body by enforcing the rule as part of [his] official duties." 69 F.3d at 631. The
plaintiffs assert that these cases are inapposite because each "concerned a generally
applicable procedural rule," Pls.' Reply at 3-4, but the plaintiffs fail to acknowledge
that their case is also about the application of a procedural rule. The court agrees
with the plaintiffs that neither *Cushing* nor *Harwood* foreclose a future case that
could present extraordinary conduct to which immunity would not apply. Pls.' Reply
at 4. Neither case defined what that conduct would be, though the Circuit indicated
that a category of such conduct would be met if "legislators engaged in conduct so
clearly exceeding the powers delegated to them." *Cushing*, 30 F.4th at 51.

The plaintiffs also assert that the sanction imposed on Representative Libby is "punitive enforcement" that disenfranchises her constituents and reflects "invidious viewpoint discrimination" which "so flagrantly violat[es] fundamental constitutional protections" that the immunity shield cannot protect the defendants from their suit. Pls.' Reply at 4. The unconstitutional application of the sanction identified in Rule 401(11) to Representative Libby, according to the plaintiffs, must be reviewed by this court because the rule may not "trump the constitution" and Speaker Fecteau acted outside the scope of his power. Tr. at 14:16-18, 35:18-21. The appellate courts have, however, put to rest any notion that legislative immunity could be circumvented simply because a plaintiff alleges a claim for a constitutional violation. While the First Circuit has acknowledged it would draw the line at "flagrant violat[ions] of fundamental constitutional protections," *Harwood*, 69 F.3d at 634 (implying a house rule excluding all members of one race or one religion would be so flagrantly violative as to qualify for the exception) (citing *Kilbourn*, 103 U.S. at 204), it has also relied on more recent discussions by the Supreme Court to generalize "that immunity is not forfeited simply because the activities, if unprotected, might violate a plaintiff's constitutional rights," *id.* (holding that a House Rule – and alleged selective enforcement – prohibiting lobbyists from sitting around the perimeter of the House floor did not "even closely approach" the border of the extraordinary character exception). Moreover, the Supreme Court has said that to believe the judiciary will intervene to protect First Amendment rights as soon as allegations are made that congressional action has infringed these rights "ignores the absolute nature of the

speech or debate protection and our cases which have broadly construed that protection." *Eastland*, 421 U.S. at 509-510. The Supreme Court has also stated that immunity applies even if the legislators' "conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) (holding congressional committee members immune from suit for alleged violations of, among other things, privacy rights when those defendants' actions were limited to conducting hearings, preparing the report, authorizing its publication). Furthermore, the courts are not "to oversee the judgment of the [legislative body] . . . to impose liability on its Members if [it] disagree[s] with their legislative judgment." *Id.* at 313. And, in a case specifically considering whether the application of a statute pertaining to legislator recusal rules (which had the effect of barring a legislator from voting on certain legislative proposals) was an infringement on the legislator's First Amendment rights, the Court declared that "restrictions upon legislators' voting are not restrictions upon legislators' protected speech" because "a legislator's vote is the commitment of [their] apportioned share of the legislature's power to the passage or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011) (Scalia, J.).

What all this means is that the court has no indication that the Circuit or Supreme Court would conclude that Speaker Fecteau's imposition of the sanction pursuant to House Rule 401(11) is of such an extraordinary character that it would

*ADD54*

decline to leave up the shield of legislative immunity. Recall that the plaintiffs are not challenging Rule 401(11) itself, but only the imposition of the sanction identified in this rule on Representative Libby. If the Circuit was not moved by the New Hampshire Speaker's enforcement of its procedural rule with the effect of forcing members to choose between their health and/or physical ability to be present in person for sessions and the ability to perform the responsibilities of their elected position, *see Cushing*, 30 F.4th at 50-52, then the court does not see how it can conclude that prohibiting an elected member of the House from speaking or voting on the House floor is of such an extraordinary character. The court takes the prudent course of exercising judicial restraint especially because the case law does not indicate this should be the first case to clear the high bar for applying this exception to a legislator's conduct.

The plaintiffs warn that if the court allows immunity to shield the defendants here, then the defendants could next "prohibit Asian-American representatives from making floor speeches or voting, silence those in same-sex marriages or interracial marriages, or prohibit voting by women." Pls.' Reply at 4. The Circuit Court in *Harwood* was also presented with a "parade of horribles" – there "a hypothetical legislature that votes to allow access to its chambers to members of only one race or to adherents of only one religion" – which prompted the reminder that there is a border past which immunity would not apply. *Harwood*, 69 F.3d at 634. But the court need not explore hypothetical scenarios and instead stays focused on the situation at hand.

Finally, the plaintiffs lean heavily on two Supreme Court cases which, they say, seal the deal here that immunity should not shield the defendants. Pls.' Reply at 4-5. The court, however, finds that neither case is as dispositive as the plaintiffs contend. In *Bond v. Floyd*, a duly elected candidate to the Georgia House of Representatives was not allowed to take his oath or his seat in the legislature because of comments he had made against the Vietnam war between election day and the first day of the legislative session. 385 U.S. 116, 118 (1966). Bond, an African American, alleged racial discrimination and violation of his First Amendment rights. The State of Georgia did not argue it was immune from suit and the Supreme Court did not explore (because it was not asked to) whether the situation presented in that case represented conduct of an extraordinary character that would not be entitled to immunity. Rather, the Supreme Court acknowledged that "[t]he State does not claim that it should be completely free of judicial review whenever it disqualifies an elected Representative; it admits that, if a State Legislature excluded a legislator on racial or other clearly unconstitutional grounds, the federal (or state) judiciary would be justified in testing the exclusion by federal constitutional standards." *Id.* at 130. This is not the same as the Court concluding that the conduct alleged against defendants met the extraordinary character exception. While the plaintiffs insist this case is on point because here there is also an "exclusion of an elected legislator" in "flagrant violation of Supreme Court precedent barring exclusion of an elected legislator because of their protected speech espousing a viewpoint that majority rejects," Pls.' Reply at 4, the court agrees with the defendants that this case is

factually distinguishable because Representative Libby has not been disqualified, excluded, or expelled from her elected seat. *Bond* is about a member-elect being prevented from taking his seat at all and not about a sanction imposed on a seated member of the House for violations of the Code of Ethics pursuant to a democratically passed censure. Defs.' Opp'n at 6 n.6.

Next, in *Powell*, the Supreme Court held that certain legislative employees were not entitled to the protection of legislative immunity for their roles in enforcing a resolution which excluded a member-elect from his seat in the U.S. House of Representatives. 395 U.S. at 489, 506. The Court affirmed the proposition that legislators were completely immune from suit, but a House clerk, sergeant-at-arms, and doorkeeper were not protected by immunity even though their conduct was pursuant to an express order of the House. *Id.* at 504-05. The Court relied on *Kilbourn*, where the Court had allowed a lawsuit against a sergeant-at-arms for his execution of an illegal arrest warrant resulting in an alleged false imprisonment to go forward. *Id.* at 503-04 (citing *Kilbourn*, 103 U.S. at 204). Like with *Bond*, however, the court considers Representative Libby's situation to be readily distinguishable from *Powell* because Representative Libby has not been disqualified or expelled from her seat.[9]

---

[9] The plaintiffs do not include any allegations against Clerk Hunt or provide any indication or argument in their motion about how or why any actions he has taken would qualify as extraordinary for purposes of getting around legislative immunity and so the court does not provide a separate analysis for this defendant. The law, however, is clear that, "as long as [a legislative employee's] conduct would be covered by legislative immunity were the same conduct performed by the legislator

- 26 -
*ADD57*

Despite the court's take on the applicable law, especially that the appellate courts have been clear that simply alleging claims for constitutional violations does not automatically meet the high bar set for the extraordinary-character exception, the appellate courts also instruct that context is an important consideration. *See Cushing*, 30 F.4th at 52 (instructing that the court must be "sensitive to [the] context" in which the legislative act arose and must focus on the "character of the legislative act being challenged"). The court is also mindful of the serious effect the imposed sanction has on Representative Libby's ability to fulfill her duties as an elected representative of District 90, so the court will closely examine the context surrounding the imposition of the sanction to determine whether the details known at this time about the defendants' conduct will reach the high bar of this exception.

The Resolution introduced by Representative Moonen included a "resolve[]" that Representative Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." Fecteau Decl. Ex. D. Representative Libby was on notice of the potential consequence if the Resolution passed because the consequence is clearly identified in Rule 401(11). The Resolution was deeply debated on the floor of the House. Throughout the hour-long debate, Speaker Fecteau repeatedly refocused the comments from the members on the precise Resolution before the House, redirecting members on both sides of the aisle when another member raised a point of order or on his own when the comments

himself, the [legislature's employee] shares the immunity." *Harwood*, 69 F.3d at 631, 631 n.10.

strayed from the merits of the censure for Representative Libby's conduct. *See, e.g.,*
*Archived Hearings & Meetings: House Chamber*, at 6:17:10 PM. None of the
comments discussed the precise sanction allowed by Rule 401(11) or questioned what
the consequence might be if Representative Libby refused to comply with the
Resolution. None of the comments raised concerns about the effect of imposing the
sanction articulated in Rule 401(11). After the Resolution passed, Speaker Fecteau
provided Representative Libby with an opportunity to make the satisfaction
demanded by the Resolution – the apology – but she declined. Speaker Fecteau then
proceeded to announce the precise sanction identified in Rule 401(11), without
objection from any member of the body.

As the parties brought to the court's attention, this is not the first time that
Rule 401(11) has been invoked or applied in the Maine House.[10] But this is the first
time a censured Representative has refused to apologize and so the first time the

---

[10] Two censures passed in April 2024 pursuant to violations of House Rule
401(11) where the body found two members in "egregious violation of the decorum of
the House" when they made statements on the House floor "claiming that the 2023
Lewiston mass shooting was God's response to a recent abortion law that took effect
the same day." Compl. at ¶ 53 (citing to the Resolutions). The Speaker for the 131st
Legislature summoned the members to the well of the House, announced the censure,
and "await[ed] an assurance and an issuance of a formal apology, to be read on the
House floor, to make satisfaction." Journal and Legislative Record – House, Apr. 11,
2024 at 2 [https://perma.cc/BG6W-SVTU]. Both members apologized to the House
and to the public, Journal and Legislative Record – House, Apr. 11, 2024 at 3
[https://perma.cc/BG6W-SVTU], which obviated the need for any further sanction.

The parties also point this court to the first censure imposed on a House
member. In 2001, the House voted to adopt a Resolution censuring a member who
had "verbally abused a female Senator in the hallway outside the chamber of the
House of Representatives." Journal and Legislative Record – House, Feb. 8, 2001 at
10 [https://perma.cc/GL5C-FVY7]. That member also apologized immediately
following the vote to adopt the Resolution to censure him. *Id.* at 14.

Speaker imposed the consequence of the censure when satisfaction has not been made. This "first" does not in and of itself make the act extraordinary, however, because the consequence is plainly stated in the rule.

The effect of the sanction, as clearly known by now, is that Representative Libby is prohibited from speaking on the House floor during the debate of proposed legislation and voting on proposed legislation and other matters up for a vote by the full House. Fecteau Decl. at ¶ 24. Representative Libby considers the suspension of these privileges to be indefinite, but the sanction remains in place only until Representative Libby apologizes, the House votes to dispense with Rule 401(11), or the 132nd Legislature session ends. *Id.* ¶ 25. As indicated by Speaker Fecteau, a House member may move to dispense with or suspend the Resolution and a majority vote will pass the motion. *Id.* ¶¶ 41-42. At least two attempts since February 25 to do so have failed. On March 20, a member of the House made such a motion so Representative Libby could speak during the debate on the State's proposed budget, but the motion did not receive a majority vote. *Id.* ¶¶ 39-41. On March 25, a similar motion was made and failed. *Id.* ¶ 42. Of course, pursuant to Rule 401(11), Representative Libby may also choose to make satisfaction.

Representative Libby considers "speaking and voting on behalf of her District 90 constituents to be "[t]he two most critical responsibilities of a duly elected legislator." Libby Decl. at ¶ 10. This court hears the predicament but notes that the sanction does not render her unable to represent her constituents or speak in favor of or in opposition to policies and legislation in all ways. As Speaker Fecteau points

out in his declaration (and Representative Libby does not challenge), Representative

Libby can:

- Fully participate on committees to which she is assigned, including voting, debating, and testifying at public hearings.
- Sponsor and co-sponsor bills and resolutions.
- Lobby other members for support or opposition to proposed legislation.
- Participate in legislative caucus meetings.
- Testify at public hearings about any pending legislation.
- Be present on the House floor during debates and votes.
- Engage in procedural actions on the House floor such as make a motion to amend or postpone a bill or raise an objection thereto.
- Use all legislative staff and offices without any restrictions.
- Be fully compensated, including travel-related expenses and meal allowances.

Fecteau Decl. at ¶¶ 28-31, 34-38. At the time of the briefing on this motion,

Representative Libby had introduced several amendments to a measure regarding

the State's biennial budget. *Id.* ¶ 39.

After carefully considering the case law, the details presented by the parties

about the House governing rules, and the process by which the House adopted the

Resolution and imposed the censure on Representative Libby, the court concludes

that the suspension of Representative Libby's privilege to speak or vote on the House

floor is not of such an extraordinary character that this exception to absolute

legislative immunity for legislators will apply. That said, the ability to suspend an

elected representative's privileges to either speak on the House floor or enter a vote

on legislation pending before the entire House until the representative apologizes for

censured conduct is a weighty sword to wield. However, the process Speaker Fecteau

followed when he imposed the sanction ultimately reflected the will of the majority of

the House members. The court must carefully heed the caution from the First Circuit

that federal judges should not "improperly intrud[e] into internal state legislative affairs [or] warring sides in partisan state legislators' battles." *Cushing*, 30 F.4th at 52. The censure and its sanction on Representative Libby is, at bottom, an internal Maine House affair. "As a rule, a legislature's regulation of the atmosphere in which it conducts its core legislative activities—debating, voting, passing legislation, and the like—is part and parcel of the legislative process, and, hence, not subject to a judicial veto." *Harwood*, 69 F.3d at 635 (citing *Eastland,* 421 U.S. at 509). And so, in this context (and with the plaintiff's plain instruction that they are challenging the application of Rule 401(11) to Representative Libby and not the Rule itself firmly rooted in mind), the imposition of the sanction plainly identified and authorized by the House Rule is not of such extraordinary character as to obliterate the formidable shield the courts have provided to legislative acts. The defendants are, therefore, immune from the plaintiffs' claims against them.

## IV.   CONCLUSION

For the reasons stated above, the plaintiffs' Motion for a Preliminary Injunction (ECF No. 8) is DENIED.

IT IS SO ORDERED.

Melissa R. DuBose
United States District Judge

April 18, 2025

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
_____

LAUREL D. LIBBY, State Representative   CIVIL ACTION
of Maine House District 90,              Docket No:
RONALD P. LEBEL, WENDY MUNSELL,          1:25-cv-00083-MRD
JASON LEVESQUE, BERNICE FRASER,
RENE FRASER, and DONALD DUBUC,

            Plaintiffs,

         -versus-

RYAN M. FECTEAU, in his official
capacity as Speaker of the Maine
House of Representatives, and
ROBERT B. HUNT, in his official
capacity as Clerk of the House,

            Defendants.
_____

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on for VIDEO
ORAL ARGUMENT held before **THE HONORABLE MELISSA R. DUBOSE,**
United States District Court Judge, in the United States
District Court, District of Rhode Island, One Exchange Terrace,
Providence, Rhode Island, on the 4th day of April, 2025, at
12:01 p.m. as follows:

Appearances:

For the Plaintiffs:   Patrick N. Strawbridge, Esquire
                      Daniel M. Vitagliano, Esquire
                      Marie E. Sayer, Esquire
                      Taylor A.R. Meehan, Esquire

For the Defendants:   Jonathan R. Bolton, Esquire
                      Kimberly L. Patwardhan, Esquire


                Michelle R. Feliccitti, RPR
                   Official Court Reporter

               (Prepared from manual stenography and
                  computer-aided transcription.)

**ADD63**

```
 1              (Zoom video court proceeding.)
 2         THE CLERK:  Good afternoon.  The United States
 3  District Court is now in session.  As a reminder, the Judicial
 4  Conference Policy generally prohibits the broadcasting of
 5  proceedings in federal trial courts.  Persons granted remote
 6  access to proceedings are reminded of the general prohibition
 7  against photographing, recording, and rebroadcasting of court
 8  proceedings pursuant to Judicial Conference Policy.  This
 9  position applies to counsel, the parties, the media, and any
10  member of the public.
11      It is the Court's wish that we use the following best
12  practices during this proceeding.  If you're not an interactive
13  participant, please mute your audio and video.  If you are an
14  interactive participant, please mute your audio until such time
15  you need to address the Court.  To maintain the highest --
16  highest audio quality possible during this proceeding, court
17  staff may mute anyone not in compliance with these best
18  practices.
19      And with that, the Honorable Melissa Dubose is now
20  appearing.  Thank you.
21         THE COURT:  Good morning.  Thank you Maggie.
22      We are here today on Civil Action 25-00083.  This is
23  Laurel Libby, Robert Lebel, Wendy Munsell, Jason Levesque,
24  Bernice Fraser, Rene Fraser, and Donald Dubuc v Ryan Fecteau
25  and Robert Hunt.
```

*ADD64*

```
 1        If I could just have the parties identify themselves for
 2    the record, please.
 3            MR. STRAWBRIDGE:  Yes.  Good afternoon, Your Honor.
 4    For the plaintiffs you have Patrick Strawbridge.  I'm joined by
 5    my colleagues, Taylor Meehan, Dan Vitagliano, and Marie Sayer.
 6    I do regret to inform the Court that you're stuck hearing only
 7    from me during this hearing today.
 8            THE COURT:  Thank you, Counsel.
 9            MR. BOLTON:  Good afternoon, Your Honor.  My name is
10    Jonathan Bolton.  I'm assistant attorney general.  I represent
11    the defendants.  And I'm joined by my colleague, Kimberly
12    Patwardhan.  And you'll be hearing from both of us today.
13            THE COURT:  Very good.  So I had a brief conference
14    with the parties before this hearing today to, kind of, set up
15    some of the logistics.  We do things slightly differently here
16    in Rhode Island.
17        But just for the purpose for the folks who are tuned in,
18    the Court is going to be allowing approximately 30 minutes for
19    each side to give their presentation, with an opportunity for
20    10 to 15 minutes for a rebuttal.
21        If there's anything that we need to go over with the
22    Counsel, unless you're ready to start, I'm happy to kick this
23    off.
24            MR. STRAWBRIDGE:  Thank you, Your Honor.  I assume
25    we'll start, since it's our motion for preliminary injunction.
```

**ADD65**

```
 1    And we reserve some time for rebuttal.  I'm obviously hoping to
 2    delay answering whatever questions Your Honor might have during
 3    this hearing, but --
 4            THE COURT:  I'm sorry, Counsel.  One quick -- I'm very
 5    sorry.
 6        Maggie, in my screen I'm having -- when folks are in the
 7    waiting room, I'm getting an audible chime.  Is that something
 8    we can disable, or is that just kind of part of the process
 9    here?
10            THE CLERK:  Let me see if I can disabled that, Judge.
11    I'll see what I can search on my end.
12            THE COURT:  All right.  Very good.  Thank you.
13        Attorney Strawbridge, please.
14        MR. STRAWBRIDGE:  Thank you, Your Honor.
15        This case I think brings a number of sort of unprecedented
16    features before the Court.  And the most important one of them
17    is the fact that there are 9,000 Maine residents who live in
18    House District 90 who are currently without effective
19    representation in the legislature.  They have no voice, and
20    they have no vote.  These are the central pillars of
21    representation, and they were taken away by a simple party line
22    vote in the Maine House of Representatives.  Why?  Because the
23    speaker and his copartisans objected to Representative Laurel
24    Libby's constitutionally-protected speech on social media.
25    That is a textbook denial of both Representative Libby's First
```

**ADD66**

 1   Amendment rights and her constituents' rights to

 2   representation.

 3        Indeed, the defendants' barely mount any First Amendment

 4   defense on the merits at all.  And no one can really dispute

 5   that the district has been left without representation under

 6   the terms of the suspension, which the State admits will last

 7   at least through the end of next year, and which they do not

 8   deny could be reinstituted by rule in the next legislature, and

 9   indefinitely as far as we can tell.  The defendants' main

10   argument in opposition is they are immune from this Court's

11   reach.  No matter how unconstitutional their conduct may be,

12   defendants say there is nothing this Court can do about it.

13        That's not true.  The facts of this case are strikingly

14   similar to the supreme court's decision in Bond v. Floyd and

15   Powell v. McCormack.  And the First Circuit has, likewise,

16   acknowledged the exceptions to immunity for extraordinary cases

17   like this one.  In fact they -- they allowed liability on

18   similar facts in the Miller case.  And their more recent

19   decisions in Harwood and Cushing warily recognize that there

20   are circumstances where immunity cannot serve as broadly as the

21   defendants would have it here.

22        THE COURT:  Counsel, could you help me understand how

23   the action that was taken here rises to the level of the

24   extraordinary action as contemplated in those cases?

25        MR. STRAWBRIDGE:  Sure.  I think the -- the obvious

*ADD67*

```
 1    one is the complete ban on her ability to vote.  None of the

 2    other cases that they cite in their support involved that kind

 3    of squelching of the core power of representation -- of

 4    legislative representation.  None of them involved the complete

 5    disenfranchisement.  The closest ones are Bond and Powell

 6    because that was the same situation.  You had a duly-elected

 7    representative who was denied the ability to actually take

 8    their seat and act as the representative for the officials --

 9    for the citizens that they represented in the body.  And they

10    don't have anything close to that.

11        They have some -- you know, in Harwood we were talking

12    about some restrictions on where lobbyists could sit during the

13    session of the legislature.  That's not the complete denial of

14    the right to vote.  Indeed, I don't think there's a single case

15    out there that they can point to which sustained the suspension

16    of a right to vote on the indefinite terms that this suspension

17    does.  That's clearly what I think makes this an easier case.

18    And it takes us into completely unprecedented territory, of

19    which the only real guidance comes from Bond and from Powell.

20             THE COURT:  You contemplate -- or could you

21    contemplate any circumstance under the Maine's legislative rule

22    applying the censure provision where it would be proper for a

23    member to be stripped of his or her vote?

24             MR. STRAWBRIDGE:  I don't think that there's any --

25    no, I don't think the constitution could prohibit them to be
```

**ADD68**

1    stripped of their vote, short of the expulsion provision,

2    which, of course the Maine Constitution provides for.  The

3    Maine contusion allowed for a two-thirds vote to expel a

4    representative.  But there are also important procedures that

5    protect the right of representation for the constituents in

6    that case.  Not only does it require a two-thirds vote, but it

7    also would allow for a special election to replace the

8    representative.  And so then you might have a situation like

9    Monserrate where there is a temporary loss of representation,

10   but one that could be remedied in relatively short fashion

11   through a special election.  Moreover, if that were to happen

12   to Representative Libby and she was reelected to the position,

13   the Maine Constitution specifically prohibits her from being

14   removed for the same offense again.

15        So those are important safeguards that are completely

16   avoided by the action of the House pursuant to rule in this

17   case.  Instead of having a two-thirds majority, they were able

18   to do it through a simple straight party line majority vote.

19   And instead of the constituents being able to obtain

20   representation via a special election or replacement, they are

21   stuck in limbo for this session and perhaps the next session

22   without representation, no matter how much they -- they

23   reaffirm their support for Representative Libby as their

24   elected official.

25        I do think it's important to note, too, and the State, you

```
 1   know, alludes to, sort of, political remedies in this case.
 2   And I don't think that that's the answer at all when you're
 3   talking about the vote in the House and the House District.
 4   The folks in District 90 don't have the opportunity to
 5   challenge the election of officials in other districts.  They
 6   don't vote in those elections.  They don't have the ability to
 7   speak.  And
 8   by -- by its nature, House District 90 is a member of the
 9   minority.  Their rights -- their rights -- you know, day-to-day
10   business in the legislature are going to be the rights that
11   minority members have.
12       And I think the slippery slopes here are -- are staring
13   the Court right in the face.  This is extreme.  And one can
14   image all sorts of hypotheticals that the logic of Maine's
15   position would permit.  You could have people who are
16   discriminated against on the basis of race, their vote was
17   taken away.  You could have a decision to take away a
18   representative vote because they didn't affirm the legislative
19   prayer at the beginning.
20           THE COURT:  But, Counsel, doesn't -- doesn't --
21   doesn't the case law already address those circumstances by
22   having the exemption for extraordinary circumstances?  Why
23   wouldn't those cases fall squarely in the camp of those -- the
24   cases where the court says, wait a second, this is going a bit
25   too far, we're going to pierce that legislative immunity
```

```
 1   because it is so extraordinary?
 2        MR. STRAWBRIDGE:  Well, I think they do.  And I think
 3   that we sit comfortably right alongside those extraordinary
 4   circumstances.  My only point here is that -- is that the logic
 5   of Maine's position does not provide a basis for why it would
 6   be okay to discriminate upon some equal protection categories
 7   but not upon other equal protection categories or why the First
 8   Amendment wouldn't be just as -- just as applicable to these
 9   types of proceedings than -- than the Fourteenth Amendment.
10        And, indeed, that's -- that's actually the holding of
11   Bond.  Bond is a First Amendment case.  And even the Georgia
12   legislature in the 1960s was unwilling stake out the position
13   that Maine has staken out here.  If you look at Bond,
14   Georgia -- the Georgia legislature is quite clear.  They say
15   that they could not take a violation on -- they could not
16   institute the rule or refuse to seat a member for members of
17   racial discrimination or other constitutional violations.  And
18   the First Amendment does not sit in a secondary position with
19   respect to its applicability here.
20        THE COURT:  From a separation of powers perspective,
21   wouldn't the path of least resistance for the Maine General
22   Assembly be to strike the censure provision or, alternatively,
23   keep the censure provision have the right to do that, but
24   take -- remove the penalty?  It seems that the members are
25   voting on the penalty, which calls for the stripping of the
```

1    right to vote and to speak on the floor, that this isn't a new

2    provision.  This has been around.  For my understanding from

3    the briefing, that this is an age-old censure rule, has

4    virtually been unchanged since the adoption.  So why is it that

5    -- that Maine wouldn't be in a better position to address your

6    concerns by simply changing the rule?

7         MR. STRAWBRIDGE:  Well, I guess -- I guess the

8    practical answer to that is because they have not.  They've

9    taken the unprecedented step of actually enforcing this, and

10   doing so in the face of a court challenge.  There are reported

11   court decisions that address whether or not this kind of broad

12   refusal to allow -- to allow an elected official to vote and to

13   represent their constituents both is constitutional -- we think

14   it's plainly not -- and whether or not the immunity bars review

15   of that.

16        It would be obviously nice if the legislature or if the

17   House of Representatives had decided to -- to not force this

18   issue upon the courts.  But the courts absolutely have

19   jurisdiction to hear this case.  And -- and this is -- this is

20   kind of why the federal courts exist and why cases like

21   Kilbourn exist.

22        Kilbourn is very similar to this case.  You had actions by

23   both the legislator and by officers of the legislator -- or I

24   should say employees of the legislature who acted

25   unconstitutionally.  And notwithstanding the strong arguments

1   the House of Representatives made in <u>Kilbourn</u>, that -- that

2   their actions in that case punishing and contempt of a witness,

3   could not be reviewed in courts, the court rejected that and

4   specifically acknowledged that, at minimum, the sergeant at

5   arms in that case could be held liable, notwithstanding

6   whatever legislative immunity the legislators had, which, of

7   course, in this case is why we have included the clerk as a

8   defendant.

9       Now I -- I do want to address a point that you've made

10  that I think is true.  There's absolutely no First Amendment

11  problem, in our view, with -- with the House voting to censure

12  a representative.  They have the right to free speech, and a

13  censure is a form of speech by the body.  And they can -- they

14  can censure them all day long.  The problem in this case is

15  that the censure has extended to a prohibition on her speaking

16  on the floor and casting a vote to represent her constituents.

17      THE COURT:  Didn't Representative Libby acquiesce in

18  some way to the rule?

19      MR. STRAWBRIDGE:  She -- she -- I mean, my

20  understanding is the rules are basically passed in a very pro

21  forma session with little notice.  But the rules were enacted

22  by the House.  And they could have been enacted in a lot of

23  different ways.  She certainly did not acquiesce in the

24  application of what is a very general rule about upholding

25  the standards of the legislature to punish her

1    constitutionally-protected speech.  Which I will also note was

2    not -- this was not like some sort of violent or -- or

3    disruptive confrontation on the -- to the operations of the

4    House of Representatives.  It isn't a situation where somebody

5    is brawling within the chamber or in the hallway.  This was

6    speech that occurred outside of the -- of the House of

7    Representatives.  And it sets --

8         THE COURT:  In those circumstances where if somebody

9    were brawling in the -- in the floor or in the well, when

10   your -- in your opinion, would that be conduct that could, in

11   fact, rise to the level where censure by way of stripping of a

12   vote until pending an apology and not being able to vote, would

13   that rise to the level?

14        MR. STRAWBRIDGE:  It's harder to imagine for me

15   because of the right that the constituents have that you could

16   ever have a situation where a suspension of a vote would be --

17   would be acceptable.  One could certainly see a stronger

18   argument perhaps for some temporary suspension on the ability

19   to speak or the time, place, or manner of speech in order to

20   ensure that the proceedings of the House can proceed.  So I

21   would acknowledge that would be a closer case at least with

22   respect to the speech restriction.

23        I -- I think I agree with what the House of

24   Representatives agrees with and what I think the vast majority

25   of state legislatures have historically accepted, which is that

```
 1   stripping a vote is an entirely different aspect because you
 2   are not only depriving the legislator of their right to cast a
 3   vote, but you're depriving the people of that district from any
 4   representation.  And that is a bridge too far.  I think the
 5   remedies in that case are, you know, expulsion, if -- if --
 6   if -- if that's what the House chooses to do in that case, or
 7   whatever political remedies for recall in some states there may
 8   be available.
 9        THE COURT:  Did you want to be heard with respect to
10   whether the conduct that the representative engaged in was in
11   her official capacity as opposed to private conduct?
12        MR. STRAWBRIDGE:  I'm not -- I don't think that it
13   really matters.  I do think that -- I think it matters only in
14   this respect, in that I think they're on even more tenuous
15   ground because it was not, like I said, a disruption of the
16   proceedings on the house floor.  But I don't think that they
17   can punish her conduct any more than they can punish her speech
18   if --- or any legislator could punish the speech of a
19   legislator if they found out 20 years ago that the legislator
20   had made a statement that they disagreed with in a college
21   newspaper editorial.
22        Protected speech is protected speech, regardless of forum.
23   And, indeed, there's really some irony in the extent to which
24   the State is raising legislative immunity defense, and pushing
25   for it, notwithstanding the precedent of Powell and Bond.  And
```

***ADD75***

1    that irony is that if you read <u>Bond</u> in particular, it

2    emphasizes that the point of the legislative immunity doctrine

3    is -- and some of the other cases say this too -- is to ensure

4    that legislators are free to debate and discuss and act upon

5    the most controversial topics free from any interference from

6    the outside world.  That's why we don't have defamation

7    liability for statements made in House proceedings.  And in

8    this case, of course, the rule is being used to silence

9    Representatives Libby, to disenfranchise her constituents --

10        THE COURT:  It goes back to -- and I don't want to

11   belabor the point -- but there is no challenge to the

12   constitutionality of the penalty.  And I guess that that's

13   where the Court is perplexed.  It's not the conduct of -- you

14   would not suggest that the legislators were not acting pursuant

15   to their internal rules, correct?

16        MR. STRAWBRIDGE:  No.  I think -- I think the

17   application of the rule in this respect is unconstitutional and

18   creates the constitutional violation.  Not only of

19   Representative Libby, but also of her constituents.

20        THE COURT:  But outside of application of the rule,

21   there is no separate constitutional challenge to the penalty

22   provision of -- of 40111, correct?

23        MR. STRAWBRIDGE:  Well, we're certainly not

24   bringing -- well, I guess two points.  We're not bringing a

25   facial challenge to it.  Although, I'm telling you it's hard

*ADD76*

1    for me to imagine, at least with respect to voting

2    restrictions, a scenario in which it could survive.  But I

3    don't think we're obligated to bring a facial challenge.  As

4    you know, courts disfavor facial challenges, and they prefer as

5    applied challenges.

6        And back to your original point.  I don't think that any

7    representative would have believed that they could be punished

8    in this way for speech that was made, again, not even on the

9    floor, not even disruptive.

10        The fact that there are very few examples of this rule

11    being invoked to actually strip voting rights and they're only

12    in the last two or three years I think tells you how out over

13    the ledge and out of step with both mainstream constitutional

14    thought and legislative practice the Maine House has become.

15    And I really do believe that this is the type of emergency that

16    all of the cases recognize applies.

17        I also just again note that I don't think legislative

18    immunity covers the aspect of the case that seeks an injunction

19    against the clerk requiring her to count her vote.  The same

20    reason it didn't apply in <u>Kilbourn</u> to an action against a

21    sergeant of arms and the same reason it didn't apply in <u>Powell</u>

22    <u>v. McCormack</u> to those who are actually barring the

23    representative from the chamber or refusing to enroll the

24    representative on the payroll.

25                THE COURT:  Those -- those are administrative actions.

***ADD77***

1   And there's a distinction between administrative actions and

2   legislative actions.  And I just want to know, how -- how are

3   you reconciling the clear findings in Cushing and Judge

4   Thompson in Bogan v. Scott-Harris that -- that -- that this

5   right, this legislative immunity, is sacrosanct to orderly

6   legislative procedures for -- as a state's right.

7           MR. STRAWBRIDGE:  Well, I don't -- I don't think

8   that's quite what they say.  And, indeed, the most recent case

9   from this on the First Circuit is en banc decision in Cushing.

10  And it specifically in footnote 20 calls out the scenario

11  that -- calls out Bond by name as an example and distinguishing

12  the -- the restriction that was at issue in Cushing, which was

13  basically a time, place, manner in voting how -- how

14  legislators could gather to count their votes versus having

15  remote option during COVID.  It says that case is different

16  from a case like Bond where they are refusing to allow the

17  representative to assume their position as the elected

18  official.  This -- this case is clearly much, much closer to

19  Bond than it is to the actual facts of Cushing.  And in those

20  -- in these types of cases, immunity has to yield, if it even

21  applies.

22      I mean, again, there are arguably legislative actions that

23  were happening in Kilbourn.  There were -- all the actions that

24  were taken in Bond and Powell, even by the legislative

25  employees, were at the direction and pursuant to a rule of the

```
 1    house or an order of the house.  That did not stop the court
 2    from vindicating constitutional rights there.  It should not
 3    stop this Court from stepping in and vindicating the rights of
 4    Representative Libby and her constituents here.
 5            THE COURT:  Thank you.
 6            MR. STRAWBRIDGE:  I think I'll probably just reserve
 7    the rest of my time for the sake of efficiency.  If Your Honor
 8    has any other questions, I'm obviously happy to answer them
 9    now.
10            THE COURT:  Very good.  Thank you.
11            MS. PATWARDHAN:  Good afternoon, Your Honor.  My name
12    is Kimberly Patwardhan.  I'm an assistant attorney general here
13    for the defendants today.
14        There are a few key details that defendants want to
15    highlight regarding the role of the house speaker and the clerk
16    of the house with respect to -- and also the conduct that's at
17    issue.
18        So both the speaker and the clerk are officers that are
19    identified in the Maine Constitution.  Article IV, Part 1,
20    Section 7, says that, The House shall choose their speaker,
21    clerk, and other officers.  There are numerous other references
22    to the speaker and the clerk throughout Maine's constitution.
23    Article III -- Article IV, Part 3, Section 5, also says that,
24    The House shall keep a journal and from time to time publish
25    its proceedings.
```

*ADD79*

```
 1        The -- the role of the speaker, in many ways, is to
 2   facilitate the orderly business of the house.  That's included
 3   in Rule 101, Subsection 1, paragraphs (d) and (e) of the House
 4   rules.  And as noted in the Fecteau declaration, which has not
 5   been disputed by plaintiffs, one of the speaker's obligations
 6   is to enforce the House rules.  That means that the speaker
 7   will make a ruling on points of order, but the entire body can
 8   overturn the speaker's decision.  Any member can appeal that
 9   ruling.  So what plaintiffs are claiming are acts of
10   individuals are, in our view, acts of the entire house that
11   have constitutional dimension.  We highlight these facts
12   because they bear on the nature of the conduct the plaintiffs
13   are challenging.  Because legislative acts are protected by
14   legislative immunity.
15        And in many ways this is a bright-line test.  The supreme
16   court decision in Tenney tells us that motivations don't matter
17   whether or not we're determining an act is legislative in
18   nature.  Even conduct that has a retaliatory motive is
19   protected by legislative immunity.  And the supreme court's
20   decision in Supreme Court of Virginia and Gravel tell us that
21   nonlegislatures can also be protected by legislative immunity.
22   What matters is the nature of the conduct at issue.
23        So in our view, all of the conduct that's been challenged
24   here by plaintiffs is legislative conduct.  The House adopted
25   the resolution censuring Representative Libby pursuant to its
```

**ADD80**

1    authority to punish its members for disorderly behavior.  The

2    House adopted its rules pursuant to its constitutional

3    authority to determine the rules of its proceedings.  The

4    speaker applied House Rule 40111 as its initial ruling.  But

5    since then, the House has twice voted against suspending

6    application of the rule to Representative Libby.

7         These are all actions that are occurring on the floor of

8    the House chamber.  Voting, adopting rules, punishing members,

9    these are all matters which the constitution places within the

10   jurisdiction of the Maine House.

11        I -- I disagree with plaintiffs when they focus on the

12   speech and the voting and things that are the inter -- just

13   the -- what Gravel calls the -- part of the deliberative and

14   communicative process by which legislation is passed.  That is

15   not the only conduct that is protected by legislative immunity.

16   Gravel also says that other matters which the constitution

17   places within the jurisdiction of either house is protected by

18   legislative immunity.

19        We also don't agree that the conduct that's being

20   challenged here is administrative.  The -- the focus now might

21   be on the speaker not recognizing Representative Libby for

22   debate or for not counting her votes, but we believe these too

23   are all legislative acts.  These are all acts that are

24   occurring on the House floor, while the House is in session.

25   They are either matters that the constitution places within the

1    jurisdiction of the House or they're the integral part --

2    process by which members participate in those House

3    proceedings.

4         THE COURT:  Given the sense or the fact that the vote,

5    itself, is so seminal and it is a pillar of our democracy, why

6    shouldn't we look at the taking away of that very fundamental

7    right, even though it's within the context of a legislative

8    body, that we wouldn't put it in the camp of, this is an

9    egregious act where immunity shouldn't lie?  We're talking

10   about removing and taking away somebody's right to vote and, in

11   this case, voting on -- on issues that -- of great public

12   interest.  So can you just help me understand why we shouldn't

13   put this case squarely in the camp where it rises to that

14   level?

15        MS. PATWARDHAN:  I think Your Honor's question is why

16   shouldn't this be one the extraordinary circumstances where

17   legislative immunity should not apply.  Obviously legislative

18   immunity does have an outer bound.  The First Circuit has said

19   so in Cushing.  That has to be an act that's of such

20   extraordinary character.  But the examples they provided, like

21   ordering an execution by bill of attainder or converting a

22   legislative body in a court of capital punishment.  Those

23   aren't this particular case.

24        Representative Libby has a plethora of other legislative

25   privileges that she still enjoys, including participating in

1    committees, voting in committee.  She can put forth motions on

2    the floor of the House.  So this is not a case where she has

3    been stripped of all of her legislative privileges like in <u>Bond</u>

4    or like in <u>Powell</u>.  So --

5           THE COURT:  But -- I'm sorry, Counsel.  Upon

6    imposition of the -- of the censure, was Representative

7    Libby -- is there a process or an appellate -- internal

8    appellate process where she could be heard on the censure,

9    itself?  Is there any mechanism within the body to address her

10   objection to the censure based on all of the grounds that

11   counsel for the plaintiffs are asserting today?

12          MS. PATWARDHAN:  At the time Representative Libby

13   could have objected to application of the rule.  She did not.

14   But there isn't an explicit process that you're talking about,

15   Your Honor.  I -- in our view, whatever the outer, outer bound

16   of legislative immunity is, it hasn't been reached here.

17      The House censured Representative Libby for violation of

18   the legislative code of ethics by engaging in conduct that the

19   House viewed as endangering a child.  And the House has an

20   important interest in ensuring that its members are conducting

21   themselves in a manner that ensures the safety and security of

22   its citizens, and the House also has an important interest in

23   protecting its reputation and integrity as the Second Circuit

24   said in <u>Monserrate</u>.  But I want to be absolutely clear, there

25   is no conceivable interest that justifies invidious

1  discrimination on the basis of race.  So we agree that the --

2  certainly the outer bound would be invidious discrimination on

3  the basis of race.

4      I also want to touch on Bond and Powell.  Because those

5  two cases were about the qualifications of members to be seated

6  in the Georgia house and also in the -- in the U.S. house.

7  Those cases did not address the punishment of an

8  already-sitting member, which is what this case is about.

9      And in -- in Powell, the legislators in that case were

10 immune.  It was only the actions that were taken by the

11 sergeant at arms and other legislative staff that was

12 determined not to be within the scope of legislative immunity.

13 But that wasn't because, in our view, you can only get relief

14 from -- against a clerk or a sergeant at arms or other

15 legislative staff.  It's because the conduct that was being

16 challenged wasn't legislative in nature.

17     That's the same thing in the Kilbourn case.  The sergeant

18 at arms that went out and served and executed the warrant,

19 that's not a legislative act.  It's not what -- it's not

20 something that's specifically identified that legislators can

21 engage in in the constitution, and it doesn't have anything to

22 do with speech and debate.  Right?  But here all of the actions

23 that are being challenged are all squarely within that frame.

24 So it is -- it is the votes that have been taken.  It's the

25 rulings on the floor about -- about debate.  It's -- it's

**ADD84**

1    the -- the entry even in the House journal.  That's another

2    aspect of this case that is imbued with constitutional

3    dimension.  These are all squarely within the authority of the

4    House.  They are all legislative acts.

5         THE COURT:  Do representatives have a constitutional

6    right to vote on the floor?

7         MS. PATWARDHAN:  The -- the supreme court has said

8    that the -- that -- that there is no First Amendment right to

9    vote on any particular piece of legislation.  So -- or then

10   also if not being able to vote on that particular piece of

11   legislation, then there's no concomitant right to debate on

12   that particular piece of legislation.

13       With respect to the First Amendment issues, we think

14   they're fairly well-briefed.  There really isn't a case truly

15   on all fours with this one that touches on First Amendment

16   retaliation based on protective legislative conduct.  <u>Boquist</u>

17   did not address legislative immunity, and neither did <u>Wilson</u>.

18   <u>Wilson</u> also involved a local legislative body.

19       By contrast, the Maine House has express constitutional

20   powers to engage in the conduct that it has engaged in.  The

21   tension here is that both Representative Libby and the

22   defendants are asserting that their conduct is of

23   constitutional dimension -- dimension.  Defendants' view is

24   that those factors weigh against the likelihood of success on

25   the merits on Representative Libby's First Amendment claim.

1    She doesn't have a personal First Amendment right to vote on

2    any particular piece of legislation.  And history supports that

3    for centuries legislative bodies have imposed a variety of

4    punishments against their members without anyone thinking that

5    those punishments run afoul of the First Amendment.  We cite it

6    in our brief, instances in 1808 and thereafter wherein members

7    of the house -- Massachusetts House of Representatives had been

8    suspended for their conduct.

9        As the Court noted the rules, Rule 40111, is of ancient

10   origin in our state.  It derives from Massachusetts.  And it

11   has been a part of the House's rules for more than 200 years.

12   Legislative bodies have to have the constitutional authority to

13   enforce their rules.  If it didn't, those rules would

14   essentially be meaningless.  And that's the Fourth Circuit's

15   decision in Whitener.

16       I -- I also just want to touch briefly on sort of the --

17   the rest of the remaining factors for the preliminary

18   injunction relief.  I think that -- I won't put words in

19   Attorney Strawbridge's mouth, but I think we probably agree

20   that this case sort of rises and falls on the likelihood of

21   success on the merits.  But we do note that in this particular

22   case, these are rules that Representative Libby agreed to at

23   the beginning of the session.  These are rules that have been

24   part of the legislature for more than 200 years, and

25   Representative Libby has agreed to these rules in the past as

**ADD86**

```
 1   well.  So

 2   these -- and the last point I'll make is that these -- the rule

 3   in question applies to all violations of House rules.  It's --

 4   it's applied equally when there has been some violation of a

 5   rule, house, or order.

 6          THE COURT:  Is there any conduct that Representative

 7   Libby could engage in outside of the legislative body in her

 8   personal life that is outside the reach or scope of the ethics

 9   rule?  In other words, is she held to a standard where in her

10   day-to-day life she doesn't have the luxury -- and that's for

11   lack of a better term -- of being able to have an opinion?  Or

12   is that always tied back to the ethics rule?

13          MS. PATWARDHAN:  I think that we expect better conduct

14   from our elected officials and public officials than we do from

15   general members of the -- of the citizenry.  But to be really

16   clear, the House viewed the action that was censurable here as

17   engaging in conduct that -- that endangered a child.  It wasn't

18   about the topic that Representative Libby was engaged in.  It

19   was about the fact that a harm could come to a child, and that

20   the post had also included numerous comments that suggested

21   that harm should come to the child and that, in the House's

22   view, this was conduct that fell below the required ethical

23   conduct for members of the legislature.

24       So, yes, Representative Libby is -- of course can speak

25   out -- continue to speak out on the issues underlying this
```

1    appeal.  And she has continued to speak out on the issues

2    underlying this appeal.  In the House's view, what was the

3    ethical violation was the endangering a child through

4    identifying that child in their school publically, and that was

5    the conduct that led to the censure.

6         THE COURT:  And that's distinguishable from other

7    examples, the whole notion of selective enforcement where other

8    members have used social media to post pictures of themselves

9    with -- with children at, you know, fundraising events and

10    sports events?  That falls outside the scope of the ethics

11    rule?  This is specific to Ms. Libby's posting here?  Help me

12    understand the difference.

13         MS. PATWARDHAN:  Sure.  The -- the ethics rules

14    specifically speaks to -- that a legislator is entrusted -- is

15    entrusted with the security, safety, health, prosperity,

16    respect, and general well-being of those legislator -- those

17    the legislator serves and with whom the legislator serves.  So

18    that is what the ethical rule says.  But I apologize, Your

19    Honor, I lost track of your question.

20         THE COURT:  I just -- somewhere in the briefing I know

21    there was mentioned that other members of the House had used

22    their social media and posted pictures, photos of themselves

23    with minors in -- at celebratory events involving minors.  And

24    I'm assuming that -- that not having permission, that those

25    requirements aren't generally applied to all members?  This --

 1    this censure is specific to this ethics rule and Ms. Libby's

 2    specific posting?

 3        MS. PATWARDHAN:  So -- so any censure is going to be

 4    specific to the conduct of the member at issue.  But I guess my

 5    response here is twofold.  Number one is that the House acts by

 6    motion of the body.  So if there is conduct that a member of

 7    the House feels violates the ethical code of conduct, they can

 8    bring forward a similar resolution, as the one that was brought

 9    forth here, in order to censure that member of the body.  That

10    motion, that resolution may fail, or it may succeed.  But this

11    is a process by which the members punish their own as a body.

12        And I think that matters because it's not a -- in a very

13    traditional sort of -- in the First Amendment context, the

14    First Amendment retaliation context, is that, you know,

15    typically the individual being retaliated against doesn't have

16    necessarily a vote in all of what is happening.  Right?  Or

17    doesn't have an ability to -- to -- to fight back.  For

18    example, in an employment context.  Right?  But this is a way

19    that the body self-polices itself through -- through a censure

20    or other similar resolution like this one.  And I'm going to

21    turn argument over to my cocounsel, Jonathan Bolton.

22        THE COURT:  Thank you.

23        MR. BOLTON:  Thank you, Your Honor.  I just want to

24    make a few -- few points here.  I think my colleague has -- has

25    laid out most of the important issues for consideration in this

```
 1    motion.  But I wanted to address -- I'm -- I'm addressing the

 2    Fourteenth Amendment, and I can address any questions Your

 3    Honor may have about the Guarantee Clause claim.

 4         And what I wanted to focus on for the Fourteenth Amendment

 5    was the point that -- that the plaintiffs make in their reply

 6    brief that -- suggesting that really the Fourteenth Amendment

 7    analysis should be a sort of one person, one vote type analysis

 8    like was done in the Reynolds v. Sims case.  And I really just

 9    fundamentally disagree that that -- those are the right cases

10    and that's the right analysis under which to conduct the

11    Fourteenth Amendment analysis.  And there are three reasons for

12    that.  One is that Reynolds v. Sims, in the cases that follow,

13    those are cases about how equal protection applies to the

14    drawing of legislative districts.  And they say basically that

15    when you draw legislative districts, they should have roughly

16    the same number of people in each one.  It's not -- they're not

17    cases about the scope of legislative punishments or what can be

18    imposed on legislators as punishments after they've been

19    elected to office.

20         And I think what's going on here is that the plaintiffs

21    are in some sense conflating the idea that voting in a pop --

22    popular election is equivalent to casting a vote on the floor

23    of the house.  And our contention is those are not the same

24    thing.  A vote on the floor of the House is one of many things

25    that a legislator can do to further their interest -- the
```

*ADD90*

```
 1   interest of their constituents.

 2        And I think my colleague pointed out, Representative Libby

 3   can serve in committee.  She can make motions.  She can sponsor

 4   legislation.  She can do all sorts of things that are part of

 5   her job, along with casting votes on the floor.  Whereas if

 6   you're a voter, the only action you can take in your role as a

 7   voter is to vote.  So they're really different -- they're

 8   categorically different, and I think those -- those cases are

 9   just not applicable.  And to say that, you know, Representative

10   Libby has been disenfranchise -- her constituents have been

11   disenfranchised I think is just not accurate because she is --

12        THE COURT:  Well, as a representative -- as a

13   representative democracy, when her 9,000 constituents elected

14   her certainly to be their voice and their vote in that body,

15   how is it that we're not in some way impinging on their right

16   to be heard on that floor?

17        MR. BOLTON:  Well, Your Honor, I think -- I think it's

18   probably accurate if you want to say that -- that, you know,

19   one of -- one of her privileges as a member of the legislature

20   has been stripped conditionally until she apologizes or certain

21   other things occur, which could be suspension of the rules or

22   until the legislative -- until this legislature ends.  So there

23   is -- there is some reduction in, you know, the -- the

24   privileges she has versus other members.  But that's not the

25   same thing as disenfranchisement under this case law.
```

**ADD91**

```
 1        And I think -- you know, I think what -- what -- the

 2   correct way to look at this is -- is the way the Second Circuit

 3   case Monserrate looked at this analysis, which is that -- and

 4   that was the same thing.  Right?  That member of the

 5   legislature was actually expelled.  So lost not just the right

 6   to vote but lost all of their legislative privileges.  And what

 7   the Second Circuit explained is the way you look at that is,

 8   you don't just say, well, one person, one vote, the

 9   constituents have been disenfranchised, constitutional

10   violation.  But you conduct, you know, the sliding scale

11   balancing test under the Anderson verdict framework.

12        So that I think -- so I think the idea that you would look

13   at these apportionment cases about drawing legislative

14   districts when, in fact, we have case law that is directly on

15   point that explains exactly how this analysis should work, I

16   think that's the case law that -- that -- that the Court should

17   focus on.  And that case law indicates that you can, in fact,

18   reduce a member's legislative privileges or you -- you can

19   create a sort of imbalance, to some degree, if there's a

20   sufficiently important government interest on the other side.

21        And here -- here there clearly is.  The House of

22   Representatives is protecting its reputation and integrity,

23   which is a governmental interest that the Second Circuit viewed

24   as an important interest.  I would argue it's a compelling

25   interest, but it's at least an important interest.  And so you
```

1    -- under the correct analysis, you balance that important if

2    not compelling government interest versus the limited and

3    conditional loss of privilege that occurs as a result of the

4    censure.

5         So we would -- I would just submit that that's the correct

6    way to analyze the -- if the Court were to reach on the

7    Fourteenth Amendment claims at all, which, of course, we're

8    arguing that it does not need to because of legislative

9    immunity.  But if it did, the Monserrate case we think is the

10   correct analysis.  And I think that analysis shows that this is

11   clearly a -- an exercise of legislative power that is

12   consistent with the Fourteenth Amendment.

13        And that -- that's the only point I wanted to make, Your

14   Honor.  I'm also -- again, if you have any questions either

15   about other Fourteenth Amendment issues or about the Guarantee

16   Clause, I'm happy to answer those.

17             THE COURT:  Those issues have been pretty well

18   briefed, so I appreciate that.

19        Attorney Strawbridge, did you want to be heard?

20             MR. STRAWBRIDGE:  Yes.  Let me just run through a few

21   things in rebuttal.  I shouldn't need ten minutes.  But

22   obviously interrupt me at any point if you think I've gone on

23   too long or you have additional questions.

24        But one thing I want to start, I don't think the content

25   of the post is that significant to the legal principles in this

1   case, but just to -- obviously my friends on other side seem to

2   think it is.  I just want to make a couple of comments so the

3   record is clear on this.

4       The post in and of itself was just reposting pictures and

5   factual information from a highly-publicized event, an athletic

6   competition.  There was no threat that was included in the

7   post.  And at no point has Representative Libby ever encouraged

8   anybody else to make threats.  The suggestion that this

9   actually endangered anybody is pure speculation.  There's no

10   evidence of that in the record.  And I don't think anybody

11   really -- really disputes that but for some other arguments on

12   justiciability and immunity, that that is a protected First

13   Amendment post.

14       With respect to their citation of some of the -- sort of

15   the ancient nature of the rule and what happened in

16   Massachusetts in 1806, I would note that that's not very

17   relevant for a claim that arises under the First Amendment post

18   incorporation or the Fourteenth Amendment, which was obviously

19   enacted in the late 19th Century.  I think the actual history

20   of attempts to suspend members and prevent them voting is

21   extremely thin, particularly post those events.

22       And, indeed, the two examples they have, which is a -- a

23   dispute in the U.S. Senate and a Wisconsin legislative dispute,

24   our research indicates were both hotly contested at the time as

25   to whether there was authority to impose those punishments.  It

*ADD94*

1    never came to litigation.  In fact, I think both punishments

2    were -- were either resolved or voting rights were restored

3    very, very quickly, in a matter of days in those cases.

4        Bond was a First Amendment case.  And it specifically

5    rejects the statement that my friend on the other side made

6    that it's permissible for the legislature to hold legislators

7    to higher standard than private citizens with respect to

8    retaliating them from speech.  It could not be more clear on

9    that point.  It's not a qualification case.  It's a First

10   Amendment retaliation case.

11       As for Powell, Powell involved and specifically said that

12   immunity was no obstacle because the non-legislators who are

13   enforcing the legislative direction were attached as defendants

14   and could provide relief.  And that's precisely the situation

15   you have here with the clerk.  If you have any concerns about

16   enjoining or issuing an order to the speaker of the house,

17   themself, the clerk is here and available for relief.  That's

18   consistent with Kilbourn as well.

19       The voting -- the right protected in Reynolds v. Sims is

20   absolutely a right to effective representation.  It was decided

21   in the context of redistricting.  But the entire point of what

22   the Reynolds v. Sims and the Baker rule require is that people

23   have roughly proportionate representation in their legislative

24   bodies.  No rule, just because it was a rule, that suspended

25   the members of the ten smallest districts would survive

**ADD95**

1   scrutiny under the Fourteenth Amendment.  I think it's fanciful

2   to suggest otherwise.

3       I also remain stunned at the minimization of the core

4   legislative right here, which is the right to cast a vote, the

5   right to have your representative cast a vote and participate

6   in floor debate.  Nobody would say that -- that they're

7   significant -- a significant portion of the judicial role is

8   hiring law clerks or serving on the administrative office of

9   the court committees or going to investiture ceremonies, even

10  though those are incidental and perhaps important and enjoyable

11  aspects of being a judge, the core aspect of being a judge is

12  hearing and deciding cases.  The core aspect of being a

13  legislator or having representation in the state legislature is

14  having your representative vote and having your representative

15  speak on the floor and debate to try to persuade others to

16  vote.  We are absolutely in the heart of the -- of the right

17  here.  And I don't think it saves the unconstitutional nature

18  of this action merely because she can still hire staff or

19  receive a discount on stamps.

20      Monserrate is a case that helps us; it does not help them.

21  Monserrate quite clearly says two points.  One, it was

22  expulsion and so the Fourteenth Amendment problem was

23  necessarily temporary in nature because there was going to be a

24  special election called and the constituents were going to have

25  representation in a matter of weeks.  And of course, the entire

```
 1    problem with the approach that's been taken here is rather than
 2    invoke expulsion and ensure that both Representative Libby
 3    could run for reelection and not risk repunishment and that the
 4    represent -- the people who live in District 90 could obtain
 5    representation in relatively short order through a special
 6    election, they have invoked this rule by simple majority vote
 7    instead of two-thirds majority vote, and now purport to apply
 8    it for the rest of the entire legislative term.  And, again,
 9    nothing you heard today suggested it wouldn't be invoked and
10    reapplied in the next legislative term.  That is an incredible
11    expansion of the asserted power, and the idea that there's no
12    remedy for it I think is just inconsistent with Kilbourn and --
13          THE COURT:  You're not suggesting, again, that -- that
14    the defendants in this case acted outside the scope of the
15    legislative authority that they've been given?  They followed
16    their own rule.
17          MR. STRAWBRIDGE:  Well, I -- I disagree that -- they
18    invoked the rule; but I disagree that the rule can trump the
19    constitution, I suppose.  Like, it's necessarily outside the
20    scope of their enumerated powers if they're violating the First
21    Amendment or if they're violating the Fourteenth Amendment.  In
22    the same way that it would be outside -- it would be a
23    Fourteenth Amendment violation if they had a rule that said,
24    we're not going to count the votes of the 15 smallest districts
25    that are represented in the Maine House of Representatives.
```

*ADD97*

1    That may well be pursuant to a rule, but it would not be

2    constitutional, and we do not think that they have authority to

3    do that.  We think the Court has authority to address it.

4        There was a brief allusion to the apology that hasn't

5    gotten a lot of play in the argument today, nor should it.  The

6    First Amendment does not allow one to compel speech or to

7    require somebody to adopt a particular point of view.  That is

8    a fixed point in our constitutional constellation, to borrow

9    Justice Jackson's phrase from <u>West Virginia v. Barnette</u>, and so

10    I don't think that can be the answer.

11        And then I -- my closing point here, unless Your Honor has

12    other questions, is that I think my friends on the other side

13    give away the game when having announced their view that all

14    that matters is the character of the act, and all that matters

15    is -- is the fact that it's pursuant to a legislative rule, but

16    racial discrimination would be different.  I think that they

17    say that because they -- they sense that it can't simply be

18    true that you could invoke racial discriminatory basis and it

19    somehow survives scrutiny under the Fourteenth Amendment and

20    notwithstanding the existence of legislative immunity.  What I

21    don't hear, and what I don't think they could provide, is a

22    reasoned principle basis as to why that particular aspect of

23    the Fourteenth Amendment is more important than the First

24    Amendment or why it's more important than the Fourteenth

25    Amendment right to representation in the legislature.

**ADD98**

1        This case is a massive extension of any prior attempt to

2   censure somebody.  The closest authority, by far, is <u>Bond</u> and

3   <u>Powell</u>.  And that's why we ask that this Court enter an order

4   preliminarily enjoining at least the clerk from denying her the

5   ability to vote.  We also think we're entitled to a rule

6   allowing her to speak on the floor of the House.

7        Unless Your Honor has other questions, that is our

8   position.

9        THE COURT:  Thank you.  Like I said, this matter has

10  been well-briefed, and I appreciate the parties being very

11  thoughtful in those presentations.  And the Court will take

12  this under advisement.

13       I understand that this is a sensitive issue, that there is

14  high interest in this issue.  I'm going to take all of this

15  material and come back with a -- with a thoughtful decision.

16       If there is anything else from the clerk's position that

17  we need to do, Maggie?

18       THE CLERK:  All set, Judge.  Thank you.

19       THE COURT:  Thank you, folks.

20       MR. STRAWBRIDGE:  Your Honor, can I just raise one

21  other point that was alluded to?  And it's not -- not a

22  rebuttal.  I just wanted to highlight a housekeeping matter as

23  Your Honor decides this.  And we appreciate your attention and

24  your willingness to decide it quickly.

25       There may well be further proceedings in this case, no

1   matter who wins or loses, as I think Your Honor can probably
2   anticipate.  And one of the issues will be addressing a stay or
3   an injunction pending appeal.  I do think that all the other
4   factors for injunctive relief weigh in our favor, but I also
5   assume that the Court's view of the merits will probably
6   dictate what it's going to do with respect to the preliminary
7   injunction.  And we would just appreciate it if the Court can
8   address the question of a stay or injunction pending appeal or
9   arrange for the parties to address that in very short order so
10  there's no further delay in our ability to get a final answer,
11  if necessary.
12      I'd be more than happy to be surprised that no further
13  appellate proceedings are necessary, of course, but I think no
14  matter who wins or loses, it's at least a possibility.
15              THE COURT:  Point taken.  Thank you.
16              MR. STRAWBRIDGE:  Thank you.
17              THE COURT:  And I believe we're adjourned.
18              THE CLERK:  Great.  I will end the meeting.
19              THE COURT:  Thank you.
20                  (Time noted:  12:54 p.m.)
21
22
23
24
25

**ADD100**

1                          * * * * *

2                    **C E R T I F I C A T I O N**

3          I, Michelle R. Feliccitti, Registered Professional

4    Reporter and Official Court Reporter for the United States

5    District Court, District of Maine, certify that the foregoing

6    is a correct transcript from the record of proceedings in the

7    above-entitled matter.

8    Dated:  April 8, 2025

9                    /s/ Michelle R. Feliccitti

10                   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

LAUREL D. LIBBY, State Representative of
Maine House District 90, RONALD P.
LEBEL, WENDY MUNSELL, JASON
LEVESQUE, BERNICE FRASER, RENE
FRASER, and DONALD DUBUC,

Plaintiffs,

v.

RYAN M. FECTEAU, in his official capacity
as Speaker of the Maine House of
Representatives, and ROBERT B. HUNT, in
his official capacity as Clerk of the House,

Defendants.

Civil Action No. _____

**VERIFIED COMPLAINT**

INJUNCTIVE RELIEF SOUGHT

## INTRODUCTION

1.      Along a strict party-line vote, led by the Speaker of the Maine House of
Representatives, the House unconstitutionally stripped a duly elected Republican member of her right
to speak and vote on the House floor—disenfranchising the 9,000 Mainers in her district—in
retaliation for protected speech on a highly important and hotly debated matter of public concern.

2.      Rep. Laurel Libby (R-Auburn) represents Maine's House District 90. A mother of five,
including three girls, Rep. Libby has a been a staunch advocate of protecting the rights of Maine girls
in athletics. She is an outspoken critic of Maine's state policy allowing boys who identify as transgender
to compete in girls' sports.

3.      Rep. Libby recently posted on social media to call attention to the Maine high school
girls indoor track and field state championship. A Greely High School student who competed as a boy
last year but now identifies as transgender took first place in girls' pole vault. That first-place finish
propelled the Greely girls' team to win the team girls track and field state championship by a single

1

*ADD102*

point. The championship was a public event, was streamed online, and the names, schools, and photographs of the winners were all posted publicly.

4.       Rep. Libby's social media posts went viral, garnering national media attention and placing Maine's policy under the microscope. Rep. Libby made several appearances on national television and radio broadcasts to bring further attention to the issue. The posts even captured the attention of the White House, prompting President Donald Trump to threaten Maine's allocation of federal education funding in a highly publicized exchange with Maine Governor Janet Mills. Three federal agencies have launched investigations into the Maine Department of Education and its compliance with Title IX's prohibition on sex-based discrimination in federally funded education programs.

5.       Nothing is particularly surprising about this reaction; strong majorities of Americans oppose allowing boys to compete in girls' sports. The obvious physical advantage of boys on average allows them to jump higher, run faster, and throw harder than girls. Indeed, permitting boys to compete against girls can present a serious threat to girls' physical safety. It also severely distorts the fairness of the competition.

6.       The Maine Democrat-controlled House took swift retaliatory action against Rep. Libby for shining a light on the State's controversial policy. By a party-line vote of 75-70, the House passed a resolution censuring Rep. Libby, declaring her posts to be "reprehensible," unethical, and "incompatible with her duty and responsibilities as a Member of th[e] House." The censure resolution provides that Rep. Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." When Rep. Libby refused to apologize, the House Speaker prohibited her from speaking or voting on the House floor.

7.       Whatever one thinks of males who identify as transgender competing in girls' and women's sports, the issue and Maine's policy is of public importance and subject to ongoing debate.

As Governor Mills recently put it: "If [lawmakers] wish to change [Maine's policy], they have the authority to change it." "**It's worthy of a debate, a full, democratic debate.**"[1] But the House is actively barring one of its staunchest advocates on the issue from participating as a full member of the House. Just last week, a representative introduced a bill that would reverse Maine's policy. Yet Rep. Libby is barred from speaking or voting on that proposed legislation—or any other issue, large or small, that may come before the House for the rest of her elected term.

8.     While legislatures have authority to discipline their members, stripping them of their voting rights is another matter. The U.S. House of Representatives, for example, believes it violates the Constitution to deprive sitting members of their right to vote. And the reason why is illustrated here: the Speaker's actions have effectively disenfranchised Rep. Libby and her 9,000 constituents in House District 90, some of whom are plaintiffs here.

9.     The heavy-handed, partisan actions violate the First Amendment and the Equal Protection, Due Process, and Guarantee Clauses of the U.S. Constitution. This Court should grant injunctive relief and protect Rep. Libby's constituents' representation in the House.

## PARTIES

10.     Plaintiff Laurel D. Libby is a duly elected representative of the 132nd Maine Legislature. Rep. Libby represents Maine House District 90, composed of parts of the City of Auburn and the Town of Minot. She is currently serving her third term as a state representative. Rep. Libby meets all the state constitutional requirements to serve in the Maine House: she is over the age of 21, she has been a U.S. citizen for over five years, she has resided in Maine and House District 90 for more than one year, and she continues to reside in House District 90. *See* Me. Const. Me. Const. Art. IV, Pt. 1, §4.

---

[1] Michael Shepherd, *Janet Mills says Maine's transgender athlete policies are 'worthy of a debate,'* Bangor Daily News (Mar. 3, 2025), https://perma.cc/6L9Y-PV6B (emphasis added).

3
*ADD104*

11.     Plaintiff Ronald P. Lebel is a resident of Auburn, Maine. He resides in Maine House District 90. Lebel voted in the 2024 state legislative election.

12.     Plaintiff Wendy Munsell is a resident of Auburn, Maine. She resides in Maine House District 90. Munsell voted in the 2024 state legislative election.

13.     Plaintiff Jason Levesque is a resident of Auburn, Maine. He resides in Maine House District 90. Levesque voted in the 2024 state legislative election.

14.     Plaintiff Bernice Fraser is a resident of Minot, Maine. She resides in Maine House District 90. Fraser voted in the 2024 state legislative election.

15.     Plaintiff Rene Fraser is a resident of Minot, Maine. He resides in Maine House District 90. Fraser voted in the 2024 state legislative election.

16.     Plaintiff Donald Duboc is a resident of Minot, Maine. He resides in Maine House District 90. Duboc voted in the 2024 state legislative election.

17.     Defendant Ryan M. Fecteau (D-Biddeford) is Speaker of the Maine House of Representatives. He is a resident of this district for purposes of this action because he performs his official duties here. He is sued in his official capacity only.

18.     Defendant Robert B. Hunt is the clerk of the House. He is a resident of this district for purposes of this action because he performs his official duties here. He is sued in his official capacity only.

## JURISDICTION AND VENUE

19.     The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343 because this action arises under the Constitution and laws of the United States.

20.     The Court has authority under 28 U.S.C. §§2201 and 2202 to issue the relief sought.

21.     Venue lies in this district under 28 U.S.C. §1391(b)(1) and (2).

## STATEMENT OF FACTS

***Males Who Identify as Transgender Competing in Female Sports Is a Hotly Debated Issue That Has Prompted Responses by States and the Federal Government***

22.     The issue of males who identify as transgender competing in female sports has been at the forefront of public debate for the past several years.

23.     Americans have grown increasingly against males participating in female sports in recent years. A January 2018 PRRI survey found that 43% of Americans were opposed to allowing male students who identify as transgender to compete against female classmates. Daniel Cox et al., *Americans Differ on Participation of Male, Female Transgender Students in Team Sports*, PRRI (Jan. 25, 2018), https://perma.cc/SJQ5-A7Y2. A June 2022 NPR/Ipsos poll found that 63% of Americans were opposed to allowing males who identify as transgender to compete on sports teams that align with their gender identity. Melissa Block, *Americans are deeply divided on transgender rights, a poll shows*, NPR (June 29, 2022), https://perma.cc/4WGF-XV8S. A May 2023 Gallup poll found that 69% of Americans said transgender athletes should only be allowed to compete on sports teams that "conform with their birth gender," up from 62% in 2021. Jeffrey M. Jones, *More Say Birth Gender Should Dictate Sports Participation*, Gallup (June 12, 2023), https://perma.cc/ZYS4-QN37. And a January 2025 New York Times/Ipsos poll found that 79% of Americans, including 67% of people who identify as Democrats or leaning Democrat, believe biological males who identify as women should not be allowed to participate in women's sports. Jackson Thompson, *NYT poll finds majority of Democrats oppose transgender athletes in women's sports*, Fox News (Jan. 18, 2025), https://perma.cc/TVD3-MGJY.

24.     Many who oppose boys and men competing in girls' and women's sports recognize the obvious, inherent physical advantages males have over females, which can present a serious risk to girls' and women's safety. In 2014, a transgender MMA fighter Fallon Fox brutally defeated her female opponent Tamikka Brents in just two minutes, leaving Brents with a concussion, a fractured orbital bone inside her skull, and seven staples in her head. Bhavesh Purohit, *When transgender fighter*

*ADD106*

*Fallon Fox broke her opponent's skull in MMA fight*, Sportskeeda (Sept. 30, 2021), https://bit.ly/4i8k2Ey. In 2022, North Carolina volleyball player Payton McNabb suffered serious injury after a transgender-identified male player spiked a ball at her head, rendering her unconscious and causing her partial paralysis. Ashley McClure, *After a Male Caused Her Partial Paralysis, Female Volleyball Player Payton McNabb Now Fights to Protect Women's Sports*, Indep. Women's Forum, https://perma.cc/CX43-9WZG. In 2023, a Massachusetts female high school field hockey player was hospitalized for significant facial injuries, including loss of teeth, after being hit in the face by a ball struck by a male opponent. *Massachusetts school calls for change after female field hockey player hurt by boy's shot*, CBS News (Nov. 6, 2023), https://perma.cc/CLJ4-TUB7.

25.     Scrutiny of the issue and public debate has led to action in state legislatures across the country. Since 2020, more than half the States have prohibited transgender individuals from participating in interscholastic athletics consistent with their gender identity. Movement Advancement Project, *LGBTQ Youth: Bans on Transgender Youth Participation in Sports* (2025), https://perma.cc/C69P-2CNS.

26.     Maine went in the opposite direction. In 2021, the Maine Legislature passed and Governor Mills signed LD1688 into law. *See generally* P.L. 2021, Ch. 366. The bill enshrined protections across Maine law for "gender identity," defined as "the gender-related identity, appearance, mannerisms or other gender-related characteristics of an individual, regardless of the individual's assigned sex at birth." 5 MRS §4553(5-C).

27.     Maine law "recognize[s] and declare[s] to be a civil right" the "opportunity for an individual at an educational institution to participate in all educational … and all extracurricular activities without discrimination because of … gender identity." *Id.* §4601. Maine law makes it "unlawful educational discrimination" to "[e]xclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research,

6

*ADD107*

occupational training or other program or activity" or "[d]eny a person equal opportunity in athletic programs" based on "gender identity." *Id.* §4602(1)(A)-(B).

28.     Transgender sports were at the forefront of the 2024 presidential election. The *Wall Street Journal* identified it as a "2024 sleeper issue." Editorial Board, Opinion, *Transgender Sports Is a 2024 Sleeper Issue*, Wall St. J. (Oct. 13, 2024), https://perma.cc/25Z6-HF95. President Trump campaigned aggressively to "keep men out of women's sports." *Trump: 'We will of course keep men out of women's sports,'* Wash. Post. (Nov. 3, 2024), https://bit.ly/41n2mxC. That platform resonated with voters. *E.g.*, Rob Harris, *Donald Trump's trans athletes rhetoric resonated with voters concerned about sporting fairness*, Sky News (Feb. 6, 2025), https://bit.ly/4h4EXH5. A national exit poll found that 70% of voters saw President Trump's opposition to boys in girls' sports (and bathrooms) as important to them. Macy Petty, *New Exit Polls Confirm the Surprising Key Issue in the 2024 Election*, Concerned Women Am. (Nov. 18, 2024), https://perma.cc/35XV-WSUF.

29.     Shortly after taking office, President Trump signed an executive order to rescind federal funds from educational programs that permit males who identify as transgender to compete against females. Exec. Order No. 14,201, 90 Fed. Reg. 9,279 (2025). The executive order drew praise from countless female athletes and parents.

*ADD108*



*Trump signs executive order banning transgender athletes from women's sports*, ABC News (Feb. 5, 2025), https://bit.ly/4bHj3sB.

30.     The next day, the NCAA banned transgender athletes from competing in women's sporting competitions. Kiara Alfonseca, *NCAA changes transgender participation policy in response to executive order*, ABC News (Feb. 6, 2025), https://perma.cc/P6S9-CLUA. But several state-level associations signaled they would continue to follow state law. Steve Karnowski, *For high school sports, decisions loom: Follow Trump or state law on transgender athletes*, AP (Feb. 7, 2025), https://bit.ly/4i5LClQ. The Maine Principal's Association said it would continue to allow boys who identify as transgender to compete in girls' sports, notwithstanding President Trump's executive order. Patty Wright, *Transgender female athletes can still compete under state law, Maine sports governing body says*, Me. Pub. (Feb. 7, 2025), https://perma.cc/5RAN-8MWH.

***Rep. Libby's Public Advocacy and the Federal Government's Response***

31.     On February 17, 2025, Rep. Libby posted on Facebook about a high school student who won the Maine girls class B pole vault state championship. *See* Representative Laurel Libby,

Facebook (Feb. 17, 2025), https://perma.cc/CL35-A558. Libby observed that the student previously "was competing in boy's pole vault" and "had [a] fifth place finish." *Id.* "So all of this transpired in the last year, with the full blessing of the Maine Principals' Association." *Id.* The post showed the athlete on the boys' medal podium side-by-side with the athlete on the girls' podium this year.



*Id.* Rep. Libby also posted about the matter on X (formerly Twitter). *See, e.g.*, @laurel_libby, X (Feb. 18, 2025, 5:45 PM), https://perma.cc/UB86-PHJD.

32.     The state championship results were publicly reported online with students' full names, schools, and photos. *See Class B State Meet 2025: Girls Pole Vault Finals*, MaineTrackXC, https://perma.cc/22SA-T99Q.

33.     Coverage of the event and photographs of the first-place winner and other participants are publicly accessibly on the internet and social media. *See, e.g.*, Dan Zaksheske, *Trans-Identifying Male Athlete Wins Maine State Title In Girls' Pole-Vaulting*, OutKick (Feb. 19, 2025), https://bit.ly/3F23GOR (identifying student's current and prior names and school); Hudson Crozier, *Male Athlete Sweeps Women's Event Days After State Refused To Enforce Trump's Rule*, Daily Caller (Feb. 18, 2025), https://perma.cc/P6ZM-3V5N (same and noting with hyperlinks that "[p]hotos posted online and media coverage of the event confirm [the male student's] identity"); @bourne_beth2345, X (Feb. 18, 2025, 12:50 PM), https://perma.cc/7JNV-6N6Z (identifying student by name with photo of student on the medal podium); @icons_women, X (Feb. 18, 2025, 1:32 AM), https://perma.cc/QH67-5QWG (identifying student by name with photo of student holding "STATE CHAMPS" poster and the caption "[Name] with 1st in pole vault!!"); @mainerunningphotos, flickr (Feb. 17, 2025), https://perma.cc/XJ3G-RMNC (photo of student pole vaulting identified by name); @mainerunningphotos, flickr (Feb. 17, 2025), https://perma.cc/2FG2-BJXA (photo of student pole vaulting); @mainerunningphotos, flickr (Feb. 17, 2025), https://perma.cc/63VS-F2VX (same).

34.     The male student's first-place pole vault finish propelled the Greely High School's girls' team to win the overall state championship. The school edged out runner-up Freeport—whose two pole vaulters finished tied for second—by a one-point margin. Derek Veilleux, *Greely Edges Freeport By 1 Point to Win Class B Girls Title*, MaineTrackXC (Feb. 21, 2025), https://perma.cc/TU6F-Q426 (including team photo with pole vaulter and results). The male student's victory won Greely the overall class B indoor track and field state championship.

35.     Rep. Libby's social media posts about the girls' state championship went viral. Her initial Facebook post generated over 100,000 reactions, 60,000 comments, and 18,000 shares. Her initial X post generated over 686,000 views. As one media outlet reported, "Maine state lawmaker Laurel Libby drew attention to the controversy." Amanda Prestigiacomo, *Boy Wins Girls' Pole Vault Championship In Maine Days After State Pledged To Defy Trump Order*, DailyWire (Feb. 18, 2025), https://perma.cc/H7BY-H2KY.

36.     Over the next few days, Rep. Libby appeared on several national television and radio broadcasts and continued to post on social media, highlighting and criticizing Maine's policy permitting boys who identify as transgender to compete in girls' sports and the "Maine Democrat Majority" and calling on the federal government to act, consistent with President Trump's executive order. *E.g.*, @laurel_libby, X (Feb. 19, 2025, 10:23 PM), https://perma.cc/AKT2-ZTEY ("Honored to serve as the voice for our girls in this fight—they deserve so much better leadership than what the Maine Democrat Majority is offering!"); Representative Laurel Libby, Facebook (Feb. 19, 2025), https://bit.ly/3D5c2oB ("Maine's Democrat Majority is openly defying President Trump's Executive Order designed to keep biological males out of girls' sports. … [O]ur girls deserve better.").

37.     On February 20, three days after Rep. Libby's initial post, President Trump during public remarks called out Maine for its transgender sports policy and threatened to withhold federal funding. Fredrick Placey, *Trump threatens to withhold federal money over transgender students*, WMTV (Feb. 20, 2025), https://perma.cc/SJ8Y-G9RZ. Rep. Libby shared President Trump's remarks on social media and commented, "President Trump pledges to step in to protect girls' sports in Maine and clean up the failure by both the Maine Principals' Association and the Maine Democrat Majority!" Representative Laurel Libby, Facebook (Feb. 20, 2025), https://bit.ly/4bvtL55. Another post stated, "With $280M+ per year on the line in federal funding, this shouldn't be a hard choice for Maine

Democrats. It's time to restore girls' sports and protect the funding for our schools." @laurel_libby, X (Feb. 21, 2025, 12:34 PM), https://perma.cc/S9SM-2F6V.

38.     The next day, during a governors' event at the White House, President Trump called out Governor Mills over Maine's transgender sports policy in a tense exchange. Trump asked, "I understand Maine—is Maine here, the governor of Maine?" "I'm here," Mills replied. "Are you not going to comply with it?" Trump asked. Mills answered, "I'm complying with state and federal laws." "Well, we are the federal law," Trump said. "You better do it. You better do it, because you're not going to get any federal funding at all if you don't. And by the way your population … doesn't want men playing in women's sports. So you better comply," Trump continued. Mills then replied, "See you in court." Trump concluded the exchange, "Good, I'll see you in court. I look forward to that. That should be a real easy one. And enjoy your life after governor, because I don't think you'll be in elected politics." Lexie Schapitl, *'See you in court': Trump and Maine's governor spar over trans athlete order*, NPR (Feb. 21, 2025), https://bit.ly/4i4Olfa. The heated exchange made endless headlines.

39.     President Trump again called out Governor Mills the next day during his remarks at the Conservative Political Action Conference. "You saw Maine yesterday, right? The governor of Maine," Trump said, eliciting boos from the audience. "She's fighting to keep men in women's sports. … Let her do that fight. Let them all do that fight, because I think that's about a 90/10 issue, and I can't figure out who the 10% are." @TheMaineWire, X (Feb. 22, 2025, 3:15 PM), https://bit.ly/3Xt76k2.

40.     Federal agencies have since announced investigations into Maine's policy. The U.S. Department of Education's Office of Civil Rights launched a self-initiated probe into the Maine Department of Education and Maine the Maine School Administrative District #51, which has jurisdiction over Greely High School, for potentially violating Title IX, which bars sex-based discrimination in federally funded education programs. Press Release, U.S. Dep't of Educ., *Office for*

*Civil Rights Launches Title IX Violation Investigations into Maine Department of Education and Maine School District* (Feb. 21, 2025), https://perma.cc/9QYG-YYRT. The U.S. Department of Health and Human Services' Office of Civil Rights likewise initiated a Title IX compliance review of the Maine Department of Education, including the University of Maine System. Press Release, U.S. Dep't Health & Hum. Servs., *HHS' Civil Rights Office Acts to Keep Men out of Women's Sports* (Feb. 21, 2025), https://perma.cc/WXM4-HGEW. The United States Department of Agriculture also initiated a compliance review of the University of Maine. Press Release, U.S. Dep't of Agric., *USDA Launces Compliance Review of University of Maine for Title IX Violations* (Feb. 22, 2025), https://perma.cc/5QLJ-MDN4.

41.     U.S. Attorney General Pam Bondi also sent Governor Mills a letter, putting Maine "on notice" that "if these or other federal investigations show that the relevant Maine entities are indeed denying girls an equal opportunity to participate in sports and athletic events by requiring them to compete against boys, the Department of Justice stands ready to take all appropriate action to enforce federal law." Letter from Pam Bondi, U.S. Att'y Gen., to Janet Mills, Governor of Maine (Feb. 25, 2025), https://perma.cc/8HJM-77GV.

### *The Maine House Retaliates Against Rep. Libby*

42.     After Rep. Libby's advocacy went viral, Maine House Speaker Ryan Fecteau (D-Biddeford) asked Rep. Libby to take down her initial Facebook post. Rep. Libby refused.

43.     Speaker Fecteau then publicly responded to Rep. Libby by urging Mainers to "reject hateful rhetoric from divisive politicians." "All kids, including transgender students, deserve better than to be used as political fodder for internet bullies." Speaking to transgender students, he added, "I see you and I stand with you." "You deserve to be your true self at home, at school and when participating in sports." Susan Cover, *Mainers should 'reject hateful rhetoric,' Maine House speaker says in*

13
*ADD114*

*response to GOP post opposing transgender student participation in sports*, Spectrum News (Feb. 20, 2025), https://perma.cc/JL3C-EDEN.

44.     The next day, Speaker Fecteau penned an op-ed in the *Bangor Daily News*, framing Rep. Libby's social media activity as an issue of "privacy of Maine kids" that can "be downright dangerous for the young person involved" and "impact their health and their safety, at school, and in their communities." He added, "Kids shouldn't have to worry about a politician sharing images of them online without their consent." He pledged "to stand up to elected officials who violate the privacy of youth for cheap political stunts." Ryan Fecteau, Opinion, *Maine kids should never be political fodder for internet bullying*, Bangor Daily News (Feb. 21, 2025), https://perma.cc/KD4Y-E7KZ.

45.     As explained, the student's name, school, and image were widely disseminated online, separate from Rep. Libby's initial post. *Supra* ¶¶32-33.

46.     Indeed, the photos Rep. Libby posted were taken at a public forum on the victory podium at state track meets. The entire point of the victory podium is to publicize the winner of the event.

47.     Moreover, the photos themselves make the very point that Governor Mills concedes is "worthy" of a "full, democratic debate." They illustrate that the winner had an obvious physical advantage in terms of height and development over the female competitors in the pole vault.

48.     The complaint that Rep. Libby's speech somehow threatened child safety is irreconcilable with the fact that her speech addresses what occurred at a public competition with publicly available photos already on the internet. There is nothing illegal or threatening about Rep. Libby's posts, and at no point has she enabled or encouraged any attacks on any individual student. Instead, she has focused on the state government's unfair policy and the rights of girls to compete fairly and safely in high school athletics.

49.     Rep. Libby kept the pressure on Maine Democrats on social media: "The people of Maine (especially our girls) deserve so much better than the 'leadership' that @GovJanetMills and the Maine Democrat Majority are currently offering." @laurel_libby, X (Feb. 23, 2025), https://bit.ly/41vkCEY. "@GovJanetMills and Maine's Democrat Majority are knowingly and willingly allowing the erasure of Maine girls, by continuing to allow biological males to compete in (and dominate) girls' sports." @laurel_libby, X (Feb. 24, 2025), https://perma.cc/Z35L-ARGD.

50.     On February 25, 2025, Maine's Democrat-controlled House passed a resolution along strict party lines (75-70) censuring Libby for her initial Facebook post with the photos of the transgender student on the medal podium. H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025), https://perma.cc/JU85-VNTS (Resolution). The resolution provides that Rep. Libby "posted a statement criticizing the participation of transgender students in high school sports"; the "post has received national attention that she has amplified by appearing on national television and radio broadcasts to discuss"; and the "post named the minor and used photos of the minor without that minor's consent, in an effort to advance her political agenda." *Id.* The resolution found Rep. Libby's conduct "to be reprehensible and in direct violation of our code of ethics," which requires legislators to "be ever mindful of the ordinary citizen who might otherwise be unrepresented" and "endeavor conscientiously to pursue the highest standards of legislative conduct inside and outside of the State House." *Id.* It further found that Rep. Libby "conducted herself in a manner incompatible with her duty and responsibilities as a Member of this House and the public trust and high standards incumbent in that office." *Id.* The resolution provides that Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine" and "must comport herself in a manner that pursues the highest standards of legislative conduct." *Id.*

51.     In introducing the resolution, Majority Leader Rep. Matt Moonen (D-Portland) accused Rep. Libby of "creat[ing] an intentionally inflammatory post on social media about a Maine

*ADD116*

high school athlete, who is a minor, at a recent track event." *Archived Hearings & Meetings: House Chamber* 5:57:35-6:01:06 PM, Me. Leg. (Feb. 25, 2025, 10:00 AM), https://bit.ly/43tBMp4 (Hearing). He emphasized that "[t]he post then went viral online and generated tens of thousands of comments," and then Rep. Libby "continued to bring national media attention" to the issue. *Id.* In other words, it was the favorable coverage Rep. Libby generated that was the problem.

52.     In response, Minority Leader Rep. Billy Bob Faulkingham (R-Winter Harbor) argued "the legislative code of ethics has no guidelines referring to online or social media posts" and "[t]he post in question does not even violate Facebook's community standards." *Id.* at 6:01:13-6:03:48 PM. He characterized the resolution as "a mockery of the censure process," "set[ting] a standard that says that the majority party, when they're displeased with a social media post that upsets them, can censure a member of the minority party and by a majority vote, censure them and, without them giving an apology, keep them out of the Legislature." *Id.* He observed none of the three prior censures in the history of the Maine Legislature targeted speech or conduct outside the statehouse. *Id.*

53.     Two of the three prior censures came last year, again by the Maine Democrat Majority against Republicans for disfavored speech. But all involved speech on the House floor, in the statehouse, or to other legislators, not a duly elected representative's speech on a matter of public concern directly to her constituents. The House censured two Republicans over statements on the House floor claiming that the 2023 Lewiston mass shooting was God's response to a recent abortion law that took effect the same day, which violated "the decorum of the House." H.R. Res. 1, 131st Leg., 2d Reg. Sess. (Me. 2024), https://perma.cc/8YC3-6RY3; H.R. Res. 2, 131st Leg., 2d Reg. Sess. (Me. 2024), https://perma.cc/S63W-3XJF; *see* Legis. Rec. H-1723-1724, 131st Leg., 2d Reg. Sess. (Me. 2024), https://perma.cc/BG6W-SVTU. The third prior censure came in 2001 when a male representative who "verbally abused a female Senator in the hallway outside of the chamber of the House," "followed her to the Senate offices where he continued to verbally abuse the Senator," and

16

*ADD117*

"verbally abused" "another female Senator [who] attempted to intervene." Legis. Rec. H-145-49, 120th Leg., 1st Reg. Sess. (Me. 2001), https://perma.cc/GL5C-FVY7.

54.    Rep. Jennifer L. Poirier (R-Skowhegan), who opposed the resolution, raised free-speech concerns and emphasized that the student's identifying information and image were publicly available on the internet before Rep. Libby ever posted on Facebook. *Id.* at 6:06:53-6:09:23. She observed that Rep. Libby would not have been censured had she posted the student's photograph and name with sentiments of congratulations. *Archived Hearings & Meetings: House Chamber*, *supra*, at 6:07:37-6:07:52.

55.    Rep. Poirier also requested clarification for other representatives "who may have reposted Representative Libby's social media post," asking whether they can "expect censures to come forth on them as well." *Id.* at 7:11:58-7:12:12. Speaker Fecteau responded, "I'm not aware of any other censures." *Id.*

56.    Members repeatedly interrupted Rep. Libby as she attempted to speak on the House floor in defense of herself and her post. *Id.* at 6:15:45-6:21:36. Rep. Libby emphasized that the track and field state championship "was a public event" and the male student's "photos are posted publicly on multiple websites." *Id.* at 6:27:27-6:28:15. She explained that "folks are upset about this post" because it "exposed truth" that "there are boys participating in girls' sports" and "taking the place of girls." *Id.* at 6:28:17-6:30:00.

57.    After the House passed the censure resolution, Speaker Fecteau summoned Rep. Libby to the well of the chamber, lectured her on the House's ethics standards, and offered her an opportunity to apologize. Rep. Libby declined. Speaker Fecteau then found Rep. Libby in violation of House Rule 401(11). *Id.* at 7:08:20-7:11:15.

58.     Under Rule 401(11), a member who "is guilty of a breach of any of the rules and orders of the House … may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction." H.R. Rule 401(11), 132nd Leg. (Me.).

59.     The censure of Rep. Libby thus deprives her of the ability to speak or vote on the House floor on behalf of her 9,000 constituents in House District 90.

60.     The censure served no legitimate legislative purpose. The censure of Libby concerned speech that occurred *outside the statehouse* to her constituents on social media. *See* Nat'l Conf. of State Legis., *Mason's Manual of Legislative Procedure* §561(3) (2010) ("Whatever is spoken *in the house* is subject to the censure of the house." (emphasis added)). Thus, unlike the three prior censures in the nearly 200-year history of the Maine House, Libby's speech did not disrupt the order or decorum of the House. *Cf. id.* §123(4) (providing for censure under section titled "Use of Disorderly Words in Debate").

61.     Speaker Fecteau posted about the censure on Facebook: "Tonight the House held a vote to censure Representative Laurel Libby. Sharing images of kids online without their consent is a clear violation of the bond of trust and respect between citizens and their Legislators." Speaker Ryan Fecteau, Facebook (Feb. 25, 2025), https://perma.cc/9WXN-2SQK.

62.     Yet Speaker Fecteau is guilty of the very conduct he criticized and found worthy of censure. He has posted many photos of minors on Facebook to score political points. On information and belief, Speaker Fecteau did so without the minors' consent.



Speaker Ryan Fecteau, Facebook (Feb. 9, 2019), https://perma.cc/G956-KWKL.



Speaker Ryan Fecteau, Facebook (Jan. 18, 2020), https://perma.cc/SU2G-9VMA.



Speaker Ryan Fecteau, Facebook (Nov. 7, 2019), https://perma.cc/9FWD-56TC.



Speaker Ryan Fecteau, Facebook (Feb. 14, 2019), https://perma.cc/RPG4-KKMG.

*ADD120*

*Public Backlash*

63.    The censure of Rep. Libby drew swift condemnation in media across the country. *E.g.*, Carine Hajjar, Opinion, *A new low for free speech: Democrats strip voting rights from Maine state representative over post on trans athletes*, Bos. Globe (Feb. 28, 2025), https://perma.cc/9QVJ-8CLU; Editorial Board, Opinion, *Maine's Transgender Madness*, Wall St. J. (Feb. 28, 2025), https://perma.cc/PV8B-MTFQ.

64.    Congressmembers, national free-speech organizations, and other prominent figures criticized the censure and expressed support for Rep. Libby. *E.g.*, @tedcruz, X (Feb. 26, 2025, 1:09 AM), https://perma.cc/352E-7N42; @Speech_First, X (Feb. 26, 2025, 11:44 AM), https://perma.cc/4CN4-PXPQ; @Riley_Gaines_, X (Feb. 25, 2025, 8:03 PM), https://perma.cc/9FP7-Z397; @Liz_Wheeler, X (Feb. 25, 2025, 9:17 PM), https://perma.cc/LUT7-NGKL; *see also* Daniel Ortner, *Maine's censure of lawmaker for post about trans student-athlete is an attack on free speech*, FIRE (Mar. 7, 2025), https://perma.cc/3ZU4-DBLU.

65.    On March 1, the first day of women's history month, hundreds of Mainers descended on Augusta to march in protest of Maine's transgender sports policy, some holding signs in support of Rep. Libby. *See* Jacob Murphy, *Hundreds rally in Augusta to oppose Gov. Mills, transgender athletes in women's sports*, WMTW (Mar. 1, 2025), https://perma.cc/4MC7-2G7G; *'March Against Mills' Draws Large Protest to Augusta*, Me. Wire (Mar. 3, 2025), https://perma.cc/DW3L-RCGD; @TheMaineWire, X (Mar. 1, 2025, 11:11 AM), https://bit.ly/41Ip9oY.

66.    On March 3, 2025, in her first comments to reporters after her tense exchange with President Trump, Governor Mills refused to take a stance on Maine's transgender sports policy. "If [lawmakers] wish to change it, they have the authority to change it, but you don't change it by executive order or by wishing it differently," she said. "It's worthy of a debate, a full, democratic debate." Shepherd, *supra* note 1.

*Disenfranchisement of Rep. Libby's Constituents in House District 90*

67.    The House's censure excludes Rep. Libby from any further "democratic debate" over Maine's transgender sports policy. The day after Rep. Libby's censure, Rep. Liz Caruso (R-Caratunk) announced a bill to reverse Maine's transgender sports policy. *Maine Republican introduces bill to ban transgender athletes from girls' sports teams*, Spectrum News (Feb. 26, 2025), https://perma.cc/33LT-CJAL. Titled "An Act to Ensure Equity and Safety in Athletics, Restrooms, Changing Rooms and Housing at Elementary, Secondary and Postsecondary Schools," the bill would require "[i]nterscholastic or intramural athletic teams and sports … must be expressly designated … based on sex" and provides that "[a]thletic teams or sports designated as 'females,' 'women,' or 'girls' may not allow participation by students who are male." L.D. 868, 132nd Legis., 1st Reg. Sess. (Me. 2025), https://perma.cc/UVH3-XNGA. But because of the censure, Rep. Libby, one of the House's staunchest advocates on the issue, is barred from speaking on the floor or voting on the bill.

68.    In addition, on March 4, 2025, Rep. Reagan Paul (R-Winterport) presented a joint order and moved its passage for "the Joint Standing Committee on Education and Cultural Affairs shall report out, to the House, a bill that prohibits an educational institution in this State that receives state funds from being a member of or paying dues or fees to an organization that does not prohibit biological males from participating on teams in sports designated for 'girls' or 'females.'" H.P. 500, 132nd Legis., 1st Reg. Sess. (Me. 2025), https://perma.cc/H3TB-BRMM; *see Media Streaming: House Chamber* 11:45:29-11:51:56 AM, Me. Legis. (Mar. 4, 2025), https://bit.ly/3Dmgpvt (Rep. Paul: "This is not just about women's sports; it's about protecting fairness, reality, and the very foundation of competition. Truth isn't optional, and biology is not just an obstacle to be ignored, or dare I say pole-vaulted over."). Because of the censure, Rep. Libby and her constituents in House District 90 will be deprived of any voice or vote on any such bill.

69.     In addition to the above, the ongoing Maine legislative session features votes on numerous issues of public importance, including the State budget and the availability of funding for mental and other health services.

70.     Rep. Libby has sponsored or cosponsored resolutions proposing constitutional amendments concerning state elections and bills concerning Sunday closing laws, tobacco taxes, paid family and medical leave, public records requests, and consumer energy and electricity costs. The Defendants' unlawful actions deprive her of her ability to vote on these issues, should they come to the House.

## CLAIMS FOR RELIEF

### COUNT I
### Free Speech
### 42 U.S.C. §1983; U.S. Const. Amends. I, XIV
### Rep. Libby against Defendants

71.     Plaintiffs repeat and reallege each of their prior allegations.

72.     The Free Speech Clause of the First Amendment to the U.S. Constitution, applicable to the States through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

73.     "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up).

74.     Rep. Libby's social media posts about the Maine girls indoor track and field state championship and the intrusion of men and boys in women's and girls' sports is constitutionally protected speech on a matter of public concern.

75.     Barring Rep. Libby from speaking or voting on the House floor is a materially adverse action that prevents Rep. Libby from doing her job, interferes with her ability to adequately perform

*ADD123*

her elected duties, and denies her privileges of the office to which she was duly elected by the people of Maine.

76.     Rep. Libby was retaliated against because of her speech and would not have been censured but for her speech.

77.     The proffered reasons for censuring Rep. Libby—minor students' privacy and safety concerns—are false and a sham to cover the unlawful motive to retaliate against her because of her speech about men and boys who identify as transgender participating women's and girls' sports, her criticisms of Maine's transgender sports policy, and the national media attention she attracted.

78.     Rep. Libby has suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

## COUNT II
### Equal Protection
### 42 U.S.C. §1983; U.S. Const. Amend. XIV
### All Plaintiffs against Defendants

79.     Plaintiffs repeat and reallege each of their prior allegations.

80.     "[T]he right to vote—the wellspring of all rights in a democracy—is constitutionally protected." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001).

81.     The Constitution "protects the right of all qualified citizens to vote" in state elections, and the Equal Protection Clause requires that "all who participate in the election are to have an equal vote." *Reynolds v. Sims*, 377 U.S. 533, 554, 557-58 (1964).

82.     Equal protection applies to "the initial allocation of the franchise" and "the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam).

83.     Plaintiffs voted in the 2024 election for House District 90.

84.     Barring Rep. Libby from speaking or voting on the House floor dilutes Plaintiffs' 2024 election votes in violation of the Equal Protection Clause's "one person, one vote" principle.

85.     Barring Rep. Libby from speaking or voting on the House floor disenfranchises Plaintiffs and the 9,000 Mainers in House District 90.

86.     Barring Rep. Libby from speaking or voting on the House floor dilutes Plaintiffs' vote and disenfranchises them through "arbitrary and disparate treatment." *Bush*, 531 U.S. at 104-05.

87.     Plaintiffs have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

## COUNT III
### Due Process
### 42 U.S.C. §1983; U.S. Const. Amend. XIV
### All Plaintiffs against Defendants

88.     Plaintiffs repeat and reallege each of their prior allegations.

89.     "[T]he due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process." *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. Unit B Sept. 1981).

90.     Electors have a "right … to vote and to have their votes counted." *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994). Thus, "rejection of a ballot where the voter has been effectively deprived of the ability to cast a legal vote implicates federal due process concerns." *Id.* Due process is denied where "the election process itself reaches the point of patent and fundamental unfairness." *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978). Where "organic failures in a state or local election process threaten to work patent and fundamental unfairness, a colorable claim lies for a violation of substantive due process." *Bonas*, 265 F.3d at 74. A "total and complete disenfranchisement of the electorate as a whole is patently and fundamentally unfair" and thus "constitute[s] a violation of due process." *Id.* at 75. It necessarily follows that an ex post deprivation of representation in the Legislature works the same harm.

91.     Barring Rep. Libby from speaking or voting on the House floor excludes her from the office to which she was duly elected by the people of Maine's House District 90, even though she

satisfies the standing requirements for a person to serve as a member of the Maine House set forth in the Maine Constitution. *See* Me. Const. Art. IV, Pt. 1, §4; *cf. Powell v. McCormack*, 395 U.S. 486, 550 (1969).

92.     Barring Rep. Libby from speaking or voting on the House floor constitutes a de facto expulsion from the office to which she was duly elected by the people of Maine's House District 90 without "the concurrence of 2/3" members, as required by the Maine Constitution. Me. Const. Art. IV, Pt. 3, §4.

93.     Barring Rep. Libby from voting on the House floor deprives Plaintiffs and voters in House District 90 of their right to vote for a state representative.

94.     Canceling Rep. Libby's representative votes on the House floor in violation of the Maine Constitution's provisions for House membership violates due process.

95.     Plaintiffs have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

**COUNT IV**
**Republican Guarantee**
**42 U.S.C. §1983; U.S. Const. Art. IV, §4**
**All Plaintiffs against Defendants**

96.     Plaintiffs repeat and reallege each of their prior allegations.

97.     The U.S. Constitution "guarantee[s] to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4.

98.     "[T]he distinguishing feature of that form is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *Duncan v. McCall*, 139 U.S. 449, 461 (1891). "[W]hile the people are thus the source of political power, their governments, national and state, have been limited by written constitutions, and

25
*ADD126*

they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities." *Id.*

99.      "The Guarantee Clause is best understood as protecting basic rights of political participation within state governments." Erwin Chemerinsky, *Cases Under the Guarantee Clause Should Be Justiciable*, 65 U. Colo. L. Rev. 849, 867 (1994). "[T]he key features of a republican form of government are a right to vote and a right to political participation." *Id.* at 868.

100.      The Guarantee Clause "presupposes the continued existence of the states and … those means and instrumentalities which are the creation of their sovereign and reserved rights." *Printz v. United States*, 521 U.S. 898, 919 (1997).

101.      Barring Rep. Libby from speaking or voting on the House floor—stripping her of her most important responsibilities as an elected representative and denying her privileges of the office to which she was duly elected—deprives Plaintiffs of representation in the House and thus presents a real threat to the constitutionally guaranteed republican form of government.

102.      "A republican form of government can only be preserved by securing to its electors the right to select their [representatives] by ballot, for terms fixed in advance by the Legislature of the state." *Bd. of Elections for Franklin Cnty. v. State ex rel. Schneider*, 191 N.E. 115, 120 (Ohio 1934).

103.      Plaintiffs and the 9,000 Mainers of House District 90 elected Rep. Libby to a two-year term through 2026.

104.      Barring Rep. Libby from speaking or voting on the House floor deprives Plaintiffs of representation in the House, disenfranchises 9,000 Mainers in House District 90, and deprives them of their ability to elect their own representatives to exercise legislative power and pass laws.

105.      Barring Rep. Libby from speaking or voting on the House floor constitutes a de facto expulsion from the office to which she was duly elected by the people of Maine's House District 90

*ADD127*

without "the concurrence of 2/3" members, as required by the Maine Constitution. Me. Const. Art. IV, Pt. 3, §4.

106.    Barring Rep. Libby from speaking or voting on the House floor excludes her from the office to which she was duly elected by the people of Maine's House District 90, even though she satisfies the standing requirements for a person to serve as a member of the Maine House set forth in the Maine Constitution. *See* Me. Const. Art. IV, Pt. 1, §4; *cf. Powell*, 395 U.S. at 550.

107.    While some Guarantee Clause claims have been held to be nonjusticiable, the Supreme Court has been clear that the Guarantee Clause is a critical protection of the people in our Constitution and that there remain claims that could be justiciable. *See New York v. United States*, 505 U.S. 144, 184-85 (1992); *see also Largess v. Supreme Jud. Ct. for the State of Mass.*, 373 F.3d 219, 229 (1st Cir. 2004) (per curiam) (observing "several members of the Supreme Court have suggested that federal courts can indeed review the internal allocations of power in a state government under the text of this clause" (citing *Bush*, 531 U.S. at 112 (Rehnquist, C.J., concurring, joined by Scalia and Thomas, JJ.))). The "unusual and extreme" circumstances here present such a justiciable claim for "the federal courts to enforce the Guarantee Clause." *Largess*, 373 F.3d at 229. A State has no republican form of government when it has stripped an elected legislator—the main ingredient of any republican form of government—of her right to speak and vote on behalf of her constituents contrary to the state's constitutionally prescribed rules for what makes a qualified legislator and requirement of two-thirds vote for expulsion.

108.    Plaintiffs have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

### PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

*ADD128*

A.    A declaratory judgment that the censure of Rep. Libby and application of House rules prohibiting her from speaking on the House floor and voting on behalf of her constituents is unlawful retaliation, in violation of the First and Fourteenth Amendments of the U.S. Constitution;

B.    A declaratory judgment that the censure of Rep. Libby and application of House rules prohibiting her from voting on behalf of her constituents of the House District 90 violates the Equal Protection, Due Process, and Guarantee Clauses of the U.S. Constitution;

C.    Injunctive relief prohibiting Rep. Libby from being barred from speaking on the House floor;

D.    Injunctive relief prohibiting the disregard and non-counting of Rep. Libby's votes cast on behalf of House District 90 constituents;

E.    An award of attorney's fees, costs, and expenses under 42 U.S.C. §1988; and

F.    Any other legal or equitable relief the Court may deem just and proper.

Dated: March 11, 2025

Taylor A.R. Meehan*
Daniel M. Vitagliano*†
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Certificates for admission *pro hac vice* pending
†Supervised by principals of the firm admitted
to practice in VA

Respectfully submitted,

*/s/ Patrick Strawbridge*
Patrick Strawbridge (Bar No. 10024)
   *Lead Counsel*
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Counsel for Plaintiffs*

**VERIFICATION**

I am over the age of 18 and am a Plaintiff in this action. I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that I have read the foregoing VERIFIED COMPLAINT, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct.

Dated: March 11, 2025

/s/ *Laurel D. Libby*

Per Local Civil Rule 10, Plaintiffs' counsel retains a paper copy of this verification bearing an original signature, available for future production.
/s/ *Patrick Strawbridge*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

LAUREL D. LIBBY, State Representative of
Maine House District 90, RONALD P.
LEBEL, WENDY MUNSELL, JASON
LEVESQUE, BERNICE FRASER, RENE
FRASER, and DONALD DUBUC

Plaintiffs,

Civil Action No. 1:25-cv-83-MRD

v.

RYAN M. FECTEAU, in his official capacity
as Speaker of the Maine House of
Representatives, and ROBERT B. HUNT, in
his official capacity as Clerk of the House,

Defendants.

## DECLARATION OF LAUREL LIBBY

I, Laurel Libby, pursuant to the provisions of 28 U.S.C. §1746, declare the following:

1.       I am a resident of Auburn, Maine.

2.       I am the elected representative of Maine House District 90, which covers parts of

Auburn and Minot.

3.       I was first elected in 2020, to the 130th Legislature. I was re-elected in 2022 and again

in 2024 to the current Legislature.

4.       Since the imposition of the censure by the majority of the Maine House of

Representatives, I have been barred from voting or speaking in support or opposition to any matter

on the floor of the Maine House.

5.       Although I have not been barred from committee proceedings, committee work is

only a fraction of the work on a fraction of the topics we have to cover for the more than

2,200 bills that come before the House. The committees do only the preliminary work on

legislation before it comes in front of the full Legislature for a vote to determine if it will become law. The committee process is no substitute for my ability to make my constituents' voices heard by speaking and voting on the House floor for the 2,200-plus bills that come before the House.

6.      I have always maintained exceptional attendance for House floor sessions, with the exception of when a child was hospitalized or for unavoidable travel. That continues following my censure, though I am unable to speak or vote.

7.      My vote on legislation pending before the House represents the voice of 9,000 Maine citizens. When I push my red or green button in a roll call, I do so on behalf of all my constituents. It is the vote on the House floor that determines the ultimate passage or failure of any given legislation, and without the ability to vote my constituents are disenfranchised.

8.      It is my honor and privilege to be my constituents' voice on the issues that come before the House, and if my vote risked my office during the next election, it would be my constituents' right to elect a new representative they felt better represented them. I value the trust my constituents have placed in me, and I take my responsibility to represent them via my vote very seriously. Those constituents deserve to have my vote on the record as frequently as possible, ideally with a roll call on every possible bill.

9.      Serving in the minority for my third term, I have come to understand that speaking on behalf of my constituents, even if my vote is in the minority, is a primary responsibility. That is why (until my censure) I spoke so often on matters that come before the floor. It's particularly critical to speak as a member of the minority; without the ability to persuade other legislators, my party lacks the votes to achieve any legislative change.

10.     The two most critical responsibilities of a duly elected legislator are to speak and vote on behalf of those they represent, and it is those two responsibilities that have been stripped from me.

11.     My district did not have a vote for the State's biennial budget legislation. No bill has more of an impact on Maine citizens than our biennial budget. With a fiscal note of $11.3 billion as of this year, the budget dictates policy in many ways. The Legislature voted on the biennial budget two weeks ago, and I was unable to speak to it or vote on it, marking the first time in my three terms that I haven't done both in regard to a budget. We anticipate additional supplemental budgets this year and next, and it's critical that my constituents have a voice in those votes.

12.     I also have no voice or vote on bills or amendments that I have sponsored that are critically important to my constituents, such as my bill to increase the availability and lower the cost of mental healthcare.

13.     I have no voice or vote on hundreds of other bills and amendments that will come before the House during the 132nd Legislature, not the least of which includes a bill about girls' sports.

***ADD133***

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 3, 2025                                    /s/ Laurel Libby

4

*ADD134*

APPEAL,STANDARD

# U.S. District Court
## District of Maine (Bangor)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00083-MRD

LIBBY et al v. FECTEAU et al
Assigned to: JUDGE MELISSA R. DUBOSE
Referred to: US MAGISTRATE JUDGE PATRICIA A. SULLIVAN
Case in other court: First Circuit Court of Appeals, 25-01385
Cause: 42:1983 Civil Rights Act

Date Filed: 03/11/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**LAUREL D LIBBY**                    represented by    **DANIEL M. VITAGLIANO**
CONSOVOY MCCARTHY PLLC
1600 WILSON BLVD
SUITE 700
ARLINGTON, VA 22209
703-243-9423
Email: dvitagliano@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
CONSOVOY MCCARTHY PLLC
TEN POST OFFICE SQUARE
8TH FLOOR SOUTH PMB 706
BOSTON, MA 02109
617-227-0548
Email: patrick@consovoymccarthy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
CONSOVOY MCCARTHY PLLC
1600 WILSON BLVD
SUITE 700
ARLINGTON, VA 22209
703-243-9423
Email: taylor@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
CONSOVOY MCCARTHY PLLC
1600 WILSON BLVD

***ADD135***

SUITE 700
ARLINGTON, VA 22209
703-243-9423
Email: mari@consovoymccarthy.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RONALD P LEBEL**                    represented by    **DANIEL M. VITAGLIANO**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WENDY MUNSELL**                    represented by    **DANIEL M. VITAGLIANO**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

*ADD136*

**JASON LEVESQUE**                    represented by    **DANIEL M. VITAGLIANO**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **PATRICK N. STRAWBRIDGE**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **TAYLOR A.R. MEEHAN**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **MARIE E. SAYER**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**BERNICE FRASER**                    represented by    **DANIEL M. VITAGLIANO**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **PATRICK N. STRAWBRIDGE**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **TAYLOR A.R. MEEHAN**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **MARIE E. SAYER**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**RENE FRASER**                    represented by    **DANIEL M. VITAGLIANO**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **PATRICK N. STRAWBRIDGE**
                                                        (See above for address)

*ADD137*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**DONALD DUBUC**                 represented by   **DANIEL M. VITAGLIANO**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**RYAN M FECTEAU**               represented by   **JONATHAN R. BOLTON**
*in his official capacity as Speaker of the*                       OFFICE OF THE ATTORNEY GENERAL
*Maine House of Representatives*                       STATE HOUSE STATION 6
AUGUSTA, ME 04333-0006
207-626-8551
Email: jonathan.bolton@maine.gov
*ATTORNEY TO BE NOTICED*

**KIMBERLY L. PATWARDHAN**
OFFICE OF THE ATTORNEY GENERAL
SIX STATE HOUSE STATION
AUGUSTA, ME 04333-0006
(207) 626-8823

*ADD138*

Email: kimberly.patwardhan@maine.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT B HUNT**
*in his official capacity as Clerk of the House*

represented by **JONATHAN R. BOLTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KIMBERLY L. PATWARDHAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION**

represented by **ROBERT JOSEPH MORRIS , II**
HOUSER LLP
400 TRADECENTER DRIVE
STE 5981
WOBURN, MA 01801
339-203-6498
Email: rmorris@houser-law.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/11/2025 | 1 | COMPLAINT against RYAN M FECTEAU, ROBERT B HUNT **PAYMENT OF FILING FEE DUE WITHIN 48 HOURS. IF FILING FEE IS BEING PAID WITH A CREDIT CARD COUNSEL ARE INSTRUCTED TO LOGIN TO CMECF AND DOCKET** *Case Opening Filing Fee Paid* **FOUND IN THE** *Complaints and Other Initiating Documents* **CATEGORY. CHECK PAYMENTS DUE WITHIN 48 HOURS.**, filed by RONALD P LEBEL, JASON LEVESQUE, DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, WENDY MUNSELL. (Service of Process Deadline 6/9/2025) Fee due by 3/13/2025.(mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 2 | CIVIL COVER SHEET. (mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 3 | Summons Issued as to ROBERT B HUNT.  **Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.**  **Note-If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).**  (mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 4 | Summons Issued as to RYAN M FECTEAU.  **Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.**  **Note-If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).**  (mjlt) (Entered: 03/11/2025) |

*ADD139*

| 03/11/2025 | 5 | ORDER OF RECUSAL. By MAGISTRATE JUDGE JOHN C. NIVISON. (mjlt) (Entered: 03/11/2025) |
|---|---|---|
| 03/11/2025 | 6 | ORDER OF RECUSAL.. By JUDGE JOHN A. WOODCOCK, JR. (mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 7 | ORDER OF RECUSAL.. By JUDGE LANCE E. WALKER. (mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 8 | MOTION for Preliminary Injunction by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER Responses due by 4/1/2025. (Attachments: # 1 Affidavit Declaration of Bernice Fraser, # 2 Affidavit Declaration of Donald Dubuc, # 3 Affidavit Declaration of Ronald Lebel, # 4 Affidavit Declaration of Jason Levesque, # 5 Affidavit Declaration of Wendy Munsell, # 6 Affidavit Declaration of Rene Fraser)(STRAWBRIDGE, PATRICK) (Entered: 03/11/2025) |
| 03/11/2025 | 9 | CERTIFICATION for Admission Pro Hac Vice of Taylor A.R. Meehan filed by PATRICK N. STRAWBRIDGE on behalf of All Plaintiffs (Total admission fee $ 200 receipt number AMEDC-3080383.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (STRAWBRIDGE, PATRICK) (Entered: 03/11/2025) |
| 03/11/2025 | 10 | CERTIFICATION for Admission Pro Hac Vice of Daniel M. Vitagliano filed by PATRICK N. STRAWBRIDGE on behalf of All Plaintiffs (Total admission fee $ 200 receipt number AMEDC-3080384.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (STRAWBRIDGE, PATRICK) (Entered: 03/11/2025) |
| 03/11/2025 | 11 | NOTICE of APPROVAL by Clerk's Office re 9 Certification for Admission Pro Hac Vice,, 10 Certification for Admission Pro Hac Vice, Attorney TAYLOR A.R. MEEHAN and DANIEL M. VITAGLIANO for all plaintiffs added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Vitagliano and Meehan must register for a PACER account and/or request the appropriate e-filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 3/18/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e-filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 03/11/2025) |
| 03/11/2025 | 12 | ORDER OF RECUSAL. By MAGISTRATE JUDGE KAREN FRINK WOLF. (mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 13 | ORDER OF RECUSAL. By JUDGE STACEY D. NEUMANN. (mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 14 | ORDER OF RECUSAL.. By JUDGE NANCY TORRESEN. (mjlt) (Entered: 03/11/2025) |
| 03/12/2025 | 15 | ORDER By JUDGE LANCE E. WALKER. (mjlt) (Entered: 03/12/2025) |
| 03/12/2025 | 16 | SERVICE Returned EXECUTED filed by RONALD P LEBEL, JASON LEVESQUE, DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, WENDY MUNSELL as to ROBERT B HUNT. (STRAWBRIDGE, PATRICK) (Entered: 03/12/2025) |

*ADD140*

| 03/12/2025 | [17](#) | NOTICE of Appearance by KIMBERLY L. PATWARDHAN on behalf of RYAN M FECTEAU, ROBERT B HUNT (PATWARDHAN, KIMBERLY) (Entered: 03/12/2025) |
| --- | --- | --- |
| 03/12/2025 | [18](#) | SERVICE Returned EXECUTED filed by RONALD P LEBEL, JASON LEVESQUE, DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, WENDY MUNSELL as to RYAN M FECTEAU. (STRAWBRIDGE, PATRICK) (Entered: 03/12/2025) |
| 03/12/2025 | [19](#) | NOTICE of Appearance by JONATHAN R. BOLTON on behalf of RYAN M FECTEAU, ROBERT B HUNT (BOLTON, JONATHAN) (Entered: 03/12/2025) |
| 03/12/2025 | [20](#) | CONCURRING ORDER By CHIEF U.S. DISTRICT JUDGE JOHN J. MCCONNELL(mjlt) (Entered: 03/12/2025) |
| 03/12/2025 | | Case Assigned to JUDGE MELISSA R. DUBOSE and US MAGISTRATE JUDGE PATRICIA A. SULLIVAN. (mjlt) (Entered: 03/12/2025) |
| 03/12/2025 | | Set Answer Deadline for RYAN M FECTEAU and ROBERT B HUNT; Defendants having been served on March 11, 2025: Answer due by 4/1/2025. (mjlt) (Entered: 03/12/2025) |
| 03/13/2025 | [21](#) | Consent MOTION for Order *setting briefing schedule*, Consent MOTION for Oral Argument/Hearing re [8](#) MOTION for Preliminary Injunction by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER Responses due by 4/3/2025. (STRAWBRIDGE, PATRICK) (Entered: 03/13/2025) |
| 03/13/2025 | [22](#) | CERTIFICATION for Admission Pro Hac Vice of Marie E. Sayer filed by PATRICK N. STRAWBRIDGE on behalf of All Plaintiffs (Total admission fee $ 200 receipt number AMEDC-3081618.) <span style="color:red">The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a</span> <span style="color:green">PRO HAC VICE</span> <span style="color:red">request in this District via PACER at www.pacer.uscourts.gov</span> (STRAWBRIDGE, PATRICK) (Entered: 03/13/2025) |
| 03/13/2025 | 23 | NOTICE of APPROVAL by Clerk's Office re [22](#) Certification for Admission Pro Hac Vice. Attorney MARIE E. SAYER added for DONALD DUBUC, BERNICE FRASER, RENE FRASER, RONALD P LEBEL, JASON LEVESQUE, LAUREL D LIBBY, and WENDY MUNSELL to this specific case only. (jgd) (Entered: 03/13/2025) |
| 03/17/2025 | 24 | NOTICE of Hearing: Telephone Conference set for 3/18/2025 02:30 PM before JUDGE MELISSA R. DUBOSE. The parties have been provided the Court's call-in information. (mjlt) (Entered: 03/17/2025) |
| 03/17/2025 | | Filing Fee Paid via Credit Card ( Filing fee $ 405 receipt number AMEDC-3082728.), filed by RONALD P LEBEL, JASON LEVESQUE, DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, WENDY MUNSELL.(STRAWBRIDGE, PATRICK) (Entered: 03/17/2025) |
| 03/18/2025 | 25 | Minute Entry for proceedings held before JUDGE MELISSA R. DUBOSE: Video Conference of Counsel held. (Court Reporter: Michelle Feliccitti) (mjlt) (Entered: 03/18/2025) |
| 03/18/2025 | 26 | Order re: Consent Motion for Setting Briefing Schedule. Defendant to file a response by April 1, 2025; Plaintiff to file a Reply by April 3, 2025. Matter set for oral argument via Zoom on April 4, 2025 at 12:00 p.m. By JUDGE MELISSA R. DUBOSE. (mjlt) (Entered: 03/18/2025) |
| 03/18/2025 | | Set Deadlines as to [8](#) MOTION for Preliminary Injunction Pursuant to the Court's Order entered on March 18, 2025: Responses due by 4/1/2025. Reply due by 4/3/2025. (mjlt) (Entered: 03/18/2025) |

*ADD141*

| | | |
|---|---|---|
| 03/18/2025 | 27 | NOTICE of Hearing on Motion 8 MOTION for Preliminary Injunction : Oral Argument set for 4/4/2025 12:00 PM via Zoom Hearing before JUDGE MELISSA R. DUBOSE. The parties have been provided the Court's call-in information.(mjlt) (Entered: 03/18/2025) |
| 04/01/2025 | 28 | RESPONSE in Opposition re 8 MOTION for Preliminary Injunction filed by RYAN M FECTEAU, ROBERT B HUNT. Reply due by 4/15/2025. (Attachments: # 1 Exhibit 1) (PATWARDHAN, KIMBERLY) (Entered: 04/01/2025) |
| 04/01/2025 | 29 | AFFIDAVIT of Ryan Fecteau re 28 Response in Opposition to Motion filed by RYAN M FECTEAU, ROBERT B HUNT. (Attachments: # 1 Exhibit A - House Rules, # 2 Exhibit B - Legislative Code of Ethics, # 3 Exhibit C - Letter from Speaker to Libby, # 4 Exhibit D - HR 1)(PATWARDHAN, KIMBERLY) (Entered: 04/01/2025) |
| 04/01/2025 | 30 | AFFIDAVIT of Suzanne Gresser filed by RYAN M FECTEAU, ROBERT B HUNT. (Attachments: # 1 Exhibit 1)(PATWARDHAN, KIMBERLY) (Entered: 04/01/2025) |
| 04/01/2025 | 31 | MOTION to Dismiss for Failure to State a Claim , MOTION to Dismiss for Lack of Jurisdiction by RYAN M FECTEAU, ROBERT B HUNT Responses due by 4/22/2025. (PATWARDHAN, KIMBERLY) (Entered: 04/01/2025) |
| 04/02/2025 | | Reset Deadlines as to 8 MOTION for Preliminary Injunction In accordance with the Conference of Counsel held on March 18, 2025: Plaintiffs' Reply due by 4/3/2025. (mjlt) (Entered: 04/02/2025) |
| 04/03/2025 | 32 | NOTICE of Hearing: Conference of Counsel set for 4/4/2025 11:30 AM in VIDEO HEARING before JUDGE MELISSA R. DUBOSE. The parties have been provided the Court's call-in information.(mjlt) (Entered: 04/03/2025) |
| 04/03/2025 | 33 | MOTION for Leave to File *Amicus Curiae Brief* by Foundation for Individual Rights and Expression Responses due by 4/24/2025. (Attachments: # 1 Supplement Proposed Amicus Curiae Brief)(MORRIS, ROBERT) (Entered: 04/03/2025) |
| 04/03/2025 | 34 | REPLY to Response to Motion re 8 MOTION for Preliminary Injunction filed by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER. (Attachments: # 1 Affidavit Declaration of Laurel Libby)(STRAWBRIDGE, PATRICK) (Entered: 04/03/2025) |
| 04/04/2025 | 35 | Minute Entry for proceedings held before JUDGE MELISSA R. DUBOSE: Video Conference of Counsel held. (Court Reporter: Michelle Feliccitti) (mtm) (Entered: 04/04/2025) |
| 04/04/2025 | 36 | Minute Entry for proceedings held before JUDGE MELISSA R. DUBOSE: Video Oral Argument held re 8 MOTION for Preliminary Injunction filed by DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, RONALD P LEBEL, JASON LEVESQUE, WENDY MUNSELL. Order to issue. (Court Reporter: Michelle Feliccitti) (mtm) (Entered: 04/04/2025) |
| 04/08/2025 | 37 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Video Oral Argument held on April 4, 2025 before Judge Melissa R. Dubose. Court Reporter/Transcriber: Michelle Feliccitti, Telephone Number: 2074323114. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.med.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 7/7/2025. (FELICCITTI, MICHELLE) (Entered: 04/08/2025) |

*ADD142*

| 04/11/2025 | 38 | NOTICE/CORRESPONDENCE Re: recent and upcoming House floor votes by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER (STRAWBRIDGE, PATRICK) (Entered: 04/11/2025) |
|---|---|---|
| 04/18/2025 | 39 | MEMORANDUM AND ORDER denying 8 Motion for Preliminary Injunction By JUDGE MELISSA R. DUBOSE. (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | 40 | Emergency INTERLOCUTORY APPEAL as to 39 Order on Motion for Preliminary Injunction by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER .( Filing fee $ 605 receipt number AMEDC-3098999.)<br><br>**NOTICE TO FILER:** A transcript Report/Order form MUST be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (STRAWBRIDGE, PATRICK) (Entered: 04/18/2025) |
| 04/18/2025 | | COPIES of Notice of Appeal Sent to Counsel Re: 40 Interlocutory Appeal filed by DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, RONALD P LEBEL, JASON LEVESQUE, WENDY MUNSELL. (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | 41 | APPEAL COVER SHEET Re: 40 Interlocutory Appeal (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | 42 | CLERK'S CERTIFICATE Re: 40 Interlocutory Appeal, Documents sent to the U.S. Court of Appeals. (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | | Abbreviated Appeal Record Transmitted Electronically to U.S. Court of Appeals re 40 Interlocutory Appeal. (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | 43 | USCA Case Number 25-1385 for 40 Interlocutory Appeal, filed by DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, RONALD P LEBEL, JASON LEVESQUE, WENDY MUNSELL. (jlm) (Entered: 04/18/2025) |
| 04/18/2025 | 44 | Emergency MOTION for Injunction Pending Appeal or, Alternatively, Request for Clarification by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER Responses due by 5/9/2025. (STRAWBRIDGE, PATRICK) (Entered: 04/18/2025) |
| 04/18/2025 | 45 | AMENDED MEMORANDUM AND ORDER re 8 MOTION for Preliminary Injunction filed by DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, RONALD P LEBEL, JASON LEVESQUE, WENDY MUNSELL By JUDGE MELISSA R. DUBOSE. (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | 46 | CLERK'S FIRST SUPPLEMENTAL CERTIFICATE Re: 40 Interlocutory Appeal, Documents Sent to U.S. Court of Appeals (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | | Supplemental Record on Appeal transmitted to US Court of Appeals re 40 Interlocutory Appeal. (mtm) (Entered: 04/18/2025) |
| 04/21/2025 | 47 | ORDER denying 44 Emergency Motion for Injunction Pending Appeal or, Alternatively, Request for Clarification. The Plaintiffs "Emergency Motion for an Injunction Pending Appeal" is denied for the reasons the court stated in its Memorandum and Order (ECF No. |

*ADD143*

| | | |
|---|---|---|
| | | 45 ) denying Plaintiffs Motion for Preliminary Injunction. By JUDGE MELISSA R. DUBOSE. (mtm) (Entered: 04/21/2025) |
| 04/21/2025 | 48 | CLERK'S SECOND SUPPLEMENTAL CERTIFICATE Re: 40 Interlocutory Appeal, Documents Sent to U.S. Court of Appeals (mtm) (Entered: 04/21/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 04/21/2025 17:27:47 | | | |
| PACER Login: | ConsovoyMcCarthyLLC | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:25-cv-00083-MRD |
| Billable Pages: | 9 | Cost: | 0.90 |

*ADD144*