No. 25-1385

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

LAUREL D. LIBBY, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE,
BERNICE FRASER, RENE FRASER, and DONALD DUBUC,

*Plaintiffs-Appellants,*

v.

RYAN M. FECTEAU, in their official capacity as Speaker of the Maine House of
Representatives, and ROBERT B. HUNT, in their official capacity as Clerk of the House,

*Defendants-Appellees,*

On Appeal from the United States District Court
for the District of Maine
No. 1:25-cv-83-MRD

## BRIEF OF APPELLANTS

Taylor A.R. Meehan
Daniel M. Vitagliano*
Marie E. Sayer
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
mari@consovoymccarthy.com

*Supervised by principals of the firm
  admitted to practice in VA

Patrick N. Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Counsel for Appellants*

## RULE 26.1 DISCLOSURE STATEMENT

Appellants are individuals. They have no parent corporation, and no publicly held corporation owns 10% or more of their stock.

## STATEMENT WHY ORAL ARGUMENT SHOULD BE HEARD

The Court has scheduled this case for oral argument on Thursday, June 5, 2025. This case raises important questions regarding the scope of legislative immunity and constitutional violations arising from the disenfranchisement of Maine House District 90. This Court's decision will have broad implications for elected official Laurel Libby and her constituents who seek to vindicate their constitutional rights. Given the weighty issues this appeal raises, oral argument is warranted.

# TABLE OF CONTENTS

Rule 26.1 Disclosure Statement..................................................................i

Statement Why Oral Argument Should Be Heard.........................................ii

Table of Authorities ................................................................................v

Introduction .........................................................................................1

Jurisdictional Statement ........................................................................2

Statement of the Issue ...........................................................................2

Statement of the Case ............................................................................2

Standard of Review ...............................................................................9

Summary of the Argument ................................................................... 10

Argument .......................................................................................... 12

I.     Plaintiffs are likely to succeed on the merits of their claims................ 13

       A. Legislative immunity is no bar to this challenge to restore
          District 90's equal representation. ......................................... 13

              1.    Excluding Libby from debate and refusing to count her
                    vote are not immune legislative acts. ........................... 13

              2.    The precipitating censure resolution and House rule do
                    not immunize Defendants' acts. ................................. 20

              3.    Defendants' acts are of an extraordinary character such
                    that immunity does not apply.................................... 26

       B. Libby is likely to succeed on her First Amendment claim. ............. 30

       C. Plaintiffs are likely to succeed on their Fourteenth Amendment
          claim.................................................................................. 37

       D. Plaintiffs are likely to succeed on their Guarantee Clause claim. .... 41

II.    The remaining equitable factors favor relief................................... 46

       A. Irreparable harm is undisputed................................................ 46

       B. The balance of the equities favors restoring Plaintiffs' equal
          representation. .................................................................... 48

       C. The public interest also favors Plaintiffs. ................................. 49

Conclusion ................................................................................................. 50

Certificate of Compliance ........................................................................ 51

Certificate of Service ................................................................................ 52

Addendum

# TABLE OF AUTHORITIES

## Cases

*Acevedo-Garcia v. Vera-Monroig,*
204 F.3d 1 (1st Cir. 2000) ............................................................. 16

*Agudath Israel of Am. v. Cuomo,*
983 F.3d 620 (2d Cir. 2020) ......................................................... 48

*Ammond v. McGahn,*
390 F. Supp. 655 (D.N.J. 1975) .................................................. 39

*Baird v. Bonta,*
81 F.4th 1036 (9th Cir. 2023) ..................................................... 10

*Baker v. Carr,*
369 U.S. 186 (1962) ...................................................................... 43

*Barton v. Clancy,*
632 F.3d 9 (1st Cir. 2011) ............................................................ 36

*Bd. of Elections for Franklin Cnty. v. State ex rel. Schneider,*
191 N.E. 115 (Ohio 1934) ........................................................... 45

*Bonas v. Town of North Smithfield,*
265 F.3d 69 (1st Cir. 2001) ......................................................... 39

*Bond v. Floyd,*
385 U.S. 116 (1966) ............................................ 1, 2, 16, 17, 26, 27, 29, 30, 31, 32, 37

*Boquist v. Courtney,*
32 F.4th 764 (9th Cir. 2022) .................................................. 35, 36

*Bush v. Gore,*
531 U.S. 98 (2000) .................................................................. 39, 42

*Coffin v. Coffin,*
4 Mass. 1 (1808) ........................................................................... 19

*Council on Am. Islamic Rels. v. Ballenger,*
444 F.3d 659 (D.C. Cir. 2006) .............................................. 16, 40

*Cushing v. Packard,*
30 F.4th 27 (1st Cir. 2022) ............................... 8, 24, 25, 26, 28, 29

*Daly v. Hunt,*
93 F.3d 1212 (4th Cir. 1996) ................................................. 16, 38

*Dayton Area Visually Impaired Persons, Inc. v. Fisher,*
    70 F.3d 1474 (6th Cir. 1995) ........................................................ 49

*Democratic Party of Wis. v. Vos,*
    966 F.3d 581 (7th Cir. 2020) ........................................................ 42

*Doe v. McMillan,*
    412 U.S. 306 (1973) ...................................................................... 21

*Dombrowski v. Eastland,*
    387 U.S. 82 (1967) ........................................................................ 14

*Duncan v. McCall,*
    139 U.S. 449 (1891) ........................................................... 41, 44, 45

*Dunn v. Blumstein,*
    405 U.S. 330 (1972) ................................................................. 39, 50

*Evenwel v. Abbott,*
    578 U.S. 54 (2016) ........................................................................ 45

*Gonzalez-Fuentes v. Molina,*
    607 F.3d 864 (1st Cir. 2010) ........................................................... 9

*Gravel v. United States,*
    408 U.S. 606 (1972) ......................... 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25

*Gray v. Sanders,*
    372 U.S. 368 (1963) ...................................................................... 35

*Hiller Cranberry Prods. v. Koplovsky,*
    165 F.3d 1 (1st Cir. 1999) ............................................................... 9

*Hous. Cmty. Coll. Sys. v. Wilson,*
    595 U.S. 468 (2022) .................................... 7, 30, 32, 33, 35, 36, 37

*Hutchinson v. Proxmire,*
    443 U.S. 111 (1979) ................................................................. 14, 15

*In re Grand Jury Proc.,*
    563 F.2d 577 (3d Cir. 1977) .......................................................... 16

*Kamplain v. Curry Cnty. Bd. of Comm'rs,*
    159 F.3d 1248 (10th Cir. 1998) ..................................................... 22

*Kerr v. Hickenlooper,*
    744 F.3d 1156 (10th Cir. 2014) ............................................... 42, 43

*Kilbourn v. Thompson,*
103 U.S. 168 (1880) ...................................................... 1, 14, 20, 21, 22, 26, 29

*Koontz v. St. Johns River Water Mgmt. Dist.,*
570 U.S. 595 (2013) ........................................................................... 30

*Kucinich v. Forbes,*
432 F. Supp. 1101 (N.D. Ohio 1977) ................................................ 39

*Largess v. Supreme Jud. Ct. of Mass.,*
373 F.3d 219 (1st Cir. 2004) .................................................... 42, 43, 44

*Loving v. Virginia,*
388 U.S. 1 (1967) ............................................................................... 23

*LWV of N.C. v. North Carolina,*
769 F.3d 224 (4th Cir. 2014) ............................................................. 47

*LWV of U.S. v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ............................................................ 9, 10

*Marbury v. Madison,*
1 Cranch (5 U.S.) 137 (1803) ............................................................ 29

*Michel v. Anderson,*
14 F.3d 623 (D.C. Cir. 1994) ............................................ 17, 37, 39, 40

*Miller v. Town of Hull,*
878 F.2d 523 (1st Cir. 1989) ..................................................... 17, 40

*Mitchum v. Foster,*
407 U.S. 225 (1972) ........................................................................... 47

*Monserrate v. N.Y. Senate,*
599 F.3d 148 (2d Cir. 2010) .............................................................. 27

*Nat'l Ass'n of Soc. Workers v. Harwood,*
69 F.3d 622 (1st Cir. 1995) ................................................ 8, 24, 25, 26, 27

*Nev. Comm'n on Ethics v. Carrigan,*
564 U.S. 117 (2011) ....................................... 16, 17, 38, 40, 47, 48

*New York v. United States,*
505 U.S. 144 (1992) ...................................................................... 42, 46

*Nieves v. Bartlett,*
587 U.S. 391 (2019) ........................................................................... 30

*Obergefell v. Hodges,*
    576 U.S. 644 (2015) ................................................................ 23

*Packingham v. North Carolina,*
    582 U.S. 98 (2017) ................................................................. 30

*Peeper v. Callaway Cnty. Ambulance Dist.,*
    122 F.3d 619 (8th Cir. 1997) ................................................. 38

*Powell v. McCormack,*
    395 U.S. 486 (1969) ...............................................1, 2, 13, 14, 15, 17, 20, 21,
                                                                22, 23, 25, 30, 33, 44, 45

*Powell v. Ridge,*
    247 F.3d 520 (3d Cir. 2001) .................................................. 19

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ............................................................. 47, 50

*Reynolds v. Int'l Amateur Athletic Fed'n,*
    505 U.S. 1301 (1992) ............................................................. 49

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ...............................1, 16, 17, 28, 37, 39, 40, 42, 47, 49

*Riley v. Nat'l Fed'n of the Blind of N.C.,*
    487 U.S. 781 (1988) ............................................................... 30

*Rio Grande Cmty. Health Ctr. v. Rullan,*
    397 F.3d 56 (1st Cir. 2005) .................................................... 47

*Rosenberger v. Rector & Visitors of UVA,*
    515 U.S. 819 (1995) ............................................................... 27

*Roth v. United States,*
    354 U.S. 476 (1957) ............................................................... 30

*SFFA v. Harvard,*
    600 U.S. 181 (2023) ............................................................... 23

*Sindicato Puertorriqueno de Trabajadores v. Fortuño,*
    699 F.3d 1 (1st Cir. 2012) ....................................9, 10, 47, 48, 49

*Societe Des Produits Nestle v. Casa Helvetica,*
    982 F.2d 633 (1st Cir. 1992) ................................................. 10

*Star Distribs. v. Marino,*
    613 F.2d 4 (2d Cir. 1980) ...................................................... 25

*State Emps. Bargaining Agent Coal. v. Rowland,*
  494 F.3d 71 (2d Cir. 2007) ........................................................................ 22

*Sup. Ct. of Va. v. Consumers Union of U.S.,*
  446 U.S. 719 (1980) ................................................................................... 22

*Tandon v. Newsom,*
  593 U.S. 61 (2021) ..................................................................................... 48

*Tenney v. Brandhove,*
  341 U.S. 367 (1951) ........................................... 14, 15, 19, 22, 28, 29

*Together Emps. v. Mass Gen. Brigham Inc.,*
  19 F.4th 1 (1st Cir. 2021) ...................................................................... 9, 46

*Town of Greece v. Galloway,*
  572 U.S. 565 (2014) ................................................................................... 24

*United States v. Ballin,*
  144 U.S. 1 (1892) ....................................................................................... 29

*United States v. Brewster,*
  408 U.S. 501 (1972) .........................................................13, 14, 15, 19, 28

*United States v. Johnson,*
  383 U.S. 169 (1966) ..................................................... 14, 15, 22, 28

*United States v. Kin-Hong,*
  110 F.3d 103 (1st Cir. 1997) ...................................................................... 9

*United States v. Raines,*
  362 U.S. 17 (1960) ..................................................................................... 49

*Voice of the Arab World v. MDTV Med. News Now,*
  645 F.3d 26 (1st Cir. 2011) ........................................................................ 9

*W.Va. Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ................................................................................... 24

*Walker v. Jones,*
  733 F.2d 923 (D.C. Cir. 1984) ................................................................. 22

*Wesberry v. Sanders,*
  376 U.S. 1 (1964) ...................................................................................37, 39

*Yick Wo v. Hopkins,*
  118 U.S. 356 (1885) ................................................................................... 37

**Statutes**

28 U.S.C. §1292(a)(1) ........................................................2

28 U.S.C. §1331 ...............................................................2

42 U.S.C. §1983 ...............................................................2

5 MRS §4602(1)(A) ...........................................................3

5 MRS §4602(1)(B) ...........................................................3

**Rules**

Fed. R. App. P. 4(a)(1)(A) ..................................................2

**Constitutional Provisions**

Me. Const. art.IV, pt.1, §4 ...........................................17, 45

Me. Const. art.IV, pt.1, §6 .......................................27, 29, 41

Me. Const. art.IV, pt.3, §4 ........................... 6, 17, 27, 29, 41, 45

U.S. Const. art.IV, §4 ................................................. 1, 41

**Legislative Authorities**

1 Legis. Rec., 120th Leg., 1st Reg. Sess. (Me. 2001),
    https://perma.cc/GL5C-FVY7 ...........................................6

3 *Deschler's Precedents of the United States House
    of Representatives* (1994),
    https://perma.cc/M3ZL-9P9R...................... 7, 33, 34, 38, 41, 45

5 *Hinds' Precedents of the House of Representatives of the
    United States* (1907),
    https://perma.cc/CJ3H-SVNF ......................................... 33

*Archived Hearings & Meetings: House Chamber*, Me. Leg.
    (Apr. 23, 2025, 10:00 AM),
    https://bit.ly/3EGfZ3G ........................................... 5, 46

Colo. H.R. Rule 49(f),
    https://perma.cc/GRA2-4EY7 ........................................ 34

Colo. S. Rule 43(f),
    https://perma.cc/GRA2-4EY7 ........................................ 34

Fla. S. Rule 1.43(2),
    https://perma.cc/67Y8-G8R5 ................................................................ 34

Ga. S. Rule 9-1.2(b)-(c),
    https://perma.cc/T75R-MXNW ............................................................ 34

H.R. Res. 1, 131st Leg., 2d Reg. Sess. (Me. 2024),
    https://perma.cc/8YC3-6RY3 ..................................................................6

H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025),
    https://perma.cc/JU85-VNTS ..................................................................4

H.R. Res. 2, 131st Leg., 2d Reg. Sess. (Me. 2024),
    https://perma.cc/S63W-3XJF ...................................................................6

H.R. Roll Call No. 111 - LD 189, 132nd Leg.,
    1st Spec. Sess. (Me. May 6, 2025),
    https://perma.cc/M8V9-36H6 ..................................................................5

Idaho H.R. Rule 45(6),
    https://perma.cc/EF3R-R4L2 ................................................................ 18

Idaho S. Rule 52(F),
    https://perma.cc/6EX3-2SV9 ................................................................ 34

*Jefferson's Manual and Rules of the House of Representatives* (2023),
    https://perma.cc/U78W-KZ2G ...............................................18, 33, 35

Kan. H.R. Rule 4903,
    https://perma.cc/BX79-UALR ............................................................... 34

Kan. S. Rule 76,
    https://perma.cc/UAG7-YQ7Y ............................................................. 34

Mass. H.R. Rule 16,
    https://perma.cc/3F6D-63NC ............................................................... 34

Mich. H.R. Rule 74(8),
    https://perma.cc/2KD2-PGP4 .............................................................. 34

Mich. S. Rule 1.311,
    https://perma.cc/ZJM5-3KGB ............................................................. 35

Mont. H.R. Rule H20-20(2)(d)-(e),
    https://perma.cc/YTF6-M6KG .............................................................. 18

Or. H.R. Rule 3.20(3),
    https://perma.cc/F4DE-V84A .............................................................. 35

Or. S. Rule 3.33(8),
https://perma.cc/6KWU-723D ............................................................... 35

Pa. S. Rule 35(a),
https://perma.cc/7N5C-BADQ ............................................................... 18

Wis. Assemb. Rule 21, 43(3),
https://perma.cc/YLP7-7H5R ............................................................... 35

Wis. Leg. Ref. Bureau, *Discipline in the Wisconsin Legislature:*
*A History of Reprimand, Censure, Suspension, and Expulsion* (2020),
https://perma.cc/FK4F-JF6L ........................................................ 7, 18, 34

**Executive Authorities**

Exec. Order No. 14,201, 90 Fed. Reg. 9,279 (Feb. 5, 2025) ...............................3

**Other Authorities**

2 *Debates on the Federal Constitution* (J. Elliot ed. 1876) ................................ 44

2 Joseph Story, *Commentaries on the Constitution of the*
*United States* (1833) ............................................................15, 19, 29

D.S. Hobbs, *Comment on* Powell v. McCormack,
17 U.C.L.A. L. Rev. 129 (1969) ................................................ 34

Dan Zaksheske, *Trans-Identifying Male Athlete Wins Maine State*
*Title In Girls' Pole-Vaulting*, OutKick (Feb. 19, 2025),
https://perma.cc/8A83-9EZ8 ................................................4

Erwin Chemerinsky, *Cases Under the Guarantee Clause Should be Justiciable*,
65 U. Colo. L. Rev. 849 (1994) ................................................ 44

Gerald T. McLaughlin, *Congressional Self-Discipline: The Power*
*to Expel, to Exclude and to Punish*,
41 Fordham L. Rev. 43 (1972) ................................................ 34

Jack Maskell, Cong. Rsch. Serv., *Expulsion and Censure Actions*
*Taken by the Full Senate Against Members* (2008),
https://perma.cc/996R-GS2M ................................................7

Jack Maskell, Cong. Rsch. Serv., *Expulsion, Censure, Reprimand,*
*and Fine: Legislative Discipline in the House of Representatives* (2016),
https://perma.cc/T2P8-5Q55 ................................................7

Mary Patterson Clarke, *Parliamentary Privilege in the*
*American Colonies* (Da Capo Press ed. 1971) ................................................ 35

Me. Principals' Ass'n, *2024-2025 Handbook*,
    https://perma.cc/923N-PW6Z ..................................................................................3

*The Federalist No. 21* ........................................................................................ 46

*The Federalist No. 43* ........................................................................................ 44

*The Federalist No. 85* ........................................................................................ 44

Thomas A. Smith, Note, *The Rule of Law and the States:*
    *A New Interpretation of the Guarantee Clause,*
    93 Yale L.J. 561 (1984).................................................................................. 43

# INTRODUCTION

Defendants have disenfranchised more than 9,000 Mainers. The Speaker of the Maine House of Representatives refuses to allow District 90's representative a voice in any floor debates, and the Clerk of the House refuses to count any of her floor votes. Why? Because Representative Laurel Libby took to social media to call attention to an issue of intense public interest: the fairness of transgender athletes competing in girls' sports. That retaliation for protected speech violates the First Amendment. *Bond v. Floyd*, 385 U.S. 116 (1966). Refusing to count District 90's votes violates the Fourteenth Amendment. *Reynolds v. Sims*, 377 U.S. 533 (1964). And denying District 90 its representation in the House, contrary to the Maine Constitution, violates the Guarantee Clause. U.S. Const. art.IV, §4.

The district court acknowledged that indefinitely denying a representative her voice and vote was "a weighty sword to wield" but denied Plaintiffs' preliminary injunction motion. Add.61-62. The court held it was powerless to do anything because legislative immunity precludes courts from restoring equal representation for a House district's constituents. That holding is irreconcilable with *Kilbourn v. Thompson*, 103 U.S. 168 (1880), and *Powell v. McCormack*, 395 U.S. 486 (1969). It also turns legislative immunity on its head. Federal courts grant immunity to ensure free and full debate in the legislative chamber. It does not cloak Defendants with the power to *exclude* Libby from such debate and to deny her constituents a vote. The decision below sets a dangerous precedent, transforming the shield of legislative immunity into a republic-destroying sword.

The logical consequences of the decision below for minority legislators in every chamber are stark. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331 because Plaintiffs allege violations of the Constitution under 42 U.S.C. §1983. This Court has jurisdiction under 28 U.S.C. §1292(a)(1) because Plaintiffs appeal from an order denying a preliminary injunction. The district court entered that order on April 18, 2025. Add.1, 32. Plaintiffs timely appealed the same day. JA157; *see* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUE

Whether Plaintiffs are entitled to a preliminary injunction on their claims under the First and Fourteenth Amendments and the Guarantee Clause.

## STATEMENT OF THE CASE

**A.** There were 151 voting members in the Maine House of Representatives when the legislative session began. Now there are only 150. In late February, the House Speaker silenced District 90's representative and the Clerk stopped counting District 90's votes—all because of something said on Facebook. No legislature has tried to disenfranchise a member's constituents in retaliation for her speech since the Supreme Court rejected similar attempts more than a half-century ago in *Bond v. Floyd,* 385 U.S. 116 (1966), and *Powell v. McCormack*, 395 U.S. 486 (1969).

Representative Laurel Libby has represented District 90 since 2020. JA3, 114. A mother of five and a registered nurse, Libby regularly advocates for protecting Maine

girls in athletics. JA1. She is an outspoken critic of Maine's policies requiring its schools to allow transgender athletes to participate in girls' sports. *Id.*

Libby is not alone in her views. Girls' sports have been at the forefront of public debate. Americans of varying political views oppose transgender athletes in girls' sports. JA5-6. More than half the States now restrict girls' sports to girls. JA6. Likewise, one of the White House's first priorities was an executive order chiding educational programs permitting transgender athletes in girls' sports. JA7-8; Exec. Order No. 14,201, 90 Fed. Reg. 9,279 (Feb. 5, 2025).

Maine has gone the opposite way. JA6-7. Maine law prohibits "[e]xclud[ing] a person from participation in" any "extracurricular … activity" or "[d]eny[ing] a person equal opportunity in athletic programs" based on "gender identity." 5 MRS §4602(1)(A)-(B). In public high schools, a transgender athlete need only "declare their gender identity" to participate in girls' sports and "[n]o medical records or official documents shall be requested or required to establish a student's gender identity." Me. Principals' Ass'n, *2024-2025 Handbook* 40, https://perma.cc/923N-PW6Z. Even after President Trump's executive order, Maine remained steadfast in that policy. JA8.

In February, Libby took to Facebook to call attention to Maine's policy, borne out at this year's high school track-and-field state championship. JA8-9. The championship was a public event; the names, schools, and podium photos of participants were widely broadcast and readily accessible online. JA10. Libby re-posted already-public, truthful information showing the first-place girls' pole vaulter previously competed in

3

boys' pole vault. JA8-9. That first-place finish propelled the athlete's high school team to win the girls' state championship by one point. JA10.[1]

Libby's post put Maine's policy in the national spotlight, prompting federal investigations regarding Maine's noncompliance with federal law. JA11-13. Days later, the Maine House censured Libby along a party-line vote of 75 to 70. JA15. The censure resolution called on Libby to "publicly apologize" for bringing "national attention" to Maine. H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025), https://perma.cc/JU85-VNTS. It denounced Libby's "statement criticizing the participation of transgender students in high school sports" as "reprehensible" and "incompatible with her duty and responsibilities as a Member of this House." *Id.* And while the resolution faulted Libby for identifying a "student athlete by [first] name" and "showing the minor in an athletic uniform" without "consent," *id.*, the post merely copied public information, showing podium photos from widely publicized state championship events, contained no threats, and violated no law. JA8-10, 14. The resolution omitted that the Speaker and others regularly show minors on their social media, without any indication of consent from the subjects. JA18-19.

---

[1] The fact that the winning athlete was transgender was no secret in Maine's public high school sports community. It was the subject of correspondence from at least one other coach to the organizer of Maine's high school track meets before the state championship. *See, e.g.*, Dan Zaksheske, *Trans-Identifying Male Athlete Wins Maine State Title In Girls' Pole-Vaulting*, OutKick (Feb. 19, 2025), https://perma.cc/8A83-9EZ8.

Dissenting House members criticized the resolution as "a mockery of the censure process," "set[ting] a standard … that the majority party, when they're displeased with a social media post that upsets them, can censure a member of the minority party." JA16. Other representatives raised free-speech concerns and sought clarification on whether members who re-posted Libby's post could "expect censures to come forth on them as well." JA17. The Speaker disclaimed knowledge of "any other censures." *Id.*

After the censure resolution passed, the Speaker summoned Libby to the well of the House chamber and demanded she apologize. *Id.* When Libby refused to recant her views, the Speaker found her in violation of Maine House Rule 401(11), providing that a member "guilty of a breach of any of the rules and orders of the House … may not be allowed to vote or speak … until the member has made satisfaction." JA17-18.

Ever since, Libby's district has had no voice or vote on the House floor. The Speaker has stopped Libby from speaking on any bill, including even posing a question in a recent debate on an equal rights amendment proposed for the state constitution. *Archived Hearings & Meetings: House Chamber* 11:31:50-11:32:27 AM, Me. Leg. (Apr. 23, 2025, 10:00 AM), https://bit.ly/3EGfZ3G; JA114, 116. The Clerk has not counted any vote for District 90 and indicated he will not do so for the rest of Libby's elected term, running through 2026. JA114, 116. District 90 is simply recorded as a "Z" on roll-call votes, even bills that Libby sponsors. *See, e.g.*, H.R. Roll Call No. 111 - LD 189, 132nd Leg., 1st Spec. Sess. (Me. May 6, 2025), https://perma.cc/M8V9-36H6. District 90 had no voice or vote on the State's $11 billion biennial budget or on bills their own

representative sponsored. JA22, 116. Soon District 90 will have no voice or vote on whether Maine should change its policy and limit girls' sports to girls plus several hundred more bills coming before the House in the coming months. JA21-22, 114-16.[2]

That exclusion of a duly elected legislator—silencing her and refusing to count her vote—is unprecedented in Maine. Only three other legislators have been censured in Maine's 200-year history; no other legislator has been denied their voice or vote as punishment for something they said outside the statehouse, let alone for the rest of their elected term. The past verbal censures involved conduct disrupting legislative proceedings. The House censured two members last year for floor statements about the 2023 Lewiston mass shooting. H.R. Res. 1, 131st Leg., 2d Reg. Sess. (Me. 2024), https://perma.cc/8YC3-6RY3; H.R. Res. 2, 131st Leg., 2d Reg. Sess. (Me. 2024), https://perma.cc/S63W-3XJF. Years earlier, the House censured a representative for "verbally abus[ing]" female senators outside the House chamber. 1 Legis. Rec. H-145-49, 120th Leg., 1st Reg. Sess. (Me. 2001), https://perma.cc/GL5C-FVY7.

The refusal to let a duly elected legislator speak or to count her vote for publicly stating a viewpoint outside the statehouse is also unprecedented beyond Maine.

---

[2] Defendants put *no* limit on how long Libby could be barred from speaking or voting except to say that "the current Legislature cannot bind a future Legislature." D.Ct. Doc.28, at 19. Nothing in their position would prevent the next Legislature's majority from reimposing the same punishment on Libby for the entirety of her next term. Conversely, had the House expelled Libby, the same punishment could not be reimposed. Me. Const. art.IV, pt.3, §4.

Legislatures everywhere discipline members with verbal censures. *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 475-76 (2022). But legislatures nowhere—except Maine beginning in 2025—do so by silencing a member and disenfranchising her constituents for the rest of her elected term. Congress allows only verbal censures or reprimands absent a two-thirds vote for expulsion. *See generally* Jack Maskell, Cong. Rsch. Serv., *Expulsion, Censure, Reprimand, and Fine: Legislative Discipline in the House of Representatives* (2016), https://perma.cc/T2P8-5Q55; Jack Maskell, Cong. Rsch. Serv., *Expulsion and Censure Actions Taken by the Full Senate Against Members* (2008), https://perma.cc/996R-GS2M. The U.S. House and others recognize the "constitutional impediments" for the greater punishment of depriving a member of the right to vote, given the destruction it would cause "to representation of the constituents of the Member's district." 3 *Deschler's Precedents of the United States House of Representatives* Ch.12 §§15-15.1 (1994), https://perma.cc/M3ZL-9P9R; *see also, e.g.*, Wis. Leg. Ref. Bureau, *Discipline in the Wisconsin Legislature: A History of Reprimand, Censure, Suspension, and Expulsion* 4 (2020), https://perma.cc/FK4F-JF6L (similar).

**B.** Libby, joined by six constituents, sued to restore District 90's voice and vote in the House after it became apparent that Libby's unprecedented punishment would continue indefinitely. JA18, 21-22, 28. They alleged violations of the First and Fourteenth Amendments and the Guarantee Clause against the House Speaker and House Clerk. JA4, 22-27.

The district court denied Plaintiffs' preliminary injunction motion, asking to restore Libby's ability to speak and vote for the ongoing legislative session. The district court held legislative immunity precluded any relief because the Speaker's "sanction" was a "legislative act" and District 90's disenfranchisement was not so "extraordinary" to overcome immunity. Add.33. The court distinguished *Bond* and *Powell* because "Libby has not been disqualified or expelled from her seat." Add.56-57. The court declined to conduct "a separate analysis" of the Clerk's refusal to count Libby's votes, in part because his actions came at the Speaker's direction. Add.57-58. The court also did not address the logical implications of its decision, declining to consider "hypothetical scenarios." Add.55. The court acknowledged that denying a representative her voice and vote indefinitely was "a weighty sword to wield" but was not moved because it "reflected the will of the majority of the House members." Add.61. For the same reasons, the court denied an injunction pending appeal. JA167.

Plaintiffs appealed and sought interim relief, asking only that the Clerk count Libby's votes pending appeal. Considering "the injunction papers" and "relevant portions of the record," the motions panel denied Plaintiffs' motion. Order (Apr. 25, 2025). The panel stated that likelihood of success on the merits and irreparable harm were the two most important factors but concluded Plaintiffs did not show "a sufficient likelihood of success" for interim relief, citing *Cushing v. Packard*, 30 F.4th 27 (1st Cir. 2022) (en banc), and *National Association of Social Workers v. Harwood*, 69 F.3d 622 (1st Cir. 1995). The panel did not address *Kilbourn*, *Bond*, or *Powell*.

The parties agreed to an expedited schedule for this appeal of the denial of Plaintiffs' preliminary injunction motion. Mot. to Expedite (Apr. 29, 2025). The legislative session is ongoing and is expected to last through midsummer. *Id.* ¶7. Absent relief, District 90 remains without a voice or a vote in the House through the end of the ongoing session and the rest of Libby's elected term.

## STANDARD OF REVIEW

A district court's denial of a preliminary injunction is reviewed for abuse of discretion. *Hiller Cranberry Prods. v. Koplovsky*, 165 F.3d 1, 4 (1st Cir. 1999). Issues of law are reviewed de novo. *Voice of the Arab World v. MDTV Med. News Now*, 645 F.3d 26, 31 (1st Cir. 2011). "A material error of law constitutes an abuse of discretion." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 875 (1st Cir. 2010).

Plaintiffs are entitled to a preliminary injunction if they show likely success on the merits, irreparable harm absent relief, that the equities favor them, and the public interest is served. *See Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012). "The first two factors are the most important." *Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 7 (1st Cir. 2021). This Court has discretion to address any preliminary injunction factors the district court did not analyze, *United States v. Kin-Hong*, 110 F.3d 103, 116 (1st Cir. 1997), given there is "a full record, both in the district court and on appeal, [and] the parties amply and ably briefed and litigated all four factors of the preliminary injunction test," *LWV of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). Especially so when there are "fundamental constitutional issue[s] … at stake and time

is of the essence." *Id.*; *see, e.g., Fortuño*, 699 F.3d at 10-12; *see also Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023) (remarking "a court must not shrink from its obligation to enforce [Appellants'] constitutional rights" (cleaned up)). This Court can and should "determine for [it]sel[f] whether" Plaintiffs' claims "warrant injunctive relief." *Societe Des Produits Nestle v. Casa Helvetica*, 982 F.2d 633, 642 (1st Cir. 1992).

## SUMMARY OF THE ARGUMENT

**I. A.** Legislative immunity does not bar this suit to restore District 90's voice and vote in the House. Silencing a duly elected representative and refusing to count her votes are not legislative acts protected by immunity. Such acts are antithetical to the legislative process. Together, they disenfranchise District 90 by denying its chosen representative her two most critical functions. Immunizing Defendants' acts distorts the very reason for legislative immunity: to ensure legislators may speak and vote freely on behalf of the people they represent.

It does not matter that a House resolution precipitated Defendants' challenged acts. Even when a resolution is the but-for cause of challenged conduct, legislative defendants are responsible for that later conduct, as the Supreme Court has reaffirmed in *Kilbourn*, *Powell*, and *Gravel*. This Court's decisions in *Harwood* and *Cushing*, applying immunity to generally applicable procedural rules, do not and could not undermine those Supreme Court decisions. They are inapposite here, where one legislator has been singled out and deprived of her voice and vote.

Even if one or both of the challenged acts were legislative—silencing a duly elected representative and refusing to count her votes—those acts are together so extraordinary that immunity does not apply. The Supreme Court and this Court have cautioned legislative immunity has limits and does not shield such extraordinary acts. Applied here, targeting Libby for her viewpoint is irreconcilable with *Bond*, where the Supreme Court overturned the Georgia House's exclusion of a member because of his protected speech. And Defendants' abuse of immunity—invoking it to insulate their unprecedented antidemocratic actions from review—is equally extraordinary, rendering the doctrine inapplicable.

**B.** On Libby's First Amendment retaliation claim, Defendants have not disputed that Libby's post was protected speech or that Defendants punished her because of it. And while they suggest her *de facto* expulsion is not adverse action, they must acknowledge that punishment is no different than the refusal to seat a district's representative held unconstitutional in *Bond* and so would require overruling *Bond*. No established historical practice supports that punishment. Denying Libby her two most critical functions as a legislator is indisputably adverse action by today's standards.

**C.** Refusing to count Libby's votes deprives District 90's constituents of equal representation in the House, in violation of the Fourteenth Amendment. While Mainers outside District 90 have a say in the ongoing legislative process, those in District 90 do not. It is as if District 90 residents were excluded from the State's 2021 redistricting plan. Worse, because the House did not have the two-thirds support to expel Libby,

11

there is no vacancy and thus no way to restore District 90's representation via a special election.

**D.** Libby's *de facto* expulsion also violates the Guarantee Clause. Plaintiffs' specific Guarantee Clause claim is justiciable, as it turns only on Maine's already-chosen republican form of government. Defendants have excluded Libby from the legislative process even though she satisfies the Maine Constitution's qualifications and even though there was no two-thirds vote to expel her. Transgressing these state constitutional requirements denies District 90 residents their constitutionally guaranteed republican form of government.

**II.** The equitable factors favor relief. The irreparable harm to Plaintiffs from the indefinite denial of their representation in the House is undisputed. There can be no do-over for each floor vote Libby misses. Libby's likely success on her First Amendment claim also establishes irreparable harm. Any interest Defendants claim in punishing a member could be served by a purely verbal censure, among other tools legislatures use short of disenfranchising entire districts. And any such "punishment" interest is outweighed by the harm to Plaintiffs and the public from the indefinite disenfranchisement.

## ARGUMENT

The district court erred by holding legislative immunity bars Plaintiffs' claims. Defendants' acts are not immune, and Plaintiffs have shown likelihood of success on their underlying constitutional claims. As for the remaining injunction factors,

Defendants have not seriously contested that the harm to District 90's residents is irreparable and that the balance of the equities and public interest favor restoring District 90's equal representation.

## I.    Plaintiffs are likely to succeed on the merits of their claims.

### A.    Legislative immunity is no bar to this challenge to restore District 90's equal representation.

The district court fundamentally erred by allowing Defendants to invoke legislative immunity simply because events precipitating Libby's ongoing punishment involved a House resolution and House rule. The Supreme Court has denied immunity in nearly identical circumstances. For good reason—if the rule were as Defendants say, the House could pass a resolution ordering the Clerk to refuse to count women or minority legislators' votes and then invoke immunity by pointing to that precipitating resolution. Thankfully, that sweeping view of legislative immunity is not the one applied in American courts. This Court can freely grant relief against Defendants to restore District 90's equal representation in the House by allowing their chosen representative to speak and vote. At the very least, this Court can grant relief against the Clerk to require District 90's vote to count.

#### 1.    Excluding Libby from debate and refusing to count her vote are not immune legislative acts.

**a.** "Legislative immunity does not … bar all judicial review of legislative acts." *Powell v. McCormack*, 395 U.S. 486, 503 (1969). It covers only "purely legislative activities," *United States v. Brewster*, 408 U.S. 501, 512 (1972), meaning acts "integral" to the

13

"deliberative and communicative processes" of members, *Gravel v. United States*, 408 U.S. 606, 625 (1972). It does not immunize all acts undertaken by a legislator or staff, even if directed by a vote or by a resolution. *See, e.g.*, *Powell*, 395 U.S. at 503-06; *Kilbourn v. Thompson*, 103 U.S. 168, 200-05 (1880); *Dombrowski v. Eastland*, 387 U.S. 82, 84-85 (1967); *accord Gravel*, 408 U.S. at 620-21. Nor does it broadly immunize "all conduct *relating* to the legislative process." *Brewster*, 408 U.S. at 515. The Supreme Court has "carefully distinguished between what is only 'related to the due functioning of the legislative process,' and what constitutes the legislative process entitled to immunity." *Hutchinson v. Proxmire*, 443 U.S. 111, 131 (1979).

The origins of legislative immunity can be traced back to England and the promise that "the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament" in the English Bill of Civil Rights of 1689. *United States v. Johnson*, 383 U.S. 169, 177-78 (1966). Before then, Tudor and Stuart monarchs used criminal and civil laws "to suppress and intimidate critical legislators" in Parliament. *Id.* at 178. The Crown used its power, with "judges [who] were often lackeys of the Stuart monarchs," to imprison members of Parliament for seditious libel. *Id.* at 181-82. It was that "chief fear" over "the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum" that motivated England's parliamentary immunity. *Id.* at 182.

At the Founding, America embraced legislative immunity at the state and national levels. *See Tenney v. Brandhove*, 341 U.S. 367, 372-75 & n.5 (1951). But the American

version had its limits. A legislator's privilege was "restrained to things done in the House in a Parliamentary course," not "to exceed the bounds and limits of his place and duty." *Hutchinson*, 443 U.S. at 125. Those limits "are defined and ascertained in our constitutions." *Id.*

Still today, the twin aims of legislative immunity are protecting "the integrity of the legislative process" and ensuring "the independence of individual legislators," not cementing legislative "supremacy." *Brewster*, 408 U.S. at 507-08. Immunity allows legislators to "enjoy the fullest liberty of speech" on the floor. *Tenney*, 341 U.S. at 373. When plaintiffs challenge the constitutionality of legislation, for instance, immunity precludes them from commencing a judicial inquiry into a legislator's "motives" for legislation, *id.* at 377-78, or whether his "conduct" on the floor "was improperly motivated," *Johnson*, 383 U.S. at 180. These protections are not for the legislator's own "private indulgence but for the public good." *Tenney*, 341 U.S. at 377. At its core, immunity protects a legislator from being "withdrawn from his seat by a summons," depriving "the people, whom he represents, [of] their voice in debate and vote." 2 Joseph Story, *Commentaries on the Constitution of the United States* §857 (1833). But the version of immunity deployed by Defendants—opposing judicial review for the denial of District 90's constituents' voice and vote in the House—distorts the doctrine beyond recognition.

**b.** Excluding Libby from debate and refusing to count her votes for the rest of her term are not "legislative act[s]." *Gravel*, 408 U.S. at 621; *see Powell*, 395 U.S. at 503-05. The Speaker's refusal to recognize Libby in debate does not "involve[] establishment

of a general policy" but instead "singles out" Libby and treats her "differently from others." *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 9 (1st Cir. 2000) (cleaned up). And the Clerk's marking Libby as a "Z" on roll-call votes for the rest of her term is better understood as "clerical work" that "must be performed regardless of" her "position." *In re Grand Jury Proc.*, 563 F.2d 577, 585 (3d Cir. 1977). It defies all logic to say the refusal to recognize her in debate and the refusal to tally her votes are "integral" to the "deliberative and communicative processes" of the House. *Gravel*, 408 U.S. at 625.

Put differently, Defendants' acts are anything but "essential to legislating." *Id.* at 621. Denying Libby's voice and vote is antithetical to the legislative process as it has always been understood. Our "representative government is in essence self-government through the medium of elected representatives of the people." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). The people have "two fundamental powers" under our representative government: the "right to petition their representatives to voice their concerns and interests on particular issues" and "the power actually exercised by the representative in the governing body," *i.e.*, "the right to vote." *Daly v. Hunt*, 93 F.3d 1212, 1226 (4th Cir. 1996). A legislator's "primary obligation[s] … in a representative democracy" include "participating in debates and voting on the [chamber] floor." *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 665 (D.C. Cir. 2006); *see* JA115-16. Legislators serve "as political representatives executing the legislative process." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011). They represent their constituents "in governmental debates." *Bond v. Floyd*, 385 U.S. 116, 136-37 (1966). And their voting "consummate[s] their duty

to their constituents." *Miller v. Town of Hull*, 878 F.2d 523, 533 (1st Cir. 1989). Legislators cast their vote "as trustee for [their] constituents." *Carrigan*, 564 U.S. at 126. A legislator's vote "is not personal to the legislator but belongs to the people." *Id.*; *see, e.g.*, JA31, 34, 37.

At the very least, with respect to the Clerk's refusal to count Libby's votes, there is no conceivable argument that such an act is "essential to legislating." *Gravel*, 408 U.S. at 621. Legislators do not get to decide how much their colleague's votes count. That is not a matter that "the Constitution places within the jurisdiction of either House" and thus is not a "legislative act." *Id.* at 621, 625. The Maine Constitution already decided Libby was qualified for office and demands a two-thirds vote for her expulsion. Me. Const. art.IV, pt.1, §4 & pt.3, §4; *see also, e.g.*, *Bond*, 385 U.S. at 130-31 (rejecting Georgia legislature's asserted power to decide whether representative took state constitution's required oath "with sincerity" and rejecting "that there should be no judicial review of the legislature's power to judge whether a prospective member may conscientiously take the oath"); *Powell*, 395 U.S. at 550 (holding Congress possesses no power to exclude duly elected representatives who satisfy the constitutional prerequisites for office). And the U.S. Constitution already decided that District 90 is entitled to equal representation. *See Reynolds*, 377 U.S. at 560-61 ("the fundamental principle of representative government in this country is one of equal representation"); *see also Michel v. Anderson*, 14 F.3d 623, 630 (D.C. Cir. 1994). It is no "legislative act" for the Clerk, the Speaker, or even

17

the House majority to revise these constitutional guardrails. Absent the two-thirds vote for her expulsion, Libby is entitled to vote just the same as her colleagues.

Historical practice confirms denying Libby's voice and vote is not "essential to legislating." *Gravel*, 408 U.S. at 621. There is no longstanding or established practice of legislative bodies indefinitely denying their members a voice or vote. *Infra* I.B.2. The U.S. House, consistent with the "weight of authority," does not consider itself to have the power "to deprive a Member of the right to vote." *Jefferson's Manual and Rules of the House of Representatives* §672 (2023), https://perma.cc/U78W-KZ2G. Wisconsin similarly recognizes the "generally accepted parliamentary practice that a legislative body cannot prevent a member from voting." Wis. Leg. Ref. Bureau, *Discipline in the Wisconsin Legislature: A History of Reprimand, Censure, Suspension, and Expulsion* 4 (2020), https://perma.cc/FK4F-JF6L. Idaho House rules expressly prohibit a censure from including any "conditions or restrictions" that "deny[] a legislative district representation via floor votes." Idaho H.R. Rule 45(6), https://perma.cc/EF3R-R4L2. Montana House rules provide that punishments for repeated breaches of decorum cannot "prohibit the offending member from voting on any measure before the House." Mont. H.R. Rule H20-20(2)(d)-(e), https://perma.cc/YTF6-M6KG. Pennsylvania Senate rules provide for a member indicted for certain crimes to lose committee or leadership positions, but "the member shall otherwise continue to function as a Senator, including voting." Pa. S. Rule 35(a), https://perma.cc/7N5C-BADQ. Maine is an outlier among

these States and others. Defendants' argument that their acts are "part and parcel of the legislative process" is implausible. *Gravel*, 408 U.S. at 626.

Defendants' invocation of immunity also inverts the doctrine's purpose. Far from "protect" the legislative process and its "integrity," their version of immunity makes a mockery of it. *Brewster*, 408 U.S. at 507. It surely does not ensure legislators' "independence." *Id.* Instead, Defendants, with the imprimatur of the district court, send the opposite message: speak your mind, offend a narrow majority, lose your voice and vote indefinitely, and kiss judicial review goodbye.

Worst of all, Defendants' invocation of immunity harms the very people it is meant to protect. Immunity protects a legislator's constituents, not legislative officials for their own convenience. *Tenney*, 341 U.S. at 377. Defendants convert "the shield of legislative immunity into a sword," *Powell v. Ridge*, 247 F.3d 520, 525 (3d Cir. 2001), eliminating District 90's equal representation in the House for the rest of its chosen legislator's elected term, *but see* Story, *Commentaries* §857 ("When a representative is withdrawn from his seat … the people, whom he represents, lose their voice in debate and vote … . The enormous disparity of th[at] evil admits no comparison."); *Coffin v. Coffin*, 4 Mass. 1, 29 (1808) (legislative immunity "should not unreasonably prejudice the rights of private citizens").

### 2. The precipitating censure resolution and House rule do not immunize Defendants' acts.

The district court's decision is irreconcilable with the Supreme Court's decisions in *Kilbourn* and *Powell*. Little different than *Kilbourn* and *Powell*, the federal courts here have the power to restore District 90's equal representation by restoring Libby's voice and vote, even though the precipitating events entailed a House resolution and rule. At the very least, this Court can grant relief against the Clerk to have Libby's votes count.

**a.** The district court concluded that legislative immunity precluded Movants from challenging "Speaker Fecteau's imposition of the sanction." Add.33. That misstates the nature of this suit. The complaint also indisputably challenges the Clerk's ongoing refusal to count District 90's votes. JA18, 21-22, 28. As to both the complaint's challenges to the ongoing silencing of Libby or the refusal to count her votes, it does not matter that those ongoing acts were precipitated by a House resolution or rule. Legislators and their staff are not immune for acts not "essential to legislating" even if undertaken under the auspices of a "resolution." *Gravel*, 408 U.S. at 621. Even when precipitating acts are "legislative in nature," subsequent acts are "subject to judicial review insofar as [their] execution impinge[s] on a citizen's rights," *id.* at 618, such as the Clerk's refusal to count votes, *Powell*, 395 U.S. at 504-06.

In *Kilbourn*, for example, immunity did not bar a suit against the House's sergeant-at-arms who arrested the plaintiff pursuant to a House resolution. 103 U.S. at 200, 205. This Court distinguished between a suit against a legislator for supporting the resolution

and a suit against the sergeant-at-arms for enforcing it, which could "no more justify the person who executed it than King Charles's warrant for levying ship-money could justify his revenue officer." *Id.* at 202. The sergeant-at-arms "was held liable" for merely "execut[ing] the House Resolution." *Powell*, 395 U.S. at 505. Legislative immunity "could not be construed to immunize an illegal arrest even though directed by an immune legislative act." *Gravel*, 408 U.S. at 619. "[R]elief could be afforded without proof of a legislative act or the motives or purposes underlying such an act." *Id.* at 621. And the Court went on to grant relief, invalidating the arrest because the House had exceeded its constitutional powers. *Kilbourn*, 103 U.S. at 192-96.

Similarly in *Powell*, immunity did not bar a suit against the House clerk for refusing to tally a representative's vote, the sergeant-at-arms for refusing to pay his salary, or the doorkeeper for denying him admission to the chamber—even though all those acts were taken pursuant to a resolution excluding the representative. 395 U.S. at 494, 504-06. As the Court explained, "[t]hat House employees are acting pursuant to express orders of the House does not bar judicial review." *Id.* at 504. Staff, including the clerk, "are responsible for their acts," *id.*, and nothing bars this Court from "determin[ing] the validity of legislative actions" and "afford[ing] relief" after the implementation of an "invalid resolution[]," *Gravel*, 408 U.S. at 620.

Cases invoking legislative immunity bear no resemblance to the challenged conduct here. Muting Libby's district is anything but "essential" to the House's internal "deliberations." *Id.* at 625; *cf. Doe v. McMillan*, 412 U.S. 306, 313 (1973) (holding

immunity protected acts of committee "authorizing an investigation," "holding hearings," "preparing a report," and "authorizing the publication and distribution of that report"); *Tenney*, 341 U.S. at 377-79 (applying immunity in action challenging purpose behind legislative committee hearing); *Johnson*, 383 U.S. at 184 (applying immunity to legislator's "motives underlying" floor speech). Unlike those immunity cases, Plaintiffs' challenge does not and need not turn on any inquiry into legislative motives. *See Gravel*, 408 U.S. at 621. There is no dispute that District 90 has lost its voice and vote because of Libby's speech and the views she refuses to recant. *Infra* p.30.

*Kilbourn* and *Powell* control here. The existence of some House resolution or rule does not foreclose this suit to restore District 90's voice and vote. *See Powell*, 395 U.S. at 504-06; *see also Sup. Ct. of Va. v. Consumers Union of U.S.*, 446 U.S. 719, 734-36 (1980) (holding "enforcement" of unconstitutional state bar rules was not immunized even if decision to adopt those rules was legislative). At a minimum, injunctive relief to have Libby's vote count would run against the Clerk "in a purely non-legislative capacity," so there is "no reason why [he] should be entitled to legislative immunity simply because the harm alleged originated, in some sense, with a legislative act." *State Emps. Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 89 (2d Cir. 2007) (citing *Kilbourn*, 103 U.S. at 196-205); *accord Powell*, 395 U.S. 504-06. A vote on the censure resolution or House rules cannot "in and of itself" insulate Defendants' acts of silencing and disenfranchising District 90. *Kamplain v. Curry Cnty. Bd. of Comm'rs*, 159 F.3d 1248, 1252 (10th Cir. 1998); *see, e.g.*, *Walker v. Jones*, 733 F.2d 923, 932 (D.C. Cir. 1984) (R.B. Ginsburg, J.) (explaining

"execution of a decision," even if decided by a committee vote "is not cloaked with …
immunity").

The district court distinguished *Powell* on grounds that do not withstand *Powell* or
other binding precedent: because "Libby has not been disqualified or expelled from her
seat." Add.57. But *Powell*'s immunity holding turned on the clerk's refusal to count
votes, not the particulars of the underlying resolution. 395 U.S. at 504. And as the Su-
preme Court later described both *Powell* and *Kilbourn*, it was the legislative employees'
acts that mattered, not the resolution that precipitated them. *Gravel*, 408 U.S. at 620-21.

The district court's sweeping view of immunity—covering any acts following a
resolution or rule—has no limiting principle. If immunity precludes any review of the
Clerk's refusal to count Libby's votes, then immunity is "all-encompassing." *Contra
Gravel*, 408 U.S. at 625. The district court dismissed the consequences of its reasoning,
declining to "explore hypothetical scenarios." Add.55. But there is no rational way to
distinguish this case from any future case where a legislator, or a legislative majority,
directs a clerk not to count another legislator's vote. By Defendants' logic, they could
prohibit Asian-American or female representatives, or those in same-sex or interracial
marriages, from making floor speeches or voting and then claim immunity so long as a
resolution precipitated those restrictions. *But see SFFA v. Harvard*, 600 U.S. 181 (2023);
*Obergefell v. Hodges*, 576 U.S. 644 (2015); *Loving v. Virginia*, 388 U.S. 1 (1967). Or why not
order the Clerk to ignore votes of legislators refusing to stand for the pledge of alle-
giance, opposing President Trump's agenda, or excusing themselves from legislative

prayers? *But see W.Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Town of Greece v. Galloway*, 572 U.S. 565, 586-91 (2014). If immunity puts Defendants "above the Constitution" here, *Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 638 (1st Cir. 1995) (Lynch, J., dissenting), so too in those circumstances.

**b.** Nor are the circumstances here comparable to the generally applicable procedural rules challenged in *Harwood*, 69 F.3d 622, and *Cushing v. Packard*, 30 F.4th 27 (1st Cir. 2022) (en banc). Neither singled out a legislator and denied her district equal representation for the rest of her elected term.

*Harwood* involved a Rhode Island House rule banning lobbyists and lobbying from the House floor during floor sessions. 69 F.3d at 631-35. The policy ensured House business would be uninhibited by lobbyists. *Id.* at 632. The "legitimate legislative purposes" of such a policy are plain. *Id.* at 634. Conversely, denying Libby's voice and vote in retaliation for her protected speech serves no "legitimate legislative purposes." *Id.*; *see* JA18; *supra* I.A.1.b. Further, *Harwood* distinguished the generally applicable "procedural rule" regulating lobbyists (immune) from "*punitive* enforcement" of measures not "govern[ing] the conduct of legislative proceedings" generally (*not* immune). 69 F.3d at 631-33 & n.9. *Harwood* nowhere suggests that immunity would protect one legislator being barred from the House floor, as opposed to all lobbyists.

*Cushing* similarly involved a generally applicable policy. The New Hampshire House Speaker's refused to allow remote voting during the COVID-19 pandemic for any legislators. 30 F.4th at 49-53. That voting procedure did not discriminate between

legislators and required all House business to occur in person. *Id.* at 49. It is not as though those speaking out against COVID-19 policies on Facebook were required to vote in person but those supportive of them were allowed to vote from home. Indeed, *Cushing* distinguished the Speaker's across-the-board rule from circumstances "target[ing]" particular legislators. *Id.* at 51. *Cushing* never suggested the Speaker could claim immunity for forcing only one legislator to vote in person. Yet here, Defendants have barred Libby from debating and voting while all other representatives remain free to do so.

Neither *Harwood* nor *Cushing* purported to abrogate the Supreme Court's rejection of immunity arguments in *Kilbourn* and *Powell. Accord Gravel*, 408 U.S. at 618-21. *Harwood* simply observed *Powell* should not be misread to reject legislative immunity for *all* "legislative employees" because immunity turns "on whether 'relief could be afforded without proof of a legislative act or the motives or purposes underlying such an act,'" regardless of the actor. 69 F.3d at 633. *Cushing* similarly stressed *Powell*'s and *Kilbourn*'s "focus … on the character of the legislative act being challenged." 30 F.4th at 51-52. But this Court has not and could not disavow *Powell*'s central holding: that the Clerk of the U.S. House could not claim immunity for refusal to count Representative Powell's votes, just as the Clerk of the Maine House cannot claim immunity for refusal to count Representative Libby's votes. 395 U.S. at 504-06. Still today, "refusing to seat a member has never been determined to be protected by any type of immunity." *Star Distribs. v. Marino*, 613 F.2d 4, 9 (2d Cir. 1980). For that reason, it is entirely unsurprising

that in *Bond*, Georgia conceded it could not be "completely free of judicial review" for excluding an elected representative. 385 U.S. at 130. Neither the Supreme Court's precedent nor this Court's precedent supports Defendants' limitless argument that their silencing of a duly elected legislator and their refusal to count her votes are "legislative acts" for which immunity attaches.

### 3. Defendants' acts are of an extraordinary character such that immunity does not apply.

Even if one or both of the challenged acts—the ongoing silencing of Libby and the refusal to tally her votes—are "legislative acts," the circumstances here fit within the exception for acts "of an extraordinary character" for which immunity does not apply. *Cushing*, 30 F.4th at 50 (quoting *Kilbourn*, 103 U.S. at 204); *Harwood*, 69 F.3d at 634 (same).

Defendants' *de facto* expulsion—all for Libby's protected speech—is extraordinary. It is unprecedented in Maine until now and unprecedented nationwide after *Bond* and *Powell*. As this Court has acknowledged, legislative immunity is no shield for "extraordinary" legislative acts. *Harwood*, 69 F.3d at 634; *Cushing*, 30 F.4th at 50. The district court erred by likening District 90's disenfranchisement to *Cushing*'s circumstances—in the district court's words, "forcing members to choose between their health and/or physical ability to be present in person for sessions and the ability to perform the responsibilities of their elected position." Add.55. No district in *Cushing* was denied its voice or vote. And *Cushing* cannot be read to *sub silentio* overrule binding Supreme Court

precedent in *Powell*. The extraordinary circumstances here are the very sort that *Cushing* anticipated would not be immune.

Immunity does not shield acts "so flagrantly violative of fundamental constitutional protections," namely "invidiously discriminatory" acts, even if "legislative." *Harwood*, 69 F.3d at 634. Because of views she shared online on her own time, Libby became the target of invidious viewpoint discrimination, *see Rosenberger v. Rector & Visitors of UVA*, 515 U.S. 819, 829 (1995), irreconcilable with the Supreme Court's decision in *Bond*, overturning the Georgia House's exclusion of a legislator for espousing a viewpoint the majority rejected, 385 U.S. at 135-37; *infra* I.B.1. As a result, Libby and her constituents have lost their right to equal representation in the House. *Infra* I.C. There is no distinguishing *Bond*, as the district court did, because "Libby has not been disqualified, excluded, or expelled from her elected seat." Add.56-57.[3] No different than *Bond*, Libby's district is denied its voice and vote because Libby dared to exercise her First Amendment rights. Neither *Powell* nor *Bond* can be circumvented by letting a legislator sit and then claim immunity when she is barred from speaking or voting for the rest of her term. To hold otherwise "would permit legislative immunity, designed to safeguard

---

[3] The deprivation here is *worse* than expulsion. Had the House had the two-thirds support to expel Libby, a special election could have restored District 90's vote. *See* Me. Const. art.IV, pt.1, §6 & pt.3, §4; *see also, e.g.*, *Monserrate v. N.Y. Senate*, 599 F.3d 148, 155 (2d Cir. 2010) (explaining temporary lack of representation due to senator's expulsion was quickly remedied by a special election weeks later). Instead, a bare majority imposed *greater* harm by denying District 90's chosen representative her voice and vote indefinitely. *Infra* pp.40-41, 45-46.

representative democracy, to be weaponized against the representation it is meant to support." *Cushing*, 30 F.4th at 59 (Thompson, J., dissenting). Now that Libby and her constituents sought the judiciary's help to redress those harms, Defendants cannot turn around and invoke immunity for their entirely antidemocratic acts.

Defendants' "abuse" of immunity "warrant[s] the 'extraordinary character' descriptor." *Cushing*, 30 F.4th at 52. The Framers were "well aware" of "the abuses that could flow from too sweeping safeguards" for legislators. *Brewster*, 408 U.S. at 517. To guard against those abuses, legislative immunity operates only as a "shield" protecting "what is necessary to preserve the integrity of the legislative process," *id.*, not as a sword to destroy it. But here, Defendants' invocation of immunity looks more like the tyranny it was intended to guard against. Just as English monarchs used executive power "to suppress and intimidate critical legislators" in Parliament, *Johnson*, 383 U.S. at 178, Defendants have set out "to police" speech of members well beyond "the legislative function" that they disfavor, *Brewster*, 408 U.S. at 519, by denying Representative Libby her most critical legislative powers to debate and vote on legislation. *Supra* pp.16-17. The resulting loss of equal representation "run[s] counter to our fundamental ideas of democratic government." *Reynolds*, 377 U.S. at 564.

Worse, "the voters" cannot "be the ultimate reliance for discouraging or correcting such abuse[]" here. *Tenney*, 341 U.S. at 378. Mainers in District 90 cannot vote out the Speaker or replace the Clerk. Nor can Mainers in District 90 restore their equal representation with a special election—after all, the House lacked the two-thirds

support necessary to expel Libby, trigger a vacancy, and fill that vacancy by special election. Me. Const. art.IV, pt.1, §6 & pt.3, §4. Instead, Defendants have silenced Libby and confiscated her vote without redress for her constituents. For *at least* the rest of her term, Defendants will prohibit District 90's chosen representative from exercising the very freedom of thought and legislative action that legislative immunity is intended to protect. Legislative immunity "support[s] the rights of the people," including District 90's constituents, "by enabling their representatives to execute the functions of their office without fear of prosecutions." *Tenney*, 341 U.S. at 373-74. Defendants have turned that protection on its head, depriving "the people" in District 90 of "their voice in debate and vote." Story, *Commentaries* §857. Applying immunity here serves only anti-democratic ends, not any "democratic end." *Contra Cushing*, 30 F.4th at 52.

*     *     *

There is nothing novel about Plaintiffs' position. In 1963, the Georgia House agreed that if a legislator were excluded "on racial *or other clearly unconstitutional grounds*," of course the federal judiciary could "test[] the exclusion." *Bond*, 385 U.S. at 130 (emphasis added). The only novel argument is Defendants' contention that different rules apply in Maine. Where a legislature "by its rules ignore[s] constitutional restraints or violate[s] fundamental rights," *United States v. Ballin*, 144 U.S. 1, 5 (1892), it is "emphatically the province and duty of the judicial department" to say so, *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 177 (1803); *see Kilbourn*, 103 U.S. at 199. It is "competent and

29

proper" for this Court to consider whether the refusal to count District 90's votes is "in conformity with the Constitution." *Powell*, 395 U.S. at 506.

## B.    Libby is likely to succeed on her First Amendment claim.

Defendants have never seriously contested that the ongoing refusal to allow Libby to debate or to count District 90's votes as punishment for Libby's speech constitutes First Amendment retaliation. *See Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (describing retaliation claims). They have not contested that Libby's criticism of Maine's transgender sports policy is protected speech. Libby expressed "ideas for the bringing about of political and social changes." *Roth v. United States*, 354 U.S. 476, 484 (1957). And she did so on social media, "the most important place[] … for the exchange of views" today. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Nor have Defendants contested that, but for Libby's criticism and her refusal to recant it, she could be voting.[4] *See Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019). At most, all Defendants have done is gesture at the argument that barring Libby's speech and refusing to tally

---

[4] Defendants' contention that Libby need only apologize to restore her voice and vote only compounds the ongoing constitutional violations. *See, e.g.*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) (unconstitutional conditions doctrine bars coercively withholding benefits from those who exercise fundamental rights); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796-97 (1988) (First Amendment "necessarily compris[es] the decision of both what to say and what not to say"). The option to recant wasn't good enough in *Bond*, and it's not good enough here. *See* 385 U.S. at 128 (noting that when Bond refused to "recant" his criticism of the Vietnam War, the Georgia House continued to exclude him).

her votes indefinitely might not be material adverse action. Binding Supreme Court precedent holds that they are.

**1.** Defendants' retaliation for Libby's speech is indistinguishable from the retaliation held unconstitutional in *Bond*. After Julian Bond was elected to the Georgia House, he said in a radio interview that he didn't "believe in" the Vietnam War and that it was "hypocritical" to fight for liberty "in other places" but "not guarantee[] liberty to citizens inside the continental United States," and he endorsed a statement that "[t]he murder of Samuel Young in Tuskegee" was "no different than the murder of peasants in Viet Nam" and that "[t]he United States is no respector of persons or law when such persons or laws run counter to its needs and desires." *Bond*, 385 U.S. at 119-22. Before Bond was seated, 75 legislators petitioned that his statements made him unfit for office, including because they brought "discredit and disrespect on the House." *Id.* at 123. When Bond came to the House to be sworn in, "the clerk refused to administer the oath." *Id.* And the House overwhelmingly adopted a resolution prohibiting Bond from taking the oath and serving as his district's representative. *Id.* at 125. So Bond sued the Speaker of the House and others, and he won. *Id.* at 125, 136-37.

The Supreme Court held that disqualifying Bond from the Georgia House violated his First Amendment right of free expression. *Id.* at 137. The Court rejected that elected officials' speech is held to a higher standard than ordinary citizens: "The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Id.* at

135-36. The Court observed that "[l]egislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them." *Id.* at 136-37.

The same First Amendment interests prevail here. Defendants' unprecedented punishment, denying District 90's chosen representative her ability to speak or vote on the House floor for the rest of her term, is no different than the Georgia House's *ex ante* refusal to seat Bond as his district's chosen representative. Both accomplish the same end: denying the legislator's constituents their right to "be represented in governmental debates by the person they have elected to represent them." *Id.* at 136-37.

**2.** The Supreme Court's recent decision in *Wilson* confirms that Plaintiffs' First Amendment retaliation claim is likely to succeed. In *Wilson*, the Court was laser-focused on a legislative body's purely *verbal* censure and whether legislative colleagues' words alone could be the basis of a First Amendment retaliation claim. *See* 595 U.S. at 474, 478. The Court expressly distinguished "censures accompanied by punishments." *Id.* at 480; *see id.* at 482 ("Our case is a narrow one," "not involv[ing] expulsion, exclusion, or any other form of punishment.").

Most relevant here is how the Supreme Court distinguished *Wilson*'s verbal censure from *Bond*'s punishment. The former involved only "counterspeech from colleagues" condemning Wilson's imprudence, while the latter "implicated not only the

speech" of Bond, "it also implicated the franchise of his constituents." *Id.* at 481. Those "forms of discipline 'are not fungible' under our Constitution." *Id.* (quoting *Powell*, 395 U.S. at 512).

History makes all the difference in distinguishing verbal censures from the challenged conduct here, akin to *Bond*. For as much as "elected bodies in this country have long exercised the power to censure their members" with "a purely verbal censure," *id.* at 475, there is no equivalent historical precedent for depriving members their voting rights as Defendants have done here.

Longtime congressional practice illustrates the distinction. There is an unbroken history of verbal censures in Congress, *id.* at 475-76, but the U.S. House does not consider itself to have an additional punitive power "to deprive a Member of the right to vote," *Jefferson's Manual* §672. The Speaker "has denied" his "own power to deprive a Member of the constitutional right to vote," *id.*, even where members are in the custody of the Sergeant-at-Arms, 5 *Hinds' Precedents of the House of Representatives of the United States* §5937 (1907), https://perma.cc/CJ3H-SVNF. Denying a member the right to cast votes on behalf of her district would "deprive[] the district, which the Member was elected to represent, of representation," "effectively disenfranchis[ing]" constituents. 3 *Deschler's Precedents of the United States House of Representatives* Ch.12 §§15-15.1 (1994), https://perma.cc/M3ZL-9P9R.

Maine is an outlier among the U.S. House and other legislatures, recognizing the "constitutional impediments" to depriving a sitting member of her right to vote. *Id.* In

rejecting a proposed mandatory deprivation of voting rights for members convicted of certain crimes, the U.S. House observed the need to "preserve the right to representation of the constituents of the Member's district." *Id.* §15.1; *see also, e.g.*, *Discipline in the Wisconsin Legislature* 4 (recognizing the "legal problems with suspending legislators" because the suspended legislator's district "loses its representation"). Commentators have long observed the same. *See* Gerald T. McLaughlin, *Congressional Self-Discipline: The Power to Expel, to Exclude and to Punish*, 41 Fordham L. Rev. 43, 60 (1972) (suspension "robs" a district "of its right to congressional representation"); D.S. Hobbs, *Comment on* Powell v. McCormack, 17 U.C.L.A. L. Rev. 129, 152 (1969) ("suspension deprives the suspended member's district of representation"). Thus, other state legislative bodies expressly shield members' vote from punishment. *Supra* p.18 (discussing Idaho and Montana House and Pennsylvania Senate rules). Rules of countless state legislative bodies provide for specific disciplinary measures against members that do not contemplate indefinite exclusion from debate or denial of voting rights, including censure, reprimand, fine or restitution, loss of committee or leadership positions, or expulsion. *See, e.g.*, Colo. H.R. Rule 49(f) & S. Rule 43(f), https://perma.cc/GRA2-4EY7; Fla. S. Rule 1.43(2), https://perma.cc/67Y8-G8R5; Ga. S. Rule 9-1.2(b)-(c), https://perma.cc/T75R-MXNW; Idaho S. Rule 52(F), https://perma.cc/6EX3-2SV9; Kan. H.R. Rule 4903, https://perma.cc/BX79-UALR; Kan. S. Rule 76, https://perma.cc/UAG7-YQ7Y; Mass. H.R. Rule 16, https://perma.cc/3F6D-63NC; Mich. H.R. Rule 74(8), https://perma.cc/2KD2-PGP4; Mich. S. Rule 1.311,

https://perma.cc/ZJM5-3KGB; Or. H.R. Rule 3.20(3), https://perma.cc/F4DE-V84A; Or. S. Rule 3.33(8), https://perma.cc/6KWU-723D; Wis. Assemb. Rule 21, 43(3), https://perma.cc/YLP7-7H5R. In this litigation, Defendants have identified only two other state legislative bodies with similar rules allowing the denial of a member's speaking and voting rights, *in theory. See* D.Ct. Doc.28, at 2-3 & n.3. *In practice*, Defendants have identified no instances in which those States applied such rules, especially not as punishment for a member's speech on her own time, on social media, on issues of public importance, well beyond the legislative chamber. Maine's rule is an outlier, and its application here puts it on an island.

In the colonies, there was no "unanimity" that legislatures could "exclude members indefinitely from their seats" because common law "guaranteed" exercise of "the franchise." Mary Patterson Clarke, *Parliamentary Privilege in the American Colonies* 200 (Da Capo Press ed. 1971); *see, e.g., Gray v. Sanders*, 372 U.S. 368, 375 n.7 (1963) (recognizing common law right). That view has held true today. "[T]he prevailing view is that members of the legislature do not have the power to suspend members and therefore deprive them of the right to vote." *Boquist v. Courtney*, 32 F.4th 764, 783 (9th Cir. 2022); *accord Jefferson's Manual* §672 (describing "the weight of authority" that legislatures cannot prohibit censured members from voting).

Beyond history, "contemporary doctrine" shows the speaking and voting prohibition are both actionable adverse action. *Wilson*, 595 U.S. at 477. Retribution for speech is sufficiently adverse if it "would have a chilling effect on the [plaintiff's] exercise of

35

First Amendment rights." *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011). Retaliation against elected officials is adverse action where it denies "the full range of rights and prerogatives that came with having been publicly elected." *Boquist*, 32 F.4th at 777. The Supreme Court upheld the purely verbal censure in *Wilson* because it "did not prevent Mr. Wilson from doing his job" or "deny him any privilege of office," and so could not "have materially deterred an elected official like Mr. Wilson from exercising his own right to speak." 595 U.S. at 479. But here, barring Libby from debating and voting denies her the most central privileges of legislative office. *See* JA116 ("The two most critical responsibilities of a duly elected legislator are to speak and vote on behalf of those they represent … ."). As the Ninth Circuit held, eliminating a legislator's "ability to immediately respond to and address a political issues arising on the floor" is adverse action. *Boquist*, 32 F.4th at 783.

Importantly, the "countervailing speech" rationale that justified the purely verbal censure in *Wilson* is absent here. A legislative body's purely verbal censure "is itself a form of speech." *Wilson*, 595 U.S. at 478. But there is no First Amendment interest in "silenc[ing] other representatives." *Id.* For that reason, the "countervailing speech" of a verbal censure in *Wilson* did not "abridge" Wilson's speech rights. *Id.* at 477. But here, barring Libby from speaking and voting goes well beyond "a form of speech by elected representatives." *Id.* at 479. Libby herself has been silenced, and her district has been disenfranchised. The very essence of the unprecedented punishment is to "prevent [her] from doing [her] job" and "deny [her]" the most central "privilege[s] of office":

debating and voting. *Id.*; *supra* p.36. That punishment is irreconcilable with the "manifest function of the First Amendment" that "legislators be given the widest latitude to express their views on issues of policy." *Bond*, 385 U.S. at 135-36. Following *Wilson* and *Bond*, there is no room to doubt that Libby has suffered unconstitutional retaliation.

### C.     Plaintiffs are likely to succeed on their Fourteenth Amendment claim.

The Equal Protection Clause demands "equal state legislative representation." *Reynolds*, 377 U.S. at 568. That requirement of equality is denied "by wholly prohibiting the free exercise of the franchise" or "by a debasement or dilution of the weight of a citizen's vote." *Id.* at 555; *see Wesberry v. Sanders*, 376 U.S. 1, 7 (1964) ("when qualified voters elect members of [a legislature] each vote [must] be given as much weight as any other vote"). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry*, 376 U.S. at 17; *see Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1885) (voting "is regarded as a fundamental political right, because [it is] preservative of all rights").

That guarantee of equal representation would be an empty promise if voters' chosen representative was later prohibited from speaking or voting on their behalf on the House floor. *See Michel*, 14 F.3d at 626. But exactly that has transpired in Maine. District 90's representation has not simply been "diluted," as the Supreme Court's voting rights cases have used that term. *See, e.g.*, *Reynolds*, 377 U.S. at 562-63. District 90 has been *entirely disenfranchised* by the refusal to count Libby's votes indefinitely. That

ongoing deprivation of equal representation in the Maine House violates the Fourteenth Amendment.

By denying Libby her voice and vote, Defendants forgot that Libby does not speak or vote only for herself. JA116. Libby speaks on the floor on behalf of her constituents, "voic[ing] their concerns and interests on particular issues." *Daly*, 93 F.3d at 1226. And her vote "belongs to the people" of District 90. *Carrigan*, 564 U.S. at 126. She casts her votes "as trustee for [her] constituents." *Id.* That "vote is the commitment of [her] apportioned share of the legislature's power to the passage or defeat of a particular proposal." *Id.* at 125-26. Thus, "[r]estrictions on a public official's participation … infringe upon voters' rights to be represented." *Peeper v. Callaway Cnty. Ambulance Dist.*, 122 F.3d 619, 623 (8th Cir. 1997).

Informed by these principles inherent in our system of representative democracy, the U.S. House does not strip members of their voting rights. The House recognizes that would unconstitutionally deprive constituents of their representative vote. *See* 3 *Deschler's Precedents* Ch.12 §§15-15.1. By allowing only verbal censures, the House takes care to "preserve the right to representation of the constituents of the Member's district." *Id.* §15.1. The U.S. House recognizes that denying members their ability to vote will "deprive[] the district, which the Member was elected to represent, of representation," "effectively disenfranchis[ing]" those "who elected that person to represent them" and "undermin[ing] the basic interest of a constituency in their representative government." *Id.*

Meanwhile, in Maine, the refusal to count Libby's vote creates two classes of voters: a) those in District 90, who are not represented for roll-call votes and b) those in every other district, who are. Defendants' acts "contract[] the value of some votes and expand[] that of others." *Wesberry*, 376 U.S. at 7; *see, e.g.*, *Kucinich v. Forbes*, 432 F. Supp. 1101, 1116-17 (N.D. Ohio 1977) (holding suspension of councilmember violated equal-protection "right to representation"); *Ammond v. McGahn*, 390 F. Supp. 655, 660 (D.N.J. 1975) (excluding state senator from caucus such that she could not "effectively participate fully in the legislative process" "deprived her constituents of the Equal Protection of the law" (citing *Reynolds*, 377 U.S. at 555)), *rev'd on mootness grounds*, 532 F.2d 325 (3d Cir. 1976). This "across-the-board disenfranchisement" for District 90 voters "betokens an utter breakdown of the electoral process." *Bonas v. Town of North Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001).

District 90's lack of equal representation, promised to last at least until the end of Libby's term, is no different than if District 90's voters couldn't participate "on an equal basis with other citizens" across Maine on election day. *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). That the "dilution occurs after the voters' representative is elected" is immaterial. *Michel*, 14 F.3d at 626. Equal protection applies to "the initial allocation of the franchise" and "the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05. As the D.C. Circuit has observed, "It could not be argued seriously that voters

would not have an injury if their congressman was not permitted to vote at all on the House floor." *Michel*, 14 F.3d at 626. Just as the Maine House could not reduce the strength of District 90's vote by one-half, it cannot reduce District 90's vote to nothing. *See Reynolds*, 377 U.S. at 555-58.

It is no answer to point, as the district court did, to incidental benefits of office that Libby retains. Add.60-61. The district court accepted Defendants' argument that any burden on District 90's constituents was modest because Libby may still attend committee meetings and receive a salary, never mind that she cannot speak or vote on the floor. *Id.* But Libby's "primary obligation[s]" as a representative are "participating in debates and voting on the [chamber] floor." *Ballenger*, 444 F.3d at 665; *see* JA115-16. Other incidents of office are no substitute for Libby "executing the legislative process," *Carrigan*, 564 U.S. at 126, and "consummat[ing] [her] duty to [her] constituents," *Miller*, 878 F.2d at 533, through her voice and vote on legislation. *See, e.g.*, JA31, 34, 37. A legislator who cannot debate or vote is like a judge who cannot hear or decide cases; no one would confuse the judge's ability to attend judicial conferences, hire law clerks, or review bench memos as a substitute for the exercise of core judicial power.

Without this Court's intervention, District 90's residents have no equal representation in the House—indefinitely. And there is no political solution for Defendants' unconstitutional acts. If the House had the two-thirds support to expel Libby, a special election could have restored District 90's vote; and if Libby were then re-elected, the Maine Constitution would preclude Defendants from imposing the same punishment.

*See* Me. Const. art.IV, pt.1, §6 & pt.3, §4. But the House did not have the votes to expel Libby, and so Defendants effectuated a *de facto* expulsion instead, denying District 90's constituents "the right of the people to choose their own officers" based on "the sudden impulses of mere majorities," exceeding their powers "limited by" the Maine Constitution. *Duncan v. McCall*, 139 U.S. 449, 461 (1891). Representative Libby remains District 90's representative with no constitutional mechanism to restore her voice or vote unless, contrary to our most basic First Amendment freedoms, she recants her views. *See* 3 *Deschler's Precedents* Ch.12 §15.1 (explaining "there can be no replacement for the punished member" absent expulsion, so "a constituency would be left without a voice … for the duration of the Congress"). Denying Libby's voice and vote violates the Fourteenth Amendment's guarantee of equal representation.

### D.    Plaintiffs are likely to succeed on their Guarantee Clause claim.

Defendants' *de facto* expulsion of District 90's chosen representative, without the required two-thirds vote to formally expel her, also denies Plaintiffs their constitutionally guaranteed republican form of government. *See* U.S. Const. art.IV, §4. There is no dispute that Libby meets the Maine Constitution's qualifications to serve and that there has been no two-thirds vote to expel her. *Supra* pp.40-41. And yet, Defendants are depriving her of her two most central functions—speaking and voting on the floor—for the rest of her elected term. In flouting Maine's state constitutional requirements defining who is a qualified legislator and the high bar for expelling a legislator, Defendants

violate the federal Guarantee Clause by transgressing the Maine Constitution's provisions for its chosen republican form of government.

**1.** Plaintiffs' Guarantee Clause claim is justiciable. As the Supreme Court has observed, "not all claims under the Guarantee Clause present nonjusticiable political questions." *New York v. United States*, 505 U.S. 144, 185 (1992); *see Largess v. Supreme Jud. Ct. of Mass.*, 373 F.3d 219, 229 (1st Cir. 2004) (noting "several members of the Supreme Court have suggested that federal courts can indeed review the internal allocations of power in a state government under the text of this clause" (citing *Bush*, 531 U.S. at 112 (Rehnquist, C.J., concurring))). As with any justiciability question, this Court must look to the particulars of Plaintiffs' claim to ascertain whether courts may resolve it, or whether it is too "'political' in nature" and devoid of "judicially manageable standards." *Reynolds*, 377 U.S. at 582; *see, e.g.*, *Kerr v. Hickenlooper*, 744 F.3d 1156, 1181 (10th Cir. 2014) ("the specific Guarantee Clause claim asserted in this case is not barred by the political question doctrine"), *vacated on other grounds*, 576 U.S. 1079 (2015); *Democratic Party of Wis. v. Vos*, 966 F.3d 581, 589 (7th Cir. 2020) (noting district court "went too far in saying that no Guarantee Clause claim" is justiciable). No justiciability concerns bar consideration of Plaintiffs' narrow claim here, given that it simply turns on the constitutional parameters Maine chose for its republican form of government.

Plaintiffs' claim is not "political" so as to remove it from this Court's jurisdiction. Guarantee Clause claims are *not* "per se non-justiciable." *Kerr*, 744 F.3d at 1176. The clause references the "United States" broadly, which includes Article III courts. *Id.*; *see*

*also Baker v. Carr*, 369 U.S. 186, 242 n.2 (1962) (Douglas, J., concurring) (reading the clause to be "enforceable only by Congress or the Chief Executive is not maintainable"). As in *Kerr*, Plaintiffs' claim regarding their deprivation of representation in the Maine House, contrary to the Maine Constitution's requirements, presents a "narrow issue" with no textual commitment to a coordinate branch of the federal government. 744 F.3d at 1177. It is far from claims implicating "the relationship between the judiciary and the coordinate branches of the Federal Government," which have been held non-justiciable. *Baker*, 369 U.S. at 210.

There are also judicially manageable standards to adjudicate Plaintiffs' claim, and no other justiciability concerns preclude review. *See Kerr*, 744 F.3d at 1177-81. Plaintiffs do not ask, for example, to second-guess whether Maine's chosen parameters adequately afford its citizens a republican form of government. *Cf. Largess*, 373 F.3d at 227. They ask only whether state officials must stick to those parameters chosen to carry out its republican form of government, consistent with the Guarantee Clause. *See* Thomas A. Smith, Note, *The Rule of Law and the States: A New Interpretation of the Guarantee Clause*, 93 Yale L.J. 561, 565-73 (1984) (explaining federal courts under the Guarantee Clause could "be limited to scrutinizing state actions for their consistency with state constitutions"); *see also, e.g., Kerr*, 744 F.3d at 1173 (distinguishing cases "involv[ing] wholesale attacks on the validity of a state's government" from "a challenge to a single provision of a state constitution"). Plaintiffs contend that Defendants' acts are inconsistent with Maine's constitutional provisions essential to guaranteeing Mainers a republican form

43

of government. *Infra* I.D.2. Just as the federal courts are competent to adjudicate violations of similar provisions under the federal Constitution, *Powell*, 395 U.S. at 548, so too can this Court adjudicate Plaintiffs' claim.

**2.** Plaintiffs have shown a Guarantee Clause violation. While the outer bounds of the clause are the subject of extensive academic debate, *see Largess*, 373 F.3d at 226 (collecting authorities), there is little dispute over the core of its guarantee. At the heart of any republican form of government is, in Alexander Hamilton's words, "that the people should choose whom they please to govern them." 2 *Debates on the Federal Constitution* 257 (J. Elliot ed. 1876). It is the people who "set bounds to their own power" in their written state constitutions. *Duncan*, 139 U.S. at 461. At a minimum, it is a guarantee of the people's sovereignty over their government in place of a monarchy. *See* Erwin Chemerinsky, *Cases Under the Guarantee Clause Should be Justiciable*, 65 U. Colo. L. Rev. 849, 867 (1994) (discussing *The Federalist No. 43* (Madison) and *The Federalist No. 85* (Hamilton)). And yet here, Defendants—rather than the two-thirds majority required—have effectuated a *de facto* expulsion by denying Libby the power to speak or vote on behalf of her district for the rest of her elected term.

This case presents a paradigmatic violation of that guarantee: thousands living in District 90 have no voice or vote in the House. That deprivation amounts to the sort of "egregious circumstance[]" that violates the Guarantee Clause. *Largess*, 373 F.3d at 227. Defendants' actions deprive Plaintiffs of "the distinguishing feature" of a republican form of government "to choose their own officers for governmental

44

administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *Duncan*, 139 U.S. at 461. The total exclusion of District 90 from debate and floor votes is incompatible with any understanding of republican government. *See Evenwel v. Abbott*, 578 U.S. 54, 81-87 (2016) (Thomas, J., concurring).

Defendants' actions cannot be squared with Maine's chosen republican form of government. Described above, Libby meets all constitutional requirements for serving in the House. Me. Const. art.IV, pt.1, §4. To be denied her power to debate and vote indefinitely, then the House must muster "the concurrence of 2/3" of its members to expel her. Me. Const. art.IV, pt.3, §4. Interpreting similar provisions in the federal Constitution, the U.S. House concluded that "the only way that there could be a mandatory exclusion from the exercise of the right of any Congressman to represent his district … would be on a two-thirds vote on expulsion." 3 *Deschler's Precedents* Ch.12 §15.1; *accord Powell*, 395 U.S. at 550 (holding "the House was without power" to exclude a member "not ineligible to serve under any provision of the Constitution"). The Court need only find that Libby's punishment goes beyond what Maine's constitutional provisions permit and, in turn, violates the Guarantee Clause. Those "limit[s] by written constitutions" demarcate the "bounds" of power in Maine, protecting "against the sudden impulses of mere majorities." *Duncan*, 139 U.S. at 461; *see Bd. of Elections for Franklin Cnty. v. State ex rel. Schneider*, 191 N.E. 115, 120 (Ohio 1934) (noting state constitutional violations implicated Guarantee Clause). The Guarantee Clause repels against such "domestic

dangers," including "[u]surpation," which may "sometimes *threaten the existence of the State constitutions*" that the people have put in place. *The Federalist No. 21* (Hamilton) (emphasis added). Defendants' actions pose a "realistic risk of altering the form or the method of functioning of [the State's] government" by depriving thousands of their chosen representative and therefore violate the Guarantee Clause. *New York*, 505 U.S. at 186.

## II.     The remaining equitable factors favor relief.

### A.     Irreparable harm is undisputed.

Irreparable harm is one of the two "most important" preliminary injunction factors. *Together Emps. v. Mass Gen. Brigham, Inc.*, 19 F.4th 1, 7 (1st. Cir. 2021). Absent a preliminary injunction, District 90 is without a vote as hundreds of bills come to the House floor. This constitutes irreparable harm, and Defendants have promised it will continue indefinitely. Just two weeks ago, Libby and her constituents were deprived of their vote and voice on a proposed equal rights amendment. Far from letting Libby speak on the importance of equal rights of women, the Speaker declined to allow her even to pose a question "through the chair." *Archived Hearings & Meetings: House Chamber* 11:31:50-11:32:27 AM, Me. Leg. (Apr. 23, 2025, 10:00 AM) https://bit.ly/3EGfZ3G. He explained that such questions were "a course of debate" from which Libby was "precluded." *Id.* The same has been true for every other consequential measure before the House, even on legislation Libby herself sponsored. And the same will be true for every bill yet to come for the rest of Libby's term.

46

As for Plaintiffs' Fourteenth Amendment harms, each day Libby is deprived of her vote, she is unable to act "as a trustee for [her] constituents," *Carrigan*, 564 U.S. at 126; *see, e.g.*, JA31, 34, 37, depriving them of the "fundamental principle of representative government," *Reynolds*, 377 U.S. at 560-61; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (recognizing "strong interest in exercising the 'fundamental political right' to vote" in election-day context). This deprivation is irreparable. *See LWV of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Plaintiffs' loss of representation "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Libby cannot go back and vote on the hundreds of bills coming to the floor this session (or any bills presented in subsequent sessions during her term). Put simply, "there can be no do-over and no redress" for Libby's uncounted votes and District 90's loss of representation. *LWV of N.C.*, 769 F.3d at 247. An injunction is "essential to prevent great, immediate, and irreparable loss" of Plaintiffs' "constitutional rights." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

As for the First Amendment harms, irreparable harm is established because Libby's First Amendment claim is likely to succeed on the merits. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012) (cleaned up). And here, Defendants' retaliatory actions are not for "minimal

periods." *Id.* Defendants' refusal to count Libby's vote is entering the third month, all for a Facebook post from February.

**B.    The balance of the equities favors restoring Plaintiffs' equal representation.**

The balance of the equities decisively favors an injunction reinstating District 90's "apportioned share of the legislature's power." *Carrigan*, 564 U.S. at 126. Defendants have no conceivable interest in denying an entire House district equal representation. Their stated interest is merely the desire to "be able to punish" a "contumacious[]" member. D.Ct. Doc.28, at 20. Having never imposed such a punishment before, Defendants cannot show their interest "would be imperiled by employing less restrictive measures." *Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (cleaned up); *see also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (no interest in "maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal"). Defendants' punishment interest could be served in other ways short of depriving an entire district of its voting power for the rest of its chosen legislator's term, including by a purely verbal censure as in Congress or other States, including Maine until now. Surely any interest in "punishing" a member for making a Facebook post was satisfied over the last two months.

Even if Defendants continue to insist on their most severe and unprecedented punishment, they could reinstate that punishment at the conclusion of appellate review. There is no reason they must disenfranchise District 90's constituents *now*. Absent

immediate relief, District 90's residents will be "foreclosed" from having a say in legislation coming before the House, while the "harm, if any," to Defendants "can be fully cured by a fair and objective determination of the merits of the controversy." *Reynolds v. Int'l Amateur Athletic Fed'n*, 505 U.S. 1301, 1302 (1992) (Stevens, J., in chambers).

On the other side of the scale, an injunction that Libby's vote "be counted equally," consistent with all legislators' votes across the country, preserves the most "fundamental principle of representative government." *Reynolds*, 377 U.S. at 560. A preliminary injunction simply returns District 90 to the status quo before Defendants' unprecedented acts to deprive District 90 of equal representation. Without an injunction, Libby and District 90 are unrepresented in the House indefinitely. There is "not an adequate substitute for the intangible" loss of Libby's ability to vote and advocate for her constituents on the House floor this session. *Reynolds*, 505 U.S. at 1302.

## C. The public interest also favors Plaintiffs.

Enjoining unconstitutional conduct "is the highest public interest." *United States v. Raines*, 362 U.S. 17, 27 (1960). "[T]he public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties." *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995); *see Fortuño*, 699 F.3d at 15-16 (protecting "political speech" and ensuring "robust debate" are in the public interest). Moreover, the public's "[c]onfidence in the integrity of our electoral processes," which is "essential to the functioning of our participatory democracy," is best served when all Mainers are represented in the state House. *Purcell*, 549

U.S. at 4. The public interest lies with ensuring all citizens can exercise the "fundamental political right" to "participate … on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336. That can only be served by granting an injunction preventing District 90's votes in the House from being discarded.

## CONCLUSION

This Court should reverse and order entry of a preliminary injunction.

Dated: May 9, 2025                        Respectfully submitted,

                                          /s/ *Patrick N. Strawbridge*

Taylor A.R. Meehan                        Patrick N. Strawbridge
Daniel M. Vitagliano*                     CONSOVOY MCCARTHY PLLC
Marie E. Sayer                            Ten Post Office Square
CONSOVOY MCCARTHY PLLC                     8th Floor South PMB #706
1600 Wilson Blvd., Suite 700              Boston, MA 02109
Arlington, VA 22209                       (703) 243-9423
(703) 243-9423                            patrick@consovoymccarthy.com
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
mari@consovoymccarthy.com

*Supervised by principals of the firm
 admitted to practice in VA

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,998 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

Dated: May 9, 2025               _/s/ Patrick N. Strawbridge_

## CERTIFICATE OF SERVICE

I filed this motion via the Court's ECF system, which will electronically notify

the following:

> Jonathan R. Bolton
> Kimberyl L. Patwardhan
> Office of the Maine Attorney General
> 6 State House Station
> Augusta, ME 04333
> 207-626-8551
> jonathan.bolton@maine.gov
> kimberly.patwardhan@maine.gov

Dated: May 9, 2025                  _/s/ Patrick N. Strawbridge_

**ADDENDUM**

| Document | Page # |
|---|---|
| Memorandum and Order on Plaintiffs' Motion for Preliminary Injunction (Dkt.39) | Add.1 |
| Amended Memorandum and Order on Plaintiffs' Motion for Preliminary Injunction (Dkt.45) | Add.32 |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| Laurel D Libby, et al., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-cv-83-MRD |
| | ) | |
| Ryan M Fecteau, et al., | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.*

Participation in sports by transgender students is one of many policies that law makers around the country are fiercely debating. In Maine, "individual[s] at . . . educational institution[s]" have an equal opportunity and civil right to "participate in all educational . . . programs . . . and all extracurricular activities [including athletic programs] without discrimination because of sex, sexual orientation or gender identity, a physical or mental disability, ancestry, national origin, race, color or religion." Me. Rev. Stat. Ann. tit. 5, §§ 4601, 4602 (2021). Maine House Representative Laurel Libby self-identifies as "an outspoken critic of Maine's state policy allowing boys who identify as transgender to compete in girls' sports." Compl. at ¶ 2 (ECF No. 1). As part of her advocacy against this policy, Representative Libby generates social media content that she posts across various social media platforms including but not limited to Facebook. One such post, described below, earned her a

_____
* Of the District of Rhode Island, sitting by designation.

formal censure by her colleagues in the Maine House of Representatives and a corresponding sanction prohibiting her from speaking or voting on the House floor until she apologizes for her post. Aggrieved, she and six of her constituents filed suit in this court, claiming that the imposition of this sanction is a violation of their constitutional rights under the First, Fourth, and Fourteenth Amendments. The plaintiffs collectively moved for a preliminary injunction to prevent the enforcement of the sanction. The defendants, House Speaker Ryan Fecteau and House Clerk Robert Hunt, assert that legislative immunity shields them from liability for these claims. For the reasons explained in detail below, the court concludes that legislative immunity bars the claims in this case. In short, Speaker Fecteau's imposition of the sanction plainly identified in the House of Representatives Rule that governs when House members are found in breach of House rules is a legislative act that does not, according to binding caselaw and within the context of this censure, qualify for the narrow exception carved out for conduct of an extraordinary character. The court, therefore, denies the motion for preliminary injunction.

I.     BACKGROUND

Before summarizing the sequence of events which led to this litigation, the court starts by setting the table with some additional details about the parties and laying out the relevant rules of procedure for Maine legislators. Plaintiff Laurel Libby represents House District 90 in the current session – the 132nd – of the Maine Legislature, her third consecutive term in this elected position. Compl. at ¶ 10; Libby Decl. ¶¶ 2-3 (ECF No. 34-1). Plaintiffs Ronald P. Lebel, Wendy Munsell, Jason

Levesque, Bernice Fraser, Rene Fraser, and Donald Duboc reside within Maine House District 90 and voted in the last state legislative election. Constituents' Decls. at ¶ 3 (ECF Nos. 8-1 – 8-6). Defendant Ryan Fecteau represents House District 132 in the 132nd Maine Legislature, his fifth term in this elected position, and serves as the elected Speaker of House. Fecteau Decl. at ¶¶ 2-3 (ECF No. 29). All the court knows about defendant Robert Hunt is that he is serving as the Clerk of the House. Compl. at ¶ 18.

Pursuant to *Mason's Manual of Legislature Procedure*, "[a] legislative body has the right to regulate the conduct of its members and may discipline a member as it deems appropriate, including reprimand, censure or expulsion." Section 561(1) (2020). The Maine Constitution confers upon the State Legislature the sole authority to promulgate its own rules of procedure. Fecteau Decl. at ¶ 5. *See* Me. Const. Art. IV, Pt. 3, § 4 ("Each House may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of 2/3, expel a member, but not a 2nd time for the same cause."). Pursuant to this express authority, the 132nd Maine Legislature adopted its House Rules on December 4, 2024.[1] House Rule 401 details the "[r]ights and duties of members." Fecteau Decl. Ex. A at 12 (ECF No. 29-1). Rule 401(11) covers "'breach of rules" and states, in its entirety:

> When any member is guilty of a breach of any of the rules and orders of the House and the House has determined that the member has violated

---

[1] The Rules adopted on this day were the same as those which governed the previous legislative session and were passed by consent of the entire House after no members requested a roll-call vote when provided with the opportunity to do so. Fecteau Decl. at ¶ 6.

a rule or order, that member may not be allowed to vote or speak, unless
by way of excuse for the breach, until the member has made satisfaction.

Fecteau Decl. Ex. A at 13.[2]   Members of the House are also governed by the

Legislative Code of Ethics adopted by the 100th Legislature and amended by the

127th Legislature.  The Code of Ethics, in its entirety, states:

> Legislative service is one of democracy's worthiest pursuits. A Maine
> Legislator is charged with civility and responsible conduct inside and
> outside of the State House commensurate with the trust placed in that
> Legislator by the electorate.
>
> In a free government, a Legislator is entrusted with the security, safety,
> health, prosperity, respect and general well-being of those the Legislator
> serves and with whom the Legislator serves.
>
> To work well, government requires a bond of trust and respect between
> citizens and their Legislators. With such a trust, high moral and ethical
> standards producing the public's confidence, with the reduction to a
> minimum of any conflict between private interests and official duties,
> should be observed.
>
> No Maine Legislators will accept any employment that will impair their
> independence and integrity of judgment nor will they exercise their
> position of trust to secure unwarranted privileges for themselves or for
> others.  The Maine Legislator will be ever mindful of the ordinary citizen
> who might otherwise be unrepresented and will endeavor
> conscientiously to pursue the highest standards of legislative conduct
> inside and outside of the State House.

Fecteau Decl. Ex B (ECF No. 29-2).

    With these details laid out, the following is the sequence of events which led to

this cause of action and pending motion, as alleged in the complaint and declared by

---

[2] This particular rule seems to have been in place since at least 1820, when the
rules governing the first session of the Maine House of Representatives included the
same protocol with almost identical wording.  Defs.' Opp'n Ex. 1 at 2, 8 (section XV)
(ECF No. 28-1).

the parties in support of their respective positions. On February 17, 2025, Representative Libby used her official Representative Laurel Libby Facebook account to create a post which included the juxtaposition of two photos and some commentary. Compl. at ¶ 31. Each photo shows three adolescent student athletes standing side-by-side on a winner's podium, wearing athletic attire, and either holding a ribbon or a medal in their hand or wearing a medal around their neck. *Id.* ¶ 31. One student athlete in each photo is highlighted by way of double yellow lines encircling them from head to toe. *Id.* ¶ 31. In the right-side photo, the two student athletes not highlighted by circles have their faces blurred out; in the left photo, the faces of all three students are clearly visible. *Id.* ¶ 31. The text above the photos in the post states:

> UPDATE: We've learned that just *ONE* year ago [athlete] was competing in boy's pole vault…that's when he had his 5th place finish. So all of this transpired in the last year, with the full blessing of the Maine Principals' Association.
>
> Two years ago, [athlete] tied for 5th place in boy's pole vault. Tonight, "[athlete]" won 1st place in the girls' Maine State Class B Championship.

*Id.* ¶ 31.[3]

On February 18, 2025, Speaker Fecteau, "concern[ed] that publicizing the student's identity would threaten the student's health and safety," contacted Representative Libby twice (once by letter, once by phone call) to ask that she delete

---

[3] The court sees no reason to repeat the name of the targeted student athlete here. Also, the original photographer or source of the photos is not clear, though the court understands each to have been published prior to Representative Libby's post.

the Facebook post.  Fecteau Decl. at ¶¶ 13-14; Compl. at ¶ 42.[4]  At the next scheduled session of the House, February 25, 2025, Representative Matt Moonen presented "House Resolution Relating to the Censure of Representative Laurel D. Libby of Auburn by the Maine House of Representatives."  Fecteau Decl. at ¶ 17, Ex. D (ECF No. 29-4).  The Resolution summarized the Facebook post, the national attention that Representative Libby received for her post, and her decision not to remove the post after hearing concerns about the minor's safety as a result of the post.  Fecteau Decl. Ex. D.  The Resolution also cited excerpts from the Code of Ethics and pronounced Representative Libby's actions as "in direct violation" of the Code of Ethics.  *Id.*  The Resolution resolves that Representative Libby is "censured by the House of Representatives for just cause" and "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine."  *Id.*

House members engaged in debate over the introduced Resolution and then adopted it by a vote of 75-70.[5]  Fecteau Decl. ¶ 18.  Speaker Fecteau called Representative Libby to the well of the House, "lectured her on the House's ethics standards, and offered her an opportunity to apologize."  Compl. at ¶ 57.  Representative Libby declined to apologize and Speaker Fecteau found her in violation of Rule 401(11), *id.*, announcing she would "not be able to cast a vote or

---

[4] Speaker Fecteau's letter articulated his concern with Representative Libby sharing the student's name, school, and photo as a "risk[ to] their health and safety" and as a "violat[ion of] one of the long held political traditions of 'leaving kids out of it.'"  Fecteau Decl. Ex. C (ECF No. 29-3).

[5] *Archived Hearings & Meetings: House Chamber,* 5:57:35-7:03:40 PM, Me. Leg. (Feb. 25, 2025), https://bit.ly/43tBMp4.

speak on the floor until [she] comes back into compliance with House Rule 401 part 11," *Archived Hearings & Meetings: House Chamber*, 7:11:02-7:11:11 PM, Me. Leg. (Feb. 25, 2025), https://bit.ly/43tBMp4.  According to Speaker Fecteau, he "exercised [his] duty as Speaker to rule her in violation of House Rule 401(11), and therefore barred her from casting a vote or participating in debate on the House floor until she made satisfaction by coming into compliance with the Resolution."  Fecteau Decl. ¶ 20.  "No member, including Rep. Libby, made any objection to [his] ruling."  *Id.* ¶ 21.

On March 11, 2025, Representative Libby and six of her constituents from District 90 filed a verified complaint in this court pursuant to 42 U.S.C. § 1983 against Speaker Fecteau and Clerk Hunt, in their official capacities, claiming that barring Representative Libby from speaking on the House floor or voting on legislation violated fundamental rights protected by the U.S. Constitution.  Compl. at 1.  In Count I, Representative Libby alleges the sanction is an action taken in retaliation for her posts on social media and violates her First Amendment right to free speech.  *Id.* ¶¶ 72-76.  In Count II, Representative Libby (along with the six constituents from District 90) allege that the sanction is a result of arbitrary and disparate treatment, impinges on the "one person, one vote" principle, and effectively disenfranchises the constituents in violation of the Fourteenth Amendment's Equal Protection clause.  *Id.* ¶¶ 84-86.  In Count III, all plaintiffs claim the sanction is also excluding Representative Libby from the office to which she was duly elected and depriving her constituents of a vote for state representative in violation of the Fourteenth Amendment's Due Process clause's protection against fundamental unfairness in the

electoral process. *Id.* ¶¶ 89-94. In Count IV, all plaintiffs allege that the sanction deprives Representative Libby of the privileges of her office and deprives her constituents of representation in the House in violation of Article IV, § 4 of the U.S. Constitution which "guarantees to every State . . . a Republication Form of Government. *Id.* ¶¶ 101-05. The plaintiffs seek a declaratory judgment that the sanction infringes their constitutional rights as alleged in each count, an injunction barring the enforcement of the sanction against Representative Libby, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988. *Id.* at 28.

In their Motion for Preliminary Injunction, the plaintiffs ask this court to preliminarily enjoin the defendants from enforcing the sanction Speaker Fecteau imposed while the parties litigate the merits of the plaintiffs' claims. The defendants opposed the motion and the plaintiffs filed a reply to the defendants' opposition. The court heard argument on April 4, 2025.[6]

## II.  LEGAL STANDARD

A preliminary injunction may be granted when a plaintiff demonstrates "four long-established elements." *Santiago v. Municipality of Utuado*, 114 F.4th 25, 34-35 (1st Cir. 2024). First, "the probability of the movant's success on the merits of their

---

[6] The court is also in receipt of a letter the plaintiffs filed on Friday, April 11. ECF No. 38. The court reminds the plaintiffs that the briefing schedule entered by the court was requested by the plaintiff in a consent motion that the plaintiff filed two days after filing the motion for preliminary injunction. The court confirmed with the parties, during a chambers conference held on April 18, that the briefing timeline proposed in the consent motion was indeed satisfactory to all and the court scheduled the hearing on the earliest date suggested by the parties. The plaintiff's letter, filed one week after the hearing, neglects to mention these details.

claim(s)." *Id.* (quoting *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003)). Second, "the prospect of irreparable harm absent the injunction." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). Third, "the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does)." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). Fourth, "the effect of the court's action on the public interest." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). "The movant's likelihood of success on the merits is the element that 'weighs most heavily in the preliminary injunction calculus.'" *Id.* at 35 (quoting *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022)).

## III. DISCUSSION

As previewed above, the defendants contend that they are immune from this lawsuit under the doctrine of legislative immunity. Defs.' Opp'n at 1 (ECF No. 28). The court must address this threshold issue before considering the parties arguments about the preliminary injunction factors. If legislative immunity applies, then the court must deny the motion for preliminary injunction because the plaintiffs will not meet the weighty likely-to-succeed-on-the-merits-of-their-claims element of the preliminary injunction standard. *See Santiago*, 114 F.4th at 42 (ending the preliminary-injunction analysis after concluding the plaintiff-appellant would not prevail on this factor).

For those readers not familiar with this form of immunity from suit, the Supreme Court has long considered legislators (and often, but not always, their staff)

absolutely immune from being sued for their legislative acts. *Cushing v. Packard*, 30 F.4th 27, 36-37 (1st Cir. 2022) (en banc). The immunity has some guardrails, however. It "protects 'only purely legislative activities,'" *Nat'l Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 630 (1st Cir. 1995) (quoting *United States v. Brewster,* 408 U.S. 501, 507 (1972)), and "does not attach to the activities that are merely 'casually or incidentally related to legislative affairs,'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528), or to administrative actions that "fall outside the 'legitimate legislative sphere,'" *Harwood*, 69 F.3d at 630, 631 n.9 (quoting *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 503 (1975)). In addition to these limitations, immunity does not protect legislative activities that are deemed of an "extraordinary character," *Cushing*, 30 F.4th at 50 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)), a vaguely defined but rarely applied concept to circumvent the immunity shield. The court will take a deeper dive into this immunity and its common law limitations after setting out the parties' broad arguments about whether the defendants are entitled to legislative immunity from the plaintiffs' claims.

According to the defendants, the action the plaintiffs challenge as violating their constitutional rights – barring Representative Libby from speaking or voting on the House floor – was a legislative act entitled to the protection of legislative immunity. Defs.' Opp'n at 4, 6-7. The defendants assert that the "extraordinary character" exception is not met here because Speaker Fecteau imposed the sanction in strict adherence to a centuries-old rule of House procedure, and because Representative Libby has not been barred from performing all legislative work on

behalf of her district. Defs.' Opp'n at 9 (citing Fecteau Decl. ¶¶ 27-38)). The defendants contend that for this court to apply the "extraordinary character" exception, thereby removing the legislative immunity shield, would result in this court taking an impermissible step into another branch of government's jurisdiction and traversing into a political battle in which the court should not involve itself. Defs.' Opp'n at 9-10.

The plaintiffs counter that this action was not legislative in nature but an administrative action that falls outside the sphere of protection conferred by legislative immunity. Pls.' Reply at 1 (ECF No. 34). The imposition of the sanction stripping Representative Libby's voice and vote from the House floor is not, according to the plaintiffs, an action that the courts would consider to be part of the legislative process. Pls. Reply at 1-2. During the hearing on the pending motion, the plaintiffs also argued that stripping a House representative of what they consider her core responsibilities to her district – speaking on the House floor and voting – is so blatantly unconstitutional that the Speaker's imposition of this sanction must fall into the narrow exception for "extraordinary" conduct to which the courts have indicated legislative immunity will not apply. Apr. 4, 2025 Hearing Tr. ("Tr.") at 5:15-21, 6:3-5, 6:14-19, 9:2-4 (ECF No. 37).

This threshold issue is a narrow one because the plaintiffs are clear that they are challenging the sanction imposed and "not the wisdom of the underlying censure,

as unwise as it may be." Pls.' Reply at 2.[7]  While the appellate courts have explored

many contours of legislative immunity, the situation presented in this case does not

fit squarely into any of these courts' past discussions and applications of this absolute

immunity.  And so this court will start its deeper dive into the issue by describing

some of the contours of this doctrine as it understands the Supreme Court and First

Circuit to have defined them, beginning with the basic philosophy behind legislative

immunity before moving onto the distinctions between legislative acts and

nonlegislative (or administrative) acts and describing the amorphous exception for

extraordinary conduct.

The original source of legislative immunity is the Speech and Debate Clause of

the U.S. Constitution.  *Cushing*, 30 F.4th at 36; *Harwood*, 69 F.3d at 629

(acknowledging that "state legislators and their surrogates enjoy a parallel immunity

from liability for their legislative acts"); *see also Bogan v. Scott-Harris*, 523 U.S. 44,

49 (1998) (noting that "state and regional legislators are entitled to absolute

immunity from liability under § 1983 for their legislative activities").  The First

Circuit highlights this immunity as

> serv[ing] an important democratic end notwithstanding that it insulates
> elected representatives from legal challenges for certain of their official
> actions.  For that reason, we must be cognizant – as the [Supreme] Court
> has instructed us to be – of the risks associated with failing to respect
> the traditional scope of legislative immunity, bounded though it is, out

---

[7] During the hearing on the pending motion, the plaintiffs repeated that their
constitutional challenges are only to the imposition of the sanction – the "prohibition
on her speaking on the floor and casting a vote to represent her constituents" – and
not on the Resolution censuring Representative Libby for the Facebook post.  Tr. at
11:9-16, 14:24-25.

of respect for legislative freedom and thus democratic self-government.

*Cushing*, 30 F.4th at 52; *see Harwood*, 69 F.3d at 630 ("absolute immunity . . . afforded . . . to protect the integrity of the legislative process by insuring the independence of individual legislators."). "In reading the Clause broadly [courts] have said that legislators acting within the sphere of legitimate legislative activity 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.'" *Eastland*, 421 U.S. at 503 (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967)). It is well-settled that legislative immunity may apply against claims (such as those we have here) which "seek only declaratory or prospective injunction relief." *Cushing*, 30 F.4th at 37 (citing *Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732 (1980)).

As mentioned above, the entitlement to legislative immunity is restricted in two ways and the court will consider each separately. First, immunity is reserved for actions that are legislative in nature. As Justice Thomas wrote on behalf of the unanimous Supreme Court, "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. As an obvious example, "'voting by Members' itself constitutes a legislative act." *Cushing*, 30 F.4th at 49 (quoting *Gravel v. United States*, 408 U.S. 606, 624 (1972)). The case law is clear that legislative acts include a broad swath of conduct, including "any act 'generally done in a session of the House by one of its members in relation to the business before it.'" *Harwood*, 69 F.3d at 630 (quoting *Kilbourn*, 103 U.S. at 204); *Eastland,* 421 U.S. at 503 (holding that subpoenas issued pursuant to

an investigation related to a legitimate task of Congress fell within the "sphere of legitimate legislative activity").

As already previewed, the plaintiffs' position is that the challenged conduct is not part of the House's "general policymaking" role but an administrative act because Representative Libby was "targeted . . . specifically for the content of her speech made on her own time outside the Legislature." Pls.' Reply at 2. The plaintiffs argue that "denying Representative Libby's right to speak or vote in the House is not 'an integral part' of the House's 'deliberative and communicative processes'" and therefore outside the scope of acts that are considered legislative. Pls.' Reply at 1 (quoting *Gravel*, 408 U.S. at 625). There is no immunity, say plaintiffs, "for acts not 'essential to legislating' even if undertaken under the auspices of a resolution" "nor [for] the House clerk's act of counting (or not counting) votes." Pls.' Reply at 3 (first quoting *Gravel*, 408 U.S. at 621, and then citing *Powell v. McCormack*, 395 U.S. 486, 504 (1969)).

Common law does indeed instruct that "[a]cts undertaken by legislators that are administrative in nature do not 'give rise to absolute immunity from liability in damages under § 1983.'" *Negron-Gaztambide v. Hernandez-Torres*, 35 F.3d 25, 26, 28 (1st Cir. 1994) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). "'Employment decisions generally are administrative' except when they are 'accomplished through traditional legislative functions' such as policymaking and budgetary restructuring that 'strike at the heart of the legislative process.'" *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 8 (1st Cir. 2000) (quoting *Rateree v. Rockett,* 852 F.2d 946, 950-51 (7th Cir. 1988)). In *Negron-Gaztambide*, the Circuit identified "two

tests for distinguishing between legislative and administrative activity." 35 F.3d at 28 (quoting *Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984)).

> The first test focuses on the nature of the facts used to reach the given decision. If the underlying facts on which the decision is based are 'legislative facts,' such as 'generalizations concerning a policy or state of affairs,' then the decision is legislative. If the facts used in the decisionmaking are more specific, such as those that relate to particular individuals or situations, then the decision is administrative. The second test focuses on the 'particularity of the impact of the state action.' If the action involves establishment of a general policy, it is legislative; if the action 'singles out specifiable individuals and affects them differently from others,' it is administrative.

*Id.* (quoting *Cutting*, 724 F.2d at 261). At first blush, the application of the plain language of these tests might indicate that the imposition of the sanction on Representative Libby is an administrative act because she was "single[d] out" and "affect[ed] differently than others." *Id.* (quoting *Cutting*, 724 F.2d at 261). However, these two tests have been applied to situations readily distinguishable to the case before the court.

In *Negron-Gaztambide*, the challenged act was the head of the House of Representatives terminating a librarian who worked in the Legislative Library in the Commonwealth of Puerto Rico allegedly because of that employee's political affiliation. 35 F.3d at 26, 28. In *Cutting*, the Circuit Court tacitly concluded (while remanding for further proceedings due to an insufficiently developed record) that a local planning board's rejection of a developer's plans for a subdivision was an administrative act. 724 F.2d at 260, 260 n.1, 261. And, in *Acevedo-Garcia*, the Circuit Court held that the execution of a layoff plan was an administrative act because the actions taken to implement the plan "targeted specific individuals" and "affected

particular individuals differently from others." 204 F.3d at 9; *but see id.* at 8 (distinguishing the conduct at issue in *Bogan*, 523 U.S. at 55, where the Supreme Court held legislative immunity did apply when an employee's termination was effected through the adoption of an ordinance which eliminated the department that employed the plaintiff and not through targeting specific individuals).

These cases demonstrate the application of the test first articulated in *Cutting* to causes of action in which the plaintiff was either a former employee of the legislature whose employment had been terminated after a turnover in political party majority or a public citizen before a local board seeking approval of a land development plan, but **not** where the challenged conduct occurred during a legislative session and the legislative body was applying a black-letter house rule. At no time do the plaintiffs explain to the court why any of the cases which applied the aforementioned tests are closer analogues to the plaintiffs' situation than the cases in which the First Circuit considered challenges to procedural rules. After all, when the Circuit considered a challenge by groups of lobbyists to a house rule prohibiting lobbyists from sitting around the perimeter of the Rhode Island House of Representatives' floor during session, it decided that when the court is

> dealing with a procedural rule adopted by a house of the legislature as a whole for the management of its own business . . . [the court is] not concerned with whether the adoption of the rule comprises a legislative act – that is transparently clear – but, rather, with whether that act is more than 'casually or incidentally related' to core legislative functions.

*Harwood*, 69 F.3d at 631 n.9 (quoting *Brewster*, 408 U.S. at 528).

In this case, focusing as this court must on the nature of the action and not on the motivation or intent behind it, *Bogan*, 523 U.S. at 54, Speaker Fecteau was not terminating an employee or unilaterally deciding on a proposal for economic development. Rather, he executed the will of the body of the House of Representatives pursuant to the Resolution passed by a majority vote after full debate. The Resolution censured the Representative's conduct as a breach of the governing Code of Ethics and demanded that she issue an apology. When she did not, Speaker Fecteau imposed the precise sanction articulated in the Rule that governs members' conduct. There is, therefore, no doubt that these actions were "done in a session of the House by one of its members in relation to the business before it." *Harwood*, 69 F.3d at 630 (quoting *Kilbourn*, 103 U.S. at 204). As such, the nature of the Speaker's conduct falls "within the 'legitimate legislative sphere,'" *Eastland*, 421 U.S. at 503 (quoting *Kilbourn*, 103 U.S. at 204), and is not "merely 'casually or incidentally related to legislative affairs,'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528). Indeed, the Circuit Court has been clear that it is

> beyond serious dispute that enforcing a duly enacted legislative rule which [affects conduct] on the House floor during House sessions is well within the legislative sphere [because] [s]uch a restriction necessarily affects the manner in which the House conducts its most characteristic legislative functions, *e.g.,* debating and voting. A rule that colors the very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials (whether or not elected members) in enforcing it are therefore fully protected against judicial interference by the doctrine of legislative immunity.

*Harwood*, 69 F.3d at 632 (concluding the enforcement of a House rule prohibiting lobbyists from seating on the perimeter of the House floor was a legislative act). The rule applied here affects one censured member of the House and not an entire class of non-legislators as in *Harwood*, but the sentiment expressed above applies with equal force because the sanction imposed does in fact affect debating and voting on measures before the House during full House sessions while the sanction is in place. The court's conclusion that the plaintiffs are challenging a legislative act is also in line with the Circuit's reasoning in *Cushing* that legislative acts include situations where "the injunctive relief that the plaintiffs seek is, on their own account, relief that must run against a legislator directly to be effective." 30 F.4th at 49.

With this conclusion that the challenged conduct is to a legislative act, the court moves on to the second restriction on legislative immunity: the exception for conduct of an "extraordinary character." The court starts with a close examination of the relevant cases and the parties' arguments related to the application of these cases, and then considers the precise details provided by the parties about the process by which Speaker Fecteau imposed the sanction on Representative Libby.

As the Supreme Court has long recognized, "[l]egislative immunity does not, of course, bar all judicial review of legislative acts." *Powell*, 395 U.S. at 503. The case law carves out an exception to the entitlement to legislative immunity for "things done, in the one House or of the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible." *Cushing*, 30 F.4th at 50 (quoting *Kilbourn*, 103 U.S. at 204). Broadly speaking, "[t]here may be some

conduct, even within the legislative sphere, that is so flagrantly violative of fundamental constitutional protections that traditional notions of legislative immunity would not deter judicial intervention." *Harwood*, 69 F.3d at 634. The Supreme Court has not identified precisely what conduct would clear the "high bar" set by this exception, but suggests that a "perversion of [legislative] powers [for] a criminal purpose [such as 'imitating the Long Parliament in the execution of the Chief Magistrate of the nation, or to follow the example of the French assembly in assuming the function of a court for capital punishment'] would be screened from punishment by the constitutional provision for freedom of debate." *Cushing*, 30 F.4th at 51 (quoting *Kilbourn*, 103 U.S. at 204-05).[8] The Circuit instructs that "the assessment of when a given act that, though seemingly legislative in nature, is nonetheless 'of an extraordinary character' that makes it unworthy of the immunity's protection must be sensitive to context." *Id.* at 52 (quoting *Kilbourn*, 103 U.S. at 204). This court must therefore "ensure that [its] focus is on the character of the legislative act being challenged." *Id.*

---

[8] The dissenting opinion in *Cushing* pointed out that the Supreme Court "has never addressed a case in which it has held the extraordinary-character exception to apply." *Cushing*, 30 F.4th at 56 (Thompson, J., dissenting). "As examples of potentially extraordinary legislative acts, the Supreme Court has hypothesized a legislature that 'execut[es] . . . the Chief Magistrate of the nation, or . . . assum[es] the function of a court for capital punishment.'" *Id.* at 57 (quoting *Kilbourn*, 103 U.S. at 204-05). The dissent further explained that "[w]e have similarly pondered a legislature that 'votes to allow access to its chambers to members of only one race or to adherents of only one religion,' suggesting these might veer into the orbit of the extraordinary-character exception." *Id.* (quoting *Harwood*, 69 F.3d at 634).

The First Circuit closely examined the notion of the extraordinary-character exception in *Cushing*. 30 F.4th at 50-53. The plaintiffs – all members of the New Hampshire House of Representatives with "medical conditions and other limitations" and "disabilit[ies] plac[ing] them at greater risk than the general public for serious complications or death from COVID-19" – introduced a "proposal . . . to amend the House rules to permit virtual proceedings of the full House." *Id.* at 32-33, 35. The House voted on the proposal and rejected it. *Id.* at 32-34. A few plaintiffs sent letters to the House Speaker (and others), requesting reasonable accommodations so that they could participate remotely in House proceedings, all to no avail. *Id.* at 34. The plaintiffs sued the Speaker, alleging that his refusal to allow them to participate remotely in official House sessions (which had the consequence of keeping them from voting on bills before the House) violated Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act as well as the Fourteenth Amendment. *Id.* at 34-35, 49. The Circuit grappled with whether the Speaker's denial of some legislators' requests for accommodations to procedural rules were of such extraordinary character that the NH House Speaker would not be entitled to legislative immunity for the claims made against him. *Id.* at 52. The First Circuit, sitting en banc, concluded that the "extraordinary character" exception had not been met in part because the plaintiffs' claims asserting a Fourteenth Amendment violation was "not in and of itself suffic[ient] . . . under the *Kilbourn* standard" to obliterate the shield of legislative immunity. *Id.* at 50-52. The Circuit cautioned that the Supreme Court's jurisprudence on legislative immunity indicated that courts needed "to be wary of

construing *Kilbourn* in a manner that would deem even such a 'quintessentially legislative act' as the decision by the Speaker of the House to follow [its] rules . . . to be beyond the protection of the immunity that has been historically afforded to such an act." *Id.* at 53 (quoting *McCarthy v. Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021)).

Here, like in *Cushing*, the House took a vote on a formal request from a member. The Speaker then enforced the will of the majority of the body by enforcing the plainly written sanction articulated in the rule. As in *Cushing*:

> [T]he plaintiffs [here] take aim at conduct by the Speaker that involves a decision to follow -- rather than depart from -- existing House rules that were overwhelmingly [here, unanimously] passed . . . . The challenged conduct by the Speaker . . . involves adhering to existing rules rather than making new ones.

*Id.* at 51. The court also sees similarities to the issue presented and reasoning expressed in *Harwood*: "[A] legislative body adopt[ed] a rule, not invidiously discriminatory on its face," and Speaker Fecteau did "no more than carry out the will of the body by enforcing the rule as part of [his] official duties." 69 F.3d at 631. The plaintiffs assert that these cases are inapposite because each "concerned a generally applicable procedural rule," Pls.' Reply at 3-4, but the plaintiffs fail to acknowledge that their case is also about the application of a procedural rule. The court agrees with the plaintiffs that neither *Cushing* nor *Harwood* foreclose a future case that could present extraordinary conduct to which immunity would not apply. Pls.' Reply at 4. Neither case defined what that conduct would be, though the Circuit indicated that a category of such conduct would be met if "legislators engaged in conduct so clearly exceeding the powers delegated to them." *Cushing*, 30 F.4th at 51.

The plaintiffs also assert that the sanction imposed on Representative Libby is "punitive enforcement" that disenfranchises her constituents and reflects "invidious viewpoint discrimination" which "so flagrantly violat[es] fundamental constitutional protections" that the immunity shield cannot protect the defendants from their suit. Pls.' Reply at 4. The unconstitutional application of the sanction identified in Rule 401(11) to Representative Libby, according to the plaintiffs, must be reviewed by this court because the rule may not "trump the constitution" and Speaker Fecteau acted outside the scope of his power. Tr. at 14:16-18, 35:18-21. The appellate courts have, however, put to rest any notion that legislative immunity could be circumvented simply because a plaintiff alleges a claim for a constitutional violation. While the First Circuit has acknowledged it would draw the line at "flagrant violat[ions] of fundamental constitutional protections," *Harwood*, 69 F.3d at 634 (implying a house rule excluding all members of one race or one religion would be so flagrantly violative as to qualify for the exception) (citing *Kilbourn*, 103 U.S. at 204), it has also relied on more recent discussions by the Supreme Court to generalize "that immunity is not forfeited simply because the activities, if unprotected, might violate a plaintiff's constitutional rights," *id.* (holding that a House Rule – and alleged selective enforcement – prohibiting lobbyists from sitting around the perimeter of the House floor did not "even closely approach" the border of the extraordinary character exception). Moreover, the Supreme Court has said that to believe the judiciary will intervene to protect First Amendment rights as soon as allegations are made that congressional action has infringed these rights "ignores the absolute nature of the

speech or debate protection and our cases which have broadly construed that protection." *Eastland*, 421 U.S. at 509-510. The Supreme Court has also stated that immunity applies even if the legislators' "conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) (holding congressional committee members immune from suit for alleged violations of, among other things, privacy rights when those defendants' actions were limited to conducting hearings, preparing the report, authorizing its publication). Furthermore, the courts are not "to oversee the judgment of the [legislative body] . . . to impose liability on its Members if [it] disagree[s] with their legislative judgment." *Id.* at 313. And, in a case specifically considering whether the application of a statute pertaining to legislator recusal rules (which had the effect of barring a legislator from voting on certain legislative proposals) was an infringement on the legislator's First Amendment rights, the Court declared that "restrictions upon legislators' voting are not restrictions upon legislators' protected speech" because "a legislator's vote is the commitment of [their] apportioned share of the legislature's power to the passage or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011) (Scalia, J.).

What all this means is that the court has no indication that the Circuit or Supreme Court would conclude that Speaker Fecteau's imposition of the sanction pursuant to House Rule 401(11) is of such an extraordinary character that it would

decline to leave up the shield of legislative immunity. Recall that the plaintiffs are not challenging Rule 401(11) itself, but only the imposition of the sanction identified in this rule on Representative Libby. If the Circuit was not moved by the New Hampshire Speaker's enforcement of its procedural rule with the effect of forcing members to choose between their health and/or physical ability to be present in person for sessions and the ability to perform the responsibilities of their elected position, *see Cushing*, 30 F.4th at 50-52, then the court does not see how it can conclude that prohibiting an elected member of the House from speaking or voting on the House floor is of such an extraordinary character. The court takes the prudent course of exercising judicial restraint especially because the case law does not indicate this should be the first case to clear the high bar for applying this exception to a legislator's conduct.

The plaintiffs warn that if the court allows immunity to shield the defendants here, then the defendants could next "prohibit Asian-American representatives from making floor speeches or voting, silence those in same-sex marriages or interracial marriages, or prohibit voting by women." Pls.' Reply at 4. The Circuit Court in *Harwood* was also presented with a "parade of horribles" – there "a hypothetical legislature that votes to allow access to its chambers to members of only one race or to adherents of only one religion" – which prompted the reminder that there is a border past which immunity would not apply. *Harwood*, 69 F.3d at 634. But the court need not explore hypothetical scenarios and instead stays focused on the situation at hand.

Finally, the plaintiffs lean heavily on two Supreme Court cases which, they say, seal the deal here that immunity should not shield the defendants. Pls.' Reply at 4-5. The court, however, finds that neither case is as dispositive as the plaintiffs contend. In *Bond v. Floyd*, a duly elected candidate to the Georgia House of Representatives was not allowed to take his oath or his seat in the legislature because of comments he had made against the Vietnam war between election day and the first day of the legislative session. 385 U.S. 116, 118 (1966). Bond, an African American, alleged racial discrimination and violation of his First Amendment rights. The State of Georgia did not argue it was immune from suit and the Supreme Court did not explore (because it was not asked to) whether the situation presented in that case represented conduct of an extraordinary character that would not be entitled to immunity. Rather, the Supreme Court acknowledged that "[t]he State does not claim that it should be completely free of judicial review whenever it disqualifies an elected Representative; it admits that, if a State Legislature excluded a legislator on racial or other clearly unconstitutional grounds, the federal (or state) judiciary would be justified in testing the exclusion by federal constitutional standards." *Id.* at 130. This is not the same as the Court concluding that the conduct alleged against defendants met the extraordinary character exception. While the plaintiffs insist this case is on point because here there is also an "exclusion of an elected legislator" in "flagrant violation of Supreme Court precedent barring exclusion of an elected legislator because of their protected speech espousing a viewpoint that majority rejects," Pls.' Reply at 4, the court agrees with the defendants that this case is

factually distinguishable because Representative Libby has not been disqualified, excluded, or expelled from her elected seat. *Bond* is about a member-elect being prevented from taking his seat at all and not about a sanction imposed on a seated member of the House for violations of the Code of Ethics pursuant to a democratically passed censure. Defs.' Opp'n at 6 n.6.

Next, in *Powell*, the Supreme Court held that certain legislative employees were not entitled to the protection of legislative immunity for their roles in enforcing a resolution which excluded a member-elect from his seat in the U.S. House of Representatives. 395 U.S. at 489, 506. The Court affirmed the proposition that legislators were completely immune from suit, but a House clerk, sergeant-at-arms, and doorkeeper were not protected by immunity even though their conduct was pursuant to an express order of the House. *Id.* at 504-05. The Court relied on *Kilbourn*, where the Court had allowed a lawsuit against a sergeant-at-arms for his execution of an illegal arrest warrant resulting in an alleged false imprisonment to go forward. *Id.* at 503-04 (citing *Kilbourn*, 103 U.S. at 204). Like with *Bond*, however, the court considers Representative Libby's situation to be readily distinguishable from *Powell* because Representative Libby has not been disqualified or expelled from her seat.[9]

---

[9] The plaintiffs do not include any allegations against Clerk Hunt or provide any indication or argument in their motion about how or why any actions he has taken would qualify as extraordinary for purposes of getting around legislative immunity and so the court does not provide a separate analysis for this defendant. The law, however, is clear that, "as long as [a legislative employee's] conduct would be covered by legislative immunity were the same conduct performed by the legislator

Despite the court's take on the applicable law, especially that the appellate courts have been clear that simply alleging claims for constitutional violations does not automatically meet the high bar set for the extraordinary-character exception, the appellate courts also instruct that context is an important consideration. *See Cushing*, 30 F.4th at 52 (instructing that the court must be "sensitive to [the] context" in which the legislative act arose and must focus on the "character of the legislative act being challenged"). The court is also mindful of the serious effect the imposed sanction has on Representative Libby's ability to fulfill her duties as an elected representative of District 90, so the court will closely examine the context surrounding the imposition of the sanction to determine whether the details known at this time about the defendants' conduct will reach the high bar of this exception.

The Resolution introduced by Representative Moonen included a "resolve[]" that Representative Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." Fecteau Decl. Ex. D. Representative Libby was on notice of the potential consequence if the Resolution passed because the consequence is clearly identified in Rule 401(11). The Resolution was deeply debated on the floor of the House. Throughout the hour-long debate, Speaker Fecteau repeatedly refocused the comments from the members on the precise Resolution before the House, redirecting members on both sides of the aisle when another member raised a point of order or on his own when the comments

---

himself, the [legislature's employee] shares the immunity." *Harwood*, 69 F.3d at 631, 631 n.10.

strayed from the merits of the censure for Representative Libby's conduct. *See, e.g.,* *Archived Hearings & Meetings: House Chamber*, at 6:17:10 PM. None of the comments discussed the precise sanction allowed by Rule 401(11) or questioned what the consequence might be if Representative Libby refused to comply with the Resolution. None of the comments raised concerns about the effect of imposing the sanction articulated in Rule 401(11). After the Resolution passed, Speaker Fecteau provided Representative Libby with an opportunity to make the satisfaction demanded by the Resolution – the apology – but she declined. Speaker Fecteau then proceeded to announce the precise sanction identified in Rule 401(11), without objection from any member of the body.

As the parties brought to the court's attention, this is not the first time that Rule 401(11) has been invoked or applied in the Maine House.[10] But this is the first time a censured Representative has refused to apologize and so the first time the

---

[10] Two censures passed in April 2024 pursuant to violations of House Rule 401(11) where the body found two members in "egregious violation of the decorum of the House" when they made statements on the House floor "claiming that the 2023 Lewiston mass shooting was God's response to a recent abortion law that took effect the same day." Compl. at ¶ 53 (citing to the Resolutions). The Speaker for the 131st Legislature summoned the members to the well of the House, announced the censure, and "await[ed] an assurance and an issuance of a formal apology, to be read on the House floor, to make satisfaction." Journal and Legislative Record – House, Apr. 11, 2024 at 2 [https://perma.cc/BG6W-SVTU]. Both members apologized to the House and to the public, Journal and Legislative Record – House, Apr. 11, 2024 at 3 [https://perma.cc/BG6W-SVTU], which obviated the need for any further sanction.

The parties also point this court to the first censure imposed on a House member. In 2001, the House voted to adopt a Resolution censuring a member who had "verbally abused a female Senator in the hallway outside the chamber of the House of Representatives." Journal and Legislative Record – House, Feb. 8, 2001 at 10 [https://perma.cc/GL5C-FVY7]. That member also apologized immediately following the vote to adopt the Resolution to censure him. *Id.* at 14.

Speaker imposed the consequence of the censure when satisfaction has not been made. This "first" does not in and of itself make the act extraordinary, however, because the consequence is plainly stated in the rule.

The effect of the sanction, as clearly known by now, is that Representative Libby is prohibited from speaking on the House floor during the debate of proposed legislation and voting on proposed legislation and other matters up for a vote by the full House. Fecteau Decl. at ¶ 24. Representative Libby considers the suspension of these privileges to be indefinite, but the sanction remains in place only until Representative Libby apologizes, the House votes to dispense with Rule 401(11), or the 132nd Legislature session ends. *Id.* ¶ 25. As indicated by Speaker Fecteau, a House member may move to dispense with or suspend the Resolution and a majority vote will pass the motion. *Id.* ¶¶ 41-42. At least two attempts since February 25 to do so have failed. On March 20, a member of the House made such a motion so Representative Libby could speak during the debate on the State's proposed budget, but the motion did not receive a majority vote. *Id.* ¶¶ 39-41. On March 25, a similar motion was made and failed. *Id.* ¶ 42. Of course, pursuant to Rule 401(11), Representative Libby may also choose to make satisfaction.

Representative Libby considers "speaking and voting on behalf of her District 90 constituents to be "[t]he two most critical responsibilities of a duly elected legislator." Libby Decl. at ¶ 10. This court hears the predicament but notes that the sanction does not render her unable to represent her constituents or speak in favor of or in opposition to policies and legislation in all ways. As Speaker Fecteau points

out in his declaration (and Representative Libby does not challenge), Representative Libby can:

- Fully participate on committees to which she is assigned, including voting, debating, and testifying at public hearings.
- Sponsor and co-sponsor bills and resolutions.
- Lobby other members for support or opposition to proposed legislation.
- Participate in legislative caucus meetings.
- Testify at public hearings about any pending legislation.
- Be present on the House floor during debates and votes.
- Engage in procedural actions on the House floor such as make a motion to amend or postpone a bill or raise an objection thereto.
- Use all legislative staff and offices without any restrictions.
- Be fully compensated, including travel-related expenses and meal allowances.

Fecteau Decl. at ¶¶ 28-31, 34-38. At the time of the briefing on this motion, Representative Libby had introduced several amendments to a measure regarding the State's biennial budget. *Id.* ¶ 39.

After carefully considering the case law, the details presented by the parties about the House governing rules, and the process by which the House adopted the Resolution and imposed the censure on Representative Libby, the court concludes that the suspension of Representative Libby's privilege to speak or vote on the House floor is not of such an extraordinary character that this exception to absolute legislative immunity for legislators will apply. That said, the ability to suspend an elected representative's privileges to either speak on the House floor or enter a vote on legislation pending before the entire House until the representative apologizes for censured conduct is a weighty sword to wield. However, the process Speaker Fecteau followed when he imposed the sanction ultimately reflected the will of the majority of the House members. The court must carefully heed the caution from the First Circuit

that federal judges should not "improperly intrud[e] into internal state legislative affairs [or] warring sides in partisan state legislators' battles." *Cushing*, 30 F.4th at 52. The censure and its sanction on Representative Libby is, at bottom, an internal Maine House affair. "As a rule, a legislature's regulation of the atmosphere in which it conducts its core legislative activities—debating, voting, passing legislation, and the like—is part and parcel of the legislative process, and, hence, not subject to a judicial veto." *Harwood*, 69 F.3d at 635 (citing *Eastland,* 421 U.S. at 509). And so, in this context (and with the plaintiff's plain instruction that they are challenging the application of Rule 401(11) to Representative Libby and not the Rule itself firmly rooted in mind), the imposition of the sanction plainly identified and authorized by the House Rule is not of such extraordinary character as to obliterate the formidable shield the courts have provided to legislative acts. The defendants are, therefore, immune from the plaintiffs' claims against them.

## IV.   CONCLUSION

For the reasons stated above, the plaintiffs' Motion for a Preliminary Injunction (ECF No. 8) is DENIED.

IT IS SO ORDERED.

Melissa R. DuBose
United States District Judge

April 18, 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| Laurel D Libby, et al.,     ) | |
|     Plaintiff,     ) | |
|     ) | |
| v.     ) | C.A. No. 25-cv-83-MRD |
|     ) | |
| Ryan M Fecteau, et al.,     ) | |
|     Defendant.     ) | |
|     ) | |

MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.*

Participation in sports by transgender students is one of many policies that lawmakers around the country are fiercely debating. In Maine, "individual[s] at . . . educational institution[s]" have an equal opportunity and civil right to "participate in all educational . . . programs . . . and all extracurricular activities [including athletic programs] without discrimination because of sex, sexual orientation or gender identity, a physical or mental disability, ancestry, national origin, race, color or religion." Me. Rev. Stat. Ann. tit. 5, §§ 4601, 4602 (2021). Maine House Representative Laurel Libby self-identifies as "an outspoken critic of Maine's state policy allowing boys who identify as transgender to compete in girls' sports." Compl. at ¶ 2 (ECF No. 1). As part of her advocacy against this policy, Representative Libby generates social media content that she posts across various social media platforms including but not limited to Facebook. One such post, described below, earned her a

---

* Of the District of Rhode Island, sitting by designation.

formal censure by her colleagues in the Maine House of Representatives and a corresponding sanction prohibiting her from speaking or voting on the House floor until she apologizes for her post. Aggrieved, she and six of her constituents filed suit in this court, claiming that the imposition of this sanction is a violation of their constitutional rights under the First, Fourth, and Fourteenth Amendments. The plaintiffs collectively moved for a preliminary injunction to prevent the enforcement of the sanction. The defendants, House Speaker Ryan Fecteau and House Clerk Robert Hunt, assert that legislative immunity shields them from liability for these claims. For the reasons explained in detail below, the court concludes that legislative immunity bars the claims in this case. In short, Speaker Fecteau's imposition of the sanction plainly identified in the House of Representatives Rule that governs when House members are found in breach of House rules is a legislative act that does not, according to binding caselaw and within the context of this censure, qualify for the narrow exception carved out for conduct of an extraordinary character. The court, therefore, denies the motion for preliminary injunction.

## I.    BACKGROUND

Before summarizing the sequence of events which led to this litigation, the court starts by setting the table with some additional details about the parties and laying out the relevant rules of procedure for Maine legislators. Plaintiff Laurel Libby represents House District 90 in the current session – the 132nd – of the Maine Legislature, her third consecutive term in this elected position. Compl. at ¶ 10; Libby Decl. ¶¶ 2-3 (ECF No. 34-1). Plaintiffs Ronald P. Lebel, Wendy Munsell, Jason

Levesque, Bernice Fraser, Rene Fraser, and Donald Duboc reside within Maine House District 90 and voted in the last state legislative election. Constituents' Decls. at ¶ 3 (ECF Nos. 8-1 – 8-6). Defendant Ryan Fecteau represents House District 132 in the 132nd Maine Legislature, his fifth term in this elected position, and serves as the elected Speaker of House. Fecteau Decl. at ¶¶ 2-3 (ECF No. 29). All the court knows about defendant Robert Hunt is that he is serving as the Clerk of the House. Compl. at ¶ 18.

Pursuant to *Mason's Manual of Legislature Procedure*, "[a] legislative body has the right to regulate the conduct of its members and may discipline a member as it deems appropriate, including reprimand, censure or expulsion." Section 561(1) (2020). The Maine Constitution confers upon the State Legislature the sole authority to promulgate its own rules of procedure. Fecteau Decl. at ¶ 5. *See* Me. Const. Art. IV, Pt. 3, § 4 ("Each House may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of 2/3, expel a member, but not a 2nd time for the same cause."). Pursuant to this express authority, the 132nd Maine Legislature adopted its House Rules on December 4, 2024.[1] House Rule 401 details the "[r]ights and duties of members." Fecteau Decl. Ex. A at 12 (ECF No. 29-1). Rule 401(11) covers "'breach of rules" and states, in its entirety:

> When any member is guilty of a breach of any of the rules and orders of the House and the House has determined that the member has violated

---

[1] The Rules adopted on this day were the same as those which governed the previous legislative session and were passed by consent of the entire House after no members requested a roll-call vote when provided with the opportunity to do so. Fecteau Decl. at ¶ 6.

a rule or order, that member may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction.

Fecteau Decl. Ex. A at 13.[2]   Members of the House are also governed by the Legislative Code of Ethics adopted by the 100th Legislature and amended by the 127th Legislature.  The Code of Ethics, in its entirety, states:

> Legislative service is one of democracy's worthiest pursuits. A Maine Legislator is charged with civility and responsible conduct inside and outside of the State House commensurate with the trust placed in that Legislator by the electorate.

> In a free government, a Legislator is entrusted with the security, safety, health, prosperity, respect and general well-being of those the Legislator serves and with whom the Legislator serves.

> To work well, government requires a bond of trust and respect between citizens and their Legislators. With such a trust, high moral and ethical standards producing the public's confidence, with the reduction to a minimum of any conflict between private interests and official duties, should be observed.

> No Maine Legislators will accept any employment that will impair their independence and integrity of judgment nor will they exercise their position of trust to secure unwarranted privileges for themselves or for others.  The Maine Legislator will be ever mindful of the ordinary citizen who might otherwise be unrepresented and will endeavor conscientiously to pursue the highest standards of legislative conduct inside and outside of the State House.

Fecteau Decl. Ex B (ECF No. 29-2).

  With these details laid out, the following is the sequence of events which led to this cause of action and pending motion, as alleged in the complaint and declared by

---

[2] This particular rule seems to have been in place since at least 1820, when the rules governing the first session of the Maine House of Representatives included the same protocol with almost identical wording.  Defs.' Opp'n Ex. 1 at 2, 8 (section XV) (ECF No. 28-1).

the parties in support of their respective positions. On February 17, 2025, Representative Libby used her official Representative Laurel Libby Facebook account to create a post which included the juxtaposition of two photos and some commentary. Compl. at ¶ 31. Each photo shows three adolescent student athletes standing side-by-side on a winner's podium, wearing athletic attire, and either holding a ribbon or a medal in their hand or wearing a medal around their neck. *Id.* ¶ 31. One student athlete in each photo is highlighted by way of double yellow lines encircling them from head to toe. *Id.* ¶ 31. In the right-side photo, the two student athletes not highlighted by circles have their faces blurred out; in the left photo, the faces of all three students are clearly visible. *Id.* ¶ 31. The text above the photos in the post states:

> UPDATE: We've learned that just *ONE* year ago [athlete] was competing in boy's pole vault…that's when he had his 5th place finish. So all of this transpired in the last year, with the full blessing of the Maine Principals' Association.

> Two years ago, [athlete] tied for 5th place in boy's pole vault. Tonight, "[athlete]" won 1st place in the girls' Maine State Class B Championship.

*Id.* ¶ 31.[3]

On February 18, 2025, Speaker Fecteau, "concern[ed] that publicizing the student's identity would threaten the student's health and safety," contacted Representative Libby twice (once by letter, once by phone call) to ask that she delete

---

[3] The court sees no reason to repeat the name of the targeted student athlete here. Also, the original photographer or source of the photos is not clear, though the court understands each to have been published prior to Representative Libby's post.

the Facebook post.  Fecteau Decl. at ¶¶ 13-14; Compl. at ¶ 42.[4]  At the next scheduled session of the House, February 25, 2025, Representative Matt Moonen presented "House Resolution Relating to the Censure of Representative Laurel D. Libby of Auburn by the Maine House of Representatives."  Fecteau Decl. at ¶ 17, Ex. D (ECF No. 29-4).  The Resolution summarized the Facebook post, the national attention that Representative Libby received for her post, and her decision not to remove the post after hearing concerns about the minor's safety as a result of the post.  Fecteau Decl. Ex. D.  The Resolution also cited excerpts from the Code of Ethics and pronounced Representative Libby's actions as "in direct violation" of the Code of Ethics.  *Id.*  The Resolution resolves that Representative Libby is "censured by the House of Representatives for just cause" and "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine."  *Id.*

House members engaged in debate over the introduced Resolution and then adopted it by a vote of 75-70.[5]  Fecteau Decl. ¶ 18.  Speaker Fecteau called Representative Libby to the well of the House, "lectured her on the House's ethics standards, and offered her an opportunity to apologize."  Compl. at ¶ 57.  Representative Libby declined to apologize and Speaker Fecteau found her in violation of Rule 401(11), *id.*, announcing she would "not be able to cast a vote or

---

[4] Speaker Fecteau's letter articulated his concern with Representative Libby sharing the student's name, school, and photo as a "risk[ to] their health and safety" and as a "violat[ion of] one of the long held political traditions of 'leaving kids out of it.'"  Fecteau Decl. Ex. C (ECF No. 29-3).

[5] *Archived Hearings & Meetings: House Chamber,* 5:57:35-7:03:40 PM, Me. Leg. (Feb. 25, 2025), https://bit.ly/43tBMp4.

speak on the floor until [she] comes back into compliance with House Rule 401 part 11," *Archived Hearings & Meetings: House Chamber*, 7:11:02-7:11:11 PM, Me. Leg. (Feb. 25, 2025), https://bit.ly/43tBMp4.  According to Speaker Fecteau, he "exercised [his] duty as Speaker to rule her in violation of House Rule 401(11), and therefore barred her from casting a vote or participating in debate on the House floor until she made satisfaction by coming into compliance with the Resolution."  Fecteau Decl. ¶ 20.  "No member, including Rep. Libby, made any objection to [his] ruling."  *Id.* ¶ 21.

On March 11, 2025, Representative Libby and six of her constituents from District 90 filed a verified complaint in this court pursuant to 42 U.S.C. § 1983 against Speaker Fecteau and Clerk Hunt, in their official capacities, claiming that barring Representative Libby from speaking on the House floor or voting on legislation violated fundamental rights protected by the U.S. Constitution.  Compl. at 1.  In Count I, Representative Libby alleges the sanction is an action taken in retaliation for her posts on social media and violates her First Amendment right to free speech. *Id.* ¶¶ 72-76.  In Count II, Representative Libby (along with the six constituents from District 90) allege that the sanction is a result of arbitrary and disparate treatment, impinges on the "one person, one vote" principle, and effectively disenfranchises the constituents in violation of the Fourteenth Amendment's Equal Protection clause.  *Id.* ¶¶ 84-86.  In Count III, all plaintiffs claim the sanction is also excluding Representative Libby from the office to which she was duly elected and depriving her constituents of a vote for state representative in violation of the Fourteenth Amendment's Due Process clause's protection against fundamental unfairness in the

electoral process. *Id.* ¶¶ 89-94. In Count IV, all plaintiffs allege that the sanction deprives Representative Libby of the privileges of her office and deprives her constituents of representation in the House in violation of Article IV, § 4 of the U.S. Constitution which "guarantees to every State . . . a Republication Form of Government. *Id.* ¶¶ 101-05. The plaintiffs seek a declaratory judgment that the sanction infringes their constitutional rights as alleged in each count, an injunction barring the enforcement of the sanction against Representative Libby, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988. *Id.* at 28.

In their Motion for Preliminary Injunction, the plaintiffs ask this court to preliminarily enjoin the defendants from enforcing the sanction Speaker Fecteau imposed while the parties litigate the merits of the plaintiffs' claims. The defendants opposed the motion and the plaintiffs filed a reply to the defendants' opposition. The court heard argument on April 4, 2025.[6]

## II.   LEGAL STANDARD

A preliminary injunction may be granted when a plaintiff demonstrates "four long-established elements." *Santiago v. Municipality of Utuado*, 114 F.4th 25, 34-35 (1st Cir. 2024). First, "the probability of the movant's success on the merits of their

---

[6] The court is also in receipt of a letter the plaintiffs filed on Friday, April 11. ECF No. 38. The court reminds the plaintiffs that the briefing schedule entered by the court was requested by the plaintiff in a consent motion that the plaintiff filed two days after filing the motion for preliminary injunction. The court confirmed with the parties, during a chambers conference held on April 18, that the briefing timeline proposed in the consent motion was indeed satisfactory to all and the court scheduled the hearing on the earliest date suggested by the parties. The plaintiff's letter, filed one week after the hearing, neglects to mention these details.

claim(s)." *Id.* (quoting *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003)). Second, "the prospect of irreparable harm absent the injunction." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). Third, "the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does)." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). Fourth, "the effect of the court's action on the public interest." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). "The movant's likelihood of success on the merits is the element that 'weighs most heavily in the preliminary injunction calculus.'" *Id.* at 35 (quoting *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022)).

## III. DISCUSSION

As previewed above, the defendants contend that they are immune from this lawsuit under the doctrine of legislative immunity. Defs.' Opp'n at 1 (ECF No. 28). The court must address this threshold issue before considering the parties arguments about the preliminary injunction factors. If legislative immunity applies, then the court must deny the motion for preliminary injunction because the plaintiffs will not meet the weighty likely-to-succeed-on-the-merits-of-their-claims element of the preliminary injunction standard. *See Santiago*, 114 F.4th at 42 (ending the preliminary-injunction analysis after concluding the plaintiff-appellant would not prevail on this factor).

For those readers not familiar with this form of immunity from suit, the Supreme Court has long considered legislators (and often, but not always, their staff)

absolutely immune from being sued for their legislative acts. *Cushing v. Packard*, 30 F.4th 27, 36-37 (1st Cir. 2022) (en banc). The immunity has some guardrails, however. It "protects 'only purely legislative activities,'" *Nat'l Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 630 (1st Cir. 1995) (quoting *United States v. Brewster,* 408 U.S. 501, 507 (1972)), and "does not attach to the activities that are merely 'casually or incidentally related to legislative affairs,'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528), or to administrative actions that "fall outside the 'legitimate legislative sphere,'" *Harwood*, 69 F.3d at 630, 631 n.9 (quoting *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 503 (1975)). In addition to these limitations, immunity does not protect legislative activities that are deemed of an "extraordinary character," *Cushing*, 30 F.4th at 50 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)), a vaguely defined but rarely applied concept to circumvent the immunity shield. The court will take a deeper dive into this immunity and its common law limitations after setting out the parties' broad arguments about whether the defendants are entitled to legislative immunity from the plaintiffs' claims.

According to the defendants, the action the plaintiffs challenge as violating their constitutional rights – barring Representative Libby from speaking or voting on the House floor – was a legislative act entitled to the protection of legislative immunity. Defs.' Opp'n at 4, 6-7. The defendants assert that the "extraordinary character" exception is not met here because Speaker Fecteau imposed the sanction in strict adherence to a centuries-old rule of House procedure, and because Representative Libby has not been barred from performing all legislative work on

behalf of her district. Defs.' Opp'n at 9 (citing Fecteau Decl. ¶¶ 27-38)). The
defendants contend that for this court to apply the "extraordinary character"
exception, thereby removing the legislative immunity shield, would result in this
court taking an impermissible step into another branch of government's jurisdiction
and traversing into a political battle in which the court should not involve itself.
Defs.' Opp'n at 9-10.

The plaintiffs counter that this action was not legislative in nature but an
administrative action that falls outside the sphere of protection conferred by
legislative immunity. Pls.' Reply at 1 (ECF No. 34). The imposition of the sanction
stripping Representative Libby's voice and vote from the House floor is not, according
to the plaintiffs, an action that the courts would consider to be part of the legislative
process. Pls. Reply at 1-2. During the hearing on the pending motion, the plaintiffs
also argued that stripping a House representative of what they consider her core
responsibilities to her district – speaking on the House floor and voting – is so
blatantly unconstitutional that the Speaker's imposition of this sanction must fall
into the narrow exception for "extraordinary" conduct to which the courts have
indicated legislative immunity will not apply. Apr. 4, 2025 Hearing Tr. ("Tr.") at 5:15-
21, 6:3-5, 6:14-19, 9:2-4 (ECF No. 37).

This threshold issue is a narrow one because the plaintiffs are clear that they
are challenging the sanction imposed and "not the wisdom of the underlying censure,

as unwise as it may be." Pls.' Reply at 2.[7] While the appellate courts have explored many contours of legislative immunity, the situation presented in this case does not fit squarely into any of these courts' past discussions and applications of this absolute immunity. And so this court will start its deeper dive into the issue by describing some of the contours of this doctrine as it understands the Supreme Court and First Circuit to have defined them, beginning with the basic philosophy behind legislative immunity before moving onto the distinctions between legislative acts and nonlegislative (or administrative) acts and describing the amorphous exception for extraordinary conduct.

The original source of legislative immunity is the Speech and Debate Clause of the U.S. Constitution. *Cushing*, 30 F.4th at 36; *Harwood*, 69 F.3d at 629 (acknowledging that "state legislators and their surrogates enjoy a parallel immunity from liability for their legislative acts"); *see also Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) (noting that "state and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities"). The First Circuit highlights this immunity as

> serv[ing] an important democratic end notwithstanding that it insulates
> elected representatives from legal challenges for certain of their official
> actions. For that reason, we must be cognizant – as the [Supreme] Court
> has instructed us to be – of the risks associated with failing to respect
> the traditional scope of legislative immunity, bounded though it is, out

---

[7] During the hearing on the pending motion, the plaintiffs repeated that their constitutional challenges are only to the imposition of the sanction – the "prohibition on her speaking on the floor and casting a vote to represent her constituents" – and not on the Resolution censuring Representative Libby for the Facebook post. Tr. at 11:9-16, 14:24-25.

of respect for legislative freedom and thus democratic self-government.

*Cushing*, 30 F.4th at 52; *see Harwood*, 69 F.3d at 630 ("absolute immunity . . . afforded . . . to protect the integrity of the legislative process by insuring the independence of individual legislators."). "In reading the Clause broadly [courts] have said that legislators acting within the sphere of legitimate legislative activity 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.'" *Eastland*, 421 U.S. at 503 (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967)). It is well-settled that legislative immunity may apply against claims (such as those we have here) which "seek only declaratory or prospective injunction relief." *Cushing*, 30 F.4th at 37 (citing *Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732 (1980)).

As mentioned above, the entitlement to legislative immunity is restricted in two ways and the court will consider each separately. First, immunity is reserved for actions that are legislative in nature. As Justice Thomas wrote on behalf of the unanimous Supreme Court, "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. As an obvious example, "'voting by Members' itself constitutes a legislative act." *Cushing*, 30 F.4th at 49 (quoting *Gravel v. United States*, 408 U.S. 606, 624 (1972)). The case law is clear that legislative acts include a broad swath of conduct, including "any act 'generally done in a session of the House by one of its members in relation to the business before it.'" *Harwood*, 69 F.3d at 630 (quoting *Kilbourn*, 103 U.S. at 204); *Eastland,* 421 U.S. at 503 (holding that subpoenas issued pursuant to

an investigation related to a legitimate task of Congress fell within the "sphere of legitimate legislative activity").

As already previewed, the plaintiffs' position is that the challenged conduct is not part of the House's "general policymaking" role but an administrative act because Representative Libby was "targeted . . . specifically for the content of her speech made on her own time outside the Legislature." Pls.' Reply at 2. The plaintiffs argue that "denying Representative Libby's right to speak or vote in the House is not 'an integral part' of the House's 'deliberative and communicative processes'" and therefore outside the scope of acts that are considered legislative. Pls.' Reply at 1 (quoting *Gravel*, 408 U.S. at 625). There is no immunity, say plaintiffs, "for acts not 'essential to legislating' even if undertaken under the auspices of a resolution" "nor [for] the House clerk's act of counting (or not counting) votes." Pls.' Reply at 3 (first quoting *Gravel*, 408 U.S. at 621, and then citing *Powell v. McCormack*, 395 U.S. 486, 504 (1969)).

Common law does indeed instruct that "[a]cts undertaken by legislators that are administrative in nature do not 'give rise to absolute immunity from liability in damages under § 1983.'" *Negron-Gaztambide v. Hernandez-Torres*, 35 F.3d 25, 26, 28 (1st Cir. 1994) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). "'Employment decisions generally are administrative' except when they are 'accomplished through traditional legislative functions' such as policymaking and budgetary restructuring that 'strike at the heart of the legislative process.'" *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 8 (1st Cir. 2000) (quoting *Rateree v. Rockett,* 852 F.2d 946, 950-51 (7th Cir. 1988)). In *Negron-Gaztambide*, the Circuit identified "two

tests for distinguishing between legislative and administrative activity." 35 F.3d at

28 (quoting *Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984)).

> The first test focuses on the nature of the facts used to reach the given decision. If the underlying facts on which the decision is based are 'legislative facts,' such as 'generalizations concerning a policy or state of affairs,' then the decision is legislative. If the facts used in the decisionmaking are more specific, such as those that relate to particular individuals or situations, then the decision is administrative. The second test focuses on the 'particularity of the impact of the state action.' If the action involves establishment of a general policy, it is legislative; if the action 'singles out specifiable individuals and affects them differently from others,' it is administrative.

*Id.* (quoting *Cutting*, 724 F.2d at 261). At first blush, the application of the plain

language of these tests might indicate that the imposition of the sanction on

Representative Libby is an administrative act because she was "single[d] out" and

"affect[ed] differently than others." *Id.* (quoting *Cutting*, 724 F.2d at 261). However,

these two tests have been applied to situations readily distinguishable to the case

before the court.

In *Negron-Gaztambide*, the challenged act was the head of the House of

Representatives terminating a librarian who worked in the Legislative Library in the

Commonwealth of Puerto Rico allegedly because of that employee's political

affiliation. 35 F.3d at 26, 28. In *Cutting*, the Circuit Court tacitly concluded (while

remanding for further proceedings due to an insufficiently developed record) that a

local planning board's rejection of a developer's plans for a subdivision was an

administrative act. 724 F.2d at 260, 260 n.1, 261. And, in *Acevedo-Garcia*, the Circuit

Court held that the execution of a layoff plan was an administrative act because the

actions taken to implement the plan "targeted specific individuals" and "affected

particular individuals differently from others."  204 F.3d at 9; *but see id.* at 8 (distinguishing the conduct at issue in *Bogan*, 523 U.S. at 55, where the Supreme Court held legislative immunity did apply when an employee's termination was effected through the adoption of an ordinance which eliminated the department that employed the plaintiff and not through targeting specific individuals).

These cases demonstrate the application of the test first articulated in *Cutting* to causes of action in which the plaintiff was either a former employee of the legislature whose employment had been terminated after a turnover in political party majority or a public citizen before a local board seeking approval of a land development plan, but **not** where the challenged conduct occurred during a legislative session and the legislative body was applying a black-letter house rule.  At no time do the plaintiffs explain to the court why any of the cases which applied the aforementioned tests are closer analogues to the plaintiffs' situation than the cases in which the First Circuit considered challenges to procedural rules.  After all, when the Circuit considered a challenge by groups of lobbyists to a house rule prohibiting lobbyists from sitting around the perimeter of the Rhode Island House of Representatives' floor during session, it decided that when the court is

> dealing with a procedural rule adopted by a house of the legislature as a whole for the management of its own business . . . [the court is] not concerned with whether the adoption of the rule comprises a legislative act – that is transparently clear – but, rather, with whether that act is more than 'casually or incidentally related' to core legislative functions.

*Harwood*, 69 F.3d at 631 n.9 (quoting *Brewster*, 408 U.S. at 528).

In this case, focusing as this court must on the nature of the action and not on the motivation or intent behind it, *Bogan*, 523 U.S. at 54, Speaker Fecteau was not terminating an employee or unilaterally deciding on a proposal for economic development. Rather, he executed the will of the body of the House of Representatives pursuant to the Resolution passed by a majority vote after full debate. The Resolution censured the Representative's conduct as a breach of the governing Code of Ethics and demanded that she issue an apology. When she did not, Speaker Fecteau imposed the precise sanction articulated in the Rule that governs members' conduct. There is, therefore, no doubt that these actions were "done in a session of the House by one of its members in relation to the business before it." *Harwood*, 69 F.3d at 630 (quoting *Kilbourn*, 103 U.S. at 204). As such, the nature of the Speaker's conduct falls "within the 'legitimate legislative sphere,'" *Eastland,* 421 U.S. at 503 (quoting *Kilbourn*, 103 U.S. at 204), and is not "merely 'casually or incidentally related to legislative affairs,'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528). Indeed, the Circuit Court has been clear that it is

> beyond serious dispute that enforcing a duly enacted legislative rule which [affects conduct] on the House floor during House sessions is well within the legislative sphere [because] [s]uch a restriction necessarily affects the manner in which the House conducts its most characteristic legislative functions, *e.g.,* debating and voting. A rule that colors the very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials (whether or not elected members) in enforcing it are therefore fully protected against judicial interference by the doctrine of legislative immunity.

*Harwood*, 69 F.3d at 632 (concluding the enforcement of a House rule prohibiting lobbyists from seating on the perimeter of the House floor was a legislative act). The rule applied here affects one censured member of the House and not an entire class of non-legislators as in *Harwood*, but the sentiment expressed above applies with equal force because the sanction imposed does in fact affect debating and voting on measures before the House during full House sessions while the sanction is in place. The court's conclusion that the plaintiffs are challenging a legislative act is also in line with the Circuit's reasoning in *Cushing* that legislative acts include situations where "the injunctive relief that the plaintiffs seek is, on their own account, relief that must run against a legislator directly to be effective." 30 F.4th at 49.

With this conclusion that the challenged conduct is to a legislative act, the court moves on to the second restriction on legislative immunity: the exception for conduct of an "extraordinary character." The court starts with a close examination of the relevant cases and the parties' arguments related to the application of these cases, and then considers the precise details provided by the parties about the process by which Speaker Fecteau imposed the sanction on Representative Libby.

As the Supreme Court has long recognized, "[l]egislative immunity does not, of course, bar all judicial review of legislative acts." *Powell*, 395 U.S. at 503. The case law carves out an exception to the entitlement to legislative immunity for "things done, in the one House or of the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible." *Cushing*, 30 F.4th at 50 (quoting *Kilbourn*, 103 U.S. at 204). Broadly speaking, "[t]here may be some

conduct, even within the legislative sphere, that is so flagrantly violative of
fundamental constitutional protections that traditional notions of legislative
immunity would not deter judicial intervention." *Harwood*, 69 F.3d at 634.  The
Supreme Court has not identified precisely what conduct would clear the "high bar"
set by this exception, but suggests that a "perversion of [legislative] powers [for] a
criminal purpose [such as 'imitating the Long Parliament in the execution of the Chief
Magistrate of the nation, or to follow the example of the French assembly in assuming
the function of a court for capital punishment'] would be screened from punishment
by the constitutional provision for freedom of debate." *Cushing*, 30 F.4th at 51
(quoting *Kilbourn*, 103 U.S. at 204-05).[8]  The Circuit instructs that "the assessment
of when a given act that, though seemingly legislative in nature, is nonetheless 'of an
extraordinary character' that makes it unworthy of the immunity's protection must
be sensitive to context." *Id.* at 52 (quoting *Kilbourn*, 103 U.S. at 204).  This court
must therefore "ensure that [its] focus is on the character of the legislative act being
challenged." *Id.*

---

[8] The dissenting opinion in *Cushing* pointed out that the Supreme Court "has
never addressed a case in which it has held the extraordinary-character exception to
apply." *Cushing*, 30 F.4th at 56 (Thompson, J., dissenting).  "As examples of
potentially extraordinary legislative acts, the Supreme Court has hypothesized a
legislature that 'execut[es] . . . the Chief Magistrate of the nation, or . . . assum[es]
the function of a court for capital punishment.'" *Id.* at 57 (quoting *Kilbourn*, 103 U.S.
at 204-05).  The dissent further explained that "[w]e have similarly pondered a
legislature that 'votes to allow access to its chambers to members of only one race or
to adherents of only one religion,' suggesting these might veer into the orbit of the
extraordinary-character exception." *Id.* (quoting *Harwood*, 69 F.3d at 634).

The First Circuit closely examined the notion of the extraordinary-character exception in *Cushing*. 30 F.4th at 50-53. The plaintiffs – all members of the New Hampshire House of Representatives with "medical conditions and other limitations" and "disabilit[ies] plac[ing] them at greater risk than the general public for serious complications or death from COVID-19" – introduced a "proposal . . . to amend the House rules to permit virtual proceedings of the full House." *Id.* at 32-33, 35. The House voted on the proposal and rejected it. *Id.* at 32-34. A few plaintiffs sent letters to the House Speaker (and others), requesting reasonable accommodations so that they could participate remotely in House proceedings, all to no avail. *Id.* at 34. The plaintiffs sued the Speaker, alleging that his refusal to allow them to participate remotely in official House sessions (which had the consequence of keeping them from voting on bills before the House) violated Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act as well as the Fourteenth Amendment. *Id.* at 34-35, 49. The Circuit grappled with whether the Speaker's denial of some legislators' requests for accommodations to procedural rules were of such extraordinary character that the NH House Speaker would not be entitled to legislative immunity for the claims made against him. *Id.* at 52. The First Circuit, sitting en banc, concluded that the "extraordinary character" exception had not been met in part because the plaintiffs' claims asserting a Fourteenth Amendment violation was "not in and of itself suffic[ient] . . . under the *Kilbourn* standard" to obliterate the shield of legislative immunity. *Id.* at 50-52. The Circuit cautioned that the Supreme Court's jurisprudence on legislative immunity indicated that courts needed "to be wary of

construing *Kilbourn* in a manner that would deem even such a 'quintessentially legislative act' as the decision by the Speaker of the House to follow [its] rules . . . to be beyond the protection of the immunity that has been historically afforded to such an act." *Id.* at 53 (quoting *McCarthy v. Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021)).

Here, like in *Cushing*, the House took a vote on a formal request from a member. The Speaker then enforced the will of the majority of the body by enforcing the plainly written sanction articulated in the rule. As in *Cushing*:

> [T]he plaintiffs [here] take aim at conduct by the Speaker that involves a decision to follow -- rather than depart from -- existing House rules that were overwhelmingly [here, unanimously] passed . . . . The challenged conduct by the Speaker . . . involves adhering to existing rules rather than making new ones.

*Id.* at 51. The court also sees similarities to the issue presented and reasoning expressed in *Harwood*: "[A] legislative body adopt[ed] a rule, not invidiously discriminatory on its face," and Speaker Fecteau did "no more than carry out the will of the body by enforcing the rule as part of [his] official duties." 69 F.3d at 631. The plaintiffs assert that these cases are inapposite because each "concerned a generally applicable procedural rule," Pls.' Reply at 3-4, but the plaintiffs fail to acknowledge that their case is also about the application of a procedural rule. The court agrees with the plaintiffs that neither *Cushing* nor *Harwood* foreclose a future case that could present extraordinary conduct to which immunity would not apply. Pls.' Reply at 4. Neither case defined what that conduct would be, though the Circuit indicated that a category of such conduct would be met if "legislators engaged in conduct so clearly exceeding the powers delegated to them." *Cushing*, 30 F.4th at 51.

The plaintiffs also assert that the sanction imposed on Representative Libby is "punitive enforcement" that disenfranchises her constituents and reflects "invidious viewpoint discrimination" which "so flagrantly violat[es] fundamental constitutional protections" that the immunity shield cannot protect the defendants from their suit. Pls.' Reply at 4.  The unconstitutional application of the sanction identified in Rule 401(11) to Representative Libby, according to the plaintiffs, must be reviewed by this court because the rule may not "trump the constitution" and Speaker Fecteau acted outside the scope of his power.  Tr. at 14:16-18, 35:18-21.  The appellate courts have, however, put to rest any notion that legislative immunity could be circumvented simply because a plaintiff alleges a claim for a constitutional violation.  While the First Circuit has acknowledged it would draw the line at "flagrant violat[ions] of fundamental constitutional protections," *Harwood*, 69 F.3d at 634 (implying a house rule excluding all members of one race or one religion would be so flagrantly violative as to qualify for the exception) (citing *Kilbourn*, 103 U.S. at 204), it has also relied on more recent discussions by the Supreme Court to generalize "that immunity is not forfeited simply because the activities, if unprotected, might violate a plaintiff's constitutional rights," *id.* (holding that a House Rule – and alleged selective enforcement – prohibiting lobbyists from sitting around the perimeter of the House floor did not "even closely approach" the border of the extraordinary character exception).  Moreover, the Supreme Court has said that to believe the judiciary will intervene to protect First Amendment rights as soon as allegations are made that congressional action has infringed these rights "ignores the absolute nature of the

speech or debate protection and our cases which have broadly construed that protection." *Eastland*, 421 U.S. at 509-510. The Supreme Court has also stated that immunity applies even if the legislators' "conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) (holding congressional committee members immune from suit for alleged violations of, among other things, privacy rights when those defendants' actions were limited to conducting hearings, preparing the report, authorizing its publication). Furthermore, the courts are not "to oversee the judgment of the [legislative body] . . . to impose liability on its Members if [it] disagree[s] with their legislative judgment." *Id.* at 313. And, in a case specifically considering whether the application of a statute pertaining to legislator recusal rules (which had the effect of barring a legislator from voting on certain legislative proposals) was an infringement on the legislator's First Amendment rights, the Court declared that "restrictions upon legislators' voting are not restrictions upon legislators' protected speech" because "a legislator's vote is the commitment of [their] apportioned share of the legislature's power to the passage or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011) (Scalia, J.).

What all this means is that the court has no indication that the Circuit or Supreme Court would conclude that Speaker Fecteau's imposition of the sanction pursuant to House Rule 401(11) is of such an extraordinary character that it would

decline to leave up the shield of legislative immunity. Recall that the plaintiffs are not challenging Rule 401(11) itself, but only the imposition of the sanction identified in this rule on Representative Libby. If the Circuit was not moved by the New Hampshire Speaker's enforcement of its procedural rule with the effect of forcing members to choose between their health and/or physical ability to be present in person for sessions and the ability to perform the responsibilities of their elected position, *see Cushing*, 30 F.4th at 50-52, then the court does not see how it can conclude that prohibiting an elected member of the House from speaking or voting on the House floor is of such an extraordinary character. The court takes the prudent course of exercising judicial restraint especially because the case law does not indicate this should be the first case to clear the high bar for applying this exception to a legislator's conduct.

The plaintiffs warn that if the court allows immunity to shield the defendants here, then the defendants could next "prohibit Asian-American representatives from making floor speeches or voting, silence those in same-sex marriages or interracial marriages, or prohibit voting by women." Pls.' Reply at 4. The Circuit Court in *Harwood* was also presented with a "parade of horribles" – there "a hypothetical legislature that votes to allow access to its chambers to members of only one race or to adherents of only one religion" – which prompted the reminder that there is a border past which immunity would not apply. *Harwood*, 69 F.3d at 634. But the court need not explore hypothetical scenarios and instead stays focused on the situation at hand.

Finally, the plaintiffs lean heavily on two Supreme Court cases which, they say, seal the deal here that immunity should not shield the defendants. Pls.' Reply at 4-5. The court, however, finds that neither case is as dispositive as the plaintiffs contend. In *Bond v. Floyd*, a duly elected candidate to the Georgia House of Representatives was not allowed to take his oath or his seat in the legislature because of comments he had made against the Vietnam war between election day and the first day of the legislative session. 385 U.S. 116, 118 (1966). Bond, an African American, alleged racial discrimination and violation of his First Amendment rights. The State of Georgia did not argue it was immune from suit and the Supreme Court did not explore (because it was not asked to) whether the situation presented in that case represented conduct of an extraordinary character that would not be entitled to immunity. Rather, the Supreme Court acknowledged that "[t]he State does not claim that it should be completely free of judicial review whenever it disqualifies an elected Representative; it admits that, if a State Legislature excluded a legislator on racial or other clearly unconstitutional grounds, the federal (or state) judiciary would be justified in testing the exclusion by federal constitutional standards." *Id.* at 130. This is not the same as the Court concluding that the conduct alleged against defendants met the extraordinary character exception. While the plaintiffs insist this case is on point because here there is also an "exclusion of an elected legislator" in "flagrant violation of Supreme Court precedent barring exclusion of an elected legislator because of their protected speech espousing a viewpoint that majority rejects," Pls.' Reply at 4, the court agrees with the defendants that this case is

factually distinguishable because Representative Libby has not been disqualified, excluded, or expelled from her elected seat. *Bond* is about a member-elect being prevented from taking his seat at all and not about a sanction imposed on a seated member of the House for violations of the Code of Ethics pursuant to a democratically passed censure. Defs.' Opp'n at 6 n.6.

Next, in *Powell*, the Supreme Court held that certain legislative employees were not entitled to the protection of legislative immunity for their roles in enforcing a resolution which excluded a member-elect from his seat in the U.S. House of Representatives. 395 U.S. at 489, 506. The Court affirmed the proposition that legislators were completely immune from suit, but a House clerk, sergeant-at-arms, and doorkeeper were not protected by immunity even though their conduct was pursuant to an express order of the House. *Id.* at 504-05. The Court relied on *Kilbourn*, where the Court had allowed a lawsuit against a sergeant-at-arms for his execution of an illegal arrest warrant resulting in an alleged false imprisonment to go forward. *Id.* at 503-04 (citing *Kilbourn*, 103 U.S. at 204). Like with *Bond*, however, the court considers Representative Libby's situation to be readily distinguishable from *Powell* because Representative Libby has not been disqualified or expelled from her seat.[9]

---

[9] The plaintiffs do not include any allegations against Clerk Hunt or provide any indication or argument in their motion about how or why any actions he has taken would qualify as extraordinary for purposes of getting around legislative immunity and so the court does not provide a separate analysis for this defendant. The law, however, is clear that, "as long as [a legislative employee's] conduct would be covered by legislative immunity were the same conduct performed by the legislator

Despite the court's take on the applicable law, especially that the appellate courts have been clear that simply alleging claims for constitutional violations does not automatically meet the high bar set for the extraordinary-character exception, the appellate courts also instruct that context is an important consideration. *See Cushing*, 30 F.4th at 52 (instructing that the court must be "sensitive to [the] context" in which the legislative act arose and must focus on the "character of the legislative act being challenged"). The court is also mindful of the serious effect the imposed sanction has on Representative Libby's ability to fulfill her duties as an elected representative of District 90, so the court will closely examine the context surrounding the imposition of the sanction to determine whether the details known at this time about the defendants' conduct will reach the high bar of this exception.

The Resolution introduced by Representative Moonen included a "resolve[]" that Representative Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." Fecteau Decl. Ex. D. Representative Libby was on notice of the potential consequence if the Resolution passed because the consequence is clearly identified in Rule 401(11). The Resolution was deeply debated on the floor of the House. Throughout the hour-long debate, Speaker Fecteau repeatedly refocused the comments from the members on the precise Resolution before the House, redirecting members on both sides of the aisle when another member raised a point of order or on his own when the comments

---

himself, the [legislature's employee] shares the immunity." *Harwood*, 69 F.3d at 631, 631 n.10.

strayed from the merits of the censure for Representative Libby's conduct. *See, e.g.,*
*Archived Hearings & Meetings: House Chamber*, at 6:17:10 PM. None of the
comments discussed the precise sanction allowed by Rule 401(11) or questioned what
the consequence might be if Representative Libby refused to comply with the
Resolution. None of the comments raised concerns about the effect of imposing the
sanction articulated in Rule 401(11). After the Resolution passed, Speaker Fecteau
provided Representative Libby with an opportunity to make the satisfaction
demanded by the Resolution – the apology – but she declined. Speaker Fecteau then
proceeded to announce the precise sanction identified in Rule 401(11), without
objection from any member of the body.

As the parties brought to the court's attention, this is not the first time that
Rule 401(11) has been invoked or applied in the Maine House.[10] But this is the first
time a censured Representative has refused to apologize and so the first time the

---

[10] Two censures passed in April 2024 pursuant to violations of House Rule
401(11) where the body found two members in "egregious violation of the decorum of
the House" when they made statements on the House floor "claiming that the 2023
Lewiston mass shooting was God's response to a recent abortion law that took effect
the same day." Compl. at ¶ 53 (citing to the Resolutions). The Speaker for the 131st
Legislature summoned the members to the well of the House, announced the censure,
and "await[ed] an assurance and an issuance of a formal apology, to be read on the
House floor, to make satisfaction." Journal and Legislative Record – House, Apr. 11,
2024 at 2 [https://perma.cc/BG6W-SVTU]. Both members apologized to the House
and to the public, Journal and Legislative Record – House, Apr. 11, 2024 at 3
[https://perma.cc/BG6W-SVTU], which obviated the need for any further sanction.

The parties also point this court to the first censure imposed on a House
member. In 2001, the House voted to adopt a Resolution censuring a member who
had "verbally abused a female Senator in the hallway outside the chamber of the
House of Representatives." Journal and Legislative Record – House, Feb. 8, 2001 at
10 [https://perma.cc/GL5C-FVY7]. That member also apologized immediately
following the vote to adopt the Resolution to censure him. *Id.* at 14.

Speaker imposed the consequence of the censure when satisfaction has not been made. This "first" does not in and of itself make the act extraordinary, however, because the consequence is plainly stated in the rule.

The effect of the sanction, as clearly known by now, is that Representative Libby is prohibited from speaking on the House floor during the debate of proposed legislation and voting on proposed legislation and other matters up for a vote by the full House. Fecteau Decl. at ¶ 24. Representative Libby considers the suspension of these privileges to be indefinite, but the sanction remains in place only until Representative Libby apologizes, the House votes to dispense with Rule 401(11), or the 132nd Legislature session ends. *Id.* ¶ 25. As indicated by Speaker Fecteau, a House member may move to dispense with or suspend the Resolution and a majority vote will pass the motion. *Id.* ¶¶ 41-42. At least two attempts since February 25 to do so have failed. On March 20, a member of the House made such a motion so Representative Libby could speak during the debate on the State's proposed budget, but the motion did not receive a majority vote. *Id.* ¶¶ 39-41. On March 25, a similar motion was made and failed. *Id.* ¶ 42. Of course, pursuant to Rule 401(11), Representative Libby may also choose to make satisfaction.

Representative Libby considers "speaking and voting on behalf of her District 90 constituents to be "[t]he two most critical responsibilities of a duly elected legislator." Libby Decl. at ¶ 10. This court hears the predicament but notes that the sanction does not render her unable to represent her constituents or speak in favor of or in opposition to policies and legislation in all ways. As Speaker Fecteau points

out in his declaration (and Representative Libby does not challenge), Representative

Libby can:

- Fully participate on committees to which she is assigned, including voting, debating, and testifying at public hearings.
- Sponsor and co-sponsor bills and resolutions.
- Lobby other members for support or opposition to proposed legislation.
- Participate in legislative caucus meetings.
- Testify at public hearings about any pending legislation.
- Be present on the House floor during debates and votes.
- Engage in procedural actions on the House floor such as make a motion to amend or postpone a bill or raise an objection thereto.
- Use all legislative staff and offices without any restrictions.
- Be fully compensated, including travel-related expenses and meal allowances.

Fecteau Decl. at ¶¶ 28-31, 34-38. At the time of the briefing on this motion,

Representative Libby had introduced several amendments to a measure regarding

the State's biennial budget. *Id.* ¶ 39.

After carefully considering the case law, the details presented by the parties

about the House governing rules, and the process by which the House adopted the

Resolution and imposed the censure on Representative Libby, the court concludes

that the suspension of Representative Libby's privilege to speak or vote on the House

floor is not of such an extraordinary character that this exception to absolute

legislative immunity for legislators will apply. That said, the ability to suspend an

elected representative's privileges to either speak on the House floor or enter a vote

on legislation pending before the entire House until the representative apologizes for

censured conduct is a weighty sword to wield. However, the process Speaker Fecteau

followed when he imposed the sanction ultimately reflected the will of the majority of

the House members. The court must carefully heed the caution from the First Circuit

that federal judges should not "improperly intrud[e] into internal state legislative affairs [or] warring sides in partisan state legislators' battles." *Cushing*, 30 F.4th at 52. The censure and its sanction on Representative Libby is, at bottom, an internal Maine House affair. "As a rule, a legislature's regulation of the atmosphere in which it conducts its core legislative activities—debating, voting, passing legislation, and the like—is part and parcel of the legislative process, and, hence, not subject to a judicial veto." *Harwood*, 69 F.3d at 635 (citing *Eastland,* 421 U.S. at 509). And so, in this context (and with the plaintiff's plain instruction that they are challenging the application of Rule 401(11) to Representative Libby and not the Rule itself firmly rooted in mind), the imposition of the sanction plainly identified and authorized by the House Rule is not of such extraordinary character as to obliterate the formidable shield the courts have provided to legislative acts. The defendants are, therefore, immune from the plaintiffs' claims against them.

## IV.    CONCLUSION

For the reasons stated above, the plaintiffs' Motion for a Preliminary Injunction (ECF No. 8) is DENIED.

IT IS SO ORDERED.

Melissa R. DuBose
United States District Judge


April 18, 2025