## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

LAUREL D. LIBBY, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE,
BERNICE FRASER, RENE FRASER, and DONALD DUBUC,
*Plaintiffs-Appellants,*

v.

RYAN M. FECTEAU, in their official capacity as Speaker of the Maine House of
Representatives, and ROBERT B. HUNT, in their official capacity as Clerk of the House,
*Defendants-Appellees,*

On Appeal from the United States District Court
for the District of Maine
No. 1:25-cv-83-MRD

## JOINT APPENDIX

Taylor A.R. Meehan
Daniel M. Vitagliano*
Marie E. Sayer
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
mari@consovoymccarthy.com

Patrick N. Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Supervised by principals of the firm
 admitted to practice in VA*

*Counsel for Appellants*

# TABLE OF CONTENTS

Verified Complaint (Dkt.1) ........................................................................................... JA1

Declaration of Bernice Fraser (Dkt.8-1) ................................................................... JA30

Declaration of Donald Dubuc (Dkt.8-2) .................................................................. JA33

Declaration of Ronald P. Lebel (Dkt.8-3) ............................................................... JA36

Declaration of Jason Levesque (Dkt.8-4) ................................................................ JA39

Declaration of Wendy Munsell (Dkt.8-5) ................................................................ JA42

Declaration of Rene Fraser (Dkt.8-6) ...................................................................... JA45

Maine House Rules 1820 (Dkt.28-1) ........................................................................ JA48

Declaration of Ryan Fecteau with exhibits (Dkt.29) .............................................. JA73

Declaration of Suzanne Gresser with exhibits (Dkt.30) ......................................... JA105

Declaration of Laurel Libby (Dkt.34-1) ................................................................... JA114

Preliminary Injunction Hearing Transcript (Dkt.37) .............................................. JA118

Notice of Appeal (Dkt.40) ......................................................................................... JA157

District Court Docket .................................................................................................. JA159

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| LAUREL D. LIBBY, State Representative of Maine House District 90, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER, RENE FRASER, and DONALD DUBUC,<br><br>Plaintiffs,<br><br>v.<br><br>RYAN M. FECTEAU, in his official capacity as Speaker of the Maine House of Representatives, and ROBERT B. HUNT, in his official capacity as Clerk of the House,<br><br>Defendants. | Civil Action No. _____<br><br><br><br><br>**VERIFIED COMPLAINT**<br><br><br><br><br>INJUNCTIVE RELIEF SOUGHT |

## INTRODUCTION

1.      Along a strict party-line vote, led by the Speaker of the Maine House of Representatives, the House unconstitutionally stripped a duly elected Republican member of her right to speak and vote on the House floor—disenfranchising the 9,000 Mainers in her district—in retaliation for protected speech on a highly important and hotly debated matter of public concern.

2.      Rep. Laurel Libby (R-Auburn) represents Maine's House District 90. A mother of five, including three girls, Rep. Libby has a been a staunch advocate of protecting the rights of Maine girls in athletics. She is an outspoken critic of Maine's state policy allowing boys who identify as transgender to compete in girls' sports.

3.      Rep. Libby recently posted on social media to call attention to the Maine high school girls indoor track and field state championship. A Greely High School student who competed as a boy last year but now identifies as transgender took first place in girls' pole vault. That first-place finish propelled the Greely girls' team to win the team girls track and field state championship by a single

point. The championship was a public event, was streamed online, and the names, schools, and photographs of the winners were all posted publicly.

4.      Rep. Libby's social media posts went viral, garnering national media attention and placing Maine's policy under the microscope. Rep. Libby made several appearances on national television and radio broadcasts to bring further attention to the issue. The posts even captured the attention of the White House, prompting President Donald Trump to threaten Maine's allocation of federal education funding in a highly publicized exchange with Maine Governor Janet Mills. Three federal agencies have launched investigations into the Maine Department of Education and its compliance with Title IX's prohibition on sex-based discrimination in federally funded education programs.

5.      Nothing is particularly surprising about this reaction; strong majorities of Americans oppose allowing boys to compete in girls' sports. The obvious physical advantage of boys on average allows them to jump higher, run faster, and throw harder than girls. Indeed, permitting boys to compete against girls can present a serious threat to girls' physical safety. It also severely distorts the fairness of the competition.

6.      The Maine Democrat-controlled House took swift retaliatory action against Rep. Libby for shining a light on the State's controversial policy. By a party-line vote of 75-70, the House passed a resolution censuring Rep. Libby, declaring her posts to be "reprehensible," unethical, and "incompatible with her duty and responsibilities as a Member of th[e] House." The censure resolution provides that Rep. Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." When Rep. Libby refused to apologize, the House Speaker prohibited her from speaking or voting on the House floor.

7.      Whatever one thinks of males who identify as transgender competing in girls' and women's sports, the issue and Maine's policy is of public importance and subject to ongoing debate.

As Governor Mills recently put it: "If [lawmakers] wish to change [Maine's policy], they have the authority to change it." "**It's worthy of a debate, a full, democratic debate.**"[1] But the House is actively barring one of its staunchest advocates on the issue from participating as a full member of the House. Just last week, a representative introduced a bill that would reverse Maine's policy. Yet Rep. Libby is barred from speaking or voting on that proposed legislation—or any other issue, large or small, that may come before the House for the rest of her elected term.

8.      While legislatures have authority to discipline their members, stripping them of their voting rights is another matter. The U.S. House of Representatives, for example, believes it violates the Constitution to deprive sitting members of their right to vote. And the reason why is illustrated here: the Speaker's actions have effectively disenfranchised Rep. Libby and her 9,000 constituents in House District 90, some of whom are plaintiffs here.

9.      The heavy-handed, partisan actions violate the First Amendment and the Equal Protection, Due Process, and Guarantee Clauses of the U.S. Constitution. This Court should grant injunctive relief and protect Rep. Libby's constituents' representation in the House.

## PARTIES

10.     Plaintiff Laurel D. Libby is a duly elected representative of the 132nd Maine Legislature. Rep. Libby represents Maine House District 90, composed of parts of the City of Auburn and the Town of Minot. She is currently serving her third term as a state representative. Rep. Libby meets all the state constitutional requirements to serve in the Maine House: she is over the age of 21, she has been a U.S. citizen for over five years, she has resided in Maine and House District 90 for more than one year, and she continues to reside in House District 90. *See* Me. Const. Me. Const. Art. IV, Pt. 1, §4.

---

[1] Michael Shepherd, *Janet Mills says Maine's transgender athlete policies are 'worthy of a debate,'* Bangor Daily News (Mar. 3, 2025), https://perma.cc/6L9Y-PV6B (emphasis added).

11.     Plaintiff Ronald P. Lebel is a resident of Auburn, Maine. He resides in Maine House District 90. Lebel voted in the 2024 state legislative election.

12.     Plaintiff Wendy Munsell is a resident of Auburn, Maine. She resides in Maine House District 90. Munsell voted in the 2024 state legislative election.

13.     Plaintiff Jason Levesque is a resident of Auburn, Maine. He resides in Maine House District 90. Levesque voted in the 2024 state legislative election.

14.     Plaintiff Bernice Fraser is a resident of Minot, Maine. She resides in Maine House District 90. Fraser voted in the 2024 state legislative election.

15.     Plaintiff Rene Fraser is a resident of Minot, Maine. He resides in Maine House District 90. Fraser voted in the 2024 state legislative election.

16.     Plaintiff Donald Duboc is a resident of Minot, Maine. He resides in Maine House District 90. Duboc voted in the 2024 state legislative election.

17.     Defendant Ryan M. Fecteau (D-Biddeford) is Speaker of the Maine House of Representatives. He is a resident of this district for purposes of this action because he performs his official duties here. He is sued in his official capacity only.

18.     Defendant Robert B. Hunt is the clerk of the House. He is a resident of this district for purposes of this action because he performs his official duties here. He is sued in his official capacity only.

### JURISDICTION AND VENUE

19.     The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343 because this action arises under the Constitution and laws of the United States.

20.     The Court has authority under 28 U.S.C. §§2201 and 2202 to issue the relief sought.

21.     Venue lies in this district under 28 U.S.C. §1391(b)(1) and (2).

## STATEMENT OF FACTS

*Males Who Identify as Transgender Competing in Female Sports Is a Hotly Debated Issue That Has Prompted Responses by States and the Federal Government*

22.     The issue of males who identify as transgender competing in female sports has been at the forefront of public debate for the past several years.

23.     Americans have grown increasingly against males participating in female sports in recent years. A January 2018 PRRI survey found that 43% of Americans were opposed to allowing male students who identify as transgender to compete against female classmates. Daniel Cox et al., *Americans Differ on Participation of Male, Female Transgender Students in Team Sports*, PRRI (Jan. 25, 2018), https://perma.cc/SJQ5-A7Y2. A June 2022 NPR/Ipsos poll found that 63% of Americans were opposed to allowing males who identify as transgender to compete on sports teams that align with their gender identity. Melissa Block, *Americans are deeply divided on transgender rights, a poll shows*, NPR (June 29, 2022), https://perma.cc/4WGF-XV8S. A May 2023 Gallup poll found that 69% of Americans said transgender athletes should only be allowed to compete on sports teams that "conform with their birth gender," up from 62% in 2021. Jeffrey M. Jones, *More Say Birth Gender Should Dictate Sports Participation*, Gallup (June 12, 2023), https://perma.cc/ZYS4-QN37. And a January 2025 New York Times/Ipsos poll found that 79% of Americans, including 67% of people who identify as Democrats or leaning Democrat, believe biological males who identify as women should not be allowed to participate in women's sports. Jackson Thompson, *NYT poll finds majority of Democrats oppose transgender athletes in women's sports*, Fox News (Jan. 18, 2025), https://perma.cc/TVD3-MGJY.

24.     Many who oppose boys and men competing in girls' and women's sports recognize the obvious, inherent physical advantages males have over females, which can present a serious risk to girls' and women's safety. In 2014, a transgender MMA fighter Fallon Fox brutally defeated her female opponent Tamikka Brents in just two minutes, leaving Brents with a concussion, a fractured orbital bone inside her skull, and seven staples in her head. Bhavesh Purohit, *When transgender fighter*

*Fallon Fox broke her opponent's skull in MMA fight*, Sportskeeda (Sept. 30, 2021), https://bit.ly/4i8k2Ey.

In 2022, North Carolina volleyball player Payton McNabb suffered serious injury after a transgender-identified male player spiked a ball at her head, rendering her unconscious and causing her partial paralysis. Ashley McClure, *After a Male Caused Her Partial Paralysis, Female Volleyball Player Payton McNabb Now Fights to Protect Women's Sports*, Indep. Women's Forum, https://perma.cc/CX43-9WZG. In 2023, a Massachusetts female high school field hockey player was hospitalized for significant facial injuries, including loss of teeth, after being hit in the face by a ball struck by a male opponent. *Massachusetts school calls for change after female field hockey player hurt by boy's shot*, CBS News (Nov. 6, 2023), https://perma.cc/CLJ4-TUB7.

25.    Scrutiny of the issue and public debate has led to action in state legislatures across the country. Since 2020, more than half the States have prohibited transgender individuals from participating in interscholastic athletics consistent with their gender identity. Movement Advancement Project, *LGBTQ Youth: Bans on Transgender Youth Participation in Sports* (2025), https://perma.cc/C69P-2CNS.

26.    Maine went in the opposite direction. In 2021, the Maine Legislature passed and Governor Mills signed LD1688 into law. *See generally* P.L. 2021, Ch. 366. The bill enshrined protections across Maine law for "gender identity," defined as "the gender-related identity, appearance, mannerisms or other gender-related characteristics of an individual, regardless of the individual's assigned sex at birth." 5 MRS §4553(5-C).

27.    Maine law "recognize[s] and declare[s] to be a civil right" the "opportunity for an individual at an educational institution to participate in all educational … and all extracurricular activities without discrimination because of … gender identity." *Id.* §4601. Maine law makes it "unlawful educational discrimination" to "[e]xclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research,

occupational training or other program or activity" or "[d]eny a person equal opportunity in athletic programs" based on "gender identity." *Id.* §4602(1)(A)-(B).

28.    Transgender sports were at the forefront of the 2024 presidential election. The *Wall Street Journal* identified it as a "2024 sleeper issue." Editorial Board, Opinion, *Transgender Sports Is a 2024 Sleeper Issue*, Wall St. J. (Oct. 13, 2024), https://perma.cc/25Z6-HF95. President Trump campaigned aggressively to "keep men out of women's sports." *Trump: 'We will of course keep men out of women's sports,'* Wash. Post. (Nov. 3, 2024), https://bit.ly/41n2mxC. That platform resonated with voters. *E.g.,* Rob Harris, *Donald Trump's trans athletes rhetoric resonated with voters concerned about sporting fairness*, Sky News (Feb. 6, 2025), https://bit.ly/4h4EXH5. A national exit poll found that 70% of voters saw President Trump's opposition to boys in girls' sports (and bathrooms) as important to them. Macy Petty, *New Exit Polls Confirm the Surprising Key Issue in the 2024 Election*, Concerned Women Am. (Nov. 18, 2024), https://perma.cc/35XV-WSUF.

29.    Shortly after taking office, President Trump signed an executive order to rescind federal funds from educational programs that permit males who identify as transgender to compete against females. Exec. Order No. 14,201, 90 Fed. Reg. 9,279 (2025). The executive order drew praise from countless female athletes and parents.



*Trump signs executive order banning transgender athletes from women's sports*, ABC News (Feb. 5, 2025), https://bit.ly/4bHj3sB.

30.    The next day, the NCAA banned transgender athletes from competing in women's sporting competitions. Kiara Alfonseca, *NCAA changes transgender participation policy in response to executive order*, ABC News (Feb. 6, 2025), https://perma.cc/P6S9-CLUA. But several state-level associations signaled they would continue to follow state law. Steve Karnowski, *For high school sports, decisions loom: Follow Trump or state law on transgender athletes*, AP (Feb. 7, 2025), https://bit.ly/4i5LClQ. The Maine Principal's Association said it would continue to allow boys who identify as transgender to compete in girls' sports, notwithstanding President Trump's executive order. Patty Wright, *Transgender female athletes can still compete under state law, Maine sports governing body says*, Me. Pub. (Feb. 7, 2025), https://perma.cc/5RAN-8MWH.

***Rep. Libby's Public Advocacy and the Federal Government's Response***

31.    On February 17, 2025, Rep. Libby posted on Facebook about a high school student who won the Maine girls class B pole vault state championship. *See* Representative Laurel Libby,

Facebook (Feb. 17, 2025), https://perma.cc/CL35-A558. Libby observed that the student previously "was competing in boy's pole vault" and "had [a] fifth place finish." *Id.* "So all of this transpired in the last year, with the full blessing of the Maine Principals' Association." *Id.* The post showed the athlete on the boys' medal podium side-by-side with the athlete on the girls' podium this year.



*Id.* Rep. Libby also posted about the matter on X (formerly Twitter). *See, e.g.*, @laurel_libby, X (Feb. 18, 2025, 5:45 PM), https://perma.cc/UB86-PHJD.

32.     The state championship results were publicly reported online with students' full names, schools, and photos. *See Class B State Meet 2025: Girls Pole Vault Finals*, MaineTrackXC, https://perma.cc/22SA-T99Q.

33.     Coverage of the event and photographs of the first-place winner and other participants are publicly accessibly on the internet and social media. *See, e.g.*, Dan Zaksheske, *Trans-Identifying Male Athlete Wins Maine State Title In Girls' Pole-Vaulting*, OutKick (Feb. 19, 2025), https://bit.ly/3F23GOR (identifying student's current and prior names and school); Hudson Crozier, *Male Athlete Sweeps Women's Event Days After State Refused To Enforce Trump's Rule*, Daily Caller (Feb. 18, 2025), https://perma.cc/P6ZM-3V5N (same and noting with hyperlinks that "[p]hotos posted online and media coverage of the event confirm [the male student's] identity"); @bourne_beth2345, X (Feb. 18, 2025, 12:50 PM), https://perma.cc/7JNV-6N6Z (identifying student by name with photo of student on the medal podium); @icons_women, X (Feb. 18, 2025, 1:32 AM), https://perma.cc/QH67-5QWG (identifying student by name with photo of student holding "STATE CHAMPS" poster and the caption "[Name] with 1st in pole vault!!"); @mainerunningphotos, flickr (Feb. 17, 2025), https://perma.cc/XJ3G-RMNC (photo of student pole vaulting identified by name); @mainerunningphotos, flickr (Feb. 17, 2025), https://perma.cc/2FG2-BJXA (photo of student pole vaulting); @mainerunningphotos, flickr (Feb. 17, 2025), https://perma.cc/63VS-F2VX (same).

34.     The male student's first-place pole vault finish propelled the Greely High School's girls' team to win the overall state championship. The school edged out runner-up Freeport—whose two pole vaulters finished tied for second—by a one-point margin. Derek Veilleux, *Greely Edges Freeport By 1 Point to Win Class B Girls Title*, MaineTrackXC (Feb. 21, 2025), https://perma.cc/TU6F-Q426 (including team photo with pole vaulter and results). The male student's victory won Greely the overall class B indoor track and field state championship.

35.    Rep. Libby's social media posts about the girls' state championship went viral. Her initial Facebook post generated over 100,000 reactions, 60,000 comments, and 18,000 shares. Her initial X post generated over 686,000 views. As one media outlet reported, "Maine state lawmaker Laurel Libby drew attention to the controversy." Amanda Prestigiacomo, *Boy Wins Girls' Pole Vault Championship In Maine Days After State Pledged To Defy Trump Order*, DailyWire (Feb. 18, 2025), https://perma.cc/H7BY-H2KY.

36.    Over the next few days, Rep. Libby appeared on several national television and radio broadcasts and continued to post on social media, highlighting and criticizing Maine's policy permitting boys who identify as transgender to compete in girls' sports and the "Maine Democrat Majority" and calling on the federal government to act, consistent with President Trump's executive order. *E.g.*, @laurel_libby, X (Feb. 19, 2025, 10:23 PM), https://perma.cc/AKT2-ZTEY ("Honored to serve as the voice for our girls in this fight—they deserve so much better leadership than what the Maine Democrat Majority is offering!"); Representative Laurel Libby, Facebook (Feb. 19, 2025), https://bit.ly/3D5c2oB ("Maine's Democrat Majority is openly defying President Trump's Executive Order designed to keep biological males out of girls' sports. … [O]ur girls deserve better.").

37.    On February 20, three days after Rep. Libby's initial post, President Trump during public remarks called out Maine for its transgender sports policy and threatened to withhold federal funding. Fredrick Placey, *Trump threatens to withhold federal money over transgender students*, WMTV (Feb. 20, 2025), https://perma.cc/SJ8Y-G9RZ. Rep. Libby shared President Trump's remarks on social media and commented, "President Trump pledges to step in to protect girls' sports in Maine and clean up the failure by both the Maine Principals' Association and the Maine Democrat Majority!" Representative Laurel Libby, Facebook (Feb. 20, 2025), https://bit.ly/4bvtL55. Another post stated, "With $280M+ per year on the line in federal funding, this shouldn't be a hard choice for Maine

Democrats. It's time to restore girls' sports and protect the funding for our schools." @laurel_libby, X (Feb. 21, 2025, 12:34 PM), https://perma.cc/S9SM-2F6V.

38.    The next day, during a governors' event at the White House, President Trump called out Governor Mills over Maine's transgender sports policy in a tense exchange. Trump asked, "I understand Maine—is Maine here, the governor of Maine?" "I'm here," Mills replied. "Are you not going to comply with it?" Trump asked. Mills answered, "I'm complying with state and federal laws." "Well, we are the federal law," Trump said. "You better do it. You better do it, because you're not going to get any federal funding at all if you don't. And by the way your population … doesn't want men playing in women's sports. So you better comply," Trump continued. Mills then replied, "See you in court." Trump concluded the exchange, "Good, I'll see you in court. I look forward to that. That should be a real easy one. And enjoy your life after governor, because I don't think you'll be in elected politics." Lexie Schapitl, *'See you in court': Trump and Maine's governor spar over trans athlete order*, NPR (Feb. 21, 2025), https://bit.ly/4i4Olfa. The heated exchange made endless headlines.

39.    President Trump again called out Governor Mills the next day during his remarks at the Conservative Political Action Conference. "You saw Maine yesterday, right? The governor of Maine," Trump said, eliciting boos from the audience. "She's fighting to keep men in women's sports. … Let her do that fight. Let them all do that fight, because I think that's about a 90/10 issue, and I can't figure out who the 10% are." @TheMaineWire, X (Feb. 22, 2025, 3:15 PM), https://bit.ly/3Xt76k2.

40.    Federal agencies have since announced investigations into Maine's policy. The U.S. Department of Education's Office of Civil Rights launched a self-initiated probe into the Maine Department of Education and Maine the Maine School Administrative District #51, which has jurisdiction over Greely High School, for potentially violating Title IX, which bars sex-based discrimination in federally funded education programs. Press Release, U.S. Dep't of Educ., *Office for*

*Civil Rights Launches Title IX Violation Investigations into Maine Department of Education and Maine School District* (Feb. 21, 2025), https://perma.cc/9QYG-YYRT. The U.S. Department of Health and Human Services' Office of Civil Rights likewise initiated a Title IX compliance review of the Maine Department of Education, including the University of Maine System. Press Release, U.S. Dep't Health & Hum. Servs., *HHS' Civil Rights Office Acts to Keep Men out of Women's Sports* (Feb. 21, 2025), https://perma.cc/WXM4-HGEW. The United States Department of Agriculture also initiated a compliance review of the University of Maine. Press Release, U.S. Dep't of Agric., *USDA Launces Compliance Review of University of Maine for Title IX Violations* (Feb. 22, 2025), https://perma.cc/5QLJ-MDN4.

41.     U.S. Attorney General Pam Bondi also sent Governor Mills a letter, putting Maine "on notice" that "if these or other federal investigations show that the relevant Maine entities are indeed denying girls an equal opportunity to participate in sports and athletic events by requiring them to compete against boys, the Department of Justice stands ready to take all appropriate action to enforce federal law." Letter from Pam Bondi, U.S. Att'y Gen., to Janet Mills, Governor of Maine (Feb. 25, 2025), https://perma.cc/8HJM-77GV.

### The Maine House Retaliates Against Rep. Libby

42.     After Rep. Libby's advocacy went viral, Maine House Speaker Ryan Fecteau (D-Biddeford) asked Rep. Libby to take down her initial Facebook post. Rep. Libby refused.

43.     Speaker Fecteau then publicly responded to Rep. Libby by urging Mainers to "reject hateful rhetoric from divisive politicians." "All kids, including transgender students, deserve better than to be used as political fodder for internet bullies." Speaking to transgender students, he added, "I see you and I stand with you." "You deserve to be your true self at home, at school and when participating in sports." Susan Cover, *Mainers should 'reject hateful rhetoric,' Maine House speaker says in*

*response to GOP post opposing transgender student participation in sports*, Spectrum News (Feb. 20, 2025), https://perma.cc/JL3C-EDEN.

44.    The next day, Speaker Fecteau penned an op-ed in the *Bangor Daily News*, framing Rep. Libby's social media activity as an issue of "privacy of Maine kids" that can "be downright dangerous for the young person involved" and "impact their health and their safety, at school, and in their communities." He added, "Kids shouldn't have to worry about a politician sharing images of them online without their consent." He pledged "to stand up to elected officials who violate the privacy of youth for cheap political stunts." Ryan Fecteau, Opinion, *Maine kids should never be political fodder for internet bullying*, Bangor Daily News (Feb. 21, 2025), https://perma.cc/KD4Y-E7KZ.

45.    As explained, the student's name, school, and image were widely disseminated online, separate from Rep. Libby's initial post. *Supra* ¶¶32-33.

46.    Indeed, the photos Rep. Libby posted were taken at a public forum on the victory podium at state track meets. The entire point of the victory podium is to publicize the winner of the event.

47.    Moreover, the photos themselves make the very point that Governor Mills concedes is "worthy" of a "full, democratic debate." They illustrate that the winner had an obvious physical advantage in terms of height and development over the female competitors in the pole vault.

48.    The complaint that Rep. Libby's speech somehow threatened child safety is irreconcilable with the fact that her speech addresses what occurred at a public competition with publicly available photos already on the internet. There is nothing illegal or threatening about Rep. Libby's posts, and at no point has she enabled or encouraged any attacks on any individual student. Instead, she has focused on the state government's unfair policy and the rights of girls to compete fairly and safely in high school athletics.

49.     Rep. Libby kept the pressure on Maine Democrats on social media: "The people of Maine (especially our girls) deserve so much better than the 'leadership' that @GovJanetMills and the Maine Democrat Majority are currently offering." @laurel_libby, X (Feb. 23, 2025), https://bit.ly/41vkCEY. "@GovJanetMills and Maine's Democrat Majority are knowingly and willingly allowing the erasure of Maine girls, by continuing to allow biological males to compete in (and dominate) girls' sports." @laurel_libby, X (Feb. 24, 2025), https://perma.cc/Z35L-ARGD.

50.     On February 25, 2025, Maine's Democrat-controlled House passed a resolution along strict party lines (75-70) censuring Libby for her initial Facebook post with the photos of the transgender student on the medal podium. H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025), https://perma.cc/JU85-VNTS (Resolution). The resolution provides that Rep. Libby "posted a statement criticizing the participation of transgender students in high school sports"; the "post has received national attention that she has amplified by appearing on national television and radio broadcasts to discuss"; and the "post named the minor and used photos of the minor without that minor's consent, in an effort to advance her political agenda." *Id.* The resolution found Rep. Libby's conduct "to be reprehensible and in direct violation of our code of ethics," which requires legislators to "be ever mindful of the ordinary citizen who might otherwise be unrepresented" and "endeavor conscientiously to pursue the highest standards of legislative conduct inside and outside of the State House." *Id.* It further found that Rep. Libby "conducted herself in a manner incompatible with her duty and responsibilities as a Member of this House and the public trust and high standards incumbent in that office." *Id.* The resolution provides that Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine" and "must comport herself in a manner that pursues the highest standards of legislative conduct." *Id.*

51.     In introducing the resolution, Majority Leader Rep. Matt Moonen (D-Portland) accused Rep. Libby of "creat[ing] an intentionally inflammatory post on social media about a Maine

high school athlete, who is a minor, at a recent track event." *Archived Hearings & Meetings: House Chamber* 5:57:35-6:01:06 PM, Me. Leg. (Feb. 25, 2025, 10:00 AM), https://bit.ly/43tBMp4 (Hearing). He emphasized that "[t]he post then went viral online and generated tens of thousands of comments," and then Rep. Libby "continued to bring national media attention" to the issue. *Id.* In other words, it was the favorable coverage Rep. Libby generated that was the problem.

52. In response, Minority Leader Rep. Billy Bob Faulkingham (R-Winter Harbor) argued "the legislative code of ethics has no guidelines referring to online or social media posts" and "[t]he post in question does not even violate Facebook's community standards." *Id.* at 6:01:13-6:03:48 PM. He characterized the resolution as "a mockery of the censure process," "set[ting] a standard that says that the majority party, when they're displeased with a social media post that upsets them, can censure a member of the minority party and by a majority vote, censure them and, without them giving an apology, keep them out of the Legislature." *Id.* He observed none of the three prior censures in the history of the Maine Legislature targeted speech or conduct outside the statehouse. *Id.*

53. Two of the three prior censures came last year, again by the Maine Democrat Majority against Republicans for disfavored speech. But all involved speech on the House floor, in the statehouse, or to other legislators, not a duly elected representative's speech on a matter of public concern directly to her constituents. The House censured two Republicans over statements on the House floor claiming that the 2023 Lewiston mass shooting was God's response to a recent abortion law that took effect the same day, which violated "the decorum of the House." H.R. Res. 1, 131st Leg., 2d Reg. Sess. (Me. 2024), https://perma.cc/8YC3-6RY3; H.R. Res. 2, 131st Leg., 2d Reg. Sess. (Me. 2024), https://perma.cc/S63W-3XJF; *see* Legis. Rec. H-1723-1724, 131st Leg., 2d Reg. Sess. (Me. 2024), https://perma.cc/BG6W-SVTU. The third prior censure came in 2001 when a male representative who "verbally abused a female Senator in the hallway outside of the chamber of the House," "followed her to the Senate offices where he continued to verbally abuse the Senator," and

"verbally abused" "another female Senator [who] attempted to intervene." Legis. Rec. H-145-49, 120th Leg., 1st Reg. Sess. (Me. 2001), https://perma.cc/GL5C-FVY7.

54.     Rep. Jennifer L. Poirier (R-Skowhegan), who opposed the resolution, raised free-speech concerns and emphasized that the student's identifying information and image were publicly available on the internet before Rep. Libby ever posted on Facebook. *Id.* at 6:06:53-6:09:23. She observed that Rep. Libby would not have been censured had she posted the student's photograph and name with sentiments of congratulations. *Archived Hearings & Meetings: House Chamber*, *supra*, at 6:07:37-6:07:52.

55.     Rep. Poirier also requested clarification for other representatives "who may have reposted Representative Libby's social media post," asking whether they can "expect censures to come forth on them as well." *Id.* at 7:11:58-7:12:12. Speaker Fecteau responded, "I'm not aware of any other censures." *Id.*

56.     Members repeatedly interrupted Rep. Libby as she attempted to speak on the House floor in defense of herself and her post. *Id.* at 6:15:45-6:21:36. Rep. Libby emphasized that the track and field state championship "was a public event" and the male student's "photos are posted publicly on multiple websites." *Id.* at 6:27:27-6:28:15. She explained that "folks are upset about this post" because it "exposed truth" that "there are boys participating in girls' sports" and "taking the place of girls." *Id.* at 6:28:17-6:30:00.

57.     After the House passed the censure resolution, Speaker Fecteau summoned Rep. Libby to the well of the chamber, lectured her on the House's ethics standards, and offered her an opportunity to apologize. Rep. Libby declined. Speaker Fecteau then found Rep. Libby in violation of House Rule 401(11). *Id.* at 7:08:20-7:11:15.

58.    Under Rule 401(11), a member who "is guilty of a breach of any of the rules and orders of the House … may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction." H.R. Rule 401(11), 132nd Leg. (Me.).

59.    The censure of Rep. Libby thus deprives her of the ability to speak or vote on the House floor on behalf of her 9,000 constituents in House District 90.

60.    The censure served no legitimate legislative purpose. The censure of Libby concerned speech that occurred *outside the statehouse* to her constituents on social media. *See* Nat'l Conf. of State Legis., *Mason's Manual of Legislative Procedure* §561(3) (2010) ("Whatever is spoken *in the house* is subject to the censure of the house." (emphasis added)). Thus, unlike the three prior censures in the nearly 200-year history of the Maine House, Libby's speech did not disrupt the order or decorum of the House. *Cf. id.* §123(4) (providing for censure under section titled "Use of Disorderly Words in Debate").

61.    Speaker Fecteau posted about the censure on Facebook: "Tonight the House held a vote to censure Representative Laurel Libby. Sharing images of kids online without their consent is a clear violation of the bond of trust and respect between citizens and their Legislators." Speaker Ryan Fecteau, Facebook (Feb. 25, 2025), https://perma.cc/9WXN-2SQK.

62.    Yet Speaker Fecteau is guilty of the very conduct he criticized and found worthy of censure. He has posted many photos of minors on Facebook to score political points. On information and belief, Speaker Fecteau did so without the minors' consent.



Speaker Ryan Fecteau, Facebook (Feb. 9, 2019), https://perma.cc/G956-KWKL.



Speaker Ryan Fecteau, Facebook (Jan. 18, 2020), https://perma.cc/SU2G-9VMA.



Speaker Ryan Fecteau, Facebook (Nov. 7, 2019), https://perma.cc/9FWD-56TC.



Speaker Ryan Fecteau, Facebook (Feb. 14, 2019), https://perma.cc/RPG4-KKMG.

***Public Backlash***

63.    The censure of Rep. Libby drew swift condemnation in media across the country. *E.g.*, Carine Hajjar, Opinion, *A new low for free speech: Democrats strip voting rights from Maine state representative over post on trans athletes*, Bos. Globe (Feb. 28, 2025), https://perma.cc/9QVJ-8CLU; Editorial Board, Opinion, *Maine's Transgender Madness*, Wall St. J. (Feb. 28, 2025), https://perma.cc/PV8B-MTFQ.

64.    Congressmembers, national free-speech organizations, and other prominent figures criticized the censure and expressed support for Rep. Libby. *E.g.*, @tedcruz, X (Feb. 26, 2025, 1:09 AM), https://perma.cc/352E-7N42; @Speech_First, X (Feb. 26, 2025, 11:44 AM), https://perma.cc/4CN4-PXPQ; @Riley_Gaines_, X (Feb. 25, 2025, 8:03 PM), https://perma.cc/9FP7-Z397; @Liz_Wheeler, X (Feb. 25, 2025, 9:17 PM), https://perma.cc/LUT7-NGKL; *see also* Daniel Ortner, *Maine's censure of lawmaker for post about trans student-athlete is an attack on free speech*, FIRE (Mar. 7, 2025), https://perma.cc/3ZU4-DBLU.

65.    On March 1, the first day of women's history month, hundreds of Mainers descended on Augusta to march in protest of Maine's transgender sports policy, some holding signs in support of Rep. Libby. *See* Jacob Murphy, *Hundreds rally in Augusta to oppose Gov. Mills, transgender athletes in women's sports*, WMTW (Mar. 1, 2025), https://perma.cc/4MC7-2G7G; *'March Against Mills' Draws Large Protest to Augusta*, Me. Wire (Mar. 3, 2025), https://perma.cc/DW3L-RCGD; @TheMaineWire, X (Mar. 1, 2025, 11:11 AM), https://bit.ly/41Ip9oY.

66.    On March 3, 2025, in her first comments to reporters after her tense exchange with President Trump, Governor Mills refused to take a stance on Maine's transgender sports policy. "If [lawmakers] wish to change it, they have the authority to change it, but you don't change it by executive order or by wishing it differently," she said. "It's worthy of a debate, a full, democratic debate." Shepherd, *supra* note 1.

*Disenfranchisement of Rep. Libby's Constituents in House District 90*

67.    The House's censure excludes Rep. Libby from any further "democratic debate" over Maine's transgender sports policy. The day after Rep. Libby's censure, Rep. Liz Caruso (R-Caratunk) announced a bill to reverse Maine's transgender sports policy. *Maine Republican introduces bill to ban transgender athletes from girls' sports teams*, Spectrum News (Feb. 26, 2025), https://perma.cc/33LT-CJAL. Titled "An Act to Ensure Equity and Safety in Athletics, Restrooms, Changing Rooms and Housing at Elementary, Secondary and Postsecondary Schools," the bill would require "[i]nterscholastic or intramural athletic teams and sports … must be expressly designated … based on sex" and provides that "[a]thletic teams or sports designated as 'females,' 'women,' or 'girls' may not allow participation by students who are male." L.D. 868, 132nd Legis., 1st Reg. Sess. (Me. 2025), https://perma.cc/UVH3-XNGA. But because of the censure, Rep. Libby, one of the House's staunchest advocates on the issue, is barred from speaking on the floor or voting on the bill.

68.    In addition, on March 4, 2025, Rep. Reagan Paul (R-Winterport) presented a joint order and moved its passage for "the Joint Standing Committee on Education and Cultural Affairs shall report out, to the House, a bill that prohibits an educational institution in this State that receives state funds from being a member of or paying dues or fees to an organization that does not prohibit biological males from participating on teams in sports designated for 'girls' or 'females.'" H.P. 500, 132nd Legis., 1st Reg. Sess. (Me. 2025), https://perma.cc/H3TB-BRMM; *see Media Streaming: House Chamber* 11:45:29-11:51:56 AM, Me. Legis. (Mar. 4, 2025), https://bit.ly/3Dmgpvt (Rep. Paul: "This is not just about women's sports; it's about protecting fairness, reality, and the very foundation of competition. Truth isn't optional, and biology is not just an obstacle to be ignored, or dare I say pole-vaulted over."). Because of the censure, Rep. Libby and her constituents in House District 90 will be deprived of any voice or vote on any such bill.

69.    In addition to the above, the ongoing Maine legislative session features votes on numerous issues of public importance, including the State budget and the availability of funding for mental and other health services.

70.    Rep. Libby has sponsored or cosponsored resolutions proposing constitutional amendments concerning state elections and bills concerning Sunday closing laws, tobacco taxes, paid family and medical leave, public records requests, and consumer energy and electricity costs. The Defendants' unlawful actions deprive her of her ability to vote on these issues, should they come to the House.

## CLAIMS FOR RELIEF

### COUNT I
**Free Speech**
**42 U.S.C. §1983; U.S. Const. Amends. I, XIV**
**Rep. Libby against Defendants**

71.    Plaintiffs repeat and reallege each of their prior allegations.

72.    The Free Speech Clause of the First Amendment to the U.S. Constitution, applicable to the States through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

73.    "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up).

74.    Rep. Libby's social media posts about the Maine girls indoor track and field state championship and the intrusion of men and boys in women's and girls' sports is constitutionally protected speech on a matter of public concern.

75.    Barring Rep. Libby from speaking or voting on the House floor is a materially adverse action that prevents Rep. Libby from doing her job, interferes with her ability to adequately perform

her elected duties, and denies her privileges of the office to which she was duly elected by the people of Maine.

76.     Rep. Libby was retaliated against because of her speech and would not have been censured but for her speech.

77.     The proffered reasons for censuring Rep. Libby—minor students' privacy and safety concerns—are false and a sham to cover the unlawful motive to retaliate against her because of her speech about men and boys who identify as transgender participating women's and girls' sports, her criticisms of Maine's transgender sports policy, and the national media attention she attracted.

78.     Rep. Libby has suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

**COUNT II**
**Equal Protection**
**42 U.S.C. §1983; U.S. Const. Amend. XIV**
**All Plaintiffs against Defendants**

79.     Plaintiffs repeat and reallege each of their prior allegations.

80.     "[T]he right to vote—the wellspring of all rights in a democracy—is constitutionally protected." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001).

81.     The Constitution "protects the right of all qualified citizens to vote" in state elections, and the Equal Protection Clause requires that "all who participate in the election are to have an equal vote." *Reynolds v. Sims*, 377 U.S. 533, 554, 557-58 (1964).

82.     Equal protection applies to "the initial allocation of the franchise" and "the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam).

83.     Plaintiffs voted in the 2024 election for House District 90.

84.     Barring Rep. Libby from speaking or voting on the House floor dilutes Plaintiffs' 2024 election votes in violation of the Equal Protection Clause's "one person, one vote" principle.

85.     Barring Rep. Libby from speaking or voting on the House floor disenfranchises Plaintiffs and the 9,000 Mainers in House District 90.

86.     Barring Rep. Libby from speaking or voting on the House floor dilutes Plaintiffs' vote and disenfranchises them through "arbitrary and disparate treatment." *Bush*, 531 U.S. at 104-05.

87.     Plaintiffs have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

**COUNT III**
**Due Process**
**42 U.S.C. §1983; U.S. Const. Amend. XIV**
**All Plaintiffs against Defendants**

88.     Plaintiffs repeat and reallege each of their prior allegations.

89.     "[T]he due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process." *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. Unit B Sept. 1981).

90.     Electors have a "right … to vote and to have their votes counted." *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994). Thus, "rejection of a ballot where the voter has been effectively deprived of the ability to cast a legal vote implicates federal due process concerns." *Id.* Due process is denied where "the election process itself reaches the point of patent and fundamental unfairness." *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978). Where "organic failures in a state or local election process threaten to work patent and fundamental unfairness, a colorable claim lies for a violation of substantive due process." *Bonas*, 265 F.3d at 74. A "total and complete disenfranchisement of the electorate as a whole is patently and fundamentally unfair" and thus "constitute[s] a violation of due process." *Id.* at 75. It necessarily follows that an ex post deprivation of representation in the Legislature works the same harm.

91.     Barring Rep. Libby from speaking or voting on the House floor excludes her from the office to which she was duly elected by the people of Maine's House District 90, even though she

24
JA24

satisfies the standing requirements for a person to serve as a member of the Maine House set forth in the Maine Constitution. *See* Me. Const. Art. IV, Pt. 1, §4; *cf. Powell v. McCormack*, 395 U.S. 486, 550 (1969).

92.    Barring Rep. Libby from speaking or voting on the House floor constitutes a de facto expulsion from the office to which she was duly elected by the people of Maine's House District 90 without "the concurrence of 2/3" members, as required by the Maine Constitution. Me. Const. Art. IV, Pt. 3, §4.

93.    Barring Rep. Libby from voting on the House floor deprives Plaintiffs and voters in House District 90 of their right to vote for a state representative.

94.    Canceling Rep. Libby's representative votes on the House floor in violation of the Maine Constitution's provisions for House membership violates due process.

95.    Plaintiffs have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

**COUNT IV**
**Republican Guarantee**
**42 U.S.C. §1983; U.S. Const. Art. IV, §4**
**All Plaintiffs against Defendants**

96.    Plaintiffs repeat and reallege each of their prior allegations.

97.    The U.S. Constitution "guarantee[s] to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4.

98.    "[T]he distinguishing feature of that form is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *Duncan v. McCall*, 139 U.S. 449, 461 (1891). "[W]hile the people are thus the source of political power, their governments, national and state, have been limited by written constitutions, and

25

they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities." *Id.*

99.     "The Guarantee Clause is best understood as protecting basic rights of political participation within state governments." Erwin Chemerinsky, *Cases Under the Guarantee Clause Should Be Justiciable*, 65 U. Colo. L. Rev. 849, 867 (1994). "[T]he key features of a republican form of government are a right to vote and a right to political participation." *Id.* at 868.

100.     The Guarantee Clause "presupposes the continued existence of the states and … those means and instrumentalities which are the creation of their sovereign and reserved rights." *Printz v. United States*, 521 U.S. 898, 919 (1997).

101.     Barring Rep. Libby from speaking or voting on the House floor—stripping her of her most important responsibilities as an elected representative and denying her privileges of the office to which she was duly elected—deprives Plaintiffs of representation in the House and thus presents a real threat to the constitutionally guaranteed republican form of government.

102.     "A republican form of government can only be preserved by securing to its electors the right to select their [representatives] by ballot, for terms fixed in advance by the Legislature of the state." *Bd. of Elections for Franklin Cnty. v. State ex rel. Schneider*, 191 N.E. 115, 120 (Ohio 1934).

103.     Plaintiffs and the 9,000 Mainers of House District 90 elected Rep. Libby to a two-year term through 2026.

104.     Barring Rep. Libby from speaking or voting on the House floor deprives Plaintiffs of representation in the House, disenfranchises 9,000 Mainers in House District 90, and deprives them of their ability to elect their own representatives to exercise legislative power and pass laws.

105.     Barring Rep. Libby from speaking or voting on the House floor constitutes a de facto expulsion from the office to which she was duly elected by the people of Maine's House District 90

without "the concurrence of 2/3" members, as required by the Maine Constitution. Me. Const. Art. IV, Pt. 3, §4.

106.     Barring Rep. Libby from speaking or voting on the House floor excludes her from the office to which she was duly elected by the people of Maine's House District 90, even though she satisfies the standing requirements for a person to serve as a member of the Maine House set forth in the Maine Constitution. *See* Me. Const. Art. IV, Pt. 1, §4; *cf. Powell*, 395 U.S. at 550.

107.     While some Guarantee Clause claims have been held to be nonjusticiable, the Supreme Court has been clear that the Guarantee Clause is a critical protection of the people in our Constitution and that there remain claims that could be justiciable. *See New York v. United States*, 505 U.S. 144, 184-85 (1992); *see also Largess v. Supreme Jud. Ct. for the State of Mass.*, 373 F.3d 219, 229 (1st Cir. 2004) (per curiam) (observing "several members of the Supreme Court have suggested that federal courts can indeed review the internal allocations of power in a state government under the text of this clause" (citing *Bush*, 531 U.S. at 112 (Rehnquist, C.J., concurring, joined by Scalia and Thomas, JJ.))). The "unusual and extreme" circumstances here present such a justiciable claim for "the federal courts to enforce the Guarantee Clause." *Largess*, 373 F.3d at 229. A State has no republican form of government when it has stripped an elected legislator—the main ingredient of any republican form of government—of her right to speak and vote on behalf of her constituents contrary to the state's constitutionally prescribed rules for what makes a qualified legislator and requirement of two-thirds vote for expulsion.

108.     Plaintiffs have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

### PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

A. A declaratory judgment that the censure of Rep. Libby and application of House rules prohibiting her from speaking on the House floor and voting on behalf of her constituents is unlawful retaliation, in violation of the First and Fourteenth Amendments of the U.S. Constitution;

B. A declaratory judgment that the censure of Rep. Libby and application of House rules prohibiting her from voting on behalf of her constituents of the House District 90 violates the Equal Protection, Due Process, and Guarantee Clauses of the U.S. Constitution;

C. Injunctive relief prohibiting Rep. Libby from being barred from speaking on the House floor;

D. Injunctive relief prohibiting the disregard and non-counting of Rep. Libby's votes cast on behalf of House District 90 constituents;

E. An award of attorney's fees, costs, and expenses under 42 U.S.C. §1988; and

F. Any other legal or equitable relief the Court may deem just and proper.

Dated: March 11, 2025

Taylor A.R. Meehan*
Daniel M. Vitagliano*†
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Certificates for admission *pro hac vice* pending
†Supervised by principals of the firm admitted to practice in VA

Respectfully submitted,

/s/ *Patrick Strawbridge*
Patrick Strawbridge (Bar No. 10024)
    *Lead Counsel*
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Counsel for Plaintiffs*

28

**VERIFICATION**

I am over the age of 18 and am a Plaintiff in this action. I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that I have read the foregoing VERIFIED COMPLAINT, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct.

Dated: March 11, 2025

_/s/ Laurel D. Libby_

Per Local Civil Rule 10, Plaintiffs' counsel retains a paper copy of this verification bearing an original signature, available for future production.
_/s/ Patrick Strawbridge_

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| LAUREL D. LIBBY, State Representative of Maine House District 90, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER, RENE FRASER, and DONALD DUBUC<br><br>Plaintiffs,<br><br>v.<br><br>RYAN M. FECTEAU, in his official capacity as Speaker of the Maine House of Representatives, and ROBERT B. HUNT, in his official capacity as Clerk of the House,<br><br>Defendants. | Civil Action No. __1:25-cv-83__ |

**DECLARATION OF BERNICE FRASER**

I, Bernice Fraser, pursuant to the provisions of 28 U.S.C. §1746, declare the following:

1.      I am a resident of Minot, Maine.

2.      I live in Maine House District 90 and am represented by Rep. Laurel Libby.

3.      I voted in the most recent legislative election.

4.      I admire Rep. Libby's commitment to her constituents and her willingness to raise issues and confront those who would prefer she remain silent.

5.      I believe the Speaker's decision to censure Rep. Libby for posting photos from a public event was made in retaliation for her raising an issue that casts him and the House majority in a bad light.

6.      The suspension of Rep. Libby is unjust. I do not think she has anything to apologize for and I do not think the House should have the power to take away her vote until she makes an

apology satisfactory to the majority. I am concerned the threat of removing a representative's vote is likely to discourage other elected officials from raising viewpoints unpopular with the Speaker.

7.    By suspending Rep. Libby indefinitely and depriving her of the ability to vote on all matters coming to the House floor, the Speaker and House Clerk have effectively disenfranchised me.

8.    I believe my elected Representative's vote should be counted on important matters like the state budget, tax reform, mental health care policies, and many other matters that will come before the Legislature in the coming weeks.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 8, 2025                          _____/s/ Bernice Fraser_____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| LAUREL D. LIBBY, State Representative of Maine House District 90, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER, RENE FRASER, and DONALD DUBUC<br><br>Plaintiffs,<br><br>v.<br><br>RYAN M. FECTEAU, in his official capacity as Speaker of the Maine House of Representatives, and ROBERT B. HUNT, in his official capacity as Clerk of the House,<br><br>Defendants. | Civil Action No. __1:25-cv-83__ |

**DECLARATION OF DONALD DUBUC**

I, Donald Dubuc, pursuant to the provisions of 28 U.S.C. §1746, declare the following:

1.    I am a resident of Minot, Maine.

2.    I live in Maine House District 90 and am represented by Rep. Laurel Libby.

3.    I voted in the most recent legislative election.

4.    I admire Rep. Libby's commitment to her constituents and her willingness to raise issues and confront those who would prefer she remain silent.

5.    I believe the Speaker's decision to censure Rep. Libby for posting photos from a public event was made in retaliation for her raising an issue that casts him and the House majority in a bad light.

6.    The suspension of Rep. Libby is unjust. I do not think she has anything to apologize for and I do not think the House should have the power to take away her vote until she makes an

apology satisfactory to the majority. I am concerned the threat of removing a representative's vote is likely to discourage other elected officials from raising viewpoints unpopular with the Speaker.

7.      By suspending Rep. Libby indefinitely and depriving her of the ability to vote on all matters coming to the House floor, the Speaker and House Clerk have effectively disenfranchised me.

8.      I believe my elected Representative's vote should be counted on important matters like the state budget, tax reform, mental health care policies, and many other matters that will come before the Legislature in the coming weeks.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 9, 2025                             _/s/ Donald Dubuc_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

LAUREL D. LIBBY, State Representative of
Maine House District 90, RONALD P.
LEBEL, WENDY MUNSELL, JASON
LEVESQUE, BERNICE FRASER, RENE
FRASER, and DONALD DUBUC.

Plaintiffs,

v.

RYAN M. FECTEAU, in his official capacity
as Speaker of the Maine House of
Representatives, and ROBERT B. HUNT, in
his official capacity as Clerk of the House,

Defendants.

Civil Action No. ___1:25-cv-83____

## DECLARATION OF RONALD P. LEBEL

I, Ronald P. Lebel, pursuant to the provisions of 28 U.S.C. §1746, declare the following:

1.      I am a resident of Auburn, Maine.

2.      I live in Maine House District 90 and am represented by Rep. Laurel Libby.

3.      I voted in the most recent legislative election.

4.      Despite my status as a lifelong registered Democrat, I voted for Rep. Libby. I admire
Rep. Libby's commitment to her constituents and her willingness to raise issues and confront those
who would prefer she remain silent.

5.      I believe the Speakers' decision to censure Rep. Libby for posting photos from a public
event was made in retaliation for her raising an issue that casts him and the House majority in a bad
light.

6.      The suspension of Rep. Libby is unjust. I do not think she has anything to apologize for and I do not think the House should have the power to take away her vote until she makes an apology satisfactory to the majority. I am concerned the threat of removing a representative's vote is likely to discourage other elected officials from raising viewpoints unpopular with the Democrat majority.

7.      By suspending Rep. Libby indefinitely and depriving her of the ability to vote on all matters coming to the House floor, the Speaker and the house Clerk have effectively disenfranchised me.

8.      I believe my elected Representative's vote should be counted on matters like the state budget, tax reform, mental health care policies, and many other matters that will come before the Legislature in the coming weeks.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 9, 2025                              ___/s/ Ronald P. Lebel_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

LAUREL D. LIBBY, State Representative of
Maine House District 90, RONALD P.
LEBEL, WENDY MUNSELL, JASON
LEVESQUE, BERNICE FRASER, RENE
FRASER, and DONALD DUBUC

Plaintiffs,

v.

RYAN M. FECTEAU, in his official capacity
as Speaker of the Maine House of
Representatives, and ROBERT B. HUNT, in
his official capacity as Clerk of the House,

Defendants.

Civil Action No. __1:25-cv-83____

### DECLARATION OF JASON LEVESQUE

I, Jason Levesque, pursuant to the provisions of 28 U.S.C. §1746, declare the following:

1.      I am a resident of Auburn, Maine.

2.      I live in Maine House District 90 and am represented by Rep. Laurel Libby.

3.      I voted in the most recent legislative election.

4.      I admire Rep. Libby's commitment to her constituents and her willingness to raise issues and confront those who would prefer she remain silent.

5.      I believe the Speaker's decision to censure Rep. Libby for posting photos from a public event was made in retaliation for her raising an issue that casts him and the House majority in a bad light.

6.      The suspension of Rep. Libby is unjust. I do not think she has anything to apologize for and I do not think the House should have the power to take away her vote until she makes an

apology satisfactory to the majority. I am concerned the threat of removing a representative's vote is likely to discourage other elected officials from raising viewpoints unpopular with the Speaker.

7.    By suspending Rep. Libby indefinitely and depriving her of the ability to vote on all matters coming to the House floor, the Speaker and House Clerk have effectively disenfranchised me.

8.    I believe my elected Representative's vote should be counted on important matters like the state budget, tax reform, mental health care policies, and many other matters that will come before the Legislature in the coming weeks.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 10, 2025                    /s/ Jason Levesque

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| LAUREL D. LIBBY, State Representative of Maine House District 90, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER, RENE FRASER, and DONALD DUBUC<br><br>Plaintiffs,<br><br>v.<br><br>RYAN M. FECTEAU, in his official capacity as Speaker of the Maine House of Representatives, and ROBERT B. HUNT, in his official capacity as Clerk of the House,<br><br>Defendants. | Civil Action No. ___1:25-cv-83_____ |

## DECLARATION OF WENDY MUNSELL

I, Wendy Munsell, pursuant to the provisions of 28 U.S.C. §1746, declare the following:

1.     I am a resident of Auburn, Maine.

2.     I live in Maine House District 90 and am represented by Rep. Laurel Libby.

3.     I voted in the most recent legislative election.

4.     I admire Rep. Libby's commitment to her constituents and her willingness to raise issues and confront those who would prefer she remain silent.

5.     I believe the Speaker's decision to censure Rep. Libby for posting photos from a public event was made in retaliation for her raising an issue that casts him and the House majority in a bad light.

6.     The suspension of Rep. Libby is unjust. I do not think she has anything to apologize for and I do not think the House should have the power to take away her vote until she makes an

apology satisfactory to the majority. I am concerned the threat of removing a representative's vote is likely to discourage other elected officials from raising viewpoints unpopular with the Speaker.

7.    By suspending Rep. Libby indefinitely and depriving her of the ability to vote on all matters coming to the House floor, the Speaker and House Clerk have effectively disenfranchised me.

8.    I believe my elected Representative's vote should be counted on important matters like the state budget, tax reform, mental health care policies, and many other matters that will come before the Legislature in the coming weeks.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 9, 2025                          /s/ Wendy Munsell

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

LAUREL D. LIBBY, State Representative of
Maine House District 90, RONALD P.
LEBEL, WENDY MUNSELL, JASON
LEVESQUE, BERNICE FRASER, RENE
FRASER, and DONALD DUBUC

Plaintiffs,

v.

RYAN M. FECTEAU, in his official capacity
as Speaker of the Maine House of
Representatives, and ROBERT B. HUNT, in
his official capacity as Clerk of the House,

Defendants.

Civil Action No. ___1:25-cv-83_____

## DECLARATION OF RENE FRASER

I, Rene Fraser, pursuant to the provisions of 28 U.S.C. §1746, declare the following:

1.      I am a resident of Minot, Maine.

2.      I live in Maine House District 90 and am represented by Rep. Laurel Libby.

3.      I voted in the most recent legislative election.

4.      I admire Rep. Libby's commitment to her constituents and her willingness to raise issues and confront those who would prefer she remain silent.

5.      I believe the Speaker's decision to censure Rep. Libby for posting photos from a public event was made in retaliation for her raising an issue that casts him and the majority in a bad light.

6.      The suspension of Rep. Libby is unjust. I do not think she has anything to apologize for and I do not think the House should have the power to take away her vote until she makes an

apology satisfactory to the majority. I am concerned the threat of removing a representative's vote is likely to discourage other elected officials from raising viewpoints unpopular with the Speaker.

7.      By suspending Rep. Libby indefinitely and depriving her of the ability to vote on all matters coming to the House floor, the Speaker and House Clerk have effectively disenfranchised me.

8.      I believe my elected Representative's vote should be counted on important matters like the state budget, tax reform, mental health care policies, and many other matters that will come before the Legislature in the coming weeks.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 8, 2025                          ____/s/ Rene Fraser_____

EXHIBIT 1

# The Library of Congress'

## *EARLY STATE RECORDS PROJECT*

converted from the original microfilm held by the
Vincent C. Immel Law Library, Saint Louis University

through the generous support of the following institutions

University of Chicago, D'Angelo Law Library

Columbia University, Arthur W. Diamond Law Library

Cornell University, Law Library

Law Library of Congress

University of North Carolina at Chapel Hill, Kathrine R. Everett Law Library

St. John's University, Rittenberg Law Library

University of South Carolina, Coleman Karesh Law Library

Stanford University, Robert Crown Law Library

State University of New York at Buffalo, Charles B. Sears Law Library

Yale University, Lillian Goldman Law Library

Boston University, Fineman and Pappas Law Libraries

Shared contribution by libraries at the following Florida institutions:

| | |
|---|---|
| University of Florida | University of Miami |
| University of South Florida | Florida State University |
| University of West Florida | Florida A&M University |
| Florida Gulf Coast University | University of Central Florida |
| University of North Florida | Rollins College |
| Northwest Florida State College | Florida Polytechnic University |

Shared contribution by law libraries at the following Virginia institutions:
The College of William & Mary, Wolf Law Library
University of Richmond Law Library
University of Virginia, Arthur J Morris Law Library

Contribution by law library at the following Maine institution:
Maine State Law and Legislative Reference Library, Maine State Legislature

LLMC DIGITAL

# RULES AND ORDERS

### TO BE OBSERVED IN THE

# House of Representatives,

### OF THE

# STATE OF MAINE,

## DURING THE CONTINUANCE OF THE

## FIRST LEGISLATURE.

*PORTLAND:*

**PRINTED BY FRANCIS DOUGLAS.**

**1820.**

JA49

LLMC DIGITAL

# STATE OF MAINE.

*House of Representatives,*
*June 1, 1820.*

ORDERED, That two hundred copies of the Rules and Orders of this House be printed for the use of the Members.

J. LORING CHILD, *Clerk.*

LLMC DIGITAL

# RULES AND ORDERS.

## CHAPTER I.

### *Of the Duties and Powers of the Speaker.*

#### I.

THE Speaker shall take the chair every day at the hour to which the House shall have adjourned; shall call the Members to order; and on the appearance of a quorum shall proceed to business.

#### II.

He shall preserve decorum and order; may speak to points of order in preference to other Members, shall decide all questions of order, subject to an appeal to the House, on motion regularly seconded and may vote in all cases.

#### III.

He shall declare all votes; but if any one Member doubts the vote, the Speaker shall order a return of the House, with the number voting in favor of the question, and declare the result.

#### IV.

He shall rise to put a question, or address the House, but may read sitting.

#### V.

When the House shall determine to go into a Committee of the whole House, the Speaker shall appoint the Member, who shall take the Chair.

JA51

LLMC DIGITAL

127

## VI.

When any Member shall demand a question to be determined by yeas and nays, the Speaker shall take the sense of the House in that manner; provided one fifth of the Members present are in favor of it.

## VII.

He shall propound all questions, in the order they were moved, unless the subsequent motion be previous in its nature; except that in naming sums, and fixing times, the largest sum and longest time shall be put first.

## VIII.

After a motion, being seconded, is stated or read by the Speaker, it shall be deemed to be in possession of the House, and shall be disposed of by vote of the House; but the mover may withdraw it at any time before a decision or amendment.

## IX.

When a question is under debate, the Speaker shall receive no motion, unless to amend, divide, or commit it, or for the previous question, or to postpone it to a certain day, or to adjourn.

## X.

He shall consider a motion to adjourn as always first in order, and it shall be decided without debate.

## XI.

He shall put the previous question in the following form, "*shall the main question be now put?*" and all amendment or further debate of the main question shall be suspended until the previous question be decided; and the previous question shall not be put unless one third of the Members present are in favor of it.

## XII.

When two or more Members happen to rise at once, the Speaker shall name the Member who is first to speak.

JA52

LLMC DIGITAL

### XIII.

All committees, except such as the House shall, from time to time, determine to select by ballot, shall be nominated by the Speaker, unless ten Members shall be in favor of a nomination by the House, in which case the nomination shall be made by the House.

———

## CHAPTER II.

*On the Duties, Rights and Decorum of Members.*

### I.

Every seat which shall be drawn by any Member, in person, at the beginning of any session, shall be his seat during that session, unless he shall have leave of the Speaker to change it.

### II.

No person shall sit at the Desk of the Speaker or Clerk, except by permission of the Speaker.

### III.

No member shall speak out of his place, without leave of the Speaker, nor without first rising up and addressing the Speaker; and he shall sit down as soon as he has done speaking.

### IV.

No member shall interrupt another while speaking, except to call to order or to correct a mistake.

### V.

No Member shall speak more than twice to one question, without first having obtained leave of the House; nor more than once, until the other Members, who have not spoken, shall speak, if they desire it.

### VI.

When any Member shall make a motion, and such motion shall be seconded by another, the same shall be received and considered by the House, and not otherwise; and no Member shall be permitted to lay

LLMC DIGITAL

a motion in writing on the table, until he has read the same in his place, and the same has been seconded; and in all cases where a Member wishes to introduce a *new bill* or *resolve* of a public nature, he shall first rise and state the subject, and move for a committee, who shall be authorized to report by bill or otherwise.

### VII.

No Member shall nominate more than one person for one committee, provided the person nominated by him be chosen.

### VIII.

No vote shall be reconsidered unless there be as many Members in the House at the time the motion for a reconsideration is made, as there were when the vote passed, provided a return of the House is called for before the question for the reconsideration is put; which question shall not be put without one day's previous notice; nor shall more than one motion for the reconsideration of any one question be sustained during the same session.

### IX.

No Member shall be obliged to be on more than two committees at the same time, nor chairman of more than one.   No Member of this House shall act as counsel for any party, before a joint committee of the Legislature, or a committee of this House.

### X.

No Member shall be permitted to stand up to the interruption of another, while any Member is speaking, or pass unnecessarily between the Speaker of the House and the person speaking.   Nor shall any Member be permitted to stand in the Alleys, during the session of the House.

### XI.

Every Member shall keep an account of his own attendance and travel, and deliver the same to the Clerk, or to the committee appointed to make up the pay-roll; and on failure thereof shall not be made up in the roll.     *I

LLMC DIGITAL

7

## XII.

When the galleries shall, at any time, be ordered to be cleared or shut, the matter which may occasion such order shall be kept secret by each Member, until the House shall order such injunction of secrecy to be taken off.

## XIII.

When a vote is declared by the Speaker, and any Member rises to doubt the vote, the House shall be returned, and the vote made certain without any further debate upon the question.

## XIV.

Every Member who shall neglect to give his attendance in the House for more than six days after the sessions commence, shall on making his appearance therein, be held to render the reason of such neglect; and in case the reason assigned shall be deemed by the House sufficient, such Member shall be entitled to receive pay for his travel, and not otherwise; and no member shall be absent more than two days without leave of the House; and no leave of absence shall avail any Member who retains his seat more than five days from the time the same was obtained.

## XV.

When any Member shall be guilty of the breach of either of the Rules and Orders of the House, and the House has determined he has so transgressed, he shall not be allowed to speak or vote until he has made satisfaction, unless by way of excuse for the same.

## XVI.

No Member shall be permitted to vote in any question, where his private right, distinct from public interest, is immediately concerned.

## XVII.

Every Member, who shall be in the House when a question is put, where he is not excluded by inter-

LLMC DIGITAL

est, shall give his vote, unless the House, for special reasons, shall excuse him.

## XVIII.

Every motion shall be reduced to writing, if the Speaker direct it.

## XIX.

On a previous question, no Member shall speak more than once without leave.

## XX.

A motion for commitment, until it is decided, shall preclude all amendment of the main question.

## XXI.

Motions and reports may be committed, or recommitted, at the pleasure of the House.

## XXII.

No new motion or proposition shall be admitted under color of amendment, as a substitute for the motion or question under debate.

## XXIII.

When the reading of a paper is called for, which had been before read to the House, and the same is objected to by any Member, it shall be determined by a vote of the House.

## XXIV.

The unfinished business in which the House was engaged, at the time of the last adjournment, shall have the preference in the orders of the day, and no motion on any other business shall be received, without special leave of the House, until the former is disposed of.

## XXV.

No Rule or Order of the House shall be dispensed with, unless two thirds of the Members present shall consent thereto.

## XXVI.

When a vote is doubted, the Members for or against a question, when called on by the Speaker, shall rise and stand uncovered till they are counted.

## CHAPTER III.

### *Of the Duties of Monitors.*

#### I.

One Monitor shall be appointed for each *division* of the House, whose duty it shall be, to see the due observance of the Orders of the House, and, on demand of the Speaker, to return the number of votes and Members in their respective divisions.

#### II.

If any Member shall transgress any of the Rules or Orders of the House, and persist therein, after being notified thereof by any Monitor, it shall be the duty of such Monitor to give information thereof to the House.

#### III.

In case the Speaker shall be absent at the hour to which the House was adjourned, one of the Monitors shall call the House to order, and the Clerk shall preside.

---

## CHAPTER IV.

### *Of Petitions, Memorials, &c.*

#### I.

All Petitions, Memorials, and other papers, addressed to the House, shall be presented by the Speaker, or by a Member, in his place, and shall be read by the Speaker, Clerk, or such other person as the Speaker may request, and shall be taken up in the order they were presented, unless where the House shall otherwise direct.

#### II.

No Petition shall be sustained for a re-hearing in any Court of Law, where the reason assigned is the discovery of further evidence, unless the petitioner can shew that he has lost his cause for want of

LLMC DIGITAL

such evidence, which it is now in his power to pro-
cure.

### III.

No Petition shall be sustained when the petitioner
can have a fair trial at common law.

### IV.

No Petition shall be sustained where it is necessa-
ry to notify the adverse party to appear, unless the
petitioner shall produce probable evidence that the
prayer of the petition ought to be granted.

---

## CHAPTER V.

### *Of Bills, Resolutions and Grants.*

### I

No resolution for a grant of money shall pass
without being read on two several days, the second
time to be assigned by the House.

### II.

No engrossed bill shall be sent to the Senate,
without notice thereof being given to the House by
the Speaker.

### III.

No bill shall pass to be engrossed without being
read on three several days, the second and third of
which to be assigned by the House.

### IV.

No private act or resolve shall pass the House,
that shall affect the character or property of any in-
dividual, unless such individual be first notified
thereof.

### V.

All bills in their third reading, shall be committed
to the Standing Committee on bills in the third read-
ing, to be by them examined, corrected, and so re-
ported to the House. JA58

LLMC DIGITAL

## 11
## VI.

All engrossed bills shall be committed to the
Standing Committee on Engrossed Bills, to be strict-
ly examined; and if found by them to be truly and
rightly engrossed, they shall so report to the House,
and the same shall be passed to be enacted without
any further reading, unless, on motion of any Mem-
ber, a majority of the House shall be in favor of
reading the same as engrossed.

## CHAPTER IV.

### *Of Committees, and their General Duties.*

### I.

The following Standing Committees shall be ap-
pointed, at the commencement of the May session,
either by ballot or nomination, as the House may
determine, viz. :

A Committee on Elections ;

A Committee on Accounts ;

A Committee on Finance ;

A Committee on New Trials ;

A Committee on Incorporation of Towns ;

A Committee on Incorporation of Parishes and
other Religious Societies ; .

A Committee on Canals, Turnpike Roads and
Bridges ;

A Committee on the Interior Fisheries ;

A Committee on Bills in the third reading ;

A Committee on Engrossed Bills ;

A Committee on the subject of State Lands ;

A Committee on the Change of Names.

### II.

In all elections by ballot of the House, a time shall
be assigned for such election ; at least one day pre-
vious thereto.

LLMC DIGITAL

## III.

In all elections by ballot, of Committees of the House, the person having the highest number of votes, shall act as Chairman.

## IV

No Chairman of any Committee shall leave the House for more than one day, without permission first obtained for that purpose; and all papers relative to any business before the House, shall be left with the Clerk, by any Member that may obtain leave of absence; and may have any such papers in his possession.

## V.

The Chairman of every Committee, other than of the Standing Committees, who shall have business referred to them, shall make report of their doings therein, within four days after their appointment.

LLMC DIGITAL

# CIVIL GOVERNMENT

### OF THE

# STATE OF MAINE,

## FOR THE POLITICAL YEAR 1820 AND 1821.

═══

# WILLIAM KING, Esq.

## GOVERNOR.

═══

# COUNCIL.

THOMAS FILLEBROWN, Esq.
WILLIAM WEBBER, Esq.
MARK HARRIS, Esq.
ABIEL WOOD, Esq.
WILLIAM C. WHITNEY, Esq.
ISAAC LANE, Esq.
WILLIAM EMERSON, Esq.

═══

## ASHUR WARE, Esq.

*Secretary of the State.*

## JOSEPH C. BOYD, Esq.

*Treasurer of the State.*

2

LLMC DIGITAL

# SENATE.

## JOHN CHANDLER, Esq.
### PRESIDENT.

| | |
|---|---|
| *County of York,* | William Moody, Esq. |
| | Josiah W. Seaver, Esq. |
| | John McDonald, Esq. |
| | |
| *County of Cumberland,* | Joseph E. Foxcroft, Esq. |
| | Barrett Potter, Esq. |
| | Jonathan Page, Esq. |
| | |
| *County of Lincoln,* | Nathaniel Green, Esq. |
| | Erastus Foote, Esq. |
| | Daniel Rose, Esq. |
| | |
| *County of Kennebec,* | John Chandler, Esq. |
| | Joshua Gage, Esq. |
| | Timothy Boutelle, Esq. |
| | |
| *County of Hancock,* | Andrew Witham, Esq. |
| | George Ulmer, Esq. |
| | |
| *County of Washington,* | Jeremiah O'Brien, Esq. |
| | |
| *County of Oxford,* | Samuel Small, Esq. |
| | James W. Ripley, Esq. |
| | |
| *County of Somerset,* | John Moore, Esq. |
| | William Kendall, Esq. |
| | |
| *County of Penobscot,* | William D. Williamson, Esq. |

EBENEZER HERRICK, Esq. *Secretary.*
RUFUS K. GOODENOW, *Assistant Secretary.*
ELIJAH KELLOGG, *Chaplain.*

JOHN MERRILL, *Messenger.*

LLMC DIGITAL

# HOUSE OF REPRESENTATIVES.

## BENJAMIN AMES, Esq.

### SPEAKER.

## COUNTY OF YORK.

| No. of Seat. | | NAMES. | TOWNS. |
|---|---|---|---|
| *89* | 20 | Andrew Conant, | ALFRED. |
| | 118 | Simon Nowell, | Arundel. |
| | 105 | Samuel Merrill, | Biddeford. |
| *100* | 98 | Nahum Heard, | Berwick. |
| *78* | 8 | Nathan Elden, | Buxton. |
| *92* | 18 | ~~Th~~ *Beng. Durin* ~~Johnson,~~ | Cornish. |
| *42* | 140 | John Hammond, | Elliot. |
| *113* | 3 | John Dennett, | Hollis. |
| *20* | 2 | Mark Dennett, | Kittery. |
| *50* | 43 | David Legro, | Lebanon. |
| *140* | 55 | John Low, | Lyman. |
| | 51 | John Burnham, | ~~Limerick.~~ |
| *33* | 24 | Nathaniel Clark, | Limington. |
| | 132 | ~~James Ayer,~~ | Newfield. |
| *44* | 13 | ~~Peter M'Intire,~~ *David Houston* | Parsonsfield. |
| *38* | 117 | John F. Scammon, | Saco. |
| *73* | 69 | John Bodwell, | Shapleigh. |
| | 11 | Elisha Allen, | Sanford. |
| *33* | 124 | Joshua Chase, | South Berwick. |
| *31* | 60 | Henry Hobbs, | Waterboro'. |
| *74* | 147 | Joseph Moody, | Wells. |
| *7* | 59 | Nahum Morrell, | " |
| *2* | 135 | Elihu Bragdon, | YORK. |
| *6* | 74 | Alex'r. M'Intire, | " |

## CUMBERLAND.

| | 78 | ~~Phineas Ingalls,~~ *John Perley* | Bridgeton, Harrison, and |
| *59* | | | 63 Baldwin. |

LLMC DIGITAL

| | | | |
|---|---|---|---|
| *87* | 88 | David Dunlap, | *Brunswick.* |
| | 119 | Daniel Stone, | " |
| *145* | 125 | Eben'r. Thrasher, | *Cape Elizabeth.* |
| *126* | 10 | Allen H. Cobb, | *Durham.* |
| *95* | 30 | John Wait, | *Falmouth.* |
| *143* | 49 | Solomon Dennison, | *Freeport.* |
| *102* | 86 | James Irish, | *Gorham.* |
| *117* | 65 | Toppan Robie, | " |
| | 138 | Peter Whitney, | *Gray.* |
| *25* | 9 | Stephen Purington, | *Harpswell.* |
| *80* | 14 | Asaph Howard, | *Minot.* |
| *61* | 79 | Isaac Gross, | *New Gloucester.* |
| *54* | 22 | Ephraim Sturdivant, | *North Yarmouth.* |
| *58* | 110 | Edward Russell, | " |
| 3 | 32 | Nicholas Emery, | PORTLAND. |
| *123* | 37 | Asa Clap, | " |
| *98* | 97 | ~~Simon Greenleaf,~~ ~~Isaac Adams~~ | " |
| *60* | 146 | Isaac Cushman, | *Pownal.* |
| *39* | 4 | Josiah Dunn, Jun. | *Poland and Danville.* |
| *10* | 91 | Zachariah Leach, | *Raymond and Otisfield.* |
| *144* | 148 | Theodore Mussey, | *Standish.* |
| *76* | 128 | Cyrus Libby, | *Scarborough.* |
| *129* | 80 | Daniel Hall, | *Windham.* |
| 8 | 114 | ~~Silas Burns,~~ ~~John Jones,~~ | *Westbrook.* |

### LINCOLN.

| | | | |
|---|---|---|---|
| *139* | 68 | Joseph Carr, | *Bowdoin.* |
| *77* | 145 | Samuel Tucker, | *Bristol.* |
| *111* | 108 | Elihu Hatch | *Bowdoinham.* |
| | 142 | John M'Kown, | *Boothbay.* |
| | | BENJAMIN AMES, (Speaker,) | *Bath.* |
| *31* | 92 | Jonas Wheeler, | *Camden.* |
| | 96 | Stephen Parsons | *Edgecomb.* |
| *88* | 99 | Fergus M'Clain, | *Hope and Appleton Ridge* |
| 6 | 102 | Jesse Rowell, | *Jefferson and Putnam, &c* |
| *34* | 12 | David C. Burr, | *Litchfield.* |
| *35* | 62 | Dan Read, | *Lewiston and Wales.* |
| *127* | 90 | Nathaniel Eames, | *Lisbon.* |
| *122* | 56 | Eben'r. D. Robinson, | *Newcastle.* |
| *69* | 29 | Ephraim Rollins, | *Noblebpro.* |

JA64

LLMC DIGITAL

| | | | |
|---|---|---|---|
| *118* | | *Moses Burleigh* | |
| | 119 | ~~Thomas Flewellen~~, | Palermo, Montville and Montville Plantation. |
| *104* | 93 | Parker M'Cobb, | Phipsburgh and George-town. |
| *116* | 149 | Joel Miller, | St. George, Cushing and Friendship. |
| *38* | 127 | Abel Merrill, | TOPSHAM. |
| | 84 | Isaac Barnard, | Thomaston. |
| *107* | 134 | Nath'l. Batchelder, | Union. |
| | 95 | ~~Joseph Bailey~~ *Judge Fales*, | Whitefield and Alna. |
| | 6 | John Miller, | WARREN. |
| | 112 | Isaac G. Reed, | Waldoboro'. |
| *46* | 36 | Samuel E. Smith, | WISCASSET. |
| *128* | 48 | Ebenezer Delano, | Woolwich and Dresden. |

### HANCOCK.

| | | | |
|---|---|---|---|
| *41* | 103 | Samuel Little, | Bucksport. |
| *29* | 139 | Alfred Johnson, Jun. | Belfast and Northport. |
| *19* | 122 | Samuel Whitney, | Brooks, Knox, Jackson, and Thorndike. |
| *96* | 100 | Amos Allen, | Bluehill and Sedgewick. |
| *7* | 123 | William Abbot, | Castine and Brooksville. |
| | 16 | Pearl Spofford, | Deer Isle. |
| *1* | 42 | Benjamin Lord, | Ellsworth, Surry, Trenton, and Mariaville Plantation. |
| *15* | 77 | Joshua Hall, | Frankfort and Monroe. |
| *09* | 19 | Ephraim Fletcher, | Lincolnville, Searsmont & Belmont. |
| *26* | 23 | David Richardson, | Mount Desert and Eden. |
| *6* | 121 | Abel W. Atherton, | Prospect and Swanville. |
| *9* | 27 | Chas. Hutchings, Jr. | Penobscot and Orland. |
| *6* | 71 | John Sargent, | Sullivan and Goldsboro'. |
| *2* | 133 | Thomas Waterman, | Vinalhaven and Islesboro'. |

### KENNEBEC.

| | | | |
|---|---|---|---|
| *2* | 129 | Robert C. Vose, | AUGUSTA. |
| *21* | 53 | Ward Locke, | Chesterville, Vienna and Rome. |
| *2* | 34 | Herbert Moore, | Clinton. |

2*

LLMC DIGITAL

18

| | | | |
|---|---|---|---|
| *81* | 38 | Robert Fletcher, | *China and Winslow.* |
| *148* | 101 | Peaslee Morrill, Jr. | *Dearborn and Belgrade.* |
| *86 –* | ~~33~~ | Joel Wellington, | *Fairfax and Freedom.* |
| *36* | 50 | Jabez Gay, | *Farmington.* |
| *97* | 106 | Samuel Tuck, | *Fayette and Wayne.* |
| *45* | 25 | Joshua Lord, | *Gardiner.* |
| *13* | 54 | Luther Robbins, | *Green.* |
| *65* | 67 | Peleg Sprague, | *Hallowell.* |
| *26* | 64 | Joseph Stewart, | *Harlem and Malta.* |
| *40* | 120 | Thomas Francis, | *Leeds.* |
| *23* | 58 | Abraham Morrill, | *Monmouth.* |
| *132* | 31 | Nathaniel Rice, | *Mount-Vernon.* |
| *37* | 89 | Nehemiah Smith, | *New-Sharon.* |
| *147* | 131 | Thomas Coss, | *Pittston.* |
| *108* | 81 | Samuel Currier, | *Readfield.* |
| | 21 | Ambrose Howard, | *Sidney.* |
| | 116 | Rufus Burnham, | *Unity, Joy and 25 mile Pond Plantation.* |
| *71* | 92 | Samuel Redington, | *Vassalborough.* |
| *72* | 15 | Baxter Crowell, | *Waterville.* |
| *146* | 5 | ~~Charles Morse,~~ *Owen Eaton* | *Wilton and Temple.* |
| *105* | 137 | Andrew Wood, | *Winthrop.* |

### WASHINGTON.

| | | | |
|---|---|---|---|
| | 73 | ~~Thomas Ruggles,~~ | *Columbia, Addison and Jonesborough.* |
| *114* | | *Ephraim Whitney* | |
| *135* | 85 | John Burgin, | *Eastport.* |
| | 113 | ~~H. G. Balch,~~ | *Lubec, Dennysville, Plantation No. 9, 10, 11 & 12.* |
| *137 –* | | *Jabez Mowry* | |
| *57* | 136 | William Emerson, | MACHIAS. |
| *11* | 33 | Thomas Vose, | *Robbinstown, Calais, Plantation No. 3, 6, 7, 15 and 16.* |
| *93* | 63 | Joseph Adams, | *Steuben, Cherryfield and Harrington.* |

### OXFORD.

| | | | |
|---|---|---|---|
| *94* | 46 | Enoch Hall, | *Buckfield and Sumner.* |
| *101* | 1 | Joseph Howard, | *Brownfield, Porter and Hiram.* |

JA66    LLMC DIGITAL

2143  John Grover,           *Bethel,  Gilead,  Newry, Albany  and  Howard's Gore.*

*14*  94  Joseph Chandler,    *Fryeburg, Denmark, &c.*
*47*  41  Cornelius Holland,  *Jay  and  Hartford.*
*85*  26  Thomas Chase, Jr.   *Livermore.*
*49*  61  Walter P. Carpenter, *Mexico,  Dixfield,  Weld and Plantation No. 4.*
*112*  28  Henry Rust, Jun.    *Norway and Hebron.*
*110*  104  James Hooper,       *PARIS,  Woodstock,  and Greenwood.*
*124*  72  Peter C. Virgin,    *Rumford, East Andover, Plantations No. 7 & 8.*
*64*  70  John Turner,        *Turner.*
*27*  130  Josiah Shaw,        *Waterford,  Sweden,  and Lovell.*

## SOMERSET.

*67*  66  James Collins,      *Anson, N. Portland, Embden & Plantation No. 1.*
*41*  44  Eleazer Coburn,     *Bloomfield and  Norridgwock.*
*70*  76  Obed Wilson,        *Bingham, Madison, Solon, Moscow and Northill.*
      47  John Wyman,         *Canaan, Warsaw, Palmyra, St. Albans & Corinna.*
      141  George Bixby,       *Cornville, Athens, Harmony, Ripley and Warrentown.*
      144  Eben'r. Lawrence,   *Fairfield.*
      75  Jonathan Brown,     *Freeman, Avon, Phillips and Kingfield.*
      45  Joseph Burr,        *Starks and Mercer.*
      52  John Read,          *Strong, New Vineyard, &c.*

## PENOBSCOT.

      57  Joseph Kelsey,      *Guilford,  Sangerville, Dexter,  Garland  and Plantation No. 3, 6th Range.*

JA67

| | | |
|---|---|---|
| *12* | 87 Jonathan Knowles, | *Hampden and Newburg.* |
| *55* | 17 Benjamin Shaw, | *Newport, Dixmont, Carmel, Hermon, Stetson and Plantation No. 4, 6th Range.* |
| | 40 Daniel Wilkins, | *New-Charleston, Blakesburgh, Levant, Corinth, Exeter and Plantation No. 1, 3d. Range, and No. 1, 4th Range.* |
| *75* | 35 Benjamin Nourse, | *Orrington, Brewer and Eddington Plantations.* |
| *21* | 107 Jackson Davis, | *Orono, Bangor and Sunkhase Plantation.* |
| *22* | 39 Wm. R. Lowney, | *Sebeck, Atkinson, Foxcroft, Brownville, Williamsburgh, Plantation No.1, 7th Range, and No. 3, 7th Range.* |

JAMES LORING CHILD, Esq. *Clerk.*
JOHN P. THURSTON, *Assistant Clerk.*

Rev. ICHABOD NICHOLS, *Chaplain.*

MOSES DAVIS, *Messenger.*
AARON CHAMBERLAIN, *Door Keeper.*
SAMUEL DAVIS, *Page.*

LLMC DIGITAL

# JOINT STANDING COMMITTEES,

## FOR THE POLITICAL YEAR 1820.

### On State Lands.

Messrs. Foote,
   Foxcroft,     } *of the Senate.*
Messrs. Francis, of Leeds,
   Merrill, Topsham,    } *of the House.*
   Turner, Turner.

### On Ministerial Lands.

Messrs. Ripley,
   Witham,     } *of the Senate.*
Messrs. Wilson, of Bingham,
   Barnard, Thomaston,    } *of the House.*
   Hooper, Paris,

### On applications for Manufacturing Companies.

Messrs. Moor,
   Green,     } *of the Senate.*
Messrs. Redington, of Vassalboro',
   Stone, Brunswick,    } *of the House.*
   Rollins, Nobleborough,

### On Interior Fisheries.

Messrs. M'Donald,
   O'Brien,     } *of the Senate.*
Messrs. Burgin, of Eastport,
   Robinson, New-Castle,
   Spofford, Deer-Isle,   } *of the House.*
   Little, Bucksport,
   Coburn, Bloomfield

LLMC DIGITAL

## On Canals, Turnpike Roads and Bridges.

Messrs. Ulmer,
Small,
} of the Senate.

Messrs. Clap, of Portland,
Allen, Sandford,
Wyman Canaan,
} of the House.

## On Incorporation of Towns.

Messrs. Rose,
Kendall,
} of the Senate.

Messrs. Abbot, of Castine,
Delano ~~McIntire, Parsonfield,~~
Waite, Falmouth,
} of the House.

## On Banks and Banking.

Messrs. Moody,
Potter, *for dr of Gardner*
} of the Senate.

Messrs. ~~Greenleaf, of Portland,~~
Robie, Gorham,
Heard, Berwick,
} of the House.

## On the Incorporation of Parishes and other Religious Societies.

Messrs. Page,
Small,
} of the Senate.

Messrs. Morrill, of Monmouth,
*Brown* ~~Burnham, Limerick,~~ *freem* of the House.
Dennison, Freeport,

## On applications from sick & wounded Soldiers.

Messrs. Ulmer,
McDonald,
} of the Senate.

Messrs. Read, of Lewiston,
Chase, Livermore,
Howard Sidney,
} of the House.

LLMC DIGITAL

## On Accounts.

Messrs. Gage,
      Seaver,     } *of the Senate.*

Messrs. Dennett, of Kittery,
      Nowell, Arundel,
      Bixby, Cornville,     } *of the House.*

## On New Trials.

Messrs. Williamson,
      Boutelle,     } *of the Senate.*

Messrs. Emery, of Portland,
      Sprague, Hallowell,
      Wheeler, Camden,     } *of the House.*

# STANDING COMMITTEES

## OF THE HOUSE.

### On Elections.

Messrs. Sprague, of Hallowell,
      Johnson, Belfast,
      Redington, Vassalborough,
      M'Intire, Parsonsfield,
      Clap, Portland.

### On the Pay Roll.

Messrs. Russell, of North-Yarmouth,
      Hobbs, Waterborough,
      Hammond, Elliot,

### On County Estimates.

Messrs. Virgin, of Rumford,
      Irish, Gorham,
      Mussey, Standish.

LLMC DIGITAL

*On Finance.*

Messrs. Smith, of Wiscasset,
   Moody, Wells,
   Hall, Frankfort,
   Burnham, Unity,
   Balch, Lubec.

*On Change of Names.*

Messrs. Grover, of Bethel,
   Davis, Orono,
*Locke*  Wilkins, New-Charleston. *Chesterville*

*On Bills in Third Reading.*

Messrs. ~~Johnson, of Belfast,~~ *Virgin*
   Libby, Scarborough,
   M'Clain, Hope.

*On Engrossed Bills.*

Messrs. Reed, of Waldoborough,
   Vose, Augusta,
   Dunlap, Brunswick.

*On leave of absence.*

Messrs. Burr, of Litchfield,
   Russell, North-Yarmouth,
   Dennett, Kittery,

---

# MONITORS.

| | | |
|---|---|---|
| *Eastern Division,* | Mr. Morrill, | *Monmouth.* |
| *Western* " | Robinson, | *New-Castle.* |
| *Middle* " | Dunlap, | *Brunswick.* |

LLMC DIGITAL

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

LAUREL D. LIBBY, State Representative of
Maine House District 90, RONALD P. LEBEL,
WENDY MUNSELL, JASON LEVESQUE,
BERNICE FRASER, RENE FRASER, and
DONALD DUBUC,

                                    Plaintiffs,          Civil Action No. 1:25-cv-00083-MRD

                v.

RYAN M. FECTEAU, in his official capacity
as Speaker of the Maine House of
Representatives, and ROBERT B. HUNT, in
his official capacity as Clerk of Maine House,

                                    Defendants.

**DECLARATION OF RYAN FECTEAU**
**(pursuant to 28 U.S.C. § 1746)**

I, Ryan Fecteau, hereby declare as follows:

1.      I am over the age of 18 and reside in Biddeford, Maine.

2.      I am currently serving my fifth term in the Maine House of Representatives
(House).  I represent the people of House District 132, which includes portions of Biddeford.

3.      I am currently serving in the 132nd Legislature, which convened on December 4,
2024, and will end on December 2, 2026.  On December 4, 2024, I was elected Speaker of the
House.

4.      I have presided as Speaker at every session of the House that has occurred since
December 4, 2024, with the exception of portions of March 27, 2025, during the consideration of
House Order 20 and House Order 21, and March 11, 2025, when I gave a speech on the floor of
the House.

1

*Relevant House Rules and Procedures*

5.      Under article IV, part third, section 4 of the Maine Constitution, "[e]ach House may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of 2/3, expel a member, but not a 2nd time for the same cause."  Under this authority, the House on December 4, 2024, adopted the same rules that had governed the 131st Legislature to govern the 132nd Legislature.  A true and correct copy of the current House Rules is attached as Exhibit A.

6.      The House adopted the rules by unanimous consent ("under the hammer").  Under that process, after a measure is brought to the floor, members are given an opportunity to request a roll-call vote on the measure.  Failure to request a roll-call vote is deemed to be consent to the measure.  No one, including Representative Laurel Libby, who was present in the House chamber that day, requested a roll-call vote on the proposed House Rules.  All members thereby consented to the proposed rules.  No members moved to amend the House Rules by House Order in accordance with Rule 524.

7.      Rule 401 of the House Rules governs the rights and duties of members.  Subsection 11 of this rule provides that "When any member is guilty of a breach of any of the rules and orders of the House and the House has determined that the member has violated a rule or order, that member may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction."

8.      Rule 522 of the House Rules provide that "The rules of parliamentary practice comprised in Mason's Rules govern the House in all cases in which they are applicable and in which they are not inconsistent with the standing rules and orders of the House and the joint rules of the Senate and House of Representatives."  Section 561 of Mason's Rules provides that "a

2

legislative body has the right to regulate the conduct of its members and may discipline a member as it deems appropriate, including reprimand, censure or expulsion."

9.    House Rule 201 details the powers and duties of the Speaker of the House.  Among those duties is to "[e]force the observance of order" and "[d]ecide all questions of order within 7 legislative days."  The Speaker's decision on a question of order is "subject to an appeal to the House."  In other words, while I make an initial determination on the application of the House Rules, that determination can be changed upon a vote of the House.

10.    As provided by statute (1 M.R.S.A. § 1023), the Legislature has also adopted a Code of Ethics.  The Code of Ethics was adopted by the 100th Legislature and amended by the 127th Legislature.  Under Joint Rule 354, the Joint Select Committee on Joint Rules must, at least once each biennium, "review the Legislative Code of Ethics that was adopted by the 100th Legislature and may recommend any changes the committee determines necessary."  A true and correct copy of the current Legislative Code of Ethics is attached as Exhibit B.

11.    Under the Code of Ethics "[a] Maine Legislator is charged with civility and responsible conduct inside and outside of the State House commensurate with the trust placed in that Legislator by the electorate."  The Code further provides that "[i]n a free government, a Legislator is entrusted with the security, safety, health, prosperity, respect and general well-being of those the Legislator serves and with whom the Legislator serves."  The Code also requires Legislators to be "ever mindful of the ordinary citizen who might otherwise be unrepresented" and to "endeavor conscientiously to pursue the highest standards of legislative conduct inside and outside of the State House."

*Representative Libby's Facebook Post and Resulting Censure*

12.    On the morning of February 18, 2025, I viewed the Facebook post by Rep. Libby at issue in this case which is included in Plaintiffs' Complaint at page 9.  The post identified a transgender high-school student in Maine by first name and school and included photographs of the student.  Some of the faces of other students in the photos—but not the transgender student's— were blurred out.  The post identified the student in the context of criticizing the student's participation in a girl's high school sporting event in Maine.

13.    The same day, I sent a letter to Rep. Libby asking her to take down her Facebook post.  The letter acknowledged Rep. Libby's right to express policy positions but expressed concern that publicizing the student's identity would threaten the student's health and safety.  A true and correct copy of my letter is attached as Exhibit C.

14.    Rep. Libby did not respond to my letter.  That evening, I called Rep. Libby to follow up on my letter.  In the ensuing conversation, Rep. Libby refused my request to take down her post.

15.    In the ensuing days, Rep. Libby's Facebook post became national news, and Rep. Libby appeared on national television and radio broadcasts discussing the post, further heightening the risks and harms to the student.

16.    The Legislature was not in session between February 17, 2025, and February 21, 2025.  No work sessions, public hearings, or sessions of either legislative body occurred during this time period.  The next scheduled session of the House occurred on February 25, 2025.

17.    On February 25, 2025, Representative Matt Moonen presented to the House H.R. 1, "A Resolution Relating to the Censure of Representative Laurel D. Libby of Auburn by the

4

Maine House of Representative" (Resolution).   A true and correct copy of the Resolution is attached as Exhibit D.

18.      Following debate, the Resolution was adopted by a vote of 75 to 70.

19.      Following enactment of the Resolution, I called Rep. Libby to the well of the House Floor and, as is customary following censure, formally admonished the representative's breach of the Legislative Code of Ethics and provided Rep. Libby the opportunity to provide an apology to the House and the public, per the terms of the enacted resolution.  Rep. Libby did not apologize.

20.      Once Rep. Libby refused to apologize, I exercised my duty as Speaker to rule her in violation of House Rule 401(11), and therefore barred from casting a vote or participating in debate on the House floor until she made satisfaction by coming into compliance with the Resolution.

21.      No member, including Rep. Libby, made any objection to my ruling.

22.      The House then adjourned for the day.

*Consequences of the Censure*

23.      As noted above, Rule 401(11) provides that a member found in breach of House rules or orders "may not be allowed to vote or speak" until they "make satisfaction."

24.      As I have interpreted and applied Rule 401(11), Rep. Libby is prohibited from two activities: (1) engaging in debate on the House floor and (2) voting on legislative instruments and other matters under consideration by the full House.

25.      These prohibitions will end when any one of three things occurs: (1) Rep. Libby apologizes for her conduct, (2) the House votes to dispense with Rule 401(11), or (3) the 132nd Legislature ends.  Under House Rule 523, dispensation of a House rule requires the consent of two-thirds of the members present.

26.    Between the date of the censure and the date I signed this declaration, no House floor votes have been tied or decided by a one-vote margin.

27.    Despite the censure, Rep. Libby continues to enjoy considerable means to advance and oppose legislation and otherwise represent her constituents.

28.    Rep. Libby retains her existing committee assignment, which is to the Joint Standing Committee on Labor (the "Labor Committee").

29.    Rep. Libby continues to be allowed to sponsor and co-sponsor bills and resolutions. All such bills and resolutions are assigned a legislative document ("L.D.") number and referred to the appropriate Joint Legislative Committee of jurisdiction.

30.    Legislative records indicate that, in the current Legislature, Rep. Libby has sponsored 11 bills and cosponsored another 29 bills.  Rep. Libby also continues to be able to lobby other members to support or oppose legislation in any setting other than formal debate on the floor of the House and to participate in legislative caucus meetings.

31.    Sponsors of legislation are invited to give presentations about their bills to the relevant committees of jurisdiction.  Those committees also hold public hearings in which they hear testimony from the public and other interested parties, including legislators, concerning legislation under their consideration.  Rep. Libby continues to be allowed to present her bills to the relevant committee and to testify at public hearings concerning any legislation.  For example, on March 5, 2025, I saw (via video feed) Rep. Libby present LD 671, "An Act to Abolish the Maine Income Tax and Establish a Zero-based Budget," at a public hearing held by the Committee on Taxation.

32.    Rep. Libby continues to be allowed to fully participate in the activities of the Labor Committee, including (a) participating at public hearings and work sessions and (b) voting on

motions, including motions to amend legislation referred to the Labor Committee and motions to report referred legislation back to its originating chamber as "Ought to Pass," "Out to Pass as Amended," or "Ought Not to Pass."

33.    House procedures allow for fast-tracking legislation that receives a unanimous "Ought to Pass" report from the relevant Committee through a mechanism known as the "Consent Calendar."  Because Rep. Libby retains her voting privileges on the Labor Committee, she can prevent legislation referred to the Labor Committee from being placed on the Consent Calendar by voting against the legislation, even if all other members of the Labor Committee support it.

34.    Rep. Libby may be present on the House floor during debates and votes and is permitted to engage in procedural actions, such as making motions and raising objections, as long as she does not participate in the debate on such procedural actions.  She can, for example, move to amend a bill or to indefinitely postpone a bill, which, if approved, defeats it.

35.    Rep. Libby may continue to use legislative staff and offices to support her work as a legislator to the same extent as before the censure.  She continues to have access to the services offered by the Revisor of Statutes, which assists with legislative drafting, the Clerk's Office, which assists with matters of parliamentary procedure, and the Office of Policy and Legal Analysis, which analyzes the substance of proposed legislation.  Although I do not know the extent to which Rep. Libby had the assistance of partisan legislative staff prior to her censure, the censure does not limit her continued access to such staff.

36.    Rep. Libby continues to receive her full compensation as a member of the Legislature, including her stipend and any benefits she might receive.

37.     Rep. Libby remains eligible for her constituent service allowance, which defrays the cost of communicating with and providing services to her constituents and is paid out in December and at the end of the legislative session.

38.     Rep. Libby continues to be entitled to travel-related expenses and meal allowances in accordance with 3 M.R.S. § 2.

*Failed Attempt to Suspend Rule 401(11)*

*39.*     On March 20, 2025, the House was engaged in debate of the State's biennial budget, L.D. 609.  Rep. Libby was present.

40.     Although, per the terms of Rule 401(11), Rep. Libby was not permitted to participate in debate, Rep. Libby did introduce amendments to L.D. 609.  Rep. Libby in fact proposed 8 such amendments that were then debated by the House.  Rep. Libby's motions will be recorded in the House Journal.

41.     At one point during the debate on L.D. 609, another member moved to dispense with Rule 401(11) in order to allow Rep. Libby to participate in debate.  After thorough debate, the motion failed in a vote of 68 to 74.

42.     On March 25, 2025, a second motion was made on the floor to dispense with Rule 401(11) in order to allow Rep. Libby to vote and participate in debate.  That motion also failed 68 to 74.

43.     As of the signing of this declaration, Rep. Libby has not apologized to the House for her conduct.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  April 1, 2025                    /s/ Ryan Fecteau_____
                                         Ryan Fecteau

EXHIBIT A

# HOUSE RULES

## 132nd MAINE LEGISLATURE

### Adopted December 4, 2024

11111

111

# RULES OF THE HOUSE - INDEX

## 132nd LEGISLATURE

| Rule | Number |
|---|---|
| Adjournment motion | 503 |
| Amendments | |
|   Consideration | 504 |
|   Germaneness | 506 |
|   Printing | 507 |
| Assistant Clerk | 103 |
| Assistant Sergeant-at-arms, appointment | 201, Sec. 1, Par. I, Sub-Par.(b) |
| Bills and Resolves | |
|   Engrossment | 517 |
|   Examination | 515; 517 |
|   Form and introduction | 514; 518 |
|   Readings | 516; 517 |
|   Sponsor obtains signatures | 401, Sec. 13 |
|   Statutory provisions, House proceedings | 107 |
|   Transmittal to Senate | 520 |
|   Veto | 521 |
| Bills in the Second Reading Committee | 201, Sec. 1, Par. J; 515 |
| Blanks, filling | 505 |
| Business | |
|   Order | 501 |
|   Quorum necessary | 201, Sec. 1, Par. A |
|   Time for consideration | 505 |
|   Unfinished | 502 |
| Calendar | 301, Sec. 12 |
| Chaplains | 101 |
| Clerk | |
|   Duties | 301 |
|   Responsibility for legislative papers | 301; 401, Sec. 10; 511 |
|   Vacancy in office | 103 |
| Clerk pro tempore | 103 |

2

Committees
    Appointment.........................................................201, Sec. 1, Par. J; 301, Sec. 4
    Business...............................................................................301, Sec. 4
    Joint Standing Committees, reports ..............................................................519
    Standing Committees .............................................................201, Sec. 1, Par. J
Consent Calendar.........................................................................................519
Courier, appointment ....................................................... 201, Sec. 1, Par. I, Sub-Par.(b)
Debate, relevance............................................................201, Sec. 1, Par. M; 401, Sec. 5
Decorum.........................................................................201, Sec. 1, Par. D; 401, Sec. 6
Division of questions .....................................................................................504
Document Clerk, appointment.......................................... 201, Sec. 1, Par. I, Sub-Par.(b)
Doorkeeper, appointment ............................................... 201, Sec. 1, Par. I, Sub-Par.(b)
Elections Committee........................................................................201, Sec. 1, Par. J
Elections of the House
    Conduct of members ...........................................................................401, Sec. 12
    Time ...................................................................................................512
Electronic Devices .................................................................................. 108; 109
Engrossed Bills Committee ...........................................................201, Sec. 1, Par. J; 517
Ethics Committee ............................................................................201, Sec. 1, Par. J
Expressions of Legislative Sentiment ....................................................................519
Guests, admission.......................................................................................106
Hall of the House, floor privileges ............................................................... 105; 106
Houlton Band of Maliseet Indians,
    privileges of representative .................................................................................525
Joint Conventions ......................................................................................108
Journal
    Decisions re points of order entered ...........................................................301, Sec. 13
    Notice of new or changed rules.................................................................524
    Preparation ...............................................................................301, Sec. 1
    Reading ......................................................................... 201, Sec. 1, Par. A; 501
Leave of Absence Committee .......................................................201, Sec. 1, Par. J; 401, Sec. 9
Legal counsel, appointment...........................................................201, Sec. 2, Par. B
Lobbyists, restrictions.....................................................................................105
Mason's Rules...........................................................................................522
Members
    Approach to the rostrum..........................................................................401, Sec. 3
    Attendance........................................................................................401, Sec. 9
    Conflict of interests ..................................................................... 401, Secs. 8 and 12
    Decorum ...................................................................201, Sec. 1, Par. D; 401, Sec. 6
    Leave of Absence .................................................................. 401, Secs. 9 and 10
    Loss of privileges ..................................................................................401, Sec. 11

3

Observance of rules ...................................................................102; 401, Sec. 11
Photograph ..………………………………………………… 401, 7-A
Recognition ...................................................................................201, Sec. 1, Par. K
Seats ...................................................................................401, Sec. 1; 525
Signature on amendments ...................................................................507
Signature on bills and resolves...............................................401, Sec. 13; 514
Speeches
    Interruptions ...................................................................401, Sec. 6
    Manner ...................................................................401, Sec. 4
    Number allowed ...................................................................401, Sec. 7
  Voting required ...................................................................401, Sec. 12
Memorials, form and introduction.......................................................514
Monitors....................................................................102; 201, Sec. 1, Par. L
Motions
  Action on or withdrawal...........................................................508
  Precedence...................................................................... 503, Par. A
  Questions of Concurrence, precedence ........................................503, Par. B
National Anthem.......................................................................................101
Orders
  Action on ...................................................................508
  Amendment ...................................................................524
  Appearance on Calendar ...................................................301, Sec. 12
  Dispensation...................................................................523
Orders of the day ......................................................................... 501; 502
Pages, appointment...................................... 201, Sec. 1, Par. I, Sub-Par.(b)
  Honorary ...................................................................201, Sec. 2, Par. A
Pairing of Votes ..............................................................................401, Sec. 2
Parliamentary practice ...................................................................522
Partisan staff, appointments...................................................................104
Passamaquoddy Tribe,
  privileges of representative ...................................................525
Penobscot Nation,
  privileges of representative ...................................................525
Petitions, form and introduction ...........................................................514
Points of Order.........................201, Sec. 1, Par. E; 201, Sec. 2, Par. C; 301, Sec. 13
Press, admission.......................................................................................106
Previous question.....................................................................................504
Questions of order (See Points of Order)
Quorum.......................................................................201, Sec. 1, Par. A
Reconsideration .................................................................. 508; 511
Reed's Rules...........................................................................................522
Revisor of Statutes, Director ..................................................................515

4

Riders, prohibited ....................................................................................................506
Roll Calls
    Motion .................................................................................................. 504; 510
    Record ............................................................................................301, Sec. 3
    Voting Required ..........................................................................401, Sec. 12
Rules
    Amendments .....................................................................................524
    Authorities........................................................................................522
    Dispensation ....................................................................................523
    Enforcement ......................................................102; 201, Sec. 1, Par. L
Rules and Business of the House Committee......................201, Sec. 1, Par. J
Sergeant-at-arms, appointment........................ 201, Sec. 1, Par. I, Sub-Par.(b)
Sessions, daily, 9 p.m. limit........................................................................501

Speaker
    Announcement of business ..........................................201, Sec. 1, Par. B
    Appointment of committees.............................. 201, Sec. 1, Pars. I and J
    Appointment of subordinate officers ............................ 201, Sec. 1, Par. I
    Appointment, rescinding .............................................. 201, Sec. 1, Par. I
    Change of seating .................................................................401, Sec. 1
    Declaration of votes .................................... 201, Sec. 1, Par. C; 509; 510
    Duties and powers .......................................................................201
    Duties, relevance of debate .........................................201, Sec. 1, Par. M
    Notice re engrossed bills and resolves ...............................................520
    Points of order, discussion and decision ........201, Sec. 1, Par. E; 201, Sec. 2, Par. C
    Recognition of members ..........................201, Sec. 1, Par. K; 401, Sec. 7
    Rules and Business of the House Committee .................201, Sec. 1, Par. J
    Signing of Bills ...........................................................201, Sec. 1, Par. G
    Voting by Members, regulations................................. 401, Secs. 2 and 12
    Voting privileges........................................................201, Sec. 2, Par. D
Speaker pro tempore......................................201, Sec. 1, Par. H; 301, Sec. 8
Standing Committees (See Committees)
Supreme Judicial Court, Opinion of the Justices....................................513
Tabling motion ................................................................................ 503; 511
Vetoes ....................................................................................................521
Votes and Voting
    Conduct of members ............................................... 401, Secs. 11 and 12
    Pairing ...............................................................................401, Sec. 2
    Procedures when doubted ...............................................................509
Yeas and Nays (See also Roll Calls) ...................................................510

5

# RULES OF THE HOUSE

## 132nd LEGISLATURE

**Preamble.**  These rules of the House of Representatives are adopted pursuant to the Constitution of Maine to assist in carrying out the responsibilities of the House of Representatives.  These rules take precedence over the Joint Rules, statutes enacted by a prior Legislature relating to the proceedings of the House and other rules used in Legislative assemblies.  These rules govern the proceedings of the House in all matters, subject only to the requirements of the Constitution of Maine.

## PART 1

## GENERAL PROVISIONS

**Rule 101.  Chaplains.**  Every morning the House on assembling shall join with the Chaplains in religious service.  On the first legislative day of each week, the National Anthem must follow the religious service.  Every morning the House after assembling shall recite the pledge of allegiance.

**Rule 102.  Monitors.**  A monitor shall see to the observance of the rules of the House.  If any member violates any of the rules of the House and persists in violating the rules after being notified of the violation by any monitor, the monitor shall give information of the violation to the House.

**Rule 103.  Vacancy in the office of Clerk or Assistant Clerk.**  A Clerk or Assistant Clerk is either appointed or elected in the following circumstances.

    A.  In the case of a vacancy in the office of Clerk:
        (1)  When the Legislature is in session, the House elects a Clerk; or
        (2)  When the Legislature is not in session, the Assistant Clerk is Clerk pro tempore to serve until the Legislature is in session and elects a Clerk.

B.  In the case of a vacancy in the office of Assistant Clerk:
   (1)  When the Legislature is in session, the House elects an Assistant Clerk; or
   (2)  When the Legislature is not in session, the Speaker shall appoint an Assistant Clerk to serve until the Legislature is in session and elects an Assistant Clerk.

C.  In the case of a vacancy in the offices of the Clerk and Assistant Clerk:
   (1)  When the Legislature is in session, the House elects a Clerk and Assistant Clerk; or
   (2)  When the Legislature is not in session, the Speaker shall appoint a Clerk and Assistant Clerk to serve until the Legislature is in session and elects a Clerk and Assistant Clerk.

**Rule 104.  Partisan staff.**  The floor leaders shall appoint partisan staff with staffing patterns determined by House leadership.

**Rule 105.  Lobbyists banned from House floor.**  One-half hour before the beginning of any regularly scheduled session, registered lobbyists are banned from the floor of the House of Representatives.

**Rule 106.  Admission to Representatives' hall.**  Only a member or officer of the House, a member of the Senate, the Secretary of the Senate, the Assistant Secretary of the Senate, the Governor, heads of state departments and bureaus, Justices of the Supreme Judicial Court, Chaplains of the Senate and reporters of the proceedings and debates of the House may be admitted within the Representatives' hall, unless invited by some member of the House.  While the House is in session, only members and officers of the House and officers of the Senate on official business are admitted inside the rail, except members of the press, who shall occupy places at the press table, and guests of the Speaker.

**Rule 107.  Legislation establishing House proceedings statutorily.**  A member may question the appropriateness of a bill that attempts to establish proceedings of the House in statute.  Such legislation may be ruled not properly before the House by the Speaker.

**Rule 108.  Conduct during joint conventions.** During joint conventions, and at any time so determined by the presiding officer, personal electronic communication devices in the chamber or the gallery must be turned off and inconspicuously placed.

**Rule 109.  Use of personal electronic communication devices.**  During all sessions of the House, a member shall restrict that member's use of all personal electronic communication devices to personal business and business of the House and shall in such use exercise high standards of discretion, conduct and decorum.

## PART 2

## SPEAKER

**Rule 201.  Duties and Powers of the Speaker**

**1.  Duties.**  The Speaker shall:

> A.  Take the chair at the hour to which the House has adjourned, call the members to order and, after the appearance of a quorum, cause the journal of the preceding day to be read;
>
> B.  Announce the business before the House in the order in which it is to be acted upon;
>
> C.  Receive, submit to vote and announce the result of all motions that are in proper order and that arise in the course of proceedings;
>
> D.  Enforce the observance of order and decorum;
>
> E.  Decide all questions of order within 7 legislative days, subject to an appeal to the House;
>
> F.  Receive all messages and other communications and announce them to the House;

G.  Authenticate by the Speaker's signature bills that have passed to be enacted and resolves that have finally passed;

H.  Name a member to perform the duties of Speaker during the Speaker's absence;

I.  Appoint and may rescind the appointments of the following individuals at any time:
>   (a)  The members who are to serve on committees; and
>   (b)  A sergeant-at-arms, an assistant sergeant-at-arms, a document clerk, doorkeepers, a courier and 5 pages;

J.  At the commencement of the session, appoint the following standing committees:
>   (a)  On Leave of Absence;
>   (b)  On Bills in the Second Reading;
>   (c)  On Engrossed Bills;
>   (d)  On Ethics;
>   (e)  On Elections; and
>   (f)  On Rules and Business of the House.

Each committee consists of 8 members, except the Committee on Rules and Business of the House, which consists of 3 members and the Speaker ex officio.  Each committee shall consider and report on all subjects referred to the committee;

K.  Name the person to speak when 2 or more members rise at the same time; in other instances, recognize the member who rises first and addresses the chair;

L.  Appoint one monitor for each division of the House; and

M.  Decide whether debate is relevant to some definite question under consideration.

9

**2.  Powers.**  The Speaker may:

  A.  Appoint honorary pages;

  B.  Appoint legal counsel while the Legislature is in session;

  C.  Address the House on points of order, in preference to other members; and

  D.  Vote in all cases.

# PART 3

# CLERK

**Rule 301.  Duties of the Clerk.**  The Clerk shall:

**1.  Journal.**  Keep a journal of what is done by the House;

**2.  Read papers.**  Read papers when required by the House or Speaker;

**3.  Note answers of members.**  Note the answers of members when the House orders or when a question is taken by yeas and nays;

**4.  Notify members of committee appointments.**  Notify members of their committee appointments and of the business referred to committees;

**5.  Authenticate by Clerk's signature.**  Authenticate by the Clerk's signature all the orders and proceedings of the House not authenticated by the Speaker;

**6.  Responsible for documents.**  Have responsibility for all the documents and papers of every kind confided to the care of the House;

**7.  Transmit messages and papers.**  Transmit all messages and papers from the House to the Governor or to the Senate;

**8.  Preside in Speaker's absence.**  Preside in the case of the absence of the Speaker or Speaker pro tempore at the hour for meeting, until a Speaker pro tempore is chosen;

**9.  File papers and documents.**  File in an orderly manner at the close of the session all papers and documents in possession of the House that were passed upon or received during the session;

**10.  Preside at commencement of next Legislature.**  Preside at the commencement of the next Legislature until the election of the Speaker;

**11.  Record House business.**  Record what is done by the House until a new Clerk is chosen and qualified;

**12.  Prepare daily calendar.**  Prepare a daily calendar of bills, resolves and other papers assigned for that day's consideration, bills and resolves that have had their first reading, showing the disposition of each, and orders presented to the Clerk by members;

**13.  Enter questions on journal.**  Enter every question of order that is decided on appeal on the journal of the House with the decision of every question.  The journal must include all rulings of the Chair; and

**14.  Payroll of House Employees.**  Certify vouchers of the officers and employees of the House for proper payment.

# PART 4

## MEMBERS

**Rule 401.  Rights and duties of members.**  Members of the House have the following rights and duties.

**1.  Member's seat.**  The seat a member draws at the commencement of the session is that member's during the session, unless the member has leave of the Speaker to change it.  No other person may occupy a member's seat at any time during a session of the House.

**2.  Pairing of votes.**  A member may not pair that member's vote with the vote of another member.

**3.  Sit at Speaker's or Clerk's desk.**  A member may not sit at the desk of the Speaker or Clerk, except by the permission of the Speaker.

**4.  Member may not speak.**  A member may not speak without first rising and addressing the Speaker and being recognized, and a member may not speak while away from that member's seat without leave from the Speaker.  A member shall sit down as soon as the member is done speaking.

**5.  Debate.**  A member shall limit debate to that which is relevant to some definite question under consideration.

**6.  May not interrupt.**  A member may not interrupt another member while the other is speaking, except to call to order or correct a mistake.  A member may not stand up to the interruption of another while any member is speaking, pass unnecessarily between the Speaker of the House and the person speaking, stand in an aisle or sit or stand covered during the session of the House.

**7.  Speak more than twice.**  A member may not speak more than twice to the same question without first asking leave of the House.  Any other member objecting to that member speaking more than twice to the same question must stand and be recognized by the Speaker of the House and the objection must be noted.

12

**7-A.  May not video or photograph during deliberations.**  A member may not video or photograph other members of the House during deliberations.

**8.  Counsel.**  A member may not act as counsel for any party before a joint committee of the Legislature or a committee of the House.

**9.  Leave of absence.**  A member may not be absent more than 2 days without leave of the House; and a member may not have such a leave, unless it is reported by the Committee on Leave of Absence.

**10.  Papers.**  Any member having obtained leave of absence shall leave any papers relating to the business before the House with the Clerk.

**11.  Breach of rules.**  When any member is guilty of a breach of any of the rules and orders of the House and the House has determined that the member has violated a rule or order, that member may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction.

**12.  Voting.**  A member who is in the House when a question is put shall vote, unless the presiding officer for reasons excuses that member.  When yeas and nays are ordered, a member may not leave the member's seat until the vote is declared. A call for yeas and nays must close no more than 30 minutes after a roll call is commenced.  In all elections by the House, or on joint ballot of the Chambers, a member may not leave the member's seat after voting, before a return of the House is had.  A member may not vote on any question before the House when that question immediately involves that member's private right as distinct from the public interest. With approval from the Speaker upon as prompt notice as possible from the member, a member is excused from house deliberations and roll calls for a debilitating or incapacitating major illness or injury; the member must contact the Speaker and Clerk upon return.

**13.  Sponsor obtains signatures.**  A bill or resolve in final form that is ready for signature whose primary sponsor is a member of the House may be circulated for signatures only by the sponsor or cosponsors of that bill or resolve, except that legislation presented by a department, state agency or the Governor may be circulated by agents of the department, the state agency or the Governor.  This does not preclude a bill or a resolve from being held for signature in the Office of the Speaker of the House, the offices of the minority or majority party or the Office of the Revisor of Statutes.

13

# PART 5

## PROCEEDINGS AND DEBATES

**Rule 501.  Order of business.**  After reading of the journal, the following is the order of business:

>1st.  Senate papers;
>
>2nd.  Messages and documents from the Senate, the executive, heads of departments and others;
>
>3rd.  Reception of petitions, bills and resolves requiring reference to any committee;
>
>4th.  Orders;
>
>5th.  Expressions of legislative sentiment - Special sentiment calendar;
>
>6th.  Reports of committees and first reading of accompanying bills and resolves;
>
>7th.  Consent calendar - First Day;
>
>8th.  Consent calendar - Second Day;
>
>9th.  Bills and resolves reported by the Committee on Bills in the Second Reading and on their passage to be engrossed;
>
>10th.  Bills on their passage to be enacted; and
>
>11th.  Orders of the day.

A paper may not be taken up out of its regular order.  Business may not be transacted in the House after the hour of 9:00 p.m.

**Rule 502.  Unfinished business.**  The unfinished business of the House at the time of the last adjournment has preference in the orders of the day and continues to be among the orders of the day for each succeeding day until action on it is completed.

**Rule 503.  Motions and concurrence.**  The following rules apply to motions and questions of concurrence with the Senate.

   A.  When a question is under debate, a motion may not be received, except a motion:

   1st.  To adjourn;
   2nd.  To table unassigned;
   3rd.  For the previous question;
   4th.  To commit;
   5th.  To table to a day certain;
   6th.  To amend; or
   7th.  To postpone indefinitely.

These motions have precedence in the order in which they are arranged.  A motion to adjourn must be decided without debate.

   B.  Questions of concurrence with the Senate have precedence in the following order:

   1st.  To recede;
   2nd.  To concur;
   3rd.  To insist; or
   4th.  To adhere.

**Rule 504.  Previous question.**  When a motion for the previous question is made, the consent of one third of the members present is necessary to authorize the Speaker to entertain the motion.  Debate is not allowed until the matter of consent is determined.  The previous question must be submitted in the following words: Shall the main question be put now? A member may not speak more than 5 minutes on the motion for the previous question.  A call for the yeas and nays or for division of a question is in order after the main question has been ordered to be put.  After the adoption of the previous question, the vote must be taken upon amendments and then upon the main question.

**Rule 505.  Consideration of business.**  In filling blanks and assigning times for the consideration of business, the longest time must be put first.

15

**Rule 506.  Germane amendments.**  An amendment must be germane to the proposition under consideration.

**Rule 507.  Printing and distribution of amendments.**  An amendment to a bill or resolve may not be acted upon by the House until the same has been printed and distributed to the members under the direction of the Clerk, unless the same bears the recommendation of the Committee on Rules and Business of the House that such printing be dispensed with; and any amendment not so printed or bearing such recommendation must lie on the table until printed or until the Committee has recommended that such printing be dispensed with.  All amendments filed with the Clerk for printing must bear the signature of the member filing the same.

A House amendment that strikes and replaces in total a committee amendment is not properly before the House.

**Rule 508.  Withdrawal of motion, order or amendment.**  A motion, order or amendment may be withdrawn by a sponsor only prior to a vote, except that a motion to reconsider may be withdrawn only with consent of the House.

**Rule 509.  Process when declared vote doubted.**  When a vote declared by the Speaker is doubted, the members for and against the question, when called on by the Speaker, shall vote again without further debate.

**Rule 510.  Yeas and nays.**  A call for the yeas and nays is in order at any time before a vote is made certain and declared.

**Rule 511.  Motion to reconsider.**  When a motion has been made and carried in the affirmative or negative, it is in order for any member who voted with the prevailing side, or in the negative on a tie vote, to move to reconsider on the same or succeeding day.  A motion to reconsider may not be tabled unassigned.  A motion to reconsider is not in order more than once on the same question.  When a member moves or gives notice of the member's intention to move a reconsideration of any vote, the papers to which the motion relates must remain in possession of the Clerk until the question of reconsideration has been decided, or the right to move such a question is lost.  Notwithstanding the provisions of this rule, any member may move for reconsideration of a committee reference on the floor.  A majority vote is necessary to overturn the original committee of reference.

16

**Rule 512.  Elections.**  In all elections by ballot of the House a time must be assigned for the election at least one day prior to the election.

**Rule 513.  Opinion of justices.**  A proposition to require the opinion of the justices of the Supreme Judicial Court, as provided by the Constitution, may not be acted upon until the next day after the proposition is made.

**Rule 514.  Signature required.**  All petitions, memorials and other papers addressed to the House, and all bills and resolves to be introduced in the House, must bear the signature of the member or member-elect presenting them.

**Rule 515.  Second reading.**  All bills and resolves in their Second Reading must be committed to the standing Committee on Bills in the Second Reading to be examined and corrected.  The Revisor of Statutes is the clerk of the Committee on Bills in the Second Reading.

**Rule 516.  Two several readings.**  A bill may not pass to be engrossed until the bill has had 2 several readings; the House shall assign the time for the second reading.  Every resolve that requires the approval of the Governor must have 2 several readings.

**Rule 517.  Engrossed bills.**  All engrossed bills and resolves must be committed to the standing Committee on Engrossed Bills to be strictly examined; if found by the committee to be truly and strictly engrossed, the committee shall so report to the House, and the question must be taken without any further reading.  The Speaker of the House may order any bill or resolve to be engrossed upon its introduction to the House.

**Rule 518.  Report by committee.**  A bill or resolve must be reported by a committee.

**Rule 519.  Special consent calendar.**  A bill or resolve that bears a unanimous
Ought to Pass or Ought to Pass as Amended report by the committee to which it
has been referred, upon notification to the House, must, without further action, be
placed by the Clerk upon the special consent calendar and remain there for 2
legislative days; the bill or resolve, at the termination of these 2 days, is considered
as passed to be engrossed.  Upon objection of any member to the placement or
retention of any bill or resolve on the consent calendar, that bill or resolve ceases
to be a consent calendar bill.  If a bill or resolve is taken from the special consent
calendar, the first order of business with respect to the bill or resolve must be
whether to accept the committee report.

Any expression of legislative sentiment must be placed by the Clerk upon a
special consent calendar and remain there for one legislative day.  At the end of the
legislative day the legislative sentiment is considered passed or adopted.  Upon
objection of any member to the placement or retention of such an expression on the
consent calendar, the legislative sentiment must be removed and the question
before the House is passage or adoption.

**Rule 520.  Notice to House.**  The Speaker shall give the House notice before an
engrossed bill or resolve may be sent to the Senate.

**Rule 521.  Veto.**  When a bill or resolve is returned by the Governor with
objections, the question must be stated by the Chair:  Shall this bill become a law
notwithstanding the objections of the Governor?  and the same in substance in the
case of a resolve.  The question may be postponed to a day within the session, not
exceeding one week.  No other question may apply to bills and resolves originating
in either branch.

When a bill or resolve is returned by the Governor with any dollar amount
disapproved pursuant to the Governor's line-item veto power, the House shall act
upon the disapproved item or items within 5 days of receiving the bill or resolve
from the Governor.

18

**Rule 522.  Rules of parliamentary practice.**  The rules of parliamentary practice comprised in Mason's Rules govern the House in all cases in which they are applicable and in which they are not inconsistent with the standing rules and orders of the House and the joint rules of the Senate and House of Representatives.  In the event that Mason's Rules do not cover the parliamentary practice in question, then Reed's Rules govern.  If neither Mason's Rules nor Reed's Rules cover the parliamentary practice in question, the rules of any other standard authority may be applied.

**Rule 523.  Dispensation of rule or order.**  A rule or order of the House may not be dispensed with unless two thirds of the members present consent to the dispensation.

**Rule 524.  Amendment, adoption or repeal of rule or order.**  A rule or order of the House may not be altered or repealed, nor may any new standing rule or order be adopted, unless one day's previous notice is given in each case.  The notice must be entered on the journal.  Notwithstanding this rule and Rule 523, after the convening of the First Regular Session, and before the fourth Friday in January in odd years, any amendment to the House Rules proposed by a House Order may be adopted by a majority vote in the House.  If the amendment has already failed to be adopted during that session, it may only be adopted if, upon reconsideration, it receives the approval of two thirds of the members present in the House.

**Rule 525.  Penobscot Nation and Passamaquoddy Tribe.**  The member of the Penobscot Nation, the member of the Houlton Band of Maliseet Indians and the member of the Passamaquoddy Tribe elected or appointed to represent their people at the biennial session of the Legislature must be granted seats on the floor of the House of Representatives; be granted, by consent of the Speaker, the privilege of speaking on pending legislation; must be appointed to sit with joint standing committees as nonvoting members during the committees' deliberations; and be granted such other rights and privileges as may from time to time be voted by the House of Representatives.  In reports from committees on which a tribal member serves, the position of the member must be noted and included.  The names of the member of the Penobscot Nation, the member of the Houlton Band of Maliseet Indians and the member of the Passamaquoddy Tribe elected or appointed to represent their people at the biennial session of the Legislature must be included on the roll call board for purposes of electronically recording their attendance only.

19

EXHIBIT B

# Legislative Code of Ethics

Legislative service is one of democracy's worthiest pursuits. A Maine Legislator is charged with civility and responsible conduct inside and outside of the State House commensurate with the trust placed in that Legislator by the electorate.

In a free government, a Legislator is entrusted with the security, safety, health, prosperity, respect and general well-being of those the Legislator serves and with whom the Legislator serves.

To work well, government requires a bond of trust and respect between citizens and their Legislators. With such a trust, high moral and ethical standards producing the public's confidence, with the reduction to a minimum of any conflict between private interests and official duties, should be observed.

No Maine Legislators will accept any employment that will impair their independence and integrity of judgment nor will they exercise their position of trust to secure unwarranted privileges for themselves or for others. The Maine Legislator will be ever mindful of the ordinary citizen who might otherwise be unrepresented and will endeavor conscientiously to pursue the highest standards of legislative conduct inside and outside of the State House.

*Adopted by the 100th Legislature*
*Amended by the 127th Legislature*

EXHIBIT C



# STATE OF MAINE
## HOUSE OF REPRESENTATIVES
### SPEAKER'S OFFICE
AUGUSTA, MAINE  04333-0002
(207) 287-1300

RYAN D. FECTEAU
SPEAKER OF THE HOUSE

February 18, 2025

Representative Laurel Libby
442 Park Avenue
Auburn, ME 04210

Rep. Libby,

I was recently alerted to a post on social media in which you not only depict a high school student via photos, but you share the student's name and school.

Expressing policy differences is one thing, but it is absolutely uncalled for to put students at the center of political firestorms, which in turn risks their health and safety.

I am asking you to take the post down. Please find a way to express your political opinions that is void of using students as fodder. Ask yourself, would you want a politician to post about your kids like this?

In addition to risking the young person's safety, your post violates one of the long held political traditions of "leaving kids out of it"—a tradition that has *even* been observed by political pundits with regard to the treatment of kids who are in the White House, the most scrutinized office in the nation.

I request your urgent attention to this matter.

Sincerely,

Ryan D. Fecteau
Speaker of the House

EXHIBIT D

### STATE OF MAINE

———

### IN THE YEAR OF OUR LORD

### TWO THOUSAND TWENTY-FIVE

———

### HOUSE RESOLUTION RELATING TO THE CENSURE OF REPRESENTATIVE LAUREL D. LIBBY OF AUBURN BY THE MAINE HOUSE OF REPRESENTATIVES

**WHEREAS,** on or about February 17, 2025, Representative Laurel D. Libby of Auburn posted on her Facebook page photos of a high school athlete, a minor, who won a girls' track championship this year; and

**WHEREAS,** in that same post, Representative Libby identified the student athlete by name and shared pictures showing the minor in an athletic uniform with the school name clearly legible and blurred the faces of other student athletes to protect their privacy, while intentionally and deliberately leaving the named student's face exposed; and

**WHEREAS,** accompanying the pictures, Representative Libby posted a statement criticizing the participation of transgender students in high school sports; and

**WHEREAS,** Representative Libby's post has received national attention that she has amplified by appearing on national television and radio broadcasts to discuss; and

**WHEREAS,** a recent study from the Williams Institute at UCLA found that transgender people are over four times more likely to be victims of violence; and

**WHEREAS,** numerous replies to Representative Libby's post suggested that harm should come to the young athlete; and

**WHEREAS,** Representative Libby's post named the minor and used photos of the minor without that minor's consent, in an effort to advance her political agenda; and

**WHEREAS,** when it was brought to her attention that her post may endanger the minor, Representative Libby refused to take down the post and instead continued to bring media attention to the minor; and

**WHEREAS,** it is a basic tenet of politics and good moral character that children should not be targeted by adult politicians, especially when that targeting could result in serious harm; and

**WHEREAS,** the school district, as a result of Representative Libby's actions, has had to increase security at the school causing unnecessary stress and disruption to other students, parents, teachers and school support staff and the entire community; and

**WHEREAS,** the Legislative Code of Ethics expressly states that "a Legislator is entrusted with the security, safety, health, prosperity, respect and general well-being of those the Legislator serves and with whom the Legislator serves" and that "The Maine Legislator will be ever mindful of the ordinary citizen who might otherwise be unrepresented and will endeavor conscientiously to pursue the highest standards of legislative conduct inside and outside of the State House"; and

**WHEREAS,** pursuant to Article IV, Part Third, Section 4 of the Constitution of Maine, which states that each House may "punish its members for disorderly behavior," and pursuant to Section 561, subsection 1 of Mason's Manual of Legislative Procedure, which states that "A legislative body has the right to regulate the conduct of its members and may discipline a member as it deems appropriate, including reprimand, censure or expulsion," the House is the judge of its own membership; and

**WHEREAS,** the House finds the conduct of Representative Laurel D. Libby to be reprehensible and in direct violation of our code of ethics; and

**WHEREAS,** the House finds that Representative Laurel D. Libby has conducted herself in a manner incompatible with her duty and responsibilities as a Member of this House and the public trust and high standards incumbent in that office; now, therefore, be it

**RESOLVED:** That We, the Members of the House of Representatives of the One Hundred and Thirty-second Legislature now assembled in the First Regular Session, on behalf of the people we represent, take this opportunity to declare that Representative Laurel D. Libby should be and hereby is censured by the House of Representatives for just cause; and be it further

**RESOLVED:** That Representative Laurel D. Libby must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine; and be it further

**RESOLVED:** That Representative Laurel D. Libby must comport herself in a manner that pursues the highest standards of legislative conduct; and be it further

**RESOLVED:** That this resolution must be entered on the Journal of the House of Representatives.

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| LAUREL D. LIBBY, State Representative of Maine House District 90, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER, RENE FRASER, and DONALD DUBUC, <br><br>                  Plaintiffs, <br><br>       v. <br><br> RYAN M. FECTEAU, in his official capacity as Speaker of the Maine House of Representatives, and ROBERT B. HUNT, in his official capacity as Clerk of Maine House, <br><br>                 Defendants. | Civil Action No. 1:25-cv-00083-MRD |

**DECLARATION OF SUZANNE GRESSER**
**(pursuant to 28 U.S.C. § 1746)**

I, Suzanne Gresser, hereby declare as follows:

1.      I am over the age of 18 and reside in Freeport, Maine.

2.      I am currently serving as the Executive Director of the Maine Legislature.  I have held this position since November 2020, and employed by the Maine Legislature since 1989.

3.      The Office of the Executive Director (Office) is the nonpartisan office that serves as the central administrative and management agency for the Maine Legislature.  The Office provides staffing services to the Legislative Council and its committees.

4.      The Legislative Council is the administrative body for the Legislative Branch of State government.  It consists of the ten elected members of legislative leadership: the President of the Senate, the Speaker of the House, the Republican and Democratic Floor Leaders for both the Senate and the House and their Assistant Floor Leaders.

1

5.    Among other responsibilities, the Office is responsible for providing administrative services to the Legislature, including legislator and employee payrolls, expense reimbursements, and budgeting and accounting functions.

6.    Committee clerks are hired by the chairs of the Joint Standing Committees, subject to the approval of the Presiding Officers, to staff the Joint Standing Committees.

7.    Maine Legislators are entitled to reimbursement for certain expenses related to their work as a Legislator in amounts set forth in statute.  3 M.R.S. § 2.

8.    Accordingly, the Office collects information recorded by committee clerks on the attendance of legislators for their legislative work meetings.  The Office enters the collected information into a database that is updated upon receipt of the attendance information from the committee clerks, which is generally on a daily basis.

9.    Attached hereto as Exhibit 1 is a true and accurate copy of a report issued by our system that shows the attendance of Representative Laurel Libby in her assigned committee, the Joint Standing Committee on Labor, as of today.  The abbreviations in the attached report mean as follows:

a.    "CH" means confirmation hearing;

b.    "LM" means legislative meeting;

c.    "PH" means public hearing; and

d.    "WS" means work session.

10.    Although Exhibit 1 indicates the report is for "On-Site" attendance, the information included in the report includes both in person attendance and remote participation.

2

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  April 1, 2025                           /s/ Suzanne Gresser
                                                Suzanne Gresser

EXHIBIT 1

Date: 4/1/2025 1:17:28 PM
Report ID: COMATT-071
Page 1 of 6

Legislature: 132
Committee: Labor
Begin Date Range: No lower limit
End Date Range: No upper limit

## On-Site Committee Attendance - By Committee

| | Sunday 01-12-2025 | Monday 01-13-2025 | Tuesday 01-14-2025 | Wednesday 01-15-2025 | Thursday 01-16-2025 | Friday 01-17-2025 | Saturday 01-18-2025 |
|---|---|---|---|---|---|---|---|
| **Labor** | | | | | | | |
| Archer, Marshall | | | LM | | | | |
| Beck, Matthew | | | LM | | | | |
| Bradstreet, Richard | | | LM | | | | |
| Collins, Alicia | | | LM | | | | |
| Drinkwater, Gary | | | LM | | | | |
| Geiger, Valli | | | | | | | |
| Libby, Laurel | | | LM | | | | |
| Macías, Rafael | | | LM | | | | |
| Rafferty, Joseph | | | LM | | | | |
| Roeder, Amy | | | LM | | | | |
| Skold, Charles | | | | | | | |
| Soboleski, Michael | | | LM | | | | |
| Tipping, Michael | | | LM | | | | |

| | Sunday 01-19-2025 | Monday 01-20-2025 | Tuesday 01-21-2025 | Wednesday 01-22-2025 | Thursday 01-23-2025 | Friday 01-24-2025 | Saturday 01-25-2025 |
|---|---|---|---|---|---|---|---|
| **Labor** | | | | | | | |
| Archer, Marshall | | | LM PH | | | | |
| Beck, Matthew | | | LM PH | LM | | | |
| Bradstreet, Richard | | | LM PH | LM | | | |
| Collins, Alicia | | | LM PH | LM | | | |
| Drinkwater, Gary | | | LM PH | LM | | | |
| Geiger, Valli | | | LM PH | LM | | | |
| Libby, Laurel | | | LM PH | | | | |
| Macías, Rafael | | | LM PH | LM | | | |
| Rafferty, Joseph | | | LM PH | | | | |
| Roeder, Amy | | | LM PH | LM | | | |
| Skold, Charles | | | LM PH | | | | |

JA108

Legislature: 132
Committee: Labor
Begin Date Range: No lower limit
End Date Range: No upper limit

Date: 4/1/2025 1:17:28 PM
Report ID: COMATT-071
Page 2 of 6

## On-Site Committee Attendance - By Committee

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| | 01-26-2025 | 01-27-2025 | 01-28-2025 | 01-29-2025 | 01-30-2025 | 01-31-2025 | 02-01-2025 |
| Soboleski, Michael | | | LM PH | | | | |
| Tipping, Michael | | | LM PH | LM | | | |

### Labor

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| | | 01-27-2025 | 01-28-2025 | 01-29-2025 | 01-30-2025 | 01-31-2025 | 02-01-2025 |
| Archer, Marshall | | | LM | | | | |
| Beck, Matthew | | | LM | | | | |
| Bradstreet, Richard | | | | | | | |
| Collins, Alicia | | | LM | | | | |
| Drinkwater, Gary | | | LM | | | | |
| Geiger, Valli | | | LM | | | | |
| Libby, Laurel | | | LM | | | | |
| Macias, Rafael | | | LM | | | | |
| Rafferty, Joseph | | | | | | | |
| Roeder, Amy | | | LM | | | | |
| Skold, Charles | | | LM | | | | |
| Soboleski, Michael | | | LM | | | | |
| Tipping, Michael | | | LM | | | | |

### Labor

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| | 02-02-2025 | 02-03-2025 | 02-04-2025 | 02-05-2025 | 02-06-2025 | 02-07-2025 | 02-08-2025 |
| Archer, Marshall | | | LM | | | | |
| Beck, Matthew | | | LM | PH | | | |
| Bradstreet, Richard | | | | | | | |
| Collins, Alicia | | | LM | PH | | | |
| Drinkwater, Gary | | | LM | PH | | | |
| Geiger, Valli | | | | PH | | | |
| Libby, Laurel | | | LM | | | | |
| Macias, Rafael | | | LM | PH | | | |

JA109

Legislature: 132
Committee: Labor
Begin Date Range: No lower limit
End Date Range: No upper limit

**On-Site Committee Attendance -**
**By Committee**

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| | 02-09-2025 | 02-10-2025 | 02-11-2025 | 02-12-2025 | 02-13-2025 | 02-14-2025 | 02-15-2025 |
| Rafferty, Joseph | | | LM | | | | |
| Roeder, Amy | | | LM | PH | | | |
| Skold, Charles | | | LM | PH | | | |
| Soboleski, Michael | | | LM | PH | | | |
| Tipping, Michael | | | LM | PH | | | |

**Labor**

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| | 02-09-2025 | 02-10-2025 | 02-11-2025 | 02-12-2025 | 02-13-2025 | 02-14-2025 | 02-15-2025 |
| Archer, Marshall | | LM | | PH | | | |
| Beck, Matthew | | LM | | PH | | | |
| Bradstreet, Richard | | LM | | PH | | | |
| Collins, Alicia | | LM | | PH | | | |
| Drinkwater, Gary | | LM | | PH | | | |
| Geiger, Valli | | | | PH | | | |
| Libby, Laurel | | | | | | | |
| Macias, Rafael | | LM | | PH | | | |
| Rafferty, Joseph | | | | | | | |
| Roeder, Amy | | | | PH | | | |
| Skold, Charles | | | | | | | |
| Soboleski, Michael | | LM | | PH | | | |
| Tipping, Michael | | | | PH | | | |

**Labor**

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| | 02-23-2025 | 02-24-2025 | 02-25-2025 | 02-26-2025 | 02-27-2025 | 02-28-2025 | 03-01-2025 |
| Archer, Marshall | | | | CH WS LM | | | |
| Beck, Matthew | | | | CH WS LM | | | |
| Bradstreet, Richard | | | | CH WS LM | | | |
| Collins, Alicia | | | | CH WS LM | | | |
| Drinkwater, Gary | | | | CH WS LM | | | |

JA110

Legislature: 132
Committee: Labor
Begin Date Range: No lower limit
End Date Range: No upper limit

**On-Site Committee Attendance -**
**By Committee**

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| Geiger, Valli | | | | CH WS LM | | | |
| Libby, Laurel | | | | | | | |
| Macias, Rafael | | | | CH WS LM | | | |
| Rafferty, Joseph | | | | | | | |
| Roeder, Amy | | | | CH WS LM | | | |
| Skold, Charles | | | | | | | |
| Soboleski, Michael | | | | CH WS LM | | | |
| Tipping, Michael | | | | CH WS LM | | | |
| | 03-02-2025 | 03-03-2025 | 03-04-2025 | 03-05-2025 | 03-06-2025 | 03-07-2025 | 03-08-2025 |
| **Labor** | | | | | | | |
| Archer, Marshall | | | PH WS | PH LM WS | | | |
| Beck, Matthew | | | PH WS | PH LM WS | | | |
| Bradstreet, Richard | | | PH WS | PH LM WS | | | |
| Collins, Alicia | | | PH WS | PH LM WS | | | |
| Drinkwater, Gary | | | PH WS | PH LM WS | | | |
| Geiger, Valli | | | | | | | |
| Libby, Laurel | | | PH WS | | | | |
| Macias, Rafael | | | PH WS | PH LM WS | | | |
| Rafferty, Joseph | | | | | | | |
| Roeder, Amy | | | PH WS | PH LM WS | | | |
| Skold, Charles | | | | | | | |
| Soboleski, Michael | | | PH WS | PH LM WS | | | |
| Tipping, Michael | | | PH WS | PH LM WS | | | |
| | 03-09-2025 | 03-10-2025 | 03-11-2025 | 03-12-2025 | 03-13-2025 | 03-14-2025 | 03-15-2025 |
| **Labor** | | | | | | | |
| Archer, Marshall | | | PH | CH PH WS | | | |
| Beck, Matthew | | | PH | CH PH WS | | | |

JA111

Legislature: 132
Committee: Labor
Begin Date Range: No lower limit
End Date Range: No upper limit

**On-Site Committee Attendance - By Committee**

Date: 4/1/2025 1:17:28 PM
Report ID: COMATT-071
Page 5 of 6

| | Sunday 03-16-2025 | Monday 03-17-2025 | Tuesday 03-18-2025 | Wednesday 03-19-2025 | Thursday 03-20-2025 | Friday 03-21-2025 | Saturday 03-22-2025 |
|---|---|---|---|---|---|---|---|
| Bradstreet, Richard | | | PH | CH PH WS | | | |
| Collins, Alicia | | | PH | CH PH WS | | | |
| Drinkwater, Gary | | | PH | CH PH WS | | | |
| Geiger, Valli | | | PH | | | | |
| Libby, Laurel | | | | | | | |
| Macias, Rafael | | | PH | CH PH WS | | | |
| Rafferty, Joseph | | | | | | | |
| Roeder, Amy | | | PH | CH PH WS | | | |
| Skold, Charles | | | | | | | |
| Soboleski, Michael | | | | | | | |
| Tipping, Michael | | | PH | CH PH WS | | | |
| **Labor** | | | | | | | |
| Archer, Marshall | | | PH WS | PH WS | | | |
| Beck, Matthew | | | PH WS | PH WS | | | |
| Bradstreet, Richard | | | PH WS | PH WS | | | |
| Collins, Alicia | | | PH WS | PH WS | | | |
| Drinkwater, Gary | | | PH WS | PH WS | | | |
| Geiger, Valli | | | PH WS | | | | |
| Libby, Laurel | | | | | | | |
| Macias, Rafael | | | PH WS | PH WS | | | |
| Rafferty, Joseph | | | | | | | |
| Roeder, Amy | | | PH WS | PH WS | | | |
| Skold, Charles | | | PH WS | PH WS | | | |
| Soboleski, Michael | | | PH WS | PH WS | | | |
| Tipping, Michael | | | PH WS | PH WS | | | |

JA112

Legislature: 132

Committee: Labor

Begin Date Range: No lower limit

End Date Range: No upper limit

**On-Site Committee Attendance -**

**By Committee**

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| **Labor** | **03-23-2025** | **03-24-2025** | **03-25-2025** | **03-26-2025** | **03-27-2025** | **03-28-2025** | **03-29-2025** |
| Archer, Marshall | | | PH WS | PH WS | | | |
| Beck, Matthew | | | PH WS | PH WS | | | |
| Bradstreet, Richard | | | PH WS | PH WS | | | |
| Collins, Alicia | | | PH WS | PH WS | | | |
| Drinkwater, Gary | | | PH WS | PH WS | | | |
| Geiger, Valli | | | PH WS | PH WS | | | |
| Libby, Laurel | | | | | | | |
| Macias, Rafael | | | PH WS | PH WS | | | |
| Rafferty, Joseph | | | PH WS | | | | |
| Roeder, Amy | | | PH WS | PH WS | | | |
| Skold, Charles | | | PH WS | PH WS | | | |
| Soboleski, Michael | | | PH WS | PH WS | | | |
| Tipping, Michael | | | PH WS | PH WS | | | |

JA113

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| LAUREL D. LIBBY, State Representative of Maine House District 90, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER, RENE FRASER, and DONALD DUBUC<br><br>Plaintiffs,<br><br>v.<br><br>RYAN M. FECTEAU, in his official capacity as Speaker of the Maine House of Representatives, and ROBERT B. HUNT, in his official capacity as Clerk of the House,<br><br>Defendants. | Civil Action No. 1:25-cv-83-MRD |

DECLARATION OF LAUREL LIBBY

I, Laurel Libby, pursuant to the provisions of 28 U.S.C. §1746, declare the following:

1.    I am a resident of Auburn, Maine.

2.    I am the elected representative of Maine House District 90, which covers parts of Auburn and Minot.

3.    I was first elected in 2020, to the 130th Legislature. I was re-elected in 2022 and again in 2024 to the current Legislature.

4.    Since the imposition of the censure by the majority of the Maine House of Representatives, I have been barred from voting or speaking in support or opposition to any matter on the floor of the Maine House.

5.    Although I have not been barred from committee proceedings, committee work is only a fraction of the work on a fraction of the topics we have to cover for the more than 2,200 bills that come before the House. The committees do only the preliminary work on

legislation before it comes in front of the full Legislature for a vote to determine if it will become law. The committee process is no substitute for my ability to make my constituents' voices heard by speaking and voting on the House floor for the 2,200-plus bills that come before the House.

6.     I have always maintained exceptional attendance for House floor sessions, with the exception of when a child was hospitalized or for unavoidable travel. That continues following my censure, though I am unable to speak or vote.

7.     My vote on legislation pending before the House represents the voice of 9,000 Maine citizens. When I push my red or green button in a roll call, I do so on behalf of all my constituents. It is the vote on the House floor that determines the ultimate passage or failure of any given legislation, and without the ability to vote my constituents are disenfranchised.

8.     It is my honor and privilege to be my constituents' voice on the issues that come before the House, and if my vote risked my office during the next election, it would be my constituents' right to elect a new representative they felt better represented them. I value the trust my constituents have placed in me, and I take my responsibility to represent them via my vote very seriously. Those constituents deserve to have my vote on the record as frequently as possible, ideally with a roll call on every possible bill.

9.     Serving in the minority for my third term, I have come to understand that speaking on behalf of my constituents, even if my vote is in the minority, is a primary responsibility. That is why (until my censure) I spoke so often on matters that come before the floor. It's particularly critical to speak as a member of the minority; without the ability to persuade other legislators, my party lacks the votes to achieve any legislative change.

10.     The two most critical responsibilities of a duly elected legislator are to speak and vote on behalf of those they represent, and it is those two responsibilities that have been stripped from me.

11.     My district did not have a vote for the State's biennial budget legislation. No bill has more of an impact on Maine citizens than our biennial budget. With a fiscal note of $11.3 billion as of this year, the budget dictates policy in many ways. The Legislature voted on the biennial budget two weeks ago, and I was unable to speak to it or vote on it, marking the first time in my three terms that I haven't done both in regard to a budget. We anticipate additional supplemental budgets this year and next, and it's critical that my constituents have a voice in those votes.

12.     I also have no voice or vote on bills or amendments that I have sponsored that are critically important to my constituents, such as my bill to increase the availability and lower the cost of mental healthcare.

13.     I have no voice or vote on hundreds of other bills and amendments that will come before the House during the 132nd Legislature, not the least of which includes a bill about girls' sports.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 3, 2025                                    /s/ Laurel Libby_____

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
_____

LAUREL D. LIBBY, State Representative     CIVIL ACTION
of Maine House District 90,                Docket No:
RONALD P. LEBEL, WENDY MUNSELL,           1:25-cv-00083-MRD
JASON LEVESQUE, BERNICE FRASER,
RENE FRASER, and DONALD DUBUC,

            Plaintiffs,

       -versus-

RYAN M. FECTEAU, in his official
capacity as Speaker of the Maine
House of Representatives, and
ROBERT B. HUNT, in his official
capacity as Clerk of the House,

            Defendants.
_____

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on for VIDEO
ORAL ARGUMENT held before **THE HONORABLE MELISSA R. DUBOSE,**
United States District Court Judge, in the United States
District Court, District of Rhode Island, One Exchange Terrace,
Providence, Rhode Island, on the 4th day of April, 2025, at
12:01 p.m. as follows:

Appearances:

For the Plaintiffs:  Patrick N. Strawbridge, Esquire
                     Daniel M. Vitagliano, Esquire
                     Marie E. Sayer, Esquire
                     Taylor A.R. Meehan, Esquire

For the Defendants:  Jonathan R. Bolton, Esquire
                     Kimberly L. Patwardhan, Esquire


Michelle R. Feliccitti, RPR
Official Court Reporter

(Prepared from manual stenography and
computer-aided transcription.)

```
 1                    (Zoom video court proceeding.)

 2              THE CLERK:  Good afternoon.  The United States

 3      District Court is now in session.  As a reminder, the Judicial

 4      Conference Policy generally prohibits the broadcasting of

 5      proceedings in federal trial courts.  Persons granted remote

 6      access to proceedings are reminded of the general prohibition

 7      against photographing, recording, and rebroadcasting of court

 8      proceedings pursuant to Judicial Conference Policy.  This

 9      position applies to counsel, the parties, the media, and any

10      member of the public.

11          It is the Court's wish that we use the following best

12      practices during this proceeding.  If you're not an interactive

13      participant, please mute your audio and video.  If you are an

14      interactive participant, please mute your audio until such time

15      you need to address the Court.  To maintain the highest --

16      highest audio quality possible during this proceeding, court

17      staff may mute anyone not in compliance with these best

18      practices.

19          And with that, the Honorable Melissa Dubose is now

20      appearing.  Thank you.

21              THE COURT:  Good morning.  Thank you Maggie.

22          We are here today on Civil Action 25-00083.  This is

23      Laurel Libby, Robert Lebel, Wendy Munsell, Jason Levesque,

24      Bernice Fraser, Rene Fraser, and Donald Dubuc v Ryan Fecteau

25      and Robert Hunt.
```

```
 1        If I could just have the parties identify themselves for

 2   the record, please.

 3             MR. STRAWBRIDGE:  Yes.  Good afternoon, Your Honor.

 4   For the plaintiffs you have Patrick Strawbridge.  I'm joined by

 5   my colleagues, Taylor Meehan, Dan Vitagliano, and Marie Sayer.

 6   I do regret to inform the Court that you're stuck hearing only

 7   from me during this hearing today.

 8             THE COURT:  Thank you, Counsel.

 9             MR. BOLTON:  Good afternoon, Your Honor.  My name is

10   Jonathan Bolton.  I'm assistant attorney general.  I represent

11   the defendants.  And I'm joined by my colleague, Kimberly

12   Patwardhan.  And you'll be hearing from both of us today.

13             THE COURT:  Very good.  So I had a brief conference

14   with the parties before this hearing today to, kind of, set up

15   some of the logistics.  We do things slightly differently here

16   in Rhode Island.

17        But just for the purpose for the folks who are tuned in,

18   the Court is going to be allowing approximately 30 minutes for

19   each side to give their presentation, with an opportunity for

20   10 to 15 minutes for a rebuttal.

21        If there's anything that we need to go over with the

22   Counsel, unless you're ready to start, I'm happy to kick this

23   off.

24             MR. STRAWBRIDGE:  Thank you, Your Honor.  I assume

25   we'll start, since it's our motion for preliminary injunction.
```

```
 1    And we reserve some time for rebuttal.  I'm obviously hoping to
 2    delay answering whatever questions Your Honor might have during
 3    this hearing, but --
 4              THE COURT:  I'm sorry, Counsel.  One quick -- I'm very
 5    sorry.
 6         Maggie, in my screen I'm having -- when folks are in the
 7    waiting room, I'm getting an audible chime.  Is that something
 8    we can disable, or is that just kind of part of the process
 9    here?
10              THE CLERK:  Let me see if I can disabled that, Judge.
11    I'll see what I can search on my end.
12              THE COURT:  All right.  Very good.  Thank you.
13         Attorney Strawbridge, please.
14         MR. STRAWBRIDGE:  Thank you, Your Honor.
15         This case I think brings a number of sort of unprecedented
16    features before the Court.  And the most important one of them
17    is the fact that there are 9,000 Maine residents who live in
18    House District 90 who are currently without effective
19    representation in the legislature.  They have no voice, and
20    they have no vote.  These are the central pillars of
21    representation, and they were taken away by a simple party line
22    vote in the Maine House of Representatives.  Why?  Because the
23    speaker and his copartisans objected to Representative Laurel
24    Libby's constitutionally-protected speech on social media.
25    That is a textbook denial of both Representative Libby's First
```

1  Amendment rights and her constituents' rights to

2  representation.

3       Indeed, the defendants' barely mount any First Amendment

4  defense on the merits at all.  And no one can really dispute

5  that the district has been left without representation under

6  the terms of the suspension, which the State admits will last

7  at least through the end of next year, and which they do not

8  deny could be reinstituted by rule in the next legislature, and

9  indefinitely as far as we can tell.  The defendants' main

10  argument in opposition is they are immune from this Court's

11  reach.  No matter how unconstitutional their conduct may be,

12  defendants say there is nothing this Court can do about it.

13       That's not true.  The facts of this case are strikingly

14  similar to the supreme court's decision in Bond v. Floyd and

15  Powell v. McCormack.  And the First Circuit has, likewise,

16  acknowledged the exceptions to immunity for extraordinary cases

17  like this one.  In fact they -- they allowed liability on

18  similar facts in the Miller case.  And their more recent

19  decisions in Harwood and Cushing warily recognize that there

20  are circumstances where immunity cannot serve as broadly as the

21  defendants would have it here.

22            THE COURT:  Counsel, could you help me understand how

23  the action that was taken here rises to the level of the

24  extraordinary action as contemplated in those cases?

25            MR. STRAWBRIDGE:  Sure.  I think the -- the obvious

```
1   one is the complete ban on her ability to vote.  None of the
2   other cases that they cite in their support involved that kind
3   of squelching of the core power of representation -- of
4   legislative representation.  None of them involved the complete
5   disenfranchisement.  The closest ones are Bond and Powell
6   because that was the same situation.  You had a duly-elected
7   representative who was denied the ability to actually take
8   their seat and act as the representative for the officials --
9   for the citizens that they represented in the body.  And they
10  don't have anything close to that.
11      They have some -- you know, in Harwood we were talking
12  about some restrictions on where lobbyists could sit during the
13  session of the legislature.  That's not the complete denial of
14  the right to vote.  Indeed, I don't think there's a single case
15  out there that they can point to which sustained the suspension
16  of a right to vote on the indefinite terms that this suspension
17  does.  That's clearly what I think makes this an easier case.
18  And it takes us into completely unprecedented territory, of
19  which the only real guidance comes from Bond and from Powell.
20          THE COURT:  You contemplate -- or could you
21  contemplate any circumstance under the Maine's legislative rule
22  applying the censure provision where it would be proper for a
23  member to be stripped of his or her vote?
24          MR. STRAWBRIDGE:  I don't think that there's any --
25  no, I don't think the constitution could prohibit them to be
```

1    stripped of their vote, short of the expulsion provision,

2    which, of course the Maine Constitution provides for.  The

3    Maine contusion allowed for a two-thirds vote to expel a

4    representative.  But there are also important procedures that

5    protect the right of representation for the constituents in

6    that case.  Not only does it require a two-thirds vote, but it

7    also would allow for a special election to replace the

8    representative.  And so then you might have a situation like

9    Monserrate where there is a temporary loss of representation,

10   but one that could be remedied in relatively short fashion

11   through a special election.  Moreover, if that were to happen

12   to Representative Libby and she was reelected to the position,

13   the Maine Constitution specifically prohibits her from being

14   removed for the same offense again.

15       So those are important safeguards that are completely

16   avoided by the action of the House pursuant to rule in this

17   case.  Instead of having a two-thirds majority, they were able

18   to do it through a simple straight party line majority vote.

19   And instead of the constituents being able to obtain

20   representation via a special election or replacement, they are

21   stuck in limbo for this session and perhaps the next session

22   without representation, no matter how much they -- they

23   reaffirm their support for Representative Libby as their

24   elected official.

25       I do think it's important to note, too, and the State, you

1    know, alludes to, sort of, political remedies in this case.

2    And I don't think that that's the answer at all when you're

3    talking about the vote in the House and the House District.

4    The folks in District 90 don't have the opportunity to

5    challenge the election of officials in other districts.  They

6    don't vote in those elections.  They don't have the ability to

7    speak.  And

8    by -- by its nature, House District 90 is a member of the

9    minority.  Their rights -- their rights -- you know, day-to-day

10   business in the legislature are going to be the rights that

11   minority members have.

12        And I think the slippery slopes here are -- are staring

13   the Court right in the face.  This is extreme.  And one can

14   image all sorts of hypotheticals that the logic of Maine's

15   position would permit.  You could have people who are

16   discriminated against on the basis of race, their vote was

17   taken away.  You could have a decision to take away a

18   representative vote because they didn't affirm the legislative

19   prayer at the beginning.

20            THE COURT:  But, Counsel, doesn't -- doesn't --

21   doesn't the case law already address those circumstances by

22   having the exemption for extraordinary circumstances?  Why

23   wouldn't those cases fall squarely in the camp of those -- the

24   cases where the court says, wait a second, this is going a bit

25   too far, we're going to pierce that legislative immunity

1    because it is so extraordinary?

2         MR. STRAWBRIDGE:  Well, I think they do.  And I think

3    that we sit comfortably right alongside those extraordinary

4    circumstances.  My only point here is that -- is that the logic

5    of Maine's position does not provide a basis for why it would

6    be okay to discriminate upon some equal protection categories

7    but not upon other equal protection categories or why the First

8    Amendment wouldn't be just as -- just as applicable to these

9    types of proceedings than -- than the Fourteenth Amendment.

10        And, indeed, that's -- that's actually the holding of

11   Bond.  Bond is a First Amendment case.  And even the Georgia

12   legislature in the 1960s was unwilling stake out the position

13   that Maine has staken out here.  If you look at Bond,

14   Georgia -- the Georgia legislature is quite clear.  They say

15   that they could not take a violation on -- they could not

16   institute the rule or refuse to seat a member for members of

17   racial discrimination or other constitutional violations.  And

18   the First Amendment does not sit in a secondary position with

19   respect to its applicability here.

20        THE COURT:  From a separation of powers perspective,

21   wouldn't the path of least resistance for the Maine General

22   Assembly be to strike the censure provision or, alternatively,

23   keep the censure provision have the right to do that, but

24   take -- remove the penalty?  It seems that the members are

25   voting on the penalty, which calls for the stripping of the

1    right to vote and to speak on the floor, that this isn't a new

2    provision.  This has been around.  For my understanding from

3    the briefing, that this is an age-old censure rule, has

4    virtually been unchanged since the adoption.  So why is it that

5    -- that Maine wouldn't be in a better position to address your

6    concerns by simply changing the rule?

7         MR. STRAWBRIDGE:  Well, I guess -- I guess the

8    practical answer to that is because they have not.  They've

9    taken the unprecedented step of actually enforcing this, and

10   doing so in the face of a court challenge.  There are reported

11   court decisions that address whether or not this kind of broad

12   refusal to allow -- to allow an elected official to vote and to

13   represent their constituents both is constitutional -- we think

14   it's plainly not -- and whether or not the immunity bars review

15   of that.

16       It would be obviously nice if the legislature or if the

17   House of Representatives had decided to -- to not force this

18   issue upon the courts.  But the courts absolutely have

19   jurisdiction to hear this case.  And -- and this is -- this is

20   kind of why the federal courts exist and why cases like

21   Kilbourn exist.

22       Kilbourn is very similar to this case.  You had actions by

23   both the legislator and by officers of the legislator -- or I

24   should say employees of the legislature who acted

25   unconstitutionally.  And notwithstanding the strong arguments

1    the House of Representatives made in <u>Kilbourn</u>, that -- that

2    their actions in that case punishing and contempt of a witness,

3    could not be reviewed in courts, the court rejected that and

4    specifically acknowledged that, at minimum, the sergeant at

5    arms in that case could be held liable, notwithstanding

6    whatever legislative immunity the legislators had, which, of

7    course, in this case is why we have included the clerk as a

8    defendant.

9        Now I -- I do want to address a point that you've made

10   that I think is true.  There's absolutely no First Amendment

11   problem, in our view, with -- with the House voting to censure

12   a representative.  They have the right to free speech, and a

13   censure is a form of speech by the body.  And they can -- they

14   can censure them all day long.  The problem in this case is

15   that the censure has extended to a prohibition on her speaking

16   on the floor and casting a vote to represent her constituents.

17       THE COURT:  Didn't Representative Libby acquiesce in

18   some way to the rule?

19       MR. STRAWBRIDGE:  She -- she -- I mean, my

20   understanding is the rules are basically passed in a very pro

21   forma session with little notice.  But the rules were enacted

22   by the House.  And they could have been enacted in a lot of

23   different ways.  She certainly did not acquiesce in the

24   application of what is a very general rule about upholding

25   the standards of the legislature to punish her

 1    constitutionally-protected speech.  Which I will also note was

 2    not -- this was not like some sort of violent or -- or

 3    disruptive confrontation on the -- to the operations of the

 4    House of Representatives.  It isn't a situation where somebody

 5    is brawling within the chamber or in the hallway.  This was

 6    speech that occurred outside of the -- of the House of

 7    Representatives.  And it sets --

 8         THE COURT:  In those circumstances where if somebody

 9    were brawling in the -- in the floor or in the well, when

10    your -- in your opinion, would that be conduct that could, in

11    fact, rise to the level where censure by way of stripping of a

12    vote until pending an apology and not being able to vote, would

13    that rise to the level?

14         MR. STRAWBRIDGE:  It's harder to imagine for me

15    because of the right that the constituents have that you could

16    ever have a situation where a suspension of a vote would be --

17    would be acceptable.  One could certainly see a stronger

18    argument perhaps for some temporary suspension on the ability

19    to speak or the time, place, or manner of speech in order to

20    ensure that the proceedings of the House can proceed.  So I

21    would acknowledge that would be a closer case at least with

22    respect to the speech restriction.

23         I -- I think I agree with what the House of

24    Representatives agrees with and what I think the vast majority

25    of state legislatures have historically accepted, which is that

1    stripping a vote is an entirely different aspect because you

2    are not only depriving the legislator of their right to cast a

3    vote, but you're depriving the people of that district from any

4    representation.  And that is a bridge too far.  I think the

5    remedies in that case are, you know, expulsion, if -- if --

6    if -- if that's what the House chooses to do in that case, or

7    whatever political remedies for recall in some states there may

8    be available.

9         THE COURT:  Did you want to be heard with respect to

10   whether the conduct that the representative engaged in was in

11   her official capacity as opposed to private conduct?

12        MR. STRAWBRIDGE:  I'm not -- I don't think that it

13   really matters.  I do think that -- I think it matters only in

14   this respect, in that I think they're on even more tenuous

15   ground because it was not, like I said, a disruption of the

16   proceedings on the house floor.  But I don't think that they

17   can punish her conduct any more than they can punish her speech

18   if --- or any legislator could punish the speech of a

19   legislator if they found out 20 years ago that the legislator

20   had made a statement that they disagreed with in a college

21   newspaper editorial.

22        Protected speech is protected speech, regardless of forum.

23   And, indeed, there's really some irony in the extent to which

24   the State is raising legislative immunity defense, and pushing

25   for it, notwithstanding the precedent of <u>Powell</u> and <u>Bond</u>.  And

1    that irony is that if you read <u>Bond</u> in particular, it

2    emphasizes that the point of the legislative immunity doctrine

3    is -- and some of the other cases say this too -- is to ensure

4    that legislators are free to debate and discuss and act upon

5    the most controversial topics free from any interference from

6    the outside world.  That's why we don't have defamation

7    liability for statements made in House proceedings.  And in

8    this case, of course, the rule is being used to silence

9    Representatives Libby, to disenfranchise her constituents --

10           THE COURT:  It goes back to -- and I don't want to

11   belabor the point -- but there is no challenge to the

12   constitutionality of the penalty.  And I guess that that's

13   where the Court is perplexed.  It's not the conduct of -- you

14   would not suggest that the legislators were not acting pursuant

15   to their internal rules, correct?

16           MR. STRAWBRIDGE:  No.  I think -- I think the

17   application of the rule in this respect is unconstitutional and

18   creates the constitutional violation.  Not only of

19   Representative Libby, but also of her constituents.

20           THE COURT:  But outside of application of the rule,

21   there is no separate constitutional challenge to the penalty

22   provision of -- of 40111, correct?

23           MR. STRAWBRIDGE:  Well, we're certainly not

24   bringing -- well, I guess two points.  We're not bringing a

25   facial challenge to it.  Although, I'm telling you it's hard

1    for me to imagine, at least with respect to voting

2    restrictions, a scenario in which it could survive.  But I

3    don't think we're obligated to bring a facial challenge.  As

4    you know, courts disfavor facial challenges, and they prefer as

5    applied challenges.

6        And back to your original point.  I don't think that any

7    representative would have believed that they could be punished

8    in this way for speech that was made, again, not even on the

9    floor, not even disruptive.

10       The fact that there are very few examples of this rule

11   being invoked to actually strip voting rights and they're only

12   in the last two or three years I think tells you how out over

13   the ledge and out of step with both mainstream constitutional

14   thought and legislative practice the Maine House has become.

15   And I really do believe that this is the type of emergency that

16   all of the cases recognize applies.

17       I also just again note that I don't think legislative

18   immunity covers the aspect of the case that seeks an injunction

19   against the clerk requiring her to count her vote.  The same

20   reason it didn't apply in <u>Kilbourn</u> to an action against a

21   sergeant of arms and the same reason it didn't apply in <u>Powell</u>

22   <u>v. McCormack</u> to those who are actually barring the

23   representative from the chamber or refusing to enroll the

24   representative on the payroll.

25               THE COURT:  Those -- those are administrative actions.

1  And there's a distinction between administrative actions and

2  legislative actions.  And I just want to know, how -- how are

3  you reconciling the clear findings in <u>Cushing</u> and Judge

4  Thompson in <u>Bogan v. Scott-Harris</u> that -- that -- that this

5  right, this legislative immunity, is sacrosanct to orderly

6  legislative procedures for -- as a state's right.

7          MR. STRAWBRIDGE:  Well, I don't -- I don't think

8  that's quite what they say.  And, indeed, the most recent case

9  from this on the First Circuit is en banc decision in Cushing.

10  And it specifically in footnote 20 calls out the scenario

11  that -- calls out <u>Bond</u> by name as an example and distinguishing

12  the -- the restriction that was at issue in Cushing, which was

13  basically a time, place, manner in voting how -- how

14  legislators could gather to count their votes versus having

15  remote option during COVID.  It says that case is different

16  from a case like <u>Bond</u> where they are refusing to allow the

17  representative to assume their position as the elected

18  official.  This -- this case is clearly much, much closer to

19  <u>Bond</u> than it is to the actual facts of <u>Cushing</u>.  And in those

20  -- in these types of cases, immunity has to yield, if it even

21  applies.

22      I mean, again, there are arguably legislative actions that

23  were happening in <u>Kilbourn</u>.  There were -- all the actions that

24  were taken in <u>Bond</u> and <u>Powell</u>, even by the legislative

25  employees, were at the direction and pursuant to a rule of the

1    house or an order of the house.  That did not stop the court

2    from vindicating constitutional rights there.  It should not

3    stop this Court from stepping in and vindicating the rights of

4    Representative Libby and her constituents here.

5            THE COURT:  Thank you.

6            MR. STRAWBRIDGE:  I think I'll probably just reserve

7    the rest of my time for the sake of efficiency.  If Your Honor

8    has any other questions, I'm obviously happy to answer them

9    now.

10           THE COURT:  Very good.  Thank you.

11           MS. PATWARDHAN:  Good afternoon, Your Honor.  My name

12   is Kimberly Patwardhan.  I'm an assistant attorney general here

13   for the defendants today.

14       There are a few key details that defendants want to

15   highlight regarding the role of the house speaker and the clerk

16   of the house with respect to -- and also the conduct that's at

17   issue.

18       So both the speaker and the clerk are officers that are

19   identified in the Maine Constitution.  Article IV, Part 1,

20   Section 7, says that, The House shall choose their speaker,

21   clerk, and other officers.  There are numerous other references

22   to the speaker and the clerk throughout Maine's constitution.

23   Article III -- Article IV, Part 3, Section 5, also says that,

24   The House shall keep a journal and from time to time publish

25   its proceedings.

1        The -- the role of the speaker, in many ways, is to

2   facilitate the orderly business of the house.  That's included

3   in Rule 101, Subsection 1, paragraphs (d) and (e) of the House

4   rules.  And as noted in the Fecteau declaration, which has not

5   been disputed by plaintiffs, one of the speaker's obligations

6   is to enforce the House rules.  That means that the speaker

7   will make a ruling on points of order, but the entire body can

8   overturn the speaker's decision.  Any member can appeal that

9   ruling.  So what plaintiffs are claiming are acts of

10  individuals are, in our view, acts of the entire house that

11  have constitutional dimension.  We highlight these facts

12  because they bear on the nature of the conduct the plaintiffs

13  are challenging.  Because legislative acts are protected by

14  legislative immunity.

15       And in many ways this is a bright-line test.  The supreme

16  court decision in Tenney tells us that motivations don't matter

17  whether or not we're determining an act is legislative in

18  nature.  Even conduct that has a retaliatory motive is

19  protected by legislative immunity.  And the supreme court's

20  decision in Supreme Court of Virginia and Gravel tell us that

21  nonlegislatures can also be protected by legislative immunity.

22  What matters is the nature of the conduct at issue.

23       So in our view, all of the conduct that's been challenged

24  here by plaintiffs is legislative conduct.  The House adopted

25  the resolution censuring Representative Libby pursuant to its

1    authority to punish its members for disorderly behavior.  The

2    House adopted its rules pursuant to its constitutional

3    authority to determine the rules of its proceedings.  The

4    speaker applied House Rule 40111 as its initial ruling.  But

5    since then, the House has twice voted against suspending

6    application of the rule to Representative Libby.

7        These are all actions that are occurring on the floor of

8    the House chamber.  Voting, adopting rules, punishing members,

9    these are all matters which the constitution places within the

10   jurisdiction of the Maine House.

11       I -- I disagree with plaintiffs when they focus on the

12   speech and the voting and things that are the inter -- just

13   the -- what Gravel calls the -- part of the deliberative and

14   communicative process by which legislation is passed.  That is

15   not the only conduct that is protected by legislative immunity.

16   Gravel also says that other matters which the constitution

17   places within the jurisdiction of either house is protected by

18   legislative immunity.

19       We also don't agree that the conduct that's being

20   challenged here is administrative.  The -- the focus now might

21   be on the speaker not recognizing Representative Libby for

22   debate or for not counting her votes, but we believe these too

23   are all legislative acts.  These are all acts that are

24   occurring on the House floor, while the House is in session.

25   They are either matters that the constitution places within the

```
 1   jurisdiction of the House or they're the integral part --
 2   process by which members participate in those House
 3   proceedings.
 4        THE COURT:  Given the sense or the fact that the vote,
 5   itself, is so seminal and it is a pillar of our democracy, why
 6   shouldn't we look at the taking away of that very fundamental
 7   right, even though it's within the context of a legislative
 8   body, that we wouldn't put it in the camp of, this is an
 9   egregious act where immunity shouldn't lie?  We're talking
10   about removing and taking away somebody's right to vote and, in
11   this case, voting on -- on issues that -- of great public
12   interest.  So can you just help me understand why we shouldn't
13   put this case squarely in the camp where it rises to that
14   level?
15        MS. PATWARDHAN:  I think Your Honor's question is why
16   shouldn't this be one the extraordinary circumstances where
17   legislative immunity should not apply.  Obviously legislative
18   immunity does have an outer bound.  The First Circuit has said
19   so in Cushing.  That has to be an act that's of such
20   extraordinary character.  But the examples they provided, like
21   ordering an execution by bill of attainder or converting a
22   legislative body in a court of capital punishment.  Those
23   aren't this particular case.
24        Representative Libby has a plethora of other legislative
25   privileges that she still enjoys, including participating in
```

1    committees, voting in committee.  She can put forth motions on

2    the floor of the House.  So this is not a case where she has

3    been stripped of all of her legislative privileges like in <u>Bond</u>

4    or like in <u>Powell</u>.  So --

5          THE COURT:  But -- I'm sorry, Counsel.  Upon

6    imposition of the -- of the censure, was Representative

7    Libby -- is there a process or an appellate -- internal

8    appellate process where she could be heard on the censure,

9    itself?  Is there any mechanism within the body to address her

10   objection to the censure based on all of the grounds that

11   counsel for the plaintiffs are asserting today?

12         MS. PATWARDHAN:  At the time Representative Libby

13   could have objected to application of the rule.  She did not.

14   But there isn't an explicit process that you're talking about,

15   Your Honor.  I -- in our view, whatever the outer, outer bound

16   of legislative immunity is, it hasn't been reached here.

17       The House censured Representative Libby for violation of

18   the legislative code of ethics by engaging in conduct that the

19   House viewed as endangering a child.  And the House has an

20   important interest in ensuring that its members are conducting

21   themselves in a manner that ensures the safety and security of

22   its citizens, and the House also has an important interest in

23   protecting its reputation and integrity as the Second Circuit

24   said in <u>Monserrate</u>.  But I want to be absolutely clear, there

25   is no conceivable interest that justifies invidious

1    discrimination on the basis of race.  So we agree that the --

2    certainly the outer bound would be invidious discrimination on

3    the basis of race.

4        I also want to touch on <u>Bond</u> and <u>Powell</u>.  Because those

5    two cases were about the qualifications of members to be seated

6    in the Georgia house and also in the -- in the U.S. house.

7    Those cases did not address the punishment of an

8    already-sitting member, which is what this case is about.

9        And in -- in Powell, the legislators in that case were

10   immune.  It was only the actions that were taken by the

11   sergeant at arms and other legislative staff that was

12   determined not to be within the scope of legislative immunity.

13   But that wasn't because, in our view, you can only get relief

14   from -- against a clerk or a sergeant at arms or other

15   legislative staff.  It's because the conduct that was being

16   challenged wasn't legislative in nature.

17       That's the same thing in the <u>Kilbourn</u> case.  The sergeant

18   at arms that went out and served and executed the warrant,

19   that's not a legislative act.  It's not what -- it's not

20   something that's specifically identified that legislators can

21   engage in in the constitution, and it doesn't have anything to

22   do with speech and debate.  Right?  But here all of the actions

23   that are being challenged are all squarely within that frame.

24   So it is -- it is the votes that have been taken.  It's the

25   rulings on the floor about -- about debate.  It's -- it's

1    the -- the entry even in the House journal.  That's another

2    aspect of this case that is imbued with constitutional

3    dimension.  These are all squarely within the authority of the

4    House.  They are all legislative acts.

5         THE COURT:  Do representatives have a constitutional

6    right to vote on the floor?

7         MS. PATWARDHAN:  The -- the supreme court has said

8    that the -- that -- that there is no First Amendment right to

9    vote on any particular piece of legislation.  So -- or then

10   also if not being able to vote on that particular piece of

11   legislation, then there's no concomitant right to debate on

12   that particular piece of legislation.

13       With respect to the First Amendment issues, we think

14   they're fairly well-briefed.  There really isn't a case truly

15   on all fours with this one that touches on First Amendment

16   retaliation based on protective legislative conduct.  <u>Boquist</u>

17   did not address legislative immunity, and neither did <u>Wilson</u>.

18   <u>Wilson</u> also involved a local legislative body.

19       By contrast, the Maine House has express constitutional

20   powers to engage in the conduct that it has engaged in.  The

21   tension here is that both Representative Libby and the

22   defendants are asserting that their conduct is of

23   constitutional dimension -- dimension.  Defendants' view is

24   that those factors weigh against the likelihood of success on

25   the merits on Representative Libby's First Amendment claim.

1    She doesn't have a personal First Amendment right to vote on

2    any particular piece of legislation.  And history supports that

3    for centuries legislative bodies have imposed a variety of

4    punishments against their members without anyone thinking that

5    those punishments run afoul of the First Amendment.  We cite it

6    in our brief, instances in 1808 and thereafter wherein members

7    of the house -- Massachusetts House of Representatives had been

8    suspended for their conduct.

9        As the Court noted the rules, Rule 40111, is of ancient

10   origin in our state.  It derives from Massachusetts.  And it

11   has been a part of the House's rules for more than 200 years.

12   Legislative bodies have to have the constitutional authority to

13   enforce their rules.  If it didn't, those rules would

14   essentially be meaningless.  And that's the Fourth Circuit's

15   decision in <u>Whitener</u>.

16       I -- I also just want to touch briefly on sort of the --

17   the rest of the remaining factors for the preliminary

18   injunction relief.  I think that -- I won't put words in

19   Attorney Strawbridge's mouth, but I think we probably agree

20   that this case sort of rises and falls on the likelihood of

21   success on the merits.  But we do note that in this particular

22   case, these are rules that Representative Libby agreed to at

23   the beginning of the session.  These are rules that have been

24   part of the legislature for more than 200 years, and

25   Representative Libby has agreed to these rules in the past as

1    well.  So

2    these -- and the last point I'll make is that these -- the rule

3    in question applies to all violations of House rules.  It's --

4    it's applied equally when there has been some violation of a

5    rule, house, or order.

6              THE COURT:  Is there any conduct that Representative

7    Libby could engage in outside of the legislative body in her

8    personal life that is outside the reach or scope of the ethics

9    rule?  In other words, is she held to a standard where in her

10   day-to-day life she doesn't have the luxury -- and that's for

11   lack of a better term -- of being able to have an opinion?  Or

12   is that always tied back to the ethics rule?

13             MS. PATWARDHAN:  I think that we expect better conduct

14   from our elected officials and public officials than we do from

15   general members of the -- of the citizenry.  But to be really

16   clear, the House viewed the action that was censurable here as

17   engaging in conduct that -- that endangered a child.  It wasn't

18   about the topic that Representative Libby was engaged in.  It

19   was about the fact that a harm could come to a child, and that

20   the post had also included numerous comments that suggested

21   that harm should come to the child and that, in the House's

22   view, this was conduct that fell below the required ethical

23   conduct for members of the legislature.

24        So, yes, Representative Libby is -- of course can speak

25   out -- continue to speak out on the issues underlying this

```
 1    appeal.  And she has continued to speak out on the issues

 2    underlying this appeal.  In the House's view, what was the

 3    ethical violation was the endangering a child through

 4    identifying that child in their school publically, and that was

 5    the conduct that led to the censure.

 6              THE COURT:  And that's distinguishable from other

 7    examples, the whole notion of selective enforcement where other

 8    members have used social media to post pictures of themselves

 9    with -- with children at, you know, fundraising events and

10    sports events?  That falls outside the scope of the ethics

11    rule?  This is specific to Ms. Libby's posting here?  Help me

12    understand the difference.

13              MS. PATWARDHAN:  Sure.  The -- the ethics rules

14    specifically speaks to -- that a legislator is entrusted -- is

15    entrusted with the security, safety, health, prosperity,

16    respect, and general well-being of those legislator -- those

17    the legislator serves and with whom the legislator serves.  So

18    that is what the ethical rule says.  But I apologize, Your

19    Honor, I lost track of your question.

20              THE COURT:  I just -- somewhere in the briefing I know

21    there was mentioned that other members of the House had used

22    their social media and posted pictures, photos of themselves

23    with minors in -- at celebratory events involving minors.  And

24    I'm assuming that -- that not having permission, that those

25    requirements aren't generally applied to all members?  This --
```

1    this censure is specific to this ethics rule and Ms. Libby's

2    specific posting?

3         MS. PATWARDHAN:  So -- so any censure is going to be

4    specific to the conduct of the member at issue.  But I guess my

5    response here is twofold.  Number one is that the House acts by

6    motion of the body.  So if there is conduct that a member of

7    the House feels violates the ethical code of conduct, they can

8    bring forward a similar resolution, as the one that was brought

9    forth here, in order to censure that member of the body.  That

10   motion, that resolution may fail, or it may succeed.  But this

11   is a process by which the members punish their own as a body.

12        And I think that matters because it's not a -- in a very

13   traditional sort of -- in the First Amendment context, the

14   First Amendment retaliation context, is that, you know,

15   typically the individual being retaliated against doesn't have

16   necessarily a vote in all of what is happening.  Right?  Or

17   doesn't have an ability to -- to -- to fight back.  For

18   example, in an employment context.  Right?  But this is a way

19   that the body self-polices itself through -- through a censure

20   or other similar resolution like this one.  And I'm going to

21   turn argument over to my cocounsel, Jonathan Bolton.

22        THE COURT:  Thank you.

23        MR. BOLTON:  Thank you, Your Honor.  I just want to

24   make a few -- few points here.  I think my colleague has -- has

25   laid out most of the important issues for consideration in this

1    motion.  But I wanted to address -- I'm -- I'm addressing the

2    Fourteenth Amendment, and I can address any questions Your

3    Honor may have about the Guarantee Clause claim.

4        And what I wanted to focus on for the Fourteenth Amendment

5    was the point that -- that the plaintiffs make in their reply

6    brief that -- suggesting that really the Fourteenth Amendment

7    analysis should be a sort of one person, one vote type analysis

8    like was done in the Reynolds v. Sims case.  And I really just

9    fundamentally disagree that that -- those are the right cases

10    and that's the right analysis under which to conduct the

11    Fourteenth Amendment analysis.  And there are three reasons for

12    that.  One is that Reynolds v. Sims, in the cases that follow,

13    those are cases about how equal protection applies to the

14    drawing of legislative districts.  And they say basically that

15    when you draw legislative districts, they should have roughly

16    the same number of people in each one.  It's not -- they're not

17    cases about the scope of legislative punishments or what can be

18    imposed on legislators as punishments after they've been

19    elected to office.

20        And I think what's going on here is that the plaintiffs

21    are in some sense conflating the idea that voting in a pop --

22    popular election is equivalent to casting a vote on the floor

23    of the house.  And our contention is those are not the same

24    thing.  A vote on the floor of the House is one of many things

25    that a legislator can do to further their interest -- the

1    interest of their constituents.

2        And I think my colleague pointed out, Representative Libby

3    can serve in committee.  She can make motions.  She can sponsor

4    legislation.  She can do all sorts of things that are part of

5    her job, along with casting votes on the floor.  Whereas if

6    you're a voter, the only action you can take in your role as a

7    voter is to vote.  So they're really different -- they're

8    categorically different, and I think those -- those cases are

9    just not applicable.  And to say that, you know, Representative

10   Libby has been disenfranchise -- her constituents have been

11   disenfranchised I think is just not accurate because she is --

12        THE COURT:  Well, as a representative -- as a

13   representative democracy, when her 9,000 constituents elected

14   her certainly to be their voice and their vote in that body,

15   how is it that we're not in some way impinging on their right

16   to be heard on that floor?

17        MR. BOLTON:  Well, Your Honor, I think -- I think it's

18   probably accurate if you want to say that -- that, you know,

19   one of -- one of her privileges as a member of the legislature

20   has been stripped conditionally until she apologizes or certain

21   other things occur, which could be suspension of the rules or

22   until the legislative -- until this legislature ends.  So there

23   is -- there is some reduction in, you know, the -- the

24   privileges she has versus other members.  But that's not the

25   same thing as disenfranchisement under this case law.

1    And I think -- you know, I think what -- what -- the

2    correct way to look at this is -- is the way the Second Circuit

3    case Monserrate looked at this analysis, which is that -- and

4    that was the same thing.  Right?  That member of the

5    legislature was actually expelled.  So lost not just the right

6    to vote but lost all of their legislative privileges.  And what

7    the Second Circuit explained is the way you look at that is,

8    you don't just say, well, one person, one vote, the

9    constituents have been disenfranchised, constitutional

10    violation.  But you conduct, you know, the sliding scale

11    balancing test under the Anderson verdict framework.

12    So that I think -- so I think the idea that you would look

13    at these apportionment cases about drawing legislative

14    districts when, in fact, we have case law that is directly on

15    point that explains exactly how this analysis should work, I

16    think that's the case law that -- that -- that the Court should

17    focus on.  And that case law indicates that you can, in fact,

18    reduce a member's legislative privileges or you -- you can

19    create a sort of imbalance, to some degree, if there's a

20    sufficiently important government interest on the other side.

21    And here -- here there clearly is.  The House of

22    Representatives is protecting its reputation and integrity,

23    which is a governmental interest that the Second Circuit viewed

24    as an important interest.  I would argue it's a compelling

25    interest, but it's at least an important interest.  And so you

1    -- under the correct analysis, you balance that important if

2    not compelling government interest versus the limited and

3    conditional loss of privilege that occurs as a result of the

4    censure.

5        So we would -- I would just submit that that's the correct

6    way to analyze the -- if the Court were to reach on the

7    Fourteenth Amendment claims at all, which, of course, we're

8    arguing that it does not need to because of legislative

9    immunity.  But if it did, the Monserrate case we think is the

10   correct analysis.  And I think that analysis shows that this is

11   clearly a -- an exercise of legislative power that is

12   consistent with the Fourteenth Amendment.

13       And that -- that's the only point I wanted to make, Your

14   Honor.  I'm also -- again, if you have any questions either

15   about other Fourteenth Amendment issues or about the Guarantee

16   Clause, I'm happy to answer those.

17           THE COURT:  Those issues have been pretty well

18   briefed, so I appreciate that.

19       Attorney Strawbridge, did you want to be heard?

20           MR. STRAWBRIDGE:  Yes.  Let me just run through a few

21   things in rebuttal.  I shouldn't need ten minutes.  But

22   obviously interrupt me at any point if you think I've gone on

23   too long or you have additional questions.

24       But one thing I want to start, I don't think the content

25   of the post is that significant to the legal principles in this

1    case, but just to -- obviously my friends on other side seem to

2    think it is.  I just want to make a couple of comments so the

3    record is clear on this.

4        The post in and of itself was just reposting pictures and

5    factual information from a highly-publicized event, an athletic

6    competition.  There was no threat that was included in the

7    post.  And at no point has Representative Libby ever encouraged

8    anybody else to make threats.  The suggestion that this

9    actually endangered anybody is pure speculation.  There's no

10   evidence of that in the record.  And I don't think anybody

11   really -- really disputes that but for some other arguments on

12   justiciability and immunity, that that is a protected First

13   Amendment post.

14       With respect to their citation of some of the -- sort of

15   the ancient nature of the rule and what happened in

16   Massachusetts in 1806, I would note that that's not very

17   relevant for a claim that arises under the First Amendment post

18   incorporation or the Fourteenth Amendment, which was obviously

19   enacted in the late 19th Century.  I think the actual history

20   of attempts to suspend members and prevent them voting is

21   extremely thin, particularly post those events.

22       And, indeed, the two examples they have, which is a -- a

23   dispute in the U.S. Senate and a Wisconsin legislative dispute,

24   our research indicates were both hotly contested at the time as

25   to whether there was authority to impose those punishments.  It

1  never came to litigation.  In fact, I think both punishments

2  were -- were either resolved or voting rights were restored

3  very, very quickly, in a matter of days in those cases.

4      Bond was a First Amendment case.  And it specifically

5  rejects the statement that my friend on the other side made

6  that it's permissible for the legislature to hold legislators

7  to higher standard than private citizens with respect to

8  retaliating them from speech.  It could not be more clear on

9  that point.  It's not a qualification case.  It's a First

10  Amendment retaliation case.

11      As for Powell, Powell involved and specifically said that

12  immunity was no obstacle because the non-legislators who are

13  enforcing the legislative direction were attached as defendants

14  and could provide relief.  And that's precisely the situation

15  you have here with the clerk.  If you have any concerns about

16  enjoining or issuing an order to the speaker of the house,

17  themself, the clerk is here and available for relief.  That's

18  consistent with Kilbourn as well.

19      The voting -- the right protected in Reynolds v. Sims is

20  absolutely a right to effective representation.  It was decided

21  in the context of redistricting.  But the entire point of what

22  the Reynolds v. Sims and the Baker rule require is that people

23  have roughly proportionate representation in their legislative

24  bodies.  No rule, just because it was a rule, that suspended

25  the members of the ten smallest districts would survive

 1    scrutiny under the Fourteenth Amendment.  I think it's fanciful

 2    to suggest otherwise.

 3         I also remain stunned at the minimization of the core

 4    legislative right here, which is the right to cast a vote, the

 5    right to have your representative cast a vote and participate

 6    in floor debate.  Nobody would say that -- that they're

 7    significant -- a significant portion of the judicial role is

 8    hiring law clerks or serving on the administrative office of

 9    the court committees or going to investiture ceremonies, even

10    though those are incidental and perhaps important and enjoyable

11    aspects of being a judge, the core aspect of being a judge is

12    hearing and deciding cases.  The core aspect of being a

13    legislator or having representation in the state legislature is

14    having your representative vote and having your representative

15    speak on the floor and debate to try to persuade others to

16    vote.  We are absolutely in the heart of the -- of the right

17    here.  And I don't think it saves the unconstitutional nature

18    of this action merely because she can still hire staff or

19    receive a discount on stamps.

20         Monserrate is a case that helps us; it does not help them.

21    Monserrate quite clearly says two points.  One, it was

22    expulsion and so the Fourteenth Amendment problem was

23    necessarily temporary in nature because there was going to be a

24    special election called and the constituents were going to have

25    representation in a matter of weeks.  And of course, the entire

1   problem with the approach that's been taken here is rather than

2   invoke expulsion and ensure that both Representative Libby

3   could run for reelection and not risk repunishment and that the

4   represent -- the people who live in District 90 could obtain

5   representation in relatively short order through a special

6   election, they have invoked this rule by simple majority vote

7   instead of two-thirds majority vote, and now purport to apply

8   it for the rest of the entire legislative term.  And, again,

9   nothing you heard today suggested it wouldn't be invoked and

10  reapplied in the next legislative term.  That is an incredible

11  expansion of the asserted power, and the idea that there's no

12  remedy for it I think is just inconsistent with <u>Kilbourn</u> and --

13          THE COURT:  You're not suggesting, again, that -- that

14  the defendants in this case acted outside the scope of the

15  legislative authority that they've been given?  They followed

16  their own rule.

17          MR. STRAWBRIDGE:  Well, I -- I disagree that -- they

18  invoked the rule; but I disagree that the rule can trump the

19  constitution, I suppose.  Like, it's necessarily outside the

20  scope of their enumerated powers if they're violating the First

21  Amendment or if they're violating the Fourteenth Amendment.  In

22  the same way that it would be outside -- it would be a

23  Fourteenth Amendment violation if they had a rule that said,

24  we're not going to count the votes of the 15 smallest districts

25  that are represented in the Maine House of Representatives.

1    That may well be pursuant to a rule, but it would not be

2    constitutional, and we do not think that they have authority to

3    do that.  We think the Court has authority to address it.

4        There was a brief allusion to the apology that hasn't

5    gotten a lot of play in the argument today, nor should it.  The

6    First Amendment does not allow one to compel speech or to

7    require somebody to adopt a particular point of view.  That is

8    a fixed point in our constitutional constellation, to borrow

9    Justice Jackson's phrase from West Virginia v. Barnette, and so

10   I don't think that can be the answer.

11       And then I -- my closing point here, unless Your Honor has

12   other questions, is that I think my friends on the other side

13   give away the game when having announced their view that all

14   that matters is the character of the act, and all that matters

15   is -- is the fact that it's pursuant to a legislative rule, but

16   racial discrimination would be different.  I think that they

17   say that because they -- they sense that it can't simply be

18   true that you could invoke racial discriminatory basis and it

19   somehow survives scrutiny under the Fourteenth Amendment and

20   notwithstanding the existence of legislative immunity.  What I

21   don't hear, and what I don't think they could provide, is a

22   reasoned principle basis as to why that particular aspect of

23   the Fourteenth Amendment is more important than the First

24   Amendment or why it's more important than the Fourteenth

25   Amendment right to representation in the legislature.

1          This case is a massive extension of any prior attempt to

2     censure somebody.  The closest authority, by far, is <u>Bond</u> and

3     <u>Powell</u>.  And that's why we ask that this Court enter an order

4     preliminarily enjoining at least the clerk from denying her the

5     ability to vote.  We also think we're entitled to a rule

6     allowing her to speak on the floor of the House.

7          Unless Your Honor has other questions, that is our

8     position.

9          THE COURT:  Thank you.  Like I said, this matter has

10    been well-briefed, and I appreciate the parties being very

11    thoughtful in those presentations.  And the Court will take

12    this under advisement.

13         I understand that this is a sensitive issue, that there is

14    high interest in this issue.  I'm going to take all of this

15    material and come back with a -- with a thoughtful decision.

16         If there is anything else from the clerk's position that

17    we need to do, Maggie?

18         THE CLERK:  All set, Judge.  Thank you.

19         THE COURT:  Thank you, folks.

20         MR. STRAWBRIDGE:  Your Honor, can I just raise one

21    other point that was alluded to?  And it's not -- not a

22    rebuttal.  I just wanted to highlight a housekeeping matter as

23    Your Honor decides this.  And we appreciate your attention and

24    your willingness to decide it quickly.

25         There may well be further proceedings in this case, no

1    matter who wins or loses, as I think Your Honor can probably

2    anticipate.  And one of the issues will be addressing a stay or

3    an injunction pending appeal.  I do think that all the other

4    factors for injunctive relief weigh in our favor, but I also

5    assume that the Court's view of the merits will probably

6    dictate what it's going to do with respect to the preliminary

7    injunction.  And we would just appreciate it if the Court can

8    address the question of a stay or injunction pending appeal or

9    arrange for the parties to address that in very short order so

10   there's no further delay in our ability to get a final answer,

11   if necessary.

12       I'd be more than happy to be surprised that no further

13   appellate proceedings are necessary, of course, but I think no

14   matter who wins or loses, it's at least a possibility.

15           THE COURT:  Point taken.  Thank you.

16           MR. STRAWBRIDGE:  Thank you.

17           THE COURT:  And I believe we're adjourned.

18           THE CLERK:  Great.  I will end the meeting.

19           THE COURT:  Thank you.

20               (Time noted:  12:54 p.m.)

21

22

23

24

25

1                                  * * * * *

2                        **C E R T I F I C A T I O N**

3            I, Michelle R. Feliccitti, Registered Professional

4     Reporter and Official Court Reporter for the United States

5     District Court, District of Maine, certify that the foregoing

6     is a correct transcript from the record of proceedings in the

7     above-entitled matter.

8     Dated:  April 8, 2025

9                          /s/ Michelle R. Feliccitti

10                         Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

LAUREL D. LIBBY, State Representative of
Maine House District 90, RONALD P.
LEBEL, WENDY MUNSELL, JASON
LEVESQUE, BERNICE FRASER, RENE
FRASER, and DONALD DUBUC,

   Plaintiffs,

              v.

RYAN M. FECTEAU, in his official capacity
as Speaker of the Maine House of Representa-
tives, and ROBERT B. HUNT, in his official
capacity as Clerk of the House,

   Defendants.

Case No. 1:25-cv-83-MRD

## PLAINTIFFS' <u>EMERGENCY</u> NOTICE OF APPEAL

Plaintiffs Laurel D. Libby, Ronald P. Lebel, Wendy Munsell, Jason Levesque, Bernice Fraser,

Rene Fraser, and Donald Dubuc appeal this Court's order denying Plaintiffs' motion for preliminary

injunction, entered April 18, 2025, ECF No. 39, to the U.S. Court of Appeals for the First Circuit.

Dated: April 18, 2025

Respectfully submitted,

/s/ *Patrick N. Strawbridge*
Patrick N. Strawbridge (Bar No. 10024)
  *Lead Counsel*
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

Taylor A.R. Meehan*
Daniel M. Vitagliano*†
Marie E. Sayer*†
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
mari@consovoymccarthy.com

*Admitted *pro hac vice*

†Supervised by principals of the firm
admitted to practice in VA

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2025, I electronically filed a true and correct copy of Plaintiffs'

reply in support of motion for preliminary injunction through the Court's CM/ECF system, which

will provide service to all parties.

/s/ *Patrick N. Strawbridge*

# U.S. District Court
## District of Maine (Bangor)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00083-MRD

| | |
|---|---|
| LIBBY et al v. FECTEAU et al | Date Filed: 03/11/2025 |
| Assigned to: JUDGE MELISSA R. DUBOSE | Jury Demand: None |
| Referred to: US MAGISTRATE JUDGE PATRICIA A. SULLIVAN | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |
| Case in other court: First Circuit Court of Appeals, 25-01385 | |
| Cause: 42:1983 Civil Rights Act | |

**Plaintiff**

**LAUREL D LIBBY**                     represented by      **DANIEL M. VITAGLIANO**
CONSOVOY MCCARTHY PLLC
1600 WILSON BLVD
SUITE 700
ARLINGTON, VA 22209
703-243-9423
Email: dvitagliano@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
CONSOVOY MCCARTHY PLLC
TEN POST OFFICE SQUARE
8TH FLOOR SOUTH PMB 706
BOSTON, MA 02109
617-227-0548
Email: patrick@consovoymccarthy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
CONSOVOY MCCARTHY PLLC
1600 WILSON BLVD
SUITE 700
ARLINGTON, VA 22209
703-243-9423
Email: taylor@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
CONSOVOY MCCARTHY PLLC
1600 WILSON BLVD
SUITE 700
ARLINGTON, VA 22209
703-243-9423

JA159

Email: mari@consovoymccarthy.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RONALD P LEBEL**                          represented by **DANIEL M. VITAGLIANO**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WENDY MUNSELL**                          represented by **DANIEL M. VITAGLIANO**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JASON LEVESQUE**                          represented by **DANIEL M. VITAGLIANO**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**BERNICE FRASER**                represented by **DANIEL M. VITAGLIANO**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**RENE FRASER**                   represented by **DANIEL M. VITAGLIANO**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA161

**TAYLOR A.R. MEEHAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DONALD DUBUC**                     represented by   **DANIEL M. VITAGLIANO**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TAYLOR A.R. MEEHAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MARIE E. SAYER**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**RYAN M FECTEAU**                   represented by   **JONATHAN R. BOLTON**
*in his official capacity as Speaker of the*          OFFICE OF THE ATTORNEY GENERAL
*Maine House of Representatives*                      STATE HOUSE STATION 6
                                                     AUGUSTA, ME 04333-0006
                                                     207-626-8551
                                                     Email: jonathan.bolton@maine.gov
                                                     *ATTORNEY TO BE NOTICED*

**KIMBERLY L. PATWARDHAN**
OFFICE OF THE ATTORNEY GENERAL
SIX STATE HOUSE STATION
AUGUSTA, ME 04333-0006
(207) 626-8823
Email: kimberly.patwardhan@maine.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

JA162

**ROBERT B HUNT**                         represented by   **JONATHAN R. BOLTON**
*in his official capacity as Clerk of the House*          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **KIMBERLY L. PATWARDHAN**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Movant**

**FOUNDATION FOR INDIVIDUAL**            represented by   **ROBERT JOSEPH MORRIS , II**
**RIGHTS AND EXPRESSION**                                 HOUSER LLP
                                                          400 TRADECENTER DRIVE
                                                          STE 5981
                                                          WOBURN, MA 01801
                                                          339-203-6498
                                                          Email: rmorris@houser-law.com
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 03/11/2025 | 1 | COMPLAINT against RYAN M FECTEAU, ROBERT B HUNT **PAYMENT OF FILING FEE DUE WITHIN 48 HOURS. IF FILING FEE IS BEING PAID WITH A CREDIT CARD COUNSEL ARE INSTRUCTED TO LOGIN TO CMECF AND DOCKET** *Case Opening Filing Fee Paid* **FOUND IN THE** *Complaints and Other Initiating Documents* **CATEGORY. CHECK PAYMENTS DUE WITHIN 48 HOURS.**, filed by RONALD P LEBEL, JASON LEVESQUE, DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, WENDY MUNSELL. (Service of Process Deadline 6/9/2025) Fee due by 3/13/2025.(mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 2 | CIVIL COVER SHEET. (mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 3 | Summons Issued as to ROBERT B HUNT.<br><br>**Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.**<br><br>**Note-If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).**<br><br>(mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 4 | Summons Issued as to RYAN M FECTEAU.<br><br>**Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.**<br><br>**Note-If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).**<br><br>(mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 5 | ORDER OF RECUSAL. By MAGISTRATE JUDGE JOHN C. NIVISON. (mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | 6 | ORDER OF RECUSAL.. By JUDGE JOHN A. WOODCOCK, JR. (mjlt) (Entered: 03/11/2025) |

JA163

| 03/11/2025 | [7](#) | ORDER OF RECUSAL.. By JUDGE LANCE E. WALKER. (mjlt) (Entered: 03/11/2025) |
|---|---|---|
| 03/11/2025 | [8](#) | MOTION for Preliminary Injunction by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER Responses due by 4/1/2025. (Attachments: # [1](#) Affidavit Declaration of Bernice Fraser, # [2](#) Affidavit Declaration of Donald Dubuc, # [3](#) Affidavit Declaration of Ronald Lebel, # [4](#) Affidavit Declaration of Jason Levesque, # [5](#) Affidavit Declaration of Wendy Munsell, # [6](#) Affidavit Declaration of Rene Fraser)(STRAWBRIDGE, PATRICK) (Entered: 03/11/2025) |
| 03/11/2025 | [9](#) | CERTIFICATION for Admission Pro Hac Vice of Taylor A.R. Meehan filed by PATRICK N. STRAWBRIDGE on behalf of All Plaintiffs (Total admission fee $ 200 receipt number AMEDC-3080383.) <span style="color:red">The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a</span> <span style="color:green">PRO HAC VICE</span> <span style="color:red">request in this District via PACER at www.pacer.uscourts.gov</span> (STRAWBRIDGE, PATRICK) (Entered: 03/11/2025) |
| 03/11/2025 | [10](#) | CERTIFICATION for Admission Pro Hac Vice of Daniel M. Vitagliano filed by PATRICK N. STRAWBRIDGE on behalf of All Plaintiffs (Total admission fee $ 200 receipt number AMEDC-3080384.) <span style="color:red">The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a</span> <span style="color:green">PRO HAC VICE</span> <span style="color:red">request in this District via PACER at www.pacer.uscourts.gov</span> (STRAWBRIDGE, PATRICK) (Entered: 03/11/2025) |
| 03/11/2025 | 11 | NOTICE of APPROVAL by Clerk's Office re [9](#) Certification for Admission Pro Hac Vice,, [10](#) Certification for Admission Pro Hac Vice, Attorney TAYLOR A.R. MEEHAN and DANIEL M. VITAGLIANO for all plaintiffs added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Vitagliano and Meehan must register for a PACER account and/or request the appropriate e-filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 3/18/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e-filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 03/11/2025) |
| 03/11/2025 | [12](#) | ORDER OF RECUSAL. By MAGISTRATE JUDGE KAREN FRINK WOLF. (mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | [13](#) | ORDER OF RECUSAL. By JUDGE STACEY D. NEUMANN. (mjlt) (Entered: 03/11/2025) |
| 03/11/2025 | [14](#) | ORDER OF RECUSAL.. By JUDGE NANCY TORRESEN. (mjlt) (Entered: 03/11/2025) |
| 03/12/2025 | [15](#) | ORDER By JUDGE LANCE E. WALKER. (mjlt) (Entered: 03/12/2025) |
| 03/12/2025 | [16](#) | SERVICE Returned EXECUTED filed by RONALD P LEBEL, JASON LEVESQUE, DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, WENDY MUNSELL as to ROBERT B HUNT. (STRAWBRIDGE, PATRICK) (Entered: 03/12/2025) |
| 03/12/2025 | [17](#) | NOTICE of Appearance by KIMBERLY L. PATWARDHAN on behalf of RYAN M FECTEAU, ROBERT B HUNT (PATWARDHAN, KIMBERLY) (Entered: 03/12/2025) |
| 03/12/2025 | [18](#) | SERVICE Returned EXECUTED filed by RONALD P LEBEL, JASON LEVESQUE, DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, WENDY MUNSELL as to RYAN M FECTEAU. (STRAWBRIDGE, PATRICK) (Entered: 03/12/2025) |

| 03/12/2025 | 19 | NOTICE of Appearance by JONATHAN R. BOLTON on behalf of RYAN M FECTEAU, ROBERT B HUNT (BOLTON, JONATHAN) (Entered: 03/12/2025) |
|---|---|---|
| 03/12/2025 | 20 | CONCURRING ORDER By CHIEF U.S. DISTRICT JUDGE JOHN J. MCCONNELL(mjlt) (Entered: 03/12/2025) |
| 03/12/2025 | | Case Assigned to JUDGE MELISSA R. DUBOSE and US MAGISTRATE JUDGE PATRICIA A. SULLIVAN. (mjlt) (Entered: 03/12/2025) |
| 03/12/2025 | | Set Answer Deadline for RYAN M FECTEAU and ROBERT B HUNT; Defendants having been served on March 11, 2025: Answer due by 4/1/2025. (mjlt) (Entered: 03/12/2025) |
| 03/13/2025 | 21 | Consent MOTION for Order *setting briefing schedule*, Consent MOTION for Oral Argument/Hearing re 8 MOTION for Preliminary Injunction by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER Responses due by 4/3/2025. (STRAWBRIDGE, PATRICK) (Entered: 03/13/2025) |
| 03/13/2025 | 22 | CERTIFICATION for Admission Pro Hac Vice of Marie E. Sayer filed by PATRICK N. STRAWBRIDGE on behalf of All Plaintiffs (Total admission fee $ 200 receipt number AMEDC-3081618.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (STRAWBRIDGE, PATRICK) (Entered: 03/13/2025) |
| 03/13/2025 | 23 | NOTICE of APPROVAL by Clerk's Office re 22 Certification for Admission Pro Hac Vice. Attorney MARIE E. SAYER added for DONALD DUBUC, BERNICE FRASER, RENE FRASER, RONALD P LEBEL, JASON LEVESQUE, LAUREL D LIBBY, and WENDY MUNSELL to this specific case only. (jgd) (Entered: 03/13/2025) |
| 03/17/2025 | 24 | NOTICE of Hearing: Telephone Conference set for 3/18/2025 02:30 PM before JUDGE MELISSA R. DUBOSE. The parties have been provided the Court's call-in information. (mjlt) (Entered: 03/17/2025) |
| 03/17/2025 | | Filing Fee Paid via Credit Card ( Filing fee $ 405 receipt number AMEDC-3082728.), filed by RONALD P LEBEL, JASON LEVESQUE, DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, WENDY MUNSELL.(STRAWBRIDGE, PATRICK) (Entered: 03/17/2025) |
| 03/18/2025 | 25 | Minute Entry for proceedings held before JUDGE MELISSA R. DUBOSE: Video Conference of Counsel held. (Court Reporter: Michelle Feliccitti) (mjlt) (Entered: 03/18/2025) |
| 03/18/2025 | 26 | Order re: Consent Motion for Setting Briefing Schedule. Defendant to file a response by April 1, 2025; Plaintiff to file a Reply by April 3, 2025. Matter set for oral argument via Zoom on April 4, 2025 at 12:00 p.m. By JUDGE MELISSA R. DUBOSE. (mjlt) (Entered: 03/18/2025) |
| 03/18/2025 | | Set Deadlines as to 8 MOTION for Preliminary Injunction Pursuant to the Court's Order entered on March 18, 2025: Responses due by 4/1/2025. Reply due by 4/3/2025. (mjlt) (Entered: 03/18/2025) |
| 03/18/2025 | 27 | NOTICE of Hearing on Motion 8 MOTION for Preliminary Injunction : Oral Argument set for 4/4/2025 12:00 PM via Zoom Hearing before JUDGE MELISSA R. DUBOSE. The parties have been provided the Court's call-in information.(mjlt) (Entered: 03/18/2025) |
| 04/01/2025 | 28 | RESPONSE in Opposition re 8 MOTION for Preliminary Injunction filed by RYAN M FECTEAU, ROBERT B HUNT. Reply due by 4/15/2025. (Attachments: # 1 Exhibit 1) (PATWARDHAN, KIMBERLY) (Entered: 04/01/2025) |

JA165

| 04/01/2025 | 29 | AFFIDAVIT of Ryan Fecteau re 28 Response in Opposition to Motion filed by RYAN M FECTEAU, ROBERT B HUNT. (Attachments: # 1 Exhibit A - House Rules, # 2 Exhibit B - Legislative Code of Ethics, # 3 Exhibit C - Letter from Speaker to Libby, # 4 Exhibit D - HR 1)(PATWARDHAN, KIMBERLY) (Entered: 04/01/2025) |
|---|---|---|
| 04/01/2025 | 30 | AFFIDAVIT of Suzanne Gresser filed by RYAN M FECTEAU, ROBERT B HUNT. (Attachments: # 1 Exhibit 1)(PATWARDHAN, KIMBERLY) (Entered: 04/01/2025) |
| 04/01/2025 | 31 | MOTION to Dismiss for Failure to State a Claim , MOTION to Dismiss for Lack of Jurisdiction by RYAN M FECTEAU, ROBERT B HUNT Responses due by 4/22/2025. (PATWARDHAN, KIMBERLY) (Entered: 04/01/2025) |
| 04/02/2025 | | Reset Deadlines as to 8 MOTION for Preliminary Injunction In accordance with the Conference of Counsel held on March 18, 2025: Plaintiffs' Reply due by 4/3/2025. (mjlt) (Entered: 04/02/2025) |
| 04/03/2025 | 32 | NOTICE of Hearing: Conference of Counsel set for 4/4/2025 11:30 AM in VIDEO HEARING before JUDGE MELISSA R. DUBOSE. The parties have been provided the Court's call-in information.(mjlt) (Entered: 04/03/2025) |
| 04/03/2025 | 33 | MOTION for Leave to File *Amicus Curiae Brief* by Foundation for Individual Rights and Expression Responses due by 4/24/2025. (Attachments: # 1 Supplement Proposed Amicus Curiae Brief)(MORRIS, ROBERT) (Entered: 04/03/2025) |
| 04/03/2025 | 34 | REPLY to Response to Motion re 8 MOTION for Preliminary Injunction filed by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER. (Attachments: # 1 Affidavit Declaration of Laurel Libby)(STRAWBRIDGE, PATRICK) (Entered: 04/03/2025) |
| 04/04/2025 | 35 | Minute Entry for proceedings held before JUDGE MELISSA R. DUBOSE: Video Conference of Counsel held. (Court Reporter: Michelle Feliccitti) (mtm) (Entered: 04/04/2025) |
| 04/04/2025 | 36 | Minute Entry for proceedings held before JUDGE MELISSA R. DUBOSE: Video Oral Argument held re 8 MOTION for Preliminary Injunction filed by DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, RONALD P LEBEL, JASON LEVESQUE, WENDY MUNSELL. Order to issue. (Court Reporter: Michelle Feliccitti) (mtm) (Entered: 04/04/2025) |
| 04/08/2025 | 37 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Video Oral Argument held on April 4, 2025 before Judge Melissa R. Dubose. Court Reporter/Transcriber: Michelle Feliccitti, Telephone Number: 2074332114. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.med.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 7/7/2025. (FELICCITTI, MICHELLE) (Entered: 04/08/2025) |
| 04/11/2025 | 38 | NOTICE/CORRESPONDENCE Re: recent and upcoming House floor votes by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER (STRAWBRIDGE, PATRICK) (Entered: 04/11/2025) |
| 04/18/2025 | 39 | MEMORANDUM AND ORDER denying 8 Motion for Preliminary Injunction By JUDGE MELISSA R. DUBOSE. (mtm) (Entered: 04/18/2025) |

JA166

| 04/18/2025 | 40 | Emergency INTERLOCUTORY APPEAL as to 39 Order on Motion for Preliminary Injunction by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER .( Filing fee $ 605 receipt number AMEDC-3098999.)<br><br>**NOTICE TO FILER:** A transcript Report/Order form <u>MUST</u> be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (STRAWBRIDGE, PATRICK) (Entered: 04/18/2025) |
|---|---|---|
| 04/18/2025 | | COPIES of Notice of Appeal Sent to Counsel Re: 40 Interlocutory Appeal filed by DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, RONALD P LEBEL, JASON LEVESQUE, WENDY MUNSELL. (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | 41 | APPEAL COVER SHEET Re: 40 Interlocutory Appeal (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | 42 | CLERK'S CERTIFICATE Re: 40 Interlocutory Appeal, Documents sent to the U.S. Court of Appeals. (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | | Abbreviated Appeal Record Transmitted Electronically to U.S. Court of Appeals re 40 Interlocutory Appeal. (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | 43 | USCA Case Number 25-1385 for 40 Interlocutory Appeal, filed by DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, RONALD P LEBEL, JASON LEVESQUE, WENDY MUNSELL. (jlm) (Entered: 04/18/2025) |
| 04/18/2025 | 44 | Emergency MOTION for Injunction Pending Appeal or, Alternatively, Request for Clarification by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER Responses due by 5/9/2025. (STRAWBRIDGE, PATRICK) (Entered: 04/18/2025) |
| 04/18/2025 | 45 | AMENDED MEMORANDUM AND ORDER re 8 MOTION for Preliminary Injunction filed by DONALD DUBUC, BERNICE FRASER, RENE FRASER, LAUREL D LIBBY, RONALD P LEBEL, JASON LEVESQUE, WENDY MUNSELL By JUDGE MELISSA R. DUBOSE. (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | 46 | CLERK'S FIRST SUPPLEMENTAL CERTIFICATE Re: 40 Interlocutory Appeal, Documents Sent to U.S. Court of Appeals (mtm) (Entered: 04/18/2025) |
| 04/18/2025 | | Supplemental Record on Appeal transmitted to US Court of Appeals re 40 Interlocutory Appeal. (mtm) (Entered: 04/18/2025) |
| 04/21/2025 | 47 | ORDER denying 44 Emergency Motion for Injunction Pending Appeal or, Alternatively, Request for Clarification. The Plaintiffs "Emergency Motion for an Injunction Pending Appeal" is denied for the reasons the court stated in its Memorandum and Order (ECF No. 45 ) denying Plaintiffs Motion for Preliminary Injunction. By JUDGE MELISSA R. DUBOSE. (mtm) (Entered: 04/21/2025) |
| 04/21/2025 | 48 | CLERK'S SECOND SUPPLEMENTAL CERTIFICATE Re: 40 Interlocutory Appeal, Documents Sent to U.S. Court of Appeals (mtm) (Entered: 04/21/2025) |
| 04/22/2025 | 49 | RESPONSE to Motion re 31 MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction by RENE FRASER, DONALD DUBUC, LAUREL D LIBBY, RONALD P LEBEL, WENDY MUNSELL, JASON LEVESQUE, |

| | | BERNICE FRASER. Reply due by 5/6/2025. (STRAWBRIDGE, PATRICK) (Entered: 04/22/2025) |
|---|---|---|
| 04/24/2025 | [50](#) | RESPONSE to Motion re [33](#) MOTION for Leave to File *Amicus Curiae Brief* filed by RYAN M FECTEAU, ROBERT B HUNT. Reply due by 5/8/2025. (PATWARDHAN, KIMBERLY) (Entered: 04/24/2025) |
| 05/06/2025 | [51](#) | REPLY to Response to Motion re [31](#) MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction filed by RYAN M FECTEAU, ROBERT B HUNT. (BOLTON, JONATHAN) (Entered: 05/06/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/07/2025 09:18:51 | | | |
| **PACER Login:** | marisayer | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-00083-MRD |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

JA168