No. 25-1385

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

LAUREL D. LIBBY; RONALD P. LEBEL; WENDY MUNSELL; JASON
LEVESQUE; BERNICE FRASER; RENE FRASER; and DONALD DUBUC,

Plaintiffs-Appellants

v.

RYAN M. FECTEAU, in their official capacity as Speaker of the
Maine House of Representatives; ROBERT B. HUNT, in their official capacity as
Clerk of the House,

Defendants-Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING APPELLANTS AND URGING REVERSAL

_____

HARMEET K. DHILLON
  Assistant Attorney General
  Civil Rights Division

JESUS A. OSETE
  Deputy Assistant Attorney General
  Civil Rights Division

MATTHEW J. DONNELLY
  Attorney
  Department of Justice
  950 Pennsylvania Avenue, NW
  Washington, D.C.  20530
  (202) 514-4609

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................ 1

INTEREST OF THE UNITED STATES ............................................................ 2

STATEMENT OF THE ISSUE ........................................................................... 3

STATEMENT OF THE CASE ............................................................................ 3

SUMMARY OF THE ARGUMENT ................................................................... 6

STANDARD OF REVIEW ................................................................................. 9

ARGUMENT

    A.    Denying District 90's representation in these circumstances violates the Equal Protection Clause's one-person, one-vote guarantee. ....................................................................................... 10

          1.    The Equal Protection Clause applies to representative voting in state legislatures........................................................... 10

          2.    Representative Libby's sanction exceeds historical precedent .................................................................................. 13

    B.    Legislative immunity provides no shield to the flagrant, extraordinary act of stripping District 90's representation................. 15

CONCLUSION ................................................................................................. 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                            **PAGE**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .................................................. 13, 15

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) ............................................................................9, 19

*Bonas v. Town of N. Smithfield*, 265 F.3d 69 (1st Cir. 2001) .......................... 18, 21

*Bond v. Floyd*, 385 U.S. 116 (1966) ......................................................... 1, 8, 14-15

*Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) ................................................ 6-7

*Bush v. Gore*, 531 U.S. 98 (2000) (per curiam)................................................. 11, 14

*Coleman v. Miller*, 307 U.S. 433 (1939) ...............................................................10

*Cushing v. Packard*, 30 F.4th 27 (1st Cir. 2022) (en banc)..................... 9, 16-17, 20

*Evans v. Cornman*, 398 U.S. 419 (1970) ........................................................ *passim*

*Financial Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 590 U.S. 448 (2020)............................................................................. 18, 22

*French v. Senate of State of Cal.*, 146 Cal. 604 (1905) ..........................................14

*Gravel v. United States*, 408 U.S. 606 (1972) .......................................................17

*Gray v. Sanders*, 372 U.S. 368 (1963)..................................................................11

*Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50 (1970)....................11

*Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022) .................................8, 14

*Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979)..............13

*In re Chapman*, 166 U.S. 661 (1897) ....................................................................13

**CASES (continued):**                                                                **PAGE**

*In re Duncan*, 139 U.S. 449 (1891) ...............................................................18

*Kilbourn v. Thompson*, 103 U.S. 168 (1880)..............................................2, 8, 16-17

*Lake Country Ests., Inc.* v. *Tahoe Reg'l Plan. Agency*,
    440 U.S. 391 (1979)..............................................................................16

*Lyman v. Baker*, 954 F.3d 351 (1st Cir. 2020)...................................... 11-12

*Moore v. Ogilvie*, 394 U.S. 814 (1969) ...................................................12

*National Ass'n of Soc. Workers v. Harwood*,
    69 F.3d 622 (1st Cir. 1995)................................................ 17-18, 21

*Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011)...................... 8, 10-11

*OfficeMax, Inc. v. Levesque*, 658 F.3d 94 (1st Cir. 2011) .......................................10

*Pacific States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118 (1912)..............................19

*Powell v. McCormack*, 395 U.S. 486 (1969) ..............................................16

*Raines v. Byrd*, 521 U.S. 811 (1997) ........................................................10

*Reynolds v. Sims*, 377 U.S. 533 (1964)............................................... *passim*

*Rucho v. Common Cause*, 588 U.S. 684 (2019) .......................................12

*Ryan v. United States Immigr. & Customs Enf't*,
    974 F.3d 9 (1st Cir. 2020)................................................................9

*Shaw v. Reno*, 509 U.S. 630 (1993) .................................................. 11-12

*Supreme Ct. of Va. v. Consumers Union of United States, Inc.*,
    446 U.S. 719 (1980)..............................................................................16

*Tenney v. Brandhove*, 341 U.S. 367 (1951)........................................ 16-17

**CASES (continued):**                                                                    **PAGE**

*United States v. Brewster*, 408 U.S. 501 (1972) ................................................ 16-17

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
    121 F.4th 339 (1st Cir. 2024) ..................................................... 9-10

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ................................................... 18

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................ 18

**CONSTITUTION AND STATUTES:**

Americans with Disabilities Act
    42 U.S.C. § 12132 .................................................................................. 20

Rehabilitation Act
    29 U.S.C. § 794 ..................................................................................... 20

Voting Rights Act
    52 U.S.C. § 10301 ................................................................................... 2
    52 U.S.C. § 10308(d) .............................................................................. 2

Me. Const. Art. IV, Pt.1 ...................................................................... 22

H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025) ................................................. 4

**RULE:**

Fed. R. App. P. 29(a)(2) .................................................................. 3

**MISCELLANEOUS:**

2 Joseph Story, *Commentaries on the Constitution of the United States*
    (1833) ................................................................................. 19

*Constitution, Jefferson's Manual, and Rules of the House of
    Representatives* (2025) ................................................................ 7

Mitchell N. Berman, *Managing Gerrymandering*, 83 Tex. L. Rev. (2005) ........... 19

**INTRODUCTION**

The right to vote—and representation in the legislature—form the bedrock for our republican form of government and provide the foundational protection for all fundamental rights and privileges. *See, e.g.*, *Evans v. Cornman*, 398 U.S. 419, 422 (1970). The voters' chosen representative in the legislature, in turn, has "an obligation to take positions on controversial political questions." *Bond v. Floyd*, 385 U.S. 116, 136-137 (1966).

Despite this, the Speaker of the Maine House of Representatives has barred House District 90's elected representative, Maine State Representative Laurel Libby, from *voting* simply because she will not apologize to the level of the Speaker's arbitrary standards for her view on an intensely debated issue—the participation of male athletes in girls' high school sports. Absent a compelled apology, this prohibition has eliminated District 90's voting representation in the Maine lower chamber for the rest of Representative Libby's elected term, which runs through 2026.

While there may be occasions for state legislative bodies to impose sanctions or remove members for conduct at state legislative proceedings, this unique penalty, based on private speech, implicates the Equal Protection Clause's "one-person, one-vote" guarantee of representation in the legislature. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Barring District 90's vote in the Maine House of

- 2 -

Representatives until its chosen representative relents to a forced apology for her political view expressed on her Facebook page is arbitrary and disparate treatment compared to the history and tradition of legislative body sanctions. She has not been expelled, so the district cannot select a new representative, but she cannot vote on their behalf. By sidelining Representative Libby for her views until she recants, the Speaker has determined District 90 deserves *no* representation.

Legislative immunity provides no shield here. Stripping the qualified voters of District 90 of their voice and vote because of their chosen representative's views and her failure to apologize for them is so "extraordinary" that any claim of purported legislative immunity must fail. *See Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880).

The Court should reverse the district court's denial of the plaintiffs' Motion for a Preliminary Injunction.

**INTEREST OF THE UNITED STATES**

This case implicates the Equal Protection Clause's "one-person, one-vote" principle. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). The United States has a substantial interest in ensuring that states do not violate this fundamental right that forms the basis of our republican form of government. *See, e.g.*, *Evans*, 398 U.S. at 422; *see also* Voting Rights Act, 52 U.S.C. §§ 10308(d) and 10301. The

United States respectfully submits this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## STATEMENT OF THE ISSUE

Whether the district court erred in denying a preliminary injunction to reinstate Maine State Representative Laurel Libby's voting power.

## STATEMENT OF THE CASE

1.     Until her recent censure and corresponding lack of a floor vote, Representative Laurel Libby had represented District 90 and its approximately 9000 citizens in the Maine House of Representatives since 2020.  JA3, 114-115.  In February 2025, Representative Libby posted on Facebook about Maine's transgender sports policy and a boy winning the girls' pole-vaulting competition. JA8-10.  Beyond Libby's Facebook post, the boy's victory was a public event and widely accessible in the media and online.  JA10.

Maine House Speaker Ryan Fecteau asked Representative Libby to take down her initial Facebook post, but she refused.  JA13.  Within days of her refusal, on February 25, 2025, the Maine House censured Representative Libby for the social media post through a slim party-line vote of 75 to 70.  JA15.  Despite the event and information already being widely publicized, the censure criticized Libby for posting "a statement criticizing the participation of transgender students in high school sports" and for identifying the student by name and picture without consent "to

- 4 -

advance her political agenda." JA103-104, 8-10, 14-15; H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025). The censure found Representative Libby's conduct "to be reprehensible and in direct violation of [the House's] code of ethics" that requires legislators "be ever mindful of the ordinary citizen who might otherwise be unrepresented" and "endeavor conscientiously to pursue the highest standards of legislative conduct inside and outside of the State House." JA103-104. The censure requires Representative Libby to "accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." JA15, 103-104; Maine H.R. Res. 1.

In stark comparison to the treatment of Representative Libby, Speaker Fecteau, and other house members regularly show minors on their social media without reprisal. JA18-19. During the debate on Libby's censure, other members raised First Amendment concerns and asked whether members who re-posted Representative Libby's post could "expect censures to come forth on them as well." JA17 (citation omitted). Speaker Fecteau specified there would not be "any other censures." JA17 (citation omitted).

After the censure resolution passed, the Speaker demanded Representative Libby's public apology, and she refused. JA17. Speaker Fecteau then found her in violation of Maine House Rule 401(11), which provides that a member "guilty of a breach of any of the rules and orders of the House . . . may not be allowed to vote or

speak . . . until the member has made satisfaction." JA17-18 (first alteration in original). Ever since the Speaker found Libby in violation, her District 90 has had no representative voice or vote on the House floor. JA114, 116. Since the censure, the Clerk of the Maine House has counted no vote for District 90 on the floor and conveyed he will not do so for the rest of Representative Libby's current term running through 2026. *See* JA114, 116. District 90 will have no voice or vote on the House floor for the "hundreds of other bills and amendments that will come before the House during the [rest of the] 132nd Legislature, not the least of which includes a bill about girls' sports." JA116.

2. Several District 90 constituents, including Representative Libby, sued House Speaker Fecteau and House Clerk to restore District 90's vote. JA1-4. The suit alleges violations of the First and Fourteenth Amendments, as well as the Constitution's Guarantee Clause. JA22-27.

On April 18, 2025, the district court denied the plaintiffs' preliminary injunction motion seeking to restore District 90's voice and vote, holding that legislative immunity barred restoration because the punishment was a "legislative act" and not "extraordinary" enough to override immunity. Add.33, 61-62. Beyond declaring immunity applied, the district court did not analyze the merits of the constitutional claims or the other preliminary injunction factors. *Ibid.* The district

court also denied an injunction pending appeal on April 21, 2025. JA167 (Docket entry No. 47).

On April 18, 2025, plaintiffs filed a Notice of Appeal. JA157-158. On April 21, 2025, plaintiffs filed an Emergency Motion for an Injunction Pending Appeal, which a motions panel of this Court denied on April 25, 2025. On May 1, 2025, this Court granted the parties' Motion for an Expedited Briefing Schedule, and subsequently scheduled oral argument for June 5, 2025.

## SUMMARY OF THE ARGUMENT

The District 90 plaintiffs have shown a likelihood of success on the merits of their Equal Protection Clause claim, and legislative immunity does not shield this violation.

A.   Stripping District 90's voting representation in the Maine House of Representatives under these unique, arbitrary, and disparate circumstances violates the Equal Protection Clause's "one-person, one-vote" guarantee that each person's vote should count equally. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). While "[l]egislatures have historically exercised the power to expel their members, as well as to discipline them through the use of censures, reprimands, and fines," there is no historical tradition of legislatures "bar[ring] an elected official from the legislative chamber (whether temporarily or permanently)." *Boquist v. Courtney*, 32 F.4th 764, 782 (9th Cir. 2022). To the contrary, "the prevailing view is that members

- 7 -

of the legislature do not have the power to suspend members and therefore deprive them of the right to vote." *Id.* at 783. The United States House of Representatives itself does not consider itself to have an additional punitive power "to deprive a Member of the right to vote." *Constitution*, *Jefferson's Manual, and Rules of the House of Representatives* § 672 (2025).

As it stands now, based on an extreme and unique censure because of a single Facebook post expressing an opinion on a hotly debated topic, District 90's voters have had their votes disregarded and currently have no vote or voice on the Maine House floor until their chosen representative recants her political view expressed on her personal Facebook page, issues a public apology that is considered sufficient by Speaker Fecteau, or her term expires in 2026.

Completely disregarding a portion of the population's vote for its state representative—as with District 90 here— under these rare circumstances, violates Equal Protection, which requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. *Reynolds*, 377 U.S. at 568. The Equal Protection Clause guarantee reaches beyond District 90 citizens' direct vote for their house representative. It also extends to the district's votes on the Maine House floor—as those votes belong to the people of District 90 not their representative. This is because a "legislator's vote is the commitment of his

- 8 -

apportioned share of the legislature's power to the passage or defeat of a particular proposal." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-126 (2011).

As evidence of the arbitrariness of the decision, Libby, and other representatives "have an *obligation* to take positions on controversial political questions." *Bond v. Floyd*, 385 U.S. 116, 136-137 (1966). Therefore, stripping District 90's voters of their house representation and vote because their chosen representative will not apologize for fulfilling this obligation is well beyond the bounds of an appropriate sanction. *See id.* at 123-125; *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 481 (2022). This Court should accordingly find that plaintiffs are likely to succeed on the merits of their Equal Protection claim.

B. Legislative Immunity provides no shield to the act of stripping District 90 of its representation. First, this Equal Protection violation of stripping District 90 of its voice and vote unless its representative recants her political views is a flagrant act of such "extraordinary character" that any claim of purported legislative immunity must fail. *See Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880). This is because the right to vote and representation form the bedrock for our republican form of government and provide the foundational protection for all fundamental rights and privileges. *See, e.g.*, *Evans v. Cornman*, 398 U.S. 419, 422 (1970). Effectively removing District 90's representative offends "the core principle of republican government . . . that the voters should choose their representatives, not the other way

around." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 824 (2015) (citation omitted).

The district court erred in finding the Equal Protection violation here did not qualify as a flagrant, extraordinary legislative act. It misread this Court's opinion in *Cushing v. Packard*, 30 F.4th 27 (1st Cir. 2022) (en banc), which applied immunity to claims of statutory violations. The district court built on this error by discounting the constitutional violation here as a simple everyday violation rather than a violation of the bedrock constitutional right to vote and representation, which "is protective of all fundamental rights and privileges," *Evans*, 398 U.S. at 422. This Court should accordingly find that legislative immunity does not shield defendants' Equal Protection violations.

## STANDARD OF REVIEW

A preliminary injunction should be issued when the movant has shown: (1) a "likelihood of success on the merits"; (2) irreparable harm; (3) a balance of the "relative hardships" weighs in favor of an injunction; and (4) the public interest weighs in favor of such an injunction. *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (quoting *Ryan v. United States Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020)).

This Court reviews the district court's denial of a preliminary injunction for an abuse of discretion, but legal questions are reviewed de novo. *US Ghost*

*Adventures, LLC*, 121 F.4th at 347; *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 97 (1st Cir. 2011) ("[A]n incorrect finding of law in determining the likelihood of success on the merits is not within the district court's discretion." (citation omitted)).

## ARGUMENT

**A.   Denying District 90's representation in these circumstances violates the Equal Protection Clause's one-person, one-vote guarantee.**

**1.   The Equal Protection Clause applies to representative voting in state legislatures.**

The Equal Protection guarantee extends to District 90's votes on the Maine House floor—as those votes belong to the people of District 90, not Representative Libby individually.  A "legislator's vote is the commitment of his apportioned share of the legislature's power to the passage or defeat of a particular proposal.  The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-126 (2011).  A "legislator casts his vote 'as trustee for his constituents, not as a prerogative of personal power.'" *Id.* at 126 (quoting *Raines v. Byrd*, 521 U.S. 811, 821 (1997)).  Compared to a citizen, whose "voter[] franchise is a personal right," the "procedures for voting in legislative assemblies . . . pertain to legislators not as individuals but as political representatives executing the legislative process." *Ibid.* (alteration in original) (quoting *Coleman v. Miller*, 307 U.S. 433, 469-470 (1939) (opinion of Frankfurter, J.)); *accord Carrigan*, 564 U.S.

at 128 n.5 ("A legislator voting on a bill is . . . performing a governmental act as a representative of his constituent[].") Stripping District 90's voting representation in the Maine House under these circumstances thus violates the Equal Protection Clause's "one-person, one-vote" guarantee that each person's vote should count equally. *See Lyman v. Baker*, 954 F.3d 351, 364-365 (1st Cir. 2020); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Gray v. Sanders*, 372 U.S. 368, 380-381 (1963).

The Equal Protection Clause's one-person, one-vote "precept stands for the 'idea that every voter is equal to every other voter in his State.'" *Lyman*, 954 F.3d at 364 (quoting *Gray*, 372 U.S. at 380); *see also ibid.* (the "Equal Protection Clause safeguards the 'equal weight accorded to each vote and the equal dignity owed to each voter'" (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam))). Equal Protection requires that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Lyman*, 954 F.3d at 364-365 (quoting *Bush*, 531 U.S. at 104-105); *accord Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54-55 (1970) (The "crucial consideration is the right of each qualified voter to participate on an equal footing in the election process.").

A state can violate the one-person, one-vote guarantee "by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555; *accord Shaw v. Reno*,

509 U.S. 630, 640 (1993); *Lyman*, 954 F.3d at 365. "Along these lines, one's right to vote is impaired to an unconstitutional degree when the weight of one's vote is substantially diluted in comparison with the votes of citizens living elsewhere in the state." *Lyman*, 954 F.3d at 365 (citing *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) ("The idea that one group can be granted greater voting strength than another is hostile to the one [person], one vote basis of our representative government.")).

A State thus violates Equal Protection through vote dilution or—as here—by completely disregarding a portion of the population's vote for its state representative. The "Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living on other parts of the State." *Reynolds*, 377 U.S. at 568. The one-person, one-vote guarantee accordingly requires that "each representative must be accountable to (approximately) the same number of constituents." *Rucho v. Common Cause*, 588 U.S. 684, 709 (2019). "Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race." *Reynolds*, 377 U.S. at 566. Currently District 90 has no vote or voice on the Maine House floor until its' chosen representative recants her political view or her term expires in 2026.

Compared to voters in all the other districts across the State, District 90's voters for its state house representation have had their votes disregarded.

### 2. Representative Libby's sanction exceeds historical precedent

As it is established that Representative Libby's censure has eliminated her and her constituents' voting rights in the Maine House of Representatives, it must be determined whether that censure violates the constitution and under what standard. The right to vote "is of the most fundamental significance under our constitutional structure." *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). That said, the right is not absolute, and legislatures have an important interest in upholding their reputation and integrity. *See, e.g.*, *In re Chapman*, 166 U.S. 661, 668 (1897) (recognizing that Congress "necessarily possesses the inherent power of self-protection"). The Supreme Court has articulated that when state legislatures censure or expel their members, or make rules that impact the voting rights of their constituents, courts must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," considering "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

- 14 -

While it is accepted that legislatures have the power to expel members, or even effectively silence them as has happened to Libby, *see e.g.*, *French v. Senate of State of Cal.*, 146 Cal. 604, 606 (1905), this is a limited power and must be weighed against the Constitutional burdens imposed on the voters in the state. Expulsion, or mandated silence without expulsion as has happened here, is an extreme sanction as traditionally, and historically, legislative bodies have resorted to verbal censures of their member. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 475 (2022). There is no equivalent historical precedent for depriving members their voting rights as defendants have done here.

Indeed, the Supreme Court has overturned a similar action by a state legislature under nearly identical circumstances. *See Bond*, 385 U.S. at 136-137. After Julian Bond was elected to the Georgia House, he made a number of public statements about the Vietnam War. *Id.* at 119-122. Before Bond was seated, the Georgia House prohibited Bond from taking the oath and serving as his district's representative. *Id.* at 125. The Supreme Court held that disqualifying Bond from the Georgia House was impermissible as a burden on his Constitutional rights, in that case his First Amendment right of free expression. *Id.* at 137.

Here, stripping District 90's voters of their house representation and vote because their chosen representative will not apologize for fulfilling her "obligation to take positions on [a] controversial political question[]" impermissibly

disenfranchises District 90's voters and is similarly unconstitutional.  *See Bond*, 385 U.S. at 136; *Wilson*, 595 U.S. at 481 ("The legislature's action in *Bond* implicated not only the speech of an elected official, it also implicated the franchise of his constituents.").

This action is all the more egregious because the Supreme Court has found that, as the voters' trustee, representatives like Libby "have an *obligation* to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them." *Bond*, 385 U.S. at 136-137 (emphasis added).

The balancing test required by *Celebrezze* simply cannot be maintained under these unique circumstances.  The extreme censure of removing the voting rights of an entire district of Maine because of a single Facebook post expressing an opinion on a hotly debated topic, until their chosen representative recants her political view and apologizes is ahistorical, excessive and violates the Equal Protection Clause's "one-person, one-vote" guarantee of representation in the legislature.

**B.    Legislative immunity provides no shield to the flagrant, extraordinary act of stripping District 90's representation.**

Stripping District 90 of its vote in the state house until its chosen representative relents to a forced apology for her political view is a flagrant act of such "extraordinary character" that any claim of purported legislative immunity

must fail. *See Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880). As explained below, the right to vote and representation form the bedrock for our republican form of government and provide the foundational protection for all fundamental rights and privileges; legislative immunity does not apply to the extraordinary act of denying Maine District 90 voters this foundational right.

The common-law doctrine of "legislative immunity is an analogue to the Speech and Debate Clause of the federal Constitution that reflects the importance that Anglo-American law traditionally has placed on protecting 'legislators acting within their traditional sphere' from being subject to suit." *Cushing v. Packard*, 30 F.4th 27, 36 (1st Cir. 2022) (en banc) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)); *see also Supreme Ct. of Va. v. Consumers Union of United States, Inc.*, 446 U.S. 719, 732 (1980). The "reason to keep government officials 'immune from deterrents to the uninhibited discharge of their legislative dut[ies is] not for their private indulgence but for the public good.'" *Cushing*, 30 F.4th at 36 (alteration in original) (quoting *Lake Country Ests., Inc.* v. *Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 405 (1979)).

Legislative immunity, however, has limits. *Powell v. McCormack*, 395 U.S. 486, 503 (1969) ("Legislative immunity does not, of course, bar all judicial review of legislative acts."). It "does not extend beyond what is necessary to preserve the integrity of the legislative process." *United States v. Brewster*, 408 U.S. 501, 517

(1972), and thus "protects 'only purely legislative activities.'" *National Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 630 (1st Cir. 1995) (quoting *Brewster*, 408 U.S. at 512). The immunity "does not attach to the activities that are merely 'casually or incidentally related to legislative affairs.'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528).

Even for pure legislative acts, the Supreme Court has found that immunity does not shield such acts of "an extraordinary character." *Kilbourn*, 103 U.S. at 204; *see also Gravel v. United States*, 408 U.S. 606, 619 (1972); *Tenney*, 341 U.S. at 378-379. The First Circuit similarly explained that "there may be some conduct, even within the legislative sphere, that is so flagrantly violative of fundamental constitutional protections that traditional notions of legislative immunity would not deter judicial intervention." *Harwood*, 69 F.3d at 634; *accord Cushing*, 30 F.4th at 50.

The Supreme Court, while yet to rule an act sufficiently extraordinary, has given the examples of a legislature that "imitate[d] the Long Parliament in the execution of the Chief Magistrate of the nation, or to follow[ed] the example of the French Assembly in assuming the function of a court for capital punishment." *Kilbourn*, 103 U.S. at 204-205. More relevant here, the First Circuit similarly has given examples of possibly "extraordinary" legislative acts where a legislature

"votes to allow access to its chambers to members of only one race or to adherents of only one religion." *Harwood*, 69 F.3d at 634.

Here, barring Representative Libby from voting in the legislature on behalf of her District 90 constituents absent a forced apology more than qualifies as a sufficiently extraordinary circumstance that "flagrantly violat[es] fundamental constitutional protections." *Harwood*, 69 F.3d at 634. The bedrock "right to vote, as the citizen's link to his laws and government, is protective of all fundamental rights and privileges." *Evans v. Cornman*, 398 U.S. 419, 422 (1970) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (describing right to vote as "fundamental political right"); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)). The "right to vote [is] the wellspring of all rights in a democracy." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001).

Stripping District 90 of its voice and vote conflicts with the "distinguishing feature" of our "republican form of government," which the Supreme Court has consistently recognized as "the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *Financial Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 590 U.S. 448, 490 (2020) (Sotomayor, J., concurring) (quoting *In re Duncan*, 139 U.S. 449, 461 (1891) (discussing the republican governments of

the States)); *accord Pacific States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118, 149 (1912).

Letting the Maine House disregard District 90's representative and vote also offends "the core principle of republican government . . . that the voters should choose their representatives, not the other way around." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 824 (2015) (quoting Mitchell N. Berman, *Managing Gerrymandering*, 83 Tex. L. Rev. 781 (2005)).

The Maine House has effectively removed District 90 voters' choice of representative. "When a representative is withdrawn from his seat," according to early Supreme Court Justice Story, "the people, whom he represents, lose their voice in debate and vote . . . "[t]he enormous disparity of the evil admits of no comparison." 2 Joseph Story, *Commentaries on the Constitution of the United States*§ 857 (1833) (writing about the constitutional protection concerning the arrest of congressional members during their attendance of legislative sessions). That the Maine House silenced the District 90 voters' choice of representative by a slim party-line vote just adds to the flagrancy of the act.

Despite all the above, the district court found the stripping of District 90's vote failed to qualify as a legislative act of "extraordinary character." Add.49-61. The court pointed to this Court's en banc decision in *Cushing*, which found legislative immunity shielded a New Hampshire House rule from statutory claims

challenging in-person voting during the COVID-19 pandemic. *See* Add.49-52, 55. The district court, however, misread *Cushing* as dealing with "Fourteenth Amendment" violations. Add.51. This Court's *Cushing* decision dealt only with legislative immunity against claimed statutory violations of the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794. *See* 30 F.4th at 30-31 (noting review limited to preliminary injunction for statutory claims); *see also id.* at 50 (noting that the "extraordinary character" argument was "barely developed in the District Court or before the panel"). The words "equal protection" appear nowhere in this Court's *Cushing* opinion.

Denying the fundamental constitutional equal protection right to vote and representation, as explained above, is flagrantly more severe than denying the statutory rights at issue in *Cushing*. The *Cushing* case is also not on point because the dispute concerned a general house procedural rule applying to, and affecting, multiple members of the legislature. Speaker Fecteau has singled out Representative Libby for an individual censure and loss of vote, and he has done so because she refuses to recant her political view on the hotly intensely debated issue of male athletes participating in girls' high school sports.

The district court built on its misreading of *Cushing* by pointing to case law counseling that a plaintiff cannot circumvent immunity "simply" by alleging "a claim for a constitutional violation." Add.53. This ignores again that the District 90

- 21 -

plaintiffs here have not simply asserted just any constitutional right, but the bedrock constitutional right to vote and representation, which "is protective of all fundamental rights and privileges," *Evans*, 398 U.S. at 422, and "the wellspring of all rights in a democracy," *Bonas*, 265 F.3d at 74.

Denying the right to vote by singling out a single district for lack of representation because of its chosen representative's political views is precisely the type of "flagrant[] violat[ion] of fundamental constitutional protections" that this Court found should override any attempted immunity shield in *Harwood*. *See* 69 F.3d at 634; *see also ibid.* (indicating excluding all members of a race or religion could be flagrant violation); *cf. Reynolds*, 377 U.S. at 566 (finding discounting "votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race").

Last, the district court downplayed District 90's loss of vote and voice on the house floor because the "sanction does not render [Representative Libby] unable to represent her constituents or speak in favor of or in opposition to policies and legislation in all ways." Add.60-61. Representative Libby can still have staff, still gets paid, and can, among similar things, "[l]obby other members," "[p]articipate in legislative caucus meetings," "[t]estify at public hearings about any pending

legislation," and "[b]e present on the House floor during debates and votes." Add.61.

But this cuts District 90's representative down to little more than a glorified lobbyist.  Voting is the primary function that makes District 90's representative a legislator, who "the people to choose" to "pass their own laws in virtue of the legislative power reposed in representative bodies." *Financial Oversight & Mgmt. Bd. for P.R.*, 590 U.S. at 490 (Sotomayor, J., concurring).  Moreover, the Maine House's leaving Representative Libby in this lobbyist representative capacity rather than officially removing her for her political views makes the disenfranchisement even worse.  Absent removal, District 90 cannot even hold a special election to restore its vote in the house.  *See* Me. Const. Art. IV, Pt.1, § 6 & Pt. 3, § 4.

Legislative immunity accordingly fails to shield the flagrant, extraordinary act of stripping the voters of District 90 of their chosen representative and house vote until their representative apologizes for her political views or her term expires in 2026.

- 23 -

## CONCLUSION

The district court's denial of the preliminary injunction should be reversed.

Respectfully submitted,

HARMEET K. DHILLON
   Assistant Attorney General
   Civil Rights Division

JESUS A. OSETE
   Deputy Assistant Attorney General
   Civil Rights Division

s/ Matthew J. Donnelly  -
MATTHEW J. DONNELLY
   Attorney
   Department of Justice
   950 Pennsylvania Avenue, NW
   Washington, D.C.  20530
   (202) 514-4609

## CERTIFICATE OF COMPLIANCE

I certify that the attached BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING APPELLANT AND URGING REVERSAL:

(1) complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 5076 words.

(2) This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

/s/ Matthew J. Donnelly
MATTHEW J. DONNELLY
 Attorney


Dated:  May 16, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.   Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system on the following persons:

Taylor A.R. Meehan
Daniel M. Vitagliano
Marie E. Sayer
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA  22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
mari@consovoymccarthy.com

Patrick N. Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA  02109
(703) 243-9423
patrick@consovoymccarthy.com

Counsel for Plaintiffs-Appellants

Kimberyl L. Patwardhan
Jonathan R. Bolton
Office of the Maine Attorney General
6 State House Station
Augusta, ME  04333
(207) 626-8800
kimberly.patwardhan@maine.gov
jonathan.bolton@maine.gov

Counsel for Defendants-Appellees

/s/ Matthew J. Donnelly
MATTHEW J. DONNELLY