**No. 25-1385**

*In the*

# UNITED STATES COURT OF APPEALS
*for the*
# FIRST CIRCUIT

LAUREL D. LIBBY; RONALD P. LEBEL; WENDY MUNSELL; JASON LEVESQUE; BERNICE FRASER; RENE FRASER; DONALD DUBUC,

*Plaintiffs-Appellants,*

v.

RYAN M. FECTEAU, IN THEIR OFFICIAL CAPACITY AS SPEAKER OF THE MAINE HOUSE OF REPRESENTATIVES; ROBERT B. HUNT, IN THEIR OFFICIAL CAPACITY AS CLERK OF THE HOUSE,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Maine*
*No. 1:25-cv-00083-MRD*
*The Honorable Melissa R. DuBose*

**BRIEF OF THE FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

MARC J. RANDAZZA
JAY M. WOLMAN
RONALD D. GREEN
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: 888-887-1776
ecf@randazza.com
Attorneys for *Amicus Curiae*

# DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Foundation for Individual Rights and Expression ("FIRE"), by and through its undersigned counsel, hereby certifies that it is a nonprofit organization. It has no parent corporations, and no publicly held corporation owns 10% or more of its stock.

- i -

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................................... I

INTEREST OF AMICUS CURIAE ...........................................................1

ARGUMENT ...........................................................................................2

   I.   PHOTOGRAPHS ARE ENTITLED TO FIRST AMENDMENT PROTECTIONS AND SERVE ESSENTIAL COMMUNICATIVE PURPOSES. ......................................................4

   II.  THE FIRST AMENDMENT'S PROTECTION OF SPEECH—INCLUDING PHOTOGRAPHS—DOES NOT CHANGE EVEN IF SOME DEEM IT OFFENSIVE............12

   III.   LEAVING REPRESENTATIVE LIBBY WITHOUT A REMEDY FOR VIEWPOINT-BASED RETALIATION AGAINST HER PROTECTED SPEECH BETRAYS THE PROMISE OF THE FIRST AMENDMENT. ................................................................17

CONCLUSION ......................................................................................21

CERTIFICATE OF COMPLIANCE ..................................................22

CERTIFICATE OF SERVICE..............................................................23

## TABLE OF AUTHORITIES

**CASES**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ..............................................................................6, 19

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ...................................................................................16

*Berge v. School Committee of Gloucester,*
  107 F.4th 33 (1st Cir. 2024) ..............................................................7, 8, 16

*Blue Rio LLC v. Thomas*,
  No. 17 CV 2015 (VB), 2017 WL 4863091 (S.D.N.Y. Oct. 26, 2017)................19

*Bond v. Floyd*,
  385 U.S. 116 (1966) ..........................................................................3, 17, 19

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975) ..............................................................................16, 17

*Daury v. Smith*,
  842 F.2d 9 (1st Cir. 1988) ..........................................................................16

*Fla. Star v. B.J.F.*,
  491 U.S. 524 (1989) ...................................................................................16

*Gericke v. Begin*,
  753 F.3d 1 (1st Cir. 2014) ..............................................................................8

*Gertz v. Robert Welch, Inc.*
  418 U.S. 323 (1974) ...................................................................................14

*Grosjean v. Am. Press Co.*,
  297 U.S. 233 (1936) ...................................................................................16

*Hartman v. Moore*,
  547 U.S. 250 (2006) ...................................................................................13

*Hogarth v. Brinson Bell*,
  Case No. 5:24-cv-00481 (E.D.N.C.) ...............................................................7

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) ...................................................................2, 3, 17, 18

*Hurley v. Irish–American Gay, Lesbian and Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ................................................................................13

*Hustler Magazine, Inc. v. Falwell*,
485 U. S. 46 (1988) ................................................................................18

*Iancu v. Brunetti*,
588 U.S. 388 (2019) ................................................................................13

*Jean v. Mass. State Police*,
492 F.3d 24 (1st Cir. 2007) ....................................................................16

*Leuthy v. LePage*,
No. 1:17-cv-00296-JAW, 2018 U.S. Dist. LEXIS 146894
(D. Me. Aug. 29, 2018) .............................................................................6

*Marshall v. Amuso*,
571 F. Supp. 3d 412 (E.D. Pa. 2021) .....................................................14

*Matal v. Tam*,
582 U.S. 218 (2017) ................................................................................14

*Mattei v. Dunbar*,
217 F. Supp. 3d 367 (D. Mass. 2016) ....................................................13

*Mazur v. Szporer*,
No. 03-00042 (HHK), 2004 U.S. Dist. LEXIS 13176 (D.D.C. June 1, 2004).....19

*McBreairty v. Brewer Sch. Dep't*,
No. 1:24-cv-00053-LEW, 2025 U.S. Dist. LEXIS 85847
(D. Me. May 6, 2025)..............................................................................16

*McCullen v. Coakley*,
573 U.S. 464 (2014) ................................................................................14

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ..................................................................................5

*Mia. Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)................................................................................16

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ......................................................................16

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971) ......................................................................16

*Near v. Minnesota ex rel. Olson*,
   283 U.S. 697 (1931) ......................................................................16

*Neb. Press Ass'n v. Stuart*,
   427 U.S. 539 (1976) ......................................................................16

*Nevada Comm'n on Ethics v. Carrigan,*
   564 U.S. 117 (2011) ......................................................................19

*Novoa v. Diaz*,
   No. 22-13994 (11th Cir. argued June 14, 2024) ....................................1

*Okla. Publ'g Co. v. Dist. Ct. in & for Okla. Cnty.*,
   430 U.S. 308 (1977) ......................................................................16

*Org. for a Better Austin v. Keefe*,
   402 U.S. 415 (1971) ......................................................................16

*Pernell v. Bd. of Governors of the State Univ. Sys.*,
   641 F. Supp. 3d 1218 (N.D. Fla. 2022) ..............................................1

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992) ......................................................................14

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ......................................................................14

*Rideout v. Gardner,*
   838 F.3d 65 (1st Cir. 2016) ..........................................................6, 7

*Boos v. Barry*,
   485 U.S. 312 (1988) ......................................................................18

*Signs for Jesus v. Town of Pembroke*,
   977 F.3d 93 (1st Cir. 2020) ............................................................14

*Smith v. Daily Mail Publ'g Co.*,
　443 U.S. 97 (1979) ..................................................................................16, 17

*Snyder v. Phelps*,
　562 U.S. 443 (2011) ........................................................................................12

*Terminiello v. City of Chicago*,
　337 U.S. 1 (1949) ............................................................................................13

*Texas v. Johnson,*
　491 U.S. 397 (1989) ........................................................................................13

*Thomas v. Collins*,
　323 U.S. 516 (1945) ..........................................................................................3

*Trump v. Selzer*,
　No. 4:24-cv-449 (S.D. Iowa filed Dec. 17, 2024)..............................................1

*Volokh v. James*,
　656 F. Supp. 3d 431 (S.D.N.Y. 2023) ................................................................1

*Volokh v. James,*
　No. 23-356 (2d Cir. argued Feb. 16, 2024).........................................................1

*Whiddon v. Buzzfeed, Inc.*,
　638 F. Supp. 3d 342 (S.D.N.Y. 2022)................................................................7

## OTHER AUTHORITIES

Adam McCauley, *The Story Behind the Iconic Photograph from Sandy Hook*,
　TIME (Dec. 20, 2012) ......................................................................................11

Ronald K.L. Collins, Tragedy on Trial: the Story of the Infamous Emmett Till
　Murder Trial (2024) ..........................................................................................9

*Doudera Welcomes State Champions to State House*, Maine House Democrats
　(Apr. 8, 2022)..................................................................................................15

Elizabeth Dias, *Faces of Protest for Trayvon Martin*, TIME (April 16, 2012) ......11

Erin Blakemore, *The Story Behind the Famous Little Rock Nine "Scream Image"*
　History (Apr. 1, 2025)........................................................................................9

Nathan Fournier, *Greely Sweeps Class B Indoor Track and Field Titles*, PORTLAND PRESS HERALD (Feb. 17, 2025) ...........................................................................15

Oscar Holland, *'Napalm Girl' at 50: The story of the Vietnam War's defining photo*, CNN (June 9, 2022) ...................................................................................10

Sandy Hook Promise, *Emma's Story*, YouTube (Sep. 20, 2021)............................11

Sandy Hook Promise, *Teenage Dream*, YouTube (Sep. 13, 2021) ........................11

*Sundance Documentary Disputes Who Took 'Napalm Girl' Photo in Vietnam*, Associated Press (Jan. 27, 2025).........................................................................10

## CONSTITUTIONAL PROVISIONS

Me. Const. art. IV .....................................................................................................2

Me. Const. art. X ......................................................................................................2

## INTEREST OF AMICUS CURIAE[1]

The Foundation for Individual Rights and Expression ("FIRE") is a nonpartisan nonprofit that defends the individual rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended individual rights through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate expressive rights under the First Amendment. In June 2022, FIRE expanded its public advocacy beyond the university setting and now defends First Amendment rights both on campus and in society at large. FIRE seeks to vindicate First Amendment rights without regard to the speakers' political views. *See, e.g.*, *Trump v. Selzer*, No. 4:24-cv-449 (S.D. Iowa filed Dec. 17, 2024); *Volokh v. James*, 656 F. Supp. 3d 431 (S.D.N.Y. 2023), *appeal pending*, No. 23-356 (2d Cir. argued Feb. 16, 2024); *Novoa v. Diaz*, No. 22-13994 (11th Cir. argued June 14, 2024), *appealing sub nom. Pernell v. Bd. of Governors of the State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022).

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amicus*, its members, or its counsel contributed money intended to fund preparing or submitting this brief. Defendants-Appellees take no position on the filing of this brief. Plaintiffs-Appellants consent to the filing of this brief.

- 1 -

## **ARGUMENT**

With a slim majority, members of the majority party in the Maine House of Representatives censured a member of the minority by stripping her right to vote and to speak on the floor, all because they disagree with her speech outside the chamber on a widely debated public issue. Not only is the punishment for protected speech an end-run around the super-majoritarian provisions of the Maine Constitution,[2] it is an egregious violation of the First Amendment. Yet the district court held the House majority's viewpoint-based action, despite its affront to free speech, is unreviewable under legislative immunity, because the censured member somehow is "not … disqualified, excluded, or expelled from her elected seat." Add.56-57. This conclusion, which leaves the member without a remedy, does not just ignore the censure's practical effect—it conflicts with the Supreme Court's view that a legislative body's censure of a member that works to "prevent [her] from doing [her] job" or to "deny … a privilege of office" is an adverse action against their constitutional interest. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 479 (2022).

The House majority punished Representative Laurel Libby for sharing images of a transgender student athlete while criticizing the participation of transgender athletes in women's sports—core political speech about important matters of public

---

[2] *See e.g.,* Me. Const. art. IV, § 2 (veto override), § 4 (expulsion), § 16 (emergency legislation); *id.* art. X, § 4 (constitutional amendment).

concern. The Constitution fully protects sharing politically salient images, even if Rep. Libby's colleagues on the other side of the aisle dislike her sharing them to challenge their political position. The use of images to make political points follows a venerable American tradition that includes anti-war and civil rights advocates who used evocative images to change public opinion. There is no question that the House majority targeted Rep. Libby because of her viewpoint. Had she shared a post praising rather than criticizing participation in the event, the House majority would not have censored her. This viewpoint-based disparity is stark and constitutionally repugnant.

Perhaps even more troubling is the House Majority's retaliation "implicated not only the speech of an elected official, [but] also the franchise of [her] constituents." *Wilson*, 595 U.S. at 481 (discussing *Bond v. Floyd*, 385 U.S. 116, 123-25 (1966)). Penalizing a lawmaker's protected speech in a manner that disenfranchises her constituents is unconstitutional and un-American. If fellow legislators dislike her speech, the First Amendment compliant solution is "countervailing speech from [her] colleagues," which safeguards "free speech on both sides and for every faction on any side." *Id*. at 477 (quoting *Thomas v. Collins*, 323 U.S. 516, 547 (1945) (Jackson, J., concurring)) (internal quotation marks and edit omitted). Silencing and disenfranchisement are not Constitutional solutions.

But the district court's decision allows just that—and even worse, it deprives Rep. Libby of any meaningful remedy to correct the House majority's ongoing First Amendment violation. What the majority did to Rep. Libby they can do to every member of the minority, censoring and excluding members based on speech that enjoys fundamental First Amendment protection. Does the District Court judge truly believe that if the majority of a state legislature wants to simply exclude the entire minority from speaking or voting because they disagree with the majority, that this has no remedy other than the citizens voting for a new majority in the next election? Right next door in New Hampshire, Republicans are in the majority. If this Court affirms the District Court's decision, what will stop New Hampshire from simply excluding the entire Democrat caucus from both houses? The fear of an election in a few years? Libby's punishment and the threat it highlights are an affront to liberty and to the people of the State of Maine, no matter which party is in power. And there must be a remedy for it.

*Amicus* FIRE urges this Court to reverse the district court and require entry of a preliminary injunction on Plaintiffs' motion.

## I. Photographs Are Entitled to First Amendment Protections and Serve Essential Communicative Purposes.

The House majority punished Rep. Libby for her protected speech on a matter of public concern, a result the Constitution forbids. As set forth in the preambulatory clauses to the censure resolution, Rep. Libby (a) posted the photographs of a

- 4 -

transgender high school championship athlete to social media; (b) identified that student-athlete as transgender; and (c) made a political statement criticizing the participation of transgender students in female sports. JA103. For doing so, the legislature censured Rep. Libby and barred her from voting and speaking on the House floor until and unless she removed the photographs and apologized for posting them. JA 2; JA103-04; JA114.



The First Amendment unquestionably protects Rep. Libby's post. There is "practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs" and "public issues." *McIntyre*

*v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (citations and quotations marks omitted). "The right to disseminate such 'core political speech' on one's social media account is 'an area highly protected by the First Amendment.'" *Leuthy v. LePage*, No. 1:17-cv-00296-JAW, 2018 U.S. Dist. LEXIS 146894, at *41 (D. Me. Aug. 29, 2018) (quoting *Rideout v. Gardner,* 838 F.3d 65, 75 (1st Cir. 2016)).

Photographs, as a medium of expression, fall squarely within the ambit of the First Amendment's protections. "[A]ll manner of speech–from 'pictures, films, paintings, drawings, and engravings'… qualify for the First Amendment's protections." *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (citation omitted). Photographs convey messages with clarity, seriousness, and emotional depth that words alone often cannot achieve. They serve as context and justification for a speaker's view. In doing so, they offer insight where words alone are inadequate. A familiar adage puts it best: A picture is "worth a thousand words." *Rideout*, 838 F.3d at 76.

This Court's decision in *Rideout* highlights the important value of photos used to "engage[] in core political speech*." Id.* at 75. Because images capture moments and convey emotions, they have "a special communicative value." *Id.* In *Rideout,* that value took the form of a voter's special ability to communicate frustration at the slate of candidates by posting a ballot filled with his dog's name. *Id.* at 70. By sharing the photo, the plaintiff eliminated potential doubts about the seriousness of his

protest—doubts that would remain if he'd simply said, "I'd rather vote for my dog than these candidates."[3]

As the ballot selfie at issue in *Rideout* demonstrates, pictures provide essential context for a speaker's message—without it, listeners may misunderstand the speech. *See Whiddon v. Buzzfeed, Inc.*, 638 F. Supp. 3d 342, 352 (S.D.N.Y. Oct. 31, 2022) (noting that the use of photos alongside text "enhance[d] the ability of the reader to understand the text" and "allow[ed] the reader to form an opinion") (citation omitted). Visual media provide concrete and tangible evidence that allows an audience to trust a speaker's editorialization and to form their own opinion based on the raw image, rather than taking the speaker's word for it. *Id.* A speaker may hyperbolize, lie, or obscure via their speech, but the photo provides a concrete check that allows a speaker to quickly establish credibility. In *Berge v. School Committee of Gloucester*, this Court vindicated a citizen's First Amendment right to publish a video of government officials comporting themselves irrationally. 107 F.4th 33 (1st Cir. 2024). When Mr. Berge posted a video of their tantrums, the officials

---

[3]   For these reasons, *amicus* FIRE is representing Susan Hogarth in a challenge to North Carolina's prohibition on ballot selfies after she received a letter from the State Board of Elections demanding that she take down her photo from X. *See Hogarth v. Brinson Bell*, Case No. 5:24-cv-00481 (E.D.N.C.). In Hogarth's case, she took a ballot selfie in order to show pride in supporting her preferred candidates and to increase awareness of the third-party candidates she supports (among other reasons). *Id.* Verified Complaint ¶ 9, *Hogarth*, No. 5:24-cv-00481, ECF No. 1.

unconstitutionally threatened criminal sanctions against him. *Id.* at 36–37. However, a mere description of their conduct would not have led to the same public scrutiny.

Photographs and videos also communicate the gravity of a situation to an audience in uniquely powerful ways. This is precisely the reason that pictures and videos of police interactions have proliferated and become increasingly critical parts of accountability campaigns. Cases upholding the right to photograph and record public police encounters have highlighted that recordings assist public discourse. *See, e.g., Gericke v. Begin,* 753 F.3d 1, 7 (1st Cir. 2014); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011); *Berge*, 107 F.4th at 36–37. Using words to describe an officer's use of excessive force can be ineffective relative to an image or video showing the violation.

Images shape narratives, cast a spotlight on injustice, and fuel movements. The publication of powerful pictures has started and galvanized nationwide anti-war protests, civil rights advancements, and political movements of all stripes. And like Rep. Libby's post, many of these iconic images featured minors.[4] Take, for instance, the Little Rock Nine. A famous picture shows fifteen-year-old black high school student Elizabeth Eckford walking through a mob of white protesters in an initially

---

[4] To be sure, it is natural for adults to try to protect minors from widespread attention and scrutiny, and thus it is common practice for journalists to impose an additional obligation not to identify minors in their reporting on issues of public concern. However, such practices are wholly voluntary, not mandated by law.

failed effort to attend school. The image spread across the nation and became one of

the most famous images of the Civil Rights Movement.[5] Words alone fully capture

neither the resolve on Eckford's face, nor the mob's vitriol.



Another iconic controversial image featuring a minor is "The Terror of War,"

commonly known as "Napalm Girl," which shows a 9-year-old Vietnamese girl

---

[5] Erin Blakemore, *The Story Behind the Famous Little Rock Nine "Scream Image"* History (Apr. 1, 2025), https://www.history.com/news/the-story-behind-the-famous-little-rock-nine-scream-image; *see also* Ronald K.L. Collins, Tragedy on Trial: the Story of the Infamous Emmett Till Murder Trial (2024).

fleeing naked from a deadly napalm attack. More than 20 leading U.S. newspapers featured the image on their front page and won its photographer, Nick Ut, the Pulitzer Prize.[6] The image so effectively captured the horrors of war and galvanized the anti-war movement that President Richard Nixon accused it of being staged.[7]



More recently, proponents of gun control utilized images of victims and survivors of the Sandy Hook Elementary School shooting and other school shootings

---

[6] Oscar Holland, *'Napalm Girl' at 50: The story of the Vietnam War's defining photo*, CNN (June 9, 2022), https://www.cnn.com/style/article/napalm-girl-50-snap/index.html; *but see Sundance Documentary Disputes Who Took 'Napalm Girl' Photo in Vietnam*, Associated Press (Jan. 27, 2025), https://www.nbcnews.com/news/asian-america/sundance-documentary-stringer-disputes-took-napalm-girl-photo-vietnam-rcna189410 (discussing dispute over who took the famous photograph).

[7] Holland, *supra* note 6.

to illustrate their views on gun violence.[8] And an image of a police officer leading young children away from the school came to define the horrors of that day:[9]



Likewise, protestors against racial injustice and profiling utilized on their signs and t-shirts an image of Trayvon Martin, a 17-year-old shot and killed by George Zimmerman :[10]



---

[8] Sandy Hook Promise, *Teenage Dream*, YouTube (Sep. 13, 2021), https://www.youtube.com/watch?v=T254_J8Vcvw; Sandy Hook Promise, *Emma's Story*, YouTube (Sep. 20, 2021), https://www.youtube.com/watch?v=Wm3RM2-CnwQ&list=PL_BUjxjTMxcw4k9DwacfBlTdHdaLjB_Hl&index=8

[9] Adam McCauley, *The Story Behind the Iconic Photograph from Sandy Hook*, TIME (Dec. 20, 2012), https://time.com/3449676/the-story-behind-the-iconic-photograph-from-sandy-hook/

[10] Elizabeth Dias, *Faces of Protest for Trayvon Martin*, TIME (April 16, 2012), https://time.com/3787805/faces-of-protest-for-trayvon-martin.

As these examples show, images can provoke discomfort, challenge prevailing narratives, or force society to reckon with injustice. At times, a photo's communicative power will magnify a speaker's controversial or painful words. Yet the fact that a photograph or its use may offend or disturb does not strip it of constitutional protection. Instead, that powerful reaction underscores the necessity of protecting controversial expression in our free society. As Chief Justice Roberts has explained: "Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow." *Snyder v. Phelps*, 562 U.S. 443, 460 (2011). But rather than censor, "[a]s a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* at 461.

Rep. Libby's use of images represents an attempt to put a spotlight on what she believes to be an injustice and galvanize supporters to action. Because she shared images rather than merely words, Rep. Libby could make her point about a contentious public issue in a concrete and visually striking manner. Even though her post offended some who saw it, there is no question her speech enjoys the full protection of the First Amendment, just as these examples do.

## II.  The First Amendment's Protection of Speech—Including Photographs— Does Not Change Even if Some Deem it Offensive.

The Maine House explicitly and unconstitutionally retaliated against Rep. Libby for the content and viewpoint of her Facebook post and the accompanying image. The First Amendment "guarantees not only freedom from government

censorship, but also freedom from official retaliation on the basis of protected speech." *Mattei v. Dunbar*, 217 F. Supp. 3d 367, 373 (D. Mass. 2016) (*citing Hartman v. Moore*, 547 U.S. 250, 256 (2006)). Our commitment to free expression requires us to protect speech that is unpopular, painful to hear, or inspires anger, as those moments are when free speech may "serve its high purpose." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). The very idea of free speech necessitates protection primarily when it is "provocative and challenging." *Id*. As a "bedrock principle … the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989). This is the "point of all speech protection … to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish–American Gay, Lesbian and Bisexual Grp. of Bos.,* 515 U.S. 557, 574 (1995) (citations omitted). And the democratic expression of ideas requires a breathing room that includes controversial speech. Our Constitution provides "no room … for a more restrictive view." *Id.*

As the Supreme Court has reinforced, "disfavoring ideas that offend discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (citations and internal quotation marks omitted). "A viewpoint need not be political; any form of support or opposition to an idea could be considered a viewpoint." *Marshall v. Amuso*, 571 F. Supp. 3d 412, 421

- 13 -

(E.D. Pa. 2021) (quoting *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring in part) ("The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side. It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses")). "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 339–40 (1974).

Content- and viewpoint-based restrictions are subject to strict scrutiny. *See, e.g., McCullen v. Coakley*, 573 U.S. 464, 478 (2014). This daunting standard "requires the government to demonstrate that the restriction" advances a "compelling interest" and is "narrowly tailored to achieve that interest." *Signs for Jesus v. Town of Pembroke*, 977 F.3d 93, 101 (1st Cir. 2020) (*quoting Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015)); *accord R.A.V. v. City of St. Paul,* 505 U.S. 377, 395 (1992). The House majority's demands for Rep. Libby to "accept full responsibility" and issue a compelled apology before she can vote or speak on the floor serve no compelling interest and are not narrowly tailored.

The House's retaliatory actions against Rep. Libby were plainly viewpoint-based. And even though some in the House claimed identifying a minor warranted a censure (*see, e.g.,* JA14-15), the House's past behavior disproves that claim. Take,

for example, when Maine Rep. Vicki Doudera welcomed student sports champions, and the Maine House published a photograph of and named a fifth-grade chess champion.[11] Sharing photographs celebrating the successes of student-athletes is commonplace and generally uncontroversial. The *Portland Press Herald* published a series of photos of the high school student-athletes who competed in the state championship (including the pole vault competition at issue).[12]

Had Rep. Libby celebrated the student's victory, we all know that she would not have been censured or silenced. The only reason Rep. Libby's post drew the ire of the House and resulted in her censure and silencing is that she criticized rather than celebrated the student's participation in the event. This is blatant viewpoint discrimination. If laudatory speech cannot be silenced, neither can critical speech.

While the censuring resolution claims (with zero support) that political use of the photographs "may endanger the minor" and "continued to bring media attention to the minor," this rationale does not justify censoring Rep. Libby. JA103. The student was already the subject of attention and the press had already publicized the student's victory. JA14. In any case, speaking on matters of public concern generally

---

[11] *See Doudera Welcomes State Champions to State House*, Maine House Democrats (Apr. 8, 2022), https://www.maine.gov/housedems/news/doudera-welcomes-state-champions-state-house.

[12] *See* Nathan Fournier, *Greely Sweeps Class B Indoor Track and Field Titles*, PORTLAND PRESS HERALD (Feb. 17, 2025), https://www.pressherald.com/2025/02/17/greely-sweeps-class-b-indoor-track-and-field-titles/

outweighs asserted privacy interests. *See, e.g.*, *Fla. Star v. B.J.F.*, 491 U.S. 524 (1989); *Daury v. Smith*, 842 F.2d 9, 14 (1st Cir. 1988). As another court in the District of Maine recently observed:

> [T]he identification of persons engaged in public conduct of which the public has a legitimate concern is the kind of information a community ordinarily exchanges openly without fear of liability .... Shielding the identity of a person when describing a matter of public concern he or she is involved in is essentially a political or ethical preference and as such is susceptible to selective treatment based on the shifting mores of the time and place. It does not appear to be dictated by any legal tradition, though in regard to minors it may well be in good taste.

*McBreairty v. Brewer Sch. Dep't*, No. 1:24-cv-00053-LEW, 2025 U.S. Dist. LEXIS 85847, at *22-23 (D. Me. May 6, 2025). The Supreme Court has established a robust First Amendment right to publish and has built barriers against any governmental intrusion into that right.[13]

And Rep. Libby has a clearly established right to publish lawfully acquired information. *See, e.g., Bartnicki v. Vopper*, 532 U.S. 514 (2001); *Berge*, 107 F.4th at 43; *Jean v. Mass. State Police*, 492 F.3d 24 (1st Cir. 2007). If one "lawfully obtains truthful information about a matter of public significance then state officials

---

[13] *See, e.g., Fla. Star*, 491 U.S. 524; *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979); *Okla. Publ'g Co. v. Dist. Ct. in & for Okla. Cnty.*, 430 U.S. 308 (1977); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975); *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974); *Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971); *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ("Pentagon Papers"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931).

may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Daily Mail*, 443 U.S. at 103. As *Cox Broadcasting Corp. v. Cohn* established, even publishing the name of a minor rape victim is protected. 420 U.S. 469, 492 (1975). Publishing an image of a minor who was already in the spotlight for winning a championship is likewise protected.

### III. Leaving Representative Libby Without a Remedy for Viewpoint-Based Retaliation Against Her Protected Speech Betrays the Promise of the First Amendment.

If our commitment to the rule of law means anything, there must be a judicial remedy against viewpoint discrimination that not only stops a legislator from doing her job, but that disenfranchises her constituents. By denying Rep. Libby that remedy, the district court's opinion opens a dangerous door for the Maine House majority—and other controlling majorities—to handcuff those with minority views, infringe the First Amendment, and upend our republican form of government. The Court should slam that door shut.

The government, even in the form of Maine's House majority, cannot retaliate against Rep. Libby, stop her from doing her job, and effectively disenfranchise her constituents merely because her speech elicits strong emotions or challenges dominant perspectives—or even because they dislike Rep. Libby's views. *Wilson*, 595 U.S. 479, 481; *Bond*, 385 U.S. at 137 (state house majority violated the First Amendment when they disqualified a duly elected representative because of his anti-

- 17 -

war speech). To be clear, individual members of the House are free, as noted, to voice their displeasure at Rep. Libby's post, and the collective body may do so without violating Rep. Libby's rights. *See Wilson*, 596 at 479 (holding mere censure was not an adverse action when it "did not prevent" the elected official "from doing his job" and "did not deny him any privilege of office"). But the First Amendment demands that we tolerate and confront unpleasant truths rather than allow the state to sanitize public discourse to avoid controversy or discomfort. *See Boos v. Barry*, 485 U.S. 312, 322 (1988) ("in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate 'breathing space' to the freedoms protected by the First Amendment.' *Hustler Magazine, Inc. v. Falwell*, 485 U. S. 46, 56 (1988)"). Moreover, as the Supreme Court explained in *Bond*, elected officials "have an obligation to take positions on controversial political questions" both to inform and vigorously represent their constituents. 385 U.S. at 136–37. By barring Rep. Libby from voting or speaking on the floor of the House, the House majority went beyond merely expressing displeasure and veered into unconstitutional viewpoint-based retaliation.

The District Court's suggestion that its absolutist approach to legislative immunity nonetheless avoids leaving Rep. Libby without remedy is not just wrong, but dangerous. The District Court soft-pedaled the House majority's retaliation against Rep. Libby as a simple thing, rationalizing the punishment by noting "the

sanction remains in place only until Representative Libby apologizes," and "[o]f course … [she] may [] choose to make satisfaction." 2025 WL 1148726 at *12. But forcing Rep. Libby to publicly apologize for her post before she may once again represent her constituents is not a remedy—it's a further constitutional affront. Compelled utterance against a speaker's conscience violates the First Amendment. *see*, *e.g.*, *303 Creative*, 600 U.S. at 584–86 (and cases cited therein). And, so, forcing a speaker to apologize for protected expression is unconstitutional. *See Mazur v. Szporer*, No. 03-00042 (HHK), 2004 U.S. Dist. LEXIS 13176, at *28 (D.D.C. June 1, 2004) (finding request for injunctive relief requiring defendant "to publish that the previously published statements were false" constitutionally impermissible); *Blue Rio LLC v. Thomas*, No. 17 CV 2015 (VB), 2017 WL 4863091, at *2, *5 (S.D.N.Y. Oct. 26, 2017); *see also* Appellants Br. at 30 n.4 (citing *Bond*, 385 U.S. at 128). It is simply shocking that one political group could disenfranchise a member of the minority until that member simply pledges fealty to the majority political opinion. This is not the stuff of a free country nor a country that honors the rule of law, due process, or any notion of freedom of expression.

The District Court's reasoning also seems to fail to appreciate the scope of the problem. The District Court confused the holding in *Nevada Comm'n on Ethics v. Carrigan* that voting is not the legislator's speech, 564 U.S. 117, 125-26 (2011) (upholding a state rule saying legislators cannot vote on matters in which they have

an interest), with the issue in this case—that the majority is retaliating against and penalizing a legislator's speech by stripping her of the ability to perform her job. The issue here is not just that Rep. Libby can't currently vote or speak on the House floor—it's also that, going forward, the majority may, without fear of correction, impose that disability on Representative Libby, anyone in the minority, or even just a member with a minority view. That boundless discretion will undoubtedly chill the speech of elected representatives and permits their political opponents to have them subsequently silenced and disenfranchised, with nowhere to turn for relief.

The danger of a majority's vote-stripping power is obvious by exercising the slightest degree of imagination. What if the House were more politically conservative and believed that encouraging transgender students was against the public interest? The District Court's ruling would permit a legislature with a different political makeup to censor politicians making statements in support of transgender students. And it essentially forces the electorate to keep the majority in power if they want a representative who can vote on their behalf. The goal here was questionable. But the end result of this is permanent one-party rule, with compelled speeches of loyalty to whatever political or social position the majority in power deems to be orthodox. This is the kind of thing that we see in tinpot dictatorships and kleptocracies across the globe – but until now, no jurist who swore to uphold and defend the constitution has stamped with their imprimatur. This Court must see

its place not only in this dispute, but this decision's place in history. If this Court upholds this decision, and the Supreme Court does not strike it down, the inevitable end will be not just single-party rule, but single-viewpoint rule. This is a constitutional disgrace and an affront to any notion of what a representative democracy should be.

This Court should direct the District Court to issue a preliminary injunction to prevent this ongoing and irreparable harm to Rep. Libby and her constituents. In doing so, it just may preserve the structure of our Republic.

## **CONCLUSION**

For these reasons, *amicus curiae* Foundation for Individual Rights and Expression urges the Court to reverse and remand for entry of an order granting the Plaintiffs' motion for preliminary injunction.

Date: May 16, 2025.                    Respectfully submitted,

RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza (Bar No. 90629)
Jay M. Wolman (Bar No. 1135959)
Ronald D. Green (*Admission Pending*)
30 Western Avenue
Gloucester, MA 01930
Tel: (888) 887-1776
ecf@randazza.com

*Attorneys for Amicus Curiae*

- 21 -

## <u>CERTIFICATE OF COMPLIANCE</u>

I am the attorney or self-represented party. This brief contains 4,615 words and excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

The undersigned hereby certify that this amici brief complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

Date: May 16, 2025.                    RANDAZZA LEGAL GROUP, PLLC

                                       /s/ Marc J. Randazza
                                       Marc J. Randazza

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: May 16, 2025.                    RANDAZZA LEGAL GROUP, PLLC

                                        /s/ Marc J. Randazza
                                        Marc J. Randazza