No. 25–1385

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

LAUREL D. LIBBY; RONALD P. LEBEL; WENDY MUNSELL; JASON
LEVESQUE; BERNICE FRASER; RENE FRASER; DONALD DUBUC,

Plaintiffs - Appellants,

v.

RYAN M. FECTEAU, in their official capacity as Speaker of the Maine House of
Representatives; ROBERT B. HUNT, in their official capacity as Clerk of the
House,

Defendants - Appellees,

_____

On Appeal from the United States District Court for the District of Maine

---

**DEFENDANTS'-APPELLEES' PRINCIPAL BRIEF**

<div style="margin-left:40%">

AARON M. FREY
Attorney General

JONATHAN R. BOLTON
KIMBERLY L. PATWARDHAN
Assistant Attorneys General

Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333–0006
207–626–8800

*Attorneys for Defendants-Appellees*

</div>

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................ i

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION .....................................................................................1

STATEMENT OF THE ISSUES .................................................................3

STATEMENT OF THE CASE ....................................................................3

    Maine's Constitution and the Maine House of Representatives' Rules ...........3

    The censure of Rep. Libby ............................................................5

    Procedural history ....................................................................11

SUMMARY OF THE ARGUMENT...........................................................14

STANDARD OF REVIEW ......................................................................16

ARGUMENT .......................................................................................17

I.    The District Court correctly determined that legislative immunity protects the challenged acts of the House Officers.............................................17

    A. Appellants challenge only legislative acts. ....................................18

    B. Clerk Hunt is also protected by legislative immunity...............................21

    C. The district court's decision is in accord with this Court's precedent........25

    D. Appellants' other arguments are unavailing. ..............................27

II.    Even if legislative immunity did not apply, Appellants' claims would be unlikely to succeed on the merits. ....................................................32

    A. Rep. Libby's First Amendment claim is unlikely to succeed. ...................32

    B. Appellants' Fourteenth Amendment claims are unlikely to succeed. ........39

    C. Appellants' Guarantee Clause claim is unlikely to succeed. .....................47

III.    The remaining injunction factors cut strongly against relief. ..........................51

    A. The public interest disfavors an injunction..................................51

    B. Appellants' irreparable harm claim is weak. ...............................52

CONCLUSION ....................................................................................53

CERTIFICATE OF COMPLIANCE ........................................................54

CERTIFICATE OF SERVICE.................................................................55

i

## TABLE OF AUTHORITIES

*Cases*

*A.C. by Waithe v. McKee*, 23 F.4th 37 (1st Cir. 2022) ..............................................49

*Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1 (1st Cir. 2000) ...............................21

*Agnew v. Moody*, 330 F.2d 868 (9th Cir. 1964)........................................................29

*Am. Party of Tex. V. White*, 415 U.S. 767 (1974)....................................................42

*Ammond v. McGahn*, 390 F. Supp. 655 (D.N.J. 1975)............................................47

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .................................................. 39, 41

*Baker v. Carr*, 369 U.S. 186 (1962)........................................................................48

*Barr v. Galvin*, 626 F.3d 99 (1st Cir. 2010)................................................ 42, 43, 47

*Bogan v. Scott-Harris*, 523 U.S. 44 (1998) .................................... 18, 23, 24, 25, 28

*Bond v. Floyd*, 385 U.S. 116 (1966) ................................................................. 13, 38

*Brown v. Thomson*, 462 U.S. 835 (1983)..................................................................46

*Burdick v. Takushi*, 504 U.S. 428 (1992)........................................................... 39, 40

*Bush v. Gore*, 531 U.S. 98 (2000) ...........................................................................45

*Coffin v. Coffin*, 4 Mass. 1 (1808).............................................................................4

*Cushing v. Packard*, 30 F.4th 27 (1st Cir. 2022)
   (en banc) ........................................... 2, 13, 23, 27, 28, 29, 31, 32, 47, 52

*Democratic Party of Wisconsin v. Vos*, 966 F.3d 581 (7th Cir. 2020)....................49

*Doe v. McMillan*, 412 U.S. 306 (1973) ...................................................................24

*Does 1–6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) .......................................................52

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975)............ 13, 24, 32, 33, 53

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*,
   445 F.3d 13 (1st Cir. 2006) ...................................................................17

*Gamrat v. McBroom*, 822 F. App'x 331 (6th Cir. 2020)........................................19

*Gravel v. United States*, 408 U.S. 606 (1972) ................................ 19, 22, 23, 24, 29

*Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022) ........................ 33, 34, 39

*In re Chapman*, 166 U.S. 661 (1897) .......................................................................44

*In re Grand Jury Proc.*, 563 F.2d 577, 585 (3d Cir. 1977) ....................................21

*In re Grand Jury Subpoenas*, 571 F.3d 1200 (D.C. Cir. 2009) ..............................32

*Kansas v. Neufeld*, 926 P.2d 1325 (Kan. 1996)......................................................29

*Kent v. Ohio House of Representatives Democratic Caucus*,
   33 F.4th 359 (6th Cir. 2022)................................................................................20

*Kerpen v. Metro. Washington Airports Auth.*, 907 F.3d 152 (4th Cir. 2018)..........50

*Kilbourn v. Thompson*, 103 U.S. 168 (1880)............................ 13, 19, 21, 23, 24, 28

*Kucinich v. Forbes*, 432 F. Supp. 1101 (N.D. Ohio 1977)......................................46

*Largess v. Supreme Jud. Ct. for State of Mass.*, 373 F.3d 219 (1st Cir. 2004)  49, 51

*Libby v. Fecteau*, 605 U.S. ___, 2025 WL 1441558 (May 20, 2025) ....................53

*Libertarian Party of New Hampshire v. Gardner*, 638 F.3d 6
   (1st Cir. 2011)................................................................................................ 40, 41

*Massie v. Pelosi*, 72 F.4th 319 (D.C. Cir. 2023)................................................ 22, 32

*McCann v. Brady*, 909 F.3d 193 (7th Cir. 2018) .............................................. 20, 32

*McCarthy v. Pelosi*, 5 F.4th 34 (D.C. Cir. 2021)...................................................21

*Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994)..................................................45

*Minor v. Happersett*, 88 U.S. 162 (1874) ..............................................................51

*Monserrate v. New York State Senate*, 599 F.3d 148
   (2d Cir. 2010) .......................................................................... 40, 42, 44, 47, 48

*Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 630
   (1st Cir. 1995).................................................... 12, 13, 24, 26, 27, 28, 29, 30, 52

*Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) ........................ 33, 34, 42

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1 (1st Cir. 2002) ...17

*New York v. United States*, 505 U.S. 144 (1992).............................................. 48, 50

*Nixon v. United States*, 506 U.S. 224 (1993).........................................................25

*Peeper v. Callaway Cnty. Ambulance Dist.*, 122 F.3d 619 (8th Cir. 1997) ............40

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984).........................50

*Pine v. Commonwealth*, 93 S.E. 652 (Va. 1917) ....................................................38

*Powell v. McCormack*, 395 U.S. 486 (1969) ........................................ 13, 23, 24, 39

*Rangel v. Boehner*, 785 F.3d 19 (D.C. Cir. 2015) ..................................................19

*Reynolds v. Sims*, 377 U.S. 533 (1964)..................................................................44

*Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982) ..................................43

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ........17

*Rucho v. Common Cause*, 588 U.S. 684 (2019) ......................................................48

*SC Testing Tech., Inc. v. Dep't of Env't Prot.*, 688 A.2d 421 (Me. 1996) .........8, 50

*Supreme Court of Va. v. Consumers Union of U.S.*,
   446 U.S. 719 (1980) ............................................................... 18, 25, 32

*Tenney v. Brandhove*, 341 U.S. 367 (1951).......................................... 18, 20, 29, 32

*The Pocket Veto Case*, 279 U. S. 655 (1929) .........................................................34

*Tolman v. Finneran*, 171 F. Supp. 2d 31 (D. Mass. 2001) .....................................29

*Trafon Grp., Inc. v. Butterball, LLC*, 820 F.3d 490 (1st Cir. 2016) .......................17

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, (1995) .....................................25

*United States v. Brewster*, 408 U.S. 501 (1972)......................................................32

*United States v. Johnson*, 337 F.2d 180 (4th Cir. 1964)..........................................29

*United States v. Johnson*, 383 U.S. 169, 181 (1966) .................................. 18, 28, 31

*Upjohn Co. v. United States*, 449 U.S. 383 (1981).................................................31

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26 (1st Cir. 2011) .................................................................................................................53

*Werme v. Merrill*, 84 F.3d 479 (1st Cir. 1996) ......................................................41

*Whitener v. McWatters*, 112 F.3d 740 (4th Cir. 1997) ...........................................19

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)............................... 52, 53

*Youngblood v. DeWeese*, 352 F.3d 836 (3d Cir. 2003) ...........................................20

## Statutes

5 M.R.S.A. § 4602.....................................................................................................44

## Other Authorities

A. Butler & W. Wolff, *United States Senate: Election, Expulsion, and Censure Cases 1793–1990* (1995) ........................................................................................35

A. Hinds, *Precedents of the House of Representatives* (1907)................................35

Cushing, Luther, *Elements of the Law and Practice of Legislative Assemblies in the United States* (1866) ....................................................................................... 34, 37

Cushing, Luther, *Reports of Contested Elections* (1834) ........................................37

D. Bowman & J. Bowman, *Article I, Section 5: Congress' Power to Expel—An Exercise in Self-Restraint*, 29 Syracuse L. Rev. 1071 (1978) ..............................34

Department of Justice, *Attorney General Bondi Announces Lawsuit Against Maine*, C-SPAN  (Apr. 16, 2025) ....................................................................................30

*Deschler's Precedents*.............................................................................................51

Federalist No. 43 (J. Madison).................................................................................51

M.P. Clarke, *Parliamentary Privilege in the American Colonies* 190 (1971) . 34, 37

U.S. Senate, *The Censure Case of John L. McLaurin and Benjamin R. Tillman of South Carolina*....................................................................................................37

*Rules*

Iowa House Code of Ethics, 91st Gen. Assem. ......................................................38

Iowa Sen. Code of Ethics, 91st Gen. Assem. ......................................................38

Massachusetts House Rules, ¶ 28 (1802).....................................................4

Me. House Rule 401
    (132nd Legis. 2024)...................4, 7, 16, 26, 28, 29, 34, 35, 39, 43, 44, 47, 50, 51

Rules and Orders, Journal of the House of Representatives of the Territory of
    Washington (1854) ..............................................................35

Rules and Precedents of the General Assembly of Connecticut (2023)..................35

Rules of Order of the Louisiana Senate, 50th Reg. Sess. ........................................35

Rules of the Arizona House of Representatives, 56th Legislature .........................35

Rules of the Del. House of Rep., 153rd Gen. Assem. ............................................38

Rules of the Del. Senate, 153rd Gen. Assem......................................................38

Rules of the Haw. House, 33rd Legis. ......................................................38

Rules of the Haw. Senate, 33rd Legis.......................................................38

Rules of the Mass. Sen., 194th Gen. Ct. ......................................................38

Standing Rules of the Assembly of the State of Florida (1872)..............................35

*Constitutional Provisions*

Cal. Const. art. IV, §§ 5(2)(A), (B)...........................................................38

Me. Const. art. IV, pt. 1, § 1 ......................................................3

Me. Const. art. IV, pt. 1, § 7 ......................................................3, 22

Me. Const. art. IV, pt. 3, § 1 ......................................................53

Me. Const. art. IV, pt. 3, § 4 ...................................... 4, 20, 21, 50

Me. Const. art. IV, pt. 3, § 5 ...................................... 21, 22

U.S. Const. art. I, § 5, cl. 2 ................................................................ 20, 21

U.S. Const. Art. I, § 6, cl. 1 ...................................................................18

*Legislative Documents*

1 Wis. Sen. Journ., 47th Sess. (1905) ......................................................37

H. Rept. No. 90-27, 90th Cong. 1st Sess. (1967) ....................................38

L.D. 1563 (132nd Me. Legis. 2025) ("An Act to Establish Content Standards for Legislation") ..........................................................................................9

L.D. 1880 (132nd Me. Legis. 2025) ("An Act to Require Photographic Identification for Voting") ........................................................................9

L.D. 1899 (132nd Me. Legis. 2025) ("An Act to Eliminate Taxation on Health Care Spending") ....................................................................................9

Me. H. Jour., 120th Leg., 1st Reg. Sess. (Feb. 8, 2001) ..........................36

Me. H. Jour., 131st Leg., 2d Reg. Sess. (Apr. 11, 2024) .........................36

Okla. H. Jour., 59th Leg., 1st Reg. Sess. (Mar. 7, 2023) .........................36

Wis. Sen. Journ., 53rd Sess. (1917) ........................................................36

*Legislative Proceedings*

*Archived Hearings & Meetings: House Chamber*, 132nd Me. Leg., 11:49:05–11:50:25 AM (Me. House Apr. 22, 2025) ...........................................9

*Archived Hearings & Meetings: House Chamber*, 132nd Me. Leg., 12:01:37–12:02:15 PM (Me. House Apr. 8, 2025) ...............................................9

*Me. Leg. Archived Hearings & Meetings: House Chamber*, 132nd Legis., at 11:59:24 a.m. to 12:41:30 p.m. (December 4, 2024) .........................22

*Me. Leg. Archived Hearings & Meetings: Room 127, Tax. Comm.*, 132nd Legis., at 3:34:50-3:56:10 p.m. (Mar. 5, 2025) ...................................10

*Me. Leg. Archived Hearings & Meetings: Room 202, Labor Comm.*, 132nd Legis. at 1:43:30-2:59:47 p.m. and 4:30:22-5:11:27 p.m. (May 7, 2025) .....................11

*Me. Leg. Archived Hearings & Meetings: Room 202, Labor Comm.*, 132nd Legis., at 1:03:21-8:53:39 p.m. (Apr. 23, 2025) ............................................................11

*Me. Leg. Archived Hearings & Meetings: Room 211, Ener., Utils. & Tech. Comm.*, 132nd Legis., at 3:01:19-3:13:08 p.m. (Mar. 4, 2025) ..........................10

*Me. Leg. Archived Hearings & Meetings: Room126, Transp. Comm.*, 132nd Legis., at 2:00:34-2:11:14 p.m. (Apr. 15, 2025) ..................................................10

**INTRODUCTION**

Maine Representative Laurel Libby breached ethical rules applicable to Maine legislators by posting on social media the name, school, and photograph of a high-school athlete in the course of attacking the student for their participation in a sports event. The Maine House of Representatives ("House") voted to censure Rep. Libby, not for her views on transgender athletes, but for jeopardizing the health and safety of a nonconsenting child by placing them in the middle of a national political firestorm.

Under a House rule so venerable it predates Maine's 1820 separation from Massachusetts, a member who is found by the body to be in breach of House rules is forbidden from debating or voting on the House floor until they have "made satisfaction"—here, apologized—for their breach. Despite agreeing to this rule, Rep. Libby now refuses to comply with it. Instead, she and several of her constituents ("Appellants") ask this Court to recast her rule-breaking into a constitutional violation in which she is the victim of "retaliation" and her constituents "disenfranchised."

The district court correctly concluded that Appellants' claims run aground on the absolute legislative immunity to which Defendants-Appellees Speaker of the House and Clerk of the House (together, the "House Officers") are entitled for their legislative acts. The only acts conceivably at issue in this case—punishing a member

1

for breaking House rules, applying a pre-existing House rule governing floor activities, and tallying members' votes—are core legislative acts placed within the jurisdiction of the House by express language of the Maine Constitution. Under numerous authorities, including this Court's controlling decision in *Cushing v. Packard*, 30 F.4th 27 (1st Cir. 2022) (en banc), *cert. denied* 143 S. Ct. 308 (2022), the House Officers are absolutely immune from Appellants' attempt to recruit the federal judiciary to referee this intra-parliamentary dispute. To hold otherwise risks opening the door to future suits brought by legislators for relief (including damages) any time a legislator claims their ability to vote or debate has been inhibited by other legislators.

While the House Officers' entitlement to immunity is dispositive of this appeal, Appellants' claims are also unlikely to succeed on their merits. Rep. Libby's First Amendment claim ignores a long tradition of legislative punishments that implicate member voting, dating back to colonial times. Appellants' Fourteenth Amendment claim relies on a strained analogy to redistricting cases while failing to acknowledge that the challenged House rule treats all House members (and thus all of their constituents) exactly the same. And Appellants come nowhere near to establishing the sort of existential threat to republican governance necessary to support their Guarantee Clause claim, if such claims are justiciable at all.

2

Because Appellants are unlikely to succeed on the merits, and because the other injunction factors tilt toward the House Officers, the District Court's decision denying a preliminary injunction should be affirmed.

## STATEMENT OF THE ISSUES

1.      Did the District Court abuse its discretion in concluding that the House Officers engaged in legislative acts entitled to absolute immunity by applying to Rep. Libby, following her censure by the full House for unethical conduct, a longstanding House Rule specifying that a member who breaches House rules may not vote or debate on the House floor until they have made satisfaction?

2.      If legislative immunity does not apply, have Appellants carried their burden to show that they are likely to succeed on the merits of their constitutional claims, that they are suffering irreparable harm, and that the balance of harms and the public interest weigh in favor of relief?

## STATEMENT OF THE CASE

*Maine's Constitution and the Maine House of Representatives' Rules*

The House is one body of Maine's bicameral Legislature. Me. Const. art. IV, pt. 1, § 1 (mandating both a Senate and a House). The House is led by the Speaker of the House, who is selected by House members. Me. Const. art. IV, pt. 1, § 7. Unlike the U.S. Constitution, the Maine Constitution requires the House to elect a Clerk, *id*., who is charged with various legislative duties, including keeping a journal

3

of what is done in the House and noting the answers of members when a vote is taken. Joint Appendix ("JA") 91–92.

Under Maine's Constitution, "[e]ach House may determine the rules of its proceedings" and "punish its members for disorderly behavior." Me. Const. art. IV, pt. 3, § 4. Under this authority, the House, on December 4, 2024, adopted the rules of procedure to govern its business during the 132nd Maine Legislature. JA74, JA82–100. The House adopted its rules by the unanimous consent of its members, including Rep. Libby. JA74.

Rule 401 of the current House Rules governs the rights and duties of members. Subsection 11 of this rule provides that:

> When any member is guilty of a breach of any of the rules and orders of the House and the House has determined that the member has violated a rule or order, that member may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction.

JA94. A version of this rule has been included in the Rules of the House since Maine's separation from Massachusetts in 1820. JA55. The Massachusetts House of Representatives used a similar rule since at least 1802.[1]

The Maine Legislature also jointly adopted a Code of Ethics. JA75, 101. Under the Code of Ethics "[a] Maine Legislator is charged with civility and

---

[1] *See* Massachusetts House Rules, ¶ 28 (1802), *available at* https://tinyurl.com/y584ht25; *see also Coffin v. Coffin*, 4 Mass. 1, 22 (1808) (quoting rule).

4

responsible conduct inside and outside of the State House commensurate with the trust placed in that Legislator by the electorate." JA101. The Code further provides that "[i]n a free government, a Legislator is entrusted with the security, safety, health, prosperity, respect and general well-being of those the Legislator serves and with whom the Legislator serves." JA101.

<div align="center">*The censure of Rep. Libby*</div>

On the evening of February 17, 2025, Rep. Libby used her official Facebook account to post about a recent high school track event in Maine. JA8–9, JA76. This was not a post offering congratulations to the event's participants and winners. Instead, Rep. Libby targeted one of the high school students who had competed in the event because that student is transgender. JA76. Rep. Libby identified the student's school, identified the student by their current name and previous name, and posted photos of the student, embellished with yellow lines encircling them from head to toe. JA9. In one photo, the faces of other students were blurred out, while the face of the targeted student was not. JA9. The post quickly went viral. JA11, JA76.

Speaker Fecteau saw Rep. Libby's post the morning of February 18, 2025. JA76. He was immediately concerned about the student's safety and welfare and sent a letter to Rep. Libby, writing:

> I was recently alerted to a post on social media in which you not only depict a high school student via photos, but

<div align="center">5</div>

you share the student's name and school.

Expressing policy differences is one thing, but it is absolutely uncalled for to put students at the center of political firestorms, which in turn risks their health and safety.

I am asking you to take the post down. Please find a way to express your political opinions that is void of using students as fodder. . . .

JA76, JA102. Rep. Libby and Speaker Fecteau spoke by phone later that evening, but Rep. Libby refused to take down her post. JA14.

The House reconvened in session on February 25, 2025.[2] JA14. At the end of the day's session, a member introduced a resolution to censure Rep. Libby because her Facebook post was a violation of Maine's Legislative Code of Ethics. JA14–15. The resolution explained that transgender individuals are "four times more likely to be victims of violence"; "numerous replies to" the aforementioned post "suggested that harm should come to the young athlete"; and, that as a result of Rep. Libby's post, the school district "has had to increase security at the school causing unnecessary stress and disruption to other students, parents, teachers and school support staff and the entire community." JA103. Rep. Libby refused to take down

---

[2] The Maine Legislature was not in session the week of February 17, 2025, to February 21, 2025; no work sessions, public hearings, or sessions of either legislative body occurred during this time period. JA76.

her post, even after being made aware that it was endangering a child. JA103; *see* JA11.

After debate, the House passed the censure resolution by a vote of 75-70. JA77. The censure required that Rep. Libby "accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." JA104. Following enactment, Speaker Fecteau called Rep. Libby to the well of the House, formally admonished her for breach of the Code of Ethics, and provided her with an opportunity to apologize. JA77. After Rep. Libby refused to apologize for her conduct,[3] the Speaker ruled her in violation of House Rule 401(11).[4] JA77. Although every ruling of the Speaker is subject to appeal to the full House, JA89, no member appealed the Speaker's ruling to body, including Rep. Libby, at that time. JA77. Since then, the House has twice voted against suspending the application of Rule 401(11) to Rep. Libby. JA80.

Until the Supreme Court's injunction, Rep. Libby could not participate in just *two* activities: floor debates and votes on matters under consideration by the full House. JA77. Those restrictions will end once she apologizes, if the House votes by

---

[3] Appellants' misleading assertion that the Speaker required Rep. Libby to "recant her views" has no support in the record. Br. at 5. On the contrary, the Speaker made clear that the "[e]xpressi[on]" of "policy differences" was *not* the conduct at issue. JA102.

[4] Appellants do not bring a facial challenge to Rule 401(11). JA131–32.

two-thirds to dispense with Rule 401(11), or when the 132nd Maine Legislature ends. JA77; *see SC Testing Tech., Inc. v. Dep't of Env't Prot*., 688 A.2d 421, 425 (Me. 1996) ("[t]he [Maine] Legislature may not enact a law that purports to bind a future Legislature").[5] In the meantime, Rep. Libby retains all other legislative privileges and continues to enjoy considerable means to advance and oppose legislation and otherwise represent her constituents. JA78–80.

Rep. Libby may be present on the House floor during debates and votes and is permitted to engage in procedural actions, such as making motions and raising objections, as long as she does not participate in the debate on such procedural actions. JA79. She can, for example, move to amend a bill or to indefinitely postpone a bill (which, if approved, defeats it) or move for a roll call vote on a measure before the House. JA79. On March 20, 2025, Rep. Libby introduced by motion eight separate proposed amendments to the State's biennial budget, L.D. 609, which motions will be recorded in the House Journal. JA80. During other House sessions,

---

[5] Appellants claim that "[n]othing in [the House Officers'] position would prevent the next Legislature's majority from reimposing the same punishment on Libby for the entirety of her next term." Br. 6 n.2. But that presumes that Rep. Libby will be re-elected in 2026 and that a majority of the newly constituted Legislature, with new members and potentially a different party in control, would vote to impose new punishment for already-punished misconduct in a previous Legislature—a speculative series of future events.

8

Rep. Libby moved for reconsideration of a House action and requested the Clerk read a fiscal note on a bill under consideration by the body.[6]

Rep. Libby can sponsor and co-sponsor bills and resolutions. JA78. As of April 1, 2025, Rep. Libby was the primary sponsor of 11 bills and the co-sponsor of 29 bills. JA78. Since April 1, 2025, Rep. Libby has sponsored three additional bills.[7] Rep. Libby may present her bills to the relevant committee of jurisdiction and testify at public hearings concerning any legislation. JA78. Rep. Libby has presented to committees on bills she sponsored on March 4, 2025,[8] March 5, 2025,[9] April 15,

---

[6] *Archived Hearings & Meetings: House Chamber*, 132nd Me. Leg., 12:01:37–12:02:15 PM (Me. House Apr. 8, 2025) (reconsideration of a House action), https://tinyurl.com/ywe5mped; *Archived Hearings & Meetings: House Chamber*, 132nd Me. Leg., 11:49:05–11:50:25 AM (Me. House Apr. 22, 2025) (fiscal note read), https://tinyurl.com/mwdhe946.

[7] L.D. 1563 (132nd Me. Legis. 2025) ("An Act to Establish Content Standards for Legislation"); L.D. 1880 (132nd Me. Legis. 2025) ("An Act to Require Photographic Identification for Voting"); L.D. 1899 (132nd Me. Legis. 2025) ("An Act to Eliminate Taxation on Health Care Spending").

[8] *See Me. Leg. Archived Hearings & Meetings: Room 211, Ener., Utils. & Tech. Comm.*, 132nd Legis., at 3:01:19–3:13:08 p.m. (Mar. 4, 2025) (oral testimony of Rep. Libby on L.D. 444, "An Act to Lower Energy Costs by Repealing the Law Setting Out the State's Goals for Consumption of Electricity from Renewable Resources"), https://tinyurl.com/2jk9rbrp.

[9] JA78; *see Me. Leg. Archived Hearings & Meetings: Room 127, Tax. Comm.*, 132nd Legis., at 3:34:50–3:56:10 p.m. (Mar. 5, 2025) (oral testimony of Rep. Libby on L.D. 671, "An Act to Abolish the Maine Income Tax and Establish a Zero-based Budget"), https://tinyurl.com/5dnnp7bn.

2025.[10]

Rep. Libby retains her existing committee assignment, which is to the Joint Standing Committee on Labor (the "Labor Committee"). JA78. Rep. Libby may continue to fully participate in the activities of the Labor Committee, including (a) participating at public hearings and work sessions, and (b) voting on motions, including motions to amend legislation referred to the Labor Committee and motions to report referred legislation back to its originating chamber as "Ought to Pass," "Ought to Pass as Amended," or "Ought Not to Pass." JA78–79. Rep. Libby attended public hearings or work sessions of the Labor Committee on March 4, 2025, JA111; April 23, 2025;[11] and May 7, 2025.[12] Rep. Libby can prevent legislation referred to the Labor Committee from being fast-tracked for consideration by the House by voting against that bill in her committee votes. JA79.

---

[10] *See Me. Leg. Archived Hearings & Meetings: Room 126, Transp. Comm.*, 132nd Legis., at 2:00:34–2:11:14 p.m. (Apr. 15, 2025) (oral testimony of Rep. Libby on L.D. 160, "An Act to Eliminate REAL ID Requirements in Maine"), https://tinyurl.com/4avubm5y.

[11] *See Me. Leg. Archived Hearings & Meetings: Room 202, Labor Comm.*, 132nd Legis., at 1:03:21–8:53:39 p.m. (Apr. 23, 2025), https://tinyurl.com/yc4rx79a.

[12] *See Me. Leg. Archived Hearings & Meetings: Room 202, Labor Comm.*, 132nd Legis. at 1:43:30–2:59:47 p.m. and 4:30:22–5:11:27 p.m. (May 7, 2025), https://tinyurl.com/3xxjuz4u.

Rep. Libby can lobby other members to support or oppose legislation in any setting other than formal debate on the floor of the House and to participate in legislative caucus meetings. JA78.

Rep. Libby remains eligible to receive financial benefits provided to Maine legislators, including her full legislative compensation, including her salary stipend and any benefits she might receive. JA79. She is eligible for her constituent service allowance, which defrays the cost of communicating with and providing services to her constituents, and is paid out at the beginning and end of the legislative session. JA80. Rep. Libby is also entitled to travel-related expenses and meal allowances. JA80.

Rep. Libby may continue to use non-partisan legislative staff and offices to support her work as a legislator. JA79. She continues to have access to the services offered by the Maine Revisor of Statutes, the Maine House Clerk's Office, and the Maine Office of Policy and Legal Analysis. JA79. She may also access partisan legislative staff. JA79.

### *Procedural history*

Appellants filed their four-count complaint on March 11, 2025, against House Officers in their official capacities only, along with a motion for a preliminary injunction. JA1–29, JA163–164. Appellants claimed that the censure of Rep. Libby violated Rep. Libby's First Amendment rights and Appellants' rights under the

Fourteenth Amendment and the Guaranty Clause. JA22–28. Their preliminary injunction motion sought an order against the House Officers requiring them to permit Rep. Libby to speak and vote on the House floor. D. Ct. Doc. 8 at 20 (Mar. 11, 2025).

After expedited briefing, the district court denied Appellants' motion on April 18, 2025. JA165–66; Addendum ("Add.") 32–62.[13] The court reasoned that all the acts challenged by Appellants were legislative in nature because they were "done in a session of the House by one of its members in relation to the business before it." Add.48. (quoting *Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 630 (1st Cir. 1995)). The court applied the reasoning of *Harwood*: "it is beyond serious dispute that enforcing a duly enacted legislative rule" that "affects the manner in which the House conducts its most characteristic legislative functions, e.g., debating and voting" is "indubitably part and parcel of the legislative process." 69 F.3d at 632; *see* Add.48. The court analogized the circumstances presented to the legislative rule addressed in *Harwood* "because the sanction imposed does in fact affect debating and voting on measure before the House during full House sessions while the sanction is in place." Add.49.

---

[13] This brief cites to the district court's corrected order. JA167.

The district court rejected Appellants' arguments that the acts in question were administrative in nature because the conduct they challenged "occurred during a legislative session and the legislative body was applying a black-letter house rule." Add.47. Accordingly, the conduct fell "within the legitimate legislative sphere" protected by legislative immunity. Add.48 (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) (cleaned up)).

The trial court also considered this Court's precedents on whether the circumstances presented were "of an extraordinary character" as to pierce legislative immunity based on "the character of the act being challenged" and the "context." Add.50 (quoting *Cushing*, 30 F.4th at 52). The district court distinguished the conduct at issue from the Supreme Court's decisions in *Kilbourn v. Thompson*, 103 U.S. 168 (1880), *Bond v. Floyd*, 385 U.S. 116 (1966), and *Powell v. McCormack*, 395 U.S. 486 (1969), concluding that none of those cases addressed conduct that required the court to disregard the Speaker and the Clerk's legislative immunity. Add.53, Add.56–57.

After weighing "the details presented by the parties about the House governing rules, and the process by which the House adopted the Resolution and imposed the censure on Representative Libby," the district court "conclude[d] that the suspension of Representative Libby's privilege to speak or vote on the House floor is not of such an extraordinary character that this exception to absolute

legislative immunity for legislators will apply." Add.61. The court thus denied the motion and a motion for injunction pending appeal. JA166–67.

Appellants appealed and moved for emergency relief pending their appeal. To this Court, Appellants narrowed their request for relief to an injunction solely against Clerk Hunt and only to permit Rep. Libby to vote. The Court denied that motion on April 25, 2025, and granted the parties' motion for expedited briefing. On May 20, 2025, the Supreme Court issued an injunction pending appeal that requires Clerk Hunt to tally Rep. Libby's votes during the pendency of this appeal, and any subsequent proceedings in the Supreme Court.

## SUMMARY OF THE ARGUMENT

The District Court correctly concluded that Appellants' claims are barred by legislative immunity and thus they lacked the likelihood of success required to obtain a preliminary injunction.

Legislative immunity, which protects the independent legislative function from meddling by the other branches, bars Appellants' claims. Absolute legislative immunity shields both legislators and their staff from any suit challenging conduct that is legislative in nature. All of the conduct challenged by Appellants are legislative acts because each act is a matter entrusted to the exclusive jurisdiction of the House and occurs on the floor of the House while the House is in session. Moreover, because the House Officers are following firmly established legislative

14

rules and Rep. Libby continues to enjoy significant other legislative privileges, Appellants' claims cannot overcome the required broad application of legislative immunity.

Even if legislative immunity did not apply, Appellants would lack a likelihood of success on the merits of their constitutional claims under the First and Fourteenth Amendments and the Guarantee Clause. Rep. Libby's First Amendment claim is contradicted by long historical practice, stretching back to colonial times, of legislatures imposing punishment on their members for speech both inside and outside the body. Given this history, the First Amendment should not be understood to prohibit state legislature from exercising their constitutional prerogative to punish their members for endangering children or otherwise breaching ethical rules merely because the breach occurs through a member's speech.

Appellants' Fourteenth Amendment claim fares no better. Such claims are properly analyzed under the flexible *Anderson-Burdick* balancing test. House Rule 401(11) easily passes this test: it imposes only reasonable and non-discriminatory burdens on Appellants' equal protection rights, no different than a generally applicable rule governing legislative vacancies. Meanwhile, the governmental interest in repairing the House's integrity and reputation is strong. Appellants' contention that the Court should eschew *Anderson-Burdick* and instead analyze House Rule 401(11) like a malapportioned legislative district is devoid of caselaw

support and, in any event, would not produce a different outcome given the strong governmental interests at stake.

Appellants come nowhere near to demonstrating that the House Officers' actions are a justiciable violation of the Guarantee Clause. Imposition of a conditional and limited legislative punishment on a single legislator does not create the sort of existential threat to republican governance that could conceivably trigger the Clause. In any event, Rule 401(11)'s colonial-era origins defeat any Guarantee Clause claim since the Clause ratified the republican nature of state governments then in existence.

Finally, the remaining injunction factors favor the House Officers. Public policy strongly favors avoidance of federal-court interference in internal state legislative affairs. And the Supreme Court's injunction pending appeal moots much of irreparable harm Appellants allege they will suffer absent an injunction, leaving only speculative future harms.

## STANDARD OF REVIEW

In considering whether to issue a preliminary injunction,

> trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

16

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 15 (1st Cir. 1996). "The *sine qua non* of" the four relevant factors "is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). "The district court's grant or denial of a preliminary injunction is reviewed for an abuse of discretion, with conclusions of law reviewed de novo and findings of fact for clear error." *Trafon Grp., Inc. v. Butterball, LLC*, 820 F.3d 490, 493 (1st Cir. 2016).

## ARGUMENT

### I.   The District Court correctly determined that legislative immunity protects the challenged acts of the House Officers.

"The purpose of [legislative] immunity is to insure that the legislative function may be performed independently without fear of outside interference," *Supreme Court of Va. v. Consumers Union of U.S.*, 446 U.S. 719, 731 (1980), including "intimidation by the executive and accountability before a possibly hostile judiciary," *United States v. Johnson*, 383 U.S. 169, 181 (1966). While the privilege derives from the Speech and Debate Clause, U.S. Const. Art. I, § 6, cl. 1, its reach is not limited to speech and debate. Instead, it protects any action "in a field where

17

legislators traditionally have power to act," *Tenney v. Brandhove*, 341 U.S. 367, 379 (1951), or an "integral step[] in the legislative process," *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998).

All of the conduct challenged by Appellants is legislative in nature because every act challenged is an act that occurs on the floor of the House in accordance with powers specifically enumerated in Maine's Constitution. The House Officers are therefore absolutely immune from suit based on those acts, and Appellants are unlikely to succeed on the merits of their claims.

### A.    Appellants challenge only legislative acts.

The protection afforded by legislative immunity applies to the "deliberative and communicative processes by which Members participate in committee and House proceedings with respect to" either "the consideration and passage or rejection of proposed legislation" or "other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. 606, 625 (1972); *see also Kilbourn*, 103 U.S. at 204 (legislative acts are those "things generally done in a session of the House by one of its members in relation to the business before it").

Throughout their brief, Appellants emphasize *Gravel*'s first category, but downplay or ignore caselaw interpreting *Gravel*'s second category—"other matters which the Constitution places within the jurisdiction of either House." 408 U.S. at

18

625. Their cramped view is at odds with precedent. For example, a legislative body's discipline, punishment, or expulsion of one of its members is a legislative act.[14] Legislative acts also include the allocating of party resources and excluding a member from a party caucus.[15] And, the adoption and enforcement of legislative rules are likewise legislative acts protected by legislative immunity, even if those rules affect member voting.[16]

---

[14]  *Whitener v. McWatters*, 112 F.3d 740, 741, 744 (4th Cir. 1997) (holding "a legislative body's discipline of one of its members is a core legislative act" and concluding "disciplinary action taken by [a county legislative body] against one of its members" was protected by legislative immunity); *Gamrat v. McBroom*, 822 F. App'x 331, 334 (6th Cir. 2020) ("the House's expulsion of Gamrat was legislative activity, regardless of any bad faith, and Gamrat cannot sue the House Defendants for participating in that process"), *cert. denied* 141 S. Ct. 1700 (2021); *Rangel v. Boehner*, 785 F.3d 19, 24 (D.C. Cir. 2015) (holding House disciplinary proceedings are legislative acts that "fall comfortably within the scope of the Speech or Debate Clause"), *cert. denied* 577 U.S. 873 (2015).

[15]  *Youngblood v. DeWeese*, 352 F.3d 836, 841–42 (3d Cir. 2003) ("allocating the total appropriation for office staffing among the Democratic house members are 'within the sphere of legitimate, legislative activity'" (quoting *Tenney*, 341 U.S. at 376)); *Kent v. Ohio House of Representatives Democratic Caucus*, 33 F.4th 359, 366 (6th Cir. 2022) (concluding control of caucus membership and allocating caucus resources are legislative acts protected by legislative immunity); *McCann v. Brady*, 909 F.3d 193, 194, 197–98 (7th Cir. 2018) (allocation of partisan staff resources protected by legislative immunity).

[16]  *Cushing v. Packard*, 30 F.4th 27, 49 (1st Cir. 2022) (en banc) (enforcement of House rule precluding remote participation in House proceedings, including voting, by Speaker of New Hampshire House of Representatives constituted "legislative act" protected by legislative immunity), *cert. denied* 143 S. Ct. 308 (2021); *Nat'l Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 625 (1st Cir. 1995) (legislators and legislative aides protected by legislative immunity for enforcing a legislative rule); *Massie v. Pelosi*, 72 F.4th 319, 322–23 (D.C. Cir. 2023) (adoption and

19

The plain language of Maine's Constitution shows that all the conduct challenged by Appellants is protected. The House adopted the resolution censuring Rep. Libby pursuant to its constitutional authority to "punish its members for disorderly behavior." Me. Const. art. IV, pt. 3, § 4; *accord* U.S. Const. art. I, § 5, cl. 2 (providing the same). The House adopted its rules pursuant to its constitutional authority to "determine the rules of its proceedings." Me. Const. art. IV, pt. 3, § 4; *accord* U.S. Const. art. I, § 5, cl. 2 (providing the same). The House includes vote counts on roll call votes in its journal based on the constitutional requirement that the House record "the yeas and nays of the members" "on any question" when "1/5 of those present" requests it. Me. Const. art. IV, pt. 3, § 5. The censure resolution, the adoption and application of House Rule 401(11), and the recordation of roll call votes all are squarely within the jurisdiction of the House and are legislative acts. Indeed, each act Appellants challenge, from the censure resolution to the tallying of votes by the Clerk, has been "done in a session of the House by one [or more] of its members in relation to the business before it."[17] *Kilbourn*, 103 U.S. at 204. It is hard

———————————

enforcement of a House rule were legislative acts), *cert. denied* 144 S. Ct. 1005 (2024); *McCarthy v. Pelosi*, 5 F.4th 34, 39–41 (D.C. Cir. 2021) (concluding legislative immunity barred review of enactment or enforcement of resolution that enabled United States House Members to cast votes by proxy), *cert. denied* 142 S. Ct. 897 (2022).

[17] Appellants suggest that the challenged acts are administrative because they, allegedly, singled out Rep. Libby and treated her differently from others. Br. at 15–

"to conceive of matters more integrally part of the legislative process than the rules governing how Members can cast their votes on legislation." *McCarthy v. Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021).

**B.     Clerk Hunt is also protected by legislative immunity.**

Legislative immunity extends not only to legislators, but to legislative aides and staff "insofar as the conduct of the latter would be a protected legislative act if performed by the [legislator her]self." *Gravel*, 408 U.S. at 618; *see also Massie v. Pelosi*, 72 F.4th 319, 323 (D.C. Cir. 2023) (concluding House Sergeant-at-Arms and Chief Administrative Officer were engaged in legislative acts when they enforced a U.S. House resolution through fines and salary garnishment).

Appellants' bid to carve out the Clerk's tally from the legislative process ignores the larger context. Br. at 20–24. First, the Clerk is not a mere "employee" of the House. Maine's Constitution requires that House members elect both a Speaker *and* a Clerk. Me. Const. art. IV, pt. 1, § 7. Indeed, the House *elected* Clerk Hunt to

---

16. But the cases they cite involve conduct or documents materially different from conduct on the House floor. *See Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1 (1st Cir. 2000) (firing employees of the opposing political party was administrative in nature); *In re Grand Jury Proc.*, 563 F.2d 577, 585 (3d Cir. 1977) (concluding legislative immunity did not preclude the production of "payroll and tax evidence" of legislative employees).

the position on December 4, 2024.[18] Further, the House must "keep a journal, and from time to time publish its proceedings" that includes vote counts on roll call votes. Me. Const. art. IV, pt. 3, § 5. In other words, the recordation of House members' votes (or lack thereof) is also legislative conduct—regardless of whether an individual legislator or the Clerk tallies the vote.[19] Because passing legislation and voting are core legislative acts, *Gravel*, 408 U.S. at 625–26; *Cushing*, 30 F.4th at 49 (voting); *Harwood*, 69 F.3d at 635 (passing legislation), the Court should reject Appellants' dubious claim that tallying votes, i.e., the process by which the House determines whether a measure has been passed, is somehow not a legislative act. *Bogan*, 523 U.S. at 55.

Neither *Kilbourn*, 103 U.S. 168, nor *Powell*, 395 U.S. 486, compels a different result. Br. at 20–23. As an initial matter, both cases predate the Supreme Court's decision in *Gravel*, 408 U.S. at 618, which formally extended the protections of legislative immunity to staff "insofar as the conduct ... would be a protected legislative act if performed by the Member himself." The Court explained:

> it is literally impossible, in view of the complexities of the

---

[18] *Me. Leg. Archived Hearings & Meetings: House Chamber*, 132nd Legis., at 11:59:24 a.m. to 12:41:30 p.m. (December 4, 2024), https://legislature.maine.gov/Audio/#house_chamber?event=92009&startDate=2024–12–04T10:00:00–05:00.

[19] Only roll call votes must be included in the House's journal. Me. Const. art. IV, pt. 3, §5. Failure to request a roll call vote on a measure brought to the floor is deemed to be consent to the measure. JA74.

> modern legislative process ... for Members of Congress to
> perform their legislative tasks without the help of aides
> and assistants; [] the day-to-day work of such aides is so
> critical to the Members' performance that they must be
> treated as the latter's alter egos[.]; and [] if they are not so
> recognized, the central role of the Speech or Debate
> Clause—to prevent intimidation of legislators by the
> Executive and accountability before a possibly hostile
> judiciary—will inevitably be diminished and frustrated.

*Id.* at 616–17 (citation omitted). *But cf. Powell*, 395 U.S. at 505–06 (rejecting the

reasoning *Gravel* adopted just three years later). Appellants fail to grapple with

*Gravel* as applied to Clerk Hunt.

Supreme Court decisions after *Gravel* have focused on the "nature of the act"

challenged, *Bogan*, 523 U.S. at 54, and not the identity of the actor, to determine if

legislative immunity attaches. *See, e.g.*, *Eastland*, 421 U.S. at 504–07; *Doe v.

McMillan*, 412 U.S. 306, 311–18 (1973). Indeed, *Gravel* distinguished *Kilbourn*

based on the nature of the act challenged: voting to adopt a resolution to arrest

Kilbourn was protected because it "was clearly legislative in nature," but the act of

arresting Kilbourn clearly was not legislative and therefore not protected. 408 U.S.

at 618–19 (citing *Kilbourn*, 103 U.S. at 200–04). While the arrest was executed in

*Kilbourn* by the House Sergeant-at-Arms, that conduct would not have been

protected by legislative immunity even if it had been undertaken by a legislator.

It is true that *Powell* said that injunctive relief could be obtained against the

U.S. House Sergeant-at-Arms, the Doorkeeper, and the Clerk. 395 U.S. at 504. But

*Gravel* calls into question this aspect of *Powell*. As this Court has already reasoned, "in later cases" *Powell* "has routinely" been "confined" "to its unique facts." *Harwood*, 69 F.3d at 633. Moreover, in subsequent cases, the Supreme Court has distinguished *Powell* and carefully limited its reach. *See, e.g.*, *Gravel*, 408 U.S. at 620. Indeed, both *Powell* and *Bond* are best understood as qualifications cases, which prohibit legislative bodies from imposing additional requirements on members-elect that are not stated in the governing constitution before they are seated or sworn in.[20] *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 787–88 (1995) (explaining *Powell* "reviewed the history and text of the Qualifications Clauses in a case involving an attempted exclusion of a duly elected Member of Congress"); *Nixon v. United States*, 506 U.S. 224, 236–38 (1993) (explaining *Powell* addressed the qualifications of a member-elect).

Appellants also rely on *Consumers Union*, 446 U.S. 719, to claim that an injunction can run against Clerk Hunt because he is merely enforcing the House rules. Br. at 22. But the critical distinction in *Consumers Union*, that the Virgina Supreme Court both adopted rules, and then enforced them through separate administrative or judicial proceedings, *see* 446 U.S. at 734, is not present here.

---

[20] *Bond* itself did not address the issue of legislative immunity, and neither *Bond* nor *Powell* addressed the ability of a legislative body to punish one of its members.

Instead, all of the conduct challenged by Appellants occurs on the floor of the House *during* the legislative process. And Appellants' claim that relief could run against the Clerk in only a "non-legislative capacity," Br. at 22, rests only on their own ipse dixit, and not any explanation of why tallying votes is not an integral step in the legislative process. *Bogan*, 523 U.S. at 55.

### C. The district court's decision is in accord with this Court's precedent.

Appellants discount both *Harwood* and *Cushing* because they claim the legislative rules at issue did not "single out" a legislator. Br. at 24–26. But they artificially narrow this Court's precedent.

*Harwood* addressed a challenge to a rule adopted by the Rhode Island House of Representatives that banned "both lobbyists and lobbying from the floor of the House while the House is in session." 69 F.3d at 625. Excluded lobbyists filed suit against the Speaker and the head doorkeeper challenging the rule on First Amendment and Fourteenth Amendment grounds. *Id.* at 626–27. While plaintiffs prevailed at trial, *id.*, this Court reversed on grounds of legislative immunity, *id.* at 628. The court reasoned that:

> Where, as here, a legislative body adopts a rule, not invidiously discriminatory on its face, that bears upon its conduct of frankly legislative business, we think that the doctrine of legislative immunity must protect legislators and legislative aides who do no more than carry out the will of the body by enforcing the rule as a part of their official duties.

*Id.* at 631 (citation omitted).[21] *Harwood* teaches that when actors, like the House Officers, adhere to and enforce legislatively adopted rules that govern the conduct of legislative proceedings, their acts are legislative and protected by immunity. *Id.*

In *Cushing*, 30 F.4th 27, the Court also held that the enforcement of a legislative rule was protected by legislative immunity, even when legislators claimed the rule prevented them from voting and participating. In 2021, the New Hampshire House of Representatives adopted rules that did not permit remote participation; attempts to change the rule to allow virtual participation were voted down by the body. *See id.* at 33–34. Several medically vulnerable members of the New Hampshire House filed a § 1983 suit against their Speaker. *Id.* at 34. They challenged the rule prohibiting remote participation on federal statutory grounds, *id.* at 34–35, effectively arguing that they were prevented from carrying out their legislative obligations to their constituents. The en banc Court concluded that the Speaker's conduct, i.e., determinations about applicable rules and procedures for casting votes, was protected by legislative immunity. *Id.* at 49 ("voting by Members itself constitutes a legislative act" (cleaned up)).

But Appellants' illogical leap, that neither case has any bearing on a case

---

[21] Rule 401(11) is not invidiously discriminatory: it applies to all House members for all breaches of rule or order. JA94.

26

brought by an individual legislator, cannot withstand scrutiny. Both cases were brought by multiple plaintiffs challenging the application of procedural rules. Neither *Harwood* nor *Cushing* suggests that their outcomes would have been different if only one plaintiff had filed suit, instead of several. Instead, both cases turn on the application of a generally applicable rule adopted by a legislative body to govern its proceedings.

Here, as in *Harwood*, the House adopted Rule 401(11) to govern its proceedings and the House Officers have done "no more than carry out the will of the [House] by enforcing the rule as a part of their official duties." 69 F.3d at 631 (citation omitted). As in *Cushing*, the House Officers are "follow[ing]—rather than depart[ing] from—existing House rules that were overwhelmingly passed" by the body. 30 F.4th at 51; *see also* Add.59 (noting prior applications of House Rule 401(11)). Appellants' claim that Rep. Libby was "singled out" is also at odds with *Bogan*‚ which specifically rejected the position that the challenged conduct "was not legislative because their actions were specifically targeted at respondent." 523 U.S. at 54–55.

### D.   Appellants' other arguments are unavailing.

Despite instruction from the Supreme Court that the "privilege" of legislative immunity "should be read broadly," *Johnson*, 383 U.S. at 179, Appellants contend that this case falls within the potential exception to legislative immunity for acts "of

an extraordinary character," *Kilbourn*, 103 U.S. at 204. *Kilbourn* identified two examples of conduct that might pierce the immunity and impose liability: if a legislative body "imitate[d] the Long Parliament in the execution of the Chief Magistrate of the nation" or "follow[ed] the example of the French Assembly in assuming the function of a court for capital punishment." *Id.* at 204–05. No court that has considered *Kilbourn*'s "of an extraordinary character" language has ever concluded that the facts presented warranted application of the exception.[22]   The present case is no different.

First, and as the district court recognized, Add.21, the House Officers are following the will of the House, as expressed through its rules and acts. *See Cushing*, 30 F.4th at 51. The House Rules were adopted by unanimous consent. JA74. House Rule 401(11) has been a rule of the House since 1820, JA49, JA55, and has been applied at least three times in modern history, Add.59. No member objected to the

---

[22] *See, e.g.*, *Tenney*, 341 U.S. at 378–79; *Gravel*, 408 U.S. at 619; *Cushing*, 30 F.4th at 50–53; *Harwood*, 69 F.3d at 634–35, *United States v. Johnson*, 337 F.2d 180, 186–91 (4th Cir. 1964) (accepting a bribe for a House floor speech was protected by legislative immunity), *aff'd* 383 U.S. 169 (1966); *Agnew v. Moody*, 330 F.2d 868, 869 (9th Cir. 1964); *Tolman v. Finneran*, 171 F. Supp. 2d 31, 36 (D. Mass. 2001) ("The failure, even if unconstitutional, to appropriate funds for an election reform does not constitute a flagrant violation of a fundamental constitutional protection so extraordinary as to abrogate legislative immunity."); *Kansas v. Neufeld*, 926 P.2d 1325, 1341 (Kan. 1996) (concluding House floor conversations among legislators inadmissible in one of those legislator's blackmail prosecution).

Speaker's ruling on February 25, 2025, that found Rep. Libby in violation of House Rule 401(11), including Rep. Libby. JA77. Nevertheless, since February 25, 2025, two votes have been taken on the floor of the House to suspend application of House Rule 401(11) to Rep. Libby. JA80. Neither vote succeeded. JA80. Should these circumstances change by a vote of the body, the House Officers will act accordingly.

Second, Rep. Libby has not been suspended or expelled from the House, nor are the House Officers prohibiting Rep. Libby's "freedom of thought" or silencing her voice. Br. at 29. Rep. Libby has continued her advocacy regarding transgender student athletes, including appearing with the Attorney General at press conference on April 16, 2025.[23] *See also* JA11. Moreover, Rep. Libby is not precluded from, among other acts, sponsoring and co-sponsoring legislation, committee work, presenting motions on the House floor, lobbying other members, participating in legislative caucuses, and testifying on bills in public hearings. JA78–80. Rep. Libby can affect the passage of legislation by calling for a roll call vote on measures or legislation that would otherwise pass upon the consent of the body. JA79. And Rep. Libby could regain all her privileges if she complied with the censure resolution and apologized—a condition of ordinary character that is within Rep. Libby's control.

---

[23] Department of Justice, *Attorney General Bondi Announces Lawsuit Against Maine*, C-SPAN  (Apr. 16, 2025), *available at* https://tinyurl.com/54mr6tm5.

Appellants' "parade of horribles" thus does not move the needle. Br. at 23. Legislative immunity is not limitless, but "[w]hatever may be the outer limits of the doctrine," "it is clear that the instant case is not so extreme as to cross (or even closely approach) the border." *Harwood*, 69 F.3d at 634 (rejecting similar arguments as Appellants make here). As the district court recognized, Add.23–24, this case is far from the "high bar that *Kilbourn* plainly intended to set for stripping seemingly protected acts from the cover [legislative] immunity confers." *Cushing*, 30 F.4th at 52.

Appellants contend that the House Officers are abusing the doctrine of legislative immunity, turning a shield into a sword. Br. at 1, 28–30. But this case demonstrates, at a fundamental level, the purposes of legislative immunity. "[T]hroughout United States history, the privilege [of legislative immunity] has been recognized as an important protection of the independence and integrity of the legislature." *Johnson*, 383 U.S. at 178. It "reinforc[es] the separation of powers so deliberately established by the Founders." *Id.*

Appellants argue that federal courts can and should interfere in the daily operations of the Maine House of Representatives and set aside a rule that has governed the House for more than two centuries. Br. at 26–29. Their approach risks inhibiting legitimate, legislative acts of the House, both now and in the future. "An uncertain privilege, or one which purports to be certain but results in widely varying

applications by the courts, is little better than no privilege at all." *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981); *see also Sable v. Myers*, 563 F.3d 1120, 1123–24 (10th Cir. 2009). "Like any privilege, the one that the Speech or Debate Clause grants to" legislators "would be virtually worthless if courts judging its applicability had to scrutinize very closely the acts ostensibly shielded, especially if those courts then had to balance the considerations for and against extending privileged status." *In re Grand Jury Subpoenas*, 571 F.3d 1200, 1206 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (quotation marks omitted).

"The Speech or Debate Clause, and the doctrine of legislative immunity on which it rests, essentially tells the courts to stay out of the internal workings of the legislative process." *McCann v. Brady*, 909 F.3d 193, 194, 198 (7th Cir. 2018); *accord Cushing*, 30 F.4th at 52. Doing so does not put the House Officers "above the Constitution," Br. at 24, but enables them to serve the public without fear of suit or personal liability. "[A] private civil action, whether for an injunction or damages, creates a distraction and forces [legislators] to divert their time, energy, and attention from their legislative tasks to defend the litigation." *Consumers Union*, 446 U.S. at 733 (quoting *Eastland*, 421 U.S. at 503); *see also Tenney*, 341 U.S. at 377.

And while legislative immunity can insulate conduct that would be deemed unconstitutional in other contexts, *Massie*, 72 F.4th at 323, that is by design. "[T]he risk of such abuse was 'the conscious choice of the Framers' buttressed and justified

31

by history." *Eastland*, 421 U.S. at 510 (quoting *United States v. Brewster*, 408 U.S. 501, 516 (1972)). "[I]n order to preserve other values, they wrote the privilege so that it tolerates and protects behavior on the part of Members not tolerated and protected when done by other citizens." *Brewster*, 408 U.S. at 517. Application of the doctrine here supports the doctrine's central purpose: legislative independence. *Eastland*, 421 U.S. at 510–11.

## II. Even if legislative immunity did not apply, Appellants' claims would be unlikely to succeed on the merits.

Because legislative immunity provides an absolute shield to the House Officers, the Court need not consider the merits of Appellants' constitutional claims. But even if the Court were to disagree on immunity, Appellants have not shown a clear likelihood of success on the substance of those claims.

### A. Rep. Libby's First Amendment claim is unlikely to succeed.

The Supreme Court has held that a legislator has no First Amendment right to vote on legislation. *See Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011). It has further held that a censure, by itself, cannot form the basis for a First Amendment retaliation claim. *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 479 (2022). Appellants seek to fit their First Amendment retaliation theory within the only area left open by these decisions: the extent to which "legislative censures accompanied by punishments," *id.* at 480, can amount to unconstitutional retaliation

32

for speech. It is far from clear that the First Amendment has or should have any application to legislative disputes like the one presented.

*Wilson* makes clear that such a claim faces an uphill battle. In considering such a claim, "great weight" must be given to "long settled and established practice" concerning the punishment imposed. *Id.* at 474 (quoting *The Pocket Veto Case*, 279 U. S. 655, 689 (1929)). And, as *Wilson* observed, going back to colonial times "assemblies often exercised the power to censure members for views they expressed and actions they took 'both within and without the legislature.'" *Id.* at 475 (quoting D. Bowman & J. Bowman, *Article I, Section 5: Congress' Power to Expel—An Exercise in Self-Restraint*, 29 Syracuse L. Rev. 1071, 1084–1085 (1978)).

Rep. Libby's First Amendment claim is inconsistent with long-settled and established practice. Historical practice supports that legislative bodies have the power to impose punishments on legislators that may disrupt their ability to vote. *See Carrigan*, 564 U.S. at 122–25 (relying in part of the long history of recusal rules in law in this country applicable to legislators, none of which were ever thought to violate the First Amendment). During the colonial era, "many a member was punished by fine, imprisonment, censure, admonition, forced apology, and kneeling at the bar." *See* M.P. Clarke, *Parliamentary Privilege in the American Colonies* 190 (1971) (*Parliamentary Privilege*); *see also* Cushing, Luther, *Elements of the Law and Practice of Legislative Assemblies in the United States*, at 251 (1866)

33

("*Elements*"), *available at* https://tinyurl.com/bdzx6336 (noting that imprisoned members of parliament could secure their release by submitting a petition to the body "expressing contrition for their offences"). Rule 401(11), which imposes consequences for a failure "ma[k]e satisfaction" for misconduct, is a species of "forced apology" rule.

Other past and present legislative bodies across the country also have followed versions of Rule 401(11).[24] And there are many examples of legislative bodies compelling apologies either through formal censure, threat of censure, or threat of investigation. In June of 1838, two members of the U.S. House voluntarily apologized for breach of order and decorum in the face of an impending vote on a resolution that would have required them to "apologize for violating [House] privileges and offending its dignity." 2 A. Hinds, *Precedents of the House of Representatives* §1648 at 1121–22 (1907) (Hinds). In 1843, the U.S. Senate voted not to censure Senator Tappan for disclosing confidential treaty materials to a

_____

[24] *See* Rules and Precedents of the General Assembly of Connecticut, House Rules ¶ 18; Senate Rules ¶ 16 (2023), *available at* https://tinyurl.com/yc9zdn7c; Rules of the Arizona House of Representatives, 56th Legislature, Rule 1(B), *available at* https://tinyurl.com/34xvvj3c; *see also* Rule 26, Standing Rules of the Assembly of the State of Florida (1872), *available at* https://tinyurl.com/4jnec2p3; Rules and Orders, ¶ 26, Journal of the House of Representatives of the Territory of Washington (1854), *available at* https://tinyurl.com/bdz6jkrp; *see also* Rules of Order of the Louisiana Senate, 50th Reg. Sess. § 6.3(D), *available at* https://tinyurl.com/ 2ve333xa; Rules of Order of the Louisiana House of Representatives, 50th Reg. Sess. § 5.2(D), *available at* https://tinyurl.com/4h6w3v7b.

newspaper in part because he "apologized and acknowledged his wrongdoing." A. Butler & W. Wolff, *United States Senate: Election, Expulsion, and Censure Cases 1793–1990* at 47–48 (1995). In 1868, the U.S. House censured a member for offensive words used during debate, which required the member to "retract or explain his words and make a satisfactory apology." Hinds, §1247 at 798–99; *see also* Hinds, §§1257, 1646–47, 1657 at 808–10, 1120–21, 1135–37 (noting other apologies by House members to escape investigation or punishment by the body). In 1917, the Wisconsin Senate voted to censure a member and require him to sign a pre-drafted apology for his conduct; the member was expelled when he refused to sign. Wis. Sen. Journ., 53rd Sess. at 597–601 (1917).

More recent examples also exist. Rep. Libby is the fourth Maine legislator in recent times to be subject to Rule 401(11)'s apology requirement. Two representatives were censured in 2024 for remarks they made on the House floor. Me. H. Jour., 131st Leg., 2d Reg. Sess. at 1723–24 (Apr. 11, 2024). Both apologized. *Id.* In 2001, a representative was censured for verbally abusing another member in the hallway outside the House chamber. Me. H. Jour., 120th Leg., 1st Reg. Sess. at 145 (Feb. 8, 2001). He also apologized.[25] *Id.* at 149. Similarly, the Oklahoma House

---

[25] The resolutions and portions of House journals concerning these censures have been compiled by the Maine Legislature at the following link: https://legislature.maine.gov/discipline-of-maine-legislators.

recently censured a member and stripped them of all committee assignments until they publicly apologized. Okla. H. Jour., 59th Leg., 1st Reg. Sess. at 506–7 (Mar. 7, 2023).

Appellants wrongly compare Rep. Libby's circumstances to a "suspension." Br. at 35. Their analogy is inapt, given the plethora of legislative privileges she continues to enjoy and because Rep. Libby can restore her privileges at any time by apologizing for her misconduct. Nevertheless, while there was "less unanimity" about the legislature power to "exclude members indefinitely from their seats," the "practical answer to this problem for many years was in favor of legislative supremacy." *Parliamentary Privilege* at 200; *see also Elements* at 251 (discussing suspension as a valid legislative punishment). Indeed, there are at least two early examples of suspensions of Maine legislators. Around 1784, the Massachusetts House suspended Maine Rep. Jeremiah Learned of Oxford while he was under indictment for "seditiously and riotously opposing the collection of public taxes." Cushing, Luther, *Reports of Contested Elections* at 13 (1834), *available at* https://tinyurl.com/a5xdkrxv. Similarly, around 1808, Maine Rep. John Waite of Falmouth was "suspended from exercising the duties of a member" based on his conviction for forgery. *Id.* at 50.

Examples outside of Maine also exist. In 1902, the U.S. Senate found two members in contempt for a physical altercation. A Senate committee described the

ruling as having the effect of "suspend[ing] their functions as Senators," a punishment "clearly within the power of the Senate." *See* U.S. Senate, *The Censure Case of John L. McLaurin and Benjamin R. Tillman of South Carolina*, https://tinyurl.com/5n87ndym. In 1905, the Wisconsin Senate suspended a member for eight months. 1 Wis. Sen. Journ., 47th Sess. at 862–64 (1905). Even though the U.S. House no longer chooses to suspend members, it has recognized that its authority to punish its members for disorderly behavior is not limited to expulsion or censure, but also includes "fine and suspension." H. Rept. No. 90–27, 90th Cong. 1st Sess., at 28 (1967). And numerous state legislative bodies include suspension of legislators, with or without pay, as an available punishment for its members.[26]

---

[26]   Cal. Const. art. IV, §§ 5(2)(A), (B) ("Each house may suspend a Member by motion or resolution" during which time the Member "shall not exercise any of the rights, privileges, duties, or powers of his or her office"); Rules of the Del. House of Rep., 153rd Gen. Assem., § 16(e) (permitting member to be suspended for misconduct by two-thirds vote), *available at* https://tinyurl.com/mr3ppyn3; Rules of the Del. Senate, 153rd Gen. Assem., § 17(h), *available at* https://tinyurl.com/4yr95cs8; Rules of the Haw. House, 33rd Legis., § 29.3 (permitting suspension of a member by two-thirds vote), *available at* https://tinyurl.com/5bcv9f69; Rules of the Haw. Senate, 33rd Legis., § 72 (permitting suspension of a member by two-thirds vote), *available at* https://tinyurl.com/fuwyz56c; Iowa House Code of Ethics, 91st Gen. Assem., § 12(l) (permitting members to be suspended without pay for ethics violations), *available at* https://tinyurl.com/jan4hews; Iowa Sen. Code of Ethics, 91st Gen. Assem., § 19(f) (noting available sanctions for ethics violations includes suspension from membership), *available at*, https://tinyurl.com/4rmw6ewm; Rules of the Mass. Sen., 194th Gen. Ct., Rule 12A (available discipline for Senate Rule violation includes "suspension with or without pay"), *available at* https://tinyurl.com/2cu9a3a3; *Pine v. Commonwealth*, 93 S.E. 652, 655 (Va. 1917) (explaining express legislative

Appellants contend that this case is comparable to *Bond v. Floyd*, 385 U.S. 116, in which the Supreme Court held that the Georgia House of Representatives could not refuse to seat a duly elected candidate based on his statements criticizing the Vietnam war. Br. at 31. But *Bond* involved a legislature seeking to impose extra-constitutional qualifications on an elected candidate in order to refuse to seat him—thereby completely excluding him from the body. In considering whether a censure could violate the First Amendment, *Wilson* distinguished *Bond*, noting that "the power to exclude and the power to issue other, lesser forms of discipline 'are not fungible' under our Constitution." 595 U.S. at 481 (quoting *Powell*, 395 U.S. at 512).

*Wilson*'s distinction applies here. While Rule 401(11) imposes more punishment than a pure censure, it is far less than the complete exclusion at issue in *Bond*. And, as shown above, it is a punishment well-supported by history and practice. Further, unlike in *Bond*, Rule 401(11) applies to Rep. Libby in her capacity as a sitting legislator, not as a mere member-elect who is not yet subject to the body's rules or Legislative Code of Ethics. The House's interest here in enforcing its ethical rules against sitting members is far more compelling than the Georgia House's

_____

power to punish members for disorderly conduct in Virginia Constitution did not "inhibit the house from exercising other powers, such as the suspension of a member, or the imposition of a penalty for neglect of duty").

purported interest in imposing an extra-constitutional qualification on an elected candidate. In short, *Bond* does not support Rep. Libby's First Amendment claim.

### B.     Appellants' Fourteenth Amendment claims are unlikely to succeed.

As at least two circuits have recognized, the flexible *Anderson-Burdick* analysis[27] used to evaluate ballot-access rules is also the appropriate framework for analyzing a claim by constituents against the imposition of a legislative punishment. *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154–55 (2d Cir. 2010); *Peeper v. Callaway Cnty. Ambulance Dist.*, 122 F.3d 619, 623 (8th Cir. 1997).[28] Applying this standard makes sense because "[a]n individual's right to be a candidate for public office under the First and Fourteenth Amendments is nearly identical to one's right to hold that office." *Peeper*, 122 F.3d at 622; *accord Monserrate*, 599 F.3d at 155 ("it seems clear enough that this flexible framework ... is not limited to the pre-vote context").

Under the *Anderson-Burdick* framework, it is an "erroneous assumption" that any law burdening the right to vote "must be subject to strict scrutiny." *Burdick v.*

---

[27] *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

[28] *Peeper* ultimately invalidated the challenged action of the defendant board after finding it could not withstand even rational-basis scrutiny. 122 F.2d at 619. *Peeper*'s merits analysis sheds little light here, as it involved an overbroad response to a perceived conflict of interest, not legislative punishment.

*Takushi*, 504 U.S. 428, 432 (1992). The framework instead "requires an assessment of the burdens, if any, placed on a plaintiff's constitutionally protected rights, followed by an evaluation of the precise interests put forward by the state as justifications for the burdens." *Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011). Although there is no "litmus-paper test," "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson v. Celebrezze*, 460 U.S. 789, 788–89 (1983). Only "severe restrictions" on First and Fourteenth Amendment rights require the regulation to be "narrowly drawn to advance a state interest of compelling importance." *Gardner*, 638 F.3d at 14 (quoting *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir. 1996)).

Application of Rule 401(11) satisfies *Anderson-Burdick* balancing because the House's regulatory interests are compelling and the restrictions imposed by Rule 401(11) are reasonable and non-discriminatory.

*Burden.* To the extent Rep. Libby's constituents are burdened by the application of Rule 401(11), it is because Rep. Libby refuses to abide by the rules that she, along with every other member of the House, approved at the outset of the session. JA74. Rep. Libby can cure her constituents' alleged injury at any time by simply following the Rule's requirement and apologizing for her breach. JA77. And, contrary to Rep. Libby's assertion, the required apology is not that she "recant[] her views" on transgender athletes. Br. at 41. Rather, as the censure resolution makes

40

clear, she need only apologize for her use of the name and image of a child in a manner that "could result in serious harm" to the child. JA103–04.

Even assuming *arguendo* that Rep. Libby's ability to end her punishment at any time could not be considered, the burden on her constituents is still reasonable. As the district court recognized, "the sanction does not render [Rep. Libby] unable to represent her constituents or speak in favor of or in opposition to policies and legislation in all ways." Add.60. Rep. Libby can still sponsor legislation, testify and vote in committee, and make floor motions and objections, among other things. Add.61.

Appellants downplay these privileges, comparing Rep. Libby to "a judge who cannot hear or decide cases." Br. at 40. But the ability to sponsor legislation is considerably more consequential than the ability to "attend judicial conferences or hire law clerks." *Id.* The same goes for her other remaining privileges. Add.61; JA78–80. While floor votes may be one way to "execute[] the legislative process," Br. at 40 (quoting *Carrigan*, 564 U.S. at 126), so too is introducing legislation, voting in committee, and making floor motions and objections. Indeed, Rep. Libby has confirmed the importance of these privileges by exercising many of them since her censure. *See* JA78–80, JA105–113; Add.61.

Nor is the burden imposed by Rule 401(11) discriminatory. "A mere demonstration that a state provision distinguishes among groups ... is insufficient by

41

itself to establish an equal protection violation." *Barr v. Galvin*, 626 F.3d 99, 109 (1st Cir. 2010). Rather, it is "only 'invidious discrimination' which offends the Constitution." *Id.* (quoting *Am. Party of Tex. v. White*, 415 U.S. 767, 781 (1974)); *see Monserrate*, 599 F.3d at 157.

Two controlling decisions illustrate this principle. In *Barr*, this Court rejected an equal protection challenge to a Massachusetts candidate substitution rule that treated recognized parties more favorably than unrecognized parties. 626 F.3d at 109. Reasoning that "all political organizations are subject to the same criteria for determining whether they qualify for recognition as political parties," this Court concluded that the rule was "nondiscriminatory" and therefore subject only to rational basis review. *Id.* at 109–110. Similarly, in *Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982), the Supreme Court rejected an equal protection challenge to Puerto Rico's process of allowing political parties to fill legislative vacancies. *Id.* at 3–5. The Court concluded that such a process did not discriminate against voters who live in districts that suffer a vacancy, since "[a] vacancy in the legislature is an unexpected, unpredictable event, and a statute providing that all such vacancies be filled by appointment does not have a special impact on any discrete group of voters or candidates." *Id.* at 10 n.10.

These cases teach that the equal-protection analysis should focus not on whether a particular application of a rule affects some voters and not others, but

whether the rule itself draws unjustified distinctions between classes of voters. Viewed through this lens, Rule 401(11) is entirely nondiscriminatory: it applies equally to every member of the House. Any member who breaches House rules, regardless of district, seniority, or party affiliation, is subject to the Rule's requirement to "ma[k]e satisfaction." JA94. Similarly, all Maine voters are subject to the risk that, if they elect a candidate who both engages in misconduct and refuses to make satisfaction, the consequences specified in Rule 401(11) will result.

*Maine's Regulatory Interests.* "It is fundamental that a legislature has an important interest in upholding its reputation and integrity." *Monserrate*, 599 F.3d at 155; *see In re Chapman*, 166 U.S. 661, 668 (1897) (highlighting the authority of U.S. Senate to "vindicate itself from aspersion" and "reproach" from its members' misbehavior). Rep. Libby damaged the House's reputation and integrity. Maine's Legislative Code of Ethics obliges members to protect the "security, safety, health, prosperity, respect and general well-being" of those they serve. JA101. In violation of that Code, Rep. Libby targeted a child and, without the child's or their parents' consent, nationally publicized their name, school, and photograph, in the course of condemning the child's participation in a sports event. Rep. Libby did so despite the child's right under Maine law to participate in the activity "without discrimination" on the basis of their gender identity. 5 M.R.S.A. § 4602. Given such egregious facts,

the House had a strong interest in repairing the damage to its reputation and integrity by holding Rep. Libby to account for her misconduct.

Appellants make no attempt to apply *Anderson-Burdick*. Instead, they rely on a strained analogy to case law holding that legislative districts must be drawn to be roughly equal in population. *See* Br. at 37 (citing *Reynolds v. Sims*, 377 U.S. 533 (1964)). According to Appellants, preventing Rep. Libby from voting or debating on the House floor until she apologizes for her misconduct results in her constituents being "*entirely disenfranchised*," or at least having their voting rights "diluted" in the same manner as if they lived in unconstitutionally malapportioned legislative districts. *Id*.

Neither the Supreme Court nor this Court has ever held that rules affecting a legislator's privileges should be analyzed like the apportionment of voting districts. *Bush v. Gore*, cited by Appellants for this proposition, Br. at 37, in fact stands for the less remarkable proposition that, if a state decides to hold an election, it must administer it in a manner that treats voters equally. 531 U.S. 98, 105 (2000). The sole Court of Appeals decision Appellants cite in support of their "dilution" theory merely suggests, in dicta, that voting restrictions on legislators may be sufficient to confer standing on constituents to challenge those restrictions—which is not at issue here. *Michel v. Anderson*, 14 F.3d 623, 626 (D.C. Cir. 1994). That decision goes on

to conclude that, though the plaintiffs had standing, their claim failed on the merits. *Id.* at 630–32.

Appellants' "vote dilution" theory is ultimately flawed because it relies on conflating two distinguishable acts: voting in a popular election and voting on the floor of a legislative body. While the ballot box is the only way for voters to choose their representatives, legislators have many powers, both formal and informal, by which they can advance legislation and further the interests of their districts. *See* JA78–80. Voting on the floor is just one.

The two acts are also distinguishable because operating a legislative body inevitably requires differential treatment of legislators. Some members are given powerful committee assignments and leadership positions, while others are relegated to the proverbial back bench. The constituents of the former group may well disproportionately benefit. Similarly, a legislative body must have rules—and be able to enforce those rules against its members—to function effectively and to maintain the public's trust. Such considerations are inapplicable to popular elections.

Moreover, even if Rule 401(11) could be analyzed as "vote dilution," the Supreme Court has recognized that sufficiently strong governmental interests can justify some population disparities between districts. *See Brown v. Thomson*, 462 U.S. 835, 844–48 (1983) (upholding apportionment where population disparities resulted from "consistent and nondiscriminatory application of a legitimate state

45

policy"). As already argued, the House's compelling interests in enforcing its rules and protecting its reputation and integrity justify the limited and conditional punishment imposed on Rep. Libby, even under a "vote dilution" analysis.

The two 1970s district court decisions Appellants cite in support of their position should be given no weight. Br. at 39 (citing *Kucinich v. Forbes*, 432 F. Supp. 1101 (N.D. Ohio 1977), and *Ammond v. McGahn*, 390 F. Supp. 655 (D.N.J. 1975), *rev'd on mootness grounds*, 532 F.2d 325 (3d Cir. 1976)). Those cases predate *Anderson* and *Burdick* and thus do not apply the appropriate analysis. Moreover, *Kucinich* involved a complete suspension of a councilmember, unlike the more limited and conditional sanction at issue here, and *Ammond* was, as Appellants note, reversed as moot by the Third Circuit.

The Second Circuit's decision in *Monserrate* illustrates a better approach to evaluating legislative punishment. The court there upheld the New York State Senate's expulsion of a member for a misdemeanor domestic violence conviction. 599 F.3d at 154–57. The court applied *Anderson-Burdick* to reject the plaintiff-constituents' equal protection argument using the same reasoning this Court applied in *Barr*. After concluding the New York Senate's expulsion rules imposed a less-than-severe burden on voters, it held that the rules were consistent with equal protection because "the voters of every Senatorial District are alike subject to the expulsion of their elected representative." *Id.* at 157 (citing *Rodriguez*, 457 U.S. at

10). Because there was no evidence that the expulsion was motivated by "invidious bias" against expelled member's constituents, the equal protection claim failed. *Id.*

Rep. Libby's censure similarly was not some bespoke procedure designed to target her constituents. Rule 401(11) applies to all House members and thus all of their constituents. Other members have been subject to censures in recent years for similar conduct. JA16–17. Moreover, while Rep. Libby's punishment may affect her constituents for longer than the member's expulsion in *Monserrate*, *see* Br. at 27 n.3, that consideration must be balanced against the facts that (1) only two of Rep. Libby's many legislative privileges are affected, and (2) Rep. Libby can restore those privileges at any time by simply complying with a rule that she herself agreed to. Thus, the burden calculus results in the same conclusion of a "less-than-severe" burden. 599 F.3d at 155.

## C. Appellants' Guarantee Clause claim is unlikely to succeed.

Appellants also claim that the censure violates the Guarantee Clause. Br. at 41-46. But it is doubtful that the Supreme Court views Guarantee Clause claims as justiciable. It has rejected all Guarantee Clause claims presented to date, typically on grounds that they present nonjusticiable political questions. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 223 (1962). Most recently, it rejected an argument that it understood as grounded in the Guarantee Clause by flatly stating that "[t]his Court has several times concluded ... that the Guarantee Clause does not provide the basis

for a justiciable claim." *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019). *Rucho* suggests that the Court no longer agrees with previous dicta, *see, e.g.*, *New York v. United States*, 505 U.S. 144, 185 (1992), that left the door open to a justiciable Guarantee Clause claim.

Moreover, while this Court has so far declined to adopt a categorical bar on Guarantee Clause claims, it has made clear that a justiciable claim would require a truly remarkable showing. This Court has noted that the "bare language of the Clause does not directly confer any rights on individuals vis-á-vis the states." *A.C. by Waithe v. McKee*, 23 F.4th 37, 47 (1st Cir. 2022) (quoting *Largess v. Supreme Jud. Ct. for State of Mass.*, 373 F.3d 219, 224 n.5 (1st Cir. 2004)). Thus, any such claim could "perhaps" be justiciable only "in the most egregious circumstances," in which there are "real threats" to the state's republican government. *Largess*, 373 F.3d at 227; *see also Democratic Party of Wis. v. Vos*, 966 F.3d 581, 590 (7th Cir. 2020) (plaintiffs failed to show "an existential threat" to republican government). Examples suggested by the Court of such "egregious circumstances" include "the establishment of a monarchy by a state," "permanent martial law," and "the hostile takeover of one branch by another." *Largess*, 373 F.3d at 225 & 227.

Nothing like that is at issue here. Maine has not become a monarchy or declared permanent martial law. The House continues to function as a majoritarian body. Rep. Libby continues to represent her constituents by participating in many of

its activities. JA78–80. The censure itself, approved by majority vote after due deliberation, shows the body's republican character.

Moreover, all members of the House remain fully accountable to the citizens of Maine. There is no violation of the Guarantee Clause when states "retain the ability to set their legislative agendas and when state government officials remain accountable to the local electorate." *Kerpen v. Metro. Washington Airports Auth.*, 907 F.3d 152, 163 (4th Cir. 2018) (quoting *New York*, 505 U.S. at 186) (cleaned up). Here, if Maine people are displeased by the actions of members who voted for censure, they can organize against them in the next election and vote them out of office. If they support Rep. Libby's conduct, they may likewise support for re-election her and those who supported her conduct. Because the current Legislature cannot bind a future Legislature, *see SC Testing Tech., Inc.*, 688 A.2d at 425, the censure's terms do not apply to a new Legislature even if Rep. Libby never apologizes. JA77.

Relying on a law review article, Appellants suggest that the Guarantee Clause should be reimagined to provide a cause of action to require "state officials [to] stick to those parameters chosen to carry out its republican form of government." Br. at 43. But, in addition to being unsupported by caselaw, Appellants' interpretation of the Guarantee Clause would place it in direct conflict with the Eleventh Amendment, which forbids federal courts from "instruct[ing] state officials on how to conform

49

their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

In any event, the censure and application of Rule 401(11) are well within the "parameters" of the Maine Constitution, which expressly allows the houses of the Legislature to establish rules and punish their members for breaches. Me. Const. art. IV, pt. 3, § 4. While Appellants repeatedly refers to the effect of Rule 401(11) as a "de facto expulsion," Rep. Libby's continued participation in the legislative process, JA78–80, 105–113, and her ability to end her punishment at any time, belie that characterization.

Appellants' Guarantee Clause claim also fails for a second, independent reason. State governments as they existed at the time of the Founding "are each presumed to have been 'Republican' within the meaning of the Guarantee Clause." *Largess*, 373 F.3d at 227; *accord Minor v. Happersett*, 88 U.S. 162, 176 (1874); Federalist No. 43 (J. Madison). The historical record discussed earlier shows that legislative punishments much harsher than the censure at issue here, including suspension and even imprisonment, were accepted at the time of the Founding. What is more, House Rule 401(11), requiring members in breach to "make satisfaction," itself dates back to the Founding era and can be found in the past and present rules of legislative bodies around the country. *See* n.24, *supra*. The recent origins of Appellants' contrary view of legislative punishment is confirmed by their own

source. *See* Br. at 45 (citing *Deschler's Precedents* Ch. 12 § 15.1). Because House Rule 401(11) reflects norms of state legislative governance prevalent when the U.S. Constitution was ratified, its enforcement cannot as a matter of law violate the Guarantee Clause.

## III.    The remaining injunction factors cut strongly against relief.

### A.    The public interest disfavors an injunction.

When the government opposes an injunction, consideration of the public interest and the harm to the opposing party merges into a single factor. *See Does 1– 6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks omitted). The relief sought here would have starkly negative public consequences for the independent functioning of a coequal branch of the Maine government.

This Court has recognized acute dangers in "[t]oo narrow a construction of [legislative] immunity": "not only federal judges improperly intruding into internal state legislative affairs but also warring sides in partisan state legislators' battles improperly enlisting federal judges to participate in them." *Cushing*, 30 F.4th 27, 52 (1st Cir. 2022); *see also Harwood*, 69 F.3d at 633 (describing judicial control of legislative speech or debate as "pernicious"). The relief sought by Appellants would

insert this Court into the middle of an internal dispute within the House over how it should apply its rules and Code of Ethics to its own members and tally votes on the floor of the chamber. Even if the Court were to have doubts as to the applicability of legislative immunity to this dispute—and it should not, *see* Part The District Court correctly determined that legislative immunity protects the challenged acts of the House Officers.I, *supra*—the important policy of protecting "legislative independence," *see Eastland*, 421 U.S. at 503, counsels against preliminary relief.

### B.    Appellants' irreparable harm claim is weak.

Appellants also fail to make the required "clear showing" of irreparable harm. *Winter*, 555 U.S. at 22; *see Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Rep. Libby does not need court intervention to remedy the alleged harm she may experience in a future legislative session; she can restore her full privileges at any time by simply apologizing for her misconduct. As already noted, she need not "recant" any of her views to do so; her apology need only address her decision to publish identifying details of a child.

Appellants alleged that they were "without a vote as hundreds of bills come to the House floor." Br. at 46. But the Supreme Court's just-issued injunction pending appeal negates that alleged harm. Now, there is little question Rep. Libby will retain her vote through the current session of the Legislature. Affirming the District Court would thus likely have no effect at all on Rep. Libby's voting until at

52

least January 2026, when the Legislature's second regular session begins. *See* Me. Const. art. IV, pt. 3, § 1. Rep. Libby certainly cannot point any "significant legislative votes" or "votes in which [her] participation would impact the outcome," *Libby v. Fecteau*, 605 U.S. ___, 2025 WL 1441558 (May 20, 2025) (Jackson, J., dissenting), in that future session. Indeed, even in the current session, the record before the lower court showed that there had not been a single floor vote that was tied or decided by a one-vote margin since the censure. JA78.

## CONCLUSION

For the reasons stated above, the Court should affirm the District Court's denial of Appellants' motion for preliminary injunction.

Dated: May 23, 2025

AARON M. FREY
Attorney General

JONATHAN R. BOLTON
Assistant Attorney General
jonathan.bolton@maine.gov

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
kimberly.patwardhan@maine.gov

Office of the Attorney General
6 State House Station
Augusta ME  04333–0006
Tel. (207) 626–8800
Fax (207) 287–3145

*Attorneys for Defendants-Appellees*

53

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6). I further certify that all text in this brief is in proportionally spaced Times New Roman Font and is 14 points in size. I further certify that, according to the word count function of the word-processing software used to prepare this opposition brief (Microsoft Word 365), this brief contains 12930 words.

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
207–626–8570
kimberly.patwardhan@maine.gov

Office of the Attorney General
6 State House Station
Augusta, Maine 04333–0006

*Attorney for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I, Kimberly L. Patwardhan, hereby certify that on May 23, 2025, I electronically filed the Defendants'-Appellees' Principal Brief with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
207–626–8570
kimberly.patwardhan@maine.gov

Office of the Attorney General
6 State House Station
Augusta, Maine 04333–0006

*Attorney for Defendants-Appellees*