No. 25-1385

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

LAUREL D. LIBBY, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER, RENE FRASER, and DONALD DUBUC,

*Plaintiffs-Appellants*,

v.

RYAN M. FECTEAU, in their official capacity as Speaker of the Maine House of Representatives, and ROBERT B. HUNT, in their official capacity as Clerk of the House,

*Defendants-Appellees*,

On Appeal from the United States District Court
for the District of Maine
No. 1:25-cv-83-MRD

## REPLY BRIEF OF APPELLANTS

Taylor A.R. Meehan
Daniel M. Vitagliano*
Marie E. Sayer
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
mari@consovoymccarthy.com

Patrick N. Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Supervised by principals of the firm
  admitted to practice in VA*

*Counsel for Appellants*

**TABLE OF CONTENTS**

Table of Authorities .........................................................................................................ii

Introduction .....................................................................................................................1

Argument ..........................................................................................................................3

I.    Plaintiffs are likely to succeed on the merits. ..................................................3

      A.  Legislative immunity is inapplicable. ......................................................3

      B.  *Bond* decides the First Amendment claim. ........................................... 13

      C.  The Fourteenth Amendment violation is plain. .................................... 18

      D.  The Guarantee Clause claim is narrow and justiciable. ....................... 21

II.   The remaining equitable factors favor relief. ................................................ 23

Conclusion ...................................................................................................................... 25

Certificate of Compliance ............................................................................................ 26

Certificate of Service ..................................................................................................... 27

i

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ................................................................................. 15

*Acevedo-Garcia v. Vera-Monroig*,
  204 F.3d 1 (1st Cir. 2000) ...........................................................................7

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l*,
  570 U.S. 205 (2013) ................................................................................. 15

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ................................................................................. 19

*Ayers-Schaffner v. DiStefano*,
  37 F.3d 726 (1st Cir. 1994) ...................................................................... 20

*Baker v. Fletcher*,
  204 S.W.3d 589 (Ky. 2006) ..........................................................................5

*Bastien v. Off. of Senator Ben Nighthorse Campbell*,
  390 F.3d 1301 (10th Cir. 2004) ...................................................................5

*Bendix Autolite Corp. v. Midwesco Enters., Inc.*,
  486 U.S. 888 (1998) ................................................................................. 19

*Bogan v. Scott-Harris*,
  523 U.S. 44 (1998) ......................................................................................6

*Bond v. Floyd*,
  385 U.S. 116 (1966) .........................................................1, 8, 14, 17, 18, 24

*Boquist v. Courtney*,
  32 F.4th 764 (9th Cir. 2022) ...................................................... 9, 14, 16, 17

*Buckley v. ACLF*,
  525 U.S. 182 (1999) ................................................................................. 21

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ................................................................................. 19

*Coffin v. Coffin*,
  4 Mass. 1 (1808) ..........................................................................................6

*Council on Am. Islamic Rels. v. Ballenger*,
  444 F.3d 659 (D.C. Cir. 2006) ................................................................. 24

*Counterman v. Colorado*,
  600 U.S. 66 (2023) ...................................................................... 13

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975) .................................................................... 13

*Cushing v. Packard*,
  30 F.4th 27 (1st Cir. 2022)..............................................2, 10, 12

*Duncan v. McCall*,
  139 U.S. 449 (1891) .................................................................... 22

*Dunn v. Blumstein*,
  405 U.S. 330 (1972) .................................................................... 20

*Eslinger v. Thomas*,
  476 F.2d 225 (4th Cir. 1973) .........................................................5

*Fla. Star v. B.J.F.*,
  491 U.S. 524 (1989) .................................................................... 13

*Gamrat v. McBroom*,
  822 F. App'x 331 (6th Cir. 2020) ............................................... 10

*Gattineri v. Town of Lynnfield*,
  58 F.4th 512 (1st Cir. 2023) ....................................................... 13

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*,
  457 U.S. 596 (1982) .................................................................... 13

*Gravel v. United States*,
  408 U.S. 606 (1972) ...........................................1, 3, 4, 5, 6, 7, 9

*Henrietta D. v. Bloomberg*,
  331 F.3d 261 (2d Cir. 2003) ....................................................... 22

*Hous. Cmty. Coll. Sys. v. Wilson*,
  595 U.S. 468 (2022) ..........................................................14, 16, 18

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) .................................................................... 14

*Hustler Mag. v. Falwell*,
  485 U.S. 46 (1988) ...................................................................... 14

*Iancu v. Brunetti*,
  588 U.S. 388 (2019) .................................................................... 16

*Kilbourn v. Thompson*,
  103 U.S. 168 (1880) ................................................... 3, 4, 7, 10, 12

*Libby v. Fecteau*,
   No. 24A1051, 2025 WL 1441558 (U.S.) ................................................................. 1, 23

*Massie v. Pelosi*,
   72 F.4th 319 (D.C. Cir. 2023) ................................................................................. 12

*McCarthy v. Pelosi*,
   5 F.4th 34 (D.C. Cir. 2021) .................................................................................... 12

*Michel v. Anderson*,
   14 F.3d 623 (D.C. Cir. 1994) ................................................................................. 19

*Monserrate v. N.Y. Senate*,
   599 F.3d 148 (2d Cir. 2010) ............................................................................... 9, 21

*Nat'l Ass'n of Soc. Workers v. Harwood*,
   69 F.3d 622 (1st Cir. 1995) .................................................................................... 12

*Nev. Comm'n on Ethics v. Carrigan*,
   564 U.S. 117 (2011) ................................................................................ 7, 19, 20, 24

*New York v. United States*,
   505 U.S. 144 (1992) ................................................................................................ 21

*Peeper v. Callaway Cnty. Ambulance Dist.*,
   122 F.3d 619 (8th Cir. 1997) ................................................................................. 20

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) .................................................................................................. 22

*Powell v. McCormack*,
   395 U.S. 486 (1969) ........................................................................................... 3, 4, 5

*Rangel v. Boehner*,
   785 F.3d 19 (D.C. Cir. 2015) ................................................................................. 10

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ................................................................................................ 19

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020) ................................................................................................... 1

*Rucho v. Common Cause*,
   588 U.S. 684 (2019) ................................................................................................ 21

*Smith v. Daily Mail Publ'g Co.*,
   443 U.S. 97 (1979) .................................................................................................. 13

*Sweeney v. Tucker*,
   375 A.2d 698 (Pa. 1977) ........................................................................................... 5

*Tenney v. Brandhove*,
  341 U.S. 367 (1951) ...............................................................................6, 10, 25

*Texas v. Johnson*,
  491 U.S. 397 (1989) ........................................................................................ 14

*United States v. Brewster*,
  408 U.S. 501 (1972) .............................................................................3, 5, 6, 8

*United States v. Johnson*,
  383 U.S. 169 (1966) ...................................................................................... 2, 6

*Watts v. United States*,
  394 U.S. 705 (1969) ........................................................................................ 13

*Whitener v. McWatters*,
  112 F.3d 740 (4th Cir. 1997) ........................................................................ 10

*Williams v. United States*,
  71 F.3d 502 (5th Cir. 1995) ............................................................................7

**Statutes**

Alaska Stat. §24.60.178 ......................................................................................8

**Constitutional Provisions**

Me. Const. art.IV, pt.3, §4.........................................................................11, 23

U.S. Const. art.I, §2, cl.5..................................................................................5

**Legislative Authorities**

2 *Hinds' Precedents of the House of Representatives of the United States* (1907),
  https://perma.cc/6DN7-H8M3........................................................15, 17

3 *Deschler's Precedents of the United States House of Representatives* (1994),
  https://perma.cc/M3ZL-9P9R................................................ 8, 9, 11, 18

Ala. H.R. R. 55 .....................................................................................................8

Ark. H.R. R. 91 (2023) .......................................................................................8

Ark. S. R. 9.6 (2025) ...........................................................................................8

Colo. H.R. R. 49(f) (2024) .................................................................................8

Colo. S. R. 43(f) (2024) ......................................................................................8

Fla. S. R. 1.43(2) (2024) .....................................................................................8

Ga. H.R. R. 164.4 (2025) ...................................................................................8

Ga. H.R. R. 164.5 (2025) ................................................................................8

Ga. S. R. 9-1.2(b) (2025) ................................................................................8

Ga. S. R. 9-1.2(c) (2025) ................................................................................8

H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025),
    https://perma.cc/JU85-VNTS ............................................................. 16

Idaho H.R. R. 45(6) ........................................................................................8

Idaho S. R. 52(F) ............................................................................................8

Ill. H.R. R. 51.5(c) (2025) .............................................................................8

Ill. H.R. R. 96(b)-(d) (2025) .........................................................................8

Ill. S. R. 11-1(a) (2025) .................................................................................8

Ind. H.R. R. 43.1 (2025) ...............................................................................8

Ind. S. R. 14(e) (2025) ..................................................................................9

J. H.R. Mass. (1784),
    https://bit.ly/4ielTqk ............................................................................ 17

J. H.R. Mass. (1808),
    https://bit.ly/42qrzI0 ............................................................................ 17

*Jefferson's Manual and Rules of the House of Representatives* (2023),
    https://perma.cc/U78W-KZ2G ...................................................... 5, 6

Kan. H.R. R. 4903 (2023) .............................................................................9

Kan. S. R. 76 (2025) ......................................................................................9

Ky. H.R. R. 23 (2024) ...................................................................................9

Ky. S. R. 23 (2024) ........................................................................................9

Mass. H.R. R. 16 (2025) ........................................................................ 9, 17

Mich. H.R. R. 74(8) (2025) ...........................................................................9

Mich. S. R. 1.311 ...........................................................................................9

Minn. H.R. R. 2.30 (2023) ............................................................................9

Minn. S. R. 55.9 (2025) .................................................................................9

Miss. H.R. R. 20 .............................................................................................9

Miss. S. R. 31 .................................................................................................9

Mo. H.R. R. 85 (2025) ...................................................................................9

Mo. S. R. 78 (2025) ..........................................................................................9

Mont. H.R. R. H20-20(2)(d) (2025) ...............................................................8

Mont. H.R. R. H20-20(2)(e) (2025) ...............................................................8

Mont. S. R. S20-20(4) (2025) ..........................................................................9

N.C. H.R. R. 9(b) (2025) ..................................................................................9

N.D. H.R. R. 304 (2025)...................................................................................9

N.D. S. R. 304 (2025) .......................................................................................9

N.H. H.R. R. 15 (2025) .....................................................................................9

N.H. S. R. 1-5 (2025) ........................................................................................9

N.J. Assemb. R. 7:6 (2024) ...............................................................................9

N.J. S. R. 7:6 (2024) ..........................................................................................9

N.M. H.R. R. 9-13-6.1 .......................................................................................9

N.M. S. R. 9-13-4...............................................................................................9

Neb. Leg. R. 2 §8 (2025)....................................................................................9

Nev. Assemb. R. 20 (2023) ...............................................................................9

Nev. S. R. 21(1) (2025) ......................................................................................9

Ohio H.R. R. 53(a) (2025) ................................................................................9

Ohio S. R. 76 (2025)..........................................................................................9

Okla. H.R. Journal, 59th Leg., 1st Reg. Sess. (Mar. 7, 2023),
   https://bit.ly/3YEI0PY ........................................................................... 15

Okla. S. R. 8-30(G) (2025) ................................................................................9

Or. H.R. R. 20.01(3) (2025)..............................................................................9

Or. H.R. R. 3.20(3) (2025)................................................................................9

Or. H.R. R. 6.35(1) (2025)................................................................................9

Or. H.R. R. 6.35(2) (2025)................................................................................9

Or. S. R. 3.33(8) (2025)......................................................................................9

Or. S. R. 6.35(1) (2025)......................................................................................9

Or. S. R. 6.35(2) (2025)......................................................................................9

Pa. H.R. R. 47 (2025) ........................................................................................8

Pa. S. R. 35(a) (2025) ............................................................................8

R.I. H.R. R. 46(g) (2025) .......................................................................9

R.I. H.R. R. 48(e) (2025) .......................................................................9

R.I. H.R. R. 48(f) (2025) ........................................................................9

R.I. S. R. 10.21 (2025) ...........................................................................9

S.C. H.R. R. 4.16(F)(a) (2025) ...............................................................9

S.D. H.R. R. H6-7 ..................................................................................9

S.D. H.R. R. H6-8 ..................................................................................9

S.D. S. R. S8-7 .......................................................................................9

S.D. S. R. S8-8 .......................................................................................9

Tenn. H.R. R. 19 (2025) .........................................................................9

Tenn. S. R. 15 (2025) .............................................................................9

Tex. H.R. R. 5(3)(d) (2025) ....................................................................9

Tex. H.R. R. 5(33) (2025) .......................................................................9

Tex. S. R. 4.09 (2025) .............................................................................9

Utah H.R. R. HR4-2-103 ........................................................................9

Utah S. R. SR4-2-103 .............................................................................9

Va. H.D. R. 58 (2024) .............................................................................9

Va. S. R. 18(h) (2024) ............................................................................9

Va. S. R. 53(b) (2024) ............................................................................9

Vt. H.R. R. 90 (2025) .............................................................................9

Vt. S. R. 101 (2025) ...............................................................................9

Vt. S. R. 102 (2025) ...............................................................................9

W.Va. H.D. R. 35 ...................................................................................9

Wash. Leg. Jt. R. 1 (2025) ......................................................................9

Wis. Assemb. R. 21 (2025) .....................................................................9

Wis. Assemb. R. 43(3) (2025) ................................................................9

viii

Wis. Leg. Ref. Bureau, *Discipline in the Wisconsin Legislature: A History of Reprimand, Censure, Suspension, and Expulsion* (2020), https://perma.cc/FK4F-JF6L ................................................................. 8, 18

Wis. S. Journal, 53rd Sess. (1917), https://bit.ly/42MV6x0 ................................................................. 15

Wyo. Leg. Jt. R. 22-1(m)(iii) (2025) ................................................................. 9

**Other Authorities**

2 Joseph Story, *Commentaries on the Constitution of the United States* (1833) ...................... 2, 6

4 Wis. Op. Att'y Gen. (1915), https://perma.cc/MCS3-G7S2 ................................................................. 17

Anne M. Butler et al., *United States Senate: Election, Expulsion, and Censure Cases 1793-1990* (1995) ................................................................. 15

Bonnie Bishop, *Poll: More Mainers against transgender athletes in women's sports*, WMTW (Mar. 27, 2025), https://perma.cc/2BP8-DA89 ................................................................. 8

## INTRODUCTION

Last week, the Supreme Court granted Plaintiffs' application for an injunction pending appeal, restoring Representative Libby's right to vote in the Maine House. *Libby v. Fecteau*, No. 24A1051, 2025 WL 1441558 (U.S.). A necessary finding of that decision was that Plaintiffs were "likely to prevail" on the merits and that "denying them relief would lead to irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16 (2020). Even Justice Jackson, though in dissent, remarked it was "certainly possible" that Plaintiffs here "have the better of the arguments on the merits of their claims." 2025 WL 1441558, at *2. They do.

What has transpired in Maine since February is unprecedented. Defendants have yet to identify a single historical example consistent with these circumstances: a legislator denied her ability to speak and vote on behalf of her constituents for the duration of her term, as punishment not for something she did on the House floor but for a Facebook post. The last legislative body to try something so extraordinary was the Georgia House, ultimately rebuked by the Supreme Court for refusing to allow a legislator to represent those who elected him because of anti-war views shared in a radio interview. *Bond v. Floyd*, 385 U.S. 116 (1966). Unsurprisingly, there was no immunity defense in *Bond*. No student of American civics could contend that the *refusal* to allow a legislator to speak or vote is a "legislative act[]" so "integral" to a legislature's "deliberative and communicative processes" that it is beyond judicial review. *Gravel v. United States*, 408 U.S. 606, 625 (1972).

1

A legislator's ability to speak and vote are her "two most critical responsibilities." JA116. Denying those critical functions is a *de facto* expulsion smacking of the very tyranny that led to immunity—the English monarchs who would "suppress and intimidate" their opponents in Parliament. *United States v. Johnson*, 383 U.S. 169, 177-78 (1966). Immunity's very purpose is to stop a legislator from being "withdrawn from his seat" so as *not* to deprive his constituents of "their voice in debate and vote." 2 Joseph Story, *Commentaries on the Constitution of the United States* §857 (1833). And yet, Defendants would have this Court contort immunity to do exactly that: deprive District 90's constituents of their voice in debate and their vote.

As the Supreme Court has already recognized, Plaintiffs are likely to succeed on the merits of their claims, and the remaining equitable factors favor preliminary injunctive relief. There will be no do-over for Libby or her constituents as hundreds of bills—including bills she sponsors—come to the House floor, and she is denied the chance to say anything about them. Likewise, but for the Supreme Court's injunction pending appeal, there would have been no do-over for District 90's exclusion from those hundreds of floor votes. Defendants' unprecedented retaliation is the antithesis of an immune legislative act. Legislative immunity has never been so "weaponized against the representation it is meant to support." *Cushing v. Packard*, 30 F.4th 27, 59 (1st Cir. 2022) (en banc) (Thompson, J., dissenting).

2

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits.

#### A. Legislative immunity is inapplicable.

Legislative immunity does not preclude this challenge to restore District 90's voice and vote. Defendants cannot evade judicial review simply because a censure resolution and House rule precipitated their unprecedented actions, any more than they could evade judicial review if a resolution directed only male legislators to speak and vote. *See Gravel v. United States*, 408 U.S. 606, 618-21 (1972); *Powell v. McCormack*, 395 U.S. 486, 504 (1969); *Kilbourn v. Thompson*, 103 U.S. 168, 205 (1880).

**1.** Defendants' version of legislative immunity is limitless. Ignoring the Supreme Court's grant of emergency relief, Defendants still insist that immunity applies if a suit challenges "tallying" votes or anything "occur[ring] on the floor." Resp.18, 20. So imagine the following resolution passes the Alabama House: "Whereas only Republicans can understand legislation: RESOLVED, that only Republican legislators may speak and vote on the House floor." The clerk cuts the microphones and stops counting votes cast by Democrats. Their constituents sue to restore their equal representation. Under Defendants' rule, there's nothing courts can do; the House majority has the last word. As the example illustrates, Defendants' rule for immunity operates at too high a level of generality. It converts legislative immunity into legislative "supremacy." *Contra United States v. Brewster*, 408 U.S. 501, 508 (1972).

3

If Defendants were right that immunity applies whenever defendants trace their challenged acts to "tallying members' votes," Resp.2, or conduct that "occurs on the floor of the House *during* the legislative process," Resp.25, or "punishment," Resp.19, then *Kilbourn*, *Powell*, and *Gravel* were wrong. In *Kilbourn*, it did not matter that the House could "determine the rules of its proceedings" or that there was a House "resolution … authorizing the investigation" or a "warrant of the speaker" for Kilbourn's arrest. 103 U.S. at 182, 196. Those precipitating events did not render the sergeant-at-arms' acts immune. *Id.* at 199-202; *see Powell*, 395 U.S. at 504-05 (stating *Kilbourn* "decisively settles" that officials cannot claim immunity even though "acting pursuant to express orders of the House"). In *Powell*, it did not matter that the clerk or others acted pursuant to "House Resolution No. 1" or "House Resolution No. 278" or "a majority vote of the House." 395 U.S. at 490-93. In *Gravel*, it did not matter that the senator acted in his "official capacity" or that committee proceedings precipitated his acts when those acts were "in no way essential to the deliberations of the Senate." 408 U.S. at 624-26. In *Gravel*'s words, the Supreme Court's cases "reflect a decidedly jaundiced view" of immunity and do *not* "privilege illegal or unconstitutional conduct beyond that essential" to legislating. *Id.* at 620. There is no immunity for "execut[ing] an invalid resolution." *Id.* at 621.

No reading of *Gravel* supports Defendants' suggestion that *Gravel* "calls into question" *Kilbourn* and *Powell*. *Contra* Resp.22-24. *Gravel* exhaustively discussed *Kilbourn*'s and *Powell*'s limits on legislative immunity as *consistent* with its holding. 408 U.S. at 618-

4

21. *Gravel* reaffirmed that immunity does *not* apply to acts "execut[ing] an invalid resolution"—the clerk and others in *Powell* who "carr[ied] out directions," the sergeant-at-arms in *Kilbourn* who "execut[ed] a legislative order," and even members who "themselves carry[] out an illegal" resolution. *Id.* at 620-21. *Powell* continues to bind this Court and others. *See Eslinger v. Thomas*, 476 F.2d 225, 230 (4th Cir. 1973) (holding clerk was "not immune," citing *Powell*); *Bastien v. Off. of Senator Ben Nighthorse Campbell*, 390 F.3d 1301, 1315-16 (10th Cir. 2004) (discussing *Powell* and observing plaintiffs can still pursue claims even if "directed" by "committee resolution"); *Baker v. Fletcher*, 204 S.W.3d 589, 596 (Ky. 2006) (discussing *Powell* and faulting plaintiffs for not suing the clerk); *Sweeney v. Tucker*, 375 A.2d 698, 704 (Pa. 1977) (allowing "action against the House Comptroller" per *Powell*).

Nor does *Gravel* purport to immunize anything, at whatever level of generality, that Defendants can posit is within the "jurisdiction" of the House. *Contra* Resp.18-19. Defendants' observation that the state constitution establishes the office of the clerk is irrelevant. *Contra* Resp.21-22. No different than Maine, the U.S. Constitution requires the House to elect its clerk. U.S. Const. art.I, §2, cl.5; *see Jefferson's Manual and Rules of the House of Representatives* §§26, 640 (2023), https://perma.cc/U78W-KZ2G. Still, the U.S. House clerk's refusal to count votes was reviewable in *Powell*. 395 U.S. at 494, 504-05.

As the foregoing illustrates, immunity does not immunize all "conduct *relating* to the legislative process." *Brewster*, 408 U.S. at 515. Its reach is more limited: precluding judicial inquiry into the likes of a legislator's "motives" for legislation, *Tenney v.*

5

*Brandhove*, 341 U.S. 367, 377 (1951), or whether his "conduct" on the floor "was improperly motivated," *United States v. Johnson*, 383 U.S. 169, 180 (1966)—for those are "legislative acts" that are "integral" and "essential" to the legislative process and legislators' independence, *Gravel*, 408 U.S. at 625. So applied, immunity ensures *all* legislators "enjoy the fullest liberty of speech" on the floor. *Tenney*, 341 U.S. at 373. It operates as a shield protecting *every* legislator, not just the majority, so that *no* constituents are deprived "their voice in debate and vote." 2 Joseph Story, *Commentaries on the Constitution of the United States* §857 (1833); *Jefferson's Manual and Rules of the House of Representatives* §290 (2023), https://perma.cc/U78W-KZ2G (same). But that's where immunity ends. It is no sword to be wielded by one legislator to deny equal representation to another duly elected legislator's constituents. *Brewster*, 408 U.S. at 517. Immunity cannot be used against the very people it protects: the constituents for whom legislators work. *Tenney*, 341 U.S. at 377; *see Coffin v. Coffin*, 4 Mass. 1, 29 (1808).

Simply put, legislative immunity is irrelevant to this suit to *restore* District 90's voice and vote in the House. Cases involving indisputably legislative acts such as introducing legislation or holding committee hearings are inapposite. *Contra* Resp.23. In *Bogan v. Scott-Harris*, for instance, the Court held the "introduction" of budget legislation and "voting for an ordinance" were immune. 523 U.S. 44, 55 (1998); *see* Br.21-22 (discussing cases involving congressional investigations, hearings, committee reports, or motives for floor speeches). Contrary to Defendants' telling, *Bogan* did not involve acts "specifically targeted at respondent." Resp.27; *see* 523 U.S. at 54-56. The ordinance there

6

"eliminated a department rather than a particular employee." *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 8-9 (1st Cir. 2000) (distinguishing *Bogan* and rejecting immunity for acts that "targeted specific individuals"). Plaintiffs here do not challenge legislation or *others'* votes; they challenge a duly elected legislator's silencing and the refusal to count *her* votes in retaliation for her protected speech.

**2.** History confirms that Libby's unprecedented punishment is no legislative act. Br.15-19. Legislators historically claimed immunity for *their own votes and speech. See Kilbourn*, 103 U.S. at 204. Such "act[s] of voting" or "words spoken in debate," *id.*, cannot be equated with the *refusal* to count a duly elected legislator's votes or to let her debate, *contra* Resp.21-25. No history supports Defendants' anti-democratic claim that silencing Libby is "integral" to the House's "deliberative and communicative processes." *Gravel*, 408 U.S. at 625. Legislators are entrusted to debate and cast votes "for … constituents," reflecting their "apportioned share of the legislature's power to the passage or defeat of a particular proposal." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011); *see* Br.16-17; *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995) (explaining that "participating in debates and voting on the Congressional floor" are "primary obligation[s] of a Member of Congress"). Refusing a legislator her apportioned share because the majority party disapproves of her speech—what Defendants call "following the will of

the House," Resp.28[1]—dismantles "the legislative process" and legislators' "independence," *contra Brewster*, 408 U.S. at 507.

No legislative body since *Powell* has claimed the *refusal* to count a legislator's vote is an immune legislative act. The Georgia House did not even raise immunity in *Bond v. Floyd*, instead conceding that the federal judiciary could "test[] the exclusion" of a legislator on "clearly unconstitutional grounds." 385 U.S. 116, 130 (1966). The U.S. House and state legislatures disclaim any punitive power to refuse to count members' votes.[2] Countless more anticipate punishments like censures, fines, or loss of committee assignments or leadership positions—short of denying equal representation to legislators' constituents for her two most essential acts of speaking and voting.[3] Formal expulsion,

---

[1] The invocation of the House's "will" is out of step with Maine residents, who generally side with Libby on the issue of girls' sports by a 2-1 margin. *See* Bonnie Bishop, *Poll: More Mainers against transgender athletes in women's sports*, WMTW (Mar. 27, 2025), https://perma.cc/2BP8-DA89.

[2] 3 *Deschler's Precedents of the United States House of Representatives* Ch.12 §§15-15.1 (1994), https://perma.cc/M3ZL-9P9R (recognizing "constitutional impediments" to depriving members' right to vote); Wis. Leg. Ref. Bureau, *Discipline in the Wisconsin Legislature: A History of Reprimand, Censure, Suspension, and Expulsion* 4 (2020), https://perma.cc/FK4F-JF6L (similar); Idaho H.R. R. 45(6) (prohibiting punishments that "deny[] a legislative district representation via floor votes"); Mont. H.R. R. H20-20(2)(d)-(e) (2025) (barring punishments that would "prohibit the offending member from voting on any measure before the House"); Pa. H.R. R. 47 (2025) (member criminally indicted "shall otherwise continue to function as a [member], including voting"); Pa. S. R. 35(a) (2025) (same).

[3] *See* Ala. H.R. R. 55; Alaska Stat. §24.60.178; Ark. H.R. R. 91 (2023); Ark. S. R. 9.6 (2025); Colo. H.R. R. 49(f) (2024); Colo. S. R. 43(f) (2024); Fla. S. R. 1.43(2) (2024); Ga. H.R. R. 164.4-164.5 (2025); Ga. S. R. 9-1.2(b)-(c) (2025); Idaho S. R. 52(F); Ill. H.R. R. 51.5(c), 96(b)-(d) (2025); Ill. S. R. 11-1(a) (2025); Ind. H.R. R. 43.1 (2025); Ind. S. R.

by a super-majority, is how legislators are stripped of their voting rights. Expulsions create vacancies filled quickly by special elections to restore constituents' representation. 3 *Deschler's Precedents of the United States House of Representatives* Ch.12 §15.1 (1994), https://perma.cc/M3ZL-9P9R; *see, e.g.*, *Monserrate v. N.Y. Senate*, 599 F.3d 148, 155 (2d Cir. 2010) (expulsion remedied by special election). Conversely, Defendants have no history of refusing to count votes as "essential to legislating." *Gravel*, 408 U.S. 621; *see Boquist v. Courtney*, 32 F.4th 764, 783 (9th Cir. 2022) ("prevailing view" that legislators "do not have the power" to deny colleagues' "right to vote").

For similar reasons, cited out-of-circuit cases about *other* forms of punishment or generally applicable voting rules are inapposite. Resp.19 & nn.14-16. No court has held "punishment" taking the form of silencing a legislator and refusing to count her vote is

---

14(e) (2025); Kan. H.R. R. 4903 (2023); Kan. S. R. 76 (2025); Ky. H.R. R. 23 (2024); Ky. S. R. 23 (2024); Mass. H.R. R. 16 (2025); Mich. H.R. R. 74(8) (2025); Mich. S. R. 1.311; Minn. H.R. R. 2.30 (2023); Minn. S. R. 55.9 (2025); Miss. H.R. R. 20; Miss. S. R. 31; Mo. H.R. R. 85 (2025); Mo. S. R. 78 (2025); Mont. S. R. S20-20(4) (2025); Neb. Leg. R. 2 §8 (2025); Nev. Assemb. R. 20 (2023); Nev. S. R. 21(1) (2025); N.H. H.R. R. 15 (2025); N.H. S. R. 1-5 (2025); N.J. Assemb. R. 7:6 (2024); N.J. S. R. 7:6 (2024); N.M. H.R. R. 9-13-6.1; N.M. S. R. 9-13-4; N.C. H.R. R. 9(b) (2025); N.D. H.R. R. 304 (2025); N.D. S. R. 304 (2025); Ohio H.R. R. 53(a) (2025); Ohio S. R. 76 (2025); Okla. S. R. 8-30(G) (2025); Or. H.R. R. 3.20(3), 6.35(1)-(2), 20.01(3) (2025); Or. S. R. 3.33(8), 6.35(1)-(2) (2025); R.I. H.R. R. 46(g), 48(e)-(f) (2025); R.I. S. R. 10.21 (2025); S.C. H.R. R. 4.16(F)(a) (2025); S.D. H.R. R. H6-7-H6-8; S.D. S. R. S8-7-S8-8; Tenn. H.R. R. 19 (2025); Tenn. S. R. 15 (2025); Tex. H.R. R. 5(3)(d), 5(33) (2025); Tex. S. R. 4.09 (2025); Utah H.R. R. HR4-2-103; Utah S. R. SR4-2-103; Vt. H.R. R. 90 (2025); Vt. S. R. 101-02 (2025); Va. H.D. R. 58 (2024); Va. S. R. 18(h), 53(b) (2024); Wash. Leg. Jt. R. 1 (2025); W.Va. H.D. R. 35; Wis. Assemb. R. 21, 43(3) (2025); Wyo. Leg. Jt. R. 22-1(m)(iii) (2025).

9

a legislative act, let alone an immune act, *contra* Resp.19 & n.14. *See Whitener v. McWatters*, 112 F.3d 740, 744 (4th Cir. 1997) (distinguishing "power to punish members" from "power to exclude those elected," which "compromis[es] the principle that citizens may choose their representatives"); *cf. Gamrat v. McBroom*, 822 F. App'x 331, 334 (6th Cir. 2020) (challenging expulsion); *Rangel v. Boehner*, 785 F.3d 19, 21, 24 (D.C. Cir. 2015) (challenging verbal censure). As for Defendants' cited cases involving voting rules, Resp.19 n.16, none singled out an individual legislator for her vote to count less, or not at all. Similarly, Defendants identify no precedent for a speaking rule deployed to silence an individual legislator but not her colleagues. And in this Circuit, this Court distinguishes generally applicable legislative rules (*i.e.*, prohibiting remote voting) from those "target[ing]" particular legislators. *Cushing v. Packard*, 30 F.4th 27, 51 (1st Cir. 2022) (en banc).

**3.** Even if the *de facto* exclusion of Libby—silencing her for the rest of her term and refusing to count her vote—could be deemed a "legislative act," it is of such "extraordinary character" that judicial review is warranted. *Kilbourn*, 103 U.S. at 204. *See* U.S.Br.15-22. *Kilbourn* did not purport to limit that exception to capital punishment. *Contra* Resp.28. If Defendants are right that immunity precludes review of vote "tallying" here, Resp.2, then it precludes review of every refusal to tally votes cast by legislators that the reigning majority does not like. Br.13, 23-24. That transformation of immunity from a shield protecting "the public good," *Tenney*, 341 U.S. at 377, into a sword destroying equal representation defies history, precedent, and the promise of

10

representative democracy. And as Defendants implicitly acknowledge, no cited cases considering whether legislative acts were sufficiently "extraordinary" entailed such a punishment, for no legislature has tried something so draconian since *Powell* and *Bond* until now. Resp.28 n.22 (committee hearings, appropriating funds, "floor conversations").

It makes no difference that the House adopted its rules "by unanimous consent" or that Rule 401(11) is old. *Contra* Resp.28-29. No one could have ever foreseen the majority's weaponizing that rule, framed in the most general terms, for these circumstances. Br.6-7, 18-19, 33-35; *infra* I.B.2. The rule has never been applied in this way— as retaliation for a duly elected member's protected speech, spoken beyond the statehouse. *Contra* Resp.28.

Nor can Defendants say the punishment is not extraordinary because "Libby has not been suspended or expelled." *Contra* Resp.29. Little different than suspension, Libby cannot exercise her "two most critical responsibilities." JA116. And it's *worse* than expulsion, leaving District 90's constituents unrepresented without any constitutional mechanism to regain their representation through a special election. Br.27 n.3, 40-41, 45-46; *see* 3 *Deschler's Precedents* Ch.12 §15.1 (explaining "there can be no replacement for [a] punished Member" barred from voting, while an "expelled Member may be immediately replaced by another person to represent the constituency"). And unlike limits on expulsion, Me. Const. art.IV, pt.3, §4, nothing precludes Defendants from re-imposing the same punishment.

Defendants also invite this Court to err by equating their extraordinary silencing of District 90's representative and refusal to count her votes with the generally applicable lobbying restrictions in *National Ass'n of Social Workers v. Harwood*, 69 F.3d 622 (1st Cir. 1995), the generally applicable voting rules for all members in *Cushing* and *McCarthy v. Pelosi*, 5 F.4th 34 (D.C. Cir. 2021), or the generally applicable mask rule in *Massie v. Pelosi*, 72 F.4th 319 (D.C. Cir. 2023). Resp.19 n.16, 25-27. Defendants contend this case is no different—a mere challenge to "the application of [a] procedural rule[]," Resp.27, that risks "intruding into internal state legislative affairs" and embroiling the Court in "warring sides in partisan state legislators' battles," Resp.51 (quoting *Cushing*, 30 F.4th at 52).

To the contrary, invoking immunity after silencing District 90 and refusing to count its votes is the very "abuse" this Court feared in *Cushing*. 30 F.4th at 52; *accord id.* at 62-65 (Thompson, J., dissenting). Just as legislative defendants could not claim immunity had they "target[ed]" particular legislators with different voting privileges in *Cushing*, 30 F.4th at 51, Defendants cannot claim immunity for their silencing and disenfranchising District 90 for the remainder of Libby's elected term. Indefinitely excluding a legislator "serves" no "democratic end." *Id.* at 52. It is entirely antidemocratic. If anything counts as an act of "extraordinary character" for which immunity does not apply, it is that. *Kilbourn*, 103 U.S. at 204.

### B.  *Bond* decides the First Amendment claim.

The retaliation question is not whether there's a "First Amendment right to vote on legislation." *Contra* Resp.32. Libby has never claimed that right. Libby claims she "engaged in constitutionally protected conduct" by speaking out on Facebook and, in response, was "subjected to an adverse action." *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023).

**1.** There is still no dispute that Libby's post was lawful, protected speech and that she cannot speak or vote because of it. Defendants claim Libby "targeted" a track-and-field champion, Resp.5, but they (correctly) do not contend that her speech was unprotected.[4] Libby brought attention to Maine's sports policy by re-posting public information from a statewide high school sports event. JA8-11, 14. The "name[s] and image[s]," Resp.41, were first names and public podium photos, without any threats or incitement, JA9-10, 14. Presumably because the Speaker has taken to social media to post photos of state cheerleading champions, JA19, Defendants fault Libby's post by

---

[4] *See, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (unprotected "[t]rue threats are serious expressions conveying that a speaker means to commit an act of unlawful violence" (cleaned up)); *Watts v. United States*, 394 U.S. 705, 708 (1969) ("political hyperbole" not a true threat); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-95 (1975) (publishing sexual assault victim's already-public identity was protected First Amendment expression); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 105-06 (1979) (publishing names of minors charged as juvenile offenders was protected); *Fla. Star v. B.J.F.,* 491 U.S. 524, 526 (1989) (similar); *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607-08 (1982) (rejecting state interest in "safeguarding the physical and psychological well-being of a minor" where names "were already in the public record"); *see also* FIRE Br.5-17.

13

distinguishing it as one not "offering congratulations to the event's participants and winners," Resp.5. That Defendants view Libby's speech as "offensive or disagreeable," *Texas v. Johnson*, 491 U.S. 397, 414 (1989), "misguided, or even hurtful," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995), is not a basis for punishing it. It's "a reason for according it constitutional protection." *Hustler Mag. v. Falwell*, 485 U.S. 46, 55 (1988).

**2.** Nor can Defendants dispute the absence of historical precedent for punishing a representative by denying her vote and voice for the rest of her elected term. Far from *Wilson* "mak[ing] clear" that Libby "faces an uphill battle," Resp.33, the Supreme Court repeatedly said that *Wilson* addressed purely verbal censures alone, *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474-78, 480, 482 (2022), and that "forms of discipline 'are not fungible' under our Constitution," *id.* at 481. The "prevailing view" is that legislatures lack punitive power to deny a district its vote. *Boquist*, 32 F.4th at 783. *Carrigan*'s discussion of *recusals* is irrelevant to the unconstitutional *punishment* imposed here, devoid of historical support. *Contra* Resp.33.

**a.** No analogous history supports Defendants' insistence that Libby just apologize as a "condition" of restoring her ability to debate and vote on behalf of her district. Resp.29, 46. That option was not good enough in *Bond*, so it is not good enough here. 385 U.S. at 128. None of Defendants' cited examples, Resp.34-36, involved forcing apologies for lawful, protected speech shared outside the statehouse. The congressional examples arose from "an assault" and "offensive words" used "in debate, upon the

14

floor" and leaking confidential materials from executive session. *See* 2 *Hinds' Precedents of the House of Representatives of the United States* §§1247, 1648 (1907), https://perma.cc/6DN7-H8M3; Anne M. Butler et al., *United States Senate: Election, Expulsion, and Censure Cases 1793-1990*, at 47-48 (1995). The Wisconsin example arose from "remarks made in the open senate." Wis. S. Journal, 53rd Sess. 597-601 (1917), https://bit.ly/42MV6x0. The Oklahoma example arose from "harboring a fugitive that assaulted an Oklahoma Highway Patrolman." Okla. H.R. Journal, 59th Leg., 1st Reg. Sess. 506-07 (Mar. 7, 2023), https://bit.ly/3YEI0PY. And recent Maine examples were for floor statements and verbally abusing another legislator in the statehouse hallway. Br.6.

Distinct from those few examples, forcing Libby's apology unconstitutionally compels her to conform to the House majority's preferred viewpoint as a "condition" of voting. *But see Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 214 (2013) (governments "may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech"); *303 Creative LLC v. Elenis*, 600 U.S. 570, 589 (2023) (finding "impermissible abridgment of the First Amendment[]" where one "must either speak as the State demands or face sanctions for expressing her own beliefs"). Contrary to Defendants' re-telling, that apology would cover more than the use of a state champion's "[first] name and image." Resp.40-41. The censure resolution was never so limited and demanded an apology for "the incident," including "criticizing the participation of transgender students in high school sports" and bringing "national

15

attention" to Maine. H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025), https://perma.cc/JU85-VNTS. Even if the apology were more limited, it would still be viewpoint based. After all, the Speaker posts photos of state-champion cheerleaders, JA19, and nevertheless demands Libby's apology because she did not similarly "offer[] congratulations," Resp.5. That is textbook viewpoint discrimination. *E.g.*, *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (prohibiting "disparagement" is viewpoint discrimination because it permits "positive" but not "derogatory" statements).

**b.** Defendants identify no analogous history supporting their continuing gag order against Libby, precluding her from speaking on behalf of her own bills or debating hundreds of others for the rest of her term. It is at loggerheads with the Supreme Court's observation in *Wilson* about how speech met with more speech presents no First Amendment problem. 595 U.S. at 477, 479. Rather than stop with the "countervailing speech" of a verbal censure, *id.* at 477, Defendants overtook the debate by applying Maine House Rule 401(11) in a way never applied before. Defendants assert the power to approve certain views and silence others—views made well beyond the House floor. That punishment, unlike purely verbal censures, denies Libby the most central "privilege[s] of office" to debate and vote. *Id.* at 479; *see Boquist*, 32 F.4th at 782 (concluding that "unlike censure, the exercise of the power to bar an elected official from the legislative chamber (whether temporarily or permanently) is not a 'long exercised' means of responding to protected speech"). The "manifest function of the First

16

Amendment" is to give "legislators … the widest latitude to express their views on issues of policy." *Bond*, 385 U.S. at 135-36.

**c.** Nor is there any analogous history of suspending legislators' voting powers indefinitely for the views they hold. While some legislatures may list suspension as a "possible disciplinary action[]" against a member, "there is *no evidence* that such a sanction was regularly imposed, let alone imposed to punish protected speech," *Boquist*, 32 F.4th at 782 (emphasis added), and Defendants do not contend any cited suspension provision has been imposed in such a way, Resp.37 n.26. The "early examples of suspensions of Maine legislators," Resp.36, occurred 200-plus years ago in the Massachusetts House pending investigations of legislators indicted for crimes. *See* J. H.R. Mass. 13, 18 (1784), https://bit.ly/4ielTqk (suspending indicted member pending trial); J. H.R. Mass. 14-15 (1808), https://bit.ly/42qrzI0 (similar, pending committee investigation). Today, the Massachusetts House authorizes only "reprimand, censure, removal from a committee" or "leadership," or "expulsion" followed by special election. Mass. H.R. R. 16. As for the cited U.S. Senate example, Resp.36-37, the question of suspending those senators' "right to vote … was not decided," and senators objected that the punishment deprived the State of "equal suffrage" and "its vote." 2 *Hinds' Precedents* §1665. And while Defendants identify a 1905 Wisconsin suspension, Resp.37, they omit that the attorney general concluded that suspension was without "any authority" and left the district "not represented." 4 Wis. Op. Att'y Gen. 81-84 (1915), https://perma.cc/MCS3-G7S2. States today recognize legislative bodies "cannot

prevent a member from voting." Wis. Leg. Ref. Bureau, *Discipline in the Wisconsin Legislature: A History of Reprimand, Censure, Suspension, and Expulsion* 4 (2020), https://perma.cc/FK4F-JF6L; *supra* n.2. So does Congress. Denying a member her vote "effectively disenfranchise[s]" the people of that district. 3 *Deschler's Precedents* Ch.12 §15.1.

**3.** This case is indistinguishable from *Bond. Contra* Resp.38-39. Defendants cannot limit *Bond* because he was "completely exclud[ed]." Resp.38. That does not withstand *Wilson*'s concern that punishments beyond verbal censures could stop a legislator "from doing his job" by denying "*any* privilege of office." 595 U.S. at 479 (emphasis added). Like *Bond*, Libby's punishment "implicate[s] the franchise of [her] constituents," *id.* at 481, denying their right to "be represented in governmental debates by the person they have elected," *Bond*, 385 U.S. at 136-37. Like *Bond*, Libby was punished for speech purportedly bringing "discredit and disrespect on the House." *Id.* at 123. And like *Bond*, noted above, blaming Libby for not apologizing is no excuse. *Id.* at 128. Defendants cannot prevail without overruling *Bond* and construing *Wilson* to pre-decide what it did "not address." 595 U.S. at 480.

### C.     The Fourteenth Amendment violation is plain.

Defendants maintain that Plaintiffs are not "*entirely disenfranchised*" and there is no unconstitutional "vote dilution." Resp.44-45. After all, Libby can still go to the labor committee hearings and sponsor legislation. Resp.9-10, 41. Defendants do not reconcile the Constitution's promise of equal representation with their draconian punishment.

Defendants try to balance away that guarantee of equal representation by equating the refusal to count District 90's votes with ballot-access restrictions. Resp.39-43 (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992)). They say the "burden" foisted on District 90's constituents is "reasonable," likening it to not receiving "powerful committee assignments." Resp.40-41, 45. Legislators are not guaranteed committee work, but every legislator is elected "to vote in the full House." *Michel v. Anderson*, 14 F.3d 623, 630-32 (D.C. Cir. 1994) (distinguishing territorial delegates' committee work from House membership); *see Carrigan*, 564 U.S. at 125-26. Just as this Court would not apply *Anderson-Burdick* balancing to a claim that voters' representation is diluted due to malapportionment, it ought not apply to the present claim that voters' representation has been denied entirely. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 568 (1964) (asking only whether seats were equally apportioned, not whether malapportionment was burdensome); *Michel*, 14 F.3d at 626 ("It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor."); *see also* U.S. Br.15. That "balancing" of such "incommensurate" interests is "more like judging whether a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1998) (Scalia, J., concurring). There is no comparing the denial of equal representation for District 90 to Defendants' nebulous interest in the House's "reputation and integrity." Resp.43.

Even applying *Anderson-Burdick*, the refusal to count District 90's vote triggers strict scrutiny. Defendants' assertion to the contrary, Resp.39, is belied by Defendants' own cited case, recognizing that restrictions that "prevent the officeholder from meaningfully representing the voters who elected the official"—the restriction here—"are subject to strict scrutiny." *Peeper v. Callaway Cnty. Ambulance Dist.*, 122 F.3d 619, 623 n.5 (8th Cir. 1997); *see also Dunn v. Blumstein*, 405 U.S. 330, 334-37 (1972); *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 729-30 & n.9 (1st Cir. 1994). Libby's floor vote is how she "execut[es] the legislative process." *Carrigan*, 564 U.S. at 126; *see* Br.40. Incidental privileges—*e.g.*, getting paid, having a staff, or "lobby[ing] other members," Resp.11—are no substitute for her legislative power, just as hiring law clerks or attending judicial conferences would be no substitute for this Court's exercise of its judicial power. Defendants attempt to rebut this analogy by claiming "the ability to sponsor legislation is considerably more consequential" and therefore the burden on Libby and her constituents is relatively light because she can still introduce—but not speak to or vote on—legislation. Resp.41. That is akin to saying members of this Court could circulate bench memoranda or listen at conference but not vote on the outcome of this appeal or author an opinion.

Defendants flunk strict scrutiny. Their purported interest is the House's "reputation and integrity." Resp.43. History and contemporary practice show there are more narrowly tailored responses, including verbal censures, loss of committee assignments, or fines. *Supra* nn.2-3. Defendants instead chose the most untailored path, refusing to

count Libby's votes indefinitely, stopped only in the interim by the Supreme Court's grant of emergency relief. No "integrity" interest can justify the unprecedented refusal to count a duly elected legislator's votes or exclusion from debate for the rest of her term. *See Buckley v. ACLF*, 525 U.S. 182, 196 (1999) (interest for restricting ballot initiatives was served by other means).

*Monserrate* is inapposite. Resp.46-47. Monserrate was *expelled* after his domestic violence indictment, and a special election followed. 599 F.3d at 152-53. Here, a bare majority lacking the votes to expel simply eliminated District 90's vote. There will be no special election to "reduce" any temporary "burden imposed on voting rights." *Id.* at 155. Defendants would leave District 90 without a vote or voice indefinitely.

### D.    The Guarantee Clause claim is narrow and justiciable.

**1.** As Defendants acknowledge, there is no "categorical bar on Guarantee Clause claims." Resp.48. *Rucho v. Common Cause* simply observed, in the partisan gerrymandering context, that most claims have been rejected before. 588 U.S. 684, 717-18 (2019). *Rucho* in no way abrogated the Court's earlier observation that "not all claims under the Guarantee Clause present nonjusticiable political questions." *New York v. United States*, 505 U.S. 144, 185 (1992). Plaintiffs' particular claim—turning on the republican form of government already prescribed in the Maine Constitution—is neither too "political" nor standardless. *See* Br.42-44. It requires the Court to decide only whether Defendants have derogated those pre-existing constitutional limits.

**2.** Here, the deprivation of District 90's voice and vote in the House is a paradigmatic violation of the guarantee that the people of Maine "set bounds to their own power." *Duncan v. McCall*, 139 U.S. 449, 461 (1891). Defendants' claim that the censure and resulting punishment evince its "republican character," Resp.48-49, is laughable. Defendants have excluded 9,000 Mainers from participation in that minority-silencing "majoritarian body." *Id.* Contrary to Defendants' assertion that "all members of the House remain fully accountable to the citizens of Maine," Resp.49, the House is in no way accountable to District 90. That local electorate has no voice or vote in the House; they could not vote out the Speaker or replace the Clerk. They are deprived of "the distinguishing feature" of a republican government "to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *Duncan*, 139 U.S. at 461.

There is no Eleventh Amendment problem with Plaintiffs' claim. *Contra* Resp.49-50. Unlike state-law claims, barred by *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), Plaintiffs' claim "vindicate[s] the supreme authority of federal law," *id.* at 106. It permissibly looks to state law to inform whether the Constitution has been violated. The Eleventh Amendment "does not bar federal relief simply because the determination of federal law also involves some antecedent state-law question, or, *a fortiori*, merely incorporates state law principles." *E.g.*, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 290 (2d Cir. 2003) (collecting cases).

Nor can Defendants seek shelter in the Maine Constitution's general rule allowing the Legislature to "establish rules and punish their members for breaches." *Contra* Resp.50. Just as Defendants could not establish a rule expressly allowing for expulsion by bare majority vote in contradiction of the Maine Constitution's two-thirds requirement, they cannot impose a *de facto* expulsion in violation of that provision. *See* Me. Const. art.IV, pt.3, §4. By depriving Libby of her two most essential functions for her term—maybe longer—Defendants have done just that. No "historical record" of "legislative punishments" or Rule 401(11) saves Defendants. *Contra* Resp.50. As explained, there is no historical support for disenfranchising District 90 because of the views its chosen representative holds. *Supra* I.A.2, I.B.2.

## II. The remaining equitable factors favor relief.

**A.** Defendants now dispute irreparable harm because "there ha[s] not been a single floor vote that was tied or decided by a one-vote margin since the censure." Resp.53. Libby's vote doesn't matter, so goes the argument, because she's in the minority. That's certainly not how a 7-2 majority of the Supreme Court saw things last week.

The Supreme Court's injunction pending appeal, moreover, cannot "moot[]" or "negate[]" Plaintiffs' alleged harm. *Contra* Resp.16, 52. By Defendants' logic, any interim relief would doom underlying appeals. The Supreme Court's injunction lasts only through "disposition of the appeal" in this Court and "disposition of [a] petition for a writ of certiorari." 2025 WL 1441558, at *1. Even if, by virtue of the Supreme Court's intercession, Libby retains her vote through the current legislative session, what about

23

next year's second regular session? Defendants have no answer, claiming only that Libby cannot point to any votes then or now that are "significant" enough to warrant relief. Resp.53. Plaintiffs identified many such significant measures. Br.5-6; JA21-22, 114-16. But more fundamentally, Libby's constituents are harmed by her inability to represent their interests on *every* bill. No Court would ever declare the denial of representation "no big deal" because the representative is in the minority, or because Defendants deem some bills more important than others.

Respondents give away the game by insisting Libby cannot "participate in just *two* activities." Resp.7-11, 29-30. They say she can "lobby other members" like a lobbyist, cash her paycheck, or caucus. Resp.11. But speak or vote on her own bills or amendments, or hundreds of others? Forget about it. Resp.7-8. If debating and voting were no big deal, then why for three months have Defendants silenced Libby and refused to tally her vote, until the Supreme Court intervened, versus lesser punishments such as withdrawing her committee assignment? Because "participating in debates and voting on the [chamber] floor" are her "primary obligation[s]" in our "representative democracy." *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 665 (D.C. Cir. 2006); *accord Carrigan*, 564 U.S. at 125-26; *Bond*, 385 U.S. at 136-37. Indeed, as a member of the minority party, her voice is the primary means by which she can seek to represent her constituents in the House. JA115. The punishment is not narrowly prescribed, and the resulting harm is irreversible. There will be no do-overs for floor sessions already passed and those to come without a voice on the floor for District 90.

24

**B.** The remaining factors favor interim relief. Defendants have no answer to the argument that there are lesser ways to achieve their "punishment" desire or that they could reinstate their draconian punishment later should they prevail. Br.48-49. As for the public interest, Defendants point to purported "starkly negative public consequences" for the House. Resp.51. That forgets that immunity is not for legislators themselves but for their constituents, including District 90's. *Tenney*, 341 U.S. at 377. Only in the most Orwellian alternative universe could one contend that Americans' right to be equally represented is contrary to some "public interest" in refusing to count a duly elected legislator's votes or allow her to speak on behalf of her constituents.

## CONCLUSION

This Court should reverse and order entry of a preliminary injunction.

Dated: May 30, 2025

Taylor A.R. Meehan
Daniel M. Vitagliano*
Marie E. Sayer
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
mari@consovoymccarthy.com

*Supervised by principals of the firm
  admitted to practice in VA

Respectfully submitted,

/s/ *Patrick N. Strawbridge*
Patrick N. Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Counsel for Appellants*

25

## CERTIFICATE OF COMPLIANCE

This reply brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 6,494 words, excluding the parts that can be excluded. This reply brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

Dated: May 30, 2025 _/s/ Patrick N. Strawbridge_

## CERTIFICATE OF SERVICE

I filed this reply brief via the Court's ECF system, which will electronically notify

the following:

Jonathan R. Bolton
Kimberyl L. Patwardhan
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
207-626-8551
jonathan.bolton@maine.gov
kimberly.patwardhan@maine.gov


Dated: May 30, 2025                          /s/ *Patrick N. Strawbridge*

27